## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### Case No. 07–CV- 00273-*** 

_____

|  |  |
|---|---|
| Pamela Carvel, as Citizen, | ) **AMENDED** |
| as Delaware Ancillary Administrator | ) **COMPLAINT** |
|    for Agnes Carvel Estate, | ) |
| as Member for Thomas and Agnes Carvel Foundation | ) |
|    Plaintiffs | ) |
|      v. | ) **DEMAND FOR** |
| William Griffin | )  **JURY TRIAL** |
| Marie Abplanalp | ) |
| Salvatore Molella | ) |
| Robert Davis | ) |
|    and | ) |
| John/Jane Doe 1-20 | ) |
| Doe Corp. 1-20 | ) |
|    Defendants | ) |

_____ )

## COMPLAINT FOR CONTINUING CONSPIRACY TO VIOLATE
## CONSTITUTIONAL RIGHTS & COMMIT FRAUDS
## AND
## DEMAND FOR JURY TRIAL

# AMENDED COMPLAINT

Pamela Carvel, appearing *pro se*
PLAINTIFF
28 Old Brompton Road, Suite 158
London SW7 3SS England

US tel/fax  1 954 524 1909

# TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

NATURE OF ACTION  . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .  2

FEDERAL JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FEDERAL VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

PARTIES  . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

DOE DEFENDANTS . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . 14

OTHER PARTIES  . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

BRIEF BACKGROUND  . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .15

INTIMIDATION OF "WHISTLEBLOWERS" . . . . . . . . . . . . . . . . .. . . . .18

CONVERSION OF CARVEL SALE PROCEEDS  . . . . . . . . . . . . . . . . ..19

PHONY UNITRUST  . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . 23

HUDSON VALLEY BANK'S INCESTUOUS RELATIONSHIPS . . . . .  24

DEFENDANT'S STOLE $10 MILLION PROPERTY FROM CHARITY
AND FROM THE ESTATE . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 29

APPARENT BRIBE VIS HUDSON VALLEY BANK LOANS . . . . . . . . 31

CONTINUING CONSPIRACIES TO DEFRAUD . . . . . . . . . . . . . . . . ..34

ACTIVITIES THAT ARE ILLEGAL
OR CONTRARY TO PUBLIC POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VIOLATIONS OF PUBLIC POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

COUNT 1-3 FRAUD, CONSPIRACY TO COMMIT FRAUD . . . . . . . . .51

COUNT 4 TORTUOUS INTERFERENCE WITH CONTRACTS . . . . . . 52

COUNT 5 TORTUOUS INTERFERENCE
WITH PLAINTIFFS' BUSINESS EXPECTANCY . . . . . . . . . . . . . . . . . . 53

COUNT 6 ABUSE OF PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

COUNT 7-22 CONSPIRACY TO INTERFERE WITH RIGHTS . . . . . . 56

COUNTS 23-28 VIOLATIINS OF RICO . . . . . . . . . . . . . . . . . . . . . . . . . .58

DEMAND FOR JUDGMENT AND TRIAL BY JURY . . . . . . . . . . . . . . 63

PLAINTIFFS' AVERMENT REGARDING RULE 11, FRCP . . . . . . . . . 63

CONCLUSION . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . .64

# TABLE OF CITATIONS

*Better Business Bureau v. United States*, 326 U.S. 279,1945 . . . . . . . . . . . 40

*Blacker v. Thatcher*, 145 F. 2d 255 certiorari denied 324 U.S. 848. . . . . . . . 9

*Bob Jones University v. United States*, 461 U.S. 574 (1983) . . . . . . . . . . . .49

*The Church of Scientology of California*, Commissioner,
83 T.C. No. 25, 1984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Lawrence v. Nelson*, 143 U.S. 215, 222 . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Leighton v. Roper*,
300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537 . . . . . . . . . . . . 9

*Markham v. Allen*, 326 U.S. 490, 494. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pufahl v. Parks*, 299 U.S. 217. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Restatement (Second) of Trusts*, Section 377, Comment c (1959) . . . . 40, 47

*IV Scott on Trusts* Section 377, 3d ed. 1967 . . . . . . . . . . . . . . . . . . . . 39, 47

*Security Trust Co. v. Black Riv. Nat. Bank,* 187 U.S. 211. . . . . . . . . . . . . .9

*The Law of Trusts and Trustees*,
Section 211, pp. 63-64, 114, 2d. ed. Rev. 1979 . . . . . . . . . . . . . . . . . . . . .47

*Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33. . . . . . . . . . 9

12 *Del. C.* 3802(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 *U.S.C.* 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 36

18 *U.S.C.* 241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 6, 8, 56

18 *U.S.C.* 242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 5, 6, 8, 42, 56

18 *U.S.C.* 245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 56

18 *U.S.C.* 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 6, 18, 36, 47, 48, 49

18 *U.S.C.* 641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 *U.S.C.*1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 56

18 *U.S.C.*1117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 8, 35, 56

18 *U.S.C.* 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 6, 35, 36, 58, 59, 62

18 *U.S.C* 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 35, 36, 58, 60, 62

18 *U.S.C* 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 35

18 *U.S.C* 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 36

18 *U.S.C* 1512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 42

18 *U.S.C* 1951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 36

18 *U.S.C* 1952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 58

18 *U.S.C* 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 *U.S.C* 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

18 *U.S.C* 1961 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 58

18 *U.S.C* 1962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 62

18 *U.S.C.*1964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7, 8, 36

18 *U.S.C.* 1965 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

18 *U.S.C.*2314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 58, 59

18 *U.S.C.*2315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 58, 59

18 *U.S.C.*ch. 95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 *U.S.C* ch..96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26 *U.S.C.* 6501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 6, 43

26 *U.S.C.* 6655 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 6

26 *U.S.C.* 7201 et seq.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

28 *U.S.C.* 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 *U.S.C.* 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

28 *U.S.C.* 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 22, 56

28 *U.S.C.* 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 *U.S.C.* 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 6, 34, 36, 56

42 *U.S.C.* 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 7, 34, 36, 56

42 *U.S.C.* 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 8, 56

42 *U.S.C.* 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 7, 8, 34, 36, 56

42 *U.S.C.* 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 7, 34, 36, 56

42 *U.S.C.* 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 56

*U.S.C. Title* 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Federal Rules of Civil Procedure*("FRCP")

*FRCP* Rule 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

*FRCP* Rule 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*FRCP* Rule *11.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63, 64

*FRCP*  Rule 71. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 62

G.C.M. (Internal Revenue Service, General Counsel Memorandum)

G.C.M. 34631 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

G.C.M. 36153. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*I.R.C.* 501  . . . . . . . . . . . . . . . . . . . . . 19, 37, 40, 41, 44, 46, 48, 49

*I.R.C.* 2056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*I.R.C.* 2523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Revenue Procedures 89-20. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Revenue Procedures 89-21. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Revenue Procedures 90-30. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Revenue Procedures 90-31 . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Rev. Rul. 67-235, 1967-2 C.B. 113  . . . . . . . . . . . . . . . . . . . . . .49

Rev. Rul. 71-447, 1971-2 C.B. 230 . . . . . . . . . . . . . . . . . . . . . . 40, 49

Treasury Regulation Section 25.2702-(c)(1) . . . . . . . . . . . . . . . . . . 23

*U.S. Constitutional Amendments* I . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 8

*U.S. Constitutional Amendments* V . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*U.S. Constitutional Amendments* IX. . . . . . . . . . . . . . . . . . . . . . . . . . .7, 8

*U.S. Constitutional Amendments* XIV . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### Case No. 07–CV- 00273-***

| | |
|---|---|
| ) | |
| Pamela Carvel, as Citizen, ) | **AMENDED** |
| as Delaware Ancillary Administrator ) | **COMPLAINT** |
| for Agnes Carvel Estate, ) | |
| as Member for Thomas and Agnes Carvel Foundation ) | |
| Plaintiffs ) | |
| v. ) | **DEMAND FOR** |
| William Griffin ) | **JURY TRIAL** |
| Marie Abplanalp ) | |
| Salvatore Molella ) | |
| Robert Davis ) | |
| and ) | |
| John/Jane Doe 1-20 ) | |
| Doe Corp. 1-20 ) | |
| Defendants ) | |
| ) | |

## COMPLAINT FOR CONTINUING CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS & COMMIT FRAUDS
## AND
## DEMAND FOR JURY TRIAL

Plaintiffs by Pamela Carvel on behalf of herself and others, as executrix and personal representative for the period in question and Delaware Ancillary Administrator for the Agnes Carvel Estate ("Estate"), London, England, and as sole Member of the Thomas and Agnes Carvel Foundation, appearing *pro se* for their her complaint avers:

1

## NATURE OF ACTION

1.      Notice of Lawsuit and Request For Waiver of Service of Summons was served on named Defendants to no avail. No response having been submitted by any Defendant, Plaintiffs herewith amend the Complaint and serve it with the Summons issued by the District Court to each named Defendant.

2.      This action is against Defendants as **individuals** who engage in a pattern of criminal enterprises to intentionally evade taxes and commit tax fraud; against Defendants' theft and abuse of the identity of the Carvels' charities with the intention to defraud the Carvels and others; against Defendants' intentional acts to harm Plaintiffs in order to cover-up and retain control of stolen assets; against Defendants' fraudulent conversion of Carvel assets to the co-conspirators; and for related illicit acts in a pattern of conspiracy in criminal enterprises. These individuals lack any semblance of fiduciary responsibility and therefore can only be treated as individual co-conspirators engaged in a deliberate and calculated conspiracy to defraud Plaintiffs, successors in interest, government, and the People.

3.      Plaintiffs seek to halt and revoke Defendants' use of any alleged tax-exempt status under which Defendants' operate to fraudulently

2

convert assets and commit tax fraud; to compel Defendants to pay penalties and interest for all actions in abuse of Carvel charities' tax-exempt status; to disgorge Defendants of their ill-gotten gains; and to determine and recover damages Defendants caused Plaintiffs.

4.    An intrinsic part of this conspiracy used as a means to perpetuate Defendants' crimes, is Defendants' obstruction of Plaintiffs' rights to equal treatment under the law and due process. Such obstruction manifests as obstruction of income and equal indemnification of legal expense that is necessary and essential under the Anglo-American judicial system for successful defense or assertions of claims and rights.

5.    Plaintiffs by Pamela Carvel (a member of the Association of Certified Fraud Examiners in the U.S. and U.K., who has no legal training or professional legal experience) are compelled to appear *pro se* after Pamela as fiduciary was compelled to spend all her personal disposable resources to defend Agnes Carvel, her aunt and an elder person, against harassment, intimidation, fraudulent conversion, violations of inalienable rights, and obstruction of Carvel control of Carvel assets. All attempts to seek voluntary compliance, restitution, and reimbursement are obstructed by Defendants'

3

litigating against Plaintiffs' rights, using the very Carvel assets that are denied to Plaintiffs.

6. This action by Plaintiffs arises from violation of U.S. law and violations of state laws of Delaware, New York, and Florida involving continuing conspiracies of two or more persons in:

i) acts to defraud the U.S. and harm its citizens by tax fraud, money laundering, identity theft and other fraudulent activities (18 *U.S.C.* Sec. 371, 1341, 1343, 1344, 1346, 1512, 1961 et seq., 1964; 42 *U.S.C.* Sec. 1886; *U.S.C.* Title 26; 26 *U.S.C .Sec.* 6501; 6655);

ii) intentional elder abuse inflicted by the Defendants with the intent to cause death and steal property of Thomas and Agnes Carvel (18 *U.S.C.* Sec. 1117, 1951);

iii) intentional violations of Constitutionally guaranteed rights with purpose of intimidating and harming Agnes Carvel and Pamela Carvel as whistleblowers, witnesses and victims (18 *U.S.C.* Sec. 241, 242; 42 *U.S.C.* Sec. 1981, 1982, 1983, 1985(3);

iv) robbery to deprive Plaintiffs of rights and property, and extortion to thwart Plaintiffs' interstate and international commerce  in order to obstruct justice by threatening Plaintiffs' with financial ruin for pursuing

investigations in cooperation with law enforcement prosecutions (18 *U.S.C* Sec. 1951).

iv)    apparent bribery of a New York State judge with the intent to deprive the Carvels of rights and property under the color of law and deprive them of the intangible right to honest services (18 *U.S.C.* Sec. 201; 242;1346);

vi)    other fraudulent acts with the intention to convert the identity and assets of the Carvels' private businesses and charities (American Institute of Health Foods, International Institute of Health Foods, Thomas and Agnes Carvel Foundation and possible others) for the personal profit for the Defendants and their co-conspirators.

7.    Plaintiffs seeks an order of this District Court:

i)    to identify, quantify and assess damages by Defendants inflicted on Plaintiffs;

ii)    to disaffirm all individual, representative, professional acts taken by Defendants to divert and fraudulently convert Carvel property and impersonate Carvel entities;

iii)    to recover misappropriated property estimated to be in excess of $300 million, and treble damages thereon;

iv)    to deny and revoke tax-exempt status under which Defendants' operate to fraudulently convert assets and commit tax fraud;

v)    to compel Defendants to pay penalties and interest for all actions in abuse of Carvel charities' tax-exempt status; and to disgorge Defendants of their ill-gotten gains.

## FEDERAL JURISDICTION

8.    United States District Court for Delaware has original jurisdiction over this action pursuant to 18 *U.S.C.*1965, 28 *U.S.C.* §1331 (federal questions) for civil actions arising under the Constitution and laws of the United States; including but not limited to: 18 *U.S.C.* §241 (conspiracy against rights), §242 (deprivation of rights), §245 (protected activities), §371 (conspiracy to defraud), §1111 (felony murder), §1117 (conspiracy to murder), §1341(frauds and swindles), §1343 (fraud by wire), §1344 (bank fraud), §1346 (honest services), §1512 (tampering with witness, victim, informant), §1951 (robbery, extortion), §1952 (aid of racketeering), §1961, et seq. (RICO), §1962 . (prohibited activities), §1964 (a),(c) (civil RICO remedies), §2314 (transportation of stolen securities), §2315 (receipt of stolen moneys); 26 *U.S.C.* *§6501* (tax fraud)*; §6655;* 28 *U.S.C.* §455 (disqualify judge), §1343 (civil rights); 42 *U.S.C.* §1981(equal

rights), §1982 (property rights), §1983 (deprivation of rights), §1985 (conspiracy against rights), §1886 (neglect to prevent), §1988 (proceeding in civil rights); and under the First (redress of grievances); Fifth (due process), Ninth (other rights), and Fourteenth (equal treatment) Amendments to the Constitution of the United States.

9.    This Court has supplemental jurisdiction over the state claims herein pursuant to 28 *U.S.C.* §1367, as Plaintiffs assert state claims arising from a common nucleus of operative facts with Plaintiffs' Federal claims.

10.    Plaintiffs amend Complaint to include 18 *U.S.C.* §1964 on the information and belief that events since the original filing and future discovery will prove that Defendants conspired to abuse Plaintiffs' assets, to fraudulently evade payments due Plaintiffs, to tortuously interfere with Plaintiffs' businesses and income, to evade payment to creditors, to evade taxes in fraud against government agencies, and to abuse the legal system and obstruct justice by abusing restricted charitable gifts to litigate to perpetuate a conspiracy of criminal enterprises.

11.    There exist questions of U.S. Constitutional law including (but not limited to) possible criminal intent and/or conspiracy:

i)    to procure the deaths of Thomas, and later, Agnes Carvel during the commission of felonies;

ii)    to defraud and embezzle from the Carvels, their estates and  charities;

iii)    to impersonate Carvel entities and abuse the Carvels' good name and reputation;

iv)    to steal and/or fraudulently convert Agnes Carvel's property to strangers;

v)    to threaten and cause financial damage to Pamela Carvel individually and as fiduciary for protecting and defending the rights of Agnes Carvel, an elder person, and asserting Agnes' testamentary intentions;

vi)    to transport stolen property across state lines by mail or by wire; to negotiate stolen U.S. government instruments; and

vii)    to deny Agnes Carvel, her Estate and her fiduciary the fundamental, substantive and material rights to equal treatment, due process, and protection from violations of Constitutional rights. (*U.S. Constitutional Amendments* I, V, IX, XIV; 18 *U.S.C.* Sec. 241, 242, 1111, 1117, 1962, 1964, 2314, 2315, ch. 95, 96; 42 *U.S.C.* Sec.1983, 1985(3)).

12.    The Supreme Court of the United States has often reaffirmed the power of the Federal courts to take jurisdiction over executors and

8

administrators without regard to the provisions of State statutes [*Leighton v. Roper*, 300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537; *Markham v. Allen*, 326 U.S. 490, 494; *Blacker v. Thatcher*, 145 F. 2d 255, certiorari denied 324 U.S. 848; *Pufahl v. Parks*, 299 U.S. 217; *Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33; *Security Trust Co. v. Black Riv. Nat. Bank,* 187 U.S. 211; *Lawrence v. Nelson*, 143 U.S. 215, 222].

13.    The largest claim (over $200 million) to recover assets of the Agnes Carvel Estate is in Delaware. Therefore the largest theft of assets and greatest fraud against Agnes Carvel, her successors in interest, the Estate, its Delaware administrator, its beneficiaries, and its creditors, is in Delaware. Delaware is the correct venue because the apparent frauds, including perjured statements to the Delaware Chancery and apparent bribery of a New York State judge by Defendants, were intended to prevent the recovery of the value of Agnes' Delaware corporate interests, the most substantial asset claimed by Plaintiffs. Defendants' acts that defrauded Agnes Carvel also defrauded Delaware state government, Delaware creditors, and Delaware contract obligations owed by Agnes Carvel (12 *Del. C.* 3802(b)(1994)). On information and belief, a continuing conspiracy to deny funds to Agnes Carvel and the Delaware ancillary administration was

intended to obstruct professional legal representation that is necessary, essential and indispensable for the Delaware ancillary administrator to carry out her fiduciary obligations and duties for Agnes Carvel, for the Estate's legitimate beneficiaries, for Delaware creditors, and for the laws of Delaware and the United States.

## FEDERAL VENUE

14. Delaware is the correct venue for this Amended Complaint because the Defendants' apparent crimes and acts that defrauded Agnes Carvel in Delaware also defrauded the Estate's ancillary administration and Agnes' successors in interest in Delaware; cheated and abused legitimate charity in Delaware and elsewhere; defrauded Delaware claimants and creditors, and violated Delaware statutes.

15. Venue lies in this District Court because Agnes Carvel, the Estate, and Pamela Carvel as fiduciary are deemed "aliens" as foreign citizens (*28 U.S.C. 1332 (c)(2))*.

16. Venue in District Court is proper under 18 *U.S.C.* §1965. This Amended Complaint alleges RICO violations and therefore invokes the venue provisions of the RICO statute. Justice demands that Delaware District Court hear this case, as provided in 18 *U.S.C.* §1965(b), because

apparent criminal enterprises, bribery and political corruption in New York denied Plaintiffs the right to redress grievance in New York, and denied that New York law protects a foreign fiduciary or Delaware ancillary administration interests.

## PARTIES

17.    Plaintiffs Agnes Carvel Estate/Thomas and Agnes Carvel Foundation are citizens of the United Kingdom, having a mailing address of 28 Old Brompton Road, Suite 158, London SW7 3SS England, United Kingdom. Pamela Carvel is defined as a foreign citizen (*28 U.S.C. 1332 (c)(2)*).

18.    Defendant, William Griffin is a lawyer who on information and belief is a citizen of New York with a business address of 51 Pondfield Road, Bronxville, NY 10708. William Griffin is also chairman and a controlling shareholder in Hudson Valley Bank. On information and belief, Griffin retained, directed and authorized payment of Delaware attorneys to thwart by perjury Agnes Carvel's claims and rights under Delaware law.

19.    Defendant Marie Abplanalp Holcombe is a controlling shareholder in Hudson Valley Bank who on information and belief is a

citizen of New York with a business address of 700 Nepperhan Avenue, Yonkers, New York 10702.

20.    Defendant Salvatore Molella is an agent of Griffin and Holcombe who on information and belief is a citizen of Florida with a mailing address of  37035 Exuma Bay, Boynton Beach, FL 33436. On information and belief, Molella retained, directed and authorized payment of Delaware attorneys to thwart by perjury Agnes Carvel's claims and rights under Delaware law.

21.    Defendant Robert Davis is a lawyer who on information and belief is a citizen of New York with a business address 430 East 57 Street, #9D, New York, New York 10022. On information and belief, Davis retained, directed and authorized payment of Delaware attorneys to thwart by perjury Agnes Carvel's claims and rights under Delaware law. On information and belief, Robert Davis' most recent address is Nidzyn Avenue, Remsenburg, New York 11960. On information and belief, Robert Davis died and the location of his estate must be determined.

22.    Defendant's intentionally interfere with business relationships, contractual relationships, and obstruct the Constitutional rights of Agnes Carvel, the Estate, the Estate's Delaware administration, and the Estate's

12

fiduciary, Pamela Carvel, in an attempt to prevent the Estate's pursuit of substantial Delaware claims to Agnes' assets, so that the Defendants may divert, to the Defendants' own profit and the benefit of their cohorts, all the assets of Agnes Carvel and the charities founded and funded exclusively by Thomas and Agnes Carvel.

23.    Defendants knowingly and intentionally committed acts and omissions over Delaware assets and effecting Delaware claim issues, in collusion with co-conspirators in Delaware and elsewhere. Defendants knew their harmful acts in Delaware and outside Delaware would damage Plaintiffs' claims and Plaintiffs' assets in Delaware. Defendants' acts in Delaware, and effect on Delaware issues, were a direct and foreseeable result of the conduct in furtherance of the conspiracy and criminal enterprise against Plaintiffs.

24.    Defendants' conspiracy in the conversion of assets, and oppression of the rights and the ability of Pamela Carvel to perform her fiduciary obligations, acts across state lines and may result in the identification of intentional civil and criminal acts in violation of Federal laws involving additional parities that may yet be identified. Plaintiffs reserve the right to amend this complaint as necessary to include others.

## "DOE" DEFENDANTS

25.    Upon information and belief, Defendants John/Jane Doe 1-20 and Doe Co. 1-20 are individuals and businesses, to be identified upon discovery, which participated in the activities described herein. Plaintiffs are ignorant of the true names, capacities, nature and extent of participation in the course of conduct alleged here and, therefore, sue these Defendants by such fictitious names. Plaintiffs will, if necessary, seek leave of Court to further amend this Amended Complaint to reflect the true names and capacities of the defendants designated herein as Doe defendants when their identities and liabilities become known. "Doe" defendants, participated as co-conspirators in the violations alleged in this Amended Complaint, performed acts, and made statements in furtherance thereof. Such Doe defendants as co-conspirators aided, abetted, or participated in the enterprises identified herein in the commission of the wrongful acts or otherwise caused the damages suffered by Plaintiffs.

## OTHER PARTIES THAT ARE NEITHER PLAINTIFFS NOR DEFENDANTS

26.    Plaintiffs assert that the People and governmental entities of the United States, on behalf of whom Plaintiffs also complain, are harmed. On information and belief, co-conspirators induce others to breach their duty of

14

loyalty, fiduciary obligations, oath of public office, and also damage others through tax fraud, money laundering, and charity fraud.

27.    Plaintiffs complain also on behalf of other directly or proximately injured parties, which injury or damage arises from Defendants' tortious actions. These parties include: Federal Government of the U. S.; Internal Revenue Service of the U. S.; Government of the United Kingdom ("U.K."); Inland Revenue of the U.K.; legitimate charities of the U.S. and elsewhere; Plaintiffs' various creditors who may have not been paid, through the systematic pattern of racketeering activity alleged herein; others whose proper payments were unnecessarily delayed with exactly the same purpose and motive, of which Plaintiffs complain herein; as well as other unknown injured parties that may yet be discovered. These parties are included in accordance with the provisions of *FRCP* Rule 71.

## BRIEF BACKGROUND

28.    Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History.

29.    The week before Tom died he estimated the family worth to exceed $250 million in cash and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock (a Delaware corporation).  The week after Tom was found dead, Tom's wife Agnes was told there was less than $40 million and that virtually none of it belonged to her. Agnes and Pamela also knew first hand that Tom and Agnes owned everything jointly with rights of survivorship outside probate, but deeds, stock and bank accounts were diverted by theft of records or altered by forgery.

30.    Agnes died on August 4, 1998 while residing in London, England. Agnes was a United Kingdom citizen since birth. The High Court of Justice for England and Wales admitted her last Will and Testament dated July 7, 1995 for probate without contest. That Will was never contested and remains in force. Pamela was appointed the sole executor and sole personal representative under that Will (Defendants' spent over $500,000 of restrict charitable assets to replace Pamela with Defendant's own "judicial trustee" on June 11, 2007 for the stated purpose to end litigation against Defendants. The judicial trustee has no funds; has no power to litigate; does not represent the named interested parties under the Will; does not represent Pamela as

16

executor-creditor; and is neither executor nor personal representative. Without funds, this matter is being appealed by Pamela *pro se* based on material errors in fact and law put forth by Defendants.)

31.    The uncontested Will provides that anyone who harmed or litigated against Agnes Carvel in life, or litigated against her estate shall not inherit. The Carvels' assets, and gifts restricted exclusively to charity, are used by Defendants to litigate against Agnes Carvel, Agnes' rights, Agnes' successors in interest, and against Pamela Carvel as Agnes' fiduciary. This abuse prohibits Defendants in any guise from benefiting under the Will.

32.    **There has never been any disagreement about money in the Carvel family. All litigation to waste and divert Carvel assets is generated exclusively by Defendants and their agents – strangers against family. Agnes never received one penny of income from Tom's estate as long as she lived.** Tom's estate was allegedly valued at only $66 million, not the $250 million Tom estimated. Withholding income from Agnes violated the terms of Tom's alleged Last Will, thereby creating tax fraud by the fraudulent elections of QTIP and marital deductions (*I.R.C.* 2056, 2523; 18 *U.S.C. Sec.* 371, 641; 26 *U.S.C. Sec.* 7201 et seq). Agnes' death from stroke was procured deliberately by stress from Defendants, who

17

stole control by forgery of charities the Carvels founded and funded. Agnes' death was intended to silence Agnes' accusations, some of which resulted in several felony convictions by the New York Attorney General with Pamela's assistance.

## INTIMIDATION OF "WHISTLEBLOWERS"

33.   Agnes and Pamela are the only fiduciaries in Carvel matters who are denied by Westchester Surrogate's Court, New York equal indemnification of legal fees and litigation expenses because they are also the only "whistleblowers" concerning criminal activities, including judicial misconduct. Carvel investigators assisted New York State Attorney Generals Abrams and Spitzer in felony convictions for financial fraudsters operating in connection with Thomas Carvel's estate (William Zuga (twice), Francis Zarro). The U.S. Attorney in another matter convicted another Carvel estate fraudster, William Fugazy, for perjury.

34.   The Carvels also assisted the New York Attorney General in charity fraud investigations that forced the ouster of two alleged Carvel charity managers for charity frauds and self-dealing grants, but not before the duo installed their "loyalist" cronies to pay the fraudsters' legal fees and

to litigate against Agnes using restricted charitable gifts, thereby creating additional tax fraud (*I.R.C.* 501(c)(3)).

35.    The foundation imposters fear loosing control of misappropriated Carvel assets. Defendants' intention was stated in a manifesto for control of the "Thomas and Agnes Carvel Foundation" written on February 18, 1992 (Exhibit A-55) in the midst of the Attorney General's fraud investigations: removing Robert Davis and Mildred Arcadipane "**provides family with opportunity to assume control of Foundation, Estate and Agnes' assets.**" Nothing could more clearly demonstrate the **intent** to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates. In the same document at #11, "Hudson Valley" [Bank] is listed generically as possible loyalist successor, i.e. anyone from Hudson Valley Bank can be counted on to stack the charity's votes against Agnes Carvel in her own charity.

## CONVERSION OF CARVEL SALE PROCEEDS

36.    In November 1989, Thomas and Agnes Carvel were coerced, by circumstances created by their employees Robert Davis and Mildred Arcadipane, into selling their jointly owned stock in Carvel Corp., a Delaware corporation, to "Investcorp", known as "investment bankers" for

Bahrainian money. Recent research in England indicates ties to suspected terrorists, a large bank collapse, and a call in Parliament for a government investigation of Investcorp.

37.    Not one original document can be found for the sale of jointly owned Carvel Corp. stock on November 21, 1989. No documents bear an ink signature of Tom or Agnes. All three original stock certificates, all issued on January 13, 1986 to "Thomas Carvel and Agnes Carvel, Joint Tenants" remained in Agnes Carvel's possession (Nos. NB 853, 857,863). The stock certificates were never endorsed to transfer joint ownership at any time. No stock powers were used to transfer joint ownership. Secretary Mildred Arcadipane or attorney Robert Davis signed many alleged sale documents instead of the Carvels, although neither fraudster had power of attorney to act on the Carvels' behalf. Other documents have signature-only pages that do not match the preceding pages that alleged to contain agreement terms. Although reference to payments by notes for approximately $100 million was found, such payments are totally missing. Money that should have been in two $20 million trust accounts at Hudson Valley Bank "disappeared". U.S. Treasury Securities held in Hudson Valley

Bank's name also could not be found; and those that were found had the ownership altered.

38.   The copies of stock sale documents, produced by the Defendants after Thomas Carvel's death, allege a sale of only half the stock owned by Tom and Agnes, i.e. only 660,646 shares not 1,321,292 shares. The missing 660,646 shares (No. NB 863) appear to constitute the missing $100 million that Thomas Carvel intended to investigate with his niece Pamela Carvel (who is a member of the Association of Certified Fraud Investigators in the U.S. and U.K.) before his suspiciously timed death occurred. Tom's falsified death certificate and possible murder is the subject of another proceeding to exhume his body to establish cause of death.

39.   Agnes Carvel, as surviving joint owner, was defrauded out of the alleged sale proceeds for Carvel stock by a series of fraudulent bank and trust transactions involving Hudson Valley Bank, Bank of New York (on probation for money-laundering violations), NatWest Bank, Barnett Bank and Defendants, who boast close personal relationships to the banks.

40.   Hudson Valley Bank, controlled by Griffin and Holcolmbe, allowed Arcadipane and Davis to fax instructions to move millions of Carvel money in and out of Tom, Agnes and Bruce Carvel's personal bank accounts

without the knowledge or consent of Tom, Agnes or Bruce (Pamela's father) and without any "power of attorney" to act on any Carvels' behalf (18 *U.S.C. Sec.* 1343). Investigations by the New York State Department of Banking confirmed Pamela's discovery that Davis altered at least $4.75 million in U.S. Treasury Bills and Notes held by Hudson Valley Bank to appear to give Agnes ownership; but in actuality, Davis was covering up his previous manipulations of ownership title resulting in the theft of over $15 million Carvel stock sale proceeds in Hudson Valley Bank that belonged to Agnes as surviving joint owner. When Pamela uncovered the theft, the $4.75 million that had been allegedly transferred to Agnes was then fraudulently converted to a Florida trust without Agnes' knowledge. The Florida trustees then withheld the money from Agnes and her estate. The trustees, who were cohorts of Davis, Arcadipane and Griffin, obstructed further investigations into the theft. These Florida trustees pay themselves and their attorneys millions from Agnes' money to litigate **against** Agnes, while Agnes received nothing but the tax bill.

## PHONY UNITRUST

41.    After the sale of Carvel stock was allegedly agreed, Arcadipane and Davis backdated documents allegedly creating the "Thomas Carvel Charitable Remainder Unitrust" ("as of March 1, 1989") for deferring Carvel stock sale proceeds from capital gains tax (Treasury Regulation Section 25.2702-(c)(1); Revenue Procedures 89-20, 89-21, 90-30, and 90-31). Tom and Agnes Carvels' jointly owned stock certificates were never surrendered nor transferred when their stock that was allegedly contributed to the "unitrust". No stock power was used to transfer the stocks. The "unitrust" was a sham to give Arcadipane and Davis power over Carvel money and power to obstruct the income payable to Tom and Agnes if they began asking questions (precisely what the fraudsters did to Agnes).

42.    The original trust allegedly contained eight trustees. After Tom's death, Arcadipane and Davis alleged that four trustees, who were "Carvel" employees, had been removed leaving only Arcadipane, Davis and the two trustees who were the least knowledgeable about "Carvel" business affairs – Adele Alexander, Tom's niece and Mary Ellen Cerrato, the wife of a friend. Arcadipane and Davis ran the trust without the knowledge or consent of the other two trustees. Allegedly no records were kept. When

23

Agnes sought to remove Arcadipane and Davis as fiduciaries for fraud and demanded accountings from the trustees, Arcadipane, Davis and Cerrato cut off mandatory distributions to Agnes, but continued to use Agnes' money to pay their own legal fees to cover-up the phony trust creation, and to litigate against Agnes' income rights. The unitrust was a fraud intended to evade taxes and make the Carvels prisoners of the trustees. On information and belief, over $10 million was diverted from the alleged original funding of the trust ($24 million instead of $35 million).

43.    Agnes Carvel's ownership of approximately $200 million taxable proceeds of the sale of Carvel Corp. stock (a Delaware corporation), and subsidiaries retained by Tom in the sale, disappeared after Tom's death.

## HUDSON VALLEY BANK'S INCESTUOUS RELATIONSHIPS

44.    The trials began in Thomas Carvel's estate in September 2001. In October 2001, Hudson Valley Bank loaned Westchester Surrogate Scarpino $200,000. The accounting proceeding in Agnes Carvel's New York ancillary administration began in May 2005. In December 2004, Hudson Valley Bank loaned Surrogate Scarpino $100,000. Surrogate Scarpino never disclosed these "loans" to the parties before him although William Griffin, chairman of Hudson Valley Bank and controlling shareholder, is alleged to

be the "most knowledgeable" director who represents the Carvel-charity usurpers at trials; and Marie Abplanalp Holcombe, another controlling shareholder in the Bank, is alleged to be a Carvel-charity member and director who authorizes litigation in Surrogate Scarpino's court paid for with Agnes' restricted charitable gifts and Agnes' income denied to Agnes. Research thus far seems to indicate that these and other "loans" were excluded from mandatory financial disclosures. Surrogate Scarpino signed Pamela Carvel's request for a subpoena duce tecum for alleged charity documents, but then Surrogate Scarpino retracted the subpoena when Defendants herein complained.

45.    The trial during which Surrogate Scarpino received a $200,000 "loan", followed by a $100,000 "loan", purported to make the "Thomas and Agnes Carvel Foundation" as controlled by Griffin, Holcombe and Molella, creditor of the residue of Agnes Carvel's estate; however, the Surrogate turned over to the mere remainderman the **gross** of Agnes' real estate New York and Florida, valued at approximately $14 million, and the gross of the unitrust account under contention.

46.    As soon as Thomas Carvel was dead, the business documents belonging to Agnes Carvel, and the many charities Thomas and Agnes

25

founded and funded, were stolen from the Carvels' offices and moved to the Hudson Valley Bank Building. Never to be returned. Hidden from scrutiny demanded by Agnes or Pamela Carvel. The alleged foundation rented pricey offices in the Hudson Valley Bank Building since 1991.

47.    Evidence of Hudson Valley Bank manipulation of Carvel bank accounts and U.S. Treasury securities was the first fraud uncovered in Thomas Carvel's estate. Hudson Valley Bank and its "owners" William Griffin, Robert Abplanalp and their co-conspirators stole control of the Carvels' private charities so as to abuse the Carvels' good name and assets to further the organized political and financial influence the bank generates in numerous ways. Upon Robert Abplanalp's death, his daughter Marie Abplanalp Holcombe took his place as "Hudson Valley" representative as stated in the 1992 manifesto to maintain control against the Carvels.

48.    The bank also runs something called "Hudson Valley Bank's Business Development Board" (A-62) of which the bank itself says,

- "members benefit from their association with Hudson Valley Bank through networking opportunities and exposure for their businesses"

- "The Board of Directors looks to fill these positions with highly-qualified professionals, who can assist in achieving the Bank's goals." (emphasis added)

49.    James Landy, the officer of Hudson Valley Bank who presided over the cover-up of the stolen and altered Treasury securities scenario, is chairman of the board of St. Joseph's Medial Center (an alleged grant recipient with kick-backs to Griffin and the Bank). Mathew Landy is James' cousin and the alleged office manager over one secretary of the alleged foundation, although the alleged foundation purports to not accept independent grant proposals.  It only makes grants proposed by "insiders".

50.    William Griffin, chairman of Hudson Valley Bank, major stock controller, and alleged foundation president, was "research counsel" to New York Lt. Gov. Malcolm Wilson. Wilson became the foundation usurpers' general counsel immediately upon Tom's death, and then alleged foundation member and director. On information and belief, Wilson directed that Agnes Carvel be denied her position as foundation director when Agnes demanded an investigation into Griffin's involvement in the St. Joseph's grant scams. Wilson installed his buddy Griffin on the foundation as "loyalist" to bolster the phony votes (Exhibit A-57). Wilson was the "campaign chairman" for Surrogate Emanuelli's unopposed "election". Surrogate Emanuelli turned a blind eye to all crimes committed against Agnes Carvel, withheld all mandatory income due Agnes Carvel to prevent her challenging the

legitimacy of the foundation usurpers, and harassed Agnes until death resulted.

51.   The Hudson Valley Bank Business Development Board also includes:

- Marc Oxman (A-66), who was installed as Guardian Ad Litem for Agnes Carvel, is one such person who "assists in achieving the Bank's goals" along with Oxman's law partner Andrew Natale, Jr.(A-65). Oxman was hired to wipe out Agnes' claims and to cause Agnes' death by stress in London -- and so he did.

- Daniel Hollis (A-64) is partner to Stuart Shamberg who was attorney for the Westchester County Public Administrator who hijacked control of the Estate by perjury by the alleged foundation's lawyers in New York in November 1998 despite the probate in England in October 1998.

- Edward A. Sheeran (formerly) is Executive Director, Yonkers Industrial Development Agency ("IDA"), the agency that played a part in the phony St. Joseph Hospital grant where Griffin purchased a property only after he knew his cronies in the alleged foundation approved a $2,000,000 purchase grant for a $700,000 parcel of land. Over $1,300,000 disappeared along with a corner of the property that was a branch office

of the Hudson Valley Bank. The IDA then stepped in to provide financing.

- Michael Spicer (A-67) is President and CEO of St. Joseph's Hospital, recipient of numerous unaccounted-for grants.

- In 1982, the Bank and its vice president John Finnerty (who remains on the Business Development Board, A-64) faced and survived indictment for phony "loan" schemes and "various count of larceny and misapplication of property".

## DEFENDANTS STOLE $10 MILLION PROPERTY FROM CHARITY AND FROM THE ESTATE

52.    On October 6, 2006 William Griffin, who is not only the chairman of Hudson Valley Bank but one of the Banks controlling shareholders, alleged to act as the president of the "Thomas and Agnes Carvel Foundation" in order to sell Agnes Carvel's former residence in Ardsley, New York containing two parcels of land of approximately 16 acres (currently valued at **$10 million**) to a shell company belonging to Denis Amicucci, a relative of Griffin's law partner Paul Amicucci, for only **$700,000** (A-6) and **$1.3 million** (A-9). A similar insider sham transaction is suspected for Agnes' real estate in Florida.

29

53. Daniel A. Amicucci formed the shell company, Chauncey Partners LLC, in March 2006. Paul Amicucci is listed as part of Griffin's law firm Griffin, Coogan and Veneruso, P.C. (Exhibit A-60,61) and also appears to be the attorney in the firm of Walsh and Amicucci, LLP who act for other charities controlled by Griffin. Paul Amicucci is also listed among the "Hudson Valley Bank Business Development Board" that has an incestuous, covert political relationship to the Carvel estate manipulations in Westchester Surrogate's Court (Exhibit A-62)

54. On that same day, October 6, 2006, the shell company returned control of the whole property back to Griffin through Hudson Valley Bank as an alleged lease assignment for security for an alleged US$1.3 million mortgage from Hudson Valley Bank (Exhibit A-12) where Griffin is not only chairman but a controlling shareholder along with alleged foundation director Marie Abplanalp Holcombe (Exhibit A-1).

55. This same Ardsley property was appraised at **$1.1 million in 1990** when Thomas Carvel died (Exhibit A-59). While all surrounding real estate has increased in value 300-400%, the Carvels' exclusive mountaintop acreage property only increased about 82%, despite the rare an unusual nature of so many undeveloped acres in such a sought-after area, and

contrary to the high demand exhibited in the past. Agnes Carvel's other Westchester property, the first Carvel ice cream stand in Hartsdale, was also stolen from Agnes' estate and sold by Griffin in 2006 allegedly for $2.8 million to the owner of the current Carvel franchise. The property increased 375% from its 1990 appraised value of $600,000. On information and belief, another $700,000 exchanged hands unreported.

### APPARENT BRIBE VIA HUDSON VALLEY BANK LOANS

56.    Agnes Carvel's only adversaries for 17 years have been the Defendants, the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets (A-55). On the same document (#11;A-56) the acceptable "loyalists" to become successor members and directors is listed "Hudson Valley" generically, i.e. anyone from Hudson Valley Bank will be a loyalist to the foundation usurpers.

57.    [As soon as Tom's was found dead, the usurpers moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed to impersonate a foundation member, director and officer. Soon again, the Bank's other major controlling stockholder, Robert Abplanalp, was also installed. When Abplanalp died, his daughter replaced him. She too is a major controlling

stockholder in the Bank. After stealing the identity and control of the Carvels' charities, Griffin and the Abplanalps abused Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving any income. The Bank asserts more control over Carvel money than any Carvel.]

58.    Trials in the Carvel matters began on September 10, 2001, on October 1, 2001 Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000 (A-40). On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000 (A-21). Neither of these loans were disclosed. The average citizen cannot know whether these "loans" are repaid by Surrogate Scarpino or just "written off" as a cost of doing business. Given Surrogate Scarpino's decisions favoring the foundation usurpers against Agnes, the sole intended beneficiary of everything, there is the appearance of impropriety, namely the appearance of bribery which is sufficient grounds to judicially disqualify Surrogate Scarpino because he lacks the personal conscience to recuse himself.

59.    The Surrogate placed no restraint whatsoever on disbursements by the executors in Thomas Carvel's estate, including the disbursement of assets belonging to Agnes Carvel held in the hands of Thomas Carvel's executors. Legal fees were paid without prior or subsequent consent of the

beneficiary or the court. This freedom to draw down Carvel property at will remained with Tom's executors despite Agnes Carvel's warning that the executor's were engaging in fraudulent business practices with known fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and U.S. and New York Attorney Generals' prosecutions convicted William Zuga twice (2002, 2003) for real estate fraud, convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds, and convicted William Fugazy (1997) for bankruptcy perjury. Several million dollars were lost to Agnes Carvel by Thomas' executors' collusion with these felons, BUT only the whistleblowers Agnes and Pamela Carvel were and are denied indemnification of legal fees from Thomas or Agnes' estate assets.

60.    It is clear enough that only strangers are becoming millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses to prosecute claims. One-sided funding of litigation seen in the light of $300,000 in undisclosed "loans" to the judge can demonstrate nothing other than the intent to fraudulently convert estate and trust assets away from the Carvels and their intended beneficiaries.

## CONTINUING CONSPIRACIES TO DEFRAUD

61.    This action arises from a conspiracy by two or more Defendants against the Constitutionally guaranteed rights of Agnes Carvel as an elder person and charitable benefactor, and Pamela Carvel as Agnes' fiduciary (18 USC Sec. 241; 42 *U.S.C.* 1981, 1982, 1985, 1986 ), in deprivation of their rights under color of law (18 USC Sec. 242), including but not limited to substantive due process, equal treatment, right to own real estate and to make a contract.

62.    Defendants continue to conspire over several years to threaten, intimidate, harm and intentional act to procure the death of Agnes Carvel, an elder person, who was a victim and witness. Defendants and their agents threaten Pamela Carvel with personal and financial jeopardy for being an informant to the New York State Attorney General and the U.S. Attorney (resulting in felony convictions for financial frauds), and to the F.B.I. and the Criminal Investigation Divisions of the U.S. Internal Revenue Service and the U.K. Inland Revenue (18 *U.S.C.* Sec. 1512); and for remaining Agnes' sole advocate. The intent was to silence Agnes Carvel's prosecution of Defendant's fraudulent actions and theft of restricted charitable donations made by Thomas and Agnes Carvel to private charities founded and funded

34

exclusively by the Carvels. On information and belief, Defendants have information regarding the possible murder of Thomas Carvel (18 USC Sec. 1117), which matter is the subject of another court proceeding for exhumation to determine the cause of death because of a falsified death certificate.

63. Defendants collude in mail fraud (18 *U.S.C.* Sec.1341) and activities relating to wire fraud (18 *U.S.C.* Sec.1343) to further other financial institution frauds through Hudson Valley Bank where Griffin and Holcolmbe are two controlling shareholders (18 *U.S.C. S*ec. 1344) (Exhibit A-1).

64. On information and belief, Defendants use Hudson Valley Bank to fraudulently convert real estate belonging to the Estate to the Defendant's agent and back to themselves (Exhibit A-6). On information and belief, Defendants forged, altered and fraudulently converted U.S. Treasury securities belonging to the Carvels but held in the Bank's name. On information and belief, Defendants forged, altered and fraudulently constructed records to steal the identity of Carvel charities in order to control of multi-million dollars of charity funds. Defendants abused their control of Hudson Valley Bank to devise schemes to defraud and swindle to embezzle

money by false pretenses using mail and wire to transport the proceeds of stolen Carvel property across state lines. (18 *U.S.C.*Sec.1341, 1343, 1346, 1956, 1957 ).

65.    Based on documents in the public record, Plaintiff asserts that Defendants used Hudson Valley Bank to provide alleged "loans" in the amount of $300,000 or more to apparently bribe Westchester County New York Surrogate's Court judge Anthony Scarpino at the same time as trials in Carvel estate matters were heard by Surrogate Scarpino, in which William Griffin was a witness seeking to divert Carvel real estate and cash to himself via one of the Carvels' charity (18 *U.S.C.* Sec. 201) (Exhibit A-21).

66.    Defendants conspired against Agnes Carvel, Pamela Carvel and against the United States to commit in tax fraud (18 *U.S.C.* Sec. 371) in the course of Defendants intentional acts to obstruct equal property rights under the law (42 U.S.C. 1981, 1982, 1985 (2), (3), 1986, 18 *U.S.C.* 1951, 1964). On information and belief, Defendants may be engaged in money laundering and the cover-up of the theft of Carvel assets for use by "investment bankers" with possible connections to suspected terrorists.

## ACTIVITIES THAT ARE ILLEGAL OR
## CONTRARY TO PUBLIC POLICY

67.    As demonstrated above, Defendants are engaged in illicit activities under the guise of tax-exempt status. Exempt purposes may generally be equated with the public good, and violations of law are the antithesis of the public good. Therefore, the conduct of such illegal activities may be a bar to exemption claimed by those who alleged to govern a charity. Factors that have to be considered in determining the effect of illegal activities on an organization's qualification for exemption are the paragraph of *Internal Revenue Code* 501(c) under which the organization is exempt (*IRC* 501(c)(3) for private foundations), and the nature and extent of the illegal activities engaged in by the organization.

68.    Exemption recognized under *IRC* 501(c)(3) is unique in that, unlike exemption under other paragraphs of *IRC* 501(c), it is grounded in charity law, so that denial of exemption under *IRC* 501(c)(3) may be based on charity law. Violation of constitutionally valid laws is inconsistent with exemption under *IRC* 501(c)(3). As a matter of trust law, one of the main sources of the general law of charity, **planned activities** that violate laws are not in furtherance of a charitable purpose.

37

69.    The "Confidential" memos created by Robert Davis dated February 18, 1992 and April 9, 1992 (A-55, A-57), and adhered to thereafter by Defendants named as "loyalists", explicitly state the continuing planned activities that violate laws. The explicitly stated intent leaves no possible doubt of the planned conspiracy to defraud Plaintiffs by prohibiting "family with opportunity to assume control of Foundation, or at least Estate and Agnes' assets" (A-55, #2). The criminal enterprise expressly stated was carried out by Defendants while Agnes was alive, namely the intent to fraudulently convert control of the Carvels' charity and ALL CARVEL ASSETS away from Agnes Carvel, who was charitable benefactor, sole surviving asset-owner and sole mandatory income beneficiary. Such criminal intent was continued to deny Pamela Carvel all rights as Agnes Carvel's successor and sole legitimate Foundation Member.

70.    Defendants' operate their criminal enterprises under a cloak of tax-exempt status stolen from the identity of the Carvels' formerly legitimate charities, therefore the tax-exempt status behind which they hide must be denied. Defendants must be held individually accountable for the tax evasion and damages resulting from their conspiracy. The stated illegal intent, to fraudulently convert all Carvel assets by litigating through the charity to

deny Agnes Carvel all assets and income, violated the QTIP and Marital Deduction elections for Thomas Carvel's estate as well as contractual obligations to Agnes in Thomas Carvel's alleged "estate plan".

71.    This stated illegal intent continues to profit the Defendants. Millions of restricted charitable funds are directed to litigation against the Carvels yearly for 17 years to accomplish this illicit goal. On information and belief, more funds are disbursed for non-charitable purposes than charitable one. Defendants directed restricted charitable gifts be used to harm Agnes Carvel and her legitimate successors in interest, and to cover-up the Defendants' illegal purposes. Such actions violate laws on the protection of rights, laws restricting charitable activities, laws on prohibited activities, as well as laws on tax, money laundering, and bribery of judges.

72.    "A trust cannot be created for a purpose which is illegal. The purpose is illegal ... if the trust tends to induce the commission of crime or if the accomplishment of the purpose is otherwise against public policy.... Where a policy is articulated in a statute making certain conduct a criminal offense, then ..., a trust is illegal if its performance involves such criminal conduct, or if it tends to encourage such conduct." (*IV Scott on Trusts* Section 377, 3d ed. 1967).

73.   Thus, all charitable trusts (and by implication all charitable organizations, regardless of their form) are subject to the requirement that their purpose may not be illegal or contrary to public policy. (*Rev. Rul.* 71-447, 1971-2 C.B. 230; *Restatement (Second) of Trusts*, Section 377, Comment c (1959)). Moreover by conducting criminal activities, an organization increases the burden of government and thus thwarts a well-recognized charitable goal, i.e., relief of the burdens of government.

74.   Reg. 1.501(c)(3)-1(c)(1) states that an organization will not be regarded as operated "exclusively" for *IRC* 501(c)(3) purposes if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. The presence of a single non-charitable purpose if substantial in nature (such as multi-million-dollar-17-year litigation exclusively against the rights of the elder benefactors) will destroy the exemption regardless of the number or importance of truly charitable purposes (*Better Business Bureau v. United States*, 326 U.S. 279,1945). Therefore, if individuals conduct an organization to engage in illegal acts that are a substantial part of its activities, such organization does not qualify for exemption under *IRC* 501(c)(3).

75.     Those who improperly or illegally hold themselves out to be charity managers in order to commit crimes using the charity's funds have committed those crimes against the benefactor, against the charity, against government and against all citizens who would benefit from legitimate charitable use of the funds.

76.     According to the analysis of G.C.M. 34631, dated October 4, 1971, in determining whether disqualifying activities are present to a "significant extent" (that is, when they become "substantial"), more must be considered than the ratio they bear to activities in furtherance of exempt purposes. The nature of such acts is as important as their quantity. A great many violations of local regulations amounting to a sizable percentage of an organization's operations might be required to disqualify it from 501(c)(3) tax exemption. Yet, if only a small fraction of its activities were directed to robbing banks, it would not be tax exempt. This is an example of an act having a substantial non-exempt nature, while lacking substantiality of amount.

77.     Defendants crimes are both substantial in quantity as well as significance, causing multi-million dollar litigation for 17 years directed at procuring the death of Agnes Carvel, the elder benefactor and beneficiary,

through incessant litigation; depriving her all sources of income, and threatening invasion of her personal privacy. Such acts to harm Agnes also resulted in tax fraud. Such acts became directed against Pamela Carvel as whistleblower, witness and investigator to silence revelations of apparent bribery and multi-million dollar embezzlement.

78.    A very little planned violence or support of terrorism would constitute "substantial" activities not in furtherance of exempt purpose. If, as suspected from available evidence, any part of the theft of control of the Carvels' millions was used against the Carvels to thwart discovery and prosecution of the Defendants, aiding and abetting the diversion of Carvel funds to persons and entities with apparent connections to suspected terrorists, or in the procurement of the death of Tom and Agnes as benefactors, then tax-exempt status used by Defendants as their ploy must certainly be revoked.

79.    In determining whether illegal activities are substantial, it must be borne in mind that actions by members and officers of an organization, (particularly those who are illegally or improperly asserting charity control) do not always reflect on the organization. Because organizations act through individuals, it is necessary to distinguish those activities of individuals that

are done in an official capacity for legitimate charitable purposes from those that are not.

80.    Defendants provided multi-million dollar financing for years of litigation to defend Thomas Carvel's executors' in furtherance of tax fraud by improper accounting practices to deny Agnes Carvel all taxable income mandatory by law. Those improper practices not only harmed Agnes, the beneficiary and charitable benefactor, by abusing her restricted gifts to charity but also created, in the Carvel estates and charities, tax frauds for which there are no statutes of limitation (26 *U.S.C. Sec.* 6501 (c)(1,2,4,5,6).

81.    The Defendants' receipt of the gross proceeds of their illicitly funded litigation against Agnes Carvel, before the full and proper administration of the Estate and payment of all creditors, demonstrates the success of Defendants' stated fraudulent intent and confirms intentional tax fraud, engagement in criminal activities against the Carvels, and manipulation of ill-gotten gains for the profit of the Defendants and their agents. All this was accomplished through the identity theft of Carvel charities and the abuse of the tax-exempt status under Defendants' control.

82.    Not only is the actual conduct of illegal activities inconsistent with tax exemption, but, the planning and sponsoring of such activities are

also incompatible with charity and social welfare. G.C.M. 36153, dated January 31, 1975, states that because planning and sponsoring illegal acts are in themselves inconsistent with charity and social welfare it is not necessary to determine whether illegal acts were, in fact, committed in connection with the resulting activities or whether such a determination can be made prior to conviction of an accused. However, it is necessary to establish that the planning and sponsorship are attributable to the organization, if exemption is to be denied or revoked on this ground. As long as the stolen identities of the Carvels' charities are operated by Defendants as individuals engaged in illegal activities, tax-exemption must be denied and revoked.

83.    *Prima facie* documentary evidence of the continuing, planned intentions of each and every activity financed by the Defendants is contained in the records of multi-million dollar payments from charity funds to allow Defendants to engage in the illegal activities including deprivation of constitutional rights, intimidation, harassment, elder abuse resulting in felony murder, tax fraud, bribery of judges, and other, as well as the lack of benefit to legitimate charitable purposes defined by the benefactors.

84.    If *IRC* 501(c)(3) an organization engages in activities designed to force an unrelated party to act or refrain from acting in a way that the

44

organization believes will assist them in the accomplishment of their purposes, then questions arise as to whether these activities are permissible methods of furthering educational or charitable purposes.

85.    Violating the benefactor-testators' expressed or implied intentions clearly defined by the benefactors' established precedents in charity management; obstructing rights to further criminal conspiracies; depriving the benefactor of mandatory income; furthering tax evasion by the fraudulent elections of the QTIP and marital deductions; and concealing crimes from prosecution, are not valid charitable activities, in addition to being violations of statutes. Harming the benefactor with her own charitable gifts is certainly against public policy; tax fraud is certainly illegal.

## VIOLATIONS OF PUBLIC POLICY

86.    Discrimination against elder surviving widows, like Agnes Carvel, is not yet as well known or as strongly complained about as racial discrimination because the very nature of the victims – elderly, often infirmed, or financially deprived – makes it difficult if not impossible for the victims to be heard. Those of us who seek to defend our elders equally become victims of the same threats, intimidations, and financial ruin inflicted on the elders to silence their claims. We can look to the cause for

ending racial discrimination to see how once routinely accepted crimes against our citizens can be changed to create a more just society and universally accepted public policy.

87.    Discrimination against Agnes Carvel, the elder benefactor, by Defendants unsubstantiated accusations of disability, intended to deprive the benefactor of personal sovereignty, to provide a means for instigation of judicial intimidation without substantive and material due process, and to repeatedly threaten Agnes as an elder person with denial of financial resources to cause stress to procure death, are all demonstrations of age discrimination used against Agnes Carvel that are routinely employed by those with illicit intents, who seek to deprive widows of mandatory income due from their husband's estates and defraud the government by fraudulent estate tax elections.

88.    A recent court case agreed with the Internal Revenue Service that an organization violated well-defined standards of public policy and did not qualify for *IRC* 501(c)(3) exemption. The organization was engaged in clear-cut violations of the law (*The Church of Scientology of California*, Commissioner, 83 T.C. No. 25, 1984). The court concluded that on the basis of all the facts of record the organization's overriding purpose was to make

money, and that criminal manipulation of the IRS to maintain its tax exemption was a crucial and purposeful element of the organization's financial planning. The court described this purpose as a conspiracy, the major features of which were to block the IRS from investigating, determining, and collecting taxes from the organization and its affiliates. It stated that the conspiracy covered 8 years and involved the manufacture and falsification of records submitted to the IRS, and subverting government processes for unlawful purposes. Officials of the organization were convicted of conspiring to obstruct justice.

89.    Citing *Restatement (Second) of Trusts* Section 377 (1959), the court stated that it is axiomatic that a charitable trust is invalid if it is created for an illegal purpose. According to the court, a trust can be voided at the request of an interested party if trust property is used to perpetuate a crime defined by statute, or if the object of the trust is to defraud the government, or if its purpose is to evade taxes (*IV Scott on Trusts* Section 377, 3d. ed. 1967; and Bogert, *The Law of Trusts and Trustees*, Section 211, pp. 63-64, 114, 2d. ed. Rev. 1979).

90.    According to the court, the organization's conduct over a period of several years constituted a violation of 18 *U.S.C. Sec.* 371 and

47

convincingly showed that the organization had a substantial illegal purpose during the years in question. The court stated that it was not required by either the First Amendment or charitable trust principles to find that the government's only remedy was criminal prosecution. It gave several reasons for this conclusion:

a. 18 *U.S.C. Sec*. 371, which provides that it is a felony offense for two or more persons to conspire to defraud the United States, is a venerable and major criminal statute;

b. the organization's conspiratorial efforts were systematic and long-lived;

c. the government's interest in ferreting out crime is not the only interest at stake; and

d. the government also had an interest in not subsidizing criminal activity.

91. The court stated that were it to sustain the organization's exemption from federal income tax under *IRC* 501(c)(3), it in effect would be sanctioning the organization's right to conspire to thwart the IRS at taxpayers' expense. The court noted that under the statutory scheme the denial of exemption is not a permanent loss to the organization because it

was ruling only on certain years and the organization was free to show that it qualified for exemption in subsequent years.

92.    According to the court, the public policy requirement is an implied condition of *IRC* 501(c)(3) and its application is consistent with the holding in the *Bob Jones* case (a racial discrimination case; *Bob Jones University v. United States*, 461 U.S. 574 (1983)) that charitable organizations seeking to qualify for exemption from federally imposed taxes must serve a valid public purpose and confer a public benefit. Application of a public policy requirement is neither harsh nor oppressive because the organization had ample notice that it was against the law to conspire to obstruct the IRS (18 *U.S.C. Sec.* 371 had been in effect for over 100 years). *IRC* 7805(b) provides the Commissioner with broad authority to make tax rulings retroactive.

93.    The court cited Rev. Rul. 67-235, 1967-2 C.B. 113, holding that an organization that is not "charitable" in the generally accepted legal sense does not qualify for *IRC* 501(c)(3) exemption, and Reg. 1.501(c)(3)-1(d)(2) which provides that the term "charity" is used in its generally accepted legal sense. It also quoted as follows from Rev. Rul. 71-447, 1971-2 C.B. 230:

"All charitable trusts * * * are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy."

94.    As to the necessity for a judicial determination, the IRS is not in a position to make a determination as to the illegality of an act under a provision of law other than the Internal Revenue Code. That is a matter for the judiciary. Such a task would be impossible for the IRS to undertake from an administrative standpoint, and from a legal standpoint it would be improper to delegate such a determination to an administrative body without the procedural and substantive due process protection provided through the judicial process.

95.    The reason for the principal activity test is that an unlawful activity should be such that in effect it nullifies or destroys the essential charitable character of the organization. It is doubtful that such a conclusion could be reached without first finding that the illegal activity constituted one of the organization's principal activities.

## COUNTS 1-3
## FRAUD; CONSPIRACY TO COMMIT FRAUD
### (Delaware, Florida, New York)

96.    Each of the allegations contained in paragraphs 1-95 is incorporated herein by reference.

97.    Defendants knowing, malicious, reckless and unwarranted obstruction of payment income, debts and expenses to Plaintiffs in Delaware, Florida and New York, is in furtherance of obstruction of the identification and prosecution of a conspiracy to defraud Plaintiffs. Defendants act in contradiction and in violation of Delaware, Florida, and New York laws against fraud, conversion, and fraudulent transfers. Defendants are liable to Plaintiffs, jointly and severally for these violations.

98.    Plaintiffs believe Defendants' acts to be part of an organized political and criminal enterprise wherein all parties acted in agreement and concordance, both written and spoken, in the activities to deny assets to Plaintiffs for the benefit of Defendants as the Plaintiffs' adversaries in litigation.

99.    Defendants conspired to obstruct investigation and to conceal their acts under their perjury, false statements, fraudulent transfers, false

court filings, fraudulent intent, and fraudulent acts in violation of Federal laws and State laws.

100. Plaintiffs seek all their compensatory damages against Defendants and Doe defendants unknown to Plaintiffs at this time.

## COUNT 4
## TORTUOUS INTERFERENCE WITH CONTRACTS

101. Each of the allegations contained in paragraphs 1-100 is incorporated herein by reference.

102. Defendants interfered with contracts between Thomas and Agnes Carvel for the purpose of defrauding Agnes Carvel of any benefit from the contracts. Defendants interfered with contracts between Agnes Carvel, Pamela Carvel, and third parties for the purpose of extortion, intimidation, harassment, and to cause financial ruin, in order to cause hardship on the Carvels for pursuing criminal investigations and prosecutions against Defendants. Defendants and Doe Defendants continue to conspire in the intentional interference with Plaintiffs' contracts without justification.

103. Defendants' and Doe Defendants' tortuous interference with Plaintiffs' contracts directly damage Plaintiffs. Plaintiffs lost investment income, lost profits, incurred costs, fees, and needless litigation expenses, in

asserting contract enforcement against Defendants' malicious conduct including misrepresentation of material facts and perjury.

104. Plaintiffs seek all their compensatory damages against Defendants and Doe Defendants unknown to Plaintiffs at this time. Defendants are responsible for the wrongful acts of their employees, attorneys, and agents.

## COUNT 5
## TORTUOUS INTERFERENCE WITH
## PLAINTIFFS' BUSINESS EXPECTANCY

105. Each of the allegations contained in paragraphs 1-104 is incorporated herein by reference.

106. At all times relevant to the allegations herein, Plaintiffs had expectations of economic advantage, benefit from business income, and investment income. Defendants harm Plaintiffs from the continuing, egregious, and malicious pattern of racketeering in violation of RICO, because Defendants are in violation of contractual duties allegedly assumed from Thomas Carvel, obstruction of contractual duties to third parties, as well as common laws prohibiting fraud, and theft.

107. Without Defendants' wrongful acts of obstruction of Plaintiffs' rights to income and business relationships, it is reasonable and probable

that Plaintiffs would have realized economic advantage or benefits of about 400% return on international investments since 1991. Plaintiffs suffered income losses, business expectancy losses, opportunity losses, and other damages suffered physically and financially by Plaintiffs because of Defendants' wrongful conduct and malicious interference.

108.   Defendants' and Doe defendants' intentional interference with a business relationship and intentional obstruction of the rights of Agnes Carvel and her successors in interest, Agnes' estate and its Delaware ancillary administration, and fiduciary Pamela Carve], was an attempt to prevent Pamela's pursuit of substantial Delaware claims by obstructing funds to inflict financial hardship, so that Defendants may divert and profit from the conspiracy in criminal enterprises.

109.   This oppression of the rights, infliction of financial harm, and obstruction of the ability of Pamela Carvel to perform her fiduciary obligations, acts across state lines. Discovery may result in the identification of intentional criminal acts in violation of Federal laws involving additional parties, therefore this conspiracy may be in furtherance of the obstruction of justice, and intimidation of witnesses, victims, and whistleblowers.

**COUNT 6**
**ABUSE OF PROCESS**

110.  Each of the allegations contained in paragraphs 1-109 is incorporated herein by reference.

111.  Pamela Carvel disaffirms for fraud all acts by Defendants alleged to be on behalf of, or in the named of, Plaintiffs or any Carvel charity. Plaintiffs assert substantive misrepresentations of material facts were made by Defendants to divert assets, ownership, and control. Such misrepresentations to the Plaintiffs, the courts, and government agencies constitute abuse of process.

112.  Plaintiffs seek costs and all their compensatory damages against Defendants responsible for the wrongful abuse of process, and from Doe defendants unknown to Plaintiffs at this time.

**COUNTS 7 TO 22**
**CONSPIRACY TO INTERFERE WITH RIGHTS IN VIOLATION OF**
**18 *U.S.C.* §241, §242, §245, §1111, §1117;**
**28 *U.S.C.* §1343; 42 *U.S.C.* §1981, §1982, §1983, §1985,**
**§1986, §1988; *U.S. Constitutional Amendments* I, V, IX, XIV**

113.    Each of the allegations contained in paragraphs 1-112 is incorporated herein by reference.

114.    Defendants did unlawfully, wilfully, and knowingly conspire with each other to deny Plaintiffs their guaranteed rights under the laws of the United States.

115.    Defendants conspired to deprive, either directly or indirectly, Plaintiffs' rights under the United States Constitution, including Plaintiffs rights to life, liberty, and happiness free from fear, extortionary threats of financial ruin, and intimidation for assertion of guaranteed rights; rights to compensation for taking of their property; rights to due process; rights to equal protection of the laws; rights to pursue an occupation, business or profession free from deprivation or undue interference; and rights guaranteed by law.

116.    Defendants acted in furtherance of the conspiracy as more fully set out above. This conspiracy was motivated by greed to fraudulent transfer the property of Plaintiffs, to harm and cause the death of Agnes as an elder

person, to deprive Agnes' successors in interest of all benefit of income, and to deny legitimate claims any successful assertion by obstructing all financial resources required in the legal system to defend or assert claims. Such invidious discriminatory animus was behind the conspirators' action so as to judicially prevail in their wrongful intent, fraudulent acts, and material misrepresentations.

117.  As a direct result of Defendants' wrongful conduct, Plaintiffs suffered damages in the form of economic loss, including income losses, out-of-pocket losses, opportunity losses, and deprivation of Plaintiffs civil and Constitutional rights.

118.  Plaintiffs' also seek mental and physical damages, anguish, emotional distress, and wrongful death from stress causing felony murder of Agnes Carvel, and possibly also Thomas Carvel.

119.  Plaintiffs seek professional fees, litigation costs, and all litigation-related expenses.

120.  Plaintiffs seek all their compensatory damages against Defendants and Doe Defendants unknown to Plaintiffs at this time.

**COUNTS 23-28**
**VIOLATIONS OF 18 U.S.C. §1961, (RICO), §1341, §1343,**
**§1952,§2314, §2315**

121.   Each of the allegations contained in paragraphs 1-120 is incorporated herein by reference.

122.   Plaintiffs assert that Defendants engaged in a pattern that contains a sequence of events that all have the same and common purpose. Such purpose is one of egregiously deliberate, calculated and malicious, fraud and conspiracy, which is a "pattern of racketeering activity". Defendants did unlawfully, knowingly, and intentionally conduct and participate in the conduct and affairs of the enterprise.

123.   Defendants did unlawfully, willfully, and knowingly conspire with each other. The goal of the conspiracy was to deprive Plaintiffs of money and property, to commit tax fraud, and to obstruct, delay, and affect claims by Plaintiffs against Defendants and others, through financial deprivation and hardship. Each defendant participated in the systematic effort to defraud Plaintiffs in creditor claims, estate and charity administration, and to deny due process.

124.   Defendants were knowledgeable of the fact that their fraudulent transfer of Carvel assets was a tortuous act under Delaware, Florida and

New York state laws. Plaintiffs do not currently know the full extent of the pattern of racketeering activity, including mail and wire fraud, and possibly international money laundering.

125. Plaintiffs contend that Defendants' actions violate 18 *U.S.C.* §1341, §2314 §2315 as the U.S. mail was used as an instrument of the planning the fraud, conspiracy to commit fraud, and in the continuation of this fraud and transportation of stolen money, securities, and other assets across state lines.

126. Defendants unlawfully, willfully, knowingly, and for the purpose of executing or attempting to execute a scheme and artifice to defraud Plaintiffs, and for obtaining money and property, did place and cause to be placed items in post office authorized depositories for mail. Defendants did cause to be delivered by mail, according to the directions thereon, by the United States Postal Service, the documents containing a means to fraudulently transfer Plaintiffs assets to Defendants. In furtherance of their scheme to defraud, Defendants used the U.S. mails to advance the misrepresentations of material facts of the fraudulent acts to Plaintiffs and to others, including various courts.

127.   In violation of 18 *U.S.C.* 1343, telephone, internet, and fax were used in the fraud, conspiracy to commit fraud, and in the continuation of this fraud, and misrepresentation of material facts to Plaintiffs and others to thwart due process and Plaintiffs' property rights. One or more of the Defendants did unlawfully, willfully, and knowingly, and for the purpose of executing or attempting to execute a scheme and artifice to defraud Plaintiffs, and for obtaining money and property, transmit or cause to be transmitted by means of wire communications in interstate commerce, transfers of Plaintiffs assets.

128.   Defendants demonstrate bad faith intent to profit and to damage Plaintiffs by the misrepresentation of material facts. Defendants made their false representations for the purpose, and with the effect of attempting to deprive Plaintiffs of money and property by means of an artifice to defraud.

129.   Defendants' forced Plaintiffs to incur the substantial legal expenses to enforce inalienable rights guaranteed by the Constitution. Defendants abused legal proceedings commenced in bad faith, making substantive misrepresentations as part and parcel of the Defendants' unlawful and fraudulent scheme to damage and obtain money and property from Plaintiffs by means of a pattern of racketeering activity including

repeated acts of deliberate, premeditated fraud and harassment. Defendants' scheme and pattern of racketeering activity are open-ended and have persisted for more than one year.

130.   As a direct, proximate, and specifically intended consequence of Defendants' fraudulent scheme set forth above, Plaintiffs are injured personally, individually, in business and in property. Defendants' fraud prevented Plaintiffs' business activities and financial opportunities. Defendants' fraudulent actions were intended to force, and have forced, Plaintiffs to incur substantial litigation and other expenses investigating and exposing Defendants' scheme.

131.   Plaintiffs allege further that as a proximate cause Defendants' Pattern of Racketeering activities contributed to Plaintiffs' permanent and irreparable emotional, spiritual and financial harm and damage, all of which was intended to leave Plaintiffs destitute, unable to defend Plaintiffs' rights, unable to investigate crimes against Plaintiffs, unable to carry out the Carvels' legitimate benevolent intentions, and unable to carry on normal personal or business activities without fear of predatory harassment, with the intent to fraudulently transfer all Carvel assets to Defendants.

132.   Plaintiffs also claim such compensatory damages, plus interest, as may be verified and claimed by the persons and entities upon whose behalf Plaintiffs also complain in accordance with *Federal Rules of Civil Procedure*("FRCP") Rule 71, such as any and all interest accrued by debt to the Internal Revenue Service of the U. S., during the period of continuing pattern of racketeering activity, by virtue of Defendants' abuse of tax-exempt status, obstruction of Plaintiffs' ability to receive taxable income, and by intentional tax fraud to evade taxes payable as a result of fraudulent estate tax exemption elections.

133.   Defendants, and any additional persons (including attorneys or law firms) whose financial or other support of, or participation in the conspiracy may hereafter be discovered, are liable to Plaintiffs, jointly and severally, for violating 18 *U.S.C.* §1962, 18 U.S.C. §1341, and 18 *U.S.C.* §1343.

134.   Defendants each knowingly committed or conspired to commit, or agreed with the commission of, at least one act described above in violation of RICO, or aided and abetted the commission of one or more such acts and thereby agreed with the objectives of the other Defendants.

135. Plaintiffs are hereby entitled to recover from Defendants individually, jointly and severally, for threefold the damages sustained, together with the costs of this suit, including a reasonable compensation for professional fees and expert fees rendered by a *pro se* litigant.

## DEMAND FOR JUDGMENT AND TRIAL BY JURY

136. On the basis of all the foregoing, Plaintiffs demand judgment for the stated relief in trial by jury.

## PLAINTIFFS' AVERMENT REGARDING RULE 11, FRCP

137. Further extant evidence and argumentation, elucidating the pattern of racketeering activity, and information which will be acquired in the process of discovery, will establish the necessary preponderance of evidence as is required by the Court in accordance with the *Federal Rules of Civil Procedure*.

138. In particular, with regard to Rule 11 of *FRCP*, Plaintiffs aver that all statements and allegations are true upon information, belief, and reasonable investigation, and further that this action is not brought with any purpose to harass or defame Defendants, and further that it is not of any nature that could be called frivolous.

139.  Plaintiffs have, in good faith, attempted to balance the necessary requirements of specificity and particularity, under Rule 9(f) of *FRCP* to establish sufficiency of this pleading, with the requirements of concision and directness under Rule 8(e) of *FRCP*, all in accordance with Rule 11 of *FRCP*.

## CONCLUSION

140.    Only discovery can determine the extent of the conspiracy that exists here. Issues of violations of Constitutional rights to further fraudulent schemes and violations of U.S. laws are at the heart of this complaint. Only Delaware is far enough removed from the political quagmire in New York to provide a fair platform for discovery. Delaware holds the most significant asset claims of the Estate if a conspiracy denied Agnes Carvel the proceeds of the sale of jointly owned Carvel Corp. stock. The overwhelming extent of the game played between Griffin, Abplanalp, Molella, Davis and Surrogate Scarpino is merely touched on in these pages. The same crimes that plagued the Carvels are eating away at beneficiaries in other estates every day. Some means to enforce Constitutional rights in Surrogate's Courts must be found.

WHEREFORE, Plaintiffs by Pamela Carvel, appearing *pro se*, on behalf of herself and others, as Citizen, executrix and personal

representative for the period in question, Delaware ancillary administrator for the Agnes Carvel Estate in London, England, and sole Member of the Thomas and Agnes Carvel Foundation, seeks orders by the District Court:

i)    for discovery to identify, quantify, assess and assert damages inflicted by Defendants on Plaintiffs [the Estate, its Delaware ancillary administrator, and legitimate charities];

ii)    to disaffirm all individual, representative, professional acts taken by Defendants to divert and fraudulently convert Carvel property and impersonate Carvel entities;

iii)    to recover misappropriated property estimated to be around $300 million, and triple damages thereon;

iv)    to deny and revoke tax-exempt status under which Defendants' operate to fraudulently convert assets and commit tax fraud;

v)    to compel Defendants to pay penalties and interest for all actions in abuse of Carvel charities' tax-exempt status; and to disgorge Defendants of their ill-gotten gains.

Signed this 31st day of August 2007    *Pamela Carvel*

Pamela Carvel, appearing *pro se*
28 Old Brompton Road, Suite 158
London SW7 3SS England
US tel/fax 1 954 524 1909