## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### Case No. 07–CV- 00273-*＊*

_____

|  |  |
|---|---|
| ) | |
| Pamela Carvel, as Citizen, ) | **AMENDED** |
| as Delaware Ancillary Administrator ) | **COMPLAINT** |
|    for Agnes Carvel Estate, ) | |
| as Member for Thomas and Agnes Carvel Foundation ) | |
|    Plaintiffs ) | |
| v. ) | **DEMAND FOR** |
| William Griffin ) | **JURY TRIAL** |
| Marie Abplanalp ) | |
| Salvatore Molella ) | |
| Robert Davis ) | |
|    and ) | |
| John/Jane Doe 1-20 ) | |
| Doe Corp. 1-20 ) | |
|    Defendants ) | |

_____)

## COMPLAINT FOR CONTINUING CONSPIRACY TO VIOLATE
## CONSTITUTIONAL RIGHTS & COMMIT FRAUDS
## AND
## DEMAND FOR JURY TRIAL

# APPENDIX
(unchanged)

Pamela Carvel, appearing *pro se*
PLAINTIFF
28 Old Brompton Road, Suite 158
London SW7 3SS England

US tel/fax  1 954 524 1909

## ITEM 1 — BUSINESS
**General**

Hudson Valley Holding Corp. (the "Company") is a New York corporation founded in 1982. The Company is registered as a bank holding company under the Bank Holding Company Act of 1956.

The Company provides financial services through its wholly-owned subsidiary, Hudson Valley Bank (the "Bank"), a New York chartered commercial bank established in 1972. The Bank is an independent bank headquartered in Westchester County, New York. The Bank has 15 branch offices in Westchester County, New York, 2 in Bronx County, New York and 2 in Manhattan, New York. In addition, the Bank has a loan production office located in Queens County, New York. The Bank opened its second Manhattan branch location at 233 Broadway, New York, New York on April 26, 2004. In March 2005, the Bank applied for regulatory approval to open a branch location at 320 Park Avenue, New York, New York. Once opened this will be the Bank's third branch location in Manhattan. Effective January 1, 2005, the Bank closed its loan production office located at 300 Westage Business Center Drive, Fishkill , New York (Dutchess County) due to staff turnover and inadequate loan production. In February 2005, the Bank applied for regulatory approval to convert its loan production office in Queens to a full service branch location.

Effective October 1, 2004, the Bank acquired A.R. Schmeidler & Co., Inc., a money management firm with more than $500 million in assets under management, located at 555 Fifth Avenue in Manhattan, New York. The acquisition, which was made for cash, was accounted for as a purchase. The acquired company is not a significant subsidiary for accounting purposes. This acquisition is part of the Bank's long-term strategic decision to diversify its revenue stream beyond the core business of taking deposits and making loans in its local communities by developing or acquiring closely related businesses or branches in the surrounding areas. The acquisition will enable the Bank to expand its investment management capabilities and provide a valuable service to its customers.

On December 23, 2004, the Company entered into an Agreement and Plan of Consolidation (the "Agreement") with New York National Bank, a national banking association ("NYNB"), whereby the Company would acquire NYNB as a wholly-owned bank subsidiary. This agreement is subject to numerous conditions, including all required regulatory approvals for which the Company and NYNB have made application as well as approval of NYNB shareholders. Management believes the acquisition of NYNB will further expand its presence in the Bronx and Manhattan where NYNB currently operates 5 branch locations. The Company anticipates that the acquisition will close by June 30, 2005 subject to the receipt of regulatory approvals and the satisfaction of other conditions contained in the Agreement.

The Company and the Bank derive substantially all of their revenue and income from providing banking and related services to small and medium-sized businesses, professionals, municipalities, not-for-profit organizations and individuals within its market area. See "Our Market Area."

Our principal executive offices are located at 21 Scarsdale Road, Yonkers, New York 10707.

The Bank's principal customers are small and medium-sized businesses, professionals, municipalities, not-for-profit organizations and individuals. The Bank's strategy is to operate as a community-oriented banking institution dedicated to providing personalized service to customers and focusing on products and services for selected segments of the market. The Bank believes that its ability to attract and retain customers is due primarily to its focused approach to its markets, its personalized and professional services, its product offerings, its experienced staff, its knowledge of its local markets and its ability to provide responsive solutions to customer needs. The Bank provides these products and services to a diverse range of customers and does not rely on a single large depositor for a significant percentage of deposits. The Bank anticipates that it will continue to expand in its current market and surrounding area by acquiring other banks and related businesses, adding staff and continuing to open new branch offices and loan production offices.

**A-1**

## HUDSON VALLEY HOLDING CORP

**Form:DEF 14A  Filing Date:4/21/2004 Jump to :  Format :    File Back**

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the "beneficial ownership" (as that term is defined in the rules of the Securities and Exchange Commission) of the common stock as of March 1, 2004, by (a) each Named Executive Officer and member of the Board of Directors, (b) each person known to be a beneficial owner of more than five percent of the common stock and (c) all executive officers and members of the Board of Directors as a group. Persons who hold options that are exercisable within 60 days of March 1, 2004 are deemed to own, beneficially, the shares of common stock that may be acquired on the exercise of such options. Such shares are deemed outstanding for purposes of computing the number of shares owned by the person holding the option, but not for any other purpose.

| Number of Shares Name Stock | Percent of Outstanding of Common Stock | Shares of Common |
|---|---|---|
| BMW Machinery Co., Inc.1 | 392,225 (1) | 5.9 % |
| John P. Abplanalp2 | 1,249,383 (2) | 18.9 |
| Josephine Abplanalp3 | 638,792 (3) | 9.7 |
| Marie A. Holcombe4 | 1,277,145 (4) | 19.3 |
| James J. Landy | 108,577 (5) | 1.6 |
| Stephen R. Brown | 70,336 (6) | 1.1 |
| Vincent T. Palaia | 80,688 (7) | 1.2 |
| Michael P. Maloney | 21,540 (8) | * |
| Frank J. Skuthan | 5,867 (9) | * |
| William E. Griffin10 | 859,413 (10) | 13.0 |
| James M. Coogan | 231,122 (11) | 3.5 |
| Gregory F. Holcombe12 | 1,277,145 (12) | 19.3 |
| Angelo R. Martinelli | 135,105 (13) | 2.0 |
| William J. Mulrow | 3,570 (14) | * |
| John A. Pratt Jr. | 112,802 (15) | 1.7 |

**A-2**

| Cecile D. Singer | 53,419 (16) | * |
| Craig S. Thompson | 218,778 (17) | 3.3 |
| All directors and executive officers as a group (15 persons) | 2,092,626 (18) | 30.6 % |

\*    Less than 1% of the outstanding shares of common stock.

1    The address for BMW Machinery Co., Inc. is P.O. Box 309, Yonkers, New York 10702.

2    The address for John P. Abplanalp is 700 Nepperhan Avenue, Yonkers, New York 10702. The shares beneficially owned by John P. Abplanalp, his sister Marie

A. Holcombe and his sister's husband, Gregory F. Holcombe, include 392,225 shares owned by BMW Machinery Co., Inc. (of which Mr. Abplanalp and Mrs. Holcombe are principal shareholders); 86,183 shares held by the R.H. Abplanalp Grantor Retained Annuity Trust of which John P. Abplanalp, Marie

A. Holcombe and William E. Griffin are co-trustees, 622,076 shares held by the Estate of Robert H. Abplanalp, of which Josephine Abplanalp, John P. Abplanalp, Marie A. Holcombe and William E. Griffin are co-executors and 107,147 shares held in trusts for the benefit of the children of John P. Abplanalp (for which Marie A. Holcombe serves as trustee) or the children of Gregory F. and Marie A. Holcombe (for which John P. Abplanalp serves as trustee). The table also includes 2,005 shares held in trusts for the children of John P. Abplanalp.

3    The address for Josephine Abplanalp is 700 Nepperhan Avenue, Yonkers, New York 10702. Includes 622,076 shares held by the Estate of Robert H. Abplanalp, of which Josephine Abplanalp, John P. Abplanalp, Marie A. Holcombe and William E. Griffin are co-executors.

**A-3**

4    The address for Marie A. Holcombe is 700 Nepperhan Avenue, Yonkers, New York
10702. Mrs. Holcombe is the wife of Gregory F. Holcombe and the sister of John P. Abplanalp. Mr. and Mrs. Holcombe share beneficial ownership of certain shares with John P. Abplanalp, as described in footnote 2 above. The table also includes 3,397 shares held in trusts for the benefit of the children of
-16-

**Table of Contents**
Mr. and Mrs. Holcombe and 13,684 shares which may be acquired by Mr. Holcombe, upon the exercise of options.

5    Includes 1,820 shares held by his sons to which Mr. Landy disclaims beneficial ownership and 39,763 shares which may be acquired upon the exercise of options.

6    Includes 47,304 shares which may be acquired upon the exercise of options.

7    Includes 30,438 shares which may be acquired upon the exercise of options.

8    Includes 7,507 shares which may be acquired upon the exercise of options.

9    Includes 5,867 shares which may be acquired upon the exercise of options.

10    The address for William E. Griffin is Griffin, Coogan & Veneruso, P.C., 51
Pondfield Road, Bronxville, New York 10708. Includes 86,183 shares held by the R.H. Abplanalp Grantor Retained Annuity Trust of which John P. Abplanalp, Marie A. Holcombe and William E. Griffin are co-trustees, and 622,076 shares held by the Estate of Robert H. Abplanalp, of which

**A-4**

Josephine Abplanalp, John P. Abplanalp, Marie A. Holcombe and William E. Griffin are co-executors.

11    Includes 100,715 shares held by the William E. Griffin Irrevocable Trusts of
which Mr. Coogan is trustee and 550 shares which may be acquired upon the exercise of options.

12    The address for Gregory F. Holcombe is 700 Nepperhan Avenue, Yonkers, New York 10702. For information concerning Mr. Holcombe's beneficial ownership, see footnote 4 above.

13    Includes 550 shares which may be acquired upon the exercise of options.

14    Includes 2,200 shares which may be acquired upon the exercise of options

15    Includes 41,085 shares which may be acquired upon the exercise of options.

16    Includes 990 shares which may be acquired upon the exercise of options.

17    Includes 6,600 shares which may be acquired upon the exercise of options.

18    Includes 209,456 shares which may be acquired upon the exercise of options.

**A-5**



*462970475DED1*

| Control Number | Instrument Type |
|---|---|
| **462970475** | **DED** |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
**\*\*\* DO NOT REMOVE \*\*\***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**
TYPE OF INSTRUMENT: <u>DED - DEED</u>
FEE PAGES: 6          TOTAL PAGES: 6

### RECORDING FEES

| STATUTORY CHARGE | $6.00 |
|---|---|
| RECORDING CHARGE | $18.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $75.00 |
| TP-584 | $5.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| **TOTAL FEES PAID** | **$123.00** |

### MORTGAGE TAXES

| MORTGAGE DATE | |
|---|---|
| MORTGAGE AMOUNT | $0.00 |
| EXEMPT | |
| COUNTY TAX | $0.00 |
| YONKERS TAX | $0.00 |
| BASIC | $0.00 |
| ADDITIONAL | $0.00 |
| MTA | $0.00 |
| SPECIAL | $0.00 |
| **TOTAL PAID** | **$0.00** |

### TRANSFER TAXES

| CONSIDERATION | $700,000.00 |
|---|---|
| TAX PAID | $2,800.00 |
| TRANSFER TAX # | 6197 |

RECORDING DATE: 12/6/2006
TIME: 10:17:00

SERIAL NUMBER:
DWELLING:

THE PROPERTY IS SITUATED  IN
WESTCHESTER COUNTY, NEW YORK IN THE:
TOWN OF GREENBURGH

**WITNESS MY HAND AND OFFICIAL SEAL**

TIMOTHY C. IDONI
WESTCHESTER COUNTY CLERK

Record & Return to:
**ALAN ROTHSCHILD ESQ**
**ROTHSCHILD & PEARL LLP**
**245 MAIN ST 3RD FL**
**WHITE PLAINS, NY 10601**

**A-6**

BIA6144S

SP
green

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT-THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

THIS INDENTURE, made the  6th  day of      October          2006

BETWEEN

THE THOMAS AND AGNES CARVEL FOUNDATION, a New York not-for-profit corporation, having an address at 35 East Grassy Sprain Road, Yonkers, New York 10710

party of the first part, and

CHAUNCEY PARTENERS LLC, a New York Limited Liability Company having an address at 245 Main Street, Suite 120, White Plains, New York 10601

party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby remise, release and quitclaim unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the

Identified as [                    ] Section 33, Sheet 48, Lot P75 in the Town of Greenburgh, County of Westchester, State of New York, as more particularly described in Schedule A and A-1, attached hereto and made a part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

                                    THE THOMAS AND AGNES CARVEL FOUNDATION
                                    a New York Not-for-Profit Corporation

IN PRESENCE OF:

                                    By: _____
                                        William E. Griffin
                                        President

Standard N.Y.B.T.U. Form 8004 – Quitclaim Deed – Uniform Acknowledgment (single sheet)
Form 2216

**A-7**

TO BE USED ONLY WHEN THE ACKNOWLEDGMENT IS MADE IN NEW YORK STATE

| | ss.: | | ss.: |
|---|---|---|---|
| State of New York, County of Westchester | | State of New York, County of | |

On the 6th day of October in the year 2006 before me, the undersigned, personally appeared William E. Griffin personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

On the        day of        in the year        before me, the undersigned, personally appeared        personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

**JAMES P. BLOSE**
Notary Public, State Of New York
No. 02BL5034117
Qualified in Westchester County
Commission Expires September 30, 20 10

_____
(signature and office of individual taking acknowledgment)

TO BE USED ONLY WHEN THE ACKNOWLEDGMENT IS MADE OUTSIDE NEW YORK STATE

| | ss.: |
|---|---|
| State (or District of Columbia, Territory, or Foreign Country) of | |

On the        day of        in the year        before me, the undersigned, personally appeared        personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the

_____ in _____
(insert the City or other political subdivision)        (and insert the State or Country or other place the acknowledgment was taken)

_____
(signature and office of individual taking acknowledgment)

DISTRICT

SECTION  33

~~BLOCK~~    Sheet 48

LOTS    [    ] P75

**QUITCLAIM DEED**

Benchmark Title Agency, LLC

Title No.  BTA 61445

THE THOMAS AND AGNES CARVEL FOUNDATION

TO

CHAUNCEY PARTNERS LLC

COUNTY OR TOWN  Town of Greenburgh
County of Westchester
STREET ADDRESS  Eastway Road
a/k/a Winding Farm Road

Recorded at Request of
THE JUDICIAL TITLE INSURANCE AGENCY LLC

RETURN BY MAIL TO:

STANDARD FORM OF NEW YORK BOARD OF TITLE UNDERWRITERS
Distributed by
THE JUDICIAL TITLE INSURANCE AGENCY LLC
560 MAMARONECK AVENUE
HARRISON, NY 10528
914-381-6700 • 800-281-TITLE

Alan Rothschild, Esq.
Roghschild & Pearl, LLP
245 Main Street, 3rd Floor
White Plains, New York 10601

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE

A-8



*462970479DED1*

Control Number
**462970479**

Instrument Type
**DED**



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
*** DO NOT REMOVE ***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**
TYPE OF INSTRUMENT: <u>DED - DEED</u>
FEE PAGES:  6        TOTAL PAGES:  6

| RECORDING FEES | |
|---|---|
| STATUTORY CHARGE | $6.00 |
| RECORDING CHARGE | $18.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $165.00 |
| TP-584 | $5.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| **TOTAL FEES PAID** | **$213.00** |

| MORTGAGE TAXES | |
|---|---|
| MORTGAGE DATE | |
| MORTGAGE AMOUNT | $0.00 |
| EXEMPT | |
| COUNTY TAX | $0.00 |
| YONKERS TAX | $0.00 |
| BASIC | $0.00 |
| ADDITIONAL | $0.00 |
| MTA | $0.00 |
| SPECIAL | $0.00 |
| **TOTAL PAID** | **$0.00** |

| TRANSFER TAXES | |
|---|---|
| CONSIDERATION | $1,300,000.00 |
| TAX PAID | $5,200.00 |
| TRANSFER TAX # | 6198 |

**RECORDING DATE: 12/6/2006**
**TIME: 10:17:00**

**SERIAL NUMBER:**
**DWELLING:**

THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:
TOWN OF GREENBURGH

WITNESS MY HAND AND OFFICIAL SEAL

*[signature]*

TIMOTHY C. IDONI
WESTCHESTER COUNTY CLERK

Record & Return to:
**ALAN ROTHSCHILD ESQ**
**ROTHSCHILD & PEARL LLP**
**245 MAIN ST 3RD FL**
**WHITE PLAINS, NY 10601**

A-9

BTA
61445    SP
green

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT-THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

THIS INDENTURE, made the   6th   day of        October              2006

BETWEEN

THE THOMAS AND AGNES CARVEL FOUNDATION, a New York not-for-profit corporation, having an address at 35 East Grassy Sprain Road, Yonkers, New York 10710

party of the first part, and

CHAUNCEY PARTNERS LLC, a New York Limited Liability Company having an address at 245 Main Street, Suite 120, White Plains, New York 10801

party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby remise, release and quitclaim unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the

identified as Section 33, Sheet 48, Lot P58 [                    ] in the Town of Greenburgh, County of Westchester, State of New York, as more particularly described in Schedule A and A-1, attached hereto and made a part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

THE THOMAS AND AGNES CARVEL FOUNDATION
a New York Not-for-Profit Corporation

IN PRESENCE OF:

By: _____
        William E. Griffin
        President

_____        _____

Standard N.Y.B.T.U. Form 8004 – Quitclaim Deed – Uniform Acknowledgment (single sheet)
Form 2218

**A-10**

TO BE USED ONLY WHEN THE ACKNOWLEDGMENT IS MADE IN NEW YORK STATE

State of New York, County of Westchester    ss:

On the 6 th day of October in the year 2006 before me, the undersigned, personally appeared William E. Griffin personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

JAMES P. BLOSE
Notary Public, State Of New York
No. 02BL5034117
Qualified in Westchester County
Commission Expires September 30, 20 10

State of New York, County of    ss:

On the    day of    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

TO BE USED ONLY WHEN THE ACKNOWLEDGMENT IS MADE OUTSIDE NEW YORK STATE    ss:

State (or District of Columbia, Territory, or Foreign Country) of

On the    day of    in the year    before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the

_____ in _____
(insert the City or other political subdivision)    (and insert the State or Country or other place the acknowledgment was taken)

_____
(signature and office of individual taking acknowledgment)

DISTRICT

SECTION  33

~~BLOCK~~  Sheet 48

LOTS  P58

COUNTY OR TOWN  Town of Greenburgh
County of Westchester
STREET ADDRESS  Eastway Road
a/k/a Winding Farm Road

Recorded at Request of
THE JUDICIAL TITLE INSURANCE AGENCY LLC

QUITCLAIM DEED

Benchmark Title Agency, LLC

Title No.  BTA 61445

THE THOMAS AND AGNES CARVEL FOUNDATION

TO

CHAUNCEY PARTNERS LLC

STANDARD FORM OF NEW YORK BOARD OF TITLE UNDERWRITERS
Distributed by
THE JUDICIAL TITLE INSURANCE AGENCY LLC
560 MAMARONECK AVENUE
HARRISON, NY 10528
914-381-6700 • 800-281-TITLE

RETURN BY MAIL TO:

Alan Rothschild, Esq.
Rothschild & Pearl, LLP
245 Main Street, 3rd Floor
White Plains, New York 10601



*462970487ALR1*

Control Number
**462970487**

Instrument Type
**ALR**



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE
(THIS PAGE FORMS PART OF THE INSTRUMENT)
*** DO NOT REMOVE *****

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**
TYPE OF INSTRUMENT: <u>ALR - ASSIGNMENT OF LEASE & RENTS</u>
FEE PAGES:  10        TOTAL PAGES:  10

RECORDING FEES

| | |
|---|---|
| STATUTORY CHARGE | $6.00 |
| RECORDING CHARGE | $30.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.50 |
| MISCELLANEOUS | $5.00 |
| TOTAL FEES PAID | $60.50 |

MORTGAGE TAXES

| | |
|---|---|
| MORTGAGE DATE | |
| MORTGAGE AMOUNT | $0.00 |
| EXEMPT | |
| COUNTY TAX | $0.00 |
| YONKERS TAX | $0.00 |
| BASIC | $0.00 |
| ADDITIONAL | $0.00 |
| MTA | $0.00 |
| SPECIAL | $0.00 |
| TOTAL PAID | $0.00 |

TRANSFER TAXES

| | |
|---|---|
| CONSIDERATION | $0.00 |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

**RECORDING DATE: 12/6/2006
TIME: 10:17:00**

**SERIAL NUMBER:  CX41216
DWELLING:**

THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:
TOWN OF GREENBURGH

WITNESS MY HAND AND OFFICIAL SEAL

TIMOTHY C. IDONI
WESTCHESTER COUNTY CLERK

Record & Return to:
**HUDSON VALLEY BANK
21 SCARSDALE RD**

**YONKERS, NY 10707**

**A-12**

*BTA 6144*  
*ap. green off.*

# CHAUNCEY PARTNERS LLC, ASSIGNOR

to

# HUDSON VALLEY BANK, ASSIGNEE

## ASSIGNMENT OF LESSOR'S INTEREST IN LEASES

Dated:  October 6, 2006

Premises:  Eastway Road a/k/a Winding Farm Road, Greenburgh, New York

| Tax Designation: | | |
|---|---|---|
| | Section: | 33 |
| | Blocks: | 45 and 48 |
| | Lots: | P58 and P75 |
| | Town: | Greenburgh |
| | County: | Westchester |

## RECORD & RETURN TO:

HUDSON VALLEY BANK  
21 Scarsdale Road  
Yonkers, New York 10707  
Attn: Loan Operations

A-13

# ASSIGNMENT OF LESSOR'S INTEREST IN LEASES

**THIS ASSIGNMENT** made this 6th day of October, 2006 by **Chauncey Partners LLC**, a New York limited liability company, organized and existing under the laws of the State of New York, having an office at 245 Main Street, Suite 120, White Plains, New York 10601 ("Assignor"), to **Hudson Valley Bank**, a state chartered bank, duly organized and existing under the laws of the State of New York having an office at 21 Scarsdale Road, Yonkers, New York 10707 ("Assignee").

## WITNESSETH:

THAT the Assignor, for good and valuable consideration, receipt whereof is hereby acknowledged, hereby absolutely and unconditionally grants, transfers and assigns to the Assignee the entire landlord's interest in and to all existing leases covering or affecting all or any part of that certain lot or piece or parcel of land and building(s), more particularly described in Schedule A annexed hereto and made a part hereof (the said premises together with the buildings and improvements now or hereafter erected thereon being hereinafter collectively referred to as the "Premises").

TOGETHER WITH all leases, tenancies and occupancy agreements hereafter made (including modifications and extensions of existing leases, tenancies and occupancy agreements) covering the Premises or any portion thereof; the assignment of present and future leases, tenancies and occupancy agreements being effective without any further or supplemental assignment of any nature whatsoever (all present and future leases, tenancies and occupancy agreements are hereinafter collectively referred to as the "Lease").

TOGETHER WITH all rents, income and profits arising from the Lease and renewals thereof and together with all rents, income and profits for the use and occupation of the Premises.

It is the intention of Assignor and Assignee that this Assignment be treated and construed as a present and absolute assignment and not as an assignment for additional security only. Nonetheless, this Assignment shall secure: 

ONE: Payment of all sums now or at any time hereafter due to the Assignee and secured by a certain mortgage made by the Assignor to the Assignee of even date herewith in the amount of $1,300,000.00 (the "Mortgage"), and recorded or to be recorded prior to the recording of this Assignment, or any other mortgage hereafter covering the whole or any part of the Premises; and

TWO: Performance and discharge of each and every obligation, covenant and agreement of Assignor contained herein or in any such mortgage or any note or bond secured thereby.

A.    TO PROTECT THE SECURITY OF THIS ASSIGNMENT ASSIGNOR AGREES, WITH RESPECT TO EACH LEASE:

1.    To faithfully abide by and substantially perform and discharge each and every material obligation, covenant and agreement of the Lease by Lessor to be performed, to give prompt notice to the Assignee of any notice of default on the part of Assignor with respect to the Lease received from Lessee or guarantor, together with an accurate and complete copy of any such notice; at the sole cost and expense of Assignor, to enforce, short of termination of the Lease, or secure the performance of each and



2

A-14

every material obligation, covenant, condition and agreement of the Lease by the Lessee to be performed; not to modify or in any way alter the terms of the Lease; not to terminate the term of the Lease and not to accept a surrender thereof unless required to do so by the terms of the Lease; not to anticipate the rents thereunder, or to waive, excuse, condone or in any manner release or discharge the Lessee thereunder of or from the material obligations, covenants, conditions and agreements by the Lessee to be performed, including the obligation to pay the rental called for thereunder in the manner and at the place and time specified therein, and Assignor does by these presents expressly release, relinquish and surrender unto the Assignee all Assignor's right, power and authority to so reduce the annual rent payable under the Lease, or to terminate the term or accept a surrender thereof, and any attempt on the part of Assignor to exercise any such right without the written authority and consent of the Assignee thereto being first had and obtained which consent shall not be unreasonably withheld or delayed shall constitute a breach of the terms hereof entitling the Assignee to declare all sums secured hereby immediately due and payable.

2.  At Assignor's sole cost and expense to appear in and defend any action or proceeding arising under, growing out of or in any manner connected with the Lease or the obligations, duties or liabilities of Lessor, Lessee or guarantor thereunder, and to pay all costs and expenses of the Assignee, including attorney's fees in a reasonable sum, in any such action or proceeding in which the Assignee may appear.

3.  That should Assignor fail to make any payment or to do any act as herein provided, then the Assignee, but without obligation to do so and without notice to or demand on Assignor, and without releasing Assignor from any obligation hereof, may make or do the same in such manner and to such extent as the Assignee may deem necessary to protect the security hereof, including specifically, without limiting its general powers, the right to appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of the Assignee, and also the right to perform and discharge each and every obligation, covenant and agreement of Lessor in the Lease; and in exercising any such powers to pay necessary costs and expenses, employ counsel and incur and pay reasonable attorney's fees.

4.  To pay immediately upon demand all sums expended by the Assignee under the authority hereof, together with interest thereon at the rate set forth in the note secured by the Mortgage plus five (5%) percent per annum, and the same shall be added to the said indebtedness and shall be secured hereby and by the said Mortgage.

5.  That Assignor will not transfer or convey to the Lessee the fee title to the demised premises unless the Lessee assumes in writing and agrees to pay the debt secured hereby in accordance with the terms, covenants and conditions of the said note or bond secured by said Mortgage.

6.  Assignor hereby covenants and warrants to the Assignee that (a) Assignor has not executed any prior Assignment of the Lease or of its right, title and interest therein or in the rentals to accrue thereunder; (b) Assignor has not performed any act or executed any instrument which might prevent the Assignee from operating under any of the terms and conditions hereof, or which would limit the Assignee in such operation; (c) Assignor has not accepted rent under the Lease for any period subsequent to the current period for which rent has already become due and payable; (d) there is no default now existing under the Lease; and (e) Assignor has not executed or granted any modification or amendment of the Lease either orally or in writing, and that the Lease is in full force and effect.

3

7.    Assignor hereby covenants and agrees with Assignee that in the event Assignor and any tenant under any Lease shall enter into an early termination agreement wherein Assignor, as landlord, receives a termination payment or should Assignor, as landlord thereunder, receive a lump sum payment by reason of a settlement or judgment against such tenant, Assignor hereby assigns such termination payment or lump sum payment to Assignee as additional collateral security for all sums owing to Assignee under the Mortgage and Assignor further covenants and agrees to pay such sum to Assignee within ten (10) days following Assignor's receipt thereof. The failure by Assignor to make such payment shall constitute a default under the Mortgage.

B.    IT IS MUTUALLY AGREED WITH RESPECT TO EACH LEASE THAT:

1.    So long as there shall exist no default by Assignor in the payment of any indebtedness secured hereby or in the performance or any obligation, covenant or agreement herein or in said Mortgage or Lease, Assignor shall have a license to collect upon but not prior to accrual, all rents, issues and profits from said leased premises and to retain, use and enjoy the same.

2.    Upon or at any time after default in the payment of any indebtedness secured hereby or in the performance of any obligation, covenant or agreement herein or in said Mortgage or Lease, Assignee may immediately take possession of all rents, issues and profits from said leased premises, whether past due, then due or to become due, by delivering a notice of default to Assignor, without the necessity of Assignee entering upon and taking possession of the leased premises in person, by agent or by a court-appointed receiver, instituting legal proceedings of any kind or taking other affirmative action of any kind, and Assignor shall thereafter hold all such rents, issues and profits from said legal premises as trustee for the exclusive benefit of Assignee. After the delivery of a notice of default, each tenant of the leased premises is hereby directed by Assignor to pay all rent to Assignee or Assignee's representatives upon receipt by such tenant of Assignee's written demand therefor, delivered to such tenant personally, by mail or by delivering such demand to the leased premises of such tenant, without any liability on the part of such tenant to inquire any further as to the actual existence of such event of default, and Assignor shall execute and deliver to the tenants of the leased premises any notices reasonably required to accomplish this result. Assignor shall forward to Assignee all rents, issues and profits from said leased premises received by Assignor after the delivery of a notice of default. All such rents, issues and profits from said leased premises shall be applied by Assignee first to the costs, if any, of taking control of and managing the leased premises and collecting the rents, issues and profits from said leased premises, including, without limitation, attorney's fees, receiver's fees, premiums on receiver's bonds, costs of repairs to the leased premises, premiums on insurance policies, taxes, assessments and other necessary charges on the leased premises, and the cost of discharging any obligations or the reduction and payment of the indebtedness secured by the Mortgage. Nothing contained herein shall be construed as constituting Assignee, as a "mortgagee in possession" in the absence of the actual possession of the leased premises by Assignee. As between Assignee and Assignor and any person claiming through or under Assignor, this assignment is intended to be absolute, unconditional and presently effective, and the provisions of this section regarding written demand for the rents, issues and profits from said leased premises by Assignee to the tenants are intended solely for the benefit of such tenants and shall never inure to the benefit of Assignor or any person claiming through or under the Assignor, other than a tenant who has not received such written demand.

3.    The whole of the indebtedness shall become due at the option of the Assignee after any attempt by the Assignor to terminate any lease, accept surrender thereof or to waive or release any Lessee from the observance, performance of any material obligation or to anticipate rents thereunder more than thirty (30) days prior to accrual.

4

A-16

4.    The Assignee shall not be obligated to perform or discharge, nor does it hereby undertake to perform and discharge, any obligation, duty or liability under the Lease, or under or by reason of this Assignment, and Assignor shall and does hereby agree to indemnify the Assignee against and hold it harmless from any and all liability, loss or damage which it may or might incur under the Lease or under or by reason of this Assignment and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligation or undertaking on its part to perform or discharge any of the terms, covenants or agreements contained in the Lease excluding from the foregoing indemnity, however, such loss or damage as may result from the willful misconduct or gross negligence of the Assignee; should the Assignee incur any such liability, loss or damage under the Lease or under or by reason of this Assignment, or in the defense against any such claims or demands, the amount thereof, including costs, expenses and reasonable attorney's fees, together with interest thereon at a rate equal to the rate otherwise due and payable under the note secured by the Mortgage plus five (5%) percent per annum, shall be secured hereby and by the said Mortgage, and Assignor shall reimburse the Assignee therefor immediately upon demand, and upon the failure of Assignor to do so, the Assignee may declare all sums secured hereby immediately due and payable.

C.    IT IS FURTHER MUTUALLY AGREED THAT:

1.    Upon the payment in full of all indebtedness secured hereby, as evidenced by the recording or filing of an instrument of satisfaction or full release of said Mortgage, unless there shall have been recorded another mortgage in favor of the Assignee covering the whole or any part of the leased premises, this Assignment shall become and be void and of no effect.

2.    This Assignment inures to the benefit of the named Assignee and its successors and assigns, and binds the Assignor and Assignor's heirs, legatees, devisees, administrators, executors, successors and assigns. The term "Lease" as used herein means not only the Lease hereby assigned or any extension or renewal thereof, but also any lease subsequently executed by Assignor covering the demised premises or any part thereof. In this Assignment, whenever the context so requires, the neuter gender includes the masculine or feminine, and the singular number includes the plural, and conversely. All obligations of each Assignor hereunder are joint and several.

3.    All notices, demands or documents which are required or permitted to be given or served hereunder shall be in writing and sent by registered mail addressed as follows:

TO ASSIGNOR at the address appearing above unless a different address is furnished below.

TO THE ASSIGNEE, Attention:  Loan Operations, Hudson Valley Bank, 21 Scarsdale Road, Yonkers, New York 10707.

Such addresses may be changed from time to time by either party by serving notice as above provided.

5

**A-17**

From:Benchmark Title          9144221550          10/08/2008 10:11    #484 P.002/003

# BENCHMARK TITLE AGENCY, LLC

Title No. BTA61445

S C H E D U L E   A

Amended 07-12-2006

ALL that certain plot, piece or parcel of land, situate lying and being in the Town of Greenburgh, County of Westchester and State of New York, bounded and described as follows:

STARTING at a point on the northwesterly side of Eastway distant 370.44 feet northeasterly as measured along the same from another point on the northwesterly side of Eastway, which later point is marked by a monument set in the ground and shown as Monument "B" on a certain map entitled, "Survey of Winding Road Farm, Property of Ken-Court, Inc., Town of Greenburgh, Westchester County, NY," made by Wulff Engineering Company, Tarrytown, NY dated October 31, 1950, and filed on November 21, 1950 in the Office of the Clerk, Division of Land Records, formerly Register's Office, Westchester County, New York, as Map No. 7258;

THENCE CONTINUING along the northwesterly line of Eastway as shown on said map, North 58 Degrees 14' 30" East 84.13 feet and North 14 Degrees 14' 20" East 57.50 feet to the true point and place of beginning;

RUNNING THENCE along the northwesterly side of Eastway, North 14 Degrees 14' 20" East 157.50 feet and North 54 Degrees 18' 30" East 635.10 feet to a point on the southerly line of a subdivision map known as "Ardsley Estates" filed in the Office of the County Clerk of Westchester County as Map No. 25171;

RUNNING THENCE along the southerly side of Map No. 25171, the following courses and distances:

1) North 62 Degrees 08' 49" West 86.06 feet;

2) North 83 Degrees 01' 29" West 84.59 feet;

3) North 72 Degrees 13' 49" West 324.78 feet;

4) North 65 Degrees 20' 49" West 115.38 feet;

5) North 70 Degrees 28' 09" West 138.05 feet;

6) North 59 Degrees 23' 59" West 68.70 feet; and

7) North 64 Degrees 37' 49" West 19.17 feet to a point;

Page 1

- continued on next page -

**A-18**

From:Benchmark Title          9144221550          10/08/2008 10:11

# BENCHMARK TITLE AGENCY, LLC

### Title No. BTA61445

### S C H E D U L E  A  (continued)

THENCE TURNING AND RUNNING North 26 Degrees 55' 25" East 238.91 feet to a point;

THENCE TURNING AND RUNNING along the southerly line of Map No. 21575, North 69 Degrees 06' 23" West 268.18 feet to a point;

RUNNING THENCE along the easterly line of lands now or formerly of McHugh, South 25 Degrees 27' 57" West 100.32 feet;

RUNNING THENCE along the southerly line of lands now or formerly of McHugh, North 69 Degrees 06' 23" West 200.00 feet to the easterly side of a Right of Way;

RUNNING THENCE along the easterly side of said Right of Way, South 25 Degrees 27' 57" West 67.39 feet and South 29 Degrees 56' 37" West 125.66 feet to a point and the southeasterly corner of the aforesaid Right of Way;

RUNNING THENCE partly along the southerly line of said Right of Way and continuing in a westerly direction, North 68 Degrees 13' 00" West 91.91 feet and North 69 Degrees 28' 40" West 64.93 feet to a point;

RUNNING THENCE over a portion of the New Croton Aquaduct, South 34 Degrees 48' 27" West 251.54 feet to the northerly line of lands now or formerly of Jaggi;

RUNNING THENCE along the northerly side of lands now or formerly of Jaggi, South 47 Degrees 36' 00" East 519.78 feet to the northwesterly line of lands now or formerly of Friedberg;

RUNNING THENCE along the northwesterly line of lands now or formerly of Friedberg, North 42 Degrees 24' 00" East 216.36 feet to a point;

RUNNING THENCE along the northeasterly line of lands now or formerly of Friedberg, South 37 Degrees 29' 21" East 499.74 feet to a point;

RUNNING THENCE South 52 Degrees 30' 39" West 6.16 feet, South 37 Degrees 29' 21" East 20.15 feet and North 52 Degrees 30' 39" East 6.16 feet to a point;

RUNNING THENCE along the northeasterly line of lands now or formerly of Friedberg, South 37 Degrees 29' 21" East 224.55 feet to the northwesterly side of Eastway, the point and place of BEGINNING.

**FOR CONVEYANCING ONLY**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

Page 2

**A-19**

IN WITNESS WHEREOF, the Assignor has executed this Assignment the day and year first above written.

Chauncey Partners LLC
a New York limited liability company

By: _Daniel A Amicucci_

Daniel Amicucci, Member

STATE OF NEW YORK          )
                                          )ss.:
COUNTY OF WESTCHESTER  )

On the 6th day of October in the year 2006 before me, the undersigned personally appeared Daniel Amicucci, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf which the individual acted, executed the instrument.

Notary Public

JAMES P. BLOSE
Notary Public, State Of New York
No. 02BL5034117
Qualified In Westchester County
Commission Expires September 30, 20 _LO_

6



**\*450690865MTGN\***

| Control Number | WHD Number | Instrument Type |
|---|---|---|
| 450690865 | 2005069-000384 | MTG |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
**\*\*\* DO NOT REMOVE \*\*\***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

TYPE OF INSTRUMENT  <u>MTG - MORTGAGE</u>
FEE PAGES  19                 TOTAL PAGES  19

### RECORDING FEES

| | |
|---|---|
| STATUTORY CHARGE | $6.00 |
| RECORDING CHARGE | $57.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| | |
| TOTAL FEES PAID | $82.00 |

### TRANSFER TAXES

| | |
|---|---|
| CONSIDERATION | $0.00 |
| | |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

RECORDING DATE                04/13/2005
              TIME                 10:58:00

### MORTGAGE TAXES

| | |
|---|---|
| MORTGAGE DATE | 12/30/2004 |
| MORTGAGE AMOUNT | $100,000.00 |
| EXEMPT | Yes |
| | |
| COUNTY TAX | $250.00 |
| YONKERS | $0.00 |
| BASIC | $500.00 |
| ADDITIONAL | $225.00 |
| SUBTOTAL | $975.00 |
| MTA | $250.00 |
| SPECIAL | $0.00 |
| | |
| TOTAL PAID | $1,225.00 |

SERIAL NUMBER            CV91818
DWELLING                    1-2 Family
          THE PROPERTY IS SITUATED  IN
WESTCHESTER COUNTY, NEW YORK IN THE:

TOWN OF NORTH CASTLE

WITNESS MY HAND AND OFFICIAL SEAL

*Leonard N. Spano*

LEONARD N. SPANO
WESTCHESTER COUNTY CLERK

| Record & Return to: |
|---|
| HUDSON VALLEY BANK |
| 21 SCARSDALE RD |
| |
| YONKERS, NY 10707 |

**A-21**

*PFC 15212w*

Parcel #: Section 1 Block 1 Lot 11-17 ✓

Loan Number : 0062000489

*18?*
*1-2*

Prepared by: **Hudson Valley Bank**

Record and Return Address:

Hudson Valley Bank
21 Scarsdale Road
Yonkers, NY  10707 ✓

Loan Number: 0062000489



**GAP**
# NEW YORK CREDIT LINE MORTGAGE
(Open End)

## WORDS OFTEN USED IN THIS DOCUMENT

(A)  "Mortgage" means this document, which is dated December 30, 2004. ✓

(B)  "Borrower" means Anthony A. Scarpino, Jr and Eleanor L. Scarpino, who shall also be the person(s) who signs this Mortgage. Borrower will sometimes be referred to as "I" and shall be deemed to be plural if more than one person signs this Mortgage. Borrower's address is:

      30 Brookwood Road
      Bedford, NY 10506

(C)  "Lender" means Hudson Valley Bank. Lender is a New York State Chartered Bank. Lender's address is: 21 Scarsdale Road Yonkers, NY 10707. Any communication to the Lender should be sent to: 21 Scarsdale Road Yonkers, NY 10707.

(D)  "Agreement" means the Home Equity Line of Credit Agreement dated the same date as this Mortgage. Under the Agreement, I may borrow up to the maximum principal amount of One Hundred Thousand Dollars and 00/100ths (U.S. $100,000.00) subject to the terms of the Agreement. The amount I owe may fluctuate from time to time. Lender and I contemplate, as provided in the Agreement, that there will be a series of advances, payments and readvances during the period of time when I can "draw" against the line of credit. The aggregate amount of principal available to the Borrower will never exceed the maximum principal amount shown above. I agree that this Mortgage shall continue to secure all sums advanced under the terms of the Agreement including, without limitation, any sums that are advanced by Lender whether or not at the time the sums are advanced there is any principal sum outstanding under the Agreement. The parties to the Agreement intend that this Mortgage shall secure unpaid balances, and all other amounts due to Lender under this Mortgage and under the Agreement, including any extensions, renewals or modifications of the Agreement. For example, should the Agreement be amended to extend the period during which the Borrower can obtain advances, or a similar modification, this Mortgage will continue to secure the indebtedness owed under the Agreement.

(E)  "Property" means the property that is described below in the section titled "Description of the Property."

(F)  "Sums Secured" means the amounts described below in the paragraph titled "Borrower's Transfer to Lender of Rights in the Property." The Sums Secured by this Mortgage will not exceed the amounts owed under the Agreement together with any expenses/costs incurred by Lender due to Borrower's default in meeting Borrower's obligations under the Mortgage which qualify as Incidental Amounts.

(G)  "Incidental Amounts" include amounts permitted under Part 648 of the New York Tax Regulations as disbursements made to protect the security of the Mortgage and the value of the Property, with interest on such disbursements at the periodic rate stated in the Agreement, including for example, where the payments represent:;

  (I)  expenses incurred by Lender on behalf of Borrower in the event Borrower's failure to perform a covenant or obligation relating to maintaining the Property or preserving its value and protecting Lender's lien under this Mortgage that would result in an event of default under the terms of this Mortgage;

  (II)  expenses incurred by Lender in the event of a foreclosure, including legal fees of Lender, and

**A-22**

Loan Number : 0063000400

(III)  interest and late payment charges.

## CREDIT LINE MORTGAGE

This is a credit line mortgage as that phrase is defined in New York Real Property Law § 281. The Mortgage secures the original indebtedness and also the indebtedness created by future advances made under the Agreement within 30 years from the date this Mortgage is recorded, to the same extent and with the same priority of lien as if such future advances had been made at the time this Mortgage was recorded, although there may have been no advances made at the time of execution and acknowledgement of the Mortgage and although there may be no indebtedness outstanding at the time any advance is made. The total amount of indebtedness secured by this Mortgage at any one time shall not exceed the Maximum Principal Amount, plus interest, and plus any additional Incidental Amounts.  I have promised to pay this debt in monthly payments and to pay the debt in full by December 1, 2035.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant, and convey the Property to Lender subject to the terms of this Mortgage. This means that, by signing this Mortgage, I am giving Lender those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A)     Pay all the amounts that I owe Lender as stated in the Agreement;

(B)     Pay, with interest, any amounts that Lender spends under this Mortgage, to protect
the value of the Property and Lender's rights in the Property;

(C)     Keep all of my other promises and agreements under this Mortgage.

## DESCRIPTION OF THE PROPERTY

I give lender rights in the Property described in (A) through (I) below:

(A)     The Property which is located at:

**30 Brookwood Road
Bedford NY 10506**

This Property is in Westchester County in the State of New York. It has the following legal description:

**SEE ATTACHED "EXHIBIT A" FOR THE DESCRIPTION OF THE PROPERTY.**

**THE ABOVE MENTIONED PROPERTY IS OR WILL BE IMPROVED BY A 1-4 FAMILY
DWELLING ONLY.**

(B)     All buildings and other improvements that are located on the Property described in Paragraph
(A) of this section;

(C)     All rights in other property that I have as owner of the Property described in Paragraph of this
section included in the phrase "together with the appurtenances and all the estate and rights of
the grantor in and to said premises" as described in §255 of New York's Real Property Law;

(D)     All rents or royalties from the Property described in Paragraph (A) of this section;

(E)     All mineral, oil and gas rights and profits, water rights and water stock that are part of the
Property described in Paragraph (A) of this section;

(F)     All rights that I have in the land which lies in the streets or roads in front of, or next to, the
Property described in Paragraph (A) of this section;

(G)     All fixtures that are now or in the future will be on the Property described in Paragraphs (A)
and (B) of this section, and all replacements of and additions to those fixtures, except for
those fixtures, replacements and additions that under the law are "consumer goods" and
that I acquire more than ten days after the date of the Agreement. Usually, fixtures are
items that are physically attached to buildings, such as hot water heaters;  .

(H)     All of the rights and property described in Paragraphs (B) through (F) of this section that I
acquire in the future; and

(I)     All replacements of or additions to the property described in Paragraphs (B) through (F)

**A-23**

and Paragraph (H) of this section.

Loan Number : 0062000489

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that except for the "exceptions" listed in any title insurance policy which insures Lender's rights in the Property: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender, and (C). There are no outstanding claims or charges against the Property except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE MORTGAGE**

This Mortgage contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary, to a limited extent, in different parts of the country. My promises and agreements are stated in "plain language."

I promise and I agree with Lender as follows:

1.  **BORROWER'S PROMISE TO PAY PRINCIPAL AND INTEREST UNDER THE AGREEMENT AND OTHER PAYMENT OBLIGATIONS**

I will promptly pay to Lender when due: principal, interest, prepayment, late charges and all other charges due under the Agreement.

2.  **AGREEMENTS ABOUT PAYMENTS OF TAXES AND INSURANCE**

I will pay, when due, all taxes, assessments, leasehold payments or ground rents (if any), and hazard insurance on the Property and mortgage insurance (if any). Lender specifically reserves to itself and its successors and assigns the unilateral right to require that I pay to it on the day monthly payments are due an amount equal to one-twelfth (1/12) of the yearly taxes, and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth (1/12) of yearly premium installments for hazard and mortgage insurance, all as Lender reasonably estimates initially and from time to time, as allowed by and in accordance with applicable law.

3.  **BORROWER'S OBLIGATION TO PAY CHARGES AND ASSESSMENTS AND TO SATISFY CLAIMS AGAINST THE PROPERTY**

I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be superior to this Mortgage. I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will do this by making the payments that are described in Paragraph 2 above when they are due, directly to the person, organization, governmental authority, or other party. Promptly after making any of those payments I will give Lender a receipt which shows that I have done so.

Any claim, demand or charge that is made against property because an obligation that has not been fulfilled is known as a "lien." I will promptly pay or satisfy all liens against the Property that may be superior to this Mortgage. However, this Mortgage does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (B) I, in good faith, argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up.

4.  **BORROWER'S OBLIGATIONS TO OBTAIN AND KEEP HAZARD INSURANCE ON THE PROPERTY**

I will obtain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies, and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. It is possible that the insurance policy will have provisions that may limit the insurance company's obligation to pay claims if the amount of coverage is too low. Those provisions are known as "coinsurance requirements." Lender may not require me to obtain an amount of coverage that is more than the larger of the following two amounts: either (i) the amount that I owe to Lender under the Agreement and under this Mortgage; or (ii) the amount necessary to satisfy the coinsurance requirements. In addition to the hazard insurance required above, if the Property is located in a Special Flood Hazard area I will obtain and maintain flood damage insurance coverage equal to the lower of the unpaid principal balance of the Agreement or the maximum amount available from time to time under the National Flood Insurance Act of 1968 as amended.

Loan Number: 0062000489

I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. Lender will have the right to hold the policies and renewal notices that I receive.

I will pay premiums on the insurance policies by making payments as described in Paragraph 2 above by paying the insurance company directly when the premium payments are due. If Lender requires, I will promptly give Lender all receipts of paid premiums and all renewal notices that I receive.

If there is a loss of or damage to the Property, I will promptly notify the insurance company and Lender. If I do not prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (a) it is not economically possible to make the repairs or restoration; or (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Mortgage; or (c) Lender and I have agreed in writing not to use the proceeds for this purpose. If the repair or restoration is not economically possible or if it would lessen Lender's protection under this Mortgage, then the proceeds will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. If any of the proceeds remain after the amount that I owe to Lender has been paid if full, the remaining proceeds will be paid to me. The use of the proceeds to reduce the amount that I owe to Lender will not be a prepayment that is subject to the prepayment charge provisions, if any, under the Agreement.

If I abandon the Property, or if I do not answer, within 30 days, a notice from the Lender stating that the insurance company has offered to settle a claim for insurance benefits, then Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. The 30-day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of my monthly payments under the Agreement and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes. If Lender acquires the Property under Paragraph 17 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the amount that I owe to Lender under the Agreement and under this Mortgage immediately before the Property is acquired by Lender or sold.

If I fail to maintain coverage as required in this section, I authorize Lender to obtain such coverage as Lender in its sole discretion determines appropriate to protect its interest in the Property in accordance with the provisions of paragraph 6. I understand and agree that any coverage Lender purchases may cover only its interest in the Property and may not cover my interest in the Property or any personal property therein. I also understand and agree that the premium for any such insurance may be higher than the premium I would pay for such insurance.

**5.    BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL OBLIGATIONS IN LEASE**

I will keep the Property in good repair. I will not destroy, damage or substantially change the Property, and I will not allow the Property to deteriorate.

**6.    LENDER'S RIGHT TO TAKE ACTION TO PROTECT THE PROPERTY**

If: (A) I do not keep my promises and agreements made in this Mortgage, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's right in the Property (such as for example, a legal proceeding in bankruptcy, in probate, for condemnation, or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions under this Paragraph 6 may include, for example, paying any sums secured by a lien which has priority over this Mortgage or any advance under the Agreement or this Mortgage, appearing in court, paying reasonable attorney's fees, paying any sums which I am required to pay under this Mortgage and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. I will pay to Lender any amounts which Lender spends under this Paragraph 6. I will also pay interest on those amounts at the same rate stated in the Agreement. However, if payment of interest at that rate would violate the law, I will pay interest on the amounts spent by Lender under this Paragraph 6 at the highest rate that the law allows. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this paragraph.

This Mortgage will protect Lender in case I do not keep this promise and pay those amounts with interest.

**A-25**

Loan Number : 0063200486

Although Lender may take action under this Paragraph 6, Lender does not have to do so.

### 7.     LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before one of those inspections is made, Lender must give me notice stating a reasonable purpose for the inspection, that purpose must be related to Lender's rights in the Property.

### 8.     AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY

A taking of property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A) to proceeds deriving from all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of the proceeds multiplied by the following amount: (A) the total amount that I owe to Lender under the Agreement and under this Mortgage immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me. The use of the proceeds to reduce the amount that I owe to Lender will not be a prepayment that is subject to the prepayment charge provisions, if any, under the Agreement.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, then Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. The 30 day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered. If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of any of my monthly payments under the Agreement and under Paragraphs 1 and 2 above.

### 9.     CONTINUATION OF LENDER'S RIGHTS

Even if lender does not exercise or enforce any right of Lender under this Mortgage or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will still have the right, under Paragraph 17 below, to demand that I make Immediate Payment in Full (See Paragraph 17 for a definition of this phrase) of the amount that I owe to Lender under the Agreement and under this Mortgage.

### 10.     LENDER'S ABILITY TO ENFORCE MORE THAN ONE OF LENDER'S RIGHTS

Each of the Lender's rights under this Mortgage is separate. Lender may exercise and enforce one or more of those rights under law, one at a time or all at once.

### 11.     OBLIGATIONS OF BORROWERS; AGREEMENTS CONCERNING CAPTIONS

If more than one person signs this Mortgage as Borrower, each of us is full obligated to keep all of Borrower's promises and obligations contained in this Mortgage. Lender may enforce Lender's rights under this Mortgage against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under the Agreement and under this Mortgage. However, if one of us does not sign the Agreement, then, (A) that person is signing this Mortgage only to give that person's rights in the Property to Lender under the terms of this Mortgage; (B) that person is not personally obligated to make payments or to act under the Agreement or under this Mortgage; and (C) agrees that Lender and anyone else who signs this Mortgage may agree to extend, modify, forbear or make any accommodations regarding the terms of this Mortgage or the Agreement without that person's consent. The captions and titles of this Mortgage are for convenience only. They may not be used to interpret or to define the terms of this Mortgage.

### 12.     AGREEMENTS ABOUT GIVING NOTICES REQUIRED UNDER THIS MORTGAGE

Unless the law requires otherwise, any notice that must be given to me under this Mortgage will be given by delivering it or by mailing it addressed to me at the address stated in the section above titled "Description of the Property."

**A-26**

Loan Number : 0063000488

A notice will be delivered or mailed to me at a different address if I give Lender a notice of my different address. Any notice that must be given to Lender under this Mortgage will be given by mailing it to Lender's address stated in Paragraph (C) of the section above entitled "Words Used Often In This Document." A notice will be mailed to Lender at a different address if Lender gives me a notice of a different address. A notice required by this Mortgage is given when it is mailed or when it is delivered according to the requirements of this Paragraph 12.

**13.    LAW THAT GOVERNS THIS MORTGAGE**

This Mortgage is governed by Federal law and the law that applies to the place that the Property is located. If any term of this Mortgage conflicts with the law, all other terms of this Mortgage will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Mortgage which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

**14.    BORROWER'S COPY OF THE AGREEMENT AND OF THIS MORTGAGE.**

I will be given a copy of the Agreement and of this Mortgage. Those copies must show that the original Agreement and Mortgage have been signed. I will be given those copies either when I sign the Agreement and this Mortgage or after this Mortgage has been recorded in the proper official records.

**15.    BORROWER'S OBLIGATION TO PAY MORTGAGE INSURANCE PREMIUMS**

If Lender requires mortgage insurance as a condition of making the loan that I promise to pay under the Agreement, I will pay the premiums for that mortgage insurance. I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law. Lender may require me to pay the premiums in the manner described in Paragraph 2 above.

**16.    TRANSFER OF THE PROPERTY OR OF A BENEFICIAL INTEREST IN BORROWER WHICH IS NOT A NATURAL PERSON**

If all or any part of the Property or any interest in the Property is sold or transferred by me (or if Borrower is not a natural person but is a corporation, partnership, trust or other legal entity and if a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, except as otherwise provided, Lender may, at Lender's option, declare all the Sums Secured by this Mortgage to be immediately due and payable. This requirement is called 'Immediate Payment In Full." Lender shall have no right to declare all sums immediately due and payable in the event of (a) the creation of a lien or encumbrance subordinate to this Mortgage which does not relate to a transfer of rights of occupancy in the Property; (b) the creation of a purchase money security interest for household appliances; (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant; or (d) the grant of any leasehold interest of three years or less containing an option to purchase.

If Lender exercises its option to declare Sums Secured by this Mortgage to be immediately due and payable, Lender shall give me notice of acceleration in accordance with Paragraph 12 hereof. Such notice shall provide for a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay the sums declared due. If I fail to pay such sums prior to the expiration of this period Lender may, without further notice or demand on me, invoke any remedies permitted by this Mortgage.

**17.    LENDER'S RIGHTS IF I FAIL TO KEEP MY PROMISES AND AGREEMENTS**

Except as provided in Paragraph 16 above, I will be in default:

   (A)    I fail to make any payment required by this Mortgage or the Agreement when it is due;

   (B)    I have engaged in or I engage in fraud or material misrepresentation, either by act or omission, in connection with this Mortgage and Agreement at any time during the application process or during the term of this Mortgage and Agreement; or

   (C)    I act or fail to act in a way that adversely affects the Lender's security under this Mortgage or any right Lender has in such security under this Mortgage.

If a default occurs and all of the conditions stated in subparagraphs (D), (E) and (F) of this Paragraph 17 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Agreement and under this Mortgage. Lender may do this without making any further demand for payment. This requirement is called "Immediate payment in full."

**A-27**

Loan Number : 0062000499

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require immediate payment in full under Paragraph 17 only if all of the following conditions are met:

(D)     I am in default

(E)     Lender sends to me, in the manner described in Paragraph 12 above, a notice that states:

       (I)     The promise or agreement that I failed to keep;

       (II)    The action that I must take to correct that default;

       (III)   A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;

       (IV)    That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another person may acquire the Property by means of foreclosure and sale;

       (V)     That if I meet the conditions stated in Paragraph 18 below, I will have the right to have lender's enforcement of this Mortgage discontinued and to have the Note and this Mortgage remain fully effective as if immediate payment in full had never been required; and

       (VI)    That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Note and under this Mortgage, and to present any other defenses that I may have.

(F)     I do not correct the default stated in the notice from the Lender by the date stated in that notice.

## 18.   MY RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS MORTGAGE DISCONTINUED

Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Mortgage discontinued. I will have this right at any time before a judgment has been entered enforcing this Mortgage if I meet the following conditions:

(A)     I pay to Lender the full amount that then would be due under this Mortgage and the Agreement as if immediate payment in full had never been required; and

(B)     I correct my failure to keep any of my other promises or agreements made in this Mortgage; and

(C)     I pay all of Lender's reasonable expenses in enforcing this Mortgage including, for example reasonable attorneys' fees; and

(D)     I do whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Security Instrument, and my obligations under the Agreement and under this Mortgage continue unchanged.

If I fulfill all of the conditions in this Paragraph 18, then the Agreement and this Mortgage will remain in effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Mortgage discontinued if Lender has required immediate payment in full under Paragraph 17 above.

## 19.   DISCONTINUANCE OF ENFORCEMENT

Lender may discontinue any proceedings Lender begins to enforce the terms of this Mortgage. Lender may do so in its sole discretion.

Loan Number : 0082008488

**20.    LENDER'S RIGHTS TO RENTAL PAYMENTS FROM THE PROPERTY AND TO TAKE POSSESSION OF THE PROPERTY**

As additional protection for Lender, I give to Lender all of my rights to any rental payments from the Property. However, until Lender requires Immediate Payment In Full under Paragraph 17 above, or until I abandon the Property, I have the right to collect and keep those rental payments as they become due if I have not given any of my rights to rental payments from the Property to anyone else, and I will not do so without Lender's consent in writing. If Lender requires Immediate Payment In Full under Paragraph 17 above, or if I abandon the Property, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may:

    (A)    collect the rental payments, including overdue rental payments, directly from the tenants;

    (B)    enter on and take possession of the Property;

    (C)    manage the property; and

    (D)    sign, cancel and change leases.

I agree that if Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 19, the tenants may make those rental payments to Lender without having to ask whether I have failed to keep my promises and agreements under this Mortgage.

If there is a judgment for Lender in a lawsuit for foreclosure and sale, I will pay to Lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property.

All rental payments collected by Lender or by a receiver, other than rent paid by me under this Paragraph 20, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. The costs of managing the Property may include receiver's fees, reasonable attorneys' fees, and the costs of any necessary bonds. Lender and the receiver will be obligated to account only for those rental payments that they actually receive.

**21.    DEFAULT NOTICE**

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, I MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF I HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE ME WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH I CAN EXERCISE THIS RIGHT.

**22.    LOAN CHARGES**

If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceed permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Agreement.

**23.    LENDER'S OBLIGATION TO DISCHARGE THIS MORTGAGE WHEN THE AGREEMENT AND THIS MORTGAGE ARE PAID IN FULL**

When Lender has been paid all amounts due under the Agreement, and under this Mortgage, Lender will discharge this Mortgage by delivering a certificate stating that this Mortgage has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

**24.    AGREEMENTS ABOUT NEW YORK LIEN LAW**

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Mortgage is recorded in the proper official records, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (A) hold all amounts, which I receive and which I have a right to receive from Lender under the Agreement, as a "trust fund"; and (B) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding these amounts as a "trust fund" means that I have a special responsibility under the law to use the amounts in the manner described in this Paragraph 24.

**PFC Abstract Corp.**
Issued on behalf of
*Chicago Title Insurance Company*

Title No.: *PFC15212 W*

## SCHEDULE A

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Town of North Castle, County of Westchester and State of New York, shown and designated as Lot No. 17 on a certain map, "Subdivision Map of Middle Patent Estates, West, situate, in the Town of North Castle, Westchester County", completed October 26, 1964 by Ralph M. McDonald and filed May 3, 1966 in the County Clerk's Office, Division of Land Records, as Map No. 14814, being more particularly bounded and described as follows:

**BEGINNING** at a point on the northerly side of Brookwood Road where the same is intersected by the division line between Lots 17 and 18 on the above mentioned map;

Said point of beginning also being 209.66 feet westerly from the westerly end of a curve connecting the northerly side of Brookwood Road and the westerly side of Mianus Drive;

**RUNNING THENCE** along the northerly side of Brookwood Road the following courses and distances:

1. westerly on a curve to the left having a radius of 575.00 feet, a length of 73.38 feet;

2. westerly on a curve to the right having a radius of 30.00 feet, a length of 26.63 feet and;

3. westerly on a curve to the left having a radius of 65.00 feet, a length of 55.08 feet to the division line between Lots 16 and 17 on the above mentioned map;

**RUNNING THENCE** along said division line North 15 degrees 23 minutes West 100.00 feet and North 27 degrees 03 minutes 20 seconds West 296.50 feet to a point;

**RUNNING THENCE** North 14 degrees 53 minutes 50 seconds East 227.89 feet to the division line between Lots 17 and 20 on the above mentioned map;

**FOR CONVEYANCING ONLY:**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of the adjoining said premises.

**A-30**

PFG Abstract Corp.
Issued on behalf of
Chicago Title Insurance Company

Title No.: PFC15212 W

## SCHEDULE A (continued)

**RUNNING THENCE** along said division line South 75 degrees 44 minutes 55 seconds East 234.50 feet to the division line between Lots 8 and 17 on the above mentioned map;

**RUNNING THENCE** along said division line South 2 degrees 46 minutes 13 seconds East 517.49 feet to the point and place of **BEGINNING.**

**SAID PREMISES** are also known as Section 1, Block 1, Lot 11.-17 of the Official Tax Map of the Town of North Castle.

**FOR CONVEYANCING ONLY:**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

**TOGETHER** with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of the adjoining said premises.

Loan Number: 0082000489

## <u>EXHIBIT B</u>



## HOME EQUITY LINE OF CREDIT
## AGREEMENT AND DISCLOSURE STATEMENT

This is the Agreement (the "Agreement"), dated December 30, 2004 governing your Home Equity Line of Credit ("Credit Account") with Hudson Valley Bank.

Read this Agreement carefully so that you know how your Credit Account works. As you read this Agreement remember that the terms "we", "us", and "our" refer to Hudson Valley Bank and to any other creditor to whom this Agreement is assigned. "You", "your", and "yours" refer to each person who signs this Agreement or has authority to use it. "Mortgage" means the mortgage, deed of trust, or deed to secure debt you are giving us on your house or condominium. Your account, any amount you owe, and our mortgage on your home may be sold or transferred to another creditor at anytime. If this happens, this Agreement and the Mortgage will remain in effect.

1.  **WHAT IS YOUR HOME EQUITY LINE OF CREDIT?** It is a credit arrangement in which we make loans to you by advancing funds ("Advances") from your Credit Account at your direction, allowing you to repay such Advances and take additional Advances. You promise and agree to repay these Advances, any interest which accrues on them, and all other charges for which you are responsible under the terms of the Agreement.

2.  **USING YOUR CREDIT ACCOUNT / MINIMUM INITIAL ADVANCE.** You may request Advances from your Credit Account by writing a Home Equity Line of Credit Check ("Draw Check") for the exact amount which you desire as long as it is in a minimum amount of $500.00. We may refuse to honor request for Advances below the minimum amount. You may also request Advances at the closing by completing a loan request form or other form of authorization that we may require. You may take advances for 360 Monthly Statement Periods after the date your Credit Account is opened ("Advanced Period").

A Monthly Statement Period is defined as successive intervals of approximately one month beginning on the date your Credit Account is opened and recurring regularly until your Credit Account is finally closed. Monthly Statement Periods occur regardless of whether there is a balance or any activity in your Credit Account or whether we have sent you a statement for the period. Your first Monthly Statement Period may be shorter than a month depending on when your Credit Account is opened.

3.  **DRAW CHECKS.** You agree to notify us promptly in any of your Checks are lost or stolen. You also agree to cooperate with us or any law enforcement agency in any effort to investigate the circumstances surrounding the incident and efforts to minimize potential losses to you or stemming from it. You are responsible for the unauthorized use of lost or stolen Draw Checks unless the law prohibits us from holding you liable.

4.  **CREDIT LIMIT.** We have assigned a Credit Limit of $100,000.00 on your Credit Account. You may not request an Advance that would cause your unpaid balance to exceed your Credit Limit. We are not required to pay any item which would cause you to exceed the amount of your Credit Limit. If we do make the advance, it does not mean your Credit Limit has been raised. We may require you to repay the amount over your Credit Limit at once. If you exceed your Credit Limit, you agree to pay a fee of $35.00 for each advance in excess of your Credit Limit.

5.  **PROMISE TO PAY.** You promise to repay to us, in U.S. Dollars, all Advances charged to your Credit Account, plus finance charges and all other amounts due under this Agreement or the Mortgage. To avoid being in default, you must pay the total monthly Minimum Payment by the "Payment Due Date" shown on each billing statement we will send to you. In any event, you promise to pay the balance of your Credit Account at the termination of this Agreement.

6.  **MINIMUM MONTHLY PAYMENT.** During the Advance Period, your monthly payments will be the amount of finance charges accrued plus credit life insurance premiums, if applicable, any fees and any amounts past due. You are not required, however, to obtain credit life insurance in connection with your Credit Account.

7.  **AVERAGE OUTSTANDING LINE BALANCE.** In consideration of Hudson Valley Bank payment of closing costs, I agree to maintain an average outstanding balance of twenty five percent (25%) for the first two (2) years of the line and to keep the line open for two (2) calendar years.. I agree to reimburse Hudson Valley Bank for closing costs paid by them on my behalf in the event that I close the Line of Credit on or before two (2) calendar years of the date of this Agreement. I further agree to reimburse Hudson Valley Bank for closing costs paid on my behalf in the event that I fail to maintain an average outstanding balance of twenty five percent (25%) during the first two (2) calendar years of this Agreement or if I close this line prior to the end of the second anniversary of the date hereof.

8.  **PROMISE TO PAY, PREPAYMENT AND LINE TERM.**

A-32

Loan Number: 0082000489

a. You promise to pay us the amounts of all Advances you obtain under your Home Equity Line of Credit, and any other charges and finance charges due as provided in this Agreement, by the end of the Credit Line Term, thirty (30) years from the date of this Agreement.

b. During the term of your Line of Credit, you will have to pay, for each monthly billing period, the interest that accrued during the billing period.

**9. AUTOMATIC PAYMENT DEDUCTION.** Hudson Valley Bank will automatically deduct your monthly payment from an account maintained at Hudson Valley Bank, or another financial institution. If you do not wish to have your monthly payment automatically deducted, we will charge an annual service fee of $250.00.

**10. FINANCE CHARGES. FINANCE CHARGES** begin to accrue on the day an Advance is charged to your Credit Account and continue until the outstanding balance on such Advance is paid in full. **FINANCE CHARGES** on your Credit Account will be determined by applying a daily periodic rate to the daily balance (as described below) of your Credit Account., an amount that will include current transactions. To calculate the daily balance, we take the beginning principal balance of your Credit Account each day, add any new Advances, and subtract any payments or credits applied to this principal balance. This gives us the daily balance against which we apply your daily periodic rate. Then we add up all the daily interest accrued for the number of days in the Monthly Statement Period, which becomes the total **FINANCE CHARGE** for the Monthly Statement Period.

The daily periodic rate and its corresponding **ANNUAL PERCENTAGE RATE** on the date your Credit Account was opened ("Initial Rate") are 0.01438% Daily Periodic Rate and 5.250% corresponding **ANNUAL PERCENTAGE RATE.** The **ANNUAL PERCENTAGE RATE** does not include other costs other than interest.

The daily periodic rate and its corresponding **ANNUAL PERCENTAGE RATE** are variable rates and therefore may increase or decrease on the first day of each calendar month based on changes in the Prime Rate. "Prime Rate" means the Prime Rate as published in the "Money Rates" table in *The Wall Street Journal*. We will use the highest Prime Rate if more than one is published. The Prime Rate is merely a pricing index. It is not intended, and you should not consider it, to represent the lowest or the best interest rate that we or affiliated organizations charge to any borrowers. An increase in the **ANNUAL PERCENTAGE RATE** and the Daily Periodic Rate will result in a higher **FINANCE CHARGE** and higher minimum payments, while a decrease in the **ANNUAL PERCENTAGE RATE** and the Daily Periodic Rate will result in a lower **FINANCE CHARGE** and lower minimum payments, assuming the same principal balance and number of days in the billing cycle.

If the Daily Periodic Rate changes, it will be increased or decreased on the first day of each calendar month using the Prime Rate in effect on the preceding business day. We will determine your Daily Periodic Rate by adding ZERO percentage points (0.00%) to the Prime Rate and dividing the result by 365 (366 in leap years). We refer to this as the "Margin".

The first time or any subsequent time there is a change to your **ANNUAL PERCENTAGE RATE**, it may increase to 16.00%. At no time, however, will your **ANNUAL PERCENTAGE RATE** exceed 16.00% Other than this cap, there are no limits on the amount by which your **ANNUAL PERCENTAGE RATE** can change over the life of your Credit Account or on any individual date on which your **ANNUAL PERCENTAGE RATE** changes.

**11. SECURITY INTEREST.** As part of this transaction, you are granting us a mortgage on the property, as further described in the Mortgage, which is located at :

**30 Brookwood Road
Bedford, NY 10506**

(the "Property"). All of the terms and conditions of the Mortgage are very important and should be read in conjunction with this Agreement.

**12. PAYMENTS.** All payments on your Credit Account must be made by check or money order delivered to us at the address indicated on your billing statement. Any payment may be returned without applying it to your Credit Account if the check or money order is: (1) not drawn on the U.S. Postal Service or a financial institution located in the United States of America; (2) not payable in U.S. Dollars; (3) drawn with different numeric and written amounts; (4) missing a signature; (5) postdated; or (6) unacceptable for any other reason. We may apply all payments and credits in accordance with our standard operating procedures and with the requirements of applicable law. Generally, your payments will be applied in the following order: credit insurance premiums which we have billed to you, interest which we have billed to you, late fees, other fees, principal, insurance premiums which have accrued but which have not yet been billed and interest which has accrued but which has not yet been billed.

We do not process payments on Saturdays, Sundays, or bank holidays, and if the Payment Due Date falls on one of these days, you will incur an additional Finance Charge if your payment is not posted on or before the preceding bank business day. We can accept late payments, partial payments, checks or money orders marked "paid in full" or containing similar language without losing any of our rights under this Agreement.

**A-33**

Loan Number: 0062000489

If on December 1, 2035, I still owe amounts under this Agreement, I will pay those amounts in full on that date which is called the "Maturity Date".

**13. COSTS FOLLOWING CLOSING.** As you maintain a Credit Account with us, you will incur other charges assessed under the Mortgage and this Agreement. For example, Closing Costs. Your estimated closing costs are listed below. You may pay these costs in cash at the closing, or charge them to your Credit Account as Advances.

| | |
|---|---|
| Loan Origination Fee (Finance Charge) | $ 0.00 |
| Loan Discount Fee (Finance Charge) | $ 0.00 |
| Appraisal Fee | $ 0.00 |
| Credit Report Fee | $ 0.00 |
| Mortgage Broker Fee (Finance Charge) | $ 0.00 |
| Attorney Review – Trust Documents (Finance Charge) | $ 0.00 |
| Flood Zone Certification Fee (Finance Charge) | $ 0.00 |
| Commitment Fee | $ 0.00 |
| Underwriting Fee (Finance Charge) | $ 0.00 |
| Processing Fee (Finance Charge) | $ 0.00 |
| Document Preparation Fee - Lender (Finance Charge) | $ 0.00 |
| Courier Fee - Lender (Finance Charge) | $ 0.00 |
| Courier Fee - Broker (Finance Charge) | $ 0.00 |
| Wire Fee - Lender (Finance Charge) | $ 0.00 |
| Wire Fee - Broker (Finance Charge) | $ 0.00 |
| Other Fee (Finance Charge) | $ 0.00 |
| Other Fee - Broker | $ 0.00 |
| Other Fee - Broker | $ 0.00 |
| Settlement or Closing Fee (Finance Charge) | $ 0.00 |
| Abstract or Title Search | $ 0.00 |
| Document Preparation Fee - Settlement Agent | $ 0.00 |
| Attorney's Fees | $ |
| Title Insurance | |
| Recording/Filing Fees | $ 0.00 |
| City/County Tax/Stamps | $ |
| State Tax/Stamps | $ 0.00 |
| Survey | $ 0.00 |
| Survey Inspection | $ 0.00 |
| Mortgage Satisfaction Fee | $ 0.00 |
| 255 Affidavit Fee | $ 0.00 |
| | |
| **AMOUNT DUE FROM BORROWER** | $ |

Any time as we may reasonably require, while you have the right to take Advances on your Credit Account, we may obtain an appraisal on the Property. You agree that you will cooperate with us in obtaining such an appraisal.

**14. RELEASE.** We will release the Mortgage when all amounts due under the Mortgage and this Agreement have been paid. Before giving you a release, you will have to return all unused Draw Checks to us and wait until seven (7) business days after your account has been closed. When we discharge or release the Mortgage or any other documents recorded or filed to perfect our security interest in the Property, you shall pay any recordation or filing costs. Recordation or filing costs are estimated to be $175.00).

**15. LATE FEES.** If you do not make the full current Minimum Payment within 10 days after the date that it is due, a late fee of 2.000% of the current Minimum Payment will be charged.

**16. CREDIT LIFE AND CREDIT DISABILITY INSURANCE.** You may be offered the ability to purchase credit insurance covering your death, disability, or unemployment. If offered, credit insurance is voluntary and is not required to obtain credit. If elected, you may terminate it at any time. Credit Insurance will not be provided unless you sign or initial a separate document requesting such insurance. Premiums for any such insurance will be shown on such separate document and will be included in the amount billed to you each month.

**17. DEFAULT.** You will be in default if :

1. You engage in fraud or material misrepresentation at any time in connection with your Credit Account.

2. We do not receive the full amount of any minimum payment due in any monthly statement period within 60 days of its payment due date, or you fail to meet any of the repayment terms of Section 5 of this Agreement or as set forth in the Mortgage.

3. Your action or inaction adversely affects the Property or our rights in it. Examples of these actions and inactions include, but are not limited to circumstances in which:

A-34

Loan Number: 0052000489

a.  You are the sole borrower on this Credit Account and you die.

b.  The Property is used for an illegal purpose.

c.  You transfer or attempt to transfer all or part of your interest in the Property without our written consent.

d.  All or part of the Property is taken by condemnation or eminent domain.

e.  You are in default on any mortgage or lien on the Property.

f.  You fail to keep the Property properly insured.

g.  You fail to pay real property taxes and assessments on the Property when they are due.

h.  You fail to keep the Property properly maintained and in good repair.

If you default, we have the right, at our option, to cancel your credit privileges, to require the immediate payment of the entire amount owed to us, and/or cause your home to be sold at foreclosure sale. If we refer your account to an attorney for collection or foreclosure, you agree to pay our reasonable attorney's fees as permitted by applicable law, plus court costs and the costs related to foreclosure.

17. CANCELLATION OF CREDIT PRIVILEGES.    We can refuse to make additional extensions of credit, or reduce your Credit Limit if:

a.  The value of the Property declines significantly below its original appraised value for purposes of this Credit Account.

b.  We reasonably believe you will not be able to meet the repayment requirements set forth in this Agreement due to a material change in your financial circumstances.

c.  You fail to meet any material obligation you have under this Agreement,

d.  You are in default under Section 14 above.

e.  Government action prevents us from imposing the **ANNUAL PERCENTAGE RATE** provided for in this Agreement.

f.  Government action impairs our security interest such that the value of our interest is less than 120 percent of your Credit Limit.

g.  A regulatory agency which supervises us has notified us that continued Advances would constitute an unsafe and unsound practice.

h.  You become the subject of a proceeding in bankruptcy.

i.  There is more than one borrower on this Credit Account, one of you dies, and that adversely affects our interest in the Property.

j.  The maximum **ANNUAL PERCENTAGE RATE** (or rate cap) is reached.

If we refuse to make additional Advances or reduce your Credit Limit under this provision, we may refuse to honor any requests for Advances, including those requests made before but presented to us after we made our decision. We will send you a written notice stating the reason for our action. If for any reason you believe your Credit Limit should be reinstated, you must send us a written request for reinstatement and include in the request the reasons why you believe your credit privilege or Credit Limit should be reinstated.

18. FORECLOSURE. The Mortgage signed in connection with this Agreement gives us certain rights to your property. The law gives us other rights you also agree to give us. If you default, we may foreclose on the Mortgage. This means that the real property covered by the Mortgage will be sold in order to pay the amount owed to us under this Agreement.

19. RIGHT OF SETOFF. If you are in default of this Agreement, we can apply any of your deposit or other credit balances or other property of yours with us towards payment of what you owe.

A-35

Loan Number: 0052000489

20. **INFORMATION.** You agree to provide us with updated financial information, in writing, if we request it. We may request a new credit report on you without telling you. If you ask, we will tell you the name and address of the consumer reporting agency that furnished it. We may furnish information about your performance under this Agreement to our affiliates and other persons.

You also agree to sign any additional or corrective documents in connection with this Agreement, at our request and as allowed by law.

21. **ASSUMPTION.** Someone buying your Property may not assume this loan on these terms.

22. **SENDING OF NOTICES.** Any statement or notice to you under this Agreement will be sufficiently given if sent to your address on file in connection with this account or to a new address of which you have notified us in writing at least 20 days before the sending of the statement or notice.

23. **AMENDMENT.** We may change the terms of this Agreement in accordance with the requirements of applicable law.

24. **DELAY IN ENFORCEMENT.** We may waive or delay enforcing our rights under this Agreement without losing them or relieving you of any of your obligations. We may waive or delay enforcing a right as to one of you without waiving it as to the others. We may release any security or any one of you from responsibility under this Agreement without releasing the others. We need not give anyone notice of our waiver, delay or release. We may sue any one of you without suing the others.

25. **OTHER RULES REGARDING DRAW CHECKS.** You may not use Draw Checks to make payments on your Credit Account. You agree that the Draw Checks we supply you with are our property and that you will return them to us at our request.

We are not responsible if anyone refuses to honor a Draw Check. We may honor postdated Draw Checks and are not responsible if we do so. We are not required to certify Draw Checks.

You may ask us to "stop payment" on a Draw Check. If you do, you must tell us the name of the payee, the amount, date and number of the Draw Check, and who signed it. We are not bound by a stop payment order unless we have a reasonable opportunity to act on it and will not be liable for failing to stop payment if we used ordinary care. You agree to indemnify us and will pay all costs and expenses we incur (including reasonable attorney's fees) as a result of honoring your stop payment order. This indemnity will survive any termination of this Agreement. You agree to pay a fee for each "stop payment" on a Draw Check, as allowed by applicable law. The "stop payment" fee is currently $30.00.

26. **LEGAL PURPOSES.** You may not use any Advances for purposes that violate any applicable federal, state or local laws or regulations.

27. **APPLICABLE LAW.** Except to the extent that federal law shall be controlling, your rights, our rights, and the terms of this Agreement shall be governed by New York law.

28. **JOINT ACCOUNT.** On a joint account each of you may use the Credit Account, but the total unpaid balance may not exceed the Credit Limit. Each of you is individually responsible for payment of the entire balance regardless of who actually requested the Advance. Each of you has the right, upon proper written notice to us, to have the Credit Limit reduced or to suspend the privilege of obtaining new Advances. We have five business days after receipt of your request to take action on it. A request to suspend the privilege of obtaining Advances, even if made only by one of you, will be effective against all of you who are eligible to obtain Advances under this Agreement. In order to restore the Credit Account, we may require financial information from all of you and may refuse to restore the Credit Account if you no longer qualify under the criteria then in effect for new Credit Accounts. Any request for reinstatement would have to be made by all of you, despite the fact that only one of you may have requested the suspension of Advances. You agree to indemnify us and hold us harmless, and will pay all costs and expenses we incur (including reasonable attorney's fees) as result of honoring the request made by any one of you under this provision.

29. **TAX CONSEQUENCES.** You acknowledge that we have given you no assurances that the interest paid on your Credit Account is tax deductible. You are urged to consult your own tax advisor concerning the deductibility of interest and other costs charged in connection with this Credit Account. The Internal Revenue Service requires you to furnish to us, the interest recipient, your tax payer identification number ("TIN") in order to verify any deduction for mortgage interest. Your failure to provide us with your TIN may subject you to a $50 penalty imposed by the Internal Revenue Service.

A-36

Loan Number: 0062000499

# YOUR BILLING RIGHTS
## Keep This Notice For Future Use

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

Notify Us In Case of Errors or Questions About Your Bill.   If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your statement. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error.

If you need more information, describe the item you are not sure about.

Your Rights and Our Responsibilities After We Receive Your Written Notice.   We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to the mistaken amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question on your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE NOTICE SPECIFYING THE CIRCUMSTANCES AND TIME UNDER WHICH YOU CAN EXERCISE THIS RIGHT.**

A-37

Loan Number: 0062000489

You agree to the terms and conditions contained in this Agreement and you acknowledge receipt of a completed copy of this Agreement, including "When Your Home is on the Line."

WITNESS:                                    ACCEPTED AND AGREED TO:

_Anna M. Mont'Ema_                          _[signature]_
                                            Signature        Anthony A. Scarpino Jr

_____                         _Eleanor Scarpino_
                                            Signature        Eleanor L. Scarpino

                                            _____
                                            Signature

                                            _____
                                            Signature

Dated:  _12/30/04_      _EXHIBIT_

LC HELOC AADS                   Page 7 of 7                          8/8/2004
NY - 30 Year

**A-38**

Loan Number : 0062000489

**25.    MORTGAGE RECORDING TAXES AND FILING FEES**

To the extent permitted by law, I will pay any additional mortgage recording taxes and filing fees which may become due in connection with this Mortgage. This will include the costs of filing and affidavits or other documents which may become necessary in order to obtain the priority of this Mortgage's lien, release this lien or enforce this Mortgage.

If I fail to pay any of these mortgage recording taxes or filing fees which may become due, the Lender may make these payments and the amounts paid will be added to the amount due under the Agreement.

**26.    ADDITIONAL CHARGES**

I agree to pay reasonable charges as allowed by law in connection with the servicing of this loan including, without limitation, the costs of obtaining tax searches and subordinations. Provided, however, that nothing contained in this section is intended to create and shall not be construed to create any duty or obligation by Lender to perform any such act, or to execute or consent to any such transaction or matter, except a release of the Mortgage upon full repayment of all Sums Secured thereby.

**27.    AFFIDAVITS AND OTHER DOCUMENTS**

I will, on the Lender's request, sign any affidavits or other documents which may be necessary in order to maintain the priority of this Mortgage's lien, release the lien or enforce this Mortgage.

**28.    RIDERS TO THIS MORTGAGE**

If I execute one or more riders and recorded together with this Mortgage, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider(s) were a part of this Mortgage. [Check applicable box(es)]

☐ Condominium Rider                    ☐ 1-4 Family Rider

☐ Planned Unit Development Rider        ☐ Other(s) Due On Transfer Rider

By signing this Mortgage I agree to all of the above.

Witnesses                              Borrower(s)

_____    _____ (Date)
                                  Signature    Anthony A. Scarpino Jr    Seal

_____    _____ (Date)
                                  Signature    Eleanor L. Scarpino       Seal

_____    _____ (Date)
                                  Signature                              Seal

_____    _____ (Date)
                                  Signature                              Seal

_____    _____ (Date)
                                  Signature                              Seal

_____    _____ (Date)
                                  Signature                              Seal

**ACKNOWLEDGEMENT**

STATE OF: NEW YORK          )
                           ) ss.:
COUNTY OF: WESTCHESTER      )

On the 30th day of December 2004, before me, the undersigned, personally appeared Anthony A. Scarpino Jr & Eleanor L. Scarpino personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)
ANNA M. MONTEFINA
Notary Public, State of New York
No. 01MO6003422
Qualified in Queens County
Certificate Filed in New York County
Commission Expires March 2, 20 06

NY CEM    10 Year                                Page 8 of 8        6/3/2004

A-39



**\*413470550MTG9\***

| Control Number | WIID Number | Instrument Type |
|---|---|---|
| 413470550 | 2001347-000226 | MTG |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
**\*\*\* DO NOT REMOVE \*\*\***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

TYPE OF INSTRUMENT   <u>MTG - MORTGAGE</u>
FEE PAGES  15                       TOTAL PAGES  15

### RECORDING FEES

| | |
|---|---|
| STATUTORY CHARGE | $5.25 |
| RECORDING CHARGE | $45.00 |
| RECORD MGT. FUND | $4.75 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| | |
| TOTAL FEES PAID | $55.00 |

### TRANSFER TAXES

| | |
|---|---|
| CONSIDERATION | $0.00 |
| | |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

RECORDING DATE             12/26/2001
TIME                             15:53:00

### MORTGAGE TAXES

| | |
|---|---|
| MORTGAGE DATE | 10/01/2001 |
| MORTGAGE AMOUNT | $200,000.00 |
| EXEMPT | Yes |
| | |
| YONKERS | $0.00 |
| BASIC | $1,000.00 |
| ADDITIONAL | $475.00 |
| SUBTOTAL | $1,475.00 |
| MTA | $500.00 |
| SPECIAL | $0.00 |
| | |
| TOTAL PAID | $1,975.00 |

SERIAL NUMBER          CS38184
DWELLING                    1-2 Family

**THE PROPERTY IS SITUATED  IN
WESTCHESTER COUNTY, NEW YORK IN THE:
TOWN OF NORTH CASTLE**

**WITNESS MY HAND AND OFFICIAL SEAL**

*Leonard N. Spano*

LEONARD N. SPANO
WESTCHESTER COUNTY CLERK

Record & Return to:
HUDSON VALLEY BANK
CLOSING DEPT
HUDSON VALLEY BANK
YONKERS, NY 10707

**A-40**

RECORD AND RETURN TO:

HUDSON VALLEY BANK
21 Scarsdale Road
Yonkers, New York 10707-3205
ATT: Closing Department
Loan No. 0062000489

Section 1
Block 1
Lot(s) 11-17
Town of North Castle
County of Westchester

5692

—————————————[Space Above This Line For Recording Data]—————————————

# CREDIT LINE MORTGAGE

## WORDS USED OFTEN IN THIS DOCUMENT

(A)  "Mortgage." The "Mortgage" means all the terms, covenants and conditions contained in these pages. This document, which is dated October 1, 2001, and which secures a revolving credit Obligation will be called the "Mortgage."

(B)  "Borrower." Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, residing at 30 Brookwood Road, Bedford, New York 10506, sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C)  "Lender."  HUDSON VALLEY BANK, will be called "Lender." Lender is a State Chartered Bank, which was formed and which exists under the laws of the State of New York. Lender's address is 21 Scarsdale Road, Yonkers, New York 10707.

(D)  "Obligation." The obligation signed by Borrower and dated October 1, 2001, means the Home Equity Loan Agreement (the "Agreement") and extensions and renewals of that obligation executed in connection with this Mortgage.

The Agreement provides that the credit secured by the Property is an open-end revolving line of credit at a variable rate of interest. The maximum amount of all loan advances made to the Borrower under the Agreement and which may be secured by this Mortgage may not exceed  $200,000.00----- Dollars  (U.S. $200,000.00)(the "Credit Limit").  At any particular time, the outstanding obligation of Borrower to Lender under the Agreement may be any sum equal to or less than the Credit Limit plus interest and other charges owing under the Agreement and amounts owing under this Mortgage. Obligations under the Agreement, Mortgage and any riders thereto shall not be released even if all indebtedness under the Agreement is paid, unless and until we cause a Discharge of Mortgage to be executed and such Discharge is properly recorded. I have promised to pay this debt in monthly payments and to pay the debt in full by October 1, 2026.

(E)  "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(F)  "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

## BORROWERS TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY
I mortgage, grant and convey the Property to Lender subject to the terms of this Mortgage a/k/a Security Instrument. This means that, by signing this Mortgage a/k/a Security Instrument, I am giving Lender those rights that are stated in this Mortgage a/k/a Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Agreement;

(B) Pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 of this Mortgage a/k/a Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Mortgage a/k/a Security Instrument.

## DESCRIPTION OF THE PROPERTY
I give Lender rights in the Property described in (A) through (G) below:

(A) the Property which is located at  30 Brookwood Road, Bedford, New York 10506

This property is in Westchester County. It has the following legal description:

SEE SCHEDULE "A" ANNEXED HERETO AND MADE A PART HEREOF BY EXPRESS REFERENCE

SAID PREMISES BEING IMPROVED BY A ONE OR TWO FAMILY DWELLING.

(B) All buildings and other improvements that are located on the Property described in subparagraph (A) of this section;
(C) All rights in other property that I have as owner of the Property as described in subparagraph (A) of this section. These rights are known as "easements and appurtenances attached to the Property";
(D) All rights that I have in the land which lies in the street or roads in front of, or next to, the Property described in subparagraph (A) of this section;
(E) All fixtures that are now or in the future will be on the Property described in subparagraphs (A) and (B) or this section;
(F) All of the rights and property described in subparagraphs (B) through (E) of this section that I acquire in the future; and
(G) All replacements of or additions to the Property described in subparagraphs (B) through (F) of this section.

(11/96)

heloemtg.hvb
**CREDIT LINE MORTGAGE** - (Home Equity Line of Credit)

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE Mortgage A/K/A SECURITY INSTRUMENT

This Mortgage a/k/a Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary, to a limited extent, in different parts of the country. My promises and agreements are stated in "plain language."

### COVENANTS

I promise and I agree with Lender as follows:

## 1. BORROWER'S PROMISE TO PAY

I will pay to Lender on time principal and interest due under the Agreement and any prepayment and late charges due under the Agreement.

## 2. MONTHLY PAYMENTS FOR TAXES AND INSURANCE

### (A) Borrower's Obligations

I will pay to Lender, if required, all amounts necessary to pay for taxes, assessments, water frontage charges and other similar charges, sewer rents, leasehold payments or ground rents (if any), hazard or property insurance covering the Property, and flood insurance (if any). If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Agreement,(i)I also will pay to Lender all amounts necessary to pay for mortgage insurance, and (ii)if, under Paragraph 8 below, instead of paying for mortgage insurance I am required to pay Lender an amount equal to the cost of mortgage insurance, I will pay this amount to Lender. I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless the law requires otherwise. I will make these payments on the same day that my monthly payments of principal and interest are due under the Agreement.

My payments under this Paragraph 2 will be for the items listed in (i)through(vi) below, which are called "Escrow Items":
(i) The estimated yearly taxes,assessments,water frontage charges and other similar charges, and sewer rents on the Property which under the law may be superior to this Mortgage a/k/a Security Instrument as a lien on the Property. Any claim, demand or charge that is made
against property because an obligation has not been fulfilled is known as a "lien";
(ii) The estimated yearly leasehold payments or ground rents on the Property (if any);
(iii) The estimated yearly premium for hazard or property insurance covering the Property;
(iv) The estimated yearly premium for flood insurance covering the Property (if any);
(v) The estimated yearly premium for mortgage insurance (if any); and
(vi) The estimated yearly amount I may be required to pay Lender under Paragraph 8 below instead of the payment of the estimated yearly premium for mortgage insurance (if any).

Lender will estimate from time to time the amount I will have to pay for Escrow Items by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless the law requires Lender to use another method for determining the amount I am to pay. The amounts that I pay to Lender for Escrow Items under this Paragraph 2 will be called the "Funds." The Funds are pledged as additional security for all Sums Secured.

The law puts limits on the total amount of Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender for a "federally related mortgage loan" could require me to place in an "escrow account" under the federal law called the "Real Estate Settlement Procedures Act of 1974," as that law may be amended from time to time. If there is another law that imposes a lower limit on the total amount of Funds Lender can collect and hold, Lender will be limited to the lower amount.

### (B) Lender's Obligations

Lender will keep the Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Funds. Except as described in this Paragraph 2, Lender will use the Funds to pay the Escrow Items. Lender will give to me, without charge, an annual accounting of the Funds. That accounting must show all additions to and deductions from the Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Funds, for using the Funds to pay Escrow Items, for making a yearly analysis of my payments of Funds or for receiving, verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Funds and if the law permits Lender to make such a charge. Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with my loan, unless the law does not permit Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Funds unless either (i) Lender and I agree in writing, at the time I sign this Mortgage a/k/a Security Instrument, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds.

Page 2 of 9 pages

(C) Adjustments to the Funds

Under the law, there is a limit on the amount of Funds Lender may hold. If the amount of Funds held by Lender exceeds this limit, then the law requires Lender to account to me in a special manner for the excess amount of Funds. There will be an excess amount if, at any time, the amount of Funds which Lender is holding or keeping is greater than the amount of Funds Lender is allowed to hold under the law. If, at any time, Lender has not received enough Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items in full. Lender will determine the number of monthly payments I have in which to pay that additional amount, but the number of payments will not be more than twelve.
When I have paid all of the Sums Secured, Lender will promptly refund to me any Funds that are then being held by Lender. If, under Paragraph 21 below, either Lender acquires or sells the Property, then before the acquisition or sale, Lender will use any Funds which Lender is holding at the time of the acquisition or sale to reduce the Sums Secured.

### 3. APPLICATION OF BORROWER'S PAYMENTS

Unless the law requires otherwise, Lender will apply each of my payments under the Agreement and under Paragraphs 1 and 2 above in the following order and for the following purposes:
First, to pay any prepayment charges due under the Agreement;
Next, to pay the amounts due to Lender under Paragraph 2 above;
Next, to pay interest due;
Next, to pay principal due; and
Last, to pay any late charges due under the Agreement.

### 4. BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS

I will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents and any other charges and fines that may be imposed on the Property and that may be superior to this Mortgage a/k/a Security Instrument. I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will do this either by making the payments to Lender that are described in Paragraph 2 above or, if I am not required to make payments under paragraph 2, by making the payments on time to the person owed them. (In this Mortgage a/k/a Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so. If I make payment to Lender under Paragraph 2, I will give Lender all notices or bills that I receive for the amounts due under this Paragraph 4.

I will promptly pay or satisfy all liens against the Property that may be superior to this Mortgage a/k/a Security Instrument. However, this Mortgage a/k/a Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Mortgage a/k/a Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Borrower a notice identifying the superior lien. Borrower shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

### 5. BORROWER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE OR PROPERTY INSURANCE

I will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage, including floods and flooding. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. If I do not maintain the insurance coverage described above, Lender may obtain insurance coverage to protect Lender's rights in the Property in accordance with Paragraph 7 below.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (A) it is not economically feasible to make the repairs or restoration; or (B) the use of the proceeds for that purpose would lessen the protection given to Lender by this Mortgage a/k/a Security Instrument; or (C) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen that protection under this Mortgage a/k/a Security Instrument, then the proceeds will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage a/k/a Security Instrument. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

**Page 3 of 9 pages**

A-43

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of any of my monthly payments under the Agreement and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

If Lender acquires the Property under Paragraph 21 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

**6. BORROWER'S OBLIGATIONS TO OCCUPY THE PROPERTY, TO MAINTAIN AND PROTECT THE PROPERTY, AND TO FULFILL ANY LEASE OBLIGATIONS; BORROWERS LOAN APPLICATION**

**(A) Borrower's Obligations to Occupy the Property**

I will occupy the Property and use the Property as my principal residence within sixty days after I sign this Mortgage a/k/a Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**(B) Borrower's Obligations to Maintain and Protect the Property**

I will keep the Property in good repair. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate.

I will be "in default" under this Mortgage a/k/a Security Instrument if I fail to keep any promise or agreement made in this Mortgage a/k/a Security Instrument. I will also be in default under this Mortgage a/k/a Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is, a legal action or proceeding to require the Property, or any part of the Property, to be given up) is begun and Lender determines, in good faith, that this action or proceeding could result in a court ruling (i) that would require forfeiture of the Property or (ii) that would materially impair the lien of this Mortgage a/k/a Security Instrument or Lender's rights in the Property. I may correct the default by obtaining a court ruling that dismisses the legal action or proceeding, if Lender determines, in good faith, that this court ruling prevents forfeiture of my interest in the Property and also prevents any material impairment of (i) the lien created by this Mortgage a/k/a Security Instrument or (ii) Lender's rights in the Property. If I correct the default, I will have the right to have enforcement of this Mortgage a/k/a Security Instrument discontinued, as provided in Paragraph 18 below, even if Lender has required immediate payment in full.

**(C) Borrower's Obligations to Fulfill Any Lease Obligations**

If I do not own but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**(D) Borrower's Loan Application**

If, during the application process for the loan that I promise to pay under the Agreement, I made false or inaccurate statements to Lender about information important to Lender in determining my eligibility for the loan, Lender will treat my actions as a default under this Mortgage a/k/a Security Instrument. False or inaccurate statements about information important to Lender would include a misrepresentation of my intentions to occupy the Property as a principal residence. This is just one example of a false or inaccurate statement of important information. Also, if during the loan application process I failed to provide Lender with information important to Lender in determining my eligibility for the loan, Lender will treat this as a default under this Mortgage a/k/a Security Instrument.

**7. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**

If:(A)I do not keep my promises and agreements made in this Mortgage a/k/a Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture or to enforce laws or regulations) Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so.

I will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 7. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the Agreement rate. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this paragraph. This Mortgage a/k/a Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

**8. MORTGAGE INSURANCE**

If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Agreement, I will pay the premiums for the mortgage insurance. If, for any reason, the mortgage insurance coverage lapses or ceases to be in effect, I will pay the premiums for substantially equivalent mortgage insurance coverage. However, the cost of this mortgage insurance coverage must be substantially equivalent mortgage insurance coverage. However the cost of this mortgage insurance coverage must be substantially equivalent to the cost to me of the previous mortgage insurance coverage, and the alternate mortgage insurer must be approved by Lender.

Page 4 of 9 pages

If substantially equivalent mortgage insurance coverage is not available, Lender will establish a "loss reserve" as a substitute for the mortgage insurance coverage. I will pay to Lender each month an amount equal to one-twelfth of the yearly mortgage insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the mortgage insurance would have covered. Lender may choose to no longer require loss reserve payments, if mortgage insurance coverage again becomes available and is obtained. The mortgage insurance coverage must be in the amount and for the period of time required by Lender. The Lender must approve the insurance company providing the coverage.

I will pay the mortgage insurance premiums, or the loss reserve payments, until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law. Lender may require me to pay the premiums, or the loss reserve payments, in the manner described in Paragraph 2 above.

## 9. LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

## 10. AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY

A taking of property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking either is equal to, or greater than, the amount of Sums Secured immediately before the taking, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by a fraction. That fraction is as follows: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

Unless Lender and I agree otherwise in writing or unless the law requires otherwise, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking is less than the amount of the Sums Secured immediately before the taking, the proceeds will be used to reduce the Sums Secured.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of any of my monthly payments under the Agreement and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

## 11. CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS

### (A) Borrower's Obligations

Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Agreement or under this Mortgage a/k/a Security Instrument. Even if Lender does this, however, that person and I will both still be fully obligated under the Agreement and under this Mortgage a/k/a Security Instrument.

Lender may allow those delays or changes for a person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Agreement or under this Mortgage a/k/a Security Instrument, even if Lender is requested to do so.

### (B) Lender's Rights

Even if Lender does not exercise or enforce any right of Lender under this Mortgage a/k/a Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 21 below to demand that I make immediate payment in full of the amount that I owe to Lender under the Agreement and under this Mortgage a/k/a Security Instrument.

## 12. OBLIGATIONS OF BORROWER AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS

Any person who takes over my rights or obligations under this Mortgage a/k/a Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Mortgage a/k/a Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Mortgage a/k/a Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Mortgage a/k/a Security Instrument.

Page 5 of 9 pages

**A-45**

If more than one person signs this Mortgage a/k/a Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Mortgage a/k/a Security Instrument. Lender may enforce Lender's rights under this Mortgage a/k/a Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Agreement: (A) that person is signing this Mortgage a/k/a Security Instrument only to give that person's rights in the Property to Lender under the terms of this Mortgage a/k/a Security Instrument; and (B) that person is not personally obligated to pay the Sums Secured; and (C) that person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Mortgage a/k/a Security Instrument or the Agreement without that person's consent.

### 13. LOAN CHARGES

If the loan secured by this Mortgage a/k/a Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Agreement.

### 14. NOTICES REQUIRED UNDER THIS MORTGAGE A/K/A SECURITY INSTRUMENT

Any notice that must be given to me under this Mortgage a/k/a Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at the address stated in the section above titled "Description of the Property." A notice will be given to me at a different address if I give Lender a notice of my different address. Any notice that must be given to Lender under this Mortgage a/k/a Security Instrument will be given by mailing it to Lender's address stated in subparagraph (C) of the section above titled "Words Used Often In This Document." A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address. A notice required by this Mortgage a/k/a Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

### 15. LAW THAT GOVERNS THIS MORTGAGE A/K/A SECURITY INSTRUMENT

This Mortgage a/k/a Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Mortgage a/k/a Security Instrument or of the Agreement conflicts with the law, all other terms of this Mortgage a/k/a Security Instrument and of the Agreement will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Mortgage a/k/a Security Instrument and of the Agreement which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

### 16. BORROWER'S COPY

I will be given one conformed copy of the Agreement and of this Mortgage a/k/a Security Instrument.

### 17. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Lender may require immediate payment in full of all Sums Secured by this Mortgage a/k/a Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Mortgage a/k/a Security Instrument.

If Lender requires immediate payment in full under this Paragraph 17, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Mortgage a/k/a Security Instrument without giving me any further notice or demand for payment.

### 18. BORROWER'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS MORTGAGE A/K/A SECURITY INSTRUMENT DISCONTINUED

Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Mortgage a/k/a Security Instrument discontinued. I will have this right at any time before sale of the Property under any power of sale granted by this Mortgage a/k/a Security Instrument or at any time before a judgment has been entered enforcing this Mortgage a/k/a Security Instrument if I meet the following conditions: (A) I pay to Lender the full amount that would be due under this Mortgage a/k/a Security Instrument and the Agreement as if immediate payment in full had never been required; and (B) I correct my failure to keep any of my other promises or agreements made in this Mortgage a/k/a Security Instrument; and (C) I pay all of Lender's reasonable expenses in enforcing this Mortgage a/k/a Security Instrument including, for example, reasonable attorney's fees; and (D) I do whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Mortgage a/k/a Security Instrument, and my obligations under the Agreement and under this Mortgage a/k/a Security Instrument continue unchanged.

If I fulfill all of the conditions in this Paragraph 18, then the Agreement and this Mortgage a/k/a Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Mortgage a/k/a Security Instrument discontinued if Lender has required immediate payment in full under Paragraph 17 above.

**19. AGREEMENT HOLDER'S RIGHT TO SELL THE AGREEMENT OR AN INTEREST IN THE AGREEMENT; BORROWER'S RIGHT TO NOTICE OF CHANGE OF LOAN SERVICER**

The Agreement, or an interest in the Agreement, together with this Mortgage a/k/a Security Instrument, may be sold one or more times. I may not receive any prior notice of these sales.

The entity that collects my monthly payments due under the Agreement and this Mortgage a/k/a Security Instrument is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Agreement; there also may be one or more changes of the Loan Servicer unrelated to a sale of the Agreement. The law requires that I be given written notice of any change of the Loan Servicer. The written notice must be given in the manner required under Paragraph 14 above and under applicable law. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice will contain any other information required by the law.

**20. CONTINUATION OF BORROWER'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY**

The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection are called "Environmental Laws." I will not do anything affecting the Property that violates Environmental Laws, and I will not allow anyone else to do so.

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Paragraph 20. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Laws and the substances considered hazardous for purposes of the Paragraph 20 are called "Hazardous Substances."

I will not permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property, and I will not allow anyone else to do so. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. However, I may permit the presence on the property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and I may use or store these small quantities on the Property. In addition, unless the law requires removal or other action, the buildings, the improvement and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

If I know of any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws, I will promptly notify the Lender in writing. If the government notifies me (or I otherwise learn) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, I will promptly take all necessary remedial actions as required by Environmental Laws.

**21. LENDER'S RIGHTS IF BORROWER FAILS TO KEEP PROMISES AND AGREEMENTS**

Except as provided in Paragraph 17 above, if all of the conditions stated in subparagraphs (A),(B) and (C) of this Paragraph 21 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Agreement and under this Mortgage a/k/a Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require immediate payment in full under this Paragraph 21 only if all of the following conditions are met:

(A) I fail to keep any promise or agreement made in this Mortgage a/k/a Security Instrument, including the promise to pay when due the Sums Secured.
(B) Lender sends to me, in the manner described in Paragraph 14 above, a notice that states:
    (i) The promise or agreement that I failed to keep;
    (ii) The action that I must take to correct that default;
    (iii) A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;
    (iv) That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another person may acquire the Property by means of foreclosure and sale;
    (v) That if I meet the conditions stated in Paragraph 18 above, I will have the right to have Lender's enforcement of this Mortgage a/k/a Security Instrument discontinued and to have the Agreement and this Mortgage a/k/a Security Instrument remain fully effective as if immediate payment in full had never been required; and
    (vi) That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Agreement and under this Mortgage a/k/a Security Instrument, and to present any other defenses that I may have.

(C) I do not correct the default stated in the notice from Lender by the date stated in that notice.

## 22. LENDER'S OBLIGATION TO DISCHARGE THIS MORTGAGE A/K/A SECURITY INSTRUMENT

When Lender has been paid all amounts due under the Agreement and under this Mortgage a/k/a Security Instrument, Lender will discharge this Mortgage a/k/a Security Instrument by delivering a certificate stating that this Mortgage a/k/a Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

## 23. AGREEMENTS ABOUT NEW YORK LIEN LAW

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Mortgage a/k/a Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (A) hold all amounts which I receive and which I have a right to receive from Lender under the Agreement as a "trust fund"; and (B) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Paragraph 23.

## 24. RIDERS TO THIS MORTGAGE A/K/A SECURITY INSTRUMENT

If one or more riders are signed by Borrower and recorded together with this Mortgage a/k/a Security Instrument, the promises and agreements of each rider are incorporated as a part of this Mortgage a/k/a Security Instrument. [Check applicable box(es)]

[x] Adjustable Rate Rider    [ ] Condominium Rider    [ ] 1-4 Family Rider

[ ] Graduated Payment Rider    [ ] Planned Unit Development Rider    [x] Due on Transfer Rider

[ ] Balloon Rider    [ ] Rate Improvement Rider    [ ] Second Home Rider

[xx] Other(s) [specify] Schedule "A"

### REQUEST FOR NOTICE OF DEFAULT
### AND FORECLOSURE UNDER SUPERIOR
### MORTGAGES OR DEEDS OF TRUST

THIS MORTGAGE IS SUBJECT AND SUBORDINATE TO a certain mortgage dated March 14, 1997 by Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, Mortgagors, to Norwest Mortgage of New York Inc., Mortgagee, in the principal amount of $310,000.00 and was recorded on March 28, 1997, in the office of the Clerk of the County of Westchester, State of New York, at Liber 22593, Map 335; Which mortgage was assigned by Norwest Mortgage of New York Inc., as Assignor, to Norwest Mortgage Inc., as Assignee, by Assignment of Mortgage dated March 9, 1998 and recorded on August 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 157,; Which mortgage was further assigned by Norwest Mortgage Inc. as Assignor, to First Union National Bank of North Carolina, as Trustee, as Assignee, by Assignment of Mortgage dated April 25, 1997 and recorded on May 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 159

Borrower and Lender request the holder of any superior mortgage or deed of trust to notify Lender in writing, at Lender's address on page 1 of this Mortgage, if the Borrower is required to make "Immediate Payment In Full" and if there is "Foreclosure and sale" under that superior mortgage or deed of trust.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 8 of this Mortgage a/k/a Security Instrument and in any rider(s) signed by me and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                            Anthony A. Scarpino, Jr.

_____                    _____ (Seal)
                                            Eleanor L. Scarpino

Page 8 of 9 pages

STATE OF NEW YORK, WESTCHESTER COUNTY ss

On the 1st day of October, in the year 2001 before me, the undersigned personally appeared Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names is subscribed to the within instrument and acknowledged to me that they executed the same in their capacities, and that by their signatures on the instrument, the individuals or the person upon behalf which the individuals acted, executed the instrument.

Notary Public

BRANDON R SALL
NOTARY PUBLIC, State of New York
No. 02SA4856812
Qualified in Westchester County
Commission Expires March 24, 20__

Page 9 of 9 pages

**A-49**

RIDER ANNEXED TO AND MADE A PART OF MORTGAGE

DATED October 1, 2001, BETWEEN Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, AS MORTGAGORS, AND Hudson Valley Bank, AS MORTGAGEE.

The provisions contained in this Rider shall be deemed to amend and supplement the above-captioned Mortgage. If Lender transfers the Mortgage, Lender shall have the right to delete this Rider in its entirety from the Mortgage. Borrower and Lender hereby further covenant and agree as follows:

25. IMPROVEMENT OF PREMISES

The real property described in this mortgage is improved by a one or two family dwelling only.

26. IF LENDER REQUIRES IMMEDIATE PAYMENT IN FULL

In addition to the rights and remedies provided Lender in Paragraph 20 of the Mortgage, if Lender requires immediate payment in Full, Borrower shall pay interest of the unpaid principal then due on the Obligation at either the interest rate described in the Obligation or at the maximum rate permitted by law, whichever shall be higher.

27. SALE IN ONE PARCEL IN FORECLOSURE

If Lender brings a lawsuit for foreclosure and sale, and if the Property consists of two or more separate parcels of land, Borrower agrees that Lender may have the Property sold in the lawsuit in one parcel.

28. ESTOPPEL CERTIFICATE

Within ten (10) days after written request from Lender, Borrower will sign a certificate, called and "Estopple Certificate", stating the amount due on this Mortgage and whether Borrower has any defense against Borrower's debt to Lender under this Mortgage.

29. ADDITIONAL SECURITY

In addition to the Property described in the Mortgage, Borrower gives Lender rights in the following Property:

(A)  All mineral, oil and gas rights and profits, water, water rights and  water stock that are part of the property described in Paragraph (A) of that section of the Mortgage captioned "Description of the Property";

(B)  All rights that Borrower has in the land which lies in the streets or road in front of, or next to, the property described in Paragraph (A) of that section of the Mortgage captioned "Description of Property";

(C)  All fixtures on the property described in Paragraph (A) and (B) of that section of the Mortgage captioned "Description of the Property".  Usually, fixtures are items that are physically attached to buildings, such as hot water heaters;

(D)  All of the property in Paragraph (B) through (D) of that section of the Mortgage captioned "Description of the Property" and Paragraphs (A) and (B) of this section, that I acquire in the future, and all rights described in Paragraphs (B) through (D) of that section of the Mortgage captioned "Description of the Property", and Paragraphs (A) and (B) of this section;

(E)  All replacements of or additions to the property described in Paragraphs (B) ' through (D) of that section of the Mortgage captioned "Description of the Property", and Paragraphs (A) and (B) of this section;

(F)  All fixtures that: (i) are on the property described in Paragraphs (A) and (B) of that section of the Mortgage captioned "Description of the Property", and (ii) Borrower acquires in the future, except for those fixtures that under the law are "consumer goods" and that Borrower acquires more than ten (10) days after the date of the Obligation; and

(G)  All replacements of or additions to the fixtures that are on the property described in Paragraphs (A) and (B) of that section of the Mortgage captioned "Description of the Property", except for those replacements and additions that are: (i) made to fixtures that under the law are "consumer goods"; and (ii) made more than ten (10) days after the date of the Obligation.

30. SUBORDINATE MORTGAGE

THIS MORTGAGE IS SUBJECT AND SUBORDINATE TO a certain mortgage dated March 14, 1997 by Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, Mortgagors, to Norwest Mortgage of New York Inc., Mortgagee, in the principal amount of $310,000.00 and was recorded on March 28, 1997, in the office of the Clerk of the County of Westchester, State of New York, at Liber 22593, Map 335; Which mortgage was assigned by Norwest Mortgage of New York Inc., as Assignor, to Norwest Mortgage Inc., as Assignee, by Assignment of Mortgage dated March 9, 1998 and recorded on August 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 157,; Which mortgage was further assigned by Norwest Mortgage Inc., as Assignor, to First Union National Bank of North Carolina, as Trustee, as Assignee, by Assignment of Mortgage dated April 25, 1997 and recorded on May 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 159

BY SIGNING BELOW,  Borrower(s) accepts and agrees to the terms and provisions contained in this Rider.

Witnesses:

_____                    _____ (Seal)
                                           Anthony A. Scarpino, Jr.

_____                    _____ (Seal)
                                           Eleanor L. Scarpino

A-50

## DUE-ON-TRANSFER RIDER

**NOTICE: THIS RIDER ADDS A PROVISION TO THE SECURITY INSTRUMENTS ALLOWING THE LENDER TO REQUIRE AN INCREASE IN THE OBLIGATION INTEREST RATE AND TO CHANGE OTHER OBLIGATION TERMS UPON TRANSFER OF THE PROPERTY.**

This Due-On-Transfer Rider is made this 1st of October, 2001, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, Or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Obligation to  (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

30 Brookwood Road, Bedford, New York 10506

**AMENDED COVENANT.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further agree as follows:

### A.  TRANSFER OF THE PROPERTY; ASSUMPTION

Uniform Promise 19 of the Security Instrument is amended to read as follows:

### 17.  AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS TRANSFERRED

If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Security Instrument which does not relate to a transfer of rights of occupancy in the property, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, Lender may, at Lender's option, declare all sums secured by this Security Instrument to be immediately due and payable.

If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with Paragraph 15 hereof. Such notice shall provide a period of not less than thirty (30) days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by Paragraph 20 hereof.

Lender may consent to a sale or transfer if: (1) Borrower causes to be submitted to Lender information required by Lender to evaluate the transferee as if a new loan were being made to the transferee; (2) Lender reasonably determines that Lender's security will not be impaired and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable; (3) interest will be payable on the sums secured by this Security Instrument at a rate acceptable to Lender; (4) changes in the terms of the Obligation and this Security Instrument required by Lender are made, including, for example, periodic adjustment in the interest rate, a different final payment date for the loan, and addition of unpaid interest to principal; and (5) the transferee signs an assumption agreement that is acceptable to Lender and that Obligates the transferee to keep all the promises and agreements made in the Obligation and in this Security Instrument, as modified if required by Lender. To the extent permitted by applicable law, Lender also may charge a reasonable fee as a conditin to Lender's consent to any sale or transfer.

Borrower will continue to be obligated under the Obligation and this Security Instrument unless Lender releases Borrower in writing.

IN WITNESS WHEREOF, Borrower has executed this Due-On-Transfer Rider.

Witnesses:

_____        _____ (Seal)
                                        Anthony A. Scarpino, Jr.

_____        _____ (Seal)
                                        Eleanor L. Scarpino

CREDIT LINE FIXED/ADJUSTABLE RATE RIDER

THIS CREDIT LINE FIXED/ADJUSTABLE RATE RIDER is made this 1st day of October, 2001, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Home Equity Loan Agreement (the "Agreement") to HUDSON VALLEY BANK, a State Chartered Bank, (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

30 Brookwood Road, Bedford, New York 10506

THE AGREEMENT CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT.  THE AGREEMENT LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1.  ADJUSTABLE INTEREST RATE

(A)  Change Dates
The interest rate I will pay may change on the first day of each month following a change in the Prime Rate.  Each date on which my interest rate could change is called a "Change Date."

(B)  The Index
The Home Equity Loan Agreement provides for an initial interest rate of 6.500%, which will adjust based on the indicated index for a period of twelve (12) months.  After this initial twelve (12) month period, the Agreement provides for changes in the interest rate which will begin on the 1st day of October, 2002.  Thereafter, my interest rate and monthly payments will be calculated as follows:

(a)  The Annual Percentage Rate applicable to my Home Equity Loan is adjustable and may increase or decrease based on changes in the highest prime rate published daily in the Wall Street Journal's listing of "Money Rates" (the "Index").  If the Wall Street Journal ceases to publish the Index, the Agreement Holder will choose a substitute Index that is based upon comparable information and, if necessary, a substitute margin, so that the change in the Index results in substantially the same rate as required under the previous Index.

(b)  The Annual Percentage Rate for the monthly billing period during which any advance (including the first advance) is made will be the value of the Index, as determined from the Prime Rate as published in the Wall Street Journal's listing of "Money Rates" on the first day of the month preceding the date of this loan, plus 1.000 percentage points.  The corresponding Daily Periodic Rate is the Annual Percentage Rate divided by 365.  Any increase or decrease in the Annual Percentage Rate will be effective on the first day of the monthly billing period.

(C)  Calculation of Changes
Before each Change Date, the Agreement Holder will calculate my new interest rate by adding 1.000 points (1.000%) to the Current Index.  Subject to the limits stated in Section 1(D) below, this will be my new interest rate until the next Change Date.

The Agreement Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

(D)  Limits on Interest Rate Changes
The Annual Percentage Rate that I may be charged at any time will not exceed the initial Annual Percentage Rate plus eight (8.0%) percent, not to exceed the New York State usury rate ceiling applicable at the Closing, currently 16.00%.

(E)  Effective Date of Changes
My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F)  Notice of Changes
The Agreement Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

2.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.
If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.  Lender also shall not exercise this option if:  (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Agreement and in this Security Instrument. Borrower will continue to be obligated under the Agreement and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

By Signing Below, Borrower accepts and agrees to the terms and covenants contained in this Credit Line Fixed/Adjustable Rate Rider.

_____ (Seal)
Anthony A. Scarpino, Jr.

_____ (Seal)
Eleanor L. Scarpino

Fidelity National Title Insurance Company of New York

TITLE NO. 01-3702-56952-W

## SCHEDULE A-1 (*Description*)

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of North Castle, County of Westchester and State of New York, shown and designated as Lot No. 17 on a certain map, "Subdivision Map of Middle Patent Estates, West, situate in the Town of North Castle, Westchester County", completed October 26, 1964 by Ralph M. McDonald and filed May 3, 1966 in the County Clerk's Office, Division of Land Records, as Map No. 14814, being more particularly bounded and described as follows:

BEGINNING at a point on the northerly side of Brookwood Road where the same is intersected by the division line between Lots 17 and 18 on the above mentioned map;

Said point of beginning also being 209.66 feet westerly from the westerly end of a curve connecting the northerly side of Brookwood Road and the westerly side of Mianus Drive;

RUNNING THENCE along the northerly side of Brookwood Road the following courses and distances:

Westerly on a curve to the left having a radius of 575.00 feet, a length of 73.38 feet;

Westerly on a curve to the right having a radius of 30.00 feet, a length of 26.63 feet and;

Westerly on a curve to the left having a radius of 65.00 feet, a length of 55.08 feet to the division line between Lots 16 and 17 on the above mentioned map;

RUNNING THENCE along said division line North 15 degrees 23 minutes West 100.00 feet and North 27 degrees 03 minutes 20 seconds West 296.50 feet to a point;

RUNNING THENCE North 14 degrees 53 minutes 50 seconds East 227.89 feet to the division line between Lots 17 and 20 on the above mentioned map;

RUNNING THENCE along said division line South 75 degrees 44 minutes 55 seconds East 234.50 feet to the division line between Lots 8 and 17 on the above mentioned map;

RUNNING THENCE along said division line South 2 degrees 46 minutes 13 seconds East 517.49 feet to the point and place of beginning.

**THE POLICY TO BE ISSUED** *under this commitment will insure the title to such buildings and improvements on the premises which by law constitute real property.*

**FOR CONVEYANCING ONLY:** *Together with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.*

*SCHEDULE A-1 (Description)*

TEL NO.4__ 867 5200                    Dec 26 91  15:45 P 11

**THE THOMAS AND AGNES CARVEL FOUNDATION**


**AG CONFERENCE**
**February 18, 1992**


1) Original basis for investigation resulted in substantially supporting Foundation position as to CEIC transaction - no impropriety; no sweetheart deal; no TC gift to his employees. Had AG accepted explanation given by RMD and MA at outset, the waste on both sides would have been avoided.

2) "Suitability" is a manufactured issue without any clear standards; if equivalent to removal for cause, we win. Practically, resignation of 2 Members plays into hands of family; counter-productive from AG viewpoint to impose family control on future operations of Foundation. Resignations of RMD and MA discredits them and provides family with opportunity to assume control of Foundation, or at least Estate and Agnes' assets.

3) Money recovery for CEIC price adjustment:

   - basis is totally artificial; no firm offer to Foundation in September which Foundation could have accepted.

   - in any event, practical difficulty of recovery from limited partners; will AG accept assignment of CEIC 11% in any escrow fund balance (i.e. $1.0MM balance = $110,000). Recovery from Estate is meaningless since Foundation is beneficiary of Estate.

4) Tuition payments:

   Iona - MA has paid.

   Pace - Foundation is seeking to recover from Pace or Chris, possibly from CEIC balance. (MA is considering guaranty of payment?)

   St. Anthony's - Foundation will undertake recovery.

   Amended 990PF will be filed - deficiency in distributions covered by excess distributions in subsequent years.


(1)


LACE-000494

CARMEL          TEL NO.407 967 5200              Dec 16 92  18 08 P.03

5) How to protect confidentiality of any settlement.

6) MA money payments:

- Tuition - see above
- Loans - Surrogate Court will decide
- CRIC profit - no basis for recovery from her; her profit reduced by any price adjustment recovery. Her "profits" are small in relation to TC generosity in stock options.
- Stock redemption profit - she would have made more if she didn't redeem.

7) MA resignations:

- Retain Membership to prevent family control.
- Designate her successor and she agrees to resign in 1993, or on Agnes' death.
- Resign as director and officer.

8) Litigation will further waste Foundation funds. AG should wish to avoid.

9) CRIC sale benefitted Foundation:

- excess business holdings
- provided cash to fund mandatory distribution
- sale at "fair value" when no other market available

10) Wolfe to attend.

11) Successor Members:

Sal Molella
Ann McHugh's son
Jim O'Connor
Hudson Valley
Dave Malane

12) Amended 990 PF for 11/30/89

13) Revised budget - shortfall in grants for 1992 without reduction in legal expense.

(2)

TACF-000895

CHRVEL    TEL NO.407 967 5200    Dec 26.92  15:47 P.23

April 9, 1992

**First:** The following actions are proposed to be taken at the 1993 Annual Meeting of Members (or a 1992 Special Meeting of Members) before Mildred resigns:

1. By-laws will be amended, effective immediately, by a two-thirds vote of the 8 Members (RMD, MA, Wilson, Griffin, Reddy and Ann) as follows:

   (i) super-majority vote (2/3) of Members required: to elect additional Members; to elect and classify directors; to remove directors with or without cause; and to amend certain By-laws.

   (ii) Two-thirds of Members, present or by proxy, constitutes a quorum at meetings to take any action requiring a two-thirds vote of Members.

   (iii) Directors to be classified into three (or five) classes with varying terms of office.

   (iv) President's duties as Chief Executive Officer to be detailed.

   (v) If at any time, President is not a director, he will act as an ex-officio director with voting rights.

2. RMD employment contract will be approved for 3 (or 5) year term commencing April 1, 1993, with annual compensation review and adjustment.

3. Nine (9) directors will be elected for terms commencing in March 1993 and classified to end as follows:

   Agnes, Davis and Wilson - March 1996
   Reddy, Molella and McHugh - March 1995
   Byrne, Cerrato and a new director - March 1994

4. AG Settlement Agreement will be approved and signed by Members (all or a majority?)

**Second:** Mildred will resign as a Member and a director (officer?), effective immediately following Members and Board of Directors Meetings. (Note: Following Mildred's resignation as a director, a majority of the 8 directors would require 5 votes, e.g., RMD, Wilson, Sal, Ann, and Reddy; thus, it is proposed to add another loyalist director (e.g., Griffin or O'Connor, or both if Tony Cerrato resigns)

FACT-000396

A-57

CONFIDENTIAL MEMORANDUM
April 9, 1992
Page 2

to better assure a majority; if a majority vote cannot be obtained, the incumbent officers (see Fourth below) will continue in office for additional three year terms; and a super-majority vote of directors to remove a director or officer will require 6 votes, whether or not a ninth director is elected.]

Third: RMD will resign as a Member following 1993 Members and Board meetings [Note: after the resignation, a 3/3 vote of the six remaining Members to take action requires 4 votes: Wilson, Griffin, Tom and Ann; if one or two new members are elected, the same four Members' votes, in addition to the vote of the new Member(s), will still be required to take action; if the two thirds vote is not obtainable, the incumbent directors will continue in office for additional terms equal to their original terms.]

Fourth:  The Board of Directors will meet in March 1993 and take the following actions:

1.   Approve actions taken by Members, described above.

2.   Elect officers for three year terms, as follows:

President and Chief Executive
        Officer   -                        RMD
VP and Treasurer -                  Ann McHugh
VP and Secretary -                  Sal Melella
Asst. Secretary/Asst. Treasurer -   Lorraine Gerard
Honorary Chairman -                 Agnes Carvel
[Mildred ?]

TACF-000497

Form 706 (Rev. 7 90)                                        (Make copies of this schedule before completing it if you will need more than one schedule.)

**Estate of:** THOMAS CARVEL

## CONTINUATION SCHEDULE

### Continuation of Schedule ___E (PART 1)___
(Enter letter of schedule you are continuing.)

| Item number | Description<br>For securities, give CUSIP number, if available. | Unit value<br>(Sch B or E only) | Alternate valuation date | Alternate value | Value at date of death or amount deductible |
|---|---|---|---|---|---|
| 10 | CHASE MANHATTAN BANK<br>800 CENTRAL PARK AVENUE<br>YONKERS, NY   10710<br>TIME DEPOSIT ACCT. #543-004970 | | | | 44,315 |
| 11 | MARINE MIDLAND BANK, N.A.<br>ONE MARINE MIDLAND CENTER<br>BUFFALO, NY   14240<br>TIME DEPOSIT ACCT. #567-49988-0 | | | | 106,178 |
| 12 | NATIONAL WESTMINSTER BANK<br>1 SAW MILL RIVER ROAD<br>YONKERS, NY   10701<br>SAVINGS ACCT. #1-353-20535-4 | | | | 4,678 |
| 13 | FIRST FEDERAL SAVINGS & LOAN<br>    OF ROCHESTER<br>99 PONDFIELD ROAD<br>BRONXVILLE, NY   10708<br>TIME DEPOSIT ACCT. #811034877 | | | | 44,089 |
| 14 | NATIONAL WESTMINSTER BANK<br>1 SAW MILL RIVER ROAD<br>YONKERS, NY   10701<br>NOW ACCT. 1-353-202850 | | | | 74,628 |
| 15 | WINDING ROAD FARM<br>SINGLE FAMILY DWELLING ON 15.628 ACRES<br>IN TOWN OF GREENBURGH, NEW YORK,<br>SECTION 33, SHEET 45, LOT P-58<br>VALUE BASED ON APPRAISAL, A COPY OF<br>WHICH IS ATTACHED | | | | 1,100,000 |
| 16 | PRIVATE RESIDENCE*<br>228 ORANGE TREE DRIVE<br>ATLANTIS, FLORIDA   33462<br>Lot 6, Block 9A, Plat 4 | | | | 175,000 |
| 17 | PRIVATE RESIDENCE*<br>265 NORTH COUNTRY CLUB DRIVE<br>ATLANTIS, FLORIDA   33462<br>Lot 1, Block 2, Plat 1 | | | | 285,000 |
| | *VALUE BASED ON APPRAISAL, COPY<br>OF WHICH IS ATTACHED." | | | | |

TOTAL. (Carry forward to main schedule.) .................................................  1,833,888

See instructions on next page.

11/5/90

Published by Tax Management Inc., a Subsidiary of The Bureau of National Affairs, Inc.

706.35

A-59

MAR-30-99 08:25 AM    ROSS,AND,MAIZA    212 587 3326    P.17



Lawyer Directory

**http://lawyers.findlaw.com**

Tuesday, May. 08, 2007

### Paul G. Amicucci

**Firm:** Griffin, Coogan & Veneruso, P.C.

**Address:** 51 Pondfield Road
Bronxville, NY 10708-3805
Map & Directions

**Phone:** (914) 961-1300

**Fax:** (914) 961-9385
(914) 961-1476

---

**West Practice Categories:**

Estate Planning

---

When viewing a listing, consider the state advertising restrictions to which lawyers and law firms must adhere, as well as our West Legal Directory disclaimers.

---

**FindLaw Lawyer Directory**    Browse by Location | Browse by Legal Issue | Search by Name | Advanced Search | Help & Tools

Copyright © 2007 FindLaw. ALL RIGHTS RESERVED    Privacy Policy  Disclaimer          About FindLaw  Advertise on FindLaw

**A-60**

**FindLaw | For the Public | For Small Business | For Legal Professionals | Find a Lawyer**

# FindLaw
Lawyer Directory

**Legal Issue:** (e.g., Divorce)      **Location:** (e.g., Chicago, IL or 60611)

Find Lawyers!

| Browse by Location | Browse by Legal Issue | Search by Name | Advanced Search | Help & Tools |

**Sponsored Listings**

FindLaw > Lawyer Directory > Law Firm Profile     Save   Email   Print   Update   Get Listed

## Griffin, Coogan & Veneruso, P.C.

**Address:** 51 Pondfield Road
Bronxville, NY 10708-3805
Map & Directions

**Phone:** (914) 961-1300

**Fax:** (914) 961-9385
(914) 961-1476

---

Attorneys

**Attorneys:**

Amicucci, Paul G.
Campbell, Jaimee L.
Coogan, James M., Member
Griffin, Daniel J.
Griffin, William E., Managing Partner
Veneruso, James J., Member

**West Practice Categories:**

Business Organizations

---

When viewing a listing, consider the state advertising restrictions to which lawyers and law firms must adhere, as well as our West Legal Directory disclaimers.

**Sponsored Listings**

**Legal Issue:** (e.g., Divorce)     **Location:** (e.g., Chicago, IL or 60611)

Find Lawyers!    **Search by Name**
**Advanced Search**

---

**FindLaw Lawyer Directory**    Browse by Location | Browse by Legal Issue | Search by Name | Advanced Search | Help & Tools

Copyright © 2007 FindLaw. ALL RIGHTS RESERVED    Privacy Policy   Disclaimer     About FindLaw   Advertise on FindLaw

**A-61**



Home | Branch Locations | Site Map

**Total Commitment
to Our Customers**

| Business & Professional Banking | Loans | Investment Management & Trusts | Personal |

Search our site:

[          ] [Search]

## BUSINESS AND DEVELOPMENT BOARD



About Us

Careers

Shareholder Information

Resource Center

Calculators

Hudson Valley Bank's Business Development Board is a special group of customers and ambassadors who help us keep in close touch with the community and provide us with quality advice and guidance. Business Development Board members are appointed by the Board of Directors to assist the Bank in developing deposits, loans and investment business and to help Hudson Valley grow and compete with other banks in areas where the Bank has a presence.

Hudson Valley Bank adds members to the Business Development Board when vacancies occur or when the Bank expands into new location Board of Directors looks to fill these positions with highly-qualified professionals, who ca achieving the Bank's goals.

Business Development Board members benefit from their association with Hudson Valle through networking opportunities and exposure for their businesses.

With our new
Hudson Valley Bank
Debit MasterCard®
you can...



**John P. Abplanalp**
President
Precision Valve Corporation

**Eugene Albert**
Attorney & President
Albert Valuation Group Inc.

**Paul A. Amicucci**
Partner
Walsh & Amicucci, LLP

**Mark I. Anker**
President
Anker Management Corp.

**Andrew J. Balint**
Attorney
DelBello, Donnellan, Weingarten Tartaglia

**William F. Banks**
Attorney
Banks, Curran & Keefe LLP

**William R. Bastardi, Jr.**
President
B & B Auto Parts

**Ellen M. Boyle**
Attorney
Boyle Real Estate

**Gerald M. Boyle**
Executive Vice President/Principal
Commodore Construction Corp.

**Steven Brown**
President
Greyston Foundation

**Mae R. Carpenter**

**A-62**

Director
Westchester Public Private Membership Fund For Aging Services, Inc.

**Ernest R. Catenacci**
Certified Public Accountant
Catenacci, Markowitz, Delandri, Rosner & Co.

**Paul F. Cocozza**
Attorney
Cocozza & Cocozza
P.F.C. Abstract Corp.

**Cathy Alexis Comas**
Vice President
M.J. Comas Company Inc.

**Clifford Cook**
Owner
Clifford Cook Moving & Storage

**The Hon. Jerry L. Crispino**
Retired State Supreme Court Justice

**Joan P. Cunningham**

**Joseph R. Curto**
Attorney
Leahy, Nyberg, Curto & D'Apice

**Michael D'Alessio**
President
D'Alessio Enterprises LLC

**Mr. Dominick D'Ambrozio, CPA**
D'Ambrozio, Newman & Co., LLP

**Carl A. D'Angelo**
Attorney

**Anthony V. DeBellis, Sr.**
Commisioner of Assessment
City of Mount Vernon

**Joseph A. Deglomini**
President
Liberty Mechanical Contractors

**Steven E. De Young**
Attorney

**Patrick A. Diggins**
President
Diggins Mechanical Corporation

**Robert J. DiSciullo, Esq.**
Attorney
DiSciullo Botchman, LLP

**Edward W. Doyle**
Attorney

**Brian Allen Eisen**
Attorney

**Mark F. Engel**
President
Langsam Property Services Corp.

**Michael E. Fareri**
President
Fareri Bros., Inc.

**John P. Farrauto**

**A-63**

Attorney
Farrauto, Berman, Fontana & Selznick

**Bram Fierstein**
Vice President
Gramatan Management Associates

**Eli B. Fine**
Certified Public Accountant

**John N. Finnerty**
Retired Director, President & CEO
Hudson Valley Bank

**David A. Ford, Sr.**
Water Commissioner
Mt. Vernon Board of Water Supply

**Ken Ford**
Principal
New York Title Research Corporation

**Jim Foy**
President & CEO
St. John's Riverside Hospital

**Robert J. Galterio**
General Manager
Yonkers Racing Corp.

**Jeffrey Garson**
President
Garson Brothers Development

**Anthony S. Gazivoda**
President
Gazivoda Realty

**Steven J. Giamundo**
President
GIA Associates, Inc.

**Mark D. Ginsburg**
Attorney
Ginsburg & Redmond P.C.

**Lisa Gioffre Baird**
Attorney
Gioffre & Gioffre, PC

**Ralph Giordano**
President
Ralph Giordano Funeral Home

**Arlen Goldberg**
President
Metropolis Abstract Corp.

**George Grossman**
Attorney
Grossman & Associates

**P. Daniel Hollis Esq.**
Partner
Shamberg, Marwell Hocherman Davis & Hollis P.C.

**George M. Homer, Jr.**
Chairman & CEO
Murray, Schoen & Homer Inc.

**Martin M. Hopwood**
President
L & M Distributors, Inc.

**Thomas J. Hughes**
Sole Practitioner

**A-64**

**Adam W. Ifshin**
President
DLC Management Corporation

**Peter Iovino**
President
Total Real Estate Services, Inc

**Paul Jones**
Jones Equities, LLC

**Laurence Keiser**
Attorney
Stern, Keiser, Panken & Wohl L.L.P.

**John T. LaMorte II**
President & COO
Westchester Property Management Group, Inc.

**Warren L. Lesser**
Chairman
H & S Property Management, Inc.

**Barbara Lerman**
Attorney

**Royden A. Letsen**
Former HVB Director, Attorney

**Barry H. Levites**
President
Levites Realty Management Corp.

**Joseph Lorono**
President
Lorono Construction

**Lawrence L. Maffei**
Attorney
Maffei, Maffei & Keating

**Robert Mandel**
Attorney

**Anthony Martello**
President
Matell Contracting Co. Inc.

**John R. McCarthy**
Managing Director
Jones Lang La Salle

**Kenneth M. Meccia**
President
Statewide Abstract Corp.

**Frederick K. Mehlman**
President & CEO
J.R.D. Management Corp.

**Giulio Monaco, Sr.**
President
Verde Electric Corp.

**Michael Morelli**
President
VIP Beach & Tennis Club

**Awni I. Naber**
President
Naber Electric Corp.

**Andrew J. Natale, Jr.**
Attorney
Oxman, Natale, Friedman, Geiger & Tulis

**A-65**

**Mark Nesoff, Esq.**
Attorney

**Ralph R. Nobile**
Attorney
Nobile, Magarian & DiSalvo

**Richard B. O'Neill**
Property Management Consultant
Fringe Benefits

**Marc S. Oxman, Esq.**
Partner
Oxman Tullis Kirkpatrick Whyatt & Geiger, LLP

**David A. Pope**
Executive Vice President & Treasurer
Generoso Pope Foundation

**Valorie J. Promisel**
Attorney

**Arnold Putterman**
President
Somers Manor Nursing Home

**Cory B. Rabin**
Attorney
Rabin & Panero

**Philip Raffiani**
Vice President
Mirado Properties Inc.

**Ronald Rettner**
President
Rettner Realty Management Corp.

**Ero F. Rifelli**
Chairman
United Iron, Inc.

**Jeffrey Rodner**
Partner
Geller & Rodner

**Richard C. Ross**
Attorney

**Sheryl Saidel**
Partner
Saidel & Saidel

**Christopher Santomero**
Owner
Lordae Management

**Jeffrey L. Sapir**
Attorney

**Donald Scampoli**
Executive Director
Westchester School for Special Children

**Andrew W. Sayegh**
Attorney

**Mark Scharfman**
President
Beach Lane Management, Inc.

**David Simkins**
President
Mobile Communications Plus Inc.

**Pat Simone**
President

**A-66**

Simone Development Company, LLC

**Frank Sinatra, Jr.**
President
Sinatra Funeral Home, Inc.

**Joseph J. Sisca, Jr.**
President
J.J. Sisca & Associates

**Robert V. Sisca, Esq.**
Attorney
Law offices of Robert V. Sisca

**Judith A. Speight**
CEO
Hudson North Management LLC

**Michael Spicer**
President & CEO
St. Joseph's Medical Center

**Louis M. Spizzirro**
Attorney

**Lyle Ison Steinberg**
President
Westchester Fairfield Agency, Ltd.

**Richard J. Strassfield, Esq.**
Partner
Harold, Salant Strassfield & Spielberg

**Richard M. Sussman**
Attorney

**Stephen P. Tenore**
Co-owner & Funeral Director
Lloyd Maxcy & Son's

**Timothy R. Tostanoski**
President
Truckmiles, Inc.

**John P. Tucciarone**
Attorney

**Louis M. Vazquez**
Executive Director
RAIN Inc.

**James J. Veneruso**
Partner
Griffin, Coogan & Veneruso P.C.

**Vito R. Verni**
President
Verco Management

**Colleen Griffin Wagner**

**Iris Walshin**
Vice President & Secretary
Martin Walshin Inc.

**Howard Wenig, Esq.**
Managing Partner
Belkin Burden Wenig Goldman, LLP

**Michael J. Whelan**
President
Gardner M. Bishop, Inc.

**Donald E. Wilson**
President
Blue Woods Management Group, Inc.

**A-67**

**Samuel A. Wilkins, Jr.**
President
Hillside Development Corp.

**Frank Wymbs**
President
Wymbs, Inc.

**Dorothy L. Zeifer**
President
North River Associates, Inc.



Member FDIC

## HUDSON VALLEY BANK
Home | Branch Locations | Site Map | **Contact Us**
Business & Professional Banking | Loans | Investment Management & Trusts | Personal Banking
Online Banking & Bill Pay | About Us | Careers | Shareholder Information | Resource Center | Calculators
Privacy Policy | Security Statement | USA PATRIOT Act | Terms of Use | For Your Protection | SEC    Equal H
Filings

©2005 Hudson Valley Bank. All rights reserved. Website designed by Goldleaf Technologies.

**A-68**