IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Pamela Carvel, as Citizen, as Delaware Ancillary Administrator for Agnes Carvel Estate, as Member for Thomas and Agnes Carvel Foundation,<br><br>Plaintiffs,<br><br>v.<br><br>William Griffin, Marie Abplanalp, Salvatore Molella, Robert Davis and John/Jane Doe 1-20 Doe Corp. 1-20,<br><br>Defendants. | Case No. 07-CV-00273-*** |

## AFFIDAVIT OF STEVEN J. FINK

STATE OF NEW YORK    )
                                        ) ss.:
COUNTY OF NEW YORK  )

I, STEVEN J. FINK, affirm under penalty of perjury as follows:

1. I am a member of the bar of this Court and of the law firm Orrick,

Herrington & Sutcliffe LLP ("Orrick"), counsel to Defendants William Griffin, Marie

Abplanalp Holcombe and Salvador Molella (the "Defendants"). I submit this affidavit in

support of the Defendants' motion to dismiss, for lack of personal jurisdiction and failure

to effect proper service, the Amended Complaint for Continuing Conspiracy to Violate

Constitutional Rights & Commit Frauds and Demand for Jury Trial (the "Amended

Complaint") filed by Pamela Carvel ("Pamela") on September 17, 2007.

### BACKGROUND

2. The Defendants are Members and Directors of The Thomas and Agnes

Carvel Foundation (the "Foundation"). Messrs. Griffin and Molella are also Foundation

1

Officers. The Foundation is a not-for-profit corporation organized pursuant to New York's Not-for-Profit Corporation Law. Its offices are located in Westchester County, New York.

        3. Plaintiff Pamela Carvel is the consanguine niece of Thomas Carvel ("Thomas"), who founded the Carvel soft ice cream franchise. Thomas and his wife Agnes Carvel ("Agnes") founded the Foundation. Pamela is a Member of the Foundation as successor to Agnes.

        4. Pamela was appointed by the Westchester County, New York Surrogate's Court ("the Westchester Surrogate's Court") as one of the seven original Executors of Thomas Carvel's Estate following Thomas's death in October 1990. She served in that capacity until July 1995, when the Surrogate suspended her as Executrix based upon the undisputed facts that Pamela had effected the transfer of $2 million from a corporation owned wholly or in part by Thomas's Estate to an account at Swiss Bank Corp. in London, England in the names of Agnes and Pamela. *See* Westchester Surrogate's Court Order dated July 5, 1995, File No. 3285/90, a true and correct copy of which is attached hereto as Exhibit 1, at 4. In February 2000, the Westchester Surrogate's Court accepted Pamela's resignation as Executor, but made clear that in doing so it was not giving her an "honorable discharge." The Surrogate stated: "Pamela's conduct as a fiduciary and campaign to thwart the legitimate processes of estate administration present reasonable grounds to summarily remove her ... [I]t is only to protect the estate from the further expense of additional proceedings that the Court has accepted her resignation." *See* Westchester Surrogate's Court Decision dated February

17, 2000, File No. 3285/1990, a true and correct copy of which is attached hereto as Exhibit 2, at 8.

5.    The Foundation is the residuary beneficiary of Thomas's Estate and the party entitled, by Westchester Surrogate's Court Decree, to the residue of Agnes's Estate. *See Matter of the Thomas and Agnes Carvel Foundation*, 4/15/2002 N.Y.L.J. 29, (col. 6) (Westchester Surrogate's Court); Westchester Surrogate's Court July 8, 2002 Decree, File Nos. 3285/1990; 2165/1998, a true and correct copy of which is attached hereto as Exhibit 3.

6.    Agnes died in London, England in August 1998. Pamela then submitted Agnes's will, dated July 7, 1995, to the High Court of Justice, Chancery Division, London England (the "High Court") for probate. The High Court probated the will and appointed Pamela as sole personal representative of Agnes's estate. Pamela served in that capacity until the High Court removed her in June of this year on the Foundation's application, recognizing that Pamela "is in a position of irreconcilable conflict with [the Foundation] and her hostility to the Foundation renders it quite impossible for her to fulfill her fiduciary duties." *See* Approved Judgment of the High Court dated June 11, 2007, Case No. HC06C03337 (the "High Court Judgment"), a true and correct copy of which is attached hereto as Exhibit 4, at ¶¶ 54-55; Order of the High Court dated June 11, 2007, Claim No. HC06C03337, a true and correct copy of which is attached hereto as Exhibit 5, at ¶ 1.

7.    Pamela is the Delaware ancillary administrator of Agnes's Estate. On August 27, 2007, the Foundation filed with the Delaware Court of Chancery a petition seeking an order removing Pamela as Ancillary Administratrix of Agnes's Estate (the

3

"Delaware Removal Proceeding"). Pamela filed her "Answer in Opposition to Plaintiffs

[sic] Petition to Removal [sic] Ancillary Administrator and Affidavit in Support of

Motion to Adjudicate Intermediate Accounting of Ancillary Administrator and to

Appoint a Receiver to Hold All Estate Assets Now in Plaintiff's [sic] Hands" ("Pamela's

Answer") on October 5, 2007. A true and correct copy of Pamela's Answer is attached

hereto as Exhibit 6.

       8. Pamela has also purported to act as ancillary administrator of Agnes's

Estate in the State of Florida. A Palm Beach County, Florida probate Court recently

ruled that in light of the High Court's order removing Pamela as UK personal

administrator, Pamela is no longer authorized to have the attorneys' fees that she has

incurred, purportedly as a fiduciary of Agnes's Estate, paid out of a trust responsible for

Estate administration expenses. *See* Order of the Circuit Court of the 15th Judicial

Circuit in and for Palm Beach County, Florida executed September 24, 2007, Case No.

CP 95-3258 IY, a true and correct copy of which is attached hereto as Exhibit 7 at ¶ 2.

### THE CARVEL LITIGATION

       9. Contentious litigation concerning the Estates of Thomas and Agnes

Carvel has been pending in the Westchester Surrogate's Court for over 16 years. Carvel

proceedings have also been before other New York courts, both State and Federal,

including litigation concerning Pamela's status as a Foundation member. *See* New York

Supreme Court (Westchester County) Decision and Order dated August 30, 1999, Index

No. 6940/99, a true and correct copy of which is attached hereto as Exhibit 8; *Matter of*

4

*Carvel v. Thomas and Agnes Carvel Foundation*, 5/8/2000 N.Y.L.J. 34 (col. 4) (N.Y.
Sup.).

      10. Pamela's litigation conduct has been criticized by a number of courts.
This includes not only the Westchester Surrogate's Court (Exh. 2, at 8), but also the
Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida (the
"Florida State Court"), the Eastern District of New York, and the High Court as well.
*See* Florida State Court Order in *In re: Recognition of Foreign Judgment*, Case No.: 05-
5762 (09) (Fla. Cir. Ct.) dated January 31, 2006, a true and correct copy of which is
attached hereto as Exhibit 9, at 5 (finding that "there is strong evidence of a fraud upon
the court perpetrated by [Pamela] in both the proceedings before the High Court and this
Court."); United States District Court for the Eastern District of New York Memorandum
and Order dated March 29, 2006 in *Carvel v. Carvel Found. Inc.*, Case No. 06-MC-0005
(DLI), a true and correct copy of which is attached hereto as Exhibit 10, at 5 (finding
Pamela was "attempting to commit the same fraud upon this court"); High Court
Judgment, Exh. 4, at ¶ 54-55.

      11. In the past six months, Pamela's litigation campaign has intensified.
In April of this year, she brought a lawsuit in the United States District Court for the
Southern District of Florida seeking to have Thomas Carvel's body exhumed, seventeen
years after his death, and accusing Foundation representatives of murdering him. *See*
Complaint for Exhumation of Thomas Carvel, filed April 20, 2007, in *Carvel v. Ferncliff
Cemetery*, File No. 06-60584 (S.D. Fla.), a true and correct copy of which is attached
hereto (without exhibits) as Exhibit 11. In May 2007, Pamela filed three lawsuits in this
Court. In addition to this proceeding, Pamela filed a "Complaint for Payment of Rent" in

*Carvel v. Carvel Corp.*, File No. 1:07-cv-00237-JJF, seeking payment of rent by Carvel

Corp., a Delaware Corporation, in respect of a parcel of real property that was awarded to

the Foundation in 2002, and a "Complaint to Disaffirm Actions of Leonard Ross &

Disqualify Surrogate Anthony Scarpino" in *Agnes Carvel Estate v. Ross*, File No. 1:07-

cv-00238-JJF, seeking an award of damages from the New York ancillary administrator

of Agnes's Estate, to "disaffirm" his actions in that capacity, and to "disqualify" the

Surrogate from hearing further Carvel matters.

12. A bench trial (the fifth) of Carvel estate matters was scheduled to

begin in the Westchester Surrogate's Court on May 7, 2007. On May 2, 2007, Pamela

removed the proceeding from the Westchester Surrogate's Court to the United States

District Court for the Southern District of New York. *See* Notice of Removal, filed May

2, 2007, *In re Final Accounting of Leonard M. Ross*, Case No. 07-cv-03504, a true and

correct copy of which (without exhibits) is attached hereto as Exhibit 12. The Southern

District summarily remanded the case, *sua sponte*. *See* Order dated May 4, 2007, a true

and correct copy of which is attached hereto as Exhibit 13. The trial was then

rescheduled for May 9, 2007. Then, by order to show cause and accompanying affidavits

in support dated Sunday, May 6, 2007, Pamela moved the Westchester Surrogate to

"disqualify" himself from hearing the trial. *See* Order to Show Cause dated May 8, 2007

and accompanying affidavits in support sworn to on May 6, 2007, File No. 2165/1998, a

true and correct copy of which is attached hereto as Exhibit 14. The Surrogate denied

that motion from the bench. *See Transcript of proceedings before the Westchester*

*Surrogate's Court*, May 9, 2007, File No. 2165-98, excerpts of which are attached as

Exhibit 15, at pp. 30-31.

6

13. Most recently, on October 1, 2007, Pamela filed a lawsuit in the United States District Court for the Northern District of New York against New York State Attorney General Andrew Cuomo seeking, *inter alia*, an order requiring Mr. Cuomo to dissolve the Foundation. *See* Complaint for Judicial Dissolution & Demand for Jury Trial, filed October 1, 2007 in *Carvel v. Cuomo*, File No. 07-civ-1034, a true and correct copy of which is attached hereto (without exhibits) as Exhibit 16.

14. Pamela has also engaged in a letter-writing campaign attacking the Westchester Surrogate and the Foundation. She has sent letters to New York's State Governor Eliot Spitzer (seeking the appointment of a Special Inspector General to investigate corruption in New York Courts), Attorney General Cuomo (claiming that Mr. Griffin has engaged in various crimes), and Chief Administrative Judge Ann Pfau (claiming misconduct by the Westchester Surrogate). *See* Letter from Pamela Carvel to Governor Eliot Spitzer dated April 26, 2007, a true and correct copy of which is attached hereto (without exhibits) as Exhibit 17; Letter from Pamela Carvel to Attorney General Cuomo dated June 29, 2007, a true and correct copy of which is attached hereto (without exhibits) as Exhibit 18; Letter from Pamela Carvel to Chief Administrative Judge Ann Pfau, a true and correct copy of which is attached hereto (without exhibits) as Exhibit 19.

## THE ANDREAS PROCEEDING

15. In September 1995, Pamela and Agnes brought a proceeding in the Delaware Court of Chancery seeking a declaration that Agnes was the sole owner of the common stock of Andreas Holdings Corp. ("Andreas"), a Delaware Corporation. *See* "Complaint Pursuant to 8 Del. C. §225(a)," filed September 5, 1995 in *Carvel v. Andreas*

7

*Holdings Corp.*, Case Number CA14520, a true and correct copy of which is attached hereto as Exhibit 20. They did so despite the fact that the stock of Andreas had been reported as an Estate asset in the Thomas Carvel Estate Form 706 Federal Estate Tax Return (executed by both Pamela and Agnes as executors) and an accounting that the Executors of Thomas's Estate (including Pamela and Agnes) prepared for Thomas's Estate for the period from his death in October 1990 through March 31, 1993. *See* Form 706 United States Estate Tax Return for Thomas Carvel, excerpts of which are attached hereto as Exhibit 21, at Continuation Schedule B, No. 23; *see also* Accounting of the Executors of the Estate of Thomas Carvel for the period October 21, 1990 through March 30, 1993, excerpts of which are attached hereto as Exhibit 22, at Schedule A, p. 6. The Foundation was not a party to the Andreas Proceeding and did not otherwise appear in the Proceeding.

16. Lawrence Fay, now deceased, submitted an affidavit in the Andreas Proceeding as attorney for Robert Davis in Mr. Davis's capacity as an Executor of Thomas's Estate.[1] *See* Affidavit of Lawrence F. Fay, sworn to on September 22, 1995, a true and correct copy of which is attached hereto as Exhibit 23. Mr. Fay was outside general counsel to the Foundation at the time, but he did not submit his affidavit or otherwise participate in the Andreas Proceeding in that capacity. *See id.* at ¶ 1. In his affidavit, Mr. Fay stated that the Andreas stock ownership issue would need to be adjudicated in connection with certain issues raised in ongoing proceedings in the Westchester Surrogate's Court. *See id.* at ¶ 13.

---

[1] Mr. Davis was also, at the time, a Member, Director and Officer of the Foundation. He resigned from those positions in 1997. Mr. Davis is now deceased.

17. The Delaware Court of Chancery stayed the Andreas Proceeding
pending a determination by the Surrogate's Court of the ownership of Andreas. *Carvel v*
*Andreas Holdings Corp.*, 698 A.2d 375 (Del. Ch. 1995). The Andreas stock ownership
issue was not adjudicated in the Westchester Surrogate's Court, but none of Pamela,
Agnes nor Agnes's Estate ever moved to lift the stay.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Steven J. Fink

Sworn to and subscribed before me this
9th day of October, 2007

_____
Notary Public

9

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2007, a copy of the foregoing was electronically filed

and was also caused to be served on the following as indicated:

### VIA FEDERAL EXPRESS

Pamela Carvel
28 Old Brompton Road, Suite 158
London SW7 3SS
England
United Kingdom

_____
Jameson A.L. Tweedie (#4927)
tweedie@rlf.com

# EXHIBIT 1

At a Surrogate's Court of the
County of Westchester, at 140
Grand Street in the City of White
Plains, New York, on the
5ᵗʰ day of ~~June~~ July, 1995.

PRESENT: HON. ALBERT J. EMANUELLI,

                    Surrogate

------------------------------------------X
In the Matter of the Judicial Settlement    :
of the First and Final Account of           :
Proceedings of Robert M. Davis and Mildred  :    ORDER
Arcadipane, as Executors of the Last Will   :
and Testament of                            :    File No. 3285/90
                                            :
          THOMAS CARVEL,                    :
                                            :
                      Deceased.             :
------------------------------------------X
                                            :

The Court, in accordance with its Decision dated

April 13, 1995, its Order dated May 22, 1995 and the letter of the

Chief Clerk of this Court also dated May 22, 1995, having

scheduled a preliminary hearing to be held on June 12, 1995,

commencing at 9:30 a.m., to determine whether Agnes Carvel is a

person under disability as defined under SCPA § 103(40) for whom a

guardian ad litem should be appointed;

Counsel having appeared, on behalf of the following

parties, for such hearing on that day as herein noted: Loeb & Loeb

for Agnes Carvel and Pamela Carvel; Albert Kalter, Esq. for

Herbert F. Roth; Kent Hazzard Jaeger Greer Wilson & Fay for Robert

M. Davis; Graubard Mollen Horowitz Pomeranz & Shapiro for Mildred

Arcadipane; W. Whitfield Wells for Betty Godley; and Donovan

Leisure Newton & Irvine for The Thomas and Agnes Carvel Foundation;

Agnes Carvel having failed personally to appear before this Court on such date and at such time in connection with such preliminary hearing, which failure to appear was in contravention of the Court's prior directive as contained in its April 13, 1995 Decision, its May 22, 1995 Order and the Chief Clerk's May 22, 1995 letter;

The Court having determined that the notice, provided by counsel for Agnes Carvel, informing the Court and counsel that she would not appear, having been delivered to the Court no earlier than approximately 3:30 p.m. on the afternoon of Friday, June 9, 1995 (and, to counsel, after the close of the business day) was neither timely nor did it set forth facts and circumstances warranting a determination by this Court that Agnes Carvel's absence from such preliminary hearing was justified;

Agnes Carvel having on June 12, 1995 tendered, by her counsel, her resignation as co-executor under the Will of Thomas Carvel;

The Court, having considered the appropriateness of (a) Agnes Carvel's continued service as a trustee of the testamentary trust created by the Will of Thomas Carvel and (b) the appointment of a guardian ad litem for Agnes Carvel, as a beneficiary under the Will of Thomas Carvel, and having considered the statement contained in Agnes Carvel's Petition for Voluntary Guardianship,

dated June 5, 1995, included in the submission made to this court by Counsel for Agnes Carvel, dated June 9, 1995 (the "June 9 submission") that "although mentally competent, [Agnes Carvel] is incapable of the care, custody and management of her estate by reason of age or physical infirmity";

The Court having reviewed the June 9 submission of counsel to Agnes Carvel, which indicates that Pamela Carvel has been appointed as the Limited Guardian of the property of Agnes Carvel, by order dated June 6, 1995 of the Circuit Court for Palm Beach County, Florida, Probate Division, and the Court having heard oral argument by all counsel present and having determined that, based thereon, Pamela Carvel has an inherent and irreconcilable conflict of interest as a result of her serving in the dual capacity of Executor and Trustee under the Will of Thomas Carvel, and as Limited Guardian of Agnes Carvel's property; and

The Court having considered the undisputed facts that, notwithstanding that either some or all of the stock of Chain Locations of America, Inc. ("Chain Locations") is an asset of the Estate of Thomas Carvel, Pamela Carvel effected the transfer of funds belonging to Chain Locations, in the amount of approximately $2,000,000, to the benefit of Agnes Carvel and transferred those funds to the Swiss Bank Corp. in London, England in the name of Agnes Carvel and Pamela Carvel;

The Court, ~~upon agreement of the parties thereto~~, having assumed jurisdiction of a matter captioned <u>Agnes Carvel and Pamela</u>

-3-

Carvel, Individually and as Directors and Officers of Chain

Locations of America, Inc. v. Betty Godley, Mildred Arcadipane,

Robert M. Davis and Herbert F. Roth, as Executors of the Estate of

Thomas Carvel, (the "Supreme Court action") pending before the

Supreme Court of the State of New York, County of Westchester, May 12, 1995
shown Having been Transferred to This court by stipulation of the parties dated May 12, 1995
(Index No. 07046/95), in which action a temporary restraining

order had been entered on April 28, 1995 by the Honorable Anthony

A. Scarpino, Jr., J.S.C.; it is therefore

ORDERED that, it appearing to the Court that Agnes

Carvel is a person under disability within the meaning of SCPA

§ 103(40), a guardian ad litem will be appointed, pursuant to SCPA

§ 403(2), for Agnes Carvel, as a beneficiary under the Will of

Thomas Carvel, such guardian to be selected by the Court; and it

is further

ORDERED that Agnes Carvel's resignation as executor of

the Estate of Thomas Carvel is hereby accepted and the letters

testamentary issued to Agnes Carvel are revoked; and it is further

ORDERED that, pending a full evidentiary hearing, Agnes

Carvel's powers to act as a trustee of the testamentary trust

created by the Will of Thomas Carvel are suspended; and it is

further

ORDERED that, pending a full evidentiary hearing, Pamela

Carvel's powers to act as an executor and trustee under the Will

of Thomas Carvel are suspended; and it is further

-4-

ORDERED that, pending a full evidentiary hearing, Agnes Carvel's and Pamela Carvel's powers to act as officers, directors or signatories of Chain Locations and Andreas Holdings Corporation are suspended and Pamela Carvel is further directed forthwith to turn over to Betty Godley all books, records, checks and like documents and materials in her custody, possession or control relating to such corporations; and it is further

ORDERED that, except as modified by the suspension, pending a full evidentiary hearing, of Agnes Carvel's and Pamela Carvel's powers to act as officers and directors of Chain Locations, the temporary restraining order entered in the Supreme Court action, brought by Agnes Carvel and Pamela Carvel, individually and as officers and directors of Chain Locations, is continued in effect for the time being; and it is further

ORDERED that Loeb & Loeb is to provide in writing to this Court and to all counsel, a detailed statement regarding the transfers of funds of Chain Locations by Pamela Carvel and/or Agnes Carvel, including all bank account information underlying such transfers, and shall do so by the end of the business day of June 12, 1995, such statement to include all supporting information that is in Loeb & Loeb's custody, possession or in the custody, possession or control of Agnes Carvel or Pamela Carvel; and it is further

ORDERED that all counsel listed above (except Loeb & Loeb) submit affidavits in form acceptable to the Court detailing

-5-

the fees incurred and expenses disbursed by the aforementioned counsel (except Loeb & Loeb), or by the Estate, in connection with their preparation for and attendance for *that portion of the* the June 12, 1995 preliminary hearing; and it is further;

ORDERED that these rulings, having been made on the record during the proceedings of June 12, 1995, are effective as of that date. *which pertained to Agnes Cassell's appearance before the Court for a determination of whether a guardian ad litem should be appointed to protect her interests*

ENTER,

_____
Surrogate

*1.4*

# EXHIBIT 2

SURROGATE'S COURT : WESTCHESTER COUNTY
* * * * * * * * * * * * * * * * * * * *
In the Matter of the Application of
Betty Godley, Mildred Arcadipane and
Robert M. Davis, as executors and
trustees of, and The Thomas and Agnes
Carvel Foundation, as remainderman
under, the Last Will and Testament of

        THOMAS CARVEL,

              Deceased.

for a decree revoking letters
testamentary and letters of
trusteeship issued to Pamela Carvel
and revoking letters of trusteeship
issued to Agnes Carvel, and rescinding
certain actions taken by them, and
granting other relief.
* * * * * * * * * * * * * * * * * * * *

       **DECISION**

   **FILE NO. 3285/1990**

EMANUELLI - S.

**REVOKE LETTERS**

    In this proceeding for revocation of letters, the Thomas and

Agnes Carvel Foundation, as remainderman under the Last Will and

Testament of Thomas Carvel, seeks partial summary judgment

pursuant to CPLR 3212 removing the respondent, Pamela Carvel, as

co-executrix of the decedent's estate and co-trustee of the

marital trust under the decedent's will.

**BACKGROUND**

    Much of the background of this estate is discussed in

numerous prior decisions of the court and familiarity with those

opinions will be assumed.  For the purposes of this decision, it

is sufficient to note that Thomas Carvel died on October 21, 1990

leaving a will which was admitted to probate on February 25,

1991.  Seven nominated executors, including Thomas' wife Agnes and his niece Pamela, were appointed to administer his estate ("Thomas' Estate" or the "Estate").

In 1994, two separate accounting were filed, the first by executors Davis and Arcadipane, and the second by executors "Roth", "Godley", "Agnes" and "Pamela".  The seventh executor post-deceased.

The competing accounts differed in several respects, including inter-alia, the treatment of a corporation known as Chain Locations of America ("Chain").  The Roth and Arcadipane account reported the corporation as wholly owned by the decedent and hence the Estate, whereas the Agnes and Pamela account reported Chain as only half owned by the Estate with Agnes as the other 50% shareholder.  Later, Agnes claimed a 93.3% shareholder interest in Chain.  The issue was compounded on November 9, 1995 when the three executor/directors of Chain, namely, Pamela, Agnes and Godley passed a resolution declaring Agnes as the owner of 107 1/2 of the 115 shares of the common stock of Chain and a new certificate for 107 1/2 common shares was issued to Agnes Carvel. The resolution was predicated upon an erroneous legal opinion by attorney Leonard Ross (See, Estate of Carvel, NYLJ, Apr. 30, 1997, at 33, col 5).  Thereafter between December 1994 and February 1995, Pamela, acting alone and without the knowledge or consent of her co-director, Godley, or her co-executors,

admittedly transferred more than $2 million of Chain's assets to a bank account at Swiss Bank Corp. in London in her name and Agnes' name alone without any nomenclature to identify these funds as belonging to the corporation. The transfers were made, she claimed, in purported repayment of an alleged contested claim by Agnes against Chain and Andreas Holding corp. (another Carvel closely held corporation). However, there had been no prior judicial determination of the claim as mandated by SCPA 1805.

On February 17, 1995, Godley filed with the court a petition seeking a return of the $2 million and a determination as to the true ownership of chain. Pamela and Agnes opposed the proceeding and moved for an order dismissing the application or in the alternative, for a determination affirming Agnes' claims. In a related hearing on June 12, 1995 Pamela was suspended as an executrix and trustee for having unlawfully transferred Chain assets from the corporation to herself and Agnes. Agnes resigned as executrix and was likewise suspended as trustee. In addition, Pamela, and her then attorney, John Lang, of Loeb and Loeb LLP, were ordered to furnish details of the overseas banking transaction. To date, these records still have not been produced, despite repeated demands by this court for their production.

Subsequently, while acting as Agnes' Florida court-appointed guardian and de facto caretaker, Pamela did not act affirmatively

3

to produce Agnes at a court-directed video conference, scheduled
to ascertain Agnes' physical capacity to be examined as to her
claims and allegations in these proceedings, or to produce court-
ordered medical records in connection with Agnes' motion for a
protective order.   Likewise, Agnes' attorney, John Lang, while
admitting that he had not spoken to his client in several years,
and apparently acting upon Pamela's instructions, declined in
open court to contact his client directly, at the court's
suggestion, in order to determine if Agnes was aware of certain
settlement proposals.   The proposals would have terminated the
litigation and settled all of Agnes' claims, both here and in
several other jurisdictions, in exchange for a cash payment to
Agnes of more than $8 million dollars.

    This removal proceeding was filed shortly after the June 11
hearing.   The petition accused Agnes and Pamela of a series of
unilateral actions involving the encumbrance and/or disposition
of Estate assets, the particulars of which are largely admitted.
This included: (i) Pamela's attempt to divest the Estate of its
shareholder interest in Chain without court approval or the
approval of her co-executors; (ii) Pamela's diversion of more
than $2 million of Chain funds to Swiss Bank Corp. accounts in
London; (iii) the entry by Pamela of a confession of judgment for
more than $4 million with the Dutchess County, New York Clerk's
office against Andreas in favor of Chain; (iv) the filing by

4

Pamela of UCC-1's encumbering property owned by the Estate, Chain and Andreas located in Dutchess County, New York, and (v) a lawsuit brought by Pamela and Agnes in Delaware Chancery Court in which they purported to act in capacities from which this court had previously suspended them.

The suspended fiduciaries were offered an immediate hearing on their suspensions but opted instead for extensive discovery. Accordingly, the court entered a series of omnibus discovery orders which directed the production of voluminous personal, estate and business records and the examination of several key witnesses, including Pamela. The examinations occurred during 35 days of continuous depositions.

The Foundation now seeks summary judgment removing Pamela without a hearing as as executrix and trustee of Thomas' estate based upon what it describes as undisputed facts established in large measure by Pamela's concessions at her deposition which allegedly substantiate each of the factual predicates alleged in the petition as a grounds for removal. According to the Foundation, the facts demonstrate that Pamela is unfit to serve as a fiduciary because she has repeatedly engaged in unilateral acts to the detriment of the Estate with flagrant disregard for her statutory and common law duties as a co-executor and co-trustee.

Pamela opposes the motion. Nevertheless, she offers to

5

resign as both an executor and a trustee, not because she acknowledges any of the accusations asserted against her, but because, inter-alia, her position as executrix of Agnes' foreign estate (Agnes died in August, 1998) places her in a conflict of interest with her position as an executrix and trustee of Thomas' estate.

The Foundation asserts that Pamela should not be permitted to resign without an adjudication that her conduct has been improper. More particularly, it claims that Pamela must be removed as a fiduciary in these proceedings and held accountable for her actions. To do otherwise, and thereby allow a fiduciary accused of misconduct to simply resign, without consequences, would, according to the Foundation, trivialize the grave responsibility borne by all fiduciaries to faithfully discharge their duties.

## LEGAL ANALYSIS AND THE COURT'S CONCLUSIONS

Initially, it must be noted that Pamela's reliance upon the Court of Appeals decision in <u>Matter of Duke</u>, 87 NY2d 465, as authority for the proposition that this court may not remove her without first conducting an evidentiary hearing, is misplaced. <u>In Matter of Duke</u>, supra, the Court of Appeals acknowledged expressly that a Surrogate may summarily remove a fiduciary "where the misconduct is established by undisputed facts or concessions ... where the fiduciary's in-court conduct causes

6

such facts to be within the court's knowledge ... or where facts
warranting amendment of letters are presented to the court during
a related evidentiary proceeding ...". Accordingly, summary
judgment in a removal proceeding is not per se inappropriate
particularly where the parties have been afforded complete
discovery and the motion is predicated upon an extensive
documentary and testimonial record. Indeed, "[s]ummary judgment
'does not deny the parties a trial; it merely ascertains that
there is nothing to try'" (In re Suffolk County Dep't of Social
Servs., 83 NY2d 178, citing, Siegal, Ny Prac §278, at 407 [2d
ed]). Thus if the record before the court is truly undisputed,
as alleged, such that the allegations and grounds for removal are
supported in almost every detail by Pamela's own admissions, it
would be within the jurisdiction and authority of this court to
remove the respondent without a hearing.

Having thus established the parameters of its authority, the
court neverthelss elects to accept the respondent's resignation
as executrix and trustee of the estate and trust and letters
testamentary and of trusteeship heretofore issued to her are
revoked. In accordance with SCPA 716 the respondent shall file a
supplemental account within 90 days from the date of the order to
be made herein. The discharge of the respondent shall be subject
to a decree settling her account.

By accepting Pamela's resignation the court does not

7

correspondingly agree with the Foundation's characterization that Pamela has been "honorabl[y] discharge[d]" thereby relieving her of accountability for her actions. Pamela's conduct as a fiduciary and her campaign to thwart the legitimate processes of estate administration present reasonable grounds to summarily remove her or to schedule an immediate hearing on the application for removal. Her unwarranted actions have subjected the parties to immeasurable expense and it is only to protect the estate from the further expense of additional proceedings that the court has accepted her resignation. Nevertheless, Pamela remains accountable and subject to surcharge. However, because the instant proceeding does not seek damages of the respondent for breach of fiduciary duty, and neither the theory of liability nor the elements of damages are before the court for consideration, it would be more appropriate and in the interest of judicial economy to permit those issues to be raised in the proceeding to judicially settle the respondent's account. To that end, the Foundation and any other interested party is authorized within 30 days of filing of the aforesaid supplemental account, to file amended objections to the account of Pamela Carvel seeking appropriate damages as a consequence of her alleged breach of fiduciary duty.

In consideration of the foregoing, the motion for partial summary judgment revoking letters testamentary and of trusteeship

8

heretofore issued to Pamela Carvel is denied.    That part of the petition which seeks to revoke letters is dismissed as moot in view of the respondent's resignation.    The balance of the proceeding is restored to the calendar of March 8, 2000 for further disposition.

        Settle order.

February 17, 2000

S U R R O G A T E

Orrick Herrington & Sutcliffe LLP
 Attorneys for Petitioner
 The Thomas and Agnes Carvel Foundation

Spitzer & Feldman
 Attorneys for Respondent Pamela Carvel

Kent Hazzard Jaeger Greer Wilson & Fay
 Attorneys for Respondent Robert Davis

W. Whitfield Wells
 Attorney for Respondent Betty Godley

Cassin Cassin & Joseph LLP
 Attorneys for Mildred Arcadipane

Shamberg Marwell Hockerman Davis & Hollis P.C.
 Attorneys for Respondent George Lambert,
 Public Administrator of Westchester County

# EXHIBIT 3



At the Surrogate's Court of the State
of New York, County of Westchester, held at
the Courthouse located at 140 Grand Street,
White Plains, New York, on the 5 day of
July , 2002.

PRESENT:    HON. ANTHONY A. SCARPINO, JR.
                            Surrogate

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

| | |
|---|---|
| In the Matter of the Application of THE THOMAS AND AGNES CARVEL FOUNDATION, as remainderman under the Last Will and Testament of Thomas Carvel, deceased, for a restraint on the transfer of certain funds | FILE NO. 3285/1990 |
| In the Matter of the Application of THE THOMAS AND AGNES CARVEL FOUNDATION, as remainderman under the Last Will and Testament of THOMAS CARVEL, deceased, for a restraint on the conveyance or encumbrance of certain real property | FILE NO. 2165/1998 |

## DECREE

A Verified Petition (the "Funds Petition") duly verified on the 12th day of August 1998 having been filed by Petitioner The Thomas and Agnes Carvel Foundation (the "Foundation") In the Matter of the Application of The Thomas and Agnes Carvel Foundation, as remainderman under the Last Will and Testament of Thomas Carvel, deceased, for a restraint on the transfer of certain funds (File No. 3285/1990), and an Order to Show Cause having been issued by this Court on August 12, 1998 to all persons required to be cited or who are interested in the proceeding in respect of the Funds Petition requiring each of them to show cause before the Surrogate's Court of the State of New York, County of Westchester, on the 9th day of September 1998, why the Court should not grant to the Foundation the relief sought in the Funds Petition, and temporarily

restraining (i) "any transfer, by any person, of any of the [assets that are the subject of the Funds

Petition]" and (ii) "all persons . . . from commencing or prosecuting in any other forum any action

or proceeding seeking to construe, or to determine the validity or enforceability of, the February 13,

1988 agreement between Thomas Carvel and Agnes Carvel . . . more fully described in the . . .

Verified Petition;" and said Order to Show Cause having been returned and it appearing that all of

the persons to whom the same was directed have been duly served with the same; Herbert Roth

having served a Verified Answer dated November 2, 1999; Robert M. Davis having served a Verified

Answer dated November 12, 1999; Betty Godley having served a Verified Answer November 17,

1999; Pamela Carvel having served a Verified Answer dated November 18, 1999; the Estate of

Agnes Carvel having served a Verified Answer dated November 18, 1999; Pamela Carvel and the

Estate of Agnes Carvel having served a Verified Amended Answer dated January 4, 2000; the

Foundation having served a Verified Reply dated September 26 2001;

A Verified Petition (the "Real Property Petition") duly verified on the 14th day of

August 1998 having been filed by Petitioner the Foundation In the Matter of the Application of

the Thomas and Agnes Carvel Foundation, as remainderman under the Last Will and Testament of

Thomas Carvel, deceased, for a restraint on the conveyance or encumbrance of certain real property

by Realities Trust, a New York resident inter vivos trust (File No. 2165/1998), and an Order to

Show Cause having been issued by this Court on August 17, 1998 to all persons required to be cited

or who are interested in the proceeding in respect of the Real Property Petition requiring them and

each of them to show cause before said Surrogate's Court of the County of Westchester, on the 9th

day of September 1998, why the Court should not grant to the Foundation the relief sought in the

Real Property Petition, and temporarily restraining "any conveyance by Pamela Carvel, and/or from

the 'Realities Trust,' as more fully described in the . . . Verified Petition, to any person other than the

Foundation, and the encumbrance by any person with notice of this order" of certain specified

parcels of real estate; and said Order to Show Cause having been returned and it appearing that all of the persons to whom the same was directed have been duly served with the same; Pamela Carvel having served a Verified Answer dated November 18, 1999 and a Verified Amended Answer dated January 4, 2000; the Foundation, having obtained the Court's permission as reflected in an Order dated June 27, 2001, having served and filed a Verified Amended Petition dated July 17, 2001, and a supplemental citation having been issued by this Court to all persons required to be cited or who are interested in this proceeding requiring them and each of them to show cause before said Surrogate's Court of the County of Westchester, on the 29th day of August 2001, why the Court should not grant to the Foundation the relief sought in the Real Property Petition; and said citation having been returned and it appearing that all of the persons to whom the same was directed have been duly served with the same; the Estate of Agnes Carvel having served a Verified Answer dated August 16, 2001; Pamela Carvel having served a Verified Amended Answer dated September 5, 2001; Herbert Roth having served an Answer dated September 15, 2001; the Foundation having served a Verified Reply dated September 11, 2001 to the counterclaim asserted in the August 16, 2001 Verified Answer of the Estate of Agnes Carvel; the Foundation having served a Verified Reply dated September 26, 2001 to the counterclaim asserted in Pamela Carvel's September 5, 2001 Verified Amended Answer;

The matters raised in both the Funds Petition and the Real Property Petition having been duly tried before Hon. Anthony A. Scarpino, Jr., Surrogate of Westchester County, at a trial term of this court held at the Surrogate's Court in the City of White Plains, on the 29th day of October 2001, and continuing on the 30th day of October 2001 and the 1st, 2nd, 5th, 7th, 13th, 14th, 15th, and 16th days of November 2001; and petitioner having duly appeared by its attorneys; respondent Pamela Carvel having appeared by her attorneys; respondent Betty Godley having appeared by her attorney; respondent Herbert F. Roth having appeared pro se; respondent Leonard M. Ross, Esq., as

3

Limited Ancillary Administrator c.t.a. of the Estate of Agnes Carvel ("Ross"), having appeared by

his attorneys; respondent Robert Davis having appeared by his attorneys; respondent Mary Ellen

Cerrato having appeared by her attorneys; respondent Adele Alexander having appeared by her

attorneys; respondents the Realities Trust and Realities, a Delaware Business Trust (the "Realities

DBT") having failed to appear at trial and the Court having issued a Decision and Order dated April

1, 2002 granting the Foundation's motion for a default judgment against Realities DBT; respondent

Lartrym Services, Inc. ("Lartrym") having failed to appear and the Court having issued a Decision

and Order dated April 1, 2002 granting the Foundation's motion for a default judgment against

Lartrym;

        The proofs and allegations of the parties having been heard and the Court having

issued a Decision After Trial dated April 1, 2002 (the "Decision After Trial");

        Upon all of the evidence, arguments and memoranda of law submitted by the parties

and for the reasons set forth in the Decision After Trial; it is hereby

        ORDERED, ADJUDGED, AND DECREED that the Agreement between

Thomas Carvel and Agnes Carvel dated February 13, 1988 (the "Reciprocal Agreement") is declared

to be a valid agreement enforceable by the Foundation; and it is further

        ORDERED, ADJUDGED, AND DECREED that the fiduciaries of the Estate of

Agnes Carvel are directed to perform the contract of the decedent; and it is further

        ORDERED, ADJUDGED AND DECREED that the purported conveyances

indicated in the following conveyance instruments, copies of which are annexed hereto as Exhibits

1-4, respectively, purporting to transfer the following real properties from an entity referred to in the

respective conveyances as "Realities" to Lartym are voided: (a) Indenture made by Realities to

Lartrym Services, Inc. and recorded in Westchester County in Liber 12039, page 338, with respect to

Agnes Carvel's former residence located on Winding Farm Road, Ardsley, New York; (b) Indenture

4

made by Realities to Lartrym Services, Inc. and recorded in Palm Beach County, Florida in Book 10493, page 1878, with respect to Agnes Carvel's former residence located at 265 North County Club Drive, Atlantis, Florida; (c) Indenture from Realities to Lartrym Services, Inc. and recorded in Palm Beach County, Florida in Book 10493, page 1882, with respect to a residence located at 228 Orange Tree Drive, Atlantis, Florida; and (d) Indenture made by Realities to Lartrym Services, Inc. and recorded in Westchester County, New York in Liber 12049, page 109, with respect to a property located at 95 South Central Avenue, Hartsdale, New York ((a) and (d) shall be referred to as the "New York Properties," (b) and (c) shall be referred to as the "Florida Properties," and (a), (b), (c), and (d) shall be referred to collectively as the "Realities Properties"); and it is further

ORDERED, ADJUDGED AND DECREED that Realities, the Realities DBT and Lartrym are permanently enjoined from conveying and/or encumbering any of the Realities Properties except as directed by this Decree; and it is further

ORDERED, ADJUDGED AND DECREED that legal and equitable title to each of the Realities Properties is awarded to the Foundation, subject to the requirements of New York Surrogate's Court Procedure Act § 2215(3), and shall be conveyed to the Foundation in accordance with this Decree; and it is further

ORDERED, ADJUDGED AND DECREED that within twenty (20) days after they are served with notice of entry of this Decree, Realities and the Realities DBT shall each execute and deliver to the Foundation (a) bargain and sale deeds, in recordable form, for the New York Properties conveying each of the New York Properties from "Realities" to the Foundation, together with all documentation required to convey title to the New York Properties to the Foundation and to properly record such deeds, including, without limitation, Form TP584 and an Equilization Form and (b) limited warranty deeds, in recordable form, for the Florida Properties conveying each of the Florida Properties from "Realities" to the Foundation, together with all

5

documentation required to convey title to the Florida Properties to the Foundation and to properly record such deeds; and all of such deeds and other documentation shall be delivered to the Foundation's counsel at the following address: Orrick, Herrington & Sutcliffe, LLP, 666 Fifth Avenue, New York, NY 10103, attention: Steven J. Fink, Esq.; and it is further

ORDERED, ADJUDGED AND DECREED that Ross, pursuant to SCPA § 1610, shall hold such assets of the Estate of Agnes Carvel as shall come into his possession as Ancillary Administrator of that estate subject to the further Order of this Court regarding payment of creditors and expenses and such other disposition as justice may require; and it is further

ORDERED, ADJUDGED, AND DECREED that the Foundation's application for a direct distribution of assets of the Estate of Agnes Carvel is denied except to the extent set forth above.

_____
Surrogate

(T)

6

# EXHIBIT 4



Neutral Citation Number: [2007] EWHC 1314 (Ch)

Case No: HC06C03337

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 11 June 2007

**Before :**

**MR JUSTICE LEWISON**

- - - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **THE THOMAS AND AGNES CARVEL FOUNDATION** | **Claimant** |
| - and - | |
| **(1) PAMELA CARVEL** | |
| **(2) CARVEL FOUNDATION, INC.** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - -

**Mr Francis Barlow QC** (instructed by **Herbert Smith LLP**) for the **Claimant**
**Mr Michael Gibbon** (instructed by **Penningtons**) for the **First Defendant**
**Mr Jeremy Dable** for the **Second Defendant**

Hearing dates: 23, 24 May 2007

- - - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

*Kevin Lewison*

THE HONOURABLE MR JUSTICE LEWISON

**Mr Justice Lewison :**

Introduction ............................................................................................................................ 2
The underlying facts .............................................................................................................. 2
The law .................................................................................................................................... 5
    Jurisdiction ......................................................................................................................... 5
    Discretion ......................................................................................................................... 12
Application to set aside ....................................................................................................... 15

**Introduction**

1.     The Claimant, The Thomas and Agnes Carvel Foundation, seeks a summary order (a) replacing the First Defendant, Pamela Carvel, currently sole personal representative of Agnes Carvel deceased, with a neutral, independent professional person pursuant to section 50 of the Administration of Justice Act 1985 or section 1 of the Judicial Trustees Act 1896; and (b) setting aside orders obtained by Pamela Carvel in the Chancery Division for the payment to her of over £8 million out of Agnes Carvel's estate. Mr Francis Barlow QC appears for the claimant. Mr Michael Gibbon appears for Pamela Carvel and Mr Jeremy Dable for the second defendant, which is the named residuary beneficiary under Agnes Carvel's last will.

2.     The underlying facts are not in any real dispute; and I take the narrative largely from Mr Barlow's full and helpful written argument.

**The underlying facts**

3.     The late Thomas Carvel ("Thomas") made a large fortune in the ice cream business in the USA. He died in 1990, and his wife Agnes Carvel ("Agnes"), died in 1998. Thomas and Agnes had no children. Pamela Carvel ("Pamela") was Thomas' niece and Agnes' niece by marriage.

4.     On 13 February 1988 Thomas and Agnes executed mutual, mirror-image wills. By her 1988 Will (the "1988 Will") Agnes left her estate on trust for Thomas if surviving for life with remainder on trust for The Thomas and Agnes Carvel Foundation (the "Foundation"). Thomas' 1988 Will was in similar form. The Foundation is a not-for-profit corporation incorporated in 1976 in the State of New York. By a simultaneous agreement (the "Reciprocal Will Agreement") Thomas and Agnes agreed that during their joint lives they would make no gratuitous transfers of property nor alter the provisions of their 1988 Wills without the consent of the other and that the survivor would make no such gratuitous transfers or alterations. Thomas died on 21st October 1990. His 1988 Will was admitted to probate in New York by the Surrogate's Court of the State of New York, County of Westchester; and seven executors, including Agnes and Pamela, were appointed to administer his estate. The Surrogate's Court is the court of probate for the State of New York.

5.     Following Thomas' death, Agnes, in the belief that her 1988 Will had been lost, made a further will on 21 November 1990 (the "1990 Will"). Apart from the omission of the life interest in favour of Thomas the terms of Agnes' 1990 Will were essentially identical with those of the 1988 Will. It, too, left Agnes' residuary estate to the

Foundation. On 22 April 1991 Agnes created a revocable trust known as "The Agnes Carvel 1991 Trust" (the "1991 Trust") under which Agnes took a life interest in the trust fund with remainder on her death upon trust to pay her funeral and administration expenses and debts and subject thereto upon trust for the Foundation or some other charitable trust or corporation to be created by the Trustees. Agnes subsequently transferred property of substantial value to the 1991 Trust.

6.    On 7 July 1995 Agnes made a new will (the "1995 Will") revoking all former wills, appointing Pamela her sole executrix and bequeathing her residuary estate to the Second Defendant Carvel Foundation, Inc. ("Carvel-Florida"). Carvel-Florida is a not-for-profit corporation which was incorporated in Florida by Pamela and Agnes on the same day as the 1995 Will was executed. Pamela was a founding director of Carvel-Florida and following Agnes' death in 1998 became the registered agent and thus the person primarily responsible for accepting service of process on behalf of the corporation. Pamela resigned from both positions in March 2003.

7.    In March 1995 Pamela and Agnes moved to London. The circumstances in which they did so are contentious, but do not matter on this application. Agnes died in London on 4 August 1998. On 2 October 1998 Pamela obtained probate of the 1995 Will from the Principal Probate Registry. The terms of the grant show that in applying for probate Pamela adopted the "excepted estates" procedure. Under the prevailing regulations (The Capital Transfer Tax (Delivery of Accounts) Regulations 1981 as amended) this procedure was available in a case where (among other things):

(1) the deceased died domiciled in the United Kingdom;

(2) the value of that person's estate was wholly attributable to property passing under his will or intestacy (or under a nomination taking effect on death or by survivorship);

(3) not more than £50,000 represented value attributable to property situated outside the jurisdiction; and

(4) the gross value of the estate (including chargeable transfers) did not exceed £200,000.

8.    In order to obtain probate Pamela swore an oath that the conditions were satisfied. She says that she believed they were. I am not in a position to find that she is not telling the truth; although her belief, if true, was naïve. The effect of the regulations is that, in cases to which they applied, it was not necessary to provide an account to the Inland Revenue.

9.    In August 1998, within days of Agnes' death, the Foundation instituted proceedings in the Westchester Surrogate's Court to enforce the Reciprocal Will Agreement and to avoid certain pre-death transactions alleged to have been shams and also alleged to have been effected with Pamela's connivance in violation of that agreement.

10.   Agnes' estate was represented in those proceedings by Leonard Ross, a New York attorney. According to a witness statement that he subsequently made, he had been designated by Pamela as an ancillary administrator; and his appointment as ancillary administrator was accepted by the Westchester Surrogate's Court on 18 August 1999. Under New York law Pamela, as a foreign fiduciary, could not represent the estate in New York. However, Pamela was a party to the action in two capacities: in her

personal capacity and as Trustee of the Realities Trust, an entity to which property had been transferred and to which the Foundation claimed title by virtue of the Reciprocal Will Agreement. These proceedings culminated in a Decision After Trial dated 1 April 2002 given by Surrogate Scarpino. I will return to what the Surrogate decided in due course; but in summary he held (i) that the Reciprocal Will Agreement was valid and enforceable, (ii) that the execution of the 1990 Will and the 1991 Trust were not breaches of the Reciprocal Will Agreement, (iii) that the execution of the 1995 Will "contravenes the estate plan created in 1988 and clearly constitutes a total breach, of the Reciprocal Agreement" (iv) that the Foundation was entitled to receive the assets of Agnes' estate subject to the payment of reasonable debts and administration expenses and (v) that the Foundation was entitled to a transfer of those assets that had been transferred to the Realities Trust. The Surrogate's decision was embodied in a decree dated 8 July 2002 and was affirmed by the Appellate Division of the Supreme Court of New York.

11.    On 13 June 2003 Pamela in her personal capacity, and acting as a litigant in person, issued a Claim Form in the Chancery Division of the High Court in England against herself as sole defendant in her capacity "as Executor of the Estate of Agnes Carvel" claiming the sum of £6,640,897.79 together with accrued interest of £1,148,827.90 and continuing interest at the daily rate of £1,455.54 until payment. The claim was based on three categories of expense:

   i)    Sums which Pamela said she had incurred on behalf of Agnes during her lifetime;

   ii)   Debts which Agnes had contracted but had not paid; and

   iii)  Sums which Pamela had incurred as Agnes' personal representative and in respect of which she claimed to be entitled to indemnity from the estate.

12.    By Order dated 24th July 2003 Deputy Master Behrens ordered Carvel-Florida to be joined as a defendant in place of Pamela. By Order dated 8th January 2004 Deputy Master Weir ordered Carvel-Florida, on its own admission of the full amount of the sum claimed, to pay to Pamela the sum of £8,085,095.51 together with £800 costs. Carvel-Florida's admission of liability was signed by Pamela's mother Linda Carvel. By order dated 6 May 2004 Master Price amended Deputy Master Weir's Order by providing that the sum of £8,085,095.51 be paid from Agnes' estate upon Carvel-Florida "as residuary beneficiary appointed to represent the said estate" consenting to the Order. The Chancery proceedings were issued and the Chancery order obtained after the Surrogate's decision and decree declaring that the Reciprocal Will Agreement was enforceable, that the 1995 Will was a "total breach" of that Agreement and that the Foundation was entitled to receive Agnes' estate; and after the Surrogate had ordered the fiduciaries of Agnes' estate to perform her contract.

13.    On 14th April 2005 Pamela petitioned the Florida Circuit Court for the County of Broward, a court with no previous experience of the Carvel estate litigation, for an order "domesticating" (or registering) the Chancery Order. By the Petition Pamela petitioned in her personal capacity and stated on oath that the Chancery Order was final and conclusive in the United Kingdom, that there was no appeal pending, that no opposition to the recording of the Chancery Order had been returned by the Broward County Administrator and that Carvel-Florida had been appointed to represent the

estate and had consented to the Order. By Order dated 10th May 2005 and made in favour of Pamela personally the Circuit Court for Broward County ordered that the Chancery Order be treated as a judgment of that Court.

14.    Pamela did not give notice to the Foundation of the Chancery proceedings in England or any of the orders made in those proceedings; or indeed of the petition to domesticate the order.

15.    On 26 August 2005 Pamela, again without notice to the Foundation and without notice to Mr Ross (who was still the ancillary administrator of the estate in New York), registered the domestication order with the Supreme Court of New York for Nassau County, another court which had had no previous dealings with Agnes' estate.

16.    On 29th August 2005 the Court issued a writ of execution against the estate of Agnes in the sum of US$15,929,214.15 (the dollar equivalent of the sum payable under the Chancery order). The writ of execution directed to the Sheriff in favour of Pamela personally was subsequently served on The Bank of New York and the firm of Edward Jones, which both held assets on behalf of the estate collectively worth in excess of US$9 million. The Bank of New York and Edward Jones refused to release the funds without a "turnover order" (a formal order of the court confirming their liability to release the funds). Pamela accordingly issued a petition in which she stated on oath that "the estate of Agnes" had received notice of the Domestication Order and did not oppose it. No notice of this petition was given to the Foundation or to Mr Ross.

17.    On 29 December 2005 the Court for Nassau County issued a temporary restraining order prohibiting Pamela from enforcing the Chancery order and subsequently transferred the proceedings to the Surrogate's Court. Also on 29 December 2005 the Surrogate's Court issued a temporary injunction in similar terms. On 30 December 2006 the Foundation intervened in the proceedings in the Court for Broward County and obtained a stay of the domestication order on 10 January 2006. The Order was vacated on 31 January 2006. Despite the temporary restraining orders issued by the Florida Court, the Court for Nassau County and the Surrogate's Court Pamela, on 20 January 2006, registered a copy of the Chancery Order in the Federal District Court for the Eastern District of New York. She did not disclose the existence of the restraining orders. Nor did she give prior notice to the Foundation or Leonard Ross. Her application was dismissed on 29 March 2006.

**The law**

*Jurisdiction*

18.    The court has no inherent jurisdiction to remove a personal representative: *Re Ratcliff* [1898] 2 Ch 352 at 356. The traditional remedy was an administration action. But an administration action was (in the words of the Law Reform Committee's 23rd Report) "an extremely clumsy, costly and time consuming procedure and in practice it is only in exceptional cases that it can be recommended". However, once the estate has been administered, the personal representative becomes a trustee; and at that stage the court's inherent jurisdiction to control trusts arises: *Re Smith* (1880) 42 Ch D 302. A power to remove a personal representative was introduced by the Judicial Trustees Act 1896. But the practice and procedure under the 1896 Act was also considered to

be cumbersome and over-formal, with the result that a new power to remove a personal representative was introduced by section 50 of the Administration of Justice Act 1985.

19.     The relevant parts of that section read as follows:

>    "(1)     Where an application relating to the estate of a deceased person is made to the High Court under this subsection by or on behalf of a personal representative of the deceased or a beneficiary of the estate, the court may in its discretion—
>
>    (a)     appoint a person (in this section called a substituted personal representative) to act as personal representative of the deceased in place of the existing personal representative or representatives of the deceased or any of them; or
>
>    (b)     if there are two or more existing personal representatives of the deceased, terminate the appointment of one or more, but not all, of those persons.
>
>    …
>
>    (4)     Where an application relating to the estate of a deceased person is made to the court under subsection (1), the court may, if it thinks fit, proceed as if the application were, or included, an application for the appointment under the Judicial Trustees Act 1896 of a judicial trustee in relation to that estate.
>
>    (5)     In this section "beneficiary", in relation to the estate of a deceased person, means a person who under the will of the deceased or under the law relating to intestacy is beneficially interested in the estate."

20.     The application is formally made under section 50. However, as an alternative Mr Barlow also relies on section 1 of the Judicial Trustees Act 1896, either through the gateway provided by section 50 (4); or as an original application under the 1896 Act. The relevant provisions of section 1 of the 1896 Act read as follows:

>    "(1)     Where application is made to the court by or on behalf of the person creating or intending to create a trust, or by or on behalf of a trustee or beneficiary, the court may, in its discretion, appoint a person (in this Act called a judicial trustee) to be a trustee of that trust, either jointly with any other person or as sole trustee, and, if sufficient cause is shown, in place of all or any existing trustees.
>
>    (2)     The administration of the property of a deceased person, whether a testator or intestate, shall be a trust, and the executor or administrator a trustee, within the meaning of this Act.
>
>    …

(7)    Where an application relating to the estate of a deceased person is made to the court under this section, the court may, if it thinks fit, proceed as if the application were, or included, an application under section 50 of the Administration of Justice Act 1985 (power of High Court to appoint substitute for, or to remove, personal representative)."

21.    The first question is: who is entitled to apply under these sections? So far as section 50 is concerned, the answer so far as this case is concerned, is: a person who "under the will of the deceased" is beneficially interested in the estate. The natural meaning of the quoted phrase is a person named in (or one of a class identified in) the will which has been admitted to probate. That, after all, will be the will in relation to which the impugned personal representative has been appointed. Moreover, the use of the definite article ("the" will) seems to me to presuppose that there is only one relevant will. The Foundation is not, however, named in Agnes' 1995 will as a beneficiary. It claims its beneficial entitlement under the doctrine of mutual wills.

22.    Mr Barlow submitted that "the will" in section 50 (4) could be read as "a will"; or that "the will" meant the *operative* will in the sense that it controlled the devolution of the deceased's estate or part of it. Accordingly, he said, although the Foundation was not named as a beneficiary in the 1995 will, its entitlement derived from one or more of Agnes' previous wills, which she had agreed not to revoke. I do not agree that "the" will can be read as "a" will. A will that has never come into operation has no legal effect at all. To give such an extended meaning to the phrase would go far beyond what Parliament can be supposed to have intended. I am inclined to agree that "the will" means "the operative will", but it must mean the operative will of the deceased whose personal representative is sought to be removed. So, it still leaves open the question: does the Foundation claim under any will of Agnes?

23.    So far as English law is concerned, the doctrine of mutual wills is founded on the principle stated by Lord Camden in *Dufour v. Pereira* (1769) Dick. 419:

> "The instrument itself is the evidence of the agreement; and he, that dies first, does by his death carry the agreement on his part into execution. If the other then refuses, he is guilty of a fraud, can never unbind himself, and becomes a trustee of course. For no man shall deceive another to his prejudice. By engaging to do something that is in his power, he is made a trustee for the performance, and transmits that trust to those that claim under him."

24.    In *Re Hagger* [1930] 2 Ch 190 Clauson J amplified the principle:

> "To my mind *Dufour v. Pereira* decides that where there is a joint will such as this, on the death of the first testator the position as regards that part of the property which belongs to the survivor will be treated in this Court as holding the property on trust to apply it so as to carry out the effect of the joint will. As I read Lord Camden's judgment in *Dufour v. Pereira* that would be so, even though the survivor did not signify his election to give effect to the will by taking

benefits under it. But in any case it is clear that Lord Camden has decided that if the survivor takes a benefit conferred on him by the joint will he will be treated as a trustee in this Court, and he will not be allowed to do anything inconsistent with the provisions of the joint will."

25.   Although these cases were concerned with joint wills, the same principle applies to mutual wills. As Snell puts it (para 22-34):

"Any will which the surviving testator may make to replace the first will will be valid. The agreement cannot make the first will irrevocable. His personal representative will, however, take the property subject to the trust arising under the prior agreement."

26.   In *Birmingham v Renfrew* (1937) 57 CLR 666 Latham C.J described it as "a trust which is declared by the law to affect the conscience of [the survivor's] executor and of the volunteers who are devisees or legatees under his will."

27.   The essential point, to my mind, is that the trust does not arise under the will of the surviving testator. Nor does it arise under any previous will of the surviving testator. It arises out of the agreement between the two testators not to revoke their wills, and the trust arises when the first of the two dies without having revoked his will. In so far as there is an "operative will", it seems to me that it is the will of the first testator (and his death with that will unrevoked) which brings the trust into effect. That being so, I do not consider that a person who claims under the doctrine of mutual wills is a person beneficially interested in the estate *under the will of the deceased*. It follows, in my judgment, that no valid application can be made by such a person under section 50 of the Administration of Justice Act 1985.

28.   Section 1 of the Judicial Trustees Act 1896 defines neither a trust nor a beneficiary. Mr Gibbon said that the jurisdiction under the 1896 Act was co-extensive, so far as estates are concerned, with that under section 50 of the 1985 Act. I do not see why that should be so; nor do I consider that there is any presumption to that effect. The jurisdictions may overlap, but there is no reason why they should be co-extensive. In *Re Marshall's Will Trusts* [1945] Ch 217 Cohen J said that the word trust was to be given its ordinary meaning; and he adopted, as its ordinary meaning, the definition then to be found in Underhill on Trusts:

"A trust is an equitable obligation, binding a person (who is called a trustee) to deal with property over which he has control (which is called the trust property) for the benefit of persons (who are called the beneficiaries or cestuis que trusts), of whom he may himself be one, and any one of whom may enforce the obligation."

29.   As Clauson J made clear the survivor of two persons who make mutual wills is treated as a trustee, and as Lord Camden said the trust binds those who claim under him. Accordingly, in my judgment the survivor and his executor are trustees in the usual sense of that word. A person entitled to enforce the trust thus imposed by law is, in my judgment, a beneficiary. In my judgment, therefore, although a person claiming under the English doctrine of mutual wills is not entitled to make an application under

section 50 of the Administration of Justice Act 1985, he is entitled to apply under section 1 of the Judicial Trustees Act 1896. If that is wrong, then I consider that the personal representative administering the estate of the survivor of two testators who made mutual wills is a trustee for the purposes of the 1896 Act, by reason of the extended definition in section 1 (2); and the person who claims to be entitled under the doctrine of mutual wills is interested in the assets being so administered, and is therefore a beneficiary for the purposes of the 1896 Act.

30.    Mr Barlow rightly accepted that a mere creditor of the estate could not be said to be a beneficiary of the estate; and consequently had no standing to apply for the removal of a personal representative. So it is necessary at this stage to consider what Surrogate Scarpino decided about the status of the Foundation. Mr Gibbon warned me against reading the Surrogate's decision by the light of nature, because there was no evidence of the law that he applied, nor of the procedures which governed proceedings in the Surrogate's Court. However, it seems to me that if there was to be any challenge to the usual presumption that foreign law is the same as English law, the burden would have been on Pamela to take up that challenge by evidence. There was none.

31.    The Surrogate's essential reasoning on the Reciprocal Will Agreement is contained in pages 20 and 21 of his written judgment. He said (omitting citation of authority):

> "The Foundation is correct that agreements, such as the Reciprocal Agreement, are enforceable in equity. It is also correct that the Court may not set up Agnes' 1988 or 1990 will as her last will and testament. However, the Foundation's contention that the equitable remedy for breach of the Reciprocal Agreement is to deem it a creditor of Agnes' estate is correct only to the extent of Agnes' residuary estate. The proper remedy is an order directing the fiduciary to perform the obligation which the testator had assumed. Agnes' obligation under the Reciprocal Agreement was to name the Foundation as the residuary beneficiary of her estate. Accordingly the Foundation's remedy is to receive the residue of Agnes' estate. This was the relief accorded in [an earlier case] where the beneficiaries under the decedent's later will were deemed to hold half of her estate as a resulting trust in favor of the husband's relatives – those who, though the beneficiaries of the joint will, were cut out by the wife's later will."

32.    It is true that there is a reference to the Foundation being deemed to be a "creditor" of Agnes' estate. But the remainder of the Surrogate's reasoning shows clearly, to my mind, that he was deciding that the Foundation was beneficially entitled to the residuary estate itself. First he said that the Reciprocal Will Agreement was enforceable in equity. It is not therefore a case of debt or damages which would make someone a creditor of the estate. Second, the order is an order directing the fiduciary to perform the testator's obligation. This is not an order sounding in money; but an order of specific performance. Third, he said that the Foundation's remedy was to receive Agnes' residuary estate. If it is entitled to receive the residue of the estate, it is hard to see how it is not beneficially entitled to it. Fourth, the justification for the Surrogate's conclusion is a reference to authority in which it was held that a resulting trust had arisen. Plainly the disappointed beneficiary was a beneficiary under that

resulting (or, as we would perhaps say, constructive) trust. In addition the decree which embodied his decision was an order directing the fiduciaries of the estate to perform the contract of the deceased; and not a money judgment. In my judgment the Surrogate clearly decided that the Foundation was beneficially entitled to Agnes' residuary estate.

33.     The next question is whether the Foundation can rely on the Surrogate's decision in these proceedings.

34.     The Foundation is not attempting to enforce the Surrogate's decree. Rather, it is relying on his decision to establish an issue estoppel as against Pamela to the effect that it is a beneficiary of the estate. A foreign judgment will give rise to an issue estoppel in subsequent English proceedings if (i) the judgment is a final and conclusive judgment on the merits of a court of competent jurisdiction, (ii) the issue in question is the same and was necessary for the decision of the foreign court; and (iii) the parties to the English litigation are the same parties (or their privies) as in the foreign litigation.

35.     It is common ground that the Surrogate's Court was a court of competent jurisdiction; that the Surrogate's decision was a decision on the merits, and that it is final and binding. The issue that the Surrogate decided was that the Reciprocal Will Agreement was binding, with the consequence that the Foundation was beneficially entitled to Agnes' residuary estate. That is the same issue as that on which its entitlement to apply under the Judicial Trustees Act depends. The contentious issue was whether the parties to the litigation are the same parties (or their privies) as in the foreign litigation.

36.     In *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510 Megarry V-C said at page 515:

> "Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest.' "

37.     This test was approved by the House of Lords in *Johnson v Gore Wood & Co* [2002] 2 AC 1.

38. As I have said, Pamela was a party to the litigation before the Surrogate; but not in her capacity as Agnes' personal representative. The reason why she did not appear in that capacity was because Agnes' estate was represented by the ancillary administrator, Mr Ross. The issue before the Surrogate was whether the Reciprocal Will Agreement was binding on Agnes; and through her on her fiduciary. Agnes' fiduciary in New York was Mr Ross; and her fiduciary in England is Pamela. Mr Gibbon pointed out that there was now considerable hostility between Pamela and Mr Ross. I do not consider that that matters. What matters is that they represent the same estate, whether they do so amicably or at each others' throats. Since both are fiduciaries in relation to the same estate; and both ultimately derive their authority from the same will I consider that there is a sufficient degree of identification between the two as to make it just to hold that the decision to which Mr Ross was party as ancillary administrator binds Pamela as personal representative. The fact that Pamela participated in the proceedings in her personal capacity and as trustee of the Realities Trust, and advanced arguments in opposition to the Foundation, adds to the justice of treating her as bound by the Surrogate's decision, even if that would not be enough on its own.

39. On the basis that Pamela is bound by the Surrogate's decision, is Carvel-Florida also bound? Carvel-Florida was not formally a party to the proceedings before the Surrogate. However, Pamela was throughout a director and the registered agent of Carvel-Florida. In my judgment Carvel-Florida is also a privy for the purposes of issue estoppel. As I have said, the Surrogate decided that the Reciprocal Will Agreement bound Agnes as from the time that Thomas died. Her personal obligation was to nominate the Foundation as the residuary beneficiary under her will; and the effect of her not having done so was to make the Foundation beneficially entitled to her residuary estate. Carvel-Florida can have no better claim than Agnes, through whom it claims. In my judgment that is enough to make Carvel-Florida a privy. Mr Barlow also had a second string to his bow. He relied on the principle stated by Lord Penzance in *Wytcherley v. Andrews* (1871) L. R. 2 P. & D. 327, 328.

> "There is a practice in this court, by which any person having an interest may make himself a party to the suit by intervening; and it was because of the existence of that practice that the judges of the Prerogative Court held, that if a person, knowing what was passing, was content to stand by and see his battle fought by somebody else in the same interest, he should be bound by the result, and not be allowed to re-open the case. That principle is founded on justice and common sense, and is acted upon in courts of equity, where, if the persons interested are too numerous to be all made parties to the suit, one or two of the class are allowed to represent them; and if it appears to the court that everything has been done bona fide in the interests of the parties seeking to disturb the arrangement, it will not allow the matter to be re-opened."

40. Although the principle originated in probate proceedings, it is not confined to them: *Nana Ofori Atta II v. Nana Abu Bonsra II* [1958] A.C. 95. In *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241 Stuart-Smith LJ said that "justice and common sense" did not require it to be confined to probate actions. It is inconceivable that, through Pamela, Carvel-Florida did not know about the proceedings in the Surrogate's

Court. However, it is here that Mr Gibbon's point about my lack of knowledge of procedure in the Surrogate's Court has force. It will be seen that Lord Penzance's statement of principle is predicated on the ability of the party estopped to be able to make himself a party to the suit. I do not know whether that option would have been open to Carvel-Florida; so in my judgment it would be unsafe for me to base my decision on that ground. But one ground is enough.

41. Mr Gibbon said that if a person was not entitled to apply under section 50 of the Administration of Justice Act 1985, the gateway to proceeding under the Judicial Trustees Act by virtue of section 50(4) remained firmly locked. The argument was that an "application under subsection (1)" meant a *valid* application. However, it is not always the case that an "application" referred to in a statute must be a valid application in the sense of an application that will succeed: compare *Zenith Investments (Torquay) Ltd v Kammins Ballrooms Co Ltd* [1971] 1 WLR 1751. One of the purposes of giving the court the power to proceed under the 1896 Act when the applicant has applied under the 1985 Act is, in my judgment, to enable the court to cure what are effectively purely procedural defects. If I am wrong about that, then Mr Barlow said that he would amend the application to claim relief in an original application under the 1896 Act. Mr Gibbon did not suggest that Pamela would suffer any prejudice if such an application were made. If necessary I would have permitted the amendment.

42. I hold therefore that the Foundation is entitled to make its application under the Judicial Trustees Act 1896.

*Discretion*

43. Having held that I have jurisdiction, the next question is whether I should exercise it in the Foundation's favour. I should say that Carvel-Florida opposes the application. It says that Pamela has proved to be a doughty champion of Agnes' estate and that another personal representative would not have her tenacity. Pamela herself also opposes the application.

44. It is common ground that, in the case of removal of a trustee, the court should act on the principles laid down by Lord Blackburn in *Letterstedt v Broers* (1884) 9 App Cas 371, and that in the case of removing a personal representative similar principles should apply. Whether I am right in concluding that Pamela is a trustee; or whether she is no more than a personal representative, the principles are therefore the same. At page 386 Lord Blackburn referred with evident approval to a passage in Story's Equity Jurisprudence:

> "But in cases of positive misconduct, Courts of Equity have no difficulty in interposing to remove trustees who have abused their trust; it is not indeed every mistake or neglect of duty, or inaccuracy of conduct of trustees, which will induce Courts of Equity to adopt such a course. But the acts or omissions must be such as to endanger the trust property or to shew a want of honesty, or a want of proper capacity to execute the duties, or a want of reasonable fidelity."

45. He continued:

> "It seems to their Lordships that the jurisdiction which a Court
> of Equity has no difficulty in exercising under the
> circumstances indicated by Story is merely ancillary to its
> principal duty, to see that the trusts are properly executed. This
> duty is constantly being performed by the substitution of new
> trustees in the place of original trustees for a variety of reasons
> in non-contentious cases. And therefore, though it should
> appear that the charges of misconduct were either not made out,
> or were greatly exaggerated, so that the trustee was justified in
> resisting them, and the Court might consider that in awarding
> costs, yet if satisfied that the continuance of the trustee would
> prevent the trusts being properly executed, the trustee might be
> removed. It must always be borne in mind that trustees exist for
> the benefit of those to whom the creator of the trust has given
> the trust estate."

46.    The overriding consideration is, therefore, whether the trusts are being properly
executed; or, as he put it in a later passage, the main guide must be "the welfare of the
beneficiaries". He referred to cases in which there was a conflict between trustee and
beneficiary and continued:

> "As soon as all questions of character are as far settled as the
> nature of the case admits, if it appears clear that the
> continuance of the trustee would be detrimental to the
> execution of the trusts, even if for no other reason than that
> human infirmity would prevent those beneficially interested, or
> those who act for them, from working in harmony with the
> trustee, and if there is no reason to the contrary from the
> intentions of the framer of the trust to give this trustee a benefit
> or otherwise, the trustee is always advised by his own counsel
> to resign, and does so. If, without any reasonable ground, he
> refused to do so, it seems to their Lordships that the Court
> might think it proper to remove him; but cases involving the
> necessity of deciding this, if they ever arise, do so without
> getting reported."

47.    He added, however, at page 389:

> "It is quite true that friction or hostility between trustees and
> the immediate possessor of the trust estate is not of itself a
> reason for the removal of the trustees. But where the hostility is
> grounded on the mode in which the trust has been administered,
> where it has been caused wholly or partially by substantial
> overcharges against the trust estate, it is certainly not to be
> disregarded."

48.    The Foundation's application to remove Pamela is mainly based on her conduct of
proceedings thus far. It is a striking fact that after the Surrogate had ruled that the
Foundation was entitled to receive Agnes' residuary estate (a decision that Pamela
knew about) she issued proceedings in the High Court in England in which she was
both claimant and defendant, seeking payment of monies from the estate without

notifying the Foundation. She pursued those proceedings until the Chancery order was made, still without notifying the Foundation. As I have said, the claim was based on three categories of expense:

i)  Sums which Pamela said she had incurred on behalf of Agnes during her lifetime;

ii)  Debts which Agnes had contracted but had not paid; and

iii)  Sums which Pamela had incurred as Agnes' personal representative and in respect of which she claimed to be entitled to indemnity from the estate.

49.  The first of these categories was a claim as creditor of the estate against the estate. In other words, this was Pamela's personal claim against the estate. The second category is more obscure, but seems also to have been Pamela's personal claim against the estate. The third was a claim in her representative capacity (in effect against the beneficiaries). A pause for thought ought to have led Pamela to realise that there was an obvious conflict of interest between her personal claims and her duties as personal representative. The procedural nonsense of a claim to which she was both claimant and sole defendant ought to have been obvious too. Mr Gibbon pointed out that Pamela was acting as a litigant in person. However, Pamela is an experienced litigant. I do not regard the fact that she was a litigant in person as an excuse. If anything, it counts against her, because a responsible personal representative, with the interests of the estate at heart, would have consulted a lawyer.

50.  Mr Gibbon submitted that Pamela was not obliged to join the Foundation as a defendant to her claims against the estate. He may well be right about that. CPR Part 64.4 says that persons with an interest in or claim against the estate "may" be made parties to the claim. But in my judgment a responsible personal representative, knowing of the Surrogate's decision, and pursuing a personal claim for over £7 million, would have given notice of the claim to the Foundation. In his Order dated 31 January 2006 vacating the domestication order Judge Andrews of the Broward County Court commented that

"this Court finds that there is strong evidence of fraud upon the court perpetrated by Petitioner in both the proceedings before the High Court and this Court. This Court is further of the opinion that Petitioner, by proceeding as she has, is attempting to circumvent the decision of the Westchester County Surrogate's Court, and the decision of Judge Vonhof of the Palm Beach Court."

51.  Even after all the criticism that has been levelled at Pamela for taking this course, both by the Foundation and Judge Andrews, she still says that she believes that it was appropriate for her to have obtained the Chancery order and that there was no need to inform the Foundation either that she had applied for it or that it had been granted. Mr Gibbon submitted, and I agree, that I should not on a summary application infer that Pamela has acted dishonestly or with deliberate disregard of her duties. But if I do not draw that inference, what is left? The only alternative conclusion that I can draw from this is that Pamela does not understand her responsibilities, and is not willing to learn them. There is no prospect of Pamela's position being any better after a trial.

52.     It is also a striking fact that when Pamela came to domesticate the Chancery order in Florida and New York, she did so in courts which had had no previous experience of this long running and bitter dispute. More than that, when restraining orders had been made against her by the state courts she registered the Chancery order in the Federal Court. This does not encourage me to believe that she will abide by orders of the court.

53.     It is plain that there is intense hostility between Pamela and the Foundation. Pamela is partisan as between the Foundation on the one hand and Carvel-Florida on the other. So far as the Foundation is concerned, the hostility is, in my judgment, grounded on the way in which the trusts have been administered.

54.     Lord Blackburn cited as the guiding principle to the jurisdiction to remove trustees as being "the welfare of the beneficiaries". Mr Barlow submitted:

> "Pamela has wholly disregarded this principle. Her every act has been calculated to promote her own personal interests and to prejudice those of the Foundation. She is in a position of irreconcilable conflict with the principal beneficiary of Agnes' estate and her hostility to the Foundation renders it quite impossible for her to fulfil her fiduciary duties. Her position as personal representative is untenable. She should be removed."

55.     I agree. I will order Pamela to be removed as personal representative. The Foundation has proposed that Mr Guy Greenhous, a solicitor and partner in RadcliffesLeBrasseur, be appointed as personal representative (or judicial trustee). He has consented to act; and has been certified as fit to act. There is no objection to him personally. I will therefore accept the Foundation's proposal.

**Application to set aside**

56.     The second application is an application to set aside the Chancery order. It is made under CPR Part 40.9 which says:

> "A person who is not a party but who is directly affected by a judgment or order may apply to have the judgment or order set aside."

57.     The Foundation is, in my judgment, a person who is directly affected by the order because if it stands it will reduce the value of Agnes' residuary estate. It is therefore entitled to make the application. The rule gives the court a discretion whether or not to set aside the order. In my judgment I should exercise my discretion in favour of the Foundation and set aside the order because:

   i)      No notice of the proceedings or the order was given to the Foundation;

   ii)     There has been no decision on the merits of the claim;

   iii)    There is, to put it no higher, a prima facie case that Pamela is influential in the decision making of Carvel-Florida;

iv) In any event the consent to the order was signed by Pamela's mother rather than a wholly disinterested third party; and

v) There is nothing to suggest that Pamela disclosed her relationship with Carvel-Florida to the court before it made its order.

58. I will therefore set aside the order. I will hear argument about what directions (if any) I should give for the future conduct of that action when this judgment is handed down.

# EXHIBIT 5

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

MR JUSTICE LEWISON

MONDAY the 11th day of JUNE 2007

Claim No: HC06C03337

IN THE ESTATE of AGNES CARVEL deceased

B E T W E E N :

THE THOMAS AND AGNES CARVEL FOUNDATION

**Claimant**

-and-

(1)    PAMELA CARVEL
(2)    CARVEL FOUNDATION, INC.

**Defendants**

---

### ORDER

---

UPON THE APPLICATION of the Claimant by Application Notice dated 8th
November 2006

AND UPON HEARING Counsel for the Claimant, for the First Defendant and
for the Second Defendant

AND UPON READING the documents recorded on the Court file as having
been read

AND the Court being of opinion that sufficient cause is shown within the meaning of Section 1(1) of the Judicial Trustees Act 1896 APPOINTS Guy Greenhous, Solicitor of the Supreme Court, of 5 Great College Street, Westminster, London EC4A 1RS ("the judicial trustee") as sole judicial trustee of the Will dated 7th July 1995 of the above-named Agnes Carvel deceased in place of the First Defendant to complete the administration of the deceased's estate

AND IT IS ORDERED

(1)    that the First Defendant do forthwith deliver up to the Principal Registry of the Family Division the grant of probate with the said Will annexed granted to her on 2nd October 1998

(2)    that the Claimant do deliver a sealed copy of this Order to the Principal Registry of the Family Division

(3)    that the First Defendant do forthwith deliver up to the judicial trustee

(a)    all property in her hands which is comprised in the said estate together with all deeds or documents of title relating to property comprised in the said estate and all other papers relating to the said estate; and

(b)    all sums of money comprised in the said estate which are in her hands or under her control

(4)    that the First Defendant do by 4.00 pm on 1st October 2007 prepare and deliver to the judicial trustee accounts of the estate from 4th

2

August 1998 (the date of the deceased's death) until the date of this Order

(5)    that until further Order of the Court the judicial trustee shall not without the prior leave of the Court

(a)    make any distribution of capital or income to any beneficiary;

(b)    bring defend or participate in any proceedings on behalf of the estate of the deceased in any jurisdiction

(6)    that subject as aforesaid the judicial trustee be at liberty

(a)    to apply for all such vesting and other consequential orders as may be necessary or expedient; and

(b)    to take all such other steps as he may consider necessary or expedient to collect and administer the assets of the deceased

(7)    that the judicial trustee be authorised to charge and retain out of the assets comprised in the estate of the deceased reasonable remuneration in accordance with section 29 of the Trustee Act 2000 and that the requirements as to the provision of security and the preparation, filing examination and inspection of accounts contained in Rules 6, 9 and 12 of the Judicial Trustees Rules 1983 be dispensed with

(8)    that the judicial trustee do prepare annual accounts of the estate of the deceased and make up the same to the anniversary of this Order

3

(9)    that the Orders made by Deputy Master Weir and Master Price on 8th January 2004 and 6th May 2005 in proceedings issued in this Division by the First Defendant on 12th June 2003 (the reference to the record whereof is HC03C02156) ("the 2003 proceedings") be set aside

(10)    that the First Defendant be at liberty on giving notice in writing to the judicial trustee and the Claimant to apply to the Master in the 2003 proceedings for directions as to the future conduct of such proceedings, such application not to be heard before 1st October 2007

(11)    that notwithstanding paragraph (5)(b) of this Order the judicial trustee be at liberty to apply to be joined as a party and to participate in the 2003 proceedings

(12)    that a copy of this Order be lodged in the Court file relating to · the 2003 proceedings

(13)    that the Claimant do cause copies of this Order and the Judgment herein to be supplied to the Surrogate's Court for the County of Westchester in the State of New York, the District Court for Palm Beach County in the State of Florida and any other Court which is seised of proceedings concerning Agnes' estate

(14)    that the Claimant's costs of the action be referred to the costs judge for detailed assessment on the standard basis and that the First Defendant do pay to the Claimant its costs as so assessed

(15)    that the First Defendant do by 4.00 pm on 1st October 2007 pay to the Claimant the sum of £100,000 on account of its costs of the

4

action, the said sum so paid to be accounted for by the Claimant on the detailed assessment of costs directed by paragraph (14) above

(16)   that the parties be at liberty to apply generally

AND the First Defendant having by her Counsel at the conclusion of the hearing applied for permission to appeal THIS COURT STATES

(a)   that this Order is a final order;

(b)   that subject to the grant of permission to appeal an appeal lies from this Order to the Court of Appeal;

(c)   that in the event of a refusal by this Court of permission to appeal any further application for permission to appeal may be made to the Court of Appeal

AND FURTHER ORDERS

(17)   that the First Defendant's application for permission to appeal from this Order be refused

(18)   that the First Defendant's time for filing an appeal notice to the Court of Appeal seeking permission to appeal from this Order be extended to 4.00 pm on Monday 16th July 2007

5

Claim No: HC06C03337

# IN THE HIGH COURT OF JUSTICE

## CHANCERY DIVISION

### MR JUSTICE LEWISON

### MONDAY the 11th day of JUNE 2007

IN THE ESTATE of AGNES CARVEL
deceased

B E T W E E N :

THE THOMAS AND AGNES CARVEL
FOUNDATION

Claimant

- and -

(1)   PAMELA CARVEL
(2)   CARVEL FOUNDATION, INC.

Defendants

---

## ORDER

---

Herbert Smith LLP,
Exchange House,
Primrose Street,
London EC4A 2HS

# IN THE HIGH COURT OF JUSTICE
## CHANCERY DIVISION
## APPLICATION FOR PERMISSION TO APPEAL

| | |
|---|---|
| Title of Action : THE THOMAS + AGNES CARVEL FOUNDATION v PAMELA CARVEL + ANR | Action No. HC06-C3357 File No. |
| Heard/Tried Before : MR JUSTICE LEWISON | Court No. 54 |
| Nature of hearing : | |
| Date of Hearing/Judgment    11TH JUNE 2007 | |
| Results of the hearing: | |

Claimant's*/Defendant's* FIRST
application for permission to appeal
*delete as appropriate

Refused
Allowed*
*delete as appropriate

Reasons for decision: *(to be completed by the Judge)*

No reasonable prospect of success.

Judges Signature:

To the Applicant :

When completed, this form should be lodged in the Civil Appeals Office on an application for permission to appeal or when setting down an appeal.

# EXHIBIT 6

6

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| THE THOMAS AND AGNES CARVEL FOUNDATION | ) ) ) |
| Petitioner, | ) |
| v. | ) ) |
| PAMELA CARVEL, individually and as Ancillary Administratix with Will Annexed of Agnes Carvel, Respondent. | ) ) ) ) ) |

C.A. No. 3185-VCP

PAMELA CARVEL'S ANSWER IN OPPOSITION TO PLAINTIFFS PETITION TO
REMOVAL ANCILLARY ADMINISTRATOR
AND
AFFIDAVIT IN SUPPORT OF MOTION TO ADJUDICATE INTERMEDIATE
ACCOUNTING OF ANCILLARY ADMINISTRATOR AND TO APPOINT A
RECEIVER TO HOLD ALL ESTATE ASSETS NOW IN PLAINTIFF'S HANDS

NOW COMES Pamela Carvel, Delaware Ancillary Administrator for the Agnes Carvel

Estate ("Estate"), Respondent in the above-entitled Petition and responding thereto, states as

follows:

1  To the extent that Paragraph 1 contains allegations of fact they are denied

Paragraph 1 misrepresents the facts. Those New York politicos who are Petitioner are identity

thieves. Petitioner is not entitled to tax-exempt status. In any guise, Petitioner's abusive and

harmful acts against Agnes Carvel disqualified those persons under Agnes Carvel's uncontested

Last Will from any benefit whatsoever from the Estate of Agnes Carvel

2  Respondent admits that Pamela Carvel is Delaware Ancillary Administrator; for

the balance of Paragraph 2 the records of the Register of Wills speak for themselves.

1

3.    To the extent that Paragraph 3 contains allegations of fact they are denied.
Paragraph 3 alleges conclusions of law properly decided by this court.

4.    Pamela Carvel is without sufficient information to form an opinion of the truth of
Paragraph 4. Petitioner and co-conspirators burgled Agnes Carvel's homes and offices while
Agnes was at the funeral of her husband Thomas Carvel. The veracity of the documents alleged
by Petitioner remains unknown. Petitioner draws conclusions of law properly decided by the
court.

5.    To the extent that Paragraph 5 contains allegations of fact they are denied.
Paragraph 5 alleges conclusions of law properly decided by this court. The documents referred to
speak for themselves, but the veracity of the alleged Agreement is denied.

6.    Pamela Carvel admits in Paragraph 6 that Thomas Carvel was found dead on
October 21, 1990, and that Agnes Carvel survived him. Pamela Carvel recently discovered that
Thomas Carvel's death certificate was falsified to evade an autopsy; no doctor ever examined the
body; the death certificate was forged. No medical determination has yet been made as to when
(or how) Thomas Carvel died. Those who are Petitioner are suspect in procuring an unnatural
and untimely death for Thomas Carvel.

7.    To the extent that Paragraph 7 contains allegations of fact they are denied.

8.    To the extent that Paragraph 8 contains allegations of fact they are denied.
Paragraph 8 misstates and misrepresents the facts. Agnes Carvel is the sole Subscriber (not
Pamela Carvel) to incorporate the Carvel Foundation in conjunction with the issuance of Agnes
Carvel's Last Will and Testament dated July 7, 1995. Petitioner repeatedly misrepresented this
material fact to all courts to create prejudice -- courts that failed to take notice of the
documentary evidence filed with the State of Florida.

2

9       Pamela Carvel admits Paragraph 9.

10      Pamela Carvel admits in Paragraph 10 that Agnes Carvel's Last Will and Testament was submitted to the High Court for probate. Probate was not contested by any party, including Petitioner. Pamela Carvel denies probate was granted on October 4, 1998.

11      Pamela Carvel denies Paragraph 11 as misrepresentation of the facts; except that Pamela Carvel admits Leonard Ross is New York Ancillary Administrator c.t.a.

12      Pamela Carvel denies Paragraph 12. Petitioner misstates and misrepresents the facts. Paragraph 12 alleges conclusions of law properly decided by this court.

13.     Pamela Carvel denies Paragraph 13. Petitioner misstates and misrepresents the facts. The decisions (if valid) speak for themselves.

14.     Pamela Carvel denies Paragraph 14. Petitioner misstates and misrepresents the facts, and fails to include those ruling that proved Pamela Carvel's actions correct for the benefit of the estates and Thomas and Agnes Carvel.

15.     Pamela Carvel denies Paragraph 15. Petitioner misstates and misrepresents the facts.

16      Pamela Carvel denies Paragraph 16. Petitioner misrepresents the facts. Pamela Carvel admits that as a *pro se litigant* guidance to issue a claim was sought from the High Court and the High Court's directions and orders were followed.

17.     Paragraph 17 documents speak for themselves. Petitioner misrepresents the facts. Pamela Carvel admits that as a *pro se litigant* guidance to domesticate a foreign judgment was sought from the Broward County Clerk (county of residence for the parties, Pamela Carvel and the Carvel Foundation), and those directions and orders were followed.

3

18.     Pamela Carvel denies Paragraph 18 as a misrepresentation of facts. Pamela Carvel admits that a 15 minute hearing was held, wherein Pamela Carvel as *pro se litigant* participated from London by telephone, and the Petitioner paid at least two lawyers to appear in person, using the Carvels gifts restricted to charity.

19.     Pamela Carvel denies Paragraph 19, but admits that on June 10, 2007 Westchester Surrogate's Court issued a Citation for an accounting from August 18, 1999 to May 10, 2005.

20.     Paragraph 20 documents speak for themselves. Pamela Carvel admits that as a *pro se litigant* guidance to domesticate a foreign judgment was sought from the Nassau County Clerk and Sheriff's office (resident county of the assets of the Estate of Agnes Carvel), and those directions and orders were followed.

21.     Pamela Carvel denies Paragraph 21 as a misstatement and misrepresentation of facts. Paragraph 21 documents speak for themselves. Pamela Carvel admits that as a *pro se litigant* guidance to domesticate a foreign judgment was sought from the Nassau County Clerk and those directions and orders were followed. Responses to the Nassau County Clerk indicated perjury by the banks and by Leonard Ross.

22.     Paragraph 22 documents speak for themselves. Petitioner misstates and misrepresents facts.

23.     Paragraph 23 documents speak for themselves. Pamela Carvel admits that as a *pro se litigant* guidance to register a foreign judgment was sought from the Pro Se Desk of the U.S. District Court of the Eastern District of New York and those directions and orders were followed. Petitioner misrepresents the facts by failing to reveal prior and subsequent orders denying Pamela Carvel's standing in Westchester Surrogate's Court, New York, and then

4

denying Pamela Carvel's Constitutional right to redress in all other courts of the world, although outside the Surrogate's jurisdiction

24    Paragraph 24 documents speak for themselves.

25    Paragraph 25 documents speak for themselves. Pamela Carvel admits that Petitioner's handcrafted words, prepared for the Broward County Court judge, are used repeatedly by Petitioner.

26.    Pamela Carvel denies Paragraph 26. Paragraph 26 documents speak for themselves. Respondent draws this court's attention to the statement at the beginning of the decision at #2 saying that only the Petitioner's recitation of the facts was used. Pamela Carvel's request is pending for Appeal in London (as a *pro se litigant*) based on mistakes in fact and law.

27    Pamela Carvel denies Paragraph 27. Inland Revenue determines "excepted estates" but was not given notice of the proceeding in London by Petitioner.

28    Paragraph 28 documents speak for themselves. The Attorney General determines issues on behalf of charities, but was not given notice of the proceeding in London by Petitioner. Pamela Carvel draws this court's attention to the statement at the beginning of the decision at # 2 saying that only the Petitioner's recitation of the facts was used. Pamela Carvel's request is pending for Appeal in London (as a *pro se litigant*) based on mistakes in fact and law.

29    Respondent denies Paragraph 29. Paragraph misstates and misrepresents the facts. Before the hearing in London, Petitioner withdrew its request to be determined to be the beneficiary of the Estate under English law, and all other remedies originally requested in its claim because a trial on the evidence would have been required. Petitioner massaged the court into arriving at summary judgment denying a trial in order to replace Pamela Carvel with a

5

"judicial trustee" with no funds and power to litigate without a court order. No executor or personal representative was appointed.

30.     Pamela Carvel denies Paragraph 30. Paragraph misstates and misrepresents the facts. Pamela Carvel denies that the recitation reflects the true nature of English law applicable.

31.     Paragraph 31 documents speak for themselves.

32.     Pamela Carvel denies Paragraph 32. Paragraph 32 misstates and misrepresents the facts, and draws conclusions of law properly decided by this court.

33.     Paragraph 33 documents speak for themselves.

34.     Pamela Carvel denies Paragraph 34. Paragraph 34 misrepresents the facts. Paragraph 34 documents speak for themselves. Respondent draws this courts attention to the last page notarized in London May 16, 2003.

35.     Pamela Carvel denies Paragraph 35. Pamela Carvel refers this court to records of conversations with the Register of Wills and Department of Taxation, if such records are retained. Paragraph 35 alleges conclusions of law properly decided by this court.

36.     Pamela Carvel denies Paragraph 36. Petitioner misstates and misrepresents the facts. Paragraph 36 alleges conclusions of law properly decided by this court.

37.     Pamela Carvel denies Paragraph 37. Petitioner misstates and misrepresents the facts. Petitioner's documents attached as exhibits are not the amended complaints currently before the U.S. District Court. Paragraph 37 alleges conclusions of law properly decided by U.S. District Court for Delaware. Pamela Carvel asserts Petitioner seeks to obstruct Agnes and Pamela Carvel's rights guaranteed by the U.S. laws and the Constitution.

38.     Pamela Carvel denies Paragraph 38. Petitioner misstates and misrepresents the facts. Paragraph 38 alleges conclusions of law properly decided by this court.

6

39.    Pamela Carvel denies Paragraph 39. Paragraph 39 alleges conclusions of law properly decided by this court.

40.    Pamela Carvel denies Paragraph 40. Paragraph 40 alleges conclusions of law properly decided by this court.

41.    Pamela Carvel denies Paragraph 41. Petitioner misstates and misrepresents the facts. Paragraph 41 alleges conclusions of law properly decided by this court. Petitioner is not a beneficiary of the Estate, but the sole adverse litigant to Agnes Carvel and the Estate for 17 years. Petitioner abused Carvel restricted charitable gifts to forcibly extort an end to Agnes Carvel's demands for the return of assets stolen by the Petitioner and its agents.

42.    Pamela Carvel denies Paragraph 42. Petitioner misstates and misrepresents the facts. Paragraph 42 alleges conclusions of law properly decided by this court.

43.    Pamela Carvel denies Paragraph 43. Petitioner misstates and misrepresents the facts.

44.    For all answers 1-43, Petitioner failed to state any cause of action "individually" against Pamela Carvel. Pamela Carvel denies any duty or liability "individually" to the Petitioner; and moves this court to dismiss all alleged claims or damages asserted "individually". Petitioner seeks to deprive Pamela Carvel "individually" of rights guaranteed under the Constitution and the laws of the United States. On information and belief, it is unethical if not illegal for a lawyer to seek improper remedies from the court and constitutes an abuse of process or obstruction to justice.

45.    Pamela Carvel concurrently moves this court for remedies that are affirmative defenses to this Petition.

7

### AFFIDAVIT IN SUPPORT OF MOTION TO ADJUDICATE INTERMEDIATE ACCOUNTING OF ANCILLARY ADMINISTRATOR AND TO APPOINT A RECEIVER TO HOLD ESTATE'S ASSETS NOW IN THE HANDS OF PETITIONER

#### BRIEF BACKGROUND

46.     Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History. Tom's wife, Agnes, invested her time and money in the couples' first business venture that became the Carvel franchise system. Agnes worked in every aspect of the business. Tom relied on Agnes' incomparable common sense approach to business problems to run the business for over 50 years. Bruce Carvel, Tom's older brother and Pamela's father, designed and built the first continuous soft ice cream freezers that became the Carvel franchise trademark. Bruce formulated the products that comprised the unique Carvel line of specialties.

47     Pamela Carvel is a member of the Association of Certified Fraud Examiners in the United States and United Kingdom. In 1990, Tom asked Pamela to return to the United States to commence fraud investigations relating to his employees and the theft of money and real estate from the sale of Carvel Corp. stock. Tom stated that his attorney in the sale, Robert Davis, was working for the buyers, "Investcorp". Tom stated on Friday, October 19, 1990 and Saturday, October 20, 1990 that on Monday, October 22, 1990 he was going to fire secretary Mildred Arcadipane and attorney Robert Davis. Tom and Pamela would then investigate the apparent embezzlement of more than $100 million known to Tom at that time, but Tom was found dead Sunday morning, October 21, 1990.

48     Instead of being unemployed on Monday morning, Arcadipane and Davis gained controlled everything away from Agnes Carvel as surviving joint owner outside probate. By

8

illicit means (forgery, burglary, bank fraud, theft of records, etc., from Tom and Agnes' offices and homes) a group of fraudsters including bank employees and attorneys colluded with Arcadipane and Davis to control and manipulated banks accounts, cash, gold, deeds, U.S. Securities, trusts, private corporations, and documents, to the exclusion of Agnes Carvel as legitimate surviving owner.

49.    Thomas Carvel died at home, allegedly in his sleep, without a doctor's care, and without any reported unusual health complaints prior to his death. Recently, Pamela discovered that the death certificate information was falsified by stating that Tom saw a doctor days before he died and that said doctor verified the cause of death on the death certificate. This was a lie apparently to evade an autopsy to determine Tom's cause of death. The death certificate was forged. No doctor ever examined the body. No doctor ever determined the cause of death or when it occurred.

50    The week before Tom died he estimated the family worth to exceed $250 million in cash, Treasury securities, and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock (a Delaware corporation). The week after Tom was found dead, Agnes was told by Malcolm Wilson (partner in Kent Hazzard et al, foundation usurpers) that there was less than $40 million and that virtually none of it belonged to her.

51    Undisclosed and unbeknownst to Agnes, Wilson purportedly became the "general counsel" to the alleged Thomas and Agnes Carvel Foundation, without Agnes' knowledge or consent as sole surviving Member, Director and Officer of the legitimate Thomas and Agnes Carvel Foundation. The criminality by Wilson and his clients progressed exponentially from that point. The unethical, if not illegal, tactics used by Wilson are detailed (albeit anonymously) in

9

the New York Law Journal article by Eve Markewich, "Getting Grounded in Ethical Dilemmas" (February 14, 2005). Markewich, an attorney hired by Pamela Carvel for the Estate in New York, failed to bring this information to Pamela's attention and failed to assert any claims on behalf of Agnes Carvel because Markewich entered into covert agreements with the foundation usurpers that she would receive $3-4 million in legal fees without contest as long as she obstructed all money from reaching Pamela or the Estate in London. This incredible revelation was made by Leonard Ross, New York ancillary administrator, when pressed for the reasons he refused to provide documents or assert any demands for payment of the Estate's funeral expenses, debts and administrative expenses.

## IDENTITY THIEVES – NOT BENEFICIARY

52.    Petitioner is NOT a beneficiary but a predator, who harmed, abused and procured the death of Agnes Carvel, an elder person, for the personal profit of those who stole the identity of the Thomas and Agnes Carvel Foundation ("alleged foundation", "usurpers") and other Carvel founded and funded private charities. Petitioner bears no resemblance to the legitimate charity founded by the Carvels. **The usurpers legitimacy has never been determined yet by any court.** The usurpers' violations of tax law are now before U.S. District Court. The usurpers' criminal activities are now under investigation by the New York Attorney General. The usurpers are once again trying to extort silence from Pamela Carvel in an attempt to derail full scrutiny of these issues in Delaware.

53.    These politicos who stole the identity of the Thomas and Agnes Carvel Foundation violate the Certificate of Incorporation, the By-Laws, and the representations made to the IRS and New York Attorney General to gain tax-exemption. The usurpers pervert the specific 14-year precedent of management that caused the Carvels to name the legitimate

10

Thomas and Agnes Carvel Foundation a remainder beneficiary in the Carvels' testamentary plans in 1988. The alleged foundation violates every principle established by the Carvels for their restricted charitable gifts

54.   The usurpers routinely use extortion tactics to force capitulation from the Carvels, their victims. The usurpers used this same tactic when Agnes and the New York Attorney General investigated the usurpers for charity fraud in 1991 and lodged fraud charges in 1992 (Exhibit 1; New York State Attorney General's letters on 17 May 1991 and 24 July 1992)

55.   The foundation impostors fear loosing control of misappropriated Carvel assets. These fraudsters' intentions are stated in their manifesto for control of the "Thomas and Agnes Carvel Foundation". Robert Davis created "Confidential" memos (Exhibit 2) dated February 18, 1992 and April 9. 1992, in the midst of the Attorney General's charity fraud investigations *(NYS v Davis. Arcadipane, and Thomas and Agnes Carvel Foundation*, Index No. 93/405052) The first memo states that removing and discrediting Robert Davis and Mildred Arcadipane **"provides family with opportunity to assume control of Foundation, Estate and Agnes' assets."** Arcadipane and Davis were indeed forced to resign by the Attorney General but not before installing the current board of "loyalists" who would pay the multi-millions dollar legal fees and not demand restitution

56.   Nothing could more clearly demonstrate the planned intent to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates. Such illegal intent (namely the intent to fraudulently transfer the Carvels' charity and withhold ALL CARVEL ASSETS from Agnes Carvel) for continuing planned activities that violate laws is adhered to thereafter by the alleged foundation managers that Davis installed, and named "loyalists"

11

57.    The same document states: **"Retain Membership to prevent family control."**
(#7) and **"Revised budget - shortfall in grants for 1992 without reduction of legal expense"**
(# 13). At #11, "Hudson Valley" [Bank] is listed generically as "loyalist" successor, i.e. anyone
from Hudson Valley Bank (where William Griffin is chairman; and where Griffin and the
Abplanalp family are major controlling shareholders) can be counted on to stack the charity's
votes against Agnes Carvel. The alleged foundation managers carried out the expressly stated
criminal enterprise while Agnes was alive, while Agnes was the sole living charitable benefactor,
the sole surviving asset-owner, and the sole mandatory income beneficiary. Such criminal intent
continued to deny Pamela Carvel all rights as Agnes Carvel's executor and successor as sole
legitimate Foundation Member.

58.    The foundation usurpers operate their criminal enterprises under a cloak as
"remainderman" with tax-exempt status stolen from the identity of the Carvels' formerly
legitimate charities. Therefore, the tax-exempt status behind which the fraudsters hide must be
denied. This request is pending before U.S. District Court. Foundation usurpers must be held
individually accountable for the tax evasion and damages resulting from their conspiracy. The
stated illegal intent, to fraudulently convert all Carvel assets by litigating through the charity to
deny Agnes Carvel all assets and income, violates restrictions on charitable purposes, the QTIP
and Marital Deduction elections for Thomas Carvel's estate taxes, as well as contractual
obligations to Agnes in Thomas Carvel's alleged 1988 "estate plan" and the "Agreement".

59.    The statement of intent in the February 18, 1992 memo (Exhibit 2) to control
"Agnes' assets" was written while Agnes Carvel was still alive. The statement of intent to
control Thomas Carvel's estate was written while Agnes was still executrix, entitled to
mandatory income and empowered to direct the use of non-income producing property. The

12

foundation usurpers' stated intent is tax fraud  The stated intent to deny Agnes asset control is in direct violation of the stated intent of Thomas' 1988 Will to prefer Agnes' income as beneficiary and <u>not</u> to preserve principal for the "remaindermen" (Petitioner's Exhibit A; page 8, EIGHTH)

> "I declare that in creating the trusts provided for In this will my primary purpose has been <u>to benefit [Agnes] the beneficiaries of the income and not to preserve the principal for the benefit of the remaindermen [the foundation]</u>, and I direct that this purpose be carried out in determining any questions which may arise between the Interests of the beneficiaries of the Income and the Interests of the beneficiaries of the remainders"(emphasis added).

60    Agnes Carvel was sole income beneficiary. **Agnes NEVER RECEIVED ON PENNY from Thomas Carvel's estate.** This failure constitutes not only fraud against Agnes but tax fraud for which there is no statute of limitations  Agnes' benefit of unrestricted income was alleged to be the basis for validity of the "Agreement".  Failure to fulfill the terms of Thomas Carvel's Will to benefit Agnes is a breach the "Agreement" contract that is enforceable by Agnes  The usurpers' denial of income to Agnes in life, coupled with the usurpers' current attempts in New York to withhold all disposal income belonging to Agnes' estate, constitutes misrepresentation of substantive material facts at trial, and thereby yet another fraud on the Carvels.

61    Pamela Carvel (a member of the Association of Certified Fraud Examiners in the U.S. and U.K., who has no legal training or professional legal experience) is compelled to appear *pro se* as fiduciary after Pamela was compelled to spend all her personal disposable resources to defend the rights and physical well being of Agnes Carvel, her aunt and an elder person, against harassment. intimidation, fraudulent conversion, violations of inalienable rights, and obstruction of Carvel control of Carvel assets

13

62.    Out of 36 fiduciary positions controlling Agnes' property and its income (7 in Tom's estate, 12 in two corporations, 4 in an alleged New York unitrust, 3 in the an alleged Florida grantor trust, 10 in the alleged foundation) all of whose legal fees are paid from Agnes' property, Pamela Carvel is the sole fiduciary other than Agnes Carvel to be deprived of equal access as all other fiduciaries to the multi-million dollar Carvel estates fund to retain competent, independent, legal counsel for the benefit of Agnes Carvel as sole beneficiary in her lifetime, to defend Agnes' continuing interests through her estate, and to assert the Carvels' testamentary intentions (e.g. Exhibit 3, denying funds to pursue litigation transferred back to Delaware after 8 years)

63.    The actions of the other conflicted fiduciaries violated the purported terms of Thomas Carvel's 1988 "estate plan", violated the Internal Revenue Code, and violated the law, but nonetheless, the Court, or anyone else never scrutinized their actions. The foundation usurpers allowed all these fiduciaries legal fees to be paid from Agnes' property without question. The foundation usurpers approve about $2-3 million in legal fees each year from Carvel funds in the hands of their agents. Many of these attorneys directly represented foundation usurpers in numerous conflicted positions. This one-sided obstruction of financial resources was intended to harm Agnes as an elder person and is intended to harm Agnes' intentions for legitimate charitable dispositions through the Estate. It is no secret that in the American justice system, the *pro se litigant* has little chance of surviving against the multi-million dollar law firms. The intent is to silence claims by denying representation or driving Pamela into financial ruin, like Agnes before her.

64.    Pamela Carvel is the sole legitimate Member and sole successor Member to Thomas Carvel and Agnes Carvel, who were sole Members, founders and benefactors of the

14

"Thomas and Agnes Carvel Foundation", a New York not-for-profit corporation founded in
1976. New York State Supreme Court adjudicated **Pamela Carvel the sole successor
Member to Agnes Carvel on August 30, 1999.**

65.    The persons, who allege herein to be Petitioner, never produced any necessary
documents to demonstrate authority to act as member (or director or officer) (Exhibit 4). The
identity of the legitimate Thomas and Agnes Carvel Foundation has been stolen. Pamela Carvel
moves this court for a full accounting trial compelling the identification of the beneficiaries of
the Estate; compelling the usurpers to produce documents within their possession and control
that are withheld from Pamela Carvel as Delaware Ancillary administrator (Exhibits 3 , 4).

66.    An accounting trial in Delaware would reveal whether it is contrary to public
policy for a benefactor to be abused for her money by those who alleged to control the charity
she founded. An accounting trial would permit the Department of Taxation and the Internal
Revenue Service to identify whether public policy disqualifies the New York usurpers from tax-
exempt status as a result of their abuse of restricted charitable assets to litigate exclusively for the
detriment of the charity's founder and benefactor.

67    The usurpers admit that they never contested the Last Will (Exhibit5; October 29,
2001, "Agreement" contract trial transcript, 19:5-19:7). The usurpers are persons disqualified
from benefit in the Estate by Article Two (E) of the uncontested Last Will for their acts to harm
Agnes Carvel and the Estate (Petitioner's Exhibit D). The Agreement decision (April 1, 2002)
specifically states at page 21 (Petitioner's Exhibit E) **"It is also correct that the Court may not
set up Agnes' 1988 or 1990 will as her last will and testament** (see Tutunjian v Vetzigan, [299
NY] 315)"; (if such decision remains valid after the New York State Attorney General's criminal

15

investigations into the apparent $300,000 bribery of the Surrogate Scarpino and massive charity frauds by the foundation usurpers).

68.    Agnes Carvel's 1995 Last Will clearly states by this instrument that Agnes Carvel, "revoke any and all former Wills and Codicils and declare this to be my Will." Previous Wills are therefore null and void. Agnes Carvel had Wills going back as far as the 1950s. The foundation usurpers failed to notify any courts of Agnes Carvel's previous Wills, many of which were stolen from the Carvels' homes and offices by the usurpers (Exhibit 6).

69    The Last Will was written in Florida. "If the provisions of the will are clear and unambiguous, we need not engage in judicial construction; rather, we apply the provisions according to their plain and ordinary meaning. See *Kernkamp v. Bolthouse*, 714 So 2d 655, 656 (Fla. 5th DCA 1998) (citing *First Nat'l Bank of Fla. v. Moffett*, 479 So. 2d 312 (Fla. 5th DCA 1985)). Equally important, we must strive to discern the intent of the testator and give effect to his or her wishes. Moffett ... Abiding by the fundamental rule that requires us to give effect to the testator's clearly expressed intent" (*Bariey v Barcus*, 877 So. 2d 42; 2004 Fla. App.)

70    New York also demands that the court's task is to ascertain the testator's intention from the words used in the trust instrument, and to give effect to that intention unless contrary to public policy or an established rule of law. (*In re: Marine Midland Bank-Western*, 55 A.D.2d 215, 389 N.Y.S 2d 705 [4th Dept. 1976]; *In re: Day's Trust*, 10 A.D.2d 220, 198 N.Y.S 2d 760 [1st Dept. 1960].) Language that is unambiguous and supports a reasonable meaning of a trust must be accepted as manifesting the grantor's intention. Therefore, the court is bound to such language and may not engage in rules of construction. (*In re: Gouraud*, 85 A.D.2d 342, 448 N.Y.S 2d 186 [1st Dept. 1982] aff'd 59 N.Y.2d 925, 453 N.E.2d 548, 466 N.Y.S.2d 319 [1983].)

16

71.    It is settled that the everyday and ordinary meaning of words reigns supreme when ascertaining the testator's intent. (*Matter of Gustafson,* 74 N.Y.2d 448, 453, 547 N.E.2d 1152, 548 N.Y.S.2d 625 [1989].) The testator's intention is to be gleaned from the language of the instrument as a whole, not from detached portions alone, and contradictory clauses are, whenever possible, to be reconciled accordingly. (106 *New York Jurisprudence 2d,* Trusts, § 100.) The foundation usurpers **never** contested the Last Will. The "Agreement" contract does not cure the illicit intent amply demonstrated by the usurpers and the harm they caused to Agnes and her estate. The usurpers are not the legitimate Thomas and Agnes Carvel Foundation.

### APPARENT BRIBERY OF JUDGE VIA HUDSON VALLEY BANK LOANS

72    There has never been any disagreement about money in the Carvel family. All litigation to waste and divert over $300 million in Carvel assets is generated exclusively by the foundation usurpers, Petitioner in this action, and their co-conspirators - strangers acting against family, using family funds. **Agnes Carvel never received one penny of income from Tom's estate as long as she lived as a result of the obstructions of the foundation usurpers.** Agnes Carvel's only adversaries for 17 years are the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets (Exhibit 2). The same document (#11) named "Hudson Valley" acceptable "loyalists" to become successor members and directors, i.e. anyone from Hudson Valley Bank would stack the vote against Agnes or Pamela.

73    As soon as Tom's was found dead, the usurpers stole foundation and other records from the Carvels' offices and moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed to impersonate a foundation member, director and officer. Soon again, the Bank's other major controlling stockholder, Robert Abplanalp, was also installed. Upon Robert Abplanalp's death,

17

his daughter Marie Abplanalp Holcombe took his place as "Hudson Valley" loyalist as stated in the 1992 manifesto, to maintain control against the Carvels. Marie Abplanalp is also a major controlling stockholder in the Bank. After stealing the identity and control of the Carvels' charities, Griffin and the Abplanalps abused Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving any income. The Bank asserts more control over Carvel money than any Carvel.

74.    Trials in the Thomas Carvel estate matters began on September 10, 2001. On October 1, 2001, Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000. The accounting proceeding in Agnes Carvel's New York ancillary administration began in May 2005. On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000. Neither of these loans was disclosed. It is Plaintiff's assertion that since the Office of Court Administration does not require "equity loans" to be listed on its forms, this type of loan-ploy forms an innovation in pay-off schemes to encourage favorable decisions.

75.    The average citizen can never know whether these "loans" are repaid by Surrogate Scarpino, or just "written off" as a cost of doing business by Griffin and his Bank. Given Surrogate Scarpino's decisions favoring the foundation usurpers against Agnes, the sole intended beneficiary of everything, there is the appearance of impropriety and bias, namely the appearance of bribery, which is sufficient grounds to judicially disqualify Surrogate Scarpino because he lacks the personal conscience to recuse himself. This demand is before the U.S. District Court in Delaware and the subject of criminal investigation by the New York attorney General.

76.    The Surrogate placed no restraint whatsoever on disbursements by the usurpers and executors in Thomas Carvel's estate, including the disbursement of assets belonging to

18

Agnes Carvel held in their hands. Legal fees are paid without prior or subsequent consent of the beneficiary or the court. This freedom, to draw down Carvel property at will, remained with Agnes' adversaries despite Agnes Carvel's warning that her adversaries were engaging in fraudulent business practices with known real estate fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and Attorney General prosecutions of three financial felons who caused losses in excess of $5 million to Agnes.

77      It is clear enough that only strangers are intended to become millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses to prosecute claims against these strangers. One-sided funding of litigation seen in the light of $300,000 in undisclosed "loans" to Surrogate Scarpino can demonstrate nothing other than an appearance of bribery with the intent to fraudulently convert estate and trust assets away from the Carvels and their intended beneficiaries.

## GRIFFIN'S FRAUDULENT CONVERSION OF REAL ESTATE

78      On October 6, 2006, William Griffin alleged to act as the president of the "Thomas and Agnes Carvel Foundation" in order to sell Agnes Carvel's former residence in Ardsley, New York containing two parcels of land of approximately 16 acres (currently valued at $8-10 million) to a shell company belonging to Denis Amicucci, a relative of Griffin's law partner Paul Amicucci. The price paid was allegedly merely $2 million, if any money changed hands at all.

79      Daniel A. Amicucci formed the shell company, Chauncey Partners LLC, in March 2006. Paul Amicucci is listed as part of Griffin's law firm Griffin, Coogan and Veneruso, P.C. and also appears to be the attorney in the firm of Walsh and Amicucci, LLP who act for other charities controlled by Griffin. Paul Amicucci is also listed among the "Hudson Valley Bank

19

Business Development Board" that has an incestuous, covert political relationship to the Carvel estate manipulations in Westchester Surrogate's Court.

80.     On that same day of the alleged sale, October 6, 2006, the shell company returned control of the whole property back to Griffin through Hudson Valley Bank as an alleged lease assignment for security for an alleged US$1.3 million mortgage from Hudson Valley Bank where Griffin is not only chairman but a controlling shareholder along with alleged foundation usurper Marie Abplanalp Holcombe.

81.     This same Ardsley property was appraised at $1.1 million in 1990 when Thomas Carvel died. While all surrounding real estate has increased in value a minimum of 300-400%, the Carvels' exclusive mountaintop acreage property only increased about 82%, despite the rare and unusual nature of so many undeveloped acres in such a sought-after area, and contrary to the high demand exhibited in the past. Agnes Carvel's other Westchester property, the first Carvel ice cream stand location in Hartsdale, was also stolen from Agnes and sold by Griffin in 2006 allegedly for $2.8 million to the owner of the current Carvel franchise. On information and belief, the actual price paid was $3.5 million, i.e. another $700,000 exchanged hands unreported. That property increased 375% from its 1990 appraised value of $600,000. Both properties have similar rocky terrains. Both properties are highly sought after for different uses.

82.     A similar insider sham transaction is suspected for Agnes' real estate in Florida when Griffin and the buyer show the same address. The foundation usurpers disposed of Agnes Florida real estate without notice to the Palm Beach probate court where multi-million creditors claims by the Estate were pending. All these disposals of Agnes Carvel's assets in New York and Florida were property held in trust by the foundation usurpers pursuant to court order and New York statute (SCPA 2215(3)). All these fraudulent transfers were done without court approval,

20

without notice to Pamela Carvel as executor, without notice to named beneficiaries, and without notice to creditors. The true amount of income from the sale of this real estate belongs to Agnes and her Delaware successor's in interest as "unrestricted income" disposed of Agnes Carvel in her lifetime. The Agreement decision in New York was by default against Agnes' Delaware successors in interest who asserted lack of jurisdiction in New York.

## OBSTRUCTION OF RIGHTS

83.    Pamela Carvel asserts that Petitioner's intentional obstruction of Agnes and Pamela Carvel's rights to redress of grievances, due process, equal treatment, and other rights guaranteed by U.S. laws and the Constitution, demonstrated illegal intent to deprive the Carvels of inalienable rights in order to profit of the usurpers.

84    Pamela Carvel called the Registry of Wills in 2006 to determine if a formal accounting was required each year even though there are no changes, and information is still being withheld. Pamela Carvel understood that an accounting was not necessary if there were no changes. If this understanding is incorrect, and not within the discretion of the Register of Wills to permit, or to give notice before enforcement, then the remedy is for this court is to take jurisdiction over the an intermediate accounting proceeding and demand the documents from the foundation usurpers who have now voluntarily submitted to the jurisdiction of this Court.

85    The usurpers admit at #41 of their Petition that Petitioner asserts there are no assets or liabilities in Delaware, therefore no "losses" could be incurred (#42) that are a liability of the Delaware ancillary administration, and the legal fees are generated by harassment. On this alleged basis of ZERO assets in Delaware (which Pamela Carvel does not adopt), the Petitioner seeks an extraordinary remedy for accountings that by Petitioner's admission would reflect nothing, and therefore could cause no possible harm to Petitioner.

21

86.    Nothing prevents additional inventories from being filed (12 *Del. C.* 1910). The usurpers, even as an alleged remainderman, do not stand ahead of the payment funeral expenses, taxes, creditors, Delaware obligations, or other beneficiaries. This priority of payments, and abatement of interests if funds are not enough, holds true in Florida and New York as well. Just as stated in 1992, the usurpers' criminal intent seeks to take everything, not merely a fair or legal share

87.    *In Matter of the Estate of Missimer* (299 Del. Ch. LEXIS 206), where beneficiaries actually claimed assets and income, the remedy determined for alleged breach of duty to account was "The executor shall present a form of order granting him 30 days from the hearing date to file an amended inventory and final account. See *12 Del. C. § 1911.*"; and the beneficiaries shall present "the reasonable cost of presenting the exceptions, and that this amount be deducted from the executor's commission and thus be available for distribution to the beneficiaries See *12 Del C. § 2305(a), (c)*; Ch. Ct. Rule 192." The foundation usurpers are not entitled to legal fees because they are not taking action on behalf of the Estate or its legitimate beneficiaries. The usurpers are taking actions using restricted charitable gifts and the Estate's assets denied to the Estate to harm the expressed and implied intentions of Agnes Carvel as executor; and the testator's inalienable right to not benefit those persons who abused and victimized her in life and engaged in behavior that would procure Agnes Carvel's death after being given warning of those very consequences by Agnes' doctor.

88    Pamela Carvel asserts that over $50 million dollars in the possession of the foundation usurpers are Delaware corporate assets denied to Agnes by fraud. An accounting proceeding, with documents produced, would confirm or refute Pamela Carvel's assertions. The

22

foundation usurpers' continuing stonewalling demonstrates a cover-up to evade taxes and defraud Agnes and her successors in interest under Delaware law.

89.    The ONLY purpose of this Petition is the obstruction of justice. If the lawsuits in U.S. District Court were "frivolous", the U.S. District Court and the U.S Supreme Court are more than capable of making that determination. The lawsuits were filed at the appropriate times given the circumstances that occurred. The demand for rent could only be made after the expiration of the lease on April 30, 2007 The demands against the usurpers and Leonard Ross cold only be made after the evidence discovered on May 8, 2007 of the apparent bribery in Surrogate Scarpino and the apparent theft of the real estate by Griffin

90.    Despite the Petitioner's previous attempts to discredit the Carvel's, Pamela Carvel assisted the U S and New York Attorney Generals' prosecutions of Carvel estate fraudsters that convicted William Zuga twice (2002, 2003) for real estate fraud; convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds; and convicted William Fugazy (1997) for bankruptcy perjury. Millions of dollars were lost to Agnes Carvel by Agnes' adversaries' collusion with these felons, BUT only the whistleblowers, Agnes and Pamela Carvel, were and are denied indemnification of legal fees from Thomas or Agnes' estate assets, or equal indemnification provide to the foundation "loyalists" who are Petitioner herein. Petitioner fears that against all adversities, someone, somewhere, may again understand the issues being raised by Pamela as a *pro se litigant* in an attempt to break the "probate mafia".

### THE USURPERS MISREPRESENT THE "AGREEMENT" DECISION

91    The "Agreement" decision is equally enforceable by Agnes against the usurpers to demand the promised consideration of unrestricted income for the "Agreement". To deny "consideration" would result in fraud To deny Agnes' unrestricted disposal of her income would

23

be tax fraud by violation of the US Internal Revenue Code Marital Deduction and QTIP
elections.

92.    The usurpers misrepresent the obligations under the Agreement decision and the
limits placed by law on the usurpers' demand for assets, even under the 1988 Will. The usurpers
allege that the Agnes' New York assets had already been awarded to the usurpers  This is untrue
Pursuant to New York statute cited in the decision (Surrogate's Court Procedure Act 2215(3);
p 22) the usurpers must hold those assets in trust and return "the assets" if they are in excess of
merely the remainder of the Estate. The usurpers have disposed of all those assets in self-dealing
under-valued transfers by Griffin  These assets include assets subject to Delaware claims  Pamela
Carvel moves this court to appoint a Receiver to hold all assets delivered to the usurpers since
1991

93    Westchester Surrogate's Court denied "a series of repetitive applications" by the
usurpers to force payment of the gross value of Agnes' property to it (decisions June 23, 2006,
December 4, 2003, June 30, 2003, and the original Agreement decision on April 1, 2002), but the
Surrogate did nothing to protect the assets previously distributed in trust to the usurpers.

94.    Agnes' Will was a creation during her lifetime disposing of property that by law
should have been paid to her in her lifetime. Therefore, the income cannot be restrained now
without creating intentional fraud by the representations made at trial  Agnes' obligation
assumed in 1988 was to name the "Thomas and Agnes Carvel Foundation" as remainder
beneficiary [p 21]. The foundation usurpers bear no resemblance to the legitimate Thomas and
Agnes Carvel Foundation that was named and intended in 1988  Agnes took the legitimate
foundation back in 1994 (Exhibit 7). Pamela Carvel has reasserted that position ever since  Only

24

now has there been sufficient documentary evidence to demonstrate the continuing criminal intent of the usurpers.

95.    Pamela Carvel moves this court to take jurisdiction over an intermediate accounting to determine the identity of the beneficiaries under Delaware law. The foundation usurpers misstated and misrepresented their standing in New York, and never asserted the validity of the foreign New York judgment against the Estate in any jurisdiction. None of the New York proceeding gave notice to any interested party as named beneficiary under the Last Will. The Carvel Foundation, named remainder beneficiary, was not given notice of any New York proceedings. The New York court lacks jurisdiction over almost all of the named beneficiaries qualified to inherit. The Agreement decision was by default against Agnes' Delaware successors in interest. The usurpers made deliberate misrepresentations of material facts about the "Agreement" contract. All of which may render the Agreement decision a fraud upon Agnes, the Estate, and Agnes' Delaware successors in interest.

## USURPERS' SUCCESSFUL USE OF PERJURY

96    In 1995, the usurpers' general counsel Lawrence Fay submitted a perjured statement (Exhibit 8) to the Court of Chancery to deny a swift determination of corporate ownership and thwart the determination of Agnes Carvel's claim to over $200 million in Delaware corporate assets. Immediately after the Court of Chancery stay in Delaware, Fay boasted at a recorded meeting that he had hoodwinked the court because the matter "was not and never would be pending in Surrogate's Court." This perjury was proven again when Orrick, the foundation usurpers "special counsel" made a similar statement that the issue of Andreas ownership was not before the Surrogate. The final proof of the perjury came SEVEN YEARS AFTER THE STAY when Surrogate Scarpino render a decision allegedly returning the corporate

25

ownershi determination to Delaware (Exhibit 9, p.7). This whole thing was a hoax that successfully duped the Court of Chancery at Agnes Carvel expense. When Pamela Carvel sought to become Delaware Ancillary Administrator and sought funds to pursue these claims, the Surrogate denied that any New York law provided for protections of the Delaware ancillary administration (Exhibit 3). The same ploy is being used here again!

97.    Over $10 million in assets "disappeared" from Chauncey Advertising through the alleged merger of Carvel Corp. subsidiaries into Andreas Holdings Corp. (Exhibit 10, as of November 21, 1989). Although Agnes was the joint shareholder of the subsidiaries, the merger allegedly took place without notice to her or her consent. On closer examination, the merger documents were inconsistent and appeared to be less than required by law. Further investigation in Thomas Carvel's estate (alleged shareholder after his death) indicated that there were no shares issued, there was never a valid shareholder meeting, and there was a possible criminal conspiracy to ignore missing assets. Agnes Carvel's ownership of taxable proceeds of the sale of Carvel Corp. stock (a Delaware corporation), and subsidiaries retained by Tom in the sale, were fraudulently converted to Investcorp and to the usurpers' control.

98.    After Agnes Carvel's death the THREE original Carvel Corp. (a Delaware corporation) share certificates -- unendorsed, never surrendered -- came to light. The week before Tom died he estimated the family worth to exceed $250 million in cash and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp stock to Investcorp. The week after Tom was found dead, Agnes was told by the usurpers that there was less than $40 million and that virtually none of it belonged to her. Robert Davis told Pamela in December 1990 that Tom and Agnes were virtually penniless before the sale of Carvel Corp. Pamela knew first hand that this was an extreme lie. Agnes and Pamela also knew

26

first hand that Tom and Agnes owned everything jointly with rights of survivorship, but the usurpers were in power through forgery and theft of documents

99     Not one original document can be found for the sale of jointly owned Carvel Corp. stock on November 21, 1989. No documents bear an ink signature of Tom or Agnes. All three original stock certificates, all issued on January 13, 1986 to "Thomas Carvel and Agnes Carvel, Joint Tenants", remained in Agnes Carvel's possession (Nos. NB 853, 857, 863). The stock certificates were never endorsed to transfer joint ownership at any time No stock powers were used to transfer joint ownership. Arcadipane or Davis signed many alleged sale documents instead of the Carvels, although neither usurper had power of attorney to act on the Carvels' behalf Other documents have signature-only pages that do not match the preceding pages that alleged to contain agreement terms. Although reference to payments by notes for approximately $100 million was found, such payments are totally missing.

100     The copies of stock sale documents, produced by the usurpers after Thomas Carvel's death, allege a sale of only half the stock owned by Tom and Agnes, i.e. only 660,646 shares not 1,321,292 shares. The missing 660,646 shares (No. NB 863) appear to constitute the missing $100 million that Thomas Carvel intended to investigate with Pamela before his suspiciously timed death occurred   Agnes Carvel, as surviving joint owner, was also defrauded out of the alleged sale proceeds by a series of fraudulent bank and trust transactions involving Hudson Valley Bank, Bank of New York (on probation for money-laundering violations), NatWest Bank, Barnett Bank and the usurpers who own Hudson Valley Bank and boast close personal relationships to the officers of the other banks

101     The banks allowed Arcadipane and Davis to fax instructions to move millions of Carvel money in and out of Tom, Agnes and Bruce Carvel's personal bank accounts without the

27

knowledge or consent of Tom, Agnes or Bruce and without any "power of attorney" to act on any Carvels' behalf. Investigations by the New York State Department of Banking confirmed Pamela's discovery that Davis altered at least $4.75 million in U.S. Treasury Bills and Notes held by Hudson Valley Bank to appear to give Agnes ownership; but in actuality, Davis was covering up his previous manipulations of ownership title resulting in the theft of over $15 million sale proceeds in Hudson Valley Bank that belonged to Agnes as surviving joint owner. When Pamela uncovered the theft, the $4.75 million that had been allegedly transferred to Agnes was then fraudulently converted to a Florida trust without Agnes' knowledge. The Florida trustees then withheld the money from Agnes and her estate. The trustees, who were cohorts of Davis and Arcadipane, obstructed further investigations into the theft. These Florida trustees pay themselves and their attorneys millions from Agnes' money to litigate against Agnes's demand for accountings and return of her money, while Agnes received nothing but the tax bill.

102.    A similar scenario played out in Chain Locations of America, Inc.($25 million missing), the so-called Thomas Carvel Charitable Remainder Unitrust ($24-35 million missing), the so-called "Agnes Carvel 1991 Trust" ($20 million missing), Ardsley Realty Corp. ($40,000 missing), the International Institute of Health Foods (over 41 million missing), and others. Every time the Carvels discovered a theft, extortion tactics cut off Agnes' money needed to live and protect her rights. The usurpers intention was to cause fear and deprivation to procure Agnes' death because the usurpers ignored all warnings from Agnes' doctor and, in fact, increased their harassment after the doctor's affidavit for a protective order stated that the continued harassment would be fatal. Agnes died days after being told she was cut-off from all funds, despite Pamela's attempts to provide her aunt with security and peace of mind in London.

28

## CONCLUSION

103.    For the above reasons, Pamela carvel moves the Court of Chancery to take jurisdiction over the foundation usurpers now that they voluntarily come before the court, to compel the Estate's asset to be delivered to a Receiver in Delaware for safekeeping pending the accounting proceeding in the ancillary administration, including determination of the legitimate beneficiaries, identification of the assets, and payment of the claims and obligations of the Estate. Justice delayed in Delaware was justice denied to Agnes Carvel. Justice cannot be served when "charity" abuses its benefactor for profit. The Delaware courts have the opportunity to break the New York "probate mafia" and demonstrated what the law can do when applied without political corruption.

WHEREFORE, Pamela Carvel moves this court for an Order:

for an Order pursuant to Chancery Court Rule 7a for:

1    an Order for the Court of Chancery to take jurisdiction over an intermediate accounting proceeding in the Estate; to compel discovery from Petitioner who has possession and control of all documents relevant to Estate assets potentially in Delaware, and other pertinent records that have been are denied to Pamela Carvel;

2.    an Order for the production of proof of all alleged foundation records, including but not limited to membership records of those who alleged to be Petitioner; financial records for all disposal of assets and disbursements from Estate assets in trust and restricted charitable gifts; and for determination by Delaware Department of Taxation and the Internal Revenue Service as to the tax-exempt status of Petitioner as an alleged charity;

3.    an Order appointing an independent Receiver in Delaware to hold all Agnes Carvel's assets prematurely delivered in trust to Petitioner, that are being disposed of without

29

notice to named beneficiaries or creditors, until this court determines the assets of the

Estate, and orders payment of debts, expenses, obligations, and taxes;

4. an Order for civil rights damages, other and further relief as the court may deem

appropriate

_s/ Pamela Carvel_

October 3, 2007

Pamela Carvel, appearing _pro se_
28 Old Brompton Road, Suite 158
London, SW7 3SS England
U.S. tel/ fax fwd 1 212 751 6746

30

# EXHIBIT 7

7

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. CP 95-3258 IY

In Re: THE AGNES CARVEL
1991 TRUST

_____ /

PAMELA CARVEL, as voluntary limited
guardian for AGNES CARVEL,

      Plaintiff,

v.

BETTY GODLEY, as Co-Trustee of The
Agnes Carvel 1991 Trust and LAWRENCE
NEWMAN, as Co-Trustee of The Agnes
Carvel 1991 Trust,

      Defendants.

_____ /

BETTY GODLEY, as Co-Trustee of
The Agnes Carvel 1991 Trust and
LAWRENCE NEWMAN, as Co-Trustee of
The Agnes Carvel 1991 Trust,

      Counterclaim Plaintiffs,

v.

PAMELA CARVEL, as voluntary limited
guardian for AGNES CARVEL; and
ETHEL G. REDDY; BANK OF NEW
YORK TRUST COMPANY OF FLORIDA;
and THE THOMAS AND AGNES CARVEL
FOUNDATION,

      Counterclaim Defendants.

_____ /



I:\8022901\JCA34171 DOC

311

## ORDER

**THIS MATTER** having come before this Court on September 18, 2007, on the Thomas and Agnes Carvel Foundation's Motion for Order Restricting Payment of Pamela Carvel's Attorneys' Fees and Costs and Pamela Carvel's Counter Petition for Appointment of Administrator Ad Litem, and this Court having considered said motion and counter petition, having reviewed the court file, having heard argument of counsel, and being otherwise duly advised of the premises, finds and decides as follows:

With respect to the Thomas and Agnes Carvel Foundation's Motion for Order Restricting Payment of Pamela Carvel's Attorneys' Fees and Costs, this Court finds that Pamela Carvel was removed as personal representative of the estate of Agnes Carvel by order of the High Court of Justice, Chancery Division, dated June 11, 2007. With respect to Pamela Carvel's Counter Petition for Appointment of Administrator Ad Litem, the Court finds that it has no jurisdiction over estate administration proceedings involving the estate of Agnes Carvel in the United Kingdom.

Accordingly, it is

**ORDERD AND ADJUDGED** that Pamela Carvel's Counter Petition for Appointment of Administrator Ad Litem is hereby **DENIED** without prejudice to any party seeking from a court in the United Kingdom an order appointing an administrator ad litem for the estate of Agnes Carvel.

It is further **ORDERED AND ADJUDGED** that the Thomas and Agnes Carvel Foundation's Motion for Order Restricting Payment of Pamela Carvel's Attorneys' Fees and Costs is hereby **GRANTED** as follows:

Case No. 501995CP003258XXTRIY
Page 3

1.    Within fifteen (15) business days of the date of this Order Broad and Cassel shall refund to the trustees of The Agnes Carvel 1991 Trust (the "Trust") all assets of the Trust previously distributed to Broad and Cassel pursuant to this Court's Order on Motion for Payment of Fees and Costs dated July 14, 2006 remaining after payment of Broad and Cassel's fees and costs through June 11, 2007; and

2.    Pamela Carvel's authorization to submit claims seeking payment of her attorneys' fees and costs with assets of the Trust pursuant to this Court's Order Establishing Procedure for the Expeditious Determination of Claims against the Agnes Carvel 1991 Trust dated December 2, 2004 is hereby terminated effective as of June 11, 2007.

DONE AND ORDERED in Chambers, Delray Beach, Palm Beach County, Florida this _____ day of September, 2007.

JOHN L. PHILLIPS
CIRCUIT COURT JUDGE

Copies furnished to:

Michael Allen Dribin, Esq.
Broad and Cassel
*Counsel for Pamela Carvel*
2 S. Biscayne Boulevard
21st Floor
Miami, FL 33131

Hal Neier, Esq., admitted *pro hac vice*
Friedman, Kaplan, Seiler & Adelman, LLP
*Counsel for Betty Godley & Lawrence Newman*
1633 Broadway, 46th Floor
New York, NY 10019-6708

Leonard M. Ross, Esq.
Ross & Matza
*New York Ancillary Administrator of the*
*Estate of Agnes Carvel*
265 Sunrise Highway, Suite 65
Rockville Centre, NY 11570

Matthew Triggs, Esq.
Stephanie Reed Traband, Esq.
Proskauer Rose LLP
*Counsel for Betty Godley & Lawrence*
*Newman*
2255 Glades Road, Suite 340 West
Boca Raton, FL 33431

Juan C. Antúnez, Esq.
Stokes, McMillan, Maracini & Antúnez P.A.
*Counsel for The Thomas and Agnes Carvel*
*Foundation*
One Southeast Third Avenue, Suite 1750
Miami, FL 33131

Steven J. Fink, Esq., admitted *pro hac vice*
Orrick, Herrington & Sutcliffe LLP
*Counsel for The Thomas and Agnes Carvel*
*Foundation*
666 Fifth Avenue
New York, NY 10103-0001

STATE OF FLORIDA · PALM BEACH COUNTY
I hereby certify that the
foregoing is a true copy
of the record in my office
THIS 28 DAY OF Sept. 20 07
SHARON R. BOCK
CLERK & COMPTROLLER
BY
DEPUTY CLERK

# EXHIBIT 8

```
┌─────────────────────────┐
│         FILED           │
│          AND            │
│        ENTERED          │
│  ON 8-30 · 1999         │
│                         │
│      WESTCHESTER        │
│      COUNTY CLERK       │
└─────────────────────────┘
```

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

PRESENT:   SAMUEL G. FREDMAN
-----------------------------------------X
In the Matter of the Application of                Index No.: 8940/99
                                                   Motion Date: 7/23/99
PAMELA CARVEL,

          Petitioner,

for a Judgment Pursuant to Article 78              DECISION AND ORDER
of the Civil Practice Law and Rules

   - against -

THE THOMAS AND AGNES CARVEL FOUNDATION,

          Respondent.
-----------------------------------------X

        The following papers numbered 1 to 32 read on this petition

pursuant to Article 78 seeking an Order of Mandamus.

                                                   PAPERS NUMBERED

Notice of Petition-Petition-Exhibits                   1-14
Answer-Exhibits                                        15-30
Memoranda of Law                                       31, 32[1]

        Upon the foregoing papers it is ORDERED and adjudged that this

petition is disposed of as follows:

        The underlying facts to this dispute are relatively simply and will

be briefly stated.   Respondent The Thomas and Agnes Carvel Foundation

("Foundation") is a not-for-profit corporation which was incorporated in

1976.  At the time that it was incorporated, the members of the Foundation

---

[1]While Memoranda of Law are not specifically permitted by
CPLR 7804, subdivision (d), the Court, in the interests of
justice, has considered petitioner's reply memorandum and
respondent's memorandum responsive thereto.

· DISP

included only Thomas and Agnes Carvel, and as its members they adopted the "Bylaws of the Thomas and Agnes Carvel Foundation."[2]  Of particular relevance to this proceeding is Article 1, Section 1 of said By-laws which provided that both Thomas and Agnes Carvel "may [each] designate his or her successor as a member of the Corporation by a written designation filed with the Secretary of the Corporation.  Any such designation may be revoked by Thomas Carvel or Agnes Carvel, as the case may be, by a notice of revocation filed with the Secretary of the Corporation."

By their separate purported notices of designation dated December 14, 1976, Agnes and Thomas Carvel designated Mildred Arcadipane, then secretary of the Foundation, as their successor member of the Foundation.[3] On April 16, 1984, Arcadipane, William Manseau and Robert M. Davis were elected by Agnes and Thomas Carvel as additional members of the Foundation pursuant to Article 1, Section 1 of the By-laws and as Board members.

Thereafter, on April 23, 1991, Agnes designated her niece Betty Godley as her successor member of the Foundation, and this designation was duly confirmed by the Foundation's Board of Directors.

On August 22, 1994, Agnes Carvel then designated her niece, petitioner herein, Pamela Carvel, as her successor member.  The letter of

_____

[2]The By-laws were thereafter Amended in 1991, 1992, 1994, 1997 and on or about March 1, 1999, but did not substantively change the right of Agnes to designate her successor, the relevant issue to be addressed <u>infra</u>.

[3]Petitioner alleges that both of these purported notices of designation were "altered at the hands of persons unknown."  In any event and notwithstanding these purported notices of designation, it appears that Arcadipane was not actually admitted as a member of the Foundation until April 16, 1984.

- 2 -

designation provided that "[a]ll prior designation of successor members previously signed by me are null and void."

On May 10, 1995, Davis and Arcadipane resigned their respective positions as members and directors of the Foundation in settlement of an action commenced by the State Attorney General against them alleging, inter alia, improper administration of the Foundation's assets.

On February 22, 1999, petitioner, as successor to Agnes Carvel, requested in writing to the Foundation notice of the required annual members' meeting. By responsive letter from the Foundation's counsel dated February 26, 1999, the Foundation apprised petitioner that her designation as successor member to Agnes Carvel was ineffective. This letter further stated that although Mrs. Carvel had never observed the procedural requirement for revoking her designation of Betty Godley, it "nonetheless treated the August 22, 1994 letter as a revocation because of Mrs. Carvel's implicit but clear desire that Mrs. Godley not succeed her." This letter went on to state that "[b]ecause the By-laws provide ... for a single designation of a successor Member and a single revocation thereof, [petitioner's] purported designation as Agnes Carvel's successor Member was of no force or effect."

Subsequent efforts to prevail upon respondent to recognize the designation of petitioner by Agnes Carvel have been to no avail. Indeed, by its counsel's letter to petitioner dated May 11, 1999, respondent asserts that Agnes Carvel's initial "designation" of Arcadipane as successor member was academic as a result of Arcadipane's subsequent election to the Foundation as a member.

This Article 78 proceeding ensued and petitioner seeks mandamus relief directing respondent to admit petitioner as a lawful member of the

Foundation pursuant to respondent's By-laws. Essentially, petitioner argues that the By-laws are binding upon the Foundation and its members, and that they must be interpreted pursuant to their plain meaning. It is argued that respondent has interpreted Article 1, Section 1 of the Foundation's By-laws in a manner "wholly inconsistent" with their plain language and have wrongly "attempted to import additional prohibitive language, which cannot be found anywhere in the documents prepared by it, to conclude that <u>both</u> Agnes and Thomas had but one right of designation and only one right of revocation."

Respondent agrees with petitioner that By-law Article 1, Section 1 is clear and unambiguous, but it construes such provision as allowing only a single designation and a single revocation, and thus claims that since Agnes previously exercised her right to a single designation in designating Betty Godley, her subsequent attempt to designate petitioner herein was void ab initio.

After its consideration of all of the submissions at bar, the Court grants the Petition and directs respondent to admit petitioner's membership in the Foundation.

If is of course well-settled that "contract interpretation is the province of the Court, and an unambiguous contract is to be interpreted in accordance with its clear language so as to effectuate the intent of the parties (citations omitted)." <u>Desir v. Spano,</u> __A.D.2d__, 687 N.Y.S.2d 411 (2nd Dept. 1999). This Court agrees with the parties that the subject By-law provision relating to successor designations is unambiguous. Equally clear to this Court is that the right to appoint and the right to revoke designations as set forth in Article 1, Section 1 of the By-laws is unfettered and unrestricted. Respondent has failed to proffer any evidence

- 4 -

in support of its contention that the By-law at issue must reasonably be interpreted to mean that designation rights are limited to a single exercise. Respondent's interpretation undermines the plain language provided since the subject By-law contains no specific single restriction language which could easily have been provided for by the Carvels had that been their intention.

Since the Court finds that the relevant By-law is not limiting as to the rights of designation and revocation, it is irrelevant whether Agnes Carvel properly previously designated Arcadipane or Godley.

Petition granted.  Submit Judgment on notice.

DATED:    White Plains, New York
          August 20 , 1999

                              _____
                              HON. SAMUEL G. FREDMAN
                              Justice of the Supreme Court

Spitzer & Feldman, P.C.
Attorney for Petitioner
405 Park Avenue
New York, NY 10022

Orrick, Herrington & Sutcliffe, LLP
Attorney for Respondent
666 Fifth Avenue
New York, NY 10103

- 5 -

# EXHIBIT 9

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

IN RE:

RECOGNITION OF FOREIGN JUDGMENT

PAMELA CARVEL, Creditor
                  Petitioner,

vs.

ESTATE OF AGNES CARVEL,
Debtor,
                  Respondent.

_____/

INSTR # 105804594
OR BK 41492 Pages 923 - 927
RECORDED 02/21/06 06:12:52
BROWARD COUNTY COMMISSION
DEPUTY CLERK 2065
#16. 5 Pages

CASE NO.: 05-5762 (09)

HON. ROBERT LANCE ANDREWS

## ORDER

THIS CAUSE having come before the Court on Motion for Relief from Judgment filed by the Thomas and Agnes Carvel Foundation, and the Court having considered same, having heard argument of the parties, and being otherwise duly advised in premises, finds and decides as follows:

The Thomas and Agnes Carvel Foundation (the "Foundation") is seeking an order pursuant to Fla. R. Civ. P. 1.540(b) vacating this Court's Order and Final Judgment dated May 10, 2005 (the "Domesticated U.K. Judgment). Petitioner, Pamela Carver, opposes the motion.

On February 13, 1988, Thomas and Agnes Carvel entered into a reciprocal will agreement whereby they both agreed to in no way change the provisions of their respective wills without the express written consent of the other. On that same date, Agnes executed a will designating the Foundation as the sole residuary beneficiary of her estate in the event that Thomas predeceased her. Thomas Carvel died on October 21, 1990. On or about July 7, 1995, Agnes executed a new will naming the Carvel Foundation, Inc., the sole residuary beneficiary on



her estate. Agnes Carvel died on August 4, 1998. The Carvel Foundation, Inc. is a Florida not-for-profit corporation incorporated on or about July 7, 1995. According to the annual reports for the corporation, Petitioner was a director for the period 1996 through 2004.

Shortly after Agnes' death on August 4, 1998, the Foundation brought two petitions in the Surrogate's Court of the State of New York, Westchester County seeking to enforce its rights as third party beneficiary under the reciprocal will agreement. The Carvel Foundation and Agnes' Estate were parties to the New York proceedings and opposed the relief sought by the Foundation.

On or about October 2, 1998, the last will of Agnes Carvel was granted probate by the High Court of Justice in London, England, United Kingdom.

On April 1, 2002, the Westchester County Surrogate's Court issued a Decision after Trial finding the Foundation to be the sole residual beneficiary of the Estate of Agnes Carvel. The Surrogate's Court found that a 1995 will executed by Agnes Carvel which named the Carvel Foundation, Inc. the sole beneficiary of the estate violated a Reciprocal Will Agreement which had been executed by Agnes and Tom Carvel in 1988.

Petitioner participated in the proceedings in New York. The Decision of the Surrogate's Court was appealed and affirmed by the Supreme Court of New York, Appellate Division, Second Department.

On or about July 24, 2003, the Carvel Foundation was ordered by the High Court to represent the estate. The Foundation was not made a party to the proceedings in the High Court. On or about May 6, 2004, the High Court rendered a final order that the sum of GBP 8,085,895.51 (Pounds Sterling) be paid by the Estate of Agnes Carvel to Pamela Carvel as Executor upon the consent of the Carvel Foundation.

2

On or about April 14, 2005, Petitioner filed a Petition to Domesticate Foreign Judgment, seeking to have the judgment entered by the High Court domesticated as a Florida judgment. The Foundation was not made a party, nor did it receive notice of the Petition. On or about May 10, 2005, this Court entered an Order and Final Judgment domesticating the foreign judgment.

The Foundation is now moving to vacate this Court's Order and Decision, arguing that it was provided no notice of the proceeding before this Court, and further that the domesticated foreign judgment is the product of fraud, misrepresentation and other misconduct on the part of the Petitioner.

Petitioner opposes the motion, arguing that the Foundation is not a legitimate remainder beneficiary under Agnes' will; that she is neither an officer nor director of the Carvel Foundation; and that no fraud or misrepresentation was used in any proceeding relating to the English judgment.

Foreign judgment may be challenged on grounds that the foreign court lacked personal jurisdiction over the defendant. *Hinchee v. Golden Oak Bank,* 540 So.2d 262, 263 (Fla. 2d DCA 1958). "Likewise, the validity of [a foreign] judgment may be challenged on grounds of extrinsic fraud." *Id.,* citing *Haas v. Haas,* 59 So.2d 640 (Fla. 1952).

This Court conducted a hearing in this matter on January 10, 2006. Based on the hearing, the record herein and the applicable law, this Court finds sufficient grounds for relief from judgment pursuant to Rule 1.540, Fla. R. Civ. P., having been shown; that the Petitioner's arguments are without merit and for the reasons stated below, the domesticated judgment should be vacated.

Turning first to Petitioner's argument that she is neither an officer nor director of the Carvel Foundation, while this statement is true as the corporation stands today, it is undisputed

as shown by the annual reports[1] filed that Petitioner was a director of the Carvel Foundation when Agnes' will was granted probate by the High Court through the time when the High Court issued the judgment. A review of the English judgment leads this Court to surmise that the High Court was unaware of Petitioner's status as a director of the Carvel Foundation. Moreover, at the time the judgment was entered by the High Court, the decision of the Westchester County Surrogate's Court had been entered and affirmed on appeal, finding that the Foundation was the sole residual beneficiary. This fact was apparently also not provided to the High Court. As the Foundation was not given any notice of those proceedings, it could not argue against the judgment being entered by the High Court. Nor could it argue against the English judgment being domesticated in this Court as it did not have notice of these proceedings. Additionally, Petitioner failed to inform this Court that proceedings were pending in Palm Beach relating to claims against Agnes' estate. On December 2, 2004, the Hon. Gary Vonhof entered an Order Establishing a Procedure for the Expeditious Determination of Claim against the Agnes Carvel 1991 Trust.

Petitioner argues that the Foundation does not have standing because it is not the sole residuary beneficiary under Florida law and does not have an enforceable New York judgment against the Estate. Petitioner further argues that the New York decisions cannot be asserted against the Estate in Florida because it was obtained by fraud. However, Petitioner participated in those proceedings and either she failed to raise the argument of fraud or, if she did raise this argument she did not prevail either at trial or on appeal. Therefore, Petitioner cannot now make the argument that the decision rendered by the Westchester County Surrogate's Court was obtained by fraud.

---

[1] This Court takes judicial notice of the annual reports for the Carvel Foundation, Inc., on file as public records with the Florida Department of State, Divisions of Corporations.

Clearly, based on the decisions rendered by the Westchester County Surrogate's Court, the Foundation was an interested party in both the proceedings before the High Court and before this Court. Nevertheless, Petitioner never provided the Foundation with any notice of either the English proceedings or those before this Court.

Based on the hearing held on this motion, this Court's review of the record, and the applicable law, this Court finds that there is strong evidence of a fraud upon the court perpetrated by Petitioner in both the proceedings before the High Court and this Court. This Court is further of the opinion that Petitioner, by proceeding as she has, is attempting to circumvent the decision of the Westchester County Surrogate's Court, and the decision the Judge Vonhof of the Palm Beach Court.

Accordingly, it is hereby

ORDERED AND ADJUDGED that the Motion for Relief from Judgment filed by the Thomas and Agnes Carvel Foundation is GRANTED.

It is further ORDERED AND ADJUDGED that the Order and Final Judgment entered by this Court on May 10, 2005, domesticating the foreign judgment of the United Kingdom is VACATED AND WITHDRAWN.

DONE AND ORDERED in Chambers, Fort Lauderdale, Florida, this 31ˢᵗ day of January, 2006.

ROBERT LANCE ANDREWS
CIRCUIT COURT JUDGE

Copies to: Juan Antunez, Esq.
Pamela Carvel
Agnes Carvel Estate
Carvel Foundation

5

# EXHIBIT 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PAMELA CARVEL, as Executor of          :
the Estate of Agnes Carvel, *pro se*   :
                                       :
                      Plaintiff,       :   **MEMORANDUM & ORDER**
                                       :   **06-MC-0005 (DLI)**
          -against-                    :
                                       :
CARVEL FOUNDATION INC.                 :
                                       :
                      Defendant.       :
------------------------------------------------------------------------X

**DORA L. IRIZARRY, U.S. District Judge:**

On January 20, 2006, *pro se* plaintiff Pamela Carvel, as Executor of the Estate of Agnes

Carvel, moved to confirm a foreign country money judgment against the Estate of Agnes Carvel.

The Thomas and Agnes Carvel Foundation (the "T&A Foundation") and Leonard M. Ross ("Ross"),

the Ancillary Administrator c.t.a. of the Estate of Agnes Carvel, (collectively the "Intervenors")

oppose plaintiff's motion and cross-move to dismiss this proceeding. On February 10, 2006, the

court ordered the plaintiff to show cause as to why (1) the T&A Foundation and Ross should not be

granted leave to intervene and (2) this matter should not be dismissed for lack of subject matter

jurisdiction. Based on a hearing held on March 9, 2006 and for the following reasons, this matter

is dismissed for lack of subject matter jurisdiction.

*Pro se* plaintiff, as executrix of the estate of Agnes Carvel, seeks to confirm a judgment by

the High Court of Justice London, England (the "High Court"), ordering "that the sum of

£8,085,095.51 be paid from the estate of the late Agnes Carvel" to the plaintiff (the "Foreign

Judgment"). Plaintiff further moves "against the assets primarily located in New York belonging

to the debtor, the Estate of Agnes Carvel, towards satisfaction of the final judgment of the High

Court . . . ."[1]  (Pl's Mot. at ¶ 2.)  In their opposition and cross-motion, the Intervenors argue that (1)

plaintiff failed to allege a sufficient basis for diversity jurisdiction in her complaint; (2) the Court

lacks subject matter jurisdiction over this action; and (3) plaintiff lacks standing to bring such an

action.

In the instant case, diversity is the alleged basis for subject matter jurisdiction.[2]  Diversity

jurisdiction requires that the amount in controversy exceed $75,000 and the parties be completely

diverse.  28 U.S.C. § 1332.  Here, the Foreign Judgment exceeds the $75,000 amount in controversy

required for diversity.   Although the allegations concerning citizenship of both plaintiff and

defendant are limited and vague, plaintiff asserts that she is the executrix of the Estate of Agnes

Carvel, and thus a citizen of London, England.  The defendant is a Florida not-for-profit corporation,

and thus a Florida citizen for jurisdictional purposes.  The court will assume that there is diversity

jurisdiction for purposes of deciding this motion.  However, irrespective of such an assumption and

for the reasons set forth below, this court lack subject matter jurisdiction.

Pursuant to the probate exception to federal diversity jurisdiction, a federal court has no

jurisdiction to probate a will or administer an estate even where diversity requirements are met.  *See*

*Markham v. Allen*, 326 U.S. 490, 494, 66 S. Ct. 296, 298, 90 L. Ed. 256, 259 (1946); *Dulce v. Dulce*,

---

[1]      Although plaintiff brings this action against the Carvel Foundation, a Florida not-for-profit corporation, plaintiff's papers seek to enforce the Foreign Judgment against the New York Estate of Agnes Carvel.  (*See* Pl's Mot. at ¶¶ 2, 6).

[2]      Plaintiff failed to assert a specific basis for subject matter jurisdiction in her initial filing, but alleged diversity of citizenship as a basis for subject matter jurisdiction in her affirmation in response to the court's order to show cause.  (Pl's Aff'm at ¶ 11.)  Because plaintiff is a *pro se* litigant, the court has construed plaintiff's papers broadly, interpreting them to raise the strongest arguments suggested.  *Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 146 (2d Cir. 2002).

233 F.3d 143, 145 (2d Cir. 2000). Although federal courts sitting in equity have jurisdiction to

entertain suits of creditors, legatees and heirs and other claimants against a decedent's estate,"

*Markham*, 326 U.S. at 494, 66 S. Ct. at 298, 90 L. Ed. at 259, they "may not exercise jurisdiction

to adjudicate rights in such property where the final judgment" will "interfere with the probate

proceedings or assume general jurisdiction of the probate or control of the property in the custody

of the state court." *Id.*

A two-prong inquiry is necessary to determine whether the probate exception to federal

diversity jurisdiction is implicated in a particular lawsuit. *Moser v. Pollin*, 294 F.23d 335, 340 (2d

Cir. 2002). The first question is whether "the federal district court sitting in diversity [is] being

asked to directly probate a will or administer an estate." *Id.* The second is "whether entertaining

the action would cause the federal district court to interfere with the probate proceedings or assume

general jurisdiction of the probate or control of property in the custody of the state court." *Id.*

(internal quotations omitted). "An affirmative answer to either prong requires [] the case be

dismissed for lack of subject matter jurisdiction." *Id.*

Here, while the first prong is not satisfied, the second prong is. The plaintiff seeks to

domesticate and enforce the Foreign Judgment against the New York Estate of Agnes Carvel – not

probate or administer the Estate of Agnes Carvel. (*See* Pl's Mot. at ¶¶ 2, 6). However, the exercise

of jurisdiction would inevitably and impermissibly interfere with on-going probate proceedings

concerning the Estate of Agnes Carvel. The instant dispute involves whether the Foreign Judgment

should be domesticated and have full force and effect in the United States. Not only has this issue

has been addressed, either directly or indirectly, by the Florida Circuit Court; the New York State

Supreme Court, Nassau County; and the Westchester County Surrogate's Court (the "Surrogate's

3

Court"), the Surrogate's Court has made various custodial and administrative determinations concerning the Estate of Agnes Carvel. Indeed, a trial on issues significantly affecting the New York Estate of Agnes Carvel is scheduled for May 2006 in the Surrogate's Court.

Since the death of Thomas Carvel ("Thomas"), the soft ice cream tycoon, in October 1990, various parties interested in his estate – including plaintiff, the T&A Foundation, and until her death in 1998, his widow Agnes Carvel ("Agnes") – have engaged in extensive, contentious litigation before the Surrogate's Court and elsewhere. In April 2002, the Surrogate's Court ruled that the T&A Foundation was the sole residual beneficiary of the Estate of Agnes Carvel. *In the Matter of the Application of the Thomas and Agnes Carvel Found.*, 8 Misc. 3d 1025 (Sur. Ct. Westchester Cty. 2002); *see also In re: Recognition of Foreign Judgment Pamela Carvel v. Estate of Agnes Carvel*, No. 05-5762, (Fla. Cir. Ct. Jan. 31, 2006). The Surrogate's Court further found that a 1995 will executed by Agnes Carvel which named Defendant, the Carvel Foundation, Inc.,[3] the sole beneficiary of the estate, violated a reciprocal will agreement executed by Agnes and Thomas Carvel in 1988. *Id*

On or about July 24, 2003, the High Court ordered the Carvel Foundation to represent the Estate. In January 2004, the High Court issued the Foreign Judgment requiring defendant Carvel Foundation to pay plaintiff £8,085,095.51. (Pl's Mot. at Ex. C.) On or about April 14, 2005, the plaintiff filed an action in a Florida Circuit Court attempting to domesticate the Foreign Judgment. *In re: Recognition of Foreign Judgment Pamela Carvel v. Estate of Agnes Carvel*, No. 05-5762. Initially, the Florida Circuit Court entered an Order and Final Judgment domesticating the Foreign Judgment. However, on or about January 31, 2006, the Florida Circuit Court vacated its order

---

[3]        A Florida not-for-profit corporation incorporated on or about July 7, 1995.

concluding that "there was strong evidence of a fraud upon the court perpetrated by [Pamela Carvel] in both the proceedings before the High Court and this Court." *In re: Recognition of Foreign Judgment Pamela Carvel v. Estate of Agnes Carvel*, No. 05-5762. Specifically, the High Court was unaware of plaintiff's status as a director of the Carvel Foundation, Inc., and that the Surrogate's Court found the T&A Foundation to be the sole residual beneficiary of the Estate. The T&A Foundation, an interested party, was not given notice of both the High Court and Florida proceedings. Furthermore, the Florida Circuit Court found that Pamela Carvel did not make an argument that the decisions rendered by the Surrogate's Court was obtained by fraud. *Id.*

Here, plaintiff is attempting to commit the same fraud upon this court. Plaintiff failed to provide notice to the interested intervening parties of this motion to confirm the same Foreign Judgment submitted to the Florida Circuit Court. Plaintiff also failed to notify the court of her prior attempts to domesticate and enforce the Foreign Judgment. Moreover, plaintiff failed to reveal that she has pursued similar or identical remedies in the New York Supreme Court, Nassau County, and a Florida Court. Plaintiff also failed to make any argument that any decision by the Surrogate's Court concerning the Estate of Agnes Carvel was obtained by fraud.

Furthermore, as a result of plaintiff's numerous attempts to penetrate the New York Estate of Agnes Carvel through various state and federal courts and circumvent the Surrogate's Court's rulings, the Surrogate's Court issued a Temporary Restraining Order, which is still in effect, prohibiting plaintiff from:

> (1) taking any action in another court pertaining to or affecting the assets and property of the Estate [of Agnes Carvel], subject to the jurisdiction of this Court, including all assets and property of said Estate that are located in the State of New York, (b) taking any action to enforce the purported Judgment obtained by Pamela Carvel with regard to assets and property of the Estate [of Agnes Carvel], or (c)

5

> taking any action which interferes with Ross' possession, custody and
> control of the funds, assets or property of the Estate recovered by him
> or over which he has custody or control for the benefit of the Estate
> and/or (d) from representing to any entity that she has legal authority
> to act on behalf of the Estate in the State of New York.

The New York State Supreme Court, Nassau County issued a similar TRO "stay[ing Pamela Carvel]

from proceeding to enforce or take any action with respect to any judgment with regard to or

pertaining to the assets or property of the Estate [of Agnes Carvel], or taking any other action or

proceedings to seize or interfere with the assets of the Estate [of Agnes Carvel]. ..." and transferred

the matter to the Surrogate's Court.   Not only are there two restraining orders prohibiting plaintiff

from bringing such an action, plaintiff failed to disclose such orders to the court.

Litigation concerning the Estate of Agnes Carvel has been on-going for nearly sixteen years

before the Surrogate's Court.   To date, the Surrogate's Court has (1) appointed Intervenor Leonard

Ross as Ancillary Administrator c.t.a. of the New York Estate of Agnes Carvel; (2) exercised

custody and control over the New York Estate of Agnes Carvel; (3) found the T&A Foundation to

be the sole beneficiary of the residual Estate of Agnes Carvel; (4) held that a 1995 will executed by

Agnes Carvel which named the Carvel Foundation, Inc. the sole beneficiary of the Estate violated

a reciprocal will agreement executed by Agnes and Thomas Carvel; (5) issued restraining orders

prohibiting plaintiff from seeking the exact relief she seeks before this court; and (6) issued other

decisions affecting the distribution and administration of the Estate of Agnes Carvel.   Additionally,

a trial that may potentially resolve all issues concerning the New York Estate of Agnes Carvel is

currently scheduled for May 2006 before the Surrogate's Court.   Thus, any exercise of jurisdiction

by this court would inevitably and impermissibly interfere with the Surrogate Court's "probate

proceedings," and custody and control over Agnes' New York Estate. *See Fay v. Fitzgerald*, 478

F.2d 181, 184 (2d Cir. 1973) (affirming dismissal of declaratory judgment action seeking declaration

that common law wife of deceased is entitled to full state on grounds that state court would rule on

such issues). Therefore, the probate exception applies and this matter is dismissed for lack of

subject matter jurisdiction.

For the above reasons, the Intervenors' motion to dismiss is granted, and this case is

accordingly dismissed in its entirety. The Clerk of Court is directed to close this case.

SO ORDERED.

DATED:      Brooklyn, New York
            March 29, 2006

                                        _____/s/_____
                                           DORA L. IRIZARRY
                                        United States District Judge

# EXHIBIT 11

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

Case No. _____ -CIV.( **07-60584**

CIV-ZLOCH

MAGISTRATE JUDGE
SNOW

| | |
|---|---|
| PAMELA CARVEL | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| FERNCLIFF CEMETERY | ) |
| a New York corporation, | ) |
| Defendant. | ) |

## COMPLAINT FOR EXHUMATION OF THOMAS CARVEL

Plaintiff, Pamela Carvel, appearing *pro se,* for her complaint avers:

### NATURE OF ACTION

1.      Pamela Carvel seeks an order of this court to Ferncliff Cemetery to exhume the body of Pamela's uncle Thomas Carvel for autopsy to determine the cause of death (a) because of the discovery that Tom's death certificate was falsified to evade an autopsy; (b) because Tom's death obstructed and silenced his investigation of multi-million dollar embezzlement by his employees; (c) because of the subsequent fraudulent conversion of virtually all Carvel assets and property as direct result of Tom's death; and (d) because, on information and belief, co-conspirators in the theft of over $100 million of Carvel money are "investment bankers" for Arab money with reported connections to suspected terrorists. Ferncliff's management told Pamela that it would not object to the exhumation, but procedurally needed a court order to proceed.  Oral argument is not requested.

1

## FEDERAL JURISDICTION

2.       The true cause of Thomas Carvel's suspiciously timed death on October 21, 1990 remains unknown to all but possibly his murderers. Tom's death certificate was falsified apparently to evade an autopsy. No doctor ever examined Tom's body to determine a cause of his death. Tom was not under a doctor's care prior to his death. The doctor's signature on the death certificate was apparently forged. Any conspiracy causing deprivation of Tom's Constitutional rights and life itself is the ultimate violation of a human's inalienable right to life, liberty and happiness that cannot be ignored (18 U.S.C. Sec. 241, 242, 1111, 1117; 42 U.S.C. Sec.1983, 1985(3)).

3.       U.S. District Court has jurisdiction over this request for an order for the exhumation for autopsy of Thomas Carvel's body based on Federal questions (28 U.S.C. Sec. 1331), as well as diversity of citizenship between Pamela Carvel, Tom's niece, and Ferncliff Cemetery controlling the Carvel family burial plots.

4.       This is not a "complaint" in an adversarial sense against Ferncliff. No "argument" is expected from Ferncliff. Ferncliff Cemetery says it would be cooperative with the proposed exhumation, but requests a court order for its own procedural purposes. There is no direct financial claim against Ferncliff; however, the potential damages resulting for the possible murder of Thomas Carvel exceed $300 million against the responsible parties when identified (28 U.S.C. Sec. 1332).

5.       Pamela Carvel is compelled to appear *pro se* after having spent all disposable resources defending Agnes Carvel against the fraudulent conversion and obstruction of Carvel assets. Pamela's U.S. residence is Fort Lauderdale, Florida. Thomas and Agnes Carvel's residence was Palm Beach County, Florida at the time of Tom's death in 1990.

## PARTIES

5.      Plaintiff, Pamela Carvel, is resident of Florida and the United Kingdom, having a mailing address: Agnes Carvel Estate, 28 Old Brompton Road, Suite 158, London SW7 3SS England, United Kingdom.

6.      Defendant, Ferncliff Cemetery, on information and belief is a New York corporation, having a mailing address: Joanne Aliberto, P.O. Box 217, Hartsdale, New York 10530, U.S.A.

## STATEMENT OF FACTS

7.      Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History.

8.      Thomas Carvel, a Florida resident, was silenced by death. Pamela Carvel is Tom's niece, as well as representative and fraud investigator for Tom and his wife Agnes and for the Carvel family. Pamela has a moral, ethical and fiduciary duty to seek protection of the inalienable Constitutional rights owed Tom during his life, and owed to Agnes who was threatened, intimidated and driven to her death by the fraudsters who may have conspired to kill Tom.

•      Did Thomas Carvel stumble over a massive money-laundering scheme involving international fraudsters before anyone knew that terrorists have investment bankers in the United States?

•      Was there more than a simple employee embezzlement and conversion scheme that made it necessary to shut up Tom forever?

9.      Thomas Carvel had no religious beliefs that prohibit exhumation and autopsy. Tom expressed an ominous premonition that he would not live one year after the sale of Carvel Corp. Tom died 11 months to the day after the sale.

3

Tom, more than anyone, would want his true cause of death finally determined for him to "rest in peace". Advances in forensic science make exhumation and autopsy to determine true cause of death at this time both realistic and necessary to assert Thomas Carvel's Constitutional rights that could have been violated by murder, or to set the matter to rest once and for all time for the Carvel family's peace of mind, most of whom reside in Florida.

10.      Pamela hired forensic expert, pathologist and scientist Dr. Michael Baden for advice regarding Tom's death and autopsy. Dr. Baden stated to Pamela that with the current state of forensic science there are more resources now available to reveal the true cause of death than an autopsy that could have been conducted in 1990, but was evaded by the falsified death certificate.

11.      "The operative standard [for exhumation] is based upon equitable principles *(Matter of Davis v Congregation Chevra Torah Anshei Radishkowitz*, 21 Misc 2d 825, 826), with due consideration given to the expressed wish of the decedent and of those "most closely bound to the deceased by ties of love and affection" *(Matter of Currier [Woodlawn Cemetery], supra*, at 164; *Matter of Teitman v Elmwier Cemetery Assn.*, 3 Misc 2d 143)." *(Weinstein v. Mintz*, 148 Misc. 2d 820; 562 N.Y.S.2d 917; 1990 N.Y. Misc.). The Carvel family is united in its desire to know how and why Tom died. Pamela Carvel as the niece by blood to Thomas Carvel seeks a court order for exhumation at the request of Ferncliff Cemetery. Pamela's father, Bruce Carvel, was Thomas Carvel's older brother and last surviving sibling. Bruce died ten months after his brother Tom as a direct result of distress caused to Bruce by Tom's death as well as the suspicious circumstances surrounding Tom's stolen "Last Will". Thomas and his wife Agnes treated Pamela as their own child. They educated Pamela through university, relied on Pamela to assist them in business, and entrusted Pamela with matters for their benefit and well-being. Pamela lived with Tom and Agnes much of the time.

4

Pamela became Agnes' sole support after Tom's death, in the wake of personal and financial attacks on Agnes by the fraudsters who may have colluded in murder.

12.     There are no disputes among the Carvel family in estate matters or for the exhumation and autopsy to determine the true cause of death (*Dinkle and Jewel Company*, 198 NYS 831, 1923; *In Darcv v. Presbyterian Hospital in City of New York*, 202 NY 259, 1911). The Carvel family will not profit financially from the determination of the cause of death. Ferncliff Cemetery is agreeable to the disinterment; however, Ferncliff requested a court order as part of its own procedure.

13.     Public officials may have been negligent by failing to perform an autopsy before burial in October 1990 (18 U.S.C. Sec. 1346). Public officials may continue to be negligent by ignoring the recent evidence of the falsified death certificate and the resulting fraudulent conversion of Carvel assets away from Agnes Carvel to strangers as a result of Tom's death (*In Application of Irene Coleman*, NY, 2 Misc2d 615, 1956). Tom's falsified death certificate and unknown cause of death provide good and substantial reason to disinter Tom's remains for a first and only autopsy (*Currier v Woodlawn Cemetery*, 300 NY 162, 90 N.E.2d 18 [1949]).

14.     Tom's exhumation and autopsy must be considered in light of all facts and circumstances peculiar to the case (*In Re Brand*, 117 A.D.2d 597, 498 N.Y.S.2d 67 [3d Dept 1987]; *Currier v Woodlawn Cemetery*, 300 NY 162, 90 N.E.2d 18 [1949]; *In People v. Radtke*, NY, 152 Misc2d 744, (1991)). Falsification of the death certificate and conversion of virtually all Carvel money to strangers as a result of Tom's death provides good and substantial reason to suspect motives to silence Tom and obstruct Tom's investigations into embezzlement and money laundering by the fraudsters and their cohorts who

5

Case 1:07-cv-00273-JJF    Document 17-3    Filed 10/09/2007    Page 32 of 62

profited most from Tom's death; but did not and would not so profit while Tom was alive.

15.     Tom, a Florida resident, was found dead in bed at his New York house, in Pine Plains, Dutchess County, in the late morning on Sunday, October 21, 1990 -- the day before Tom was going to fire secretary Mildred Arcadipane and attorney Robert Davis and begin investigations for fraud (U.S.C. Title 18) and money-laundering (18 U.S.C. Sec. 1956). Pamela Carvel's investigations since 1991 confirm Tom's suspicions and identified interstate and international conspiracies of embezzlement and fraudulent conversion of over $250 million (and income thereon since 1989), with related multi-million tax frauds against the U.S. government (18 U.S.C. ch.19, ch. 96).

16.     In 1990, Tom asked his niece Pamela, a fraud investigator assisting Australian joint ventures in China, to return home to assist him in fraud investigations of his employees and attorneys.  The day Pamela left China, Tom was found dead.  The investigations were significantly obstructed by Tom's death on Sunday because of the subsequent thefts of documents, control and money from Agnes as owner, and from Agnes and Pamela as Tom's fiduciaries.  Instead of being unemployed on Monday morning, Arcadipane and Davis diverted control of everything the Carvels ever owned or earned -- to the exclusion of Agnes Carvel as surviving joint owner and sole beneficiary of all of Tom's Wills.  The 1988 alleged "Last Will" of Thomas Carvel was stolen and concealed by Arcadipane and Davis for six months.  Davis stole later Wills, Codicils and Trusts from Tom and Agnes' home, safe and office.  This provided time for the fraudsters to alter and destroy documents to retain their control against Agnes.

17.     Arcadipane and Davis stole deeds and stock certificates, shredded documents, altered bank account names, and engaged in almost every possible type of white-collar crime imaginable.  Davis and cohorts burgled Agnes' home safe

6

Case 1:07-cv-00273-JJF    Document 17-3    Filed 10/09/2007    Page 33 of 62

with a locksmith while Agnes was at Tom's funeral. The crooks stole cash, jewelry, gold coins, collectibles and documents from Agnes' homes in New York and Florida. Forgeries of Tom's signature were more abundant than genuine signatures. Agnes was frozen-out of control of everything the Carvels ever owned or earned by over 27 fiduciaries and over 50 attorneys, who for 17 years continue to draw down Agnes' money, without restriction, to litigate against Agnes' rights and interests, and to divert the Carvels' charitable testamentary intentions into benefit for a handful of New York and New Jersey politicos.

18.    The fraudsters abused and converted Carvel money for themselves rather than paying mandatory taxable income to Agnes, thereby engaging in tax fraud (USC Title 26), fraudulent conversion and maybe worse. Although there is no statute of limitations for tax fraud, Agnes Carvel and the Internal Revenue Service agreed to waive all time limitations relating to all Carvel assets when Agnes and Pamela reported suspected fraud in Carvel matters to the Criminal Investigation division. As is usual where fraudsters are concerned, Arcadipane, Davis and their cohorts used Agnes' stolen money to lash out at Agnes by retaliatory litigation with personal attacks and financial harassment against the "whistleblowers" – Agnes, and Pamela as Agnes' sole advocate and support.

19.    The harassing litigation against Agnes was paid for out of Agnes' own money, withheld from Agnes to thwart Agnes' defense or continued assertion of claims against the fraudsters. The record is clear that only Agnes and Pamela assisted law enforcement with continuing success, while the fraudsters diverted millions of the Carvels' money to their own defense. The record abundantly demonstrates that the fraudsters alone profited from Carvel money, not the Carvels who earned it.

20.    Davis ordered 100 death certificates that all disappeared from "estate" files. Nowhere was there any evidence of how those 100 death certificates

Case 1:07-cv-00273-JJF Document 17-3 Filed 10/09/2007 Page 34 of 62

were used or what assets the death certificates transferred. As a result of the untimely death of Tom, Agnes Carvel was made chattel of Tom's estate by the same fraudsters that Tom sought to convict for their criminal activities. Agnes' Constitutional and human rights were violated for the eight years she survived as widow (18 U.S.C. Sec. 241, 242; 42 U.S.C. Sec. 1983, 1985(3)).

21.     **Agnes never received one penny of income from Tom's estate in violation of the terms of Tom's alleged Last Will**, thereby creating tax fraud by the fraudulent elections of QTIP and marital deductions (I.R.C. 2056, 2523; 18 U.S.C. Sec. 371, 641; 26 U.S.C. Sec. 7201 et seq). Agnes' death from stroke was procured deliberately by stress from the fraudsters to also silence Agnes' accusations that resulted in several felony convictions by the New York Attorney General.

22.     Events caused by Tom's death demonstrated that Tom was correct that a long-standing scheme was used to fraudulently convert Carvel assets away from the Carvels into the hands of former employees, their politico cohorts and attorneys. Agnes' death was procured by the constant harassment through Westchester Surrogate's Court, New York. Surrogate Emanuelli had the fraudsters' attorney, professional politician Malcolm Wilson, as campaign chairman and fund-raiser in an unopposed "election".

23.     Pamela Carvel makes this application, with the agreement by all surviving nieces, for a court order to exhume Thomas Carvel for autopsy. Pamela is the sole member of the family who is a fraud investigator and who is familiar with the facts and evidence contained herein. Pamela's request for an order to exhume Tom's body is to finally determine Tom's true cause of death and whether he was murdered in order to steal the Carvel fortune from Agnes Carvel or to cover-up and prevent investigations of the diversion of Carvel money to

"investment bankers" for Arab money with possible links to "terrorists" and money-laundering (18 U.S.C. Sec. 1956).

## FALSIFIED DEATH CERTIFICATE

24.     Pamela's 17-year investigations, into continuing fraud regarding Carvel money, recently revealed that Thomas Carvel's death certificate was falsified and the doctor's signature forged --apparently to evade an autopsy. The true cause of Thomas Carvel's death remains unknown. Therefore, the full importance of the consequences resulting from Tom's death remains undeterminable.

25.     The Carvel family is united for exhumation of their uncle's body and autopsy to determine whether Tom was murdered to silence his investigations into the theft from the Carvels of over $250 million and into money laundering by employees, bankers for Arab money, and strangers.

26.     Pamela Carvel is a member of the Association of Certified Fraud Examiners in the United States and United Kingdom. In 1990, Tom asked Pamela to return to the United States to commence fraud investigations relating to his employees and the theft of money and real estate from the sale of Carvel Corp. stock. Tom stated that his attorney in the sale, Robert Davis, was working for the buyers, "Investcorp". Tom stated on Friday, October 19, 1990 and Saturday, October 20, 1990 that on Monday, October 22, 1990 he was going to fire secretary Mildred Arcadipane and attorney Robert Davis. Tom and Pamela would then investigate the apparent embezzlement of more than $100 million known to Tom at that time, but Tom was found dead Sunday morning, October 21, 1990.

27.     Arcadipane and Davis gained controlled everything away from Agnes Carvel as surviving joint owner outside probate. By illicit means (forgery, burglary, bank fraud, theft of records, etc., from Tom and Agnes' offices and

9

homes) a group of fraudsters including bank employees and attorneys colluded with Arcadipane and Davis to control and manipulated banks accounts, cash, gold, deeds, U.S. Securities, trusts, private corporations, and documents, to the exclusion of Agnes Carvel as legitimate surviving owner.

28. Thomas Carvel died at home, allegedly in his sleep, without a doctor's care, and without any reported unusual health complaints prior to his death. All reports are that Tom played golf on Saturday in glorious weather. Recently, Pamela discovered that the death certificate information was falsified by stating that Tom saw a doctor days before he died. This was apparently to evade an autopsy to determine Tom's cause of death.

i. No doctor was present at the scene of Thomas Carvel's death.

ii. No doctor examined Thomas Carvel's body after his death.

iii. The death certificate falsely states the time Thomas Carvel died as "12 A.M. Morn" October 21, 1990 although no doctor ever examined the body.

iv. The death certificate falsely states that Thomas Carvel saw a doctor on Friday, October 19, 1990, apparently to provide the basis for evading an autopsy.

iv. The doctor's signature on the death certificate is apparently forged.

29. The cause of death, the time of death, the date last seen by a doctor, and the alleged doctor's verification of cause of death, are all falsified. This is just cause for the Carvel family to exhume Tom's body for autopsy to know the true cause of death and determine whether or not Tom was murdered to silence him and stop his investigations.

30. Dr. Robert Athans treated both Tom and Bruce from time to time. In a long conversation, Dr. Athans confirmed to Pamela that he had not seen Tom for many months, maybe a year, before his death. Dr. Athans also confirmed to Pamela that Tom only visited him if there was a specific complaint, and that Tom's health had been doing very well on vitamins.

10

31.    Dr. Athans informed Pamela that he never examined Tom's body to determine a cause of death and that he did not sign Tom's death certificate. Dr. Athans also told Pamela that there are several drugs that could kill with appearance of heart failure.

32.    The death certificate states that Thomas Carvel saw a doctor on October 19, 1990, the Friday before he was found dead. Pamela and family members know the events on October 19, 1990. Tom did not see or visit Dr. Athans or any other doctor. On information and belief, when a death occurs outside a hospital and not under a doctor's immediate care, then an autopsy is required to determine the true cause of death. Apparently, the falsification of the "date last seen" by the certifying doctor (allegedly Dr. Athans) on the death certificate was made to provide basis for not performing an autopsy by alleging Tom saw that doctor two days before he died, and that the same doctor signed the death certificate because he knew from that visit that the certain cause of death was a heart attack.

33.    The falsification of Thomas Carvel's death certificate is a serious matter. The reasons for the falsification of the death certificate are an even more compelling matter leading to the need for an autopsy.

## OBSTRUCTIONS TO DETERMINING THE TRUTH

34.    Pamela must make application to the court without benefit of professional legal assistance because of the suspicious events since Tom's death whereby strangers contrived to steal over $250 million from Agnes and deny financial resources to Agnes and Pamela as fiduciaries. Tom's death resulted in these fraudsters controlling all Carvel funds to the exclusion of the Carvels. The fraudsters deny Agnes and Pamela Carvel as beneficiaries and fiduciaries equal access to Carvel-owned funds that the Carvels need to investigate, defend, and

prosecute Constitutional violations against the Carvels and apparent crimes against Tom, Agnes, Bruce and the Carvel family (18 U.S.C. Sec. 241, 242).

35.      Out of 36 fiduciary positions controlling Agnes' property and its income in Carvel estates, trusts and corporations (7 in Tom's estate, 12 in two corporations, 4 in an alleged New York unitrust, 3 in the an alleged Florida grantor trust, 10 in alleged charitable foundations) whose legal fees are paid from Agnes' property, Pamela is the sole fiduciary other than Agnes to be deprived of equal access as all other fiduciaries to the multi-million dollar Carvel funds to retain competent, independent, legal counsel. This financial deprivation imposed only on Agnes and Pamela as fiduciaries denies effective legal protection for the benefit of Thomas Carvel as testator and charitable benefactor, for the benefit of Agnes Carvel as sole beneficiary and charitable benefactor in her lifetime, for defense of Agnes' continuing interests through her estate, and for asserting the Carvels' testamentary intentions and Constitutional rights (U.S. Const. amend. XIV, 18 U.S.C. Sec. 241, 242, 1343; 42 U.S.C. Sec.1983, 1985(3)).

36.      Agnes and Pamela are the only fiduciaries denied equal indemnification of legal fees and litigation expenses because they are also the only "whistleblowers" concerning criminal activities. Carvel investigators assisted New York State Attorney Generals Abrams and Spitzer in felony convictions for financial fraudsters operating in connection with Thomas Carvel's estate (William Zuga (twice), Francis Zarro). The U.S. Attorney in another matter convicted another Carvel estate fraudster, William Fugazy, for perjury.

37.      The Carvels also assisted the New York Attorney General in charity fraud investigations that forced the ouster of alleged Carvel charity managers (Arcadipane and Davis) for charity frauds and self-dealing, but not before the duo installed their "loyalist" cronies to litigate against Agnes using restricted charitable gifts thereby creating additional tax fraud (I.R.C. 501(c)(3)).

Case 1:07-cv-00273-JJF   Document 17-3   Filed 10/09/2007   Page 38 of 62

The foundation usurpers fear loosing control of misappropriated Carvel assets. The fraudsters' intention was stated in a Davis manifesto written on February 18, 1992 (Exhibit A) in the midst of the Attorney General's fraud investigations: removing Davis and Arcadipane "**provides family with opportunity to assume control of Foundation, Estate and Agnes' assets.**" Nothing could more clearly demonstrate the **intent** to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates.

38.     Strangers, attorneys, bankers, politicos and politicians are becoming millionaires on Carvel money while Agnes Carvel was denied her own property throughout her lifetime as widow and her estate continues to be denied enforcement of Agnes' rights and testamentary intentions. There has never been any dispute in the family concerning the estates. No family member benefited from Tom's death more than from his continued life. Fraudsters and suspected murderers profited in the hundreds of millions of dollars. Tom's suspiciously timed death merits a truthful determination of the cause in the light of a death certificate falsified to evade an autopsy and the fraud scenario that followed.

## MOTIVES FOR MURDER

39.     As the years progressed, the motives for murder became more evident to Pamela through the facts uncovered by Carvel investigators. It must be remembered that in 1989 few of people ever heard of "investment bankers for terrorists" although they certainly exist for a long time. Nonetheless, Tom did <u>not</u> want to sell Carvel Corp. to Investcorp. Pamela's investigations indicate that each and every time Tom attempted to find other buyers, attorney Robert Davis was advising corporate secretary Mildred Arcadipane to subverted Tom's efforts.

40.     Statements indicate that Arcadipane was manipulating Tom to force the sale of "Carvel" after Arcadipane became a significant shareholder by

diverting stock to herself from "Carvel" executives Bruce Carvel and William Manseau.    Arcadipane was providing false statements of the corporation's finances.    Arcadipane was apparently tampering with Tom's vitamins and prescriptions to keep Tom's health unstable, putting Tom in extreme distress about the future running of Carvel Corp.

41.    The week before Tom died he estimated the family worth to exceed $250 million in cash and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock.  The week after Tom was found dead, Agnes was told there was less than $40 million and that virtually none of it belonged to her.  Robert Davis told Pamela in December 1990 that Tom and Agnes were virtually penniless before the sale of Carvel Corp. Pamela knew first hand that this was an extreme lie.  Agnes and Pamela also knew first hand that Tom and Agnes owned everything jointly with rights of survivorship.

42.    Not one original document can be found for the sale of jointly owned Carvel Corp. stock on November 21, 1989.  No documents bear an ink signature of Tom or Agnes.  All three original stock certificates, all issued on January 13, 1986 to "Thomas Carvel and Agnes Carvel, Joint Tenants", remained in Agnes Carvel's possession (Nos. NB 853, 857,863; Exhibit B, color copies attached).  The stock certificates were never endorsed to transfer joint ownership at any time.  No stock powers were used to transfer joint ownership.  Arcadipane or Davis signed many alleged sale documents instead of the Carvels, although neither fraudster had power of attorney to act on the Carvels' behalf.  Other documents have signature-only pages that do not match the preceding pages that alleged to contain agreement terms.  Although reference to payments by notes for approximately $100 million was found, such payments are totally missing.

14

43.     The copies of stock sale documents, produced by the fraudsters after Thomas Carvel's death, allege a sale of only half the stock owned by Tom and Agnes, i.e. only 660,646 shares not 1,321,292 shares. The missing 660,646 shares (No. NB 863) appear to constitute the missing $100 million that Thomas Carvel intended to investigate with Pamela before his suspiciously timed death occurred. Agnes Carvel, as surviving joint owner, was also defrauded out of the alleged sale proceeds by a series of fraudulent bank and trust transactions involving Hudson Valley Bank, Bank of New York (on probation for money-laundering violations), NatWest Bank, Barnett Bank and the fraudsters who boast close personal relationships to the officers of the banks.

44.     The banks allowed Arcadipane and Davis to fax instructions to move millions of Carvel money in and out of Tom, Agnes and Bruce Carvel's personal bank accounts without the knowledge or consent of Tom, Agnes or Bruce and without any "power of attorney" to act on any Carvels' behalf (18 U.S.C. Sec. 1343). Investigations by the New York State Department of Banking confirmed Pamela's discovery that Davis altered at least $4.75 million in U.S. Treasury Bills and Notes held by Hudson Valley Bank to appear to give Agnes ownership; but in actuality, Davis was covering up his previous manipulations of ownership title resulting in the theft of over $15 million sale proceeds in Hudson Valley Bank that belonged to Agnes as surviving joint owner. When Pamela uncovered the theft, the $4.75 million that had been allegedly transferred to Agnes was then fraudulently converted to a Florida trust without Agnes' knowledge. The Florida trustees then withheld the money from Agnes and her estate. The trustees, who were cohorts of Davis and Arcadipane, obstructed further investigations into the theft. These Florida trustees pay themselves and their attorneys millions from Agnes' money to litigate against Agnes, while Agnes received nothing but the tax bill.

15

45.        Agnes Carvel's ownership of taxable proceeds of the sale of Carvel Corp. stock (a Delaware corporation), and subsidiaries retained by Tom in the sale, were fraudulently converted to Investcorp and to the fraudsters' control.

46.        **Agnes never received one penny of income from Tom's estate as long as she lived, although she was the sole lifetime beneficiary of Tom's Will and the sole intended beneficiary of everything the couple owned.** Total strangers profited ahead of, and greater than, Agnes who was the sole beneficiary if not sole legitimate asset owner.  The theft and cover-up of theft of over $250 million are significant motives for murder.

47.        On information and belief based on investigations since 1991, in exchange for money and position, former Carvel golf course employee Salvatore Molella, a Florida resident, conspired in Tom's death and subsequent thefts from Agnes' homes.  Molella stated only recently to a police investigation that Mildred Arcadipane was present in Pine Plains on the weekend of October 20-21.  Pamela believes this was a lie incriminating Arcadipane (because she is dead) to cover-up Molella's role in causing Tom's death.  Molella was a local clubhouse employee and go-for, constantly on the verge of being fired by Tom.  Molella grew up in Pine Plains and reportedly is well connected with friends who are local police. Molella had keys to the Carvel homes.  Molella is the same employee who participated in the burglary of Agnes' home and safe.  Molella had no position of authority before Tom's death.  The day after Tom's death, Molella allegedly became "real estate manager" working in the same office as Arcadipane and Davis. Arcadipane and Davis then made Molella an alleged foundation manager, on salary, paid to fly up to New York from Florida for meetings.  Molella boasted he had more power than Agnes Carvel.  As alleged foundation manager Molella subsequently victimized Agnes by authorizing constant litigation to fraudulently convert Agnes' property to the foundation fraudsters and their agents.

16

48.      Carvel investigators discovered that Mildred Arcadipane broke down in tears when confronted by her brother after a telephone caller stated that Mildred had poisoned Tom Carvel. Sobbing, Mildred told her brother that she couldn't discuss the subject. Although Mildred Arcadipane is now deceased, the conspiracy she masterminded, to fraudulently convert Carvel assets to herself and others, remains in full force by Arcadipane's cohorts. The stolen money can be traced. The continuing fraudulent conversion resulting in tax fraud can be documented. The surviving co-conspirators can be prosecuted for the possible murder of Tom and felony murder of Agnes.

## **BRIEF HISTORY**

49.      Tom Carvel, his brother Bruce and his wife Agnes created the "Carvel" soft ice cream franchise system at Bruce's machine shop on West 36 Street in New York City in the 1940s. Bruce designed and manufactured the first soft ice cream freezers and ice cream formulas. With Agnes' original financing, Tom and Agnes sold the ice cream from a traveling van for many years until the van broke down on Central Avenue in Hartsdale, New York. The couple eventually rented the property and its buildings as their home and a permanent "drive-in" stand for their business. Agnes and others worked as carhops serving food as well as ice cream. Bruce had been manufacturing and "franchising" whipped cream dispensers to drugstore soda fountains. Eventually, around 1950 Tom and Agnes purchased the Hartsdale property and built the first "Carvel" ice cream franchise store. Tom became an expert at franchise sales and advertising. Bruce designed equipment and formulated ice cream, yogurt and topping recipes. Agnes continued to run the Hartsdale business until the success of the franchise side of the business eclipsed the single store management and permitted Agnes to

17

"retire" from serving ice cream. Agnes remained Tom's most important business advisor for his entire life.

50.     In over fifty years' partnership in life and business, Tom and Agnes relied on each other for advice, common sense solutions to their business problems, and support in all their endeavors. Life was not easy, but Tom always credited Agnes with his success in business. In turn, Agnes always said there would have been no "Carvel" franchise without Bruce.

51.     Pamela has first hand knowledge that Tom wrote Wills without aid of attorneys. Tom distrusted all attorneys, and rightly so. Each Will focused on Tom's "beloved wife" Agnes and "beloved brother" Bruce. Each Will left everything to Agnes outright and left the patents and trademarks to Bruce with lifetime income. Tom's employees and attorneys stole Wills and Codicils earlier than 1988 and after 1988, and thereby wrongly asserted after Tom's death that Tom and Agnes had no testamentary plan when the attorneys concocted the 1988 "estate plan" by which the attorneys attempted to steal control of everything away from Agnes.

52.     Tom (like my Bruce) always intended that NOTHING should pass through probate via his Will. Bruce's estate plan worked exactly – no probate was necessary, but then Bruce didn't have Arcadipane and Davis undoing everything behind his back the way Tom did. Tom believed that he and Agnes owned everything jointly with rights of survivorship. None of the numerous attorneys who knew this Carvels' intention ever advised Tom that any changes were needed to secure Agnes' ownership. Tom made the serious mistake of trusting secretary Mildred Arcadipane and attorney Robert Davis with access to business and personal documents.

53.     The Carvel assets included majority ownership of private corporations, real estate, U.S. Treasury Securities, gold, collectibles and other

investments. Repeatedly, evidence indicates that banks allowed Arcadipane and Davis to directly control the Carvels' money and investments without any legal authority. Evidence and statements also indicate that Tom was shown deeds executed in Tom and Agnes' joint names, but Arcadipane never recorded those deeds. Most deeds were eventually stolen.

54.     Despite what should have been perfect planning by Tom for the benefit of Agnes as surviving widow, in 1988 attorney Lawrence Newman at the law firm Kaye Scholer concocted an alleged "estate plan" that divested Agnes Carvel of virtually everything and made Agnes mere chattel of Tom's estate. Only after Agnes' death, Newman admitted under oath that he created documents, never requested by the Carvels, which stole everything out of Agnes' hands. Newman never met or spoke to Tom or Agnes when creating an "estate plan" in their names.

55.     The documents were misrepresented to Tom to be for the protection of Agnes and tax savings. Agnes had no independent legal advice. Agnes was given less than 5 minutes to be read and sign the documents in the midst of a dinner party with drinks. In actuality, Newman and the other attorneys who manipulated the creation of this "estate plan" are the only ones to benefit as executors, trustees, and fee-charging attorneys. These attorneys and their cronies became millionaires since 1989 from Carvel money, while denying Agnes Carvel income, jointly owned corporations, cash, gold, securities and other property, for as long as she survived as widow, and now deny the same to her estate.

56.     In November 1989, Tom and Agnes unwillingly sold their jointly owned shares in Carvel Corp. to "Investcorp", so-called "investment bankers" for Bahraini money. Pamela since learned that "Investcorp" includes managers and principals with alleged connections to "terrorist" groups as well as participation in recent years in apparent huge financial frauds and banking disasters in the United Kingdom. On March 31, 1999 in London, Member of Parliament Eric Martlew

19

called for investigation by Parliament into Investcorp's bad-faith dealings and possible criminal misrepresentations to Parliament concerning business dealings in England. Information provided to MP Martlew by Pamela Carvel was forwarded to the Home Secretary.

57.    Tom rightly believed, among other apprehensions, that Investcorp was an asset-stripping entity that had little or no regard for the actual "Carvel" business being purchased, or for the people whose livelihoods were "Carvel". Tom rightly believed that Investcorp intended to finance the purchase of Carvel Corp. with over $40 million cash held in the company to finance franchise purchasers. On information and belief, Investcorp stripped the cash from Carvel Corp. and then loaned it back at a high interest rate. On information and belief, in the first year of Investcorp's ownership of "Carvel" it sought a tax refund so large that an act of Congress was required to issue the payment.

58.    It was each franchise owner's sweat and long hours of devotion to their businesses that made "Carvel" a success. Tom also rightly believed that the hard-working storeowners would be destroyed by the wrong motives of the wrong buyers. Each time Tom tried to get away from selling to Investcorp, Davis, Arcadipane and other attorneys manipulated Tom back into believing his only option was to sell to Investcorp.

59.    Tom was unaware that Davis introduced himself to people as attorney for the "buyers" while at the same time Davis alleged to be the attorney representing the interests of Tom and Agnes as sellers. Tom was unaware that other attorneys he asked for independent opinions concerning the sale were actually getting those opinions given to them by Davis. Tom also was unaware that one of his advising attorneys worked in a law firm that had represented Investcorp for years.

20

Case 1:07-cv-00273-JJF   Document 17-3   Filed 10/09/2007   Page 47 of 62

60.      After the sale of Carvel stock was allegedly agreed, Arcadipane and Davis backdated documents allegedly creating the "Thomas Carvel Charitable Remainder Unitrust" for deferring Carvel stock sale proceeds from capital gains tax (Treasury Regulation Section 25.2702-(c)(1); Revenue Procedures 89-20, 89-21, 90-30, and 90-31). Tom and Agnes Carvels' jointly owned stock certificates were never surrendered or transferred on March 1, 1989, the date that their stock was allegedly contributed to the "unitrust". No stock power was used to transfer the stocks. The "unitrust" was a sham to give Arcadipane and Davis power over Carvel money and power to obstruct the income payable to Tom and Agnes if they began asking questions (which is what they did to Agnes).

61.      The original trust allegedly contained eight trustees. After Tom's death, Arcadipane and Davis alleged that four trustees, who were "Carvel" employees, had been removed leaving only Arcadipane, Davis and the two trustees who were the least knowledgeable about "Carvel" business affairs -- Adele Alexander, Tom's niece and Mary Ellen Cerrato, the wife of a friend. Arcadipane and Davis ran the trust without the knowledge or consent of the other two trustees. Allegedly no records were kept. When Agnes sought to remove Arcadipane and Davis as fiduciaries for fraud and demanded accountings from the trustees, Arcadipane, Davis and Cerrato cut off mandatory distributions to Agnes, but continued to use Agnes' money to pay their own legal fees to cover-up the phony trust creation and to litigate against Agnes' income rights. The unitrust was a fraud intended to evade taxes and make the Carvels prisoners of the trustees. On information and belief, over $10 million was diverted from the alleged original funding of the trust ($24 million instead of $35 million).

62.      Tom came to believe (too late) that Davis and Arcadipane were working for Investcorp and themselves to structure the sale of Carvel Corp. stock against the Carvels. Tom apparently discovered that real estate that he directed to

21

be excluded from sale was deliberately included by Davis and then allegedly "bought back" out of the sale by the Carvels. One parcel was appraised for over three times its legitimate value ($10 million instead of $3 million) and allegedly deducted from the proceeds payable to the Carvels. Other parcels not intended to be included in the sale were apparently never returned to the Carvels.

63.    Million-dollar consulting contracts for Tom and Bruce disappeared from the sale, allegedly "credited" by Davis to sums owed to Investcorp; however, Mildred Arcadipane was given a consulting contract allegedly for $1 million that apparently actually paid out $2 million (i.e. the amount of the payments due Tom and Bruce).

64.    Stock in Bruce Carvel's name was apparently converted to Arcadipane by forged signatures. Royalties payable to Bruce for patents and formulas never reached Bruce. On information and belief, Arcadipane fraudulently converted checks payable to Bruce Carvel through phony bank accounts established by Arcadipane with her cohorts at Hudson Valley Bank.

65.    Arcadipane diverted ownership of several hundred thousand shares of Carvel Corp. stock to herself and her cronies – shares that belonged to Bruce Carvel and former Carvel president William Manseau. Statements by Tom and others described how, after the sale of Carvel Corp. stock, Arcadipane and Davis became autonomous ignoring Tom and his instructions as well as diverting and withholding the Carvels' personal bank account information. On information and belief, the fraudster duo also diverted U.S. Treasury Securities from the Carvels' corporate and personal ownership (18 U.S.C. Sec. 1001).

66.    Later investigations also appear to reveal that Arcadipane tampered with Tom's vitamins and prescriptions to keep his health unpredictable in order to artificially pressure Tom into a state of anxiety to force him to sell Carvel Corp. without further resistance. "Someone" was attempting to discredit Tom's

credibility and infer that he was incompetent to keep public speaking engagements. Arcadipane refused to type changes Tom wanted to make to documents, including Wills and Codicils, in order to protect the fraudsters' phony "estate plan" and the "loyalists" who the fraudsters' intended to benefit in lieu of the Carvels.

67.     Evidence revealed that Arcadipane and Davis diverted corporate mail to their own homes, as well as Tom and Agnes' personal banking mail (18 U.S.C. Sec. 1341, 1342). Handwriting experts confirm that Arcadipane forged corporate documents and checks, Tom and Agnes' personal checks, bank signature cards and documents that allegedly put Arcadipane in control of the Carvels' private charity, the "Thomas and Agnes Carvel Foundation". Another forger was also operating to a lesser extent to forge documents also putting Davis in control of the same foundation.

68.     In 1990, Davis removed four four-drawer filing cabinets from Tom's office along with all Carvel Corp. sale documents and all documents concerning the several private charities founded by Tom and Agnes. When in March 1991 the charity's documents for the "Thomas and Agnes Carvel Foundation" re-emerged from the control of Malcolm Wilson, the fraudsters attorney, the records alleged that Davis and Arcadipane held majority vote control against Agnes. The records were riddled with forgeries and inconsistencies. Thereafter, the Carvels' restricted gifts, made exclusively for charitable purposes, were used to defend and cover-up the fraudsters' activities and to litigate against Agnes to deny her all assets and income. In short, the charity's prime purpose became the fraudulent conversion of Carvel assets away from the Carvels. The stated intent was to prevent "**family with opportunity to assume control of Foundation, or at least Estate and Agnes' assets**"(Exhibit A, Confidential AG Memo, February 18, 1992 #2; also see #7, #11).

23

69.      Investigators revealed that Arcadipane removed numerous four-drawer filing cabinets from the "Carvel" walk-in safe and had them delivered to her home.  Those cabinets contained Tom and Agnes' personal documents, including deeds and stock certificates.  It was reported to Pamela that Arcadipane would leave the office nightly with large "Carvel" plastic bags full of documents and also remove the remnants of all papers that she shredded.  All these acts were part of a long-standing scheme to defraud the Carvels.

70.      In the 1980s, Tom planned to move the international headquarters for "Carvel" to Fort Lauderdale, Florida. William Manseau was Tom's chosen successor in the management of Carvel Corp.  Mildred Arcadipane ran the Yonkers, New York headquarters like Stalin, with frequent purges by threats and harassment against those whom Tom trusted or relied on.  No mail entered or left the building without Arcadipane reading it first.  No telephone calls reached Tom without Arcadipane intercepting them first.  Through the switchboard, Arcadipane routinely recorded telephone conversations.  If the headquarters moved to Florida, Arcadipane would be left as sole dictator over nothing.  Her embezzlement schemes would be ended or possibly uncovered by distant employees that she could not threaten or control.

71.      Before he died, William Manseau revealed to Pamela that at the end of his unhappy marriage he was having an affair with Arcadipane.  Arcadipane told Manseau that if he divorced his wife and married her, Manseau could be in on a scheme to steal control of the Carvel assets.  Arcadipane boasted that she and Davis concocted a scheme by which they would take control of all Carvel money away from Tom and Agnes whether the couple lived or died ... and so they did. When Manseau remained loyal to Tom, Arcadipane framed Manseau for an alleged $10,000 expense account fraud.  Arcadipane was known to have close connections to the Westchester County New York District Attorneys Carl Vergari

24

and Jeannine Pirro, as well as other politicians like former New York Lt. Governor Malcolm Wilson and former New Jersey Governor Brendan Bryne. Manseau was threatened with criminal charges if he did not resign as Carvel executive and sign his stock options over to Arcadipane. Tom was left demoralized by the loss of Bill Manseau, his trusted friend and business associate. Tom's future plans for Carvel Corp. were crushed.

72.    The fraudsters' scheme relied on forcing the sale of "Carvel" to convert the assets to cash and then stealing control of the cash from the sale, and by convincing Tom to make Arcadipane and Davis trustees for the Carvels' money as a tax-saving device. The scheme also involved stealing control of the "Thomas and Agnes Carvel's Foundation", one of the Carvels' private charities. By convincing Tom to make the foundation the remainder beneficiary of the Carvels' estates and trusts, Arcadipane and Davis had legal standing to withhold everything provided for Agnes, and also to control the foundation that as beneficiary could demand scrutiny of the fraudsters' acts in the estates and trusts. This is exactly what came to pass. Without equal access to Carvel money for effective defense and assertion of her rights, Agnes died penniless with Pamela as her sole support. Pamela exhausted her life's savings and inheritance attempting to gain justice for Tom and Agnes.

## CONCLUSION

73.    The scheme to defraud the Carvels and fraudulently convert their assets was indeed completely successful against Agnes Carvel after Tom's death.

•    Was Thomas Carvel murdered to fulfill this fraudulent conversion scheme?

•    Was the scheme to defraud the Carvels completed only because death silenced Tom and his investigations?

- Were investment bankers for terrorists responsible for the need to silence Tom's investigations into the missing money from the sale of Carvel Corp. stock?

Only an autopsy could determine the true cause of Thomas Carvel's death.

Thomas Carvel was denied that final justice in violation of his Constitutional rights. Violation of Agnes' Constitutional rights followed Tom's death.

All facts and circumstances peculiar to the case subsequent to Thomas Carvel's suspiciously timed death from unknown cause provide good and substantial reason for a court order to disinter Tom's remains for autopsy. Exhumation of Thomas Carvel is not opposed by the Carvel family nor Ferncliff Cemetery; however, Ferncliff requests such act be by court order.

- Will the truth finally be known?

## **PRAYER FOR RELIEF**

WHEREFORE, Pamela Carvel seeks an order of this court to Ferncliff Cemetery for the exhumation of Thomas Carvel's body for autopsy to determine the cause of death.

Fort Lauderdale, Florida
April 13, 2007

*Pamela Carvel*

Pamela Carvel, appearing *pro se*
Executrix, Agnes Carvel Estate
28 Old Brompton Road, Suite 158
London SW7 3SS England, U.K.
U.K. tel/fax 011 44 207 278 1726

**U.S. tel/fax  1 954 524 1909**

26

# EXHIBIT   A

THE THOMAS AND AGNES CARVEL FOUNDATION

AG CONFERENCE
February 18, 1992

1) Original basis for investigation resulted in
substantially supporting Foundation position as to CEIC
transaction - no impropriety; no sweetheart deal; no TC
gift to his employees. Had AG accepted explanation
given by RMD and MA at outset, the waste on both sides
would have been avoided.

2) "Suitability" is a manufactured issue without any clear
standards; if equivalent to removal for cause, we win.
Practically, resignation of 2 Members plays into hands
of family; counter-productive from AG viewpoint to
impose family control on future operations of
Foundation. Resignations of RMD and MA discredits them
and provides family with opportunity to assume control
of Foundation, or at least Estate and Agnes' assets.

3) Money recovery for CEIC price adjustment:

   - basis is totally artificial; no firm offer to
   Foundation in September which Foundation could
   have accepted.

   - in any event, practical difficulty of recovery
   from limited partners; will AG accept assignment
   of CEIC 11% in any escrow fund balance (i.e.
   $1.0MM balance = $110,000). Recovery from
   Estate is meaningless since Foundation is
   beneficiary of Estate.

4) Tuition payments:

   Iona - MA has paid.

   Pace - Foundation is seeking to recover from Pace or
   Chris, possibly from CEIC balance. (MA is
   considering guaranty of payment?)

   St. Anthony's - Foundation will undertake recovery.

   Amended 990PF will be filed - deficiency in
   distributions covered by excess distributions
   in subsequent years.

(1)

5) How to protect confidentiality of any settlement.

6) MA money payments:

- Tuition - see above
- Loans - Surrogate Court will decide
- CKIC profit - no basis for recovery from her; her profit reduced by any price adjustment recovery. Her "profits" are small in relation to TC generosity in stock options.
- Stock redemption profit - she would have made more if she didn't redeem.

7) MA resignations:

- Retain Membership to prevent family control.
- Designate her successor and she agrees to resign in 1993, or on Agnes' death.
- Resign as director and officer.

8) Litigation will further waste Foundation funds. AO should wish to avoid.

9) CKIC sale benefitted Foundation:

- excess business holdings
- provided cash to fund mandatory distribution
- sale at "fair value" when no other market available

10) Wolfe to attend.

11) Successor Members:

Sal Molella
Ann McHugh's son
Jim O'Connor
Hudson Valley
Dave Malane

12) Amended PPO FF for 11/30/89

13) Revised budget - shortfall in grants for 1993 without reduction in legal expense.

(3)

TACF-000495

CHRVEL                    TEL NO.407 967 5200              Dec 26.92  15:47 P.23

## April 9, 1993

**First:** The following actions are proposed to be taken at the 1993 Annual Meeting of Members (or a 1992 Special Meeting of Members) before Mildred resigns:

1. By-laws will be amended, effective immediately, by a two-thirds vote of the 8 Members (RMD, MA, Wilson, Griffin, Reddy and Ann) as follows:

   (i) Super-majority vote (2/3) of Members required: to elect additional Members; to elect and classify directors; to remove directors with or without cause; and to amend certain By-laws.

   (ii) Two-thirds of Members, present or by proxy, constitutes a quorum at meetings to take any action requiring a two-thirds vote of Members.

   (iii) Directors to be classified into three (or five) classes with varying terms of office.

   (iv) President's duties as Chief Executive Officer to be detailed.

   (v) If at any time, President is not a director, he will act as an ex-officio director with voting rights.

2. RMD employment contract will be approved for 3 (or 5) year term commencing April 1, 1993, with annual compensation review and adjustment.

3. Nine (9) directors will be elected for terms commencing in March 1993 and classified to end as follows:

   Agnes, Davis and Wilson - March 1996
   Reddy, Molella and McHugh - March 1995
   Byrne, Carrato and a new director - March 1994

4. AG Settlement Agreement will be approved and signed by Members (all or a majority?)

**Second:** Mildred will resign as a Member and a director (officer?), effective immediately following Members and Board of Directors Meetings. (Note: Following Mildred's resignation as a director, a majority of the 8 directors would require 5 votes, e.g., RMD, Wilson, Sal, Ann, and Reddy; thus, it is proposed to add another loyalist director (e.g., Griffin or O'Connor, or both if Tony Carrato resigns)

PACF-000466

CONFIDENTIAL MEMORANDUM
April 5, 1993
Page 3

to better assure a majority; if a majority vote cannot be
obtained, the incumbent officers (see Fourth below) will
continue in office for additional three year terms; and a
super-majority vote of directors to remove a director or
officer will require 6 votes, whether or not a ninth director
is elected.]

Third: RKD will resign as a Member following 1993
Members and Board meetings [Note: after the resignation, a
2/3 vote of the six remaining Members to take action requires
4 votes; Wilson, Griffin, Tom and Ann; if one or two new
members are elected, the same four Members' votes, in
addition to the vote of the new Member(s), will still be
required to take action; if the two thirds vote is not
obtainable, the incumbent directors will continue in office
for additional terms equal to their original terms.]

Fourth: The Board of Directors will meet in March 1993
and take the following actions:

1. Approve actions taken by Members, described above.

2. Elect officers for three year terms, as follows:

President and Chief Executive
       Officer   -                      RKD
VP and Treasurer -                      Ann McHugh
VP and Secretary -                      Sal Nolella
Asst. Secretary/Asst. Treasurer -       Lorraine Gerard
Honorary Chairman -                     Agnes Carvel
[Mildred ?]

TACF-00045

# EXHIBIT   B



THIS CERTIFIES that   THOMAS CARVEL AND AGNES CARVEL, JOINT TENANTS—————————— is the owner of

FIVE HUNDRED SIXTY THOUSAND SIX HUNDRED FORTY SIX——————————

FULLY PAID AND NON-ASSESSABLE SHARES, OF THE PAR VALUE OF ONE CENT ($.01) PER SHARE, OF THE COMMON STOCK of CARVEL CORPORATION transferable on the books of the corporation by the holder thereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed.

This Certificate is not valid unless countersigned and registered by the Transfer Agent and Registrar.

WITNESS the seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated January 13, 1986

CUSIP 146870 10 0

NB 853

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

CARVEL CORPORATION SEAL 1969 DELAWARE

SEE REVERSE FOR CERTAIN DEFINITIONS

560,646

Treasurer

President

Authorized Signature





CARVEL CORPORATION SEAL DELAWARE 1969

NB 863

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

Carvel CORPORATION ®

660,646

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES that   Thomas Carvel and Agnes Carvel, Joint Tenants

is the owner of

Six Hundred Sixty Thousand Six Hundred and Forty-Six

FULLY PAID AND NON-ASSESSABLE SHARES, OF THE PAR VALUE OF ONE CENT ($.01) PER SHARE, OF THE COMMON STOCK of CARVEL CORPORATION transferable on the books of the corporation by the holder thereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed.

This Certificate is not valid unless countersigned and registered by the Transfer Agent and Registrar.
WITNESS the seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated   January 13, 1986.

Treasurer

President

Authorized Signature

CUSIP 146870 10 0

AMERICAN BANK NOTE COMPANY

**JS 44** (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
PAMELA CARVEL

**DEFENDANTS**
FERNCLIFF CEMETERY

CIV-ZLOCH

**(b)** County of Residence of First Listed Plaintiff  BROWARD, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  WESTCHESTER, NY
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

MAGISTRATE JUDGE
SNOW

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Pro Se Litigant
28 Old Brompton Road, Suite 158, London SW7 3SS England, U.K.
U.S. TEL/FAX 1 954 524 1909

Attorneys (If Known)

07-60584

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☑ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

0:07CV 60584 - WJZ - LSS

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☑ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S)
(See instructions second page):
a) Re-filed Case ☐ YES ☑ NO       b) Related Cases ☐ YES ☑ NO
JUDGE                         DOCKET NUMBER

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
U.S. Constitution, Amendment 14
Order for exhumation for autopsy because of falsified death certificate
LENGTH OF TRIAL via  0  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
Pamela Carvel PRO SE

DATE
April 20, 2007

FOR OFFICE USE ONLY
AMOUNT          RECEIPT #

# EXHIBIT 12

UNITED STATES DISTRICT COURT **07  CV  3504**
SOUTHERN DISTRICT OF NEW YORK

Pamela Carvel), In the Matter of the Final Accounting of
Leonard M. Ross, as Ancillary Administrator c.t.a.
of the Estate of

AGNES CARVEL,
Deceased.

------------------------------------------------x

**Judge Berman**

RECEIVED

MAY - 2 2007

SURROGATE'S COURT

NOTICE OF REMOVAL

MAY 0 2 2007

Defendant executor, Pamela Carvel, is executrix and personal

representative of the estate of Agnes Carvel in London, England. Defendant

executor is compelled to appear *pro se* as a result of the obstruction of Estate

assets for the executor's administrative expenses. Defendant executor hereby

removes to United States District Court of the Southern District of New

York pursuant to 28 U.S.C. 1443 (1) that portion of the above action that

alleges to determine the foreign debts of the international Estate in a

proceeding transferred from WESTCHSTER ~~Nassau~~ County Supreme Court (Exhibit A); and

that portion that alleges "criminal sanctions" against the defendant executor

for asserting her Constitutional rights (Exhibit B). Defendant executor

further states as follows:

1.  This matter is appropriately before the District Court because of

cumulative evidence of violations of 18 U.S.C, 18 U.S.C 241, 242 and 42

1

U.S.C. 1983, 42 U.S.C.1985(3) and violations of numerous New York laws cited herein. This matter is not subject to the "probate exception" because there is not probate in New York. As stated in *Dulce v. Dulce*, 233 F.3d 143, 145 (2d Cir. 2000),

> "The plaintiff did not ask the district court to probate the defendant's will, administer the estate, or in any way interfere with state probate proceedings. We therefore see no reason why such relief would run afoul of the probate exception."

2.    Westchester Surrogate's Court repeatedly denied payment to the defendant executor for debts and administrative expense citing that the Surrogate will not decide non-New York debts, including Agnes Carvel's funeral expenses since 1998. In a June 30, 2003 decision (Exhibit C), that has been repeated often since then to deny payment to the defendant executor, the Surrogate ruled that:

i)    Pamela cannot "sue or be sued" in Westchester Surrogate's Court (p.5);

ii)    "The New York ancillary administrator has no standing to litigate in foreign jurisdictions (See <u>Matter of Stern</u>, 91 NY2d 591)";

iii)    "No proof has been offered that the domiciliary representative lacks standing to litigate in foreign jurisdictions" (p. 7);

iv)    Surrogate's Court denied issuing an order directing Pamela to:

(i) identify all existing or potential claims for the satisfaction of

2

funeral expenses, debts, taxes, and other administrative purposes, and

(ii) present to the court all evidence in her possession, or which is available to her, that relates to the validity or amount of such claims (p.8-9)

3. The Ross accounting proceeding purports to be adjudication of the final accounting of Leonard Ross for the jurisdiction of New York (there are also other U.S. jurisdictions) although the account ends before May 2005. No income or disbursements since 2005 are accounted for.

4. The Nassau Supreme Court subject matter is not contained in the 2005 accounting. The demand for "criminal sanctions" against defendant executor are for bringing the High Court judgment to District Court for registration to assert defendant executor's Constitutional rights on the foreign debt subject that arose only after the defendant executor was first denied legal standing in Surrogate's Court, then denied by the Surrogate payment of foreign debts, and finally restrained by the Surrogate from the right to go to "any other court" (contrary to the provision in *SCPA* 1810). The Surrogate refused to answer by what power he could restrain a party whom the Surrogate asserted could neither sue or be sued in his court on foreign debts over which the Surrogate declined jurisdiction. The New York Eastern District decision based on "lack of subject matter jurisdiction" is under appeal.

3

5.    On April 27, 2007 by telephone conference, the Court's attorney stated that defendant executor Pamela Carvel is to be deposed for 7 hours <u>without benefit of legal counsel</u> on May 3 to 4. The Court's attorney verbally denied the defendant executor the equal right to depose the Estate's adversaries and Bank of New York on the same subject to determine how $8 million dollars disappeared out of Estate's accounts while under a Sheriff's lien.

6.    The Ross accounting trial, now allegedly encompassing all foreign debts not within Ross' legal jurisdiction of authority, is scheduled to begin on May 7, 2007 (after one year of adjournments <u>not</u> requested by the defendant executor). Defendant executor is prejudice by lack of professional representation and, even as a *pro se* litigant, by denial of equal discovery as that given the Estate's adversaries.

7.    On June 30, 2006 (Exhibit B), Surrogate Scarpino ordered a hearing to determine whether the defendant executor required professional representation for lack of funds to defend against a motion for criminal sanctions. The hearing was supposed to be by October 2, 2006, the then scheduled Ross accounting trial date – albeit the subject matter of High Court's foreign judgment is not contained in the accounting. There has been no hearing to provide legal counsel for the defendant executor before

4

or after October 2, 2006 yet the adjourned trial now begins May 7, 2007.

8.    Westchester Surrogate's Court has not opened a file number for the transferred Nassau Supreme Court proceeding. The Court has not held a hearing concerning the standing of intervenors. The Court violates all the defendant executor's rights to assert a claim pursuant to *SCPA* 1810.

9.    This removal action is not being presented for any improper purpose. It is not intended to harass or to cause unnecessary delay or needless increase in the cost of litigation. Defendant executor Pamela Carvel is the <u>only</u> fiduciary (other than Agnes Carvel) who is denied access to the Estate's assets for Estate administrative expenses such as professional legal representation.

10.    Westchester Surrogate's Court allows Agnes Carvel's adversaries including alleged "remaindermen" to draw on the <u>gross</u> of Agnes assets, without restriction or limitation, for their litigation expenses against Agnes' interest. This is accomplished without fee applications to the Court, without paying out of their own pockets first before seeking reimbursement, and without scrutiny from Agnes' estate or any named beneficiary under Agnes' <u>uncontested</u> Will probate in London, England.

11.    This one-sided financing of litigation demonstrates unequal treatment under the law in violation of New York statutes for the priority

5

of debts and abatement of interests (*SCPA* 1601,1610; 1810; 1811, 2215, *EPTL* 13-1.3; 13-3.6). This and other bias by Westchester Surrogate's Court demonstrates violation of *U.S. Constitutional Amendments* 1, 5, 14 and laws 18 *U.S.C.* 241, 18 *U.S.C.* 242 and 42 *U.S.C.* 1983, 42 *U.S.C.* 1985(3), among others sections relating to financial crimes.

12. Westchester Surrogate's Court has had ample time (17 years) to demonstrate its intention to provide defendant executor with equal treatment under the law by substantive due process for the defendant executor, and to comply with the defendant executor's Constitutional rights. The Court continues to ignore New York laws that require an estate fiduciary to have access to estate funds.

13. "The fact that there may be avenues under the Surrogate Court Procedure Act for [the fiduciary] petitioner to recoup expenses from the Bank [as co-administrator], which [the fiduciary] personally incurs, has <u>no bearing on petitioner's right as an administrator to unfettered access to estate funds</u>." (*Matter of the Estate of Stanley*, 240 A.D.2d 268;660 N.Y.S.2d 107;1997 N.Y. App. Div.)(emphasis added).

14. *EPTL* 11-1.1 (b) (13) and (22), respectively, empower fiduciaries to contest any claim or settle any claim in favor of the estate and to pay administration expenses including reasonable counsel fees. (*SCPA*

6

2110, *Matter of Graham*, 238 AD2d, 682; *Matter of Glick*, 279 AD2d 575,576); however, this is impossible when the Surrogate denies the defendant executor access to the Estate's funds for administrative expenses, but allows the Estate's adversaries unrestricted access for any purpose.

15.   A fiduciary may exercise, in his or her discretion, the above powers unilaterally, even without the consent of co-fiduciaries (see, *Matter of Leopold*, 259 NY 274; *Matter of Rubin*, 147 Misc 2d 981).  Further, "every estate fiduciary, by virtue of his office, is entitled to the custody of the assets of the estate or fund.  When there are two or more fiduciaries, each possesses an equal right in this regard" (*Matter of Slensby*, 169 Misc 292, 295).

16.   The Court failed to follow any of these statutes or rulings for the benefit of the defendant executor, leaving the defendant executor (who is not a lawyer) no choice but to act *pro se* to defend Agnes Carvel's interests, or concede to Agnes' adversaries by default, intimidation and coercion by personal, financial and criminal threats.

17.   The claims, defenses, and other legal contentions herein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of

new law for the equal protection of all fiduciaries in Surrogate's Court proceedings.

18. The allegations and other factual contentions herein have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery that is denied the defendant executor in Westchester Surrogate's Court. The defendant executor is not an isolated case of a fiduciary denied equal treatment and equal right to professional legal counsel. The pattern of routine abuse of Constitutional rights by Surrogate's Courts is a matter of oppression of rights guaranteed under the Constitution and U.S. law. Pamela Carvel as Delaware Ancillary Administrator in Delaware proceedings seeks to disaffirm all actions by Leonard Ross relating to the Agnes Carvel and the Estate, and seeks statutory disqualification of Surrogate Scarpino.

WHEREFORE, defendant executor Pamela Carvel seeks removal from Westchester Surrogate's Court to United States District Court of the Southern District of New York, pursuant to 28 U.S.C. 1443 (1), that portion of the above action that alleges to determine the foreign debts of the international Agnes Carvel Estate; that is a proceeding transferred from Nassau County Supreme Court; that demands "criminal sanctions" against the defendant executor for asserting her Constitutional rights; and also for redress of continuing oppression and abuse of rights.

Signed this 30th day of April 2007

Pamela Carvel, Executrix,
appearing *pro se*
Agnes Carvel Estate
28 Old Brompton Road, Suite 158
London SW7 3SS England
US tel/fax  1 212 751 6746

MAY 1, 2007    EXHIBIT D
EXHIBIT E

9

# EXHIBIT 13

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/4/07

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In the Matter of the Final Accounting of    :
Leonard M. Ross, as Ancillary Administrator c.t.a.  :     07 Civ. 3504 (RMB)
of the Estate of AGNES CARVEL,               :
                           :
                 Deceased.     :      **ORDER**
                           :
------------------------------------------------------------x

**I.     Background**

On or about May 2, 2007, Pamela Carvel, presumably a "personal representative of the

estate of Agnes Carvel in London, England," filed a Notice of Removal of "that portion of [the

Westchester County Surrogate's Court] action . . . to determine the foreign debts of the international

[e]state in a proceeding transferred from Westchester County Supreme Court . . . and that portion

[of the case seeking] 'criminal sanctions' against [Pamela Carvel] for asserting her Constitutional

rights." (Notice of Removal at 1.) Ms. Carvel states that "trial . . . is scheduled to begin [in

Surrogate's Court] on May 7, 2007 (after <u>one year of adjournments</u> . . . )." (Notice of Removal ¶ 7

(emphasis added).)

**II.     Legal Standard**

"The notice of removal of a civil action or proceeding shall be filed within thirty days after

the receipt by the defendant . . . of a copy of the initial pleading setting forth the claim for relief

upon which such action or proceeding is based . . . ." 28 U.S.C. § 1446(b); <u>see also</u> <u>In re</u>

<u>Application of Rosenkranz</u>, No. 01 Civ. 635, 2001 WL 406250, at *3 (S.D.N.Y. Apr. 19, 2001).

**III.     Analysis**

Assuming arguendo that Ms. Carvel has standing to remove, because Ms. Carvel failed to

remove the action in a timely manner, this Court declines jurisdiction. <u>See</u> <u>Machat v. Sklar</u>, No. 96

Civ. 3796, 1997 WL 599384, at *5 (Sept. 29, 1997). That is, the Notice of Removal, by Ms.

Carvel's admission, comes at least eleven months after the deadline for removal. "[A] federal court may <u>sua sponte</u> remand a case to the appropriate state court." <u>New York v. Stoddard</u>, No. 06 Civ. 1320, 2006 WL 3423863, at *1 n.3 (N.D.N.Y. Nov. 28, 2006).

It should also be noted that Ms. Carvel unsuccessfully sought to remove (apparently related) litigation from the Westchester County Surrogate's Court to this Court in September 1998. <u>See In re Application of the Thomas & Agnes Carvel Found.</u>, 36 F. Supp. 2d 144, 148, 151 (S.D.N.Y. 1999), <u>aff'd sub nom. Carvel v. Thomas & Agnes Carvel Found.</u>, 188 F.3d 83 (2d Cir. 1999).

**IV.    Conclusion and Order**

For the reasons set forth above, the Clerk of the Court is respectfully requested to take the steps necessary to remand this action to Westchester County Surrogate's Court from which it was removed.

Dated: New York, New York
       May 4, 2007



Richard M. Berman, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/4/07

2

# EXHIBIT 14

At the Surrogate's Court of the
State of New York, held in and for
the County of Westchester, at
111 Dr Martin Luther King Blvd
White Plains, New York, on the 7th
day of May, 2007

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
--------------------------------------------------------------------------X   File No  2165/1998
In the Matter of the Final Accounting of Leonard M  Ross,
as Ancillary Administrator c t.a  of the Estate of

**ORDER TO SHOW CAUSE**

AGNES CARVEL,

Deceased
--------------------------------------------------------------------------X

Upon the annexed affidavit dated May 4, 2007 of Pamela Carvel, Executrix and Personal

Representative of the Agnes Carvel Estate ("Estate") who is compelled to appear *pro se* by

denial of Estate funds, and upon all prior papers and proceedings heretofore filed and had herein,

and sufficient cause appearing, it is hereby

**ORDERED** that any party to this litigation show cause at the Surrogate's Court,

Westchester County, located at 111 Dr  Martin Luther King Blvd , White Plains, New York, on

the 9th of May 2007 at 2:00 P.m. 9:00 A.M. in the forenoon of that day, or as soon thereafter as the parties

can be heard, pursuant to, *inter alia*, U S  Constitution Amendments 1, 5, and 14, 22 NYCRR

100, 28 U S C  455(a) and (b)(1), 18 U S C 241 and 242, 42 U S C  1983 and 1985(3) why the

Court should not grant a Order of disqualification not recusal of Surrogate Scarpino, and it is

hereby

**ORDERED,** that personal service of this Order to Show Cause and all papers upon

which it has been granted shall be made to the attorney of record for the party on or before May

8, 2007 be deemed sufficient.

Eve Markewich
Markewich & Rosenstock
8 East 41 Street, 5th Floor
New York, NY 10017

Hal Neier
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, NY 10019

Steven Fink
Orrick Herrington & Sutcliffe
666 Fifth Avenue
New York, NY 10103-001

Laura Werner, Esq
Asst Atty General
Office of the New York State
Attorney General
120 Broadway
New York, NY 10771

/s/ ANTHONY SCARPINO
SURROGATE

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------------X    File No. 2165/1998
In the Matter of the Final Accounting of Leonard M. Ross,
as Ancillary Administrator c.t.a. of the Estate of

           AGNES CARVEL,

                         **EMERGENCY
AFFIDAVIT IN SUPPORT OF
ORDER TO SHOW CAUSE**

                    Deceased
-------------------------------------------------------------------------X

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK )

        Pamela Carvel executor of the Agnes Carvel Estate ("Estate") compelled

to appear *pro se* by denial of Estate funds, under penalty of perjury deposes and says:

           1.    I am the sole executor of the Agnes Carvel Estate.

           2.    By letter of Kevin Murphy dated May 4, 2007, I was informed that

my Constitutional rights shall be violated by the Court's order that I be deposed before

trial without benefit of legal counsel, but that I am denied the equal right to depose the

Estate's adversaries on the same subject and that the District Court has declined to

address this Constitutional violation.

           3.    This proceeding and trial is due to commence on May 7, 2007

therefore there is not sufficient time to proceed with this application by notice of motion.

           4.    No prior application has been made to this court for the relief herein

requested.

Any person who knowingly makes a false statement which such person does not believe to be true has
committed a crime under the laws of the State of New York punishable as a Class A misdemeanor.
(210.45 NYS Penal Law)

Sworn to May 6, 2007

                    Pamela Carvel, Executrix, appearing *pro se*
                    28 Old Brompton Road, Suite 158
                    London SW7 3SS England
                    NY tel/fax fwd 1 212 751 6746

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------------------X   File No  2165/1998

In the Matter of the Final Accounting of Leonard M Ross,
as Ancillary Administrator c t a  of the Estate of

**AFFIDAVIT IN SUPPORT OF
ORDER TO SHOW CAUSE
FOR DISQUALIFICATION**

AGNES CARVEL,

Deceased.
------------------------------------------------------------------------X

STATE OF NEW YORK   )
                    ) ss.
COUNTY OF NEW YORK  )

Pamela Carvel executor of the Agnes Carvel Estate ("Estate") compelled to appear *pro se* by denial of Estate funds, under penalty of perjury deposes and says:

## STATUTORY DISQUALIFICATION

1.    Surrogate Scarpino's use and abuse of his discretion is indicative of the Surrogate's lack of impartiality, and demonstration of the bias perpetuated against Carvel ownership of the Carvels' money that results in fraudulent conversion of assets and violations of substantive, material, Constitutional rights (*U.S. Constitutional Amendments* I, V, XIV; 18 *U.S.C.* Sec. 241, 242, 1111, 1117, 1962, 1964, 2314, 2315, ch  95, 96; 42 *U.S.C.* Sec.1983, 1985(3)) and tax fraud (*I.R.C.* 2056, 2523, 18 *U.S.C.* Sec  371, 641, 26 *U.S.C.* Sec. 7201 et seq)   Undisclosed "loans" from Hudson Valley Bank, timed in the first month of Carvels trials before the Surrogate, provide an appearance of bribery in a scheme to deprive the Carvels of the right to honest services (18 *U.S.C.* Sec. 1346).

2    Bias and prejudice which affect the conscience of the judge can be grounds for concluding that a trial judge abused his discretion in failing to recuse or disqualify himself. (Shrager v. NYU, 227 A.D.2d189, 191, 642 N.Y.S.2d 243 (1st Dept.

1

1996). See also Johnson v. Hornbalss, 93 A.D.2d 732, 733, 461 N.Y.S.2d 277 (1st Dept 1983); Tamomina v. Presbyterian Hospital, 242 A.D.2d 505 (1st Dept. 1997); Shripek v. Shripek, 239 A.D.2d 488, 488, 658 N.Y.S.2d 62 (2nd Dept. 1997)).

      3    A showing of actual bias or interest renders the prior proceedings invalid. (Casterella v. Casterella, 65 A.D.2d 614, 615, 409 N.Y.S.2d 548 (2nd Dept. 1978),app.dism. 46 N.Y.2d 939 (1999). See also Cummings v. Christensen, 109 Misc.2d 255, 257, 439 N.Y.S.2d 825 (N.Y.Fam.Ct. Schoharie Co.1981). People v. Willsey, 148 A.D.2d 764, 766, 538 N.Y.S.2d 342 (3rd Dept. 1989), appeal denied, 74 N.Y.2d 74, 545 N.Y.S.2d 124, 543 N.E.2d 767).

      4.    It is the appearance not just the fact of impartiality and fairness that is the standard. (Leonard v. Mulroy, 93 N.Y. 392 (1883); Corradino v. Corradino, 48 N.Y.2d 894, 895 (1979); Casterella v. Casterella, 65 A.D.2d 614 (2d Dept. 1978), app.dism. 46 N.Y.2d 939 (1979), Murray v. Murray, 73 A.D.2d 1015 (3d Dept. 1980), app. dism. 50 N.Y.2d 1059 (1980); Johnson v. Hornblass, supra, People v. Zappacosta, 77 A.D.2d 928(2d Dept. 1980), app.den. 52 N.Y.2d 839(1980).(See 22NYCRR s.100.2 and 100.3, Jud. Conduct Canons 2 and 3)).

      5.    Under the canons of judicial conduct, "any conduct that would lead a reasonable man knowing all the circumstances to harbor doubts about the panelists' impartiality, is a basis for disqualification." (Scott v. Brooklyn Hospital et al., 93 A.D.2d 577, 580 (2d Dept. 1983); Cummings v. Consolidated Edison Co. of N.Y., Inc., 125 A.D.2d 224, 225 (1st Dept. 1986); See also Schrager, supra, Salzano v. City of New York, 22 A.D.2d 656 (1st Dept. 1964); Buckley v. 2570 Broadway Corp., 12 A.D.2d 473

(1st Dept. 1960), Kamen Soap Products, Inc. v. Prusansky & Prusansky, Inc. 11 A.D.2d 676 (1st Dept. 1960))

## OBSTRUCTION OF TESTATOR'S INTENT

6.     Enforcement of the testator's intention is required by law (*EPTL* 13-1.3(e); *Smither v. St.Lukes* 281 AD2d 127 (Nassau Surrogate's Court, File No. 284028, Dec.No. 274), *Matter of Fabbri*, 2 NY2d 236; *Matter of Martin*, 255 NY 248; *Matter of Cook*, 244 NY 63; *Williams v. Jones*, 166 NY 522; *Fell v. McCready*, 236 App Div 390; *Matter of Stiehler*, 133 Misc 2d 253; *Matter of Blodgett*, 168 Misc 898; *Matter of Von Deilen*, 154 Misc 877, *Matter of Smith*, 254 NY 283, 289)

7.     The alleged "estate plan" created by lawyers without the participation of Thomas or Agnes Carvel and contrary to their expressed and implied intentions, alleged contained three parts: Wills, stock powers, and the "Agreement". Those parts of the alleged estate plan that are not voided, have been violated to the detriment of Agnes Carvel, Tom's sole intended beneficiary.

- Agnes never received any income, violating Tom's express direction to pay income quarterly, and thereby creating tax fraud.

- Agnes never received all of Tom's tangible personal property and jointly tangible personal property.

- Agnes' income was not preferred over retaining the principal for the remaindermen.

- Agnes' estate has not been paid for taxes by Tom's estate.

- The stock powers are invalid.

- Any and all income has not been paid to Agnes' domiciliary estate for disposal pursuant to Agnes' expressed and implied intentions

3

- Disposal of such income for administrative expense is denied to the Estate.

        8.     Agnes Carvel Will is <u>uncontested.</u> None of the terms of Agnes' Will have been fulfilled. All of the terms of the Will have been obstructed by the Surrogate in the New York ancillary administration to prevent the rule of law by the domiciliary English jurisdiction from prevailing over Agnes' adversaries. None of the named beneficiaries are noticed or participate in any New York proceedings.

        9.     Westchester Surrogate's Court routinely turns a blind eye to the fraudulently conversion and tax fraud committed by fiduciaries who refuse to fund the testamentary trust, and who withhold all income from the widow by improper accounting practices. Westchester Surrogate's Court routinely denies the beneficiary-fiduciary equal indemnification of the fiduciary expenses as the unlimited access to estate funds provide to the beneficiaries adverse co-fiduciaries. A conspiracy to deny Constitutional rights exists resulting in the fraudulent conversion of the deceased's assets and obstruction of the testator's intent.

### CONSPIRACY IN BREACH OF CONTRACT VOIDS "AGREEMENT"

        10.     Surrogate Scarpino's decision after Agnes' death on the alleged "Agreement" contract demanded Agnes Carvel's unrestricted disposal of <u>any or all</u> of her income in order that the Agreement be valid and tax fraud not result. Surrogate Scarpino did nothing to compensate for the illegal withholding of income from Agnes Carvel for 17 years; did nothing to make restitutions for the gross wasting and abuse of Agnes' property while in the hands of her adversaries, did nothing about the reduction of the value of Agnes' property in 1990 to less than 10% of what is should be in 2007. The

4

Surrogate continues to withhold all Agnes' income for benefit of those who victimizer her and caused her death.

11    Following the decision, the Surrogate violated the Agreement by not distributing Agnes' income to the Estate so as to increase the booty of the foundation usurpers as self-styled "creditor" of the Estate's residue. Surrogate Scaprino violated the Agreement by prematurely distributing to the allege residuary interest all of Agnes' income and principal vested in real estate, without any provision to protect or return income to Agnes' estate. After denying the Estate disposal of ANY AND ALL of Agnes' income, the Agreement is void.

## SURROGATE SCARPINO IGNORES NEW YORK LAW

12.    Surrogate Scarpino has abused his "discretion" by violating and ignoring statues and laws, including but not limited to the following:

- SCPA 304(4) requiring "that there are no other persons than those mentioned interested in the application or proceeding."

- SCPA 312 requiring the Court to act "so that any person necessary or proper to a final determination therein may be made a party thereto."

- "proceedings in a court of justice to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law." [*Leighton v. Roper*, 300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y. 18 A.L.R.2d 537; *Pennoyer v. Neff*, 95 U.S. 714; *McMaster v. Gould*, 240 N.Y. 379]. Beneficiaries and creditors are not within the jurisdiction of New York and are not notice in New York proceedings, yet Surrogate Scarpino alleges to dispose of the gross of all Agnes Carvel's assets depriving those parties.

- SCPA 1811 (1), requires that funeral expense shall be paid out of the <u>first</u> estate money received by the New York administrator  Agnes' funeral expenses remain un-reimbursed to Pamela as executor for almost nine years.

- SCPA 1310(3)(f) states payment of up to $15,000 is permitted to a relative who paid funeral expenses without formal estate administration  Ross as New York administrator "rejects" the payment of funeral expenses in his accounting. Pamela's petition to Surrogate Scarpino for payment of approximately $6,000 for Agnes' funeral was denied as being a "foreign" debt.  No provision is allowed for the funeral expenses at the cemetery in Westchester County.

- SCPA 1610(2) requires that the decedent's foreign and domestic debts must be considered, domestic creditors are not given preference if the assets are insufficient. Surrogate Scarpino prematurely distribute the <u>gross</u> amount of Agnes' assets to the foundation usurpers as alleged mere "creditor of the residuary estate".  The Surrogate imposed no restrictions on disbursement of Agnes' property by the alleged creditor who uses Agnes' assets to litigate against Agnes' estate. However, the Surrogate denied Agnes' only executor equal access to the Estate's assets as required by law.

- EPTL 11-1.1 (b) (13) and (22), respectively, empower fiduciaries (including administrators) to contest any claim or settle any claim in favor of the estate and to pay administration expenses including reasonable counsel fees. Indeed, a fiduciary may exercise, in his or her discretion, the above powers unilaterally, even without the consent of co-fiduciaries (Matter of Leopold, 259 NY 274; Matter of Rubin, 147 Misc 2d 981).

- "every estate fiduciary, by virtue of his office, is entitled to the custody of the assets of the estate or fund. When there are two or more fiduciaries, each possesses an equal right in this regard" (Matter of Slensby, 169 Misc 292, 295)

- It is not relevant that the fiduciary may be able to recover the costs of the proceedings pursuant to SCPA 2301, 2302 (2) and 2110 (1)

- A fiduciary should be able to use estate funds to cover administration costs (EPTL 11-1.1 [b] [22], Matter of Rubin, 147 Misc 2d 981)

- The litigation costs at issue herein are such administration costs since they are related to the recovery of estate assets (Matter of Stanley, 240 A.D.2d 268;660 N.Y.S.2d 107;1997 N.Y. App. Div.)

- SCPA 1810 provides that "Nothing prevents a claimant from commencing an action on his claim at law or in equity." After repeatedly denying payment and legal standing to the executor, Surrogate Scarpino then restrained the executor for going to "any other court" to assert claims against the Estate's property. The effect is to make it impossible for Pamela, the executor as creditor to be paid, thereby preventing Pamela from retaining competent and objective legal counsel allowing the foundation usurpers to take the gross estate without contest. The Surrogate distributed the Estate's gross assets to an alleged remainder interest creditor before any accounting identified the debts and administrative expenses of the executor and the Estate in any jurisdiction.

- EPTL 13-1.3 requires that all property and any income be subject to the payment of debts and administrative expenses. "Residuary dispositions" abate before other dispositions. After prematurely distributing the gross amount of Agnes' income and

7

principal to the alleged "residuary disposition", the Surrogate struck all accounting claims asserted by Pamela against those funds, thereby converting a "creditor" of merely the remainder into the principal beneficiary of the gross estate standing ahead of Agnes Carvel who was denied the unrestricted disposal of her income in her lifetime.

- 22 NYCRR Part 100, Rules of the Chief Administrator of the Courts Governing Judicial Conduct

  Section 100.1 A judge shall uphold the integrity and independence of the judiciary.

  Section 100.2 A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities.

  Section 100.3 A judge shall perform the duties of judicial office impartially and diligently.

  Section 100.4 A judge shall so conduct the judge's extra-judicial activities as to minimize the risk of conflict with judicial obligations.

13.    The Surrogate placed no restraint whatsoever on disbursements by the executors in Thomas Carvel's estate, including the disbursement of assets belonging to Agnes Carvel held in the hands of Thomas Carvel's executors. Westchester Surrogate's Court ignores gross negligence and mismanagement including criminal activities. Legal fees were paid without prior or subsequent consent of the beneficiary or the court. Unlimited, un-scrutinized payment was made without fee application to Kent Hazzard, the foundation usurper's attorney in at least three conflicted positions, while the equal right to indemnification of the Carvels' legal fees is withheld and obstructed.

## HUDSON VALLEY BANK'S INCESTUOUS RELATIONS

## IN THE ALLEGED FOUNDATION

14      The trials began in Thomas Carvel's estate in September 2001. In October 2001 Hudson Valley Bank loaned Surrogate Scarpino $200,000. The accounting proceeding in Agnes Carvel's New York ancillary administration began in May 2005. In December 2004, Hudson Valley Bank loaned Surrogate Scarpino $100,000. Surrogate Scarpino never disclosed these "loans" to the parties although the William Griffin, Chairman of Hudson Valley Bank and principal, is alleged to be the "most knowledgeable" director who represents the foundation usurpers at trials; and Marie Abplanalp a principal in the Bank is alleged to be a foundation member and director. Research thus far seems to indicate that these and other "loans" were excluded from mandatory financial disclosures. Surrogate Scarpino signed Pamela Carvel's request for a subpoena duce tecum for alleged foundation documents, and the retracted it.

15      As soon as Thomas Carvel was dead, the business documents belonging to Agnes Carvel, and the many charities Thomas and Agnes founded and funded, were stolen from the Carvels' offices and moved to the Hudson Valley Bank Building. Never to be returned. Hidden from scrutiny demanded by Agnes or Pamela Carvel. The alleged foundation rented pricey offices in the Hudson Valley Bank Building since 1991.

16      Evidence of Hudson Valley Bank manipulation of Carvel bank accounts and U.S. Treasury securities was the first fraud uncovered in Thomas Carvel's estate. The foundation usurpers fear loosing control of misappropriated Carvel assets.

The fraudsters' intention was bluntly stated in a manifesto written on February 18, 1992 in the midst of the Attorney General's charity fraud investigations. Nothing could more clearly demonstrate the intent to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates by obstructing "family with opportunity to assume control of Foundation, or at least Estate and Agnes' assets." The same document identified the acceptable "loyalists" who could become members and directors to stack the vote against Agnes. "Hudson Valley" was identified generically, anyone in the Hudson Valley group could be counted on to oppose the Carvels' control of Carvel money.

17    Hudson Valley Bank and its "owners" William Griffin, Robert Abplanalp, and their co-conspirators stole control of the Thomas and Agnes Carvel Foundation so as to abuse the Carvel' good name and assets to further the organized political and financial influence the bank generates in numerous ways. Upon Robert Abplanalp's death, Marie Abplanalp Holcombe took his place as stated in the 1992 manifesto to maintain control against the Carvels.

18.    The bank also runs something called "Hudson Valley Bank's Business Development Board" of which the bank itself says,

- "members benefit from their association with Hudson Valley Bank through networking opportunities and exposure for their businesses"

- "The Board of Directors looks to fill these positions with highly-qualified professionals, who can assist in achieving the Bank's goals." (emphasis added)

19.    James Landy, an officer of Hudson Valley Bank, is chairman of the board of St, Joseph's Medial Center. Mathew Landy is James' cousin and the alleged office manager over one secretary of the alleged foundation, although the alleged

10

foundation purports to not accept independent grant proposals.  It only makes grants proposed by "insiders".

20.    William Griffin, chairman of Hudson Valley Bank, major stock controller, and alleged foundation president, was "research counsel" to Lt. Gov. Malcolm Wilson.  Wilson became the foundation usurpers general counsel, and then alleged foundation member and director.  Wilson installed his buddy Griffin on the foundation as "loyalist" to bolster the phony votes. Wilson was the "campaign chairman" for Surrogate Emanuelli's unopposed "election".  Surrogate Emanuelli turned a blind eye to all crimes committed against Agnes Carvel, withheld all mandatory income due Agnes Carvel to prevent her challenging the legitimacy of the foundation usurpers, and harassed Agnes until death resulted.

21.    The Hudson Valley Bank Business Development Board also includes:

- Marc Oxman, who was installed as Guardian Ad Litem for Agnes Carvel is one such person who "assists in achieving the Bank's goals" along with Oxman's law partner Andrew Natale, Jr.  Oxman was hired to cause Agnes' death by stress in London, and so he did.

- Daniel Hollis is partner to Stuart Shamberg who was attorney for the Westchester County Public Administrator who hijacked control of the Estate by perjury by the alleged foundation's lawyers in New York in November 1998 despite the probate in England in October 1998.

- Edward A. Sheeran, Executive Director, Yonkers Industrial Development Agency ("IDA"), the agency that play a part in the phony St. Joseph Hospital grant where

Griffin purchased a property only after he knew his cronies in the alleged foundation approved a $2,000,000 purchase grant for a $700,000 parcel of land. Over $1,300,000 disappeared along with a corner of the property that was a branch office of the Bank. The IDA then stepped in to provide financing.

- Michael Spicer, President and CEO of St. Joseph's Hospital, recipient of numerous unaccounted-for grants.

- In 1982, the Bank and its vice president John Finnerty (who remains on the Business Development Board) faced and survived indictment for phony "loan" schemes and "various count of larceny and misapplication of property"

22. SCPA 707 prohibits felons from acting as executors or trustees. Westchester Surrogate's Court ignores this law. Bankers Trust Company was convicted of three felony counts and fined in federal court. Surrogate Scarpino worked for Bankers Trust Company, but failed to voluntarily make this known to beneficiaries appearing before him. In another Westchester Surrogate's Court estate older than Carvel, that of Edmund McCormick (November 1988), although "Bankers Trust Company" was nominated in the Will to serve as co-executor with Edmund's wife Suzanne, it was "Bankers Trust Company of New York" to whom "Letters Testamentary" allegedly were issued as executor in January 1989. "Bankers Trust Company of New York" did not exist until ten years later according to the New York State Banking Department Records. When asked to recuse himself, the Surrogate refused. After numerous biased rulings, media exposure of the Surrogate's conflict, and Suzanne McCormick's demand for the Surrogate's disqualification, only then did the Surrogate recuse himself, to leave undisturbed all the biased decisions

12

benefiting the Bank (a felon), but not the widow (an executor and beneficiary)  Even after his recusal in the McCormick estate that Surrogate failed to make the conflict known in Thomas Carvel's estate where the felon-bank was sole estate banker.

### CONCEALED CONFLICT WITH FRANK STRENG

23.    "Report on In-Kind Campaign Contributions" approved by the Board of Directors of the New York County Lawyers' Association at its regular meeting on September 13, 2004, a judge "shall disqualify himself" if there exists a relationship by virtue of an attorney volunteering legal services to a judicial campaign and the judge's impartiality might reasonably be questioned when that attorney or his law firm appears before the judge and that relationship is not disclosed to all parties in open court.

24.    Westchester attorney Frank Streng worked for Surrogate Scarpino on the Surrogate's transition committee from Supreme Court.  Neither Streng nor the Surrogate disclosed their relationship in cases together  In the Estate of Margaret McKeown, Streng was accused of collusion in the forgery of assignments to defraud creditors.  Margaret's son Kevin McKeown asked that Streng be disqualified.  The Surrogate denied the motion. Only after Kevin demanded Surrogate Scarpino's disqualification did the Surrogate recuse himself, leaving in place the obstruction to probate and the edict that no motions could be filed without prior court approval.

25.    Frank Streng was attorney for Pamela Carvel as executor for Agnes Carvel. Neither Streng nor Scarpino disclosed the relationship even after Surrogate Scarpino recused himself from the McKeown case. When Pamela asked Streng to oppose Leonard Ross' ancillary accountings and $3 million in legal fees, Streng refused stating he had acquire a conflict of interest favoring Ross and Markewich

13

over the Estate's executor who was Streng's client. Streng submitted a motion to withdraw as Pamela's lawyer. Pamela asked the Surrogate to recuse himself from Streng's withdrawal based on the recusal in the McKeown case. The Surrogate refused and granted Streng's withdrawal leaving Pamela without legal counsel. Streng's withdrawal had a materially adverse effect on the executor's ability to defend the Estate, not only by delaying the trial of her counterclaims, but by leaving her without the financial means to retain new counsel (22 NYCRR 1200.15[c]).

26.    Subsequently, Surrogate Scarpino denied all motions by Pamela for reimbursement of her funds expended on the Estate's behalf to pay legal counsel. Streng refused to account for the monies he was paid.

27.    No other fiduciary, except Agnes, is denied indemnification of legal fees. No other fiduciary, except Agnes, is required to pay administrative expense out of their own pocket and then seek reimbursement. The bias against the Carvels is obvious

28.    Surrogate Scarpino has the obligation to monitor the attorneys who appear in his court. The Surrogate ignores enforcement of disciplinary rules, including but limited to:

- DR 1-102 (a) (2) (22 NYCRR 1200.3 [a] [2])—circumventing a disciplinary rule through actions of another.

- DR 1-102 (a) (3) (22 NYCRR 1200.3 [a] [3])—engaging in illegal conduct that adversely reflects on his honesty, trustworthiness or fitness as a lawyer.

- DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4])—engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

- DR 1-102 (a) (5) (22 NYCRR 1200.3 [a] [5])—engaging in conduct that is prejudicial to the administration of justice

- DR 1-102 (a) (7) (former [8]) (22 NYCRR 1200.3 [a] [7])—engaging in conduct that adversely reflects on their fitness as lawyers

- DR 2-110 (a) (2) (22 NYCRR 1200.15 [a] [2])—withdrawing from employment without taking steps to the extent reasonably practicable to avoid foreseeable prejudice to the rights of the client.

- DR 2-110 (a) (3) (22 NYCRR 1200.15 [a] [3])—failing to return unearned fees to clients.

- DR 5-101 (a) (22 NYCRR 1200.20 [a])—accepting or continuing employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by their own financial interests

- DR 6-101 (a) (3) (22 NYCRR 1200.30 [a] [3])—neglecting legal matters entrusted to the lawyer.

- DR 7-101 (a) (2) (22 NYCRR 1200.32 [a] [2])—failing to carry out a contract of employment entered into with a client for professional services.

- DR 7-101 (a) (3) (22 NYCRR 1200.32 [a] [3])—intentionally prejudicing or damaging a client during the course of the professional relationship

- DR 9-102 (b) (2) (22 NYCRR 1200.46 [b] [2])—failing to identify a trust account in a proper manner.

- DR 9-102 (c) (3) (22 NYCRR 1200.46 [c] [3]—failing to render an accounting to client.

## EX PARTE DIRECTION AGAINST THE ESTATE'S BEST INTERESTS

29    Without the knowledge or consent of the Estate, without notice to any of its named beneficiaries or creditors, without mandatory accountings, without fee applications, and contrary to the written prohibition of the Estate, Surrogate Scarpino allowed Leonard Ross and the foundation usurpers commit fraud upon the Estate by closing the so-called "Thomas Carvel Charitable Remainder Unitrust" thereby fraudulently converting to the foundation usurpers the Delaware assets stolen from Agnes Carvel

30    Without the knowledge or consent of the Estate, without notice to any of its named beneficiaries or creditors, without mandatory accountings, without fee applications, and contrary to the written prohibition of the Estate, Surrogate Scarpino allowed Leonard Ross and the foundation usurpers to commit fraud upon the Estate by a stipulation alleged to be between the "interested parties"    The foundation usurpers are NOT the named beneficiary of the so-called "Agnes Carvel 1991 Trust".    The foundation usurpers are not the named beneficiary of Agnes' estate.    The Agreement decision had NOT yet been decided when the stipulation was approved. Under Florida statute confirmed by the Florida Court of Appeal (F.S. 733.707; 733.607(2)) the intended beneficiary of the trust after Agnes' death is Pamela as personal representative.    Surrogate Scaprino violates Florida law in New York by withholding the Estate's assets from the executor and personal representative while diminishing the Florida trust for benefit of the foundation usurpers and the New York ancillary administrator.

16

31.    Surrogate's Court further violated the law by *ex parte* authorization to the trustees through the New York jurisdiction to distribute to the foundation usurpers such amount of income annually withheld from Pamela as personal representative, without notice to or consent from the Estate or interested parties.

32.    Surrogate's Court further violated the law by the *ex parte* direction to Leonard Ross to file U.S. Federal tax returns beyond the legal limit of his authority in New York, and contrary to the Estate's prohibition. The intent of the perjured tax returns is to create the false appearance that the Estate is a U.S. entity and that no taxes are payable, so that the Estate's assets can be disposed of by Surrogate Scarpino under the false assertion that there are not outstanding foreign obligations.

## CONCLUSION

33.    The freedom to draw down Carvel property at will remained with Tom's executors despite Agnes Carvel's warning that the executor's were engaging in fraudulent business practices with known fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and U.S. and New York Attorney Generals' prosecutions convicted William Zuga twice (2002, 2003) for real estate fraud, convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds, and convicted William Fugazy (1997) for bankruptcy perjury. Several million dollars were lost to Agnes Carvel by Thomas' executors' collusion with these felons, BUT only the whistleblowers Agnes and Pamela Carvel are denied indemnification of legal fees from Thomas or Agnes' estate assets. It is clear enough that only strangers are becoming millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses.

17

34    The U.S. Supreme Court in *Liteky v. U.S.*, 510 U.S. 540, 557 (1994), clearly requiring disqualification under the circumstances presented here, "Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." For present purposes, it should suffice to say that Section 455 (a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or finding". The plain language of 28 U.S.C. 455 is clear: "(a)  Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

35    Surrogate Scarpino repeatedly does not observe even his own precedent decisions for recusal, and fails to voluntarily bring the conflicts to the attention of the parties in other cases. This demonstrates a lack of the necessary "conscience" needed for a judge to recuse himself. After that point, and when the bias becomes as extreme as it is here, only statutory disqualification can be available.

36    Surrogate Scarpino's bias violates U.S. law by obstruction of Constitutional rights (18 U.S.C 241 and 242, 42 U.S.C 1983 and 1985(3)), allows a conspiracy of fraud (18 U.S.C ch 63, 96) against the international administration of the Estate, its beneficiaries and its creditors, who are not within the Surrogate's jurisdiction and are therefore denied substantive due process. The favors shown to the foundation usurpers over the primary beneficiary Agnes, and over her intentions are a violation of Constitutional protection for equal treatment.

18

37.    EPTL 13-1.3 provides, "Whenever the provisions of this section are inconsistent with the intent of the testator to prefer certain beneficiaries, interest abates as necessary to give effect to the testator's intentions.   Beneficiaries whose rights are impaired by contravention of the order of abatement are entitled to be indemnified." Agnes' intentions as expressly written in her <u>uncontested</u> Will is to deny inheritance to anyone who litigated against her in life or against her estate.

38.    Surrogate Scarpino denies <u>only</u> Pamela Carvel (and Agnes Carvel) equal treatment as all other fiduciaries receive in these matters to pay administrative expenses with estate assets (Matter of Slensby, 169 Misc 292, 295; EPTL 11-1.1, [b] [22]; EPTL 13-1 3; Matter of Rubin, 147 Misc 2d 981), and by entering into agreements, in violation of contracts and Florida statute, to obstruct payments by the so-called "Agnes Carvel 1991 Trust" to Pamela Carvel as "intended beneficiary" (Pamela Carvel v. Betty Godley et al, Fla. 4th DCA, No. 4D05-203, October 11, 2006, F.S. 733.707(3); F.S. 733.607(2))

39.    Only politically connected strangers have unlimited and unrestricted disbursements from Carvel money, and only the Carvels cannot TOUCH any Carvel money.  One-sided funding of litigation can demonstrate nothing other than the intent to fraudulently convert estate and trust assets away from the intended beneficiaries. Such bias is grounds for statutory disqualification.

Any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the State of New York punishable as a Class A misdemeanor   (210 45 NYS Penal Law)

Sworn to May 6, 2007

Pamela Carvel, Executrix, appearing *pro se*
28 Old Brompton Road, Suite 158
London SW7 3SS England
NY tel/fax fwd 1 212 751 6746

19

# EXHIBIT 15

Proceedings                                    1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF WESTCHESTER: CIVIL TERM: PART AAS

--------------------------------------------X

IN THE MATTER OF THE FINAL ACCOUNTING OF
LEONARD M. ROSS, AS ANCILLARY ADMINISTRATOR
C.T.A. OF THE ESTATE OF AGNES CARVEL,
DECEASED.
--------------------------------------------X
Index No. 2165-98

                    New York State Surrogate Court
                    Westchester County Courthouse
                    111 Dr. Martin Luther King Blvd.
                    White Plains, New York 10601
                    May 9, 2007

B E F O R E:

    HON. ANTHONY A. SCARPINO, JR.,
    JUSTICE, SUPREME COURT

A P P E A R A N C E S:

For Leonard Ross:
MARKEWICH and ROSENSTOCK, LLP
8 East 41st Street - Fifth Floor
New York, New York  10017
BY: EVE RACHEL MARKEWICH, ESQ., and
    LAWRENCE M. ROSENSTOCK, ESQ.

For Lawrence Newman, Betty Godley:
FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP
1633 Broadway
New York, New York  10019
BY:  HAL NEIER, ESQ.

For Thomas & Agnes Carvel Foundation:
ORRICK, HERRINGTON & SUTCLIFFE, LLP
666 Fifth Avenue
New York, New York  10103-0001
BY: STEVEN J. FINK, ESQ., and
    ALISON F. SWAP, ESQ.

                    BARBARA A. HIGHTOWER, RPR, CSR
                    SENIOR COURT REPORTER

Proceedings                30

1
2    occurred, or whether it did not
3    occur.  By giving me -- by allowing
4    them to depose me, and not giving me
5    the equal opportunity to depose them
6    on the same subject matter, I have
7    been denied my Constitutional rights
8    to equal treatment.  And that would
9    demonstrate, again, what I would
10   consider bias, sufficient that a
11   reasonable person would think that
12   this Court could not render an
13   objective decision over my
14   representation here, on behalf of
15   Agnes Carvel's Estate.
16        THE COURT:  Okay.
17        The Court will take a brief
18   recess.
19        (Whereupon, the case laid aside
20   to be later recalled).
21              *        *        *.
22        (Whereupon, the case recalled).
23        THE COURT:  Folks, in regards to
24   the application for the Court to
25   disqualify itself from this matter,

1
2        there has been a lot of information
3        put on the record.  The Court is
4        going to request, since we don't
5        have written opposition, the Court
6        will requests that the transcript of
7        that application be prepared for
8        additional review by the Court.
9            The Court is denying the
10       application at this time.
11           The Court will be providing a
12       more formal written decision on
13       receipt of the transcript, so that
14       we will have something for the
15       record.
16           I wanted to make a determination
17       in regards to my denial of the
18       application now so that we can
19       continue; because as I said, there
20       will be a formal decision rendered
21       in regards to the transcripts should
22       be ordered by the estate, so that I
23       can have that to render a decision.
24           It is a lot of items have been
25       indicated and listed that is not

# EXHIBIT 16

IN  THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Case No. _____ -CIV-_____-_____

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

OCT 0 1 2007

LAWRENCE K. BAERMAN, CLERK
ALBANY

-------------------------------------------------------------X

PAMELA CARVEL,
          Plaintiff,

v

ANDREW CUOMO, Attorney General of the State of
New York, on behalf of the People of the State of
New York and the Ultimate Charitable Beneficiaries
of the Thomas and Agnes Carvel Foundation,

-------------------------------------------------------------X

**COMPLAINT**
FOR JUDICIAL
DISSOLUTION
&
DEMAND FOR
JURY TRIAL

07 -CV- 1034

LEK / RFT

**COMPLAINT FOR JUDICIAL DISSOLUTION OF THE
THOMAS AND AGNES CARVEL FOUNDATION
AND DEMAND FOR JURY TRIAL**

# COMPLAINT

Pamela Carvel, appearing *pro se*
PLAINTIFF
28 Old Brompton Road, Suite 158
London SW7 3SS England

US tel/fax  1 212 751 6746

# TABLE OF CONTENTS

NATURE OF COMPLAINT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FEDERAL JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FEDERAL VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

PARTIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POTENTIAL DOE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . .  9

OTHER PARTIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

BRIEF BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

ACTIVITIES THAT ARE ILLEGAL
OR CONTRARY TO PUBLIC POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VIOLATIONS OF PUBLIC POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

APPARENT BRIBE VIA HUDSON VALLEY BANK LOANS . . . . . . . 23

HUDSON VALLEY BANK'S INCESTUOUS RELATIONSHIPS . . . . . 25

GRIFFIN'S FRAUDULENT CONVERSION OF REAL ESTATE . . . . . .28

OTHER APPARENTLY SELF-DEALING GRANTS . . . . . . . . . . . . . . .29

INTIMIDATION OF WHISTLEBLOWERS . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

## IN  THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

Case No _____-CIV-_____-_____

-------------------------------------------------------------X

PAMELA CARVEL,
  Plaintiff,

v

ANDREW CUOMO, Attorney General of the State of
 New York, on behalf of the People of the State of
 New York and the Ultimate Charitable Beneficiaries
 of the Thomas and Agnes Carvel Foundation,
-------------------------------------------------------------X

**COMPLAINT**
FOR JUDICIAL
DISSOLUTION
&
DEMAND FOR
JURY TRIAL

### COMPLAINT FOR JUDICIAL DISSOLUTION OF THE
### THOMAS AND AGNES CARVEL FOUNDATION
### AND DEMAND FOR JURY TRIAL

Pamela Carvel, Member of the Thomas and Agnes Carvel Foundation, compelled to appear *pro se* from discriminatory denial of funds, for this compliant avers:

### NATURE OF COMPLAINT

1. Pamela Carvel is the sole legitimate Member (controlling over 10% of the foundation Membership) and sole successor Member to Thomas Carvel and Agnes Carvel, who were sole Members, founders and benefactors of the "Thomas and Agnes Carvel Foundation", a New York not-for-profit corporation founded in 1976. New York State Supreme Court adjudicated Pamela Carvel the sole successor Member to Agnes Carvel on August 30, 1999. No other person produced the necessary documents to demonstrate authority to act as member (or director or officer) (A1). The identity of the legitimate Thomas and Agnes Carvel Foundation has been stolen.

2. In the above styled cause, Pamela Carvel seeks judicial dissolution of the New York entity alleged to be the "Thomas and Agnes Carvel Foundation" ("alleged foundation"), pursuant to *Not-For-Profit-Corporation Law* ("*N-PCL*") 1101(a)(2), by Andrew Cuomo as Attorney General in his statutory capacity under New York *Estates, Powers & Trusts Law*

1

("*EPTL*") 8-1.1(f) and *N-PCL* 1102 (b). Plaintiff also seeks that the Attorney General permanently restrain all persons from exercising authority in the name of the foundation in any form, and to place the foundation's assets with a court-appointed receiver.

      3.      This Complaint also seeks that the Attorney General civilly and criminally prosecutes those responsible for the crimes described herein. This complaint asserts damages from criminal conspiracy enterprises under *Racketeer Influenced and Corrupt Organizations* statutes (18 U.S.C. §1961, et seq. ("*RICO*")), using the alleged foundation as vehicle for such artifices. The conspirators intentionally harm the Carvels personally, violate the Carvels' rights, defraud the Carvels, defraud state and national government agencies and tax authorities, and defraud the People intended to be the legitimate recipients of benefits from the Carvels' charitable gifts.

      4.      Regrettably, the illicit influences of the foundation fraudsters may have caused Assistant Attorney General Laura Werner in the Charities Bureau, New York City, who is charged with monitoring the Thomas and Agnes Carvel estates and trusts, to deprive the Carvels and the People of the intangible right to honest services (18 *U.S.C.* §1346). The Charities Bureau's long failure to address these serious crimes and violations of guaranteed rights necessitates this complaint.

      5.      Plaintiff Pamela Carvel (a member of the Association of Certified Fraud Examiners in the U.S. and U.K., who has no legal training or professional legal experience) is compelled to appear *pro se* after Pamela as fiduciary was compelled to spend all her personal disposable resources to defend the rights and physical well being of Agnes Carvel, her aunt and an elder person, against harassment, intimidation, fraudulent conversion, violations of inalienable rights, and obstruction of Carvel control of Carvel assets.

      6.      The politicos who stole the identity of the Thomas and Agnes Carvel Foundation violate the Certificate of Incorporation, the By-Laws, the representation made to

2

the IRS and New York State to gain tax-exemption, and the specific 14-year precedent of management in existence in 1988, which caused the Carvels to name the legitimate Thomas and Agnes Carvel Foundation a remainder beneficiary in the Carvels' testamentary plans. The alleged foundation violates every principle established by the Carvels for their restricted charitable gifts.

7.    All attempts are thwarted to verify the records by which the foundation usurpers alleged control. Underlying documents for tax returns, and other required reports are denied. Any means for Plaintiff as sole legitimate Member to evaluate or substantiate the qualifications or actions of the directors prior to re-election are denied. The usurpers repeatedly alleged all original records that prove their membership are "missing" (A1). All experts' reviews of the records available indicate forgery, missing records, inconsistent or contradictory minutes, and fraudulent manipulations of the alleged foundation records (e.g. A17). All attempts to seek voluntary compliance, restitution, and reimbursement are obstructed by those who have stolen the identity of the Thomas and Agnes Carvel Foundation (as well as the American Institute of Health, International Institute of Health Foods, and all other Carvel charities). These foundation identity thieves abuse the Carvels' restricted charitable gifts in violations of tax-exempt restrictions, self-dealing, and litigating against Agnes and Pamela Carvel's rights.

8.    The fraudsters who stole control of the alleged foundation after Thomas Carvel's suspicious death on October 21, 1990, burglarized Agnes' offices, homes and safe; looted or wasted estate, trust and corporate assets. The identity thieves perpetuate the alleged foundation solely for their personal benefit, or otherwise act in an illegal, oppressive or fraudulent manner, particularly seeking to physically and financially harm the Carvels personally (*N-PCL* 1102 (a)(2)(D)). The alleged foundation no longer carries out the legitimate tax-exempt purposes for which the Carvels founded, funded and managed the

3

legitimate Thomas and Agnes Carvel Foundation in a careful precedent established for fourteen years (1976-1990) prior to Thomas Carvel's suspicious death (*N-PCL* 1102 (a)(2)(E). The alleged foundation bears no resemblance whatsoever to the principles seriously adhered to by the Carvels to secure the honest use of their gifts

9       The Carvels' good name and gifts restricted to charity are perverted by the theft of the legal identity of the legitimate Thomas and Agnes Carvel Foundation (and other Carvel founded and funded charities) by politico William Griffin and other shareholders controlling Hudson Valley Bank and the Bank's Business Development Board  The alleged foundation has become a vehicle for criminal activities, corruption, theft, embezzlement, forgery, burglary, as well as the sole instrument used to institute incessant violations of civil and human rights against the Carvels personally by abusing the Carvels' gifts in multi-million dollar litigation threats, intimidation, and extortion tactics to silence Agnes and Pamela Carvel's investigations into the criminal activities of Griffin and his co-conspirators.

10.     The New York State Attorney General has the duty and the power to prohibit the fraudulent use of private foundations to further the criminal enterprises for profit by those illegitimate persons who alleged to be foundation managers and act contrary to public policy. "New Yorkers donate more than $10 billion to charity every year. The Attorney General's Charities Bureau is responsible for supervising charitable organizations to ensure that donors and beneficiaries of those charities are protected from unscrupulous practices in the solicitation and management of charitable assets. The Bureau also supervises the activity of foundations and other charities to insure that their funds and other property devoted to charitable purposes are properly used. The Bureau protects the interest of the public as ultimate beneficiaries of charitable gifts and bequests contained in wills and trusts." (*Attorney General's Report, Charities Bureau,* 2000).

11. The Attorney General may bring an action for the dissolution of a corporation upon grounds that the corporation has exceeded the authority conferred upon it by law, or has violated any provision of law whereby it has forfeited its charter, or carried on, conducted or transacted its business in a persistently fraudulent or illegal manner, or by the abuse of its powers contrary to public policy of the state has become liable to be dissolved (*N-PCL* 1101).

12. The Attorney General's office is the only New York State agency authorized by to bring civil or criminal actions in court, to seek injunctive relief, to issue subpoenas and take testimony, and to seek from a court an order awarding restitution, damages, and costs; and removing any director or other person responsible for the violations of the law; dissolving a corporation and other relief which the court may deem proper.

13. The Attorney General's office has the necessary power to commence civil and criminal prosecutions. The People may have been deprived of the intangible right to honest services since 1991 by the gross negligence of Assistant Attorney General Laura Werner who has failed or refused to take actions to protect the interests of the Carvels as benefactors, to protect the interests the People as beneficiaries, or to protect the interests of government agencies by identifying and prosecuting the alleged foundation managers' self-dealings, money laundering, tax frauds, charity frauds, and other potentially criminal activities including (but not limited to) deprivation of civil rights under color of law and elder abuse of Agnes Carvel resulting in felony murder.

14. It is contrary to every common sense and public policy that any benefactors would intentionally make themselves suffer the hardships and waste of litigation by providing tax-exempt gifts for the purposes of persons who litigate to harass, harm, and render the benefactors destitute by depriving the benefactors of their own funds. The Attorney General is charged with preventing or stopping such abuses contrary to public policy. Laura Werner

failed in this duty. Plaintiff now seeks to finally remedy that negligence by dissolution of the offensive alleged foundation.

15. Thomas and Agnes Carvel (or any benefactor) would never willing deliver their gifts into the hands of persons who engage in actions and intentions exclusively designed to physically, financially and emotionally harm the Carvels, deprive them of their lifetimes' of income and property rights, so that foundation identity thieves could profit themselves and their cronies through fraudulent grants, litigation expenses, and self-dealing disposal of assets at undervalued prices. The Fourteenth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law. It is the Attorney General's duty of care to the public, to the benefactors, and to the elderly beneficiaries to prevent charity "law" from being abused to dispense restricted charitable gifts to litigate to oppress testators, grantors, benefactors, and beneficiaries in the name of a "charity" as alleged "remainderman".

16. Criminal acts and other charity abuses contrary to public policy disqualify tax-exempt status, demand dissolution of the alleged Thomas and Agnes Carvel Foundation, and compel restitution from the conspirators who are profiteers at the expense of the Carvels' legitimate charity and the People.

## FEDERAL JURISDICTION

17 United States District Court has original jurisdiction over this action pursuant to 18 *U.S.C.* 1965 (RICO) and 28 *U.S.C.* §1331 (federal questions) for civil actions arising under the Constitution and laws of the United States; including but not limited to: 18 *U.S.C.* §241 (conspiracy against rights), §242 (deprivation of rights), §245 (protected activities), §371 (conspiracy to defraud), §1111 (felony murder), §1117 (conspiracy to murder), §1341(frauds and swindles), §1343 (fraud by wire), §1344 (bank fraud), §1346 (honest services), §1512 (tampering with witness, victim, informant), §1951 (robbery, extortion),

6

§1952 (aid of racketeering), §1961, et seq. (RICO), §1962 . (prohibited activities), §1964 (a),(c) (civil RICO remedies), §2314 (transportation of stolen securities), §2315 (receipt of stolen moneys), 26 *U.S.C.* §6501 (tax fraud); §6655; 28 *U.S.C.* §455 (disqualify judge), §1343 (civil rights); 42 *U.S.C.* §1981(equal rights), §1982 (property rights), §1983 (deprivation of rights), §1985 (conspiracy against rights), §1886 (neglect to prevent), §1988 (proceeding in civil rights); and under the First (redress of grievances); Fifth (due process), Ninth (other rights), and Fourteenth (equal treatment) Amendments to the Constitution of the United States, and equivalent civil and criminal protections under the laws of New York.

18.    This Court has supplemental jurisdiction over the state claims herein pursuant to 28 *U.S.C.* §1367, as Plaintiff asserts state claims arising from a common nucleus of operative facts with Plaintiff's Federal claims.

19.    Plaintiff's Complaint includes 18 *U.S.C.* §1964 on the information and belief that past events and future discovery will prove that the foundation fraudsters and their agents plotted and conspired for more than one year to abuse Carvel assets, to fraudulently evade payments due Agnes Carvel, to obstruct the Carvels' indemnification equal to that provided to other fiduciaries, to evade taxes to defraud government agencies, and to evade payment of any judgment to creditors.

20.    There exist questions of U.S. Constitutional law including (but not limited to) possible criminal intent and/or conspiracy:

i)    to procure the death of Thomas, and later, Agnes Carvel during the commission of felonies;

ii)    to defraud and embezzle from the Carvels, their estates, their trusts and their charities;

iii)    to impersonate Carvel entities and abuse the Carvels' good name and reputation;

iv)    to steal and/or fraudulently convert Agnes Carvel's property to strangers;

v)        to threaten and cause financial damage to Pamela Carvel individually and as fiduciary

for protecting and defending the rights of Agnes Carvel, an elder person, and asserting

Agnes' testamentary intentions for legitimate charity;

vi)       to transport stolen property across state lines by mail or by wire; to negotiate stolen

U.S. government instruments; and

vii)      to deny Agnes Carvel, her Estate and her fiduciary the fundamental, substantive and

material rights to equal treatment, due process, and protection from violations of

Constitutionally guaranteed rights

## FEDERAL VENUE

21        Venue in this District Court is proper under 18 *U.S.C.* §1965. This Complaint

alleges RICO violations and therefore invokes the venue provisions of the RICO statute.

Justice demands that the Northern New York District Court as the primary location of the

Office of the Attorney General hear this case, as provided in 18 *U.S.C.* §1965(b), because

apparent criminal enterprises, bribery and political corruption in Westchester County, New

York denied Plaintiff's right to redress grievances.

## PARTIES

22        Plaintiff Pamela Carvel is a citizen of Florida, as sole legitimate Member of

the legitimate Thomas and Agnes Carvel Foundation, now a registered United Kingdom

registered, having a mailing address of 28 Old Brompton Road, Suite 158, London SW7 3SS

England, United Kingdom.

23        Defendant Andrew Cuomo, Attorney General of the State of New York, on

behalf of the People of the State of New York and the ultimate charitable beneficiaries of the

Thomas and Agnes Carvel Foundation is a citizen of New York, having a mailing address of

The Capitol, Albany, New York 12224-0341, U.S.A.

8

## POTENTIAL "DOE" DEFENDANTS

24. Upon information and belief, Defendants John/Jane Doe and Doe Co. are individuals and businesses, to be identified upon discovery, which participated in the activities described herein. Plaintiff is ignorant of the true names, capacities, nature and extent of participation in the course of conduct alleged here and, therefore, seeks redress by such fictitious names. Plaintiff will, if necessary, seek leave of Court to further amend this Complaint to reflect the true names and capacities of the defendants designated potentially as Doe defendants when their identities and liabilities become known. "Doe" defendants, participated as co-conspirators in the violations alleged in this Complaint, performed acts, and made statements in furtherance thereof. Such Doe defendants as co-conspirators aided, abetted, or participated in the enterprises identified herein in the commission of the wrongful acts or otherwise caused the damages suffered by Plaintiff and charity.

## OTHER PARTIES

25. Plaintiff asserts that the People and government entities of the United States and United Kingdom, on behalf of whom Plaintiff also complains, are harmed. On information and belief, conspirators induce others to breach their duty of loyalty, fiduciary obligations, oath of public office, and also damage others through criminal acts, tax fraud, money laundering, and charity fraud.

26. Plaintiff complains also on behalf of other directly or proximately injured parties, which injury or damage arises from Doe defendants' tortious actions. These parties include: Federal Government of the U. S.; Internal Revenue Service of the U. S.; Government of the United Kingdom ("U.K."); Inland Revenue of the U.K.; legitimate charities of the U.S. and elsewhere; Plaintiff's various creditors who may have not been paid, through the systematic pattern of racketeering activity alleged herein; others whose proper payments were unnecessarily delayed with exactly the same purpose and motive, of which Plaintiff

9

complains herein; as well as other unknown injured parties that may yet be discovered. These parties are included in accordance with the provisions of *FRCP* Rule 71

## BRIEF BACKGROUND

27. Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History Tom's wife, Agnes, invested her time and money in the couples' first business venture that became the Carvel franchise system. Agnes worked in every aspect of the business. Tom relied on Agnes' incomparable common sense approach to business problems to run the business for over 50 years. Bruce Carvel, Tom's older brother and Pamela's father, designed and built the first continuous soft ice cream freezers that became the Carvel franchise trademark. Bruce formulated the products that comprised the unique Carvel line of specialities.

28. The week before Tom died he estimated the family worth to exceed $250 million in cash, Treasury securities, and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock (a Delaware corporation). The week after Tom was found dead, Agnes was told by Malcolm Wilson (partner in Kent Hazzard et al) that there was less than $40 million and that virtually none of it belonged to her.

29. Undisclosed and unbeknownst to Agnes, Wilson purportedly became the "general counsel" to the alleged Thomas and Agnes Carvel Foundation, without Agnes' knowledge or consent as sole surviving Member, Director and Officer of the legitimate Thomas and Agnes Carvel Foundation. The criminality by Wilson and his clients progressed exponentially from that point.

10

30.    The unethical, if not illegal, tactics used by Wilson are detailed (albeit anonymously) in the New York Law Journal article by Eve Markewich, "Getting Grounded in Ethical Dilemmas" (A25)  Markewich, an attorney hired by Pamela Carvel for the Estate in New York, failed to bring this information to Pamela's attention and failed to assert any claims on behalf of Agnes Carvel because Markewich entered into covert agreements with the foundation usurpers that she would receive $3-4 million in legal fees without contest as long as she obstructed all money from reaching Pamela or the Estate in London. This incredible revelation was made by Leonard Ross, New York ancillary administrator, when pressed for the reasons he refused to assert any demands for payment of the Estate's funeral expenses, debts and administrative expenses.

31.    Agnes and Pamela also knew first hand that Tom and Agnes owned everything jointly with rights of survivorship outside probate; however, deeds, stock and bank accounts were diverted by theft of records or altered by forgery by Wilson's clients.

32    Agnes died on August 4, 1998 while residing in London, England  Agnes was a United Kingdom citizen since birth. The High Court of Justice for England and Wales admitted her last Will and Testament dated July 7, 1995 for probate **without contest**. That Will was **never** contested and remains in force. Pamela was appointed the sole executor and sole personal representative under that Will.

33.    The foundation usurpers recently spent over $500,000 of the Carvels' restricted charitable gifts to obstruct the Estate's administration and claims by replacing Pamela with the usurper's own hand-picked "judicial trustee" on June 11, 2007 for the stated purpose to end all litigation against the foundation usurpers  The usurpers also seek to obstruct Pamela's pursuit of stolen assets as Delaware ancillary administrator. The foundation usurpers counted on the denial to Pamela of reimbursement of legal fees by Markewich and Ross to prevent prosecutions of claims.

11

34.    Pamela Carvel and the Estate's ability to fight multi-million dollar charity abuse is gravely prejudiced by Pamela's being compelled to act as a *pro se* litigant or allow crimes to continue by default. The New York Attorney General has the expertise, the position, and the duty, to prosecute these crimes on behalf of charitable benefactors and beneficiaries.

35.    The judicial trustee appointed in London has no funds; has no independent power to litigate; does not represent the named interested parties under the Will; does not represent Pamela as executor-creditor; and is neither executor nor personal representative. Without funds, this matter is being appealed in London by Pamela *pro se* based on material errors in fact and law deliberately put forth by foundation usurpers.

36.    It was Agnes Carvel's inalienable right to change her Will, particularly to deny benefit to all those who victimized Agnes and the Carvels' assets. Agnes Carvel's uncontested Will provides that anyone who harmed or litigated against Agnes Carvel in life, or litigated against her estate, shall not inherit. The foundation usurpers use the Carvels' assets, and gifts restricted exclusively to charity to litigate against Agnes Carvel, Agnes' rights, the Estate, Agnes' successors in interest, and against Pamela Carvel as Agnes' fiduciary. This abuse prohibits the usurpers in any guise from benefiting under the Will.

37.    **There has never been any disagreement about money in the Carvel family. All litigation to waste and divert Carvel assets is generated exclusively by the foundation usurpers and their co-conspirators – strangers acting against family, using family funds. <u>Agnes never received one penny of income from Tom's estate as long as she lived.</u>** Not one penny is delivered to Agnes' estate to pay funeral expenses now **nine years old.** Not one penny is delivered to Agnes' estate to pay any debts or administrative expenses, although the **gross value** of Agnes' assets was distributed to the alleged foundation, as mere alleged remainderman by Surrogate Scarpino and an alleged Florida

12

trustees. There is no restraint, scrutiny or court approval required for disbursement of Agnes' gross assets distributed to an alleged remainderman in violation of statutory priorities of payment and abatement of interests, and in contradiction to the terms of the uncontested Will.

38.   Tom's estate was allegedly valued at only $66 million in 1991, not the $250 million Tom estimated. Virtually ALL of the money is gone through waste, embezzlement, and gross mismanagement in collusion with criminals. The foundation usurpers' obstruction of payment of income to Agnes violated the terms of Tom's alleged Last Will, thereby creating tax fraud by the fraudulent elections of QTIP and marital deductions (*I.R.C.* 2056, 2523; 18 *U.S.C. Sec.* 371, 641; 26 *U.S.C. Sec.* 7201 et seq). Agnes' surviving ownership in jointly owned assets was stolen by false statements by alleged foundation attorneys and the by the usurpers' concealment of material facts and documents from Agnes and Pamela.

39.   Agnes' death from stroke was procured deliberately by stress from the foundation usurpers, to retain control (gained by forgery) of charities the Carvels founded and funded. Agnes' death was intended to silence Agnes' accusations, some of which resulted in several felony convictions by the New York Attorney General with Pamela's assistance.

## ACTIVITIES THAT ARE ILLEGAL OR
## CONTRARY TO PUBLIC POLICY

40.   The conspirators are engaged in illicit activities under the guise of tax-exempt status. The conversion of undervalued Carvel assets without tax amounts to money laundering. Exempt purposes may generally be equated with the public good, and violations of law are the antithesis of the public good. Therefore, the conduct of such illegal activities may be a bar to exemption claimed by those who alleged to govern a charity. Factors that have to be considered in determining the effect of illegal activities on an organization's qualification for exemption are the paragraphs of *Internal Revenue Code* under which the organization is exempt (*IRC* 501(c)(3) for private foundations), and the nature and extent of the illegal activities engaged in by the organization.

41    Exemption recognized under *IRC* 501(c)(3) is unique in that, unlike exemption under other paragraphs of *IRC* 501(c), it is grounded in charity law, so that denial of exemption under *IRC* 501(c)(3) may be based on charity law. Violation of constitutionally valid laws is inconsistent with exemption under *IRC* 501(c)(3). As a matter of trust law, one of the main sources of the general law of charity, **planned activities** that violate laws are not in furtherance of a charitable purpose.

42.    The foundation impostors fear loosing control of misappropriated Carvel assets. These fraudsters' intentions are stated in their manifesto for control of the "Thomas and Agnes Carvel Foundation". The "Confidential" memos were created by Robert Davis dated February 18, 1992 (A32) and April 9, 1992 (A34), in the midst of the Attorney General's charity fraud investigations (*NYS v Davis, Arcadipane, and Thomas and Agnes Carvel Foundation*, Index No. 93/405052). The first memo states that removing and discrediting Robert Davis and Mildred Arcadipane "**provides family with opportunity to assume control of Foundation, Estate and Agnes' assets.**"

43.    Nothing could more clearly demonstrate the **planned intent** to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates. Such illegal intent (namely the intent to fraudulently convert control of the Carvels' charity and withhold ALL CARVEL ASSETS from Agnes Carvel) for continuing planned activities that violate laws is adhered thereafter by the alleged foundation managers that Davis installed, named "loyalists".

44.    In the same document at #11 (A33), "Hudson Valley" [Bank] is listed generically as "loyalist" successor, i.e. anyone from Hudson Valley Bank (where William Griffin is chairman; and where Griffin and the Abplanalp family are major controlling shareholders) can be counted on to stack the charity's votes against Agnes Carvel. The alleged foundation managers carried out the expressly stated criminal enterprise while Agnes

was alive; while she was the sole living charitable benefactor, the sole surviving asset-owner, and the sole mandatory income beneficiary. Such criminal intent continued to deny Pamela Carvel all rights as Agnes Carvel's executor and successor sole legitimate Foundation Member.

45.     The foundation usurpers operate their criminal enterprises under a cloak as "remainderman" with tax-exempt status stolen from the identity of the Carvels' formerly legitimate charities, therefore the tax-exempt status behind which the fraudsters hide must be denied. Foundation usurpers must be held individually accountable for the tax evasion and damages resulting from their conspiracy. The stated illegal intent, to fraudulently convert all Carvel assets by litigating through the charity to deny Agnes Carvel all assets and income, violated restrictions on charitable purposes, the QTIP and Marital Deduction elections for Thomas Carvel's estate taxes as well as contractual obligations to Agnes in Thomas Carvel's alleged 1988 "estate plan".

46.     This stated illegal intent continues to profit the foundation usurpers. Millions of restricted charitable funds are directed to litigation against the Carvels, yearly for 17 years, to accomplish this illicit goal. On information and belief, more funds are disbursed for non-charitable purposes than alleged charitable ones. Litigation expenses always take priority over grants. Foundation usurpers directed restricted charitable gifts be used to harm Agnes Carvel and her legitimate successors in interest, and to cover-up the usurpers' illegal purposes. Such actions violate laws on the protection of rights, laws restricting charitable activities, laws on prohibited activities, laws on disqualified persons, as well as laws on tax fraud, money laundering, and bribery of judges.

47     "A trust cannot be created for a purpose which is illegal. The purpose is illegal ... if the trust tends to induce the commission of crime or if the accomplishment of the purpose is otherwise against public policy.... Where a policy is articulated in a statute making

15

certain conduct a criminal offense, then ..., a trust is illegal if its performance involves such criminal conduct, or if it tends to encourage such conduct." (*IV Scott on Trusts* Section 377, 3d ed. 1967).

48.    Thus, all charitable trusts (and by implication all charitable organizations, regardless of their form) are subject to the requirement that their purpose may not be illegal or contrary to public policy. (*Rev. Rul* 71-447, 1971-2 C.B. 230; *Restatement (Second) of Trusts*, Section 377, Comment c (1959)). Moreover by conducting criminal activities, an organization increases the burden of government and thus thwarts a well-recognized charitable goal, i.e., relief of the burdens of government.

49.    Reg. 1.501(c)(3)-1(c)(1) states that an organization will not be regarded as operated "exclusively" for *IRC* 501(c)(3) purposes if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. The presence of a single non-charitable purpose if substantial in nature (such as multi-million-dollar-17-year litigation exclusively against the rights of the elder benefactors) will destroy the exemption regardless of the number or importance of truly charitable purposes (*Better Business Bureau v. United States*, 326 U.S. 279,1945). Therefore, if individuals conduct an organization to engage in illegal acts that are a substantial part of its activities, such organization does not qualify for exemption under *IRC* 501(c)(3).

50.    Those who improperly or illegally hold themselves out to be charity managers in order to commit crimes using the charity's funds have committed those crimes against the benefactor, against the charity, against government, and against all citizens who would benefit from legitimate charitable use of the funds, thereby making this these issues, whether criminal or civil, within the powers designated to the New York Attorney General to prosecute.

51. According to the analysis of the *Internal Revenue Service, General Counsel Memorandum* ("G.C.M.") 34631, dated October 4, 1971, in determining whether disqualifying activities are present to a "significant extent" (that is, when they become "substantial"), more must be considered than the ratio they bear to activities in furtherance of exempt purposes. The nature of such acts is as important as their quantity. A great many violations of local regulations amounting to a sizable percentage of an organization's operations might be required to disqualify it from 501(c)(3) tax exemption. Yet, if only a small fraction of its activities were directed to robbing banks, it would not be tax exempt. This is an example of an act having a substantial non-exempt nature, while lacking substantiality of amount.

52. Foundation usurpers' crimes are both substantial in quantity as well as significance, causing multi-million dollar litigation for 17 years, directed at procuring the death of Agnes Carvel through incessant litigation and deprivation of money to sustain life, all done to silence the elder benefactor and beneficiary; depriving Agnes all sources of income, and threatening invasion of Agnes' personal privacy and individual sovereignty, all done to retain illicit control over Agnes' charities. Such acts to harm Agnes resulted in tax fraud. Such acts became directed against Pamela Carvel as Agnes Carvel's sole financial support, sole advocate, whistleblower, witness, and investigator, to silence Carvel revelations of apparent bribery and multi-million dollar embezzlement schemes.

53. A very little planned violence or support of terrorism would constitute "substantial" activities not in furtherance of exempt purpose. If, as suspected from available evidence, any part of the theft of control of the Carvels' millions was used against the Carvels to thwart discovery and prosecution of the foundation usurpers' aiding and abetting the diversion of Carvel funds to persons and entities in the sale of Carvel Corp. with apparent connections to suspected terrorists, or in the procurement of the deaths of Tom and Agnes as

17

benefactors, then tax-exempt status, used by these foundation fraudsters as their ploy to operate, must certainly be immediately revoked.

54.    In determining whether illegal activities are substantial, it must be borne in mind that actions by members and officers of an organization, (particularly those who are illegally or improperly asserting charity control) do not always reflect on the organization. Because organizations act through individuals, it is necessary to distinguish those activities of individuals that are done in an official capacity for legitimate charitable purposes from those that are not.

55.    Foundation usurpers provided multi-million dollar financing for years of litigation to defend Thomas Carvel's executors' in furtherance of criminal activities involving real estate scam felons, as well as tax fraud by improper accounting practices to deny Agnes Carvel all taxable income mandatory by law. Those improper practices not only harmed Agnes, the beneficiary and charitable benefactor, by allowing gross negligence creating multi-million dollar losses, but also created in the Carvel estates, trusts, and charities, tax frauds for which there are no statutes of limitation (26 *U.S.C. Sec.* 6501 (c)(1,2,4,5,6).

56    The foundation usurpers' received the gross proceeds from their illicitly funded litigation against Agnes Carvel, before the full and proper administration of Agnes Carvel's London Estate and payment of all creditors in all ancillary jurisdictions. This premature distribution demonstrates the success of foundation fraudsters' written stated fraudulent intent and confirms intentional tax fraud, engagement in criminal activities against the Carvels, and manipulation of ill-gotten gains for the profit of the fraudsters and their agents. All this was accomplished through the identity theft of Carvel charities and the abuse of the charitable "remainderman" status under fraudsters' control.

57.    Not only is the actual conduct of illegal activities inconsistent with tax exemption, but also the planning and sponsoring of such activities are also incompatible with

18

charity and social welfare. G.C.M. 36153, dated January 31, 1975, states that because planning and sponsoring illegal acts are in themselves inconsistent with charity and social welfare it is not necessary to determine whether illegal acts were, in fact, committed in connection with the resulting activities or whether such a determination can be made prior to conviction of an accused. However, it is necessary to establish that the planning and sponsorship are attributable to the organization, if exemption is to be denied or revoked on this ground. As long as foundation usurpers operate the stolen identities of the Carvels' charities, as individuals engaged in illegal activities, tax-exemption must be denied and revoked to the alleged foundation itself.

58.    Because these usurpers were previously under investigation for charity fraud, and because they re-commenced the very same crimes previously committed, Carvels' good name, legitimate intentions, and charitable funds are so violently violated and damaged, that the only reasonable course of action is to dissolve the illicit stolen entity's existence under the name "Thomas and Agnes Carvel Foundation" and distribute the assets along with damages claimed against the fraudsters to other charitable entities with the same purposes set forth in the express and implied intentions of Thomas and Agnes Carvel.

59.    *Prima facie* documentary evidence of the continuing, planned intentions of each and every activity financed by the usurpers is contained in the records of multi-million dollar payments from charity funds to allow the usurpers to engage in the illegal activities including deprivation of constitutional rights, intimidation, harassment, elder abuse resulting in felony murder, tax fraud, bribery of judges, and other, as well as the lack of benefit to legitimate charitable purposes defined by the benefactors. The Attorney General has the power to subpoena such records for analysis by a fraud examiner.

60.    If an *IRC* 501(c)(3) organization engages in activities designed to force an unrelated party to act or refrain from acting in a way that the organization believes will assist

19

them in the accomplishment of their purposes, then questions arise as to whether these activities are permissible methods of furthering educational or charitable purposes

61.    Violating the benefactor-testators' expressed or implied intentions is contrary to New York statutes and common law. Clearly defined precedents established by the benefactors' in charity management demonstrate intent. Obstructing the benefactor's and Member's rights in order to conceal crimes from prosecution, are not valid charitable activities, in addition to being violations of statutes. Harming the benefactor with her own charitable gifts is certainly against public policy; tax fraud is certainly illegal.

## VIOLATIONS OF PUBLIC POLICY

62.    Discrimination against elder surviving widows, like Agnes Carvel, is not yet as well known or as strongly complained about as racial discrimination because the very nature of the victims – elderly, often infirmed, or financially oppressed – makes it difficult if not impossible for the victims to be heard. Those of us who seek to defend our elders equally become victims of the same threats, intimidations, and financial ruin inflicted on the elders to silence their claims. We can look to the cause for ending racial discrimination to see how once routinely accepted crimes against our citizens can be changed to create a more just society and universally accepted public policy.

63.    Discrimination against Agnes Carvel, the elder benefactor, by the foundation usurpers' unsubstantiated accusations of disability was intended to deprive the benefactor of personal sovereignty. Unsubstantiated accusations provided a means for instigation of judicial intimidation without substantive and material due process. To repeatedly threaten Agnes as an elder person with denial of financial resources, to cause stress to procure death, are all demonstrations of age discrimination used against Agnes Carvel that are routinely employed by those with illicit intents, who seek to deprive widows of mandatory income due from their husband's estates. These acts routinely defraud the government by fraudulent

20

estate tax elections because the widows are too old or unable to forcibly complain about being victimized.

64.    A recent court case agreed with the Internal Revenue Service that an organization violated well-defined standards of public policy and did not qualify for *IRC* 501(c)(3) exemption. The organization was engaged in clear-cut violations of the law (*The Church of Scientology of California*, Commissioner, 83 T.C. No. 25, 1984). The court concluded that on the basis of all the facts of record the organization's overriding purpose was to make money, and that criminal manipulation of the IRS to maintain its tax exemption was a crucial and purposeful element of the organization's financial planning. The court described this purpose as a conspiracy, the major features of which were to block the IRS from investigating, determining, and collecting taxes from the organization and its affiliates. It stated that the conspiracy covered 8 years and involved the manufacture and falsification of records submitted to the IRS, and subverting government processes for unlawful purposes. Officials of the organization were convicted of conspiring to obstruct justice.

65.    Citing *Restatement (Second) of Trusts* Section 377 (1959), the court stated that it is axiomatic that a charitable trust is invalid if it is created for an illegal purpose. According to the court, a trust can be voided **at the request of an interested party** if trust property is used to perpetuate a crime defined by statute, or if the object of the trust is to defraud the government, or if its purpose is to evade taxes (*IV Scott on Trusts* Section 377, 3d. ed. 1967; and Bogert, *The Law of Trusts and Trustees*, Section 211, pp. 63-64, 114, 2d. ed. Rev. 1979).

66.    According to the court, the organization's conduct over a period of several years constituted a violation of 18 *U.S.C. Sec.* 371 and convincingly showed that the organization had a substantial illegal purpose during the years in question. The court stated that it was not required by either the First Amendment or charitable trust principles to find

21

that the government's only remedy was criminal prosecution. It gave several reasons for this conclusion:

     a.  18 *U.S.C. Sec.* 371, which provides that it is a felony offense for two or more persons to conspire to defraud the United States, is a venerable and major criminal statute;

     b.  the organization's conspiratorial efforts were systematic and long-lived;

     c.  the government's interest in ferreting out crime is not the only interest at stake; and

     d.  the government also had an interest in not subsidizing criminal activity.

67     The court stated that were it to sustain the organization's exemption from federal income tax under *IRC* 501(c)(3), it in effect would be sanctioning the organization's right to conspire to thwart the IRS at taxpayers' expense.

68.     Plaintiff asserts that in the instant case, the usurpers already wasted multi-millions of dollars of restricted charitable gifts defending their illicit activities against the Attorney General, and lost, but continued the very same type of self-dealing charity frauds as prosecuted by the Attorney General. Such acts demonstrate deliberate **intent** to defraud and a pattern of activities in the furtherance of apparent criminal purposes. No reasonable person could suggest permitting more restricted charitable gifts to be wasted in defence of the usurpers' continuing bad-faith dealings.

69.     According to the court, the public policy requirement is an implied condition of *IRC* 501(c)(3) and its application is consistent with the holding in the *Bob Jones* case (a racial discrimination case; *Bob Jones University v. United States*, 461 U.S. 574 (1983)) that charitable organizations seeking to qualify for exemption from federally imposed taxes must serve a valid public purpose and confer a public benefit. Application of a public policy requirement is neither harsh nor oppressive because the organization had ample notice that it was against the law to conspire to obstruct the the IRS (18 *U.S.C. Sec.* 371 had been in effect for

22

over 100 years). *IRC* 7805(b) provides the Commissioner with broad authority to make tax rulings retroactive.

70.    The court cited Rev. Rul. 67-235, 1967-2 C.B. 113, holding that an organization that is not "charitable" in the generally accepted legal sense does not qualify for *IRC* 501(c)(3) exemption, and Reg. 1.501(c)(3)-1(d)(2) which provides that the term "charity" is used in its generally accepted legal sense. It also quoted as follows from Rev. Rul. 71-447, 1971-2 C.B. 230: "All charitable trusts * * * are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy."

71.    As to the necessity for a judicial determination, the IRS is not in a position to make a determination as to the illegality of an act under a provision of law other than the Internal Revenue Code. That is a matter for the judiciary. Such a task would be impossible for the IRS to undertake from an administrative standpoint, and from a legal standpoint it would be improper to delegate such a determination to an administrative body without the procedural and substantive due process protection provided through the judicial process. New York's Attorney General and the District Court have the power to accomplish what the IRS cannot.

## APPARENT BRIBE VIA HUDSON VALLEY BANK LOANS

72.    Agnes Carvel's only adversaries for 17 years are the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets (A32). The same document (#11;A33) named "Hudson Valley" acceptable "loyalists" to become successor members and directors, i.e. anyone from Hudson Valley Bank.

73.    As soon as Tom's was found dead, the usurpers stole all records from the Carvels' offices and moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed to impersonate a foundation member, director and officer. Soon again, the Bank's other major controlling

23

stockholder, Robert Abplanalp, was also installed. Upon Robert Abplanalp's death, his daughter Marie Abplanalp Holcombe took his place as "Hudson Valley" loyalist as stated in the 1992 manifesto, to maintain control against the Carvels. Marie Abplanalp is also a major controlling stockholder in the Bank. After stealing the identity and control of the Carvels' charities, Griffin and the Abplanalps abused Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving any income. The Bank asserts more control over Carvel money than any Carvel.

74.    Trials in the Thomas Carvel estate matters began on September 10, 2001. On October 1, 2001, Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000 (A36). The accounting proceeding in Agnes Carvel's New York ancillary administration began in May 2005. On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000 (A51). Neither of these loans was disclosed. It is Plaintiff's assertion that since the Office of Court Administration does not require "equity loans" to be listed on its forms, this type of loan-ploy forms an innovation in pay-off schemes to encourage favorable decisions.

75.    The average citizen can never know whether these "loans" are repaid by Surrogate Scarpino, or just "written off" as a cost of doing business by Griffin and his Bank. Given Surrogate Scarpino's decisions favoring the foundation usurpers against Agnes, the sole intended beneficiary of everything, there is the appearance of impropriety and bias, namely the appearance of bribery, which is sufficient grounds to judicially disqualify Surrogate Scarpino because he lacks the personal conscience to recuse himself.

76.    The Surrogate placed no restraint whatsoever on disbursements by the usurpers and executors in Thomas Carvel's estate, including the disbursement of assets belonging to Agnes Carvel held in their hands. Legal fees are paid without prior or subsequent consent of the beneficiary or the court. This freedom, to draw down Carvel

24

property at will, remained with Agnes' adversaries despite Agnes Carvel's warning that her adversaries were engaging in fraudulent business practices with known real estate fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and U.S. and New York Attorney Generals' prosecutions convicted William Zuga twice (2002, 2003) for real estate fraud, convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds, and convicted William Fugazy (1997) for bankruptcy perjury. Millions of dollars were lost to Agnes Carvel by Agnes' adversaries' collusion with these felons, BUT only the whistleblowers, Agnes and Pamela Carvel, were and are denied indemnification of legal fees from Thomas or Agnes' estate assets, or equal indemnification provide to the "loyalists" as alleged foundation members

77.    The foundation usurpers also draw freely on Agnes' assets prematurely placed in their hands by Surrogate Scarpino without notice to named beneficiaries, and without payment of any taxes, funeral expenses, debts or administrative expenses of Agnes' estate.

78.    It is clear enough that only strangers are intended to become millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses to prosecute claims against these strangers. One-sided funding of litigation seen in the light of $300,000 in undisclosed "loans" to Surrogate Scarpino can demonstrate nothing other than an appearance of bribery with the intent to fraudulently convert estate and trust assets away from the Carvels and their intended beneficiaries.

## HUDSON VALLEY BANK'S INCESTUOUS RELATIONSHIPS

79.    While Surrogate Scarpino concealed loans from Hudson Valley Bank, William Griffin, chairman of Hudson Valley Bank and controlling shareholder, appears before the Surrogate at trial as the alleged "most knowledgeable" director who represents the foundation usurpers at trials, although Griffin admitted under oath that he neither reads what he signs nor understands the contents. Marie Abplanalp Holcombe, another controlling shareholder in the

Bank, is an alleged foundation member and director who authorizes litigation in Surrogate Scarpino's court paid for with Agnes' restricted charitable gifts and Agnes' income denied to Agnes. Holcombe refuses to testify at trial, and states under oath that she only knows what she is told by attorneys. Surrogate Scarpino signed Pamela Carvel's request for subpoenas for alleged foundation documents and testimony by all the alleged foundation managers, but then Surrogate Scarpino retracted those subpoenas when the foundation usurpers complained.

80.     Evidence of Hudson Valley Bank manipulations of Carvel bank accounts and U.S. Treasury securities was the first fraud uncovered by Pamela Carvel in Thomas Carvel's estate. Hudson Valley Bank and its "owners" William Griffin, Robert Abplanalp and their co-conspirators stole control of the Carvels' private charities apparently to abuse the Carvels' good name and assets to further the organized political and financial influence the bank generates in numerous ways.

81.     The Bank runs something called "Hudson Valley Bank's Business Development Board" (A70) of which the Bank itself says,

- "members benefit from their association with Hudson Valley Bank through networking opportunities and exposure for their businesses"

- "The Board of Directors looks to fill these positions with highly-qualified professionals, **who can assist in achieving the Bank's goals.**" (emphasis added)

82.     James Landy, the officer of Hudson Valley Bank who presided over the cover-up of the stolen and altered Treasury securities scenario, is chairman of the board of St, Joseph's Medial Center (an alleged grant recipient with kick-backs to Griffin and the Bank). Mathew Landy is James' cousin and the alleged office manager over one secretary of the alleged foundation, although the alleged foundation purports to not accept independent grant proposals. It only makes grants proposed by "insiders"

83.     William Griffin, who alleges to be foundation president, was "research counsel" to New York Lt. Gov. Malcolm Wilson. Wilson became the foundation usurpers'

general counsel immediately upon Tom's death, and then alleged himself to be foundation member and director. On information and belief, Wilson directed that Agnes Carvel be denied her position as foundation director when Agnes demanded an investigation into Griffin's involvement in the St. Joseph's Hospital grant scams (A77). Wilson installed his partner Lawrence Fay and their buddy Griffin on the foundation as "loyalist" list to bolster the phoney votes against Agnes (A34, Second).

84. Wilson was the "campaign chairman" for Surrogate Emanuelli's unopposed "election". Surrogate Emanuelli turned a blind eye to all crimes committed against Agnes Carvel, withheld all mandatory income due Agnes Carvel to prevent her challenging the legitimacy of the foundation usurpers, and harassed Agnes until death resulted.

85. The Hudson Valley Bank Business Development Board also includes:

- Marc Oxman (A74), installed as Guardian Ad Litem for Agnes Carvel, is one such person who "assists in achieving the Bank's goals" along with Oxman's law partner Andrew Natale, Jr.(A73) Oxman was hired to wipe out Agnes' claims and to cause Agnes' death in London by stress -- and so he did. Oxman hired investigators to stalk Agnes in London at the estate's expense, while Oxman and the foundation usurpers aggressively obstructed all income to Agnes, needed to pay for food and care.

- Daniel Hollis (A72) is partner to Stuart Shamberg. Shamberg was attorney for the Westchester County Public Administrator who hijacked control of the London Estate into New York by perjury by the alleged foundation's lawyers in November 1998 despite the probate in England in October 1998. Over $20,000 was needlessly wasted.

- Edward A. Sheeran (formerly) is Executive Director, Yonkers Industrial Development Agency ("IDA"), the agency that played a part in the phony St. Joseph Hospital grant where Griffin purchased a property only after he knew his cronies in the alleged foundation approved a $2,000,000 purchase grant for a $700,000 parcel of land. Over

27

$1,300,000 disappeared along with a corner of the property that was a branch office of the Hudson Valley Bank. The IDA then stepped in to provide financing (A77).

- Michael Spicer (A75) is President and CEO of St. Joseph's Hospital, recipient of numerous unaccounted-for grants.

- In 1982, the Bank and its vice president John Finnerty (who remains on the Business Development Board, A71) faced and survived indictment for phony "loan" schemes and "various count of larceny and misapplication of property".

### GRIFFIN'S FRAUDULENT CONVERSION OF REAL ESTATE

86.     On October 6, 2006, William Griffin alleged to act as the president of the "Thomas and Agnes Carvel Foundation" in order to sell Agnes Carvel's former residence in Ardsley, New York containing two parcels of land of approximately 16 acres (currently valued at **$8-10 million**) to a shell company belonging to Denis Amicucci, a relative of Griffin's law partner Paul Amicucci, for only **$700,000** (A84) and **$1.3 million** (A87). A similar insider sham transaction is suspected for Agnes' real estate in Florida. All these disposals of Agnes Carvel's assets were done without court approval, without notice to Pamela Carvel as executor, without notice to named beneficiaries, and without notice to creditors.

87.     Daniel A. Amicucci formed the shell company, Chauncey Partners LLC, in March 2006. Paul Amicucci is listed as part of Griffin's law firm Griffin, Coogan and Veneruso, P.C. (A99) and also appears to be the attorney in the firm of Walsh and Amicucci, LLP who act for other charities controlled by Griffin. Paul Amicucci is also listed among the "Hudson Valley Bank Business Development Board" (A70) that has an incestuous, covert political relationship to the Carvel estate manipulations in Westchester Surrogate's Court.

88.     On that same day, October 6, 2006, the shell company returned control of the whole property back to Griffin through Hudson Valley Bank as an alleged lease assignment

28

for security for an alleged US$1.3 million mortgage from Hudson Valley Bank (A90) where Griffin is not only chairman but a controlling shareholder along with alleged foundation manager Marie Abplanalp Holcombe (Exhibit A101).

89.    This same Ardsley property was appraised at **$1.1 million in 1990** when Thomas Carvel died (A106). While all surrounding real estate has increased in value a minimum of 300-400%, the Carvels' exclusive mountaintop acreage property only increased about 82%, despite the rare and unusual nature of so many undeveloped acres in such a sought-after area, and contrary to the high demand exhibited in the past. Agnes Carvel's other Westchester property, the first Carvel ice cream stand location in Hartsdale, was also stolen from Agnes and sold by Griffin in 2006 allegedly for $2.8 million to the owner of the current Carvel franchise. On information and belief, the actual price paid was $3.5 million, i.e. another $700,000 exchanged hands unreported. That property increased 375% from its 1990 appraised value of $600,000. Both properties have similar rocky terrains. Both properties are highly sought after for different uses.

### OTHER APPARENTLY SELF-DEALING GRANTS

90.    The St. Joseph's Medical Center and Hospital grant scam by Griffin is briefly detailed above (A77). William Griffin's wife and alleged foundation manager Ann McHugh were directors on the St. Joseph's Hospital board, in addition to players from the Bank's Business Development Board. The Hospital routinely receives grants without accountability.

91.    On information and belief, alleged grants to St. Joseph School are payments for the tuition fees of Ann McHugh's (a named "loyalist", now deceased) grandchildren (A107). On information and belief, alleged grants to the Visiting Nurse Service were payments for medical assistance to Ann McHugh who died of cancer.

92.    On information and belief, a multi-million dollar grant to St. Agnes Hospital (A111) was made to disappear with the assistance of William Tan, who according to the

29

media was involved with a charitable donations slush fund used for vacations and parties at Westchester Medical Center. When Agnes Carvel asked for the details of how the grants millions were being used, Tan said he reported only to Robert Davis, the fraudster later ousted by the Attorney General. On information and belief, St. Agnes closed in bankruptcy shortly after the alleged foundation made its multi-million dollar payments alleged for new constructions and equipment, that were later sold at auction for a fraction of their price.

93.     The foundation usurpers defended Betty Godley's improper accountings in Thomas Carvel's estate. Betty Godley is also a trustee of an alleged Florida grantor trust. The trust draftsman, attorney Lawrence Newman, stated under oath at trial that the purpose of the trust was to prevent Agnes Carvel from reaching her own money. The trustees transferred over $10 million into that trust from Hudson Valley Bank and Bank of New York without the knowledge or consent of Agnes Carvel.

94.     When Agnes refused to sign a general release exempting the trustees from all accounting and all charges for fraudulently transferring the money, the trustees cut-off all distributions to Agnes. The trustees along with the foundation usurpers diminished the trust assets in litigation opposing enforcement of the accountings and terms of the trust (from what should be over $25 million to less than $7 million). Although the alleged foundation is not yet named beneficiary of the Florida trust, and although payment of Agnes' funeral expenses, debts, taxes, and estate administrative expenses are mandatory under Florida statutes and the terms of the trust, Godley paid several hundred thousand dollars a year to the foundation usurpers, but refused to pay funeral expenses and other claims by Pamela Carvel as executor.

95.     In return for Godley's collusion, the foundation usurpers nominated Godley a foundation director, and pay numerous alleged charitable grants every year to members of Godley's family. St. Barnabus is where Godley lives with her husband who is the pastor. Midnight Run is an alleged food program run by Godley's husband. The David Stewart

Memorial Fund is a creation of Godley's brother Jack Stewart. On information and belief, covert payments were made to the Frances Schevier Nursing Home for Godley's mother.

96.    Spiro Scouras, a well-known movie entrepreneur, sought support for the American Museum of Immigration's production of a video on the successes of immigrants in America. This subject was dear to the hearts of both Thomas and Agnes Carvel, who were both immigrants. Agnes personally donated funds. Eventually it was learned that the alleged foundation also donated funds. The video project was represented to be produced by Disney with narration by Leonard Nimoy. When Scouras, who had much experience in this field, received the final tape, he was outraged. It was not an original production by Disney or Nimoy. Souras called it a cut and paste that took ten minutes to put together from stock footage.

97.    Pamela Carvel's investigations learned that the alleged manager of the Museum closed the exhibit housed at the Statute of Liberty, and diverted all the charitable donations to himself as "loans" that were never repaid. The Carvels asked the alleged foundation to stop any funding of the project and seek restitution for all sums paid (A111). The foundation usurpers claimed they had no responsibility for the money once they gave it away. Reports to Charities Bureau Laura Werner were also ignored. On information and belief, the Museum sought dissolution as soon as Pamela Carvel and Spiro Scouras' investigations into the grant-loan fraud began.

98.    In 1991, the assistance of Agnes Carvel's neighbor, Thomas Reddy, was solicited by Malcolm Wilson to "control" Agnes who was living in Florida. Agnes' home mail was diverted to Reddy's house. Reddy telephoned Wilson and Fay with details of Agnes' private finances and business. Reddy alleged himself to be Agnes' "personal attorney" although he was not licensed in Florida. Reddy became a Florida trustee with Godley and an alleged foundation member and director in exchange to misdirecting Agnes

31

and obstructing Pamela's investigations of financial irregularities in Carvel accounts at Hudson Valley Bank.

99.    In further pay-off, Reddy's son-in-law politician Thomas Dickerson was publicly given credit in the newspapers and printed political advertisements for securing an alleged foundation grant to refurbish playgrounds (A113). Dickerson used this grant ploy advertisement again in his next election campaign. These backhanded attempts to influence two elections by using charitable grants is unethical self-dealing, if not disallowed by law.

100.    On information and belief, close scrutiny of all alleged foundation grants will uncover more kickbacks, self-dealing, and outright frauds. These are the very types of charity fraud that the Attorney General prosecuted previously. Such persistent intent to defraud mandates dissolution of the alleged foundation to end the abuses by the fraudsters.

## INTIMIDATION OF WHISTLEBLOWERS

101.    The basic stance of the foundation fraudsters has been to expend over $40 million in legal fees, commissions, salaries, and wasted assets as long as it is to perpetuate litigation by the usurpers and their agents against the Carvels, using the Carvels' restricted charitable funds. The usurpers successfully obstructed all funds from reaching the Carvels so as to inflict fear, hardship, intimidation, and mental anguish on Agnes Carvel as an elder person, and to threaten destitution and inflict financial ruin on Pamela Carvel for daring to oppose the usurpers' theft of Carvel assets. These tactics amount to RICO and felony murder by procuring the death of Agnes Carvel by stress through extortion to silence the Carvels' complaints and investigation against Griffin and his co-conspirators.

102.    Out of 36 fiduciary positions controlling Agnes' property and its income (7 in Thomas Carvel's estate, 12 in two corporations, 4 in an alleged New York unitrust, 3 in the an alleged Florida grantor trust, 10 in the alleged foundation), all of whose legal fees are paid from Agnes' property without notice to the Court or to Agnes as beneficiary, Pamela Carvel

32

is the sole fiduciary other than Agnes Carvel to be deprived of equal access to funds to retain competent, independent, legal counsel. All other fiduciaries draw down the multi-million dollar Carvel estates' without restriction or approval. Professional legal representation is indispensable for the benefit of Agnes Carvel as sole beneficiary in her lifetime, to defend Agnes' continuing interests through her estate, and to assert the Carvels' testamentary intentions for legitimate charity. Assistant Attorney General Laura Werner did nothing to monitor the unlimited, unrestrained, multi-million dollar payments for legal fees against Agnes Carvel as beneficiary and benefactor, while Agnes was denied all income and equal indemnification.

103. Fiduciaries controlling at least 22 of these fiduciary positions (excluding only Agnes, Pamela and Adele Alexander) are agents for the foundation usurpers in exchange for financial pay-offs. These fiduciaries acted to withhold all income and property belonging to Agnes. The **only** accountings actually determined at trial were those of Thomas' estate. Most entities owing the Carvels accountability refused to account, refused to provide documents, and evaded scrutiny to conceal fraud and embezzlement.

104. The Thomas Carvel estate accountings were supported and defended exclusively by the alleged foundation's attorneys and such defence was merely "adopted" by the executors. Those accountings were deemed by Surrogate's Court to be incorrect, improper, and not in compliance with New York law. The accountings were defended against Agnes' interests to income by the foundation usurpers using Agnes' charitable gifts exclusively for the reason to deprive Agnes Carvel of mandatory income due under the marital deduction and QTIP elections for estate tax exemption. Assistant Attorney General Laura Werner did nothing to restrain the abuse of restricted Carvel charitable gifts against Agnes' interests, or to support the rights of the benefactor against charity abuses.

33

105.   The actions of these conflicted fiduciaries violated the purported terms of the 1988 "estate plan", violated the Internal Revenue Code, and violated the law, but nonetheless, their actions were supported by the foundation usurpers, and never scrutinized by the Court, Laura Werner, or anyone else but the Carvels  The Carvels were denied funds to defend their rights against these abuses  The foundation usurpers allowed all these fiduciaries legal fees to be paid from Agnes' property without question, often without invoices, but continue to oppose payment of all Carvel legal expenses and obstruct all distributions of Agnes' income.

106.   The alleged foundation permitted more than 25 attorneys to be paid in full without fee applications, often without invoices, without scrutiny by Agnes, her Estate, her beneficiaries, her creditors, or Westchester Surrogate's Court  Many of these attorneys, like Kent Hazzard, directly represented foundation usurpers in numerous conflicted positions, double and triple billing the Carvel fund  This one-sided obstruction of financial resources was intended to discriminate against the Carvels as victims, to harm Agnes as an elder person, and is intended to harm Agnes' intentions for legitimate charitable dispositions through her Estate

107.   Agnes and Pamela are the only fiduciaries in Carvel matters who are denied equal indemnification of legal fees and reimbursement of litigation expenses because they are also the only "whistleblowers" concerning criminal activities, including judicial misconduct. Carvel investigators assisted New York State Attorney Generals Abrams and Spitzer in felony convictions for financial fraudsters operating in connection with Thomas Carvel's estate (William Zuga (twice), Francis Zarro)  The U.S. Attorney in another matter convicted another Carvel estate fraudster, William Fugazy, for perjury  Although the Attorney General's Securities Prosecution Unit was actively prosecuting these financial felons, Laura Werner failed to support the Carvels' attempts in Surrogate's Court to stop the foundation fraudsters' and their agents' who continued to support these illegal real estate scams  Not

34

even perjury by the alleged foundation's counsel was enough to draw Ms. Werner's attention to stop this abuse  Over $5 million of Agnes' income was needlessly lost to these scam artists  Several millions more were lost to charity by the foundation fraudsters' and their agents' litigation to perpetuate these scams

108.    The Carvels also assisted the New York Attorney General in charity fraud investigations that forced the ouster of two alleged Carvel charity managers for charity frauds and self-dealing grants, but not before the duo installed their "loyalist" cronies to pay the fraudsters' legal fees and to litigate against Agnes thereby creating additional tax fraud in activities not permitted under *I.R.C.* 501(c)(3).

109.    Since 1991, Ms. Werner failed to support the Carvels in stopping criminal activities in Surrogate's Court.  Ms. Werner presides over the spending of approximately $3-4 million per year by the foundation usurpers and their agents for the illegal purpose of denying Agnes Carvel her rights as beneficiary and surviving asset owner.

110.    On information and belief, Laura Werner was copied on every document filed with the Court since 1991, yet not one of these document was available from the Charities Bureau in response to a Freedom Of Information Law request. Although the Attorney General's written policy is to retain litigation records for 20 years, nothing of substance could be produced concerning the charity fraud complaints and investigations concerning the alleged foundation. Not one charity complaint to Ms. Werner from Pamela Carvel was answered.  Not one inquiry directed to Ms. Werner for her accountability was answered by Ms Werner  On information and belief, Laura Werner allowed attorneys for the foundation fraudsters to write papers opposing the rights Agnes Carvel, sole intended beneficiary who never received one penny from Thomas Carvel's estate. Those papers were then submitted to the Court on behalf of the Charities Bureau

111.    The Attorney General has the power to set aside the sale of properties made with the intent to defraud the Carvels and charity for personal profit to Griffin and his cohorts. Laura Werner ignored all these covert and blatant abuses. Demand is herewith made on the Attorney General in Albany to find a new broom, and to sweep this matter clean by dissolving this alleged foundation.

WHEREFORE, as a result of criminal enterprises to defraud the Carvels, to defraud charity, to defraud the People, and to defraud taxing authorities, this Complaint seeks to compel the New York Attorney General:

    a.  to deny and revoke tax-exempt status, and to dissolve the alleged Thomas and Agnes Carvel Foundation in New York for identity theft, to prevent further harm to the Carvel name, to the Carvel family, to the People, and to send a clear signal to all that charity fraud shall not be tolerated;

    b.  to immediately place the all assets of the alleged Thomas and Agnes Carvel Foundation (New York) into the hands of an independent court-appointed receiver until distributed by the court;

    c.  to immediately and permanently restrain alleged foundation managers William Griffin, Marie Abplanalp Holcombe, Salvatore Molella, Brendan Bryne, Mathew Landy, and Karen Springfield, their employees, their attorneys, their agents, and others not yet identified at this time, from using the Carvel named in any form or taking any action alleged to be in the name of any Carvel charity or business entity;

    d.  to recover treble damages from the above alleged foundation managers for: gross breach of fiduciary duties; all legal expenses paid out of the charity's funds or caused to Agnes and Pamela Carvel; tax fraud, penalties, interest;

charity grant fraud; self-dealing; fraudulent conversion; and other criminal enterprises against the People of the State of New York and the Carvel family;

e. to distribute all the assets of the alleged Thomas and Agnes Carvel Foundation (New York) held as of October 21, 1990, with statutory interest thereon, on a pro rata basis only to those charities now in existence that received grants prior to November 1990 (A114, some dates missing); and only to those charities that never had any connections to: Hudson Valley Bank, the Hudson Valley Bank Business Development Board, alleged foundation managers, their relatives or business associates, because of past collusion in grant frauds by these persons;

f. pursuant to Agnes Carvel's express and implied intentions, to distribute to the legitimate Thomas and Agnes Carvel Foundation (London, England) and/or the Carvel Foundation (Florida) all the assets of the alleged Thomas and Agnes Carvel Foundation (New York) acquired at the expenses of Agnes Carvel subsequent to October 21, 1990, along with all interest and damages thereon, to be monitored by the Charity Commission of the United Kingdom and/or the Attorney General of Florida,

g. to disaffirm and rescind all individual, representative, professional acts taken by the alleged foundation managers or their agents for their own profit or against the Carvels', to divert and fraudulently convert Carvel property, and impersonate Carvel entities.

September 2, 2007

Pamela Carvel, Member, appearing *pro se*
Thomas and Agnes Carvel Foundation
28 Old Brompton Road, Suite 158
London SW7 3SS
NY tel/fax fwd 1 212 751 6746

37

# EXHIBIT 17

𝔄𝔤𝔫𝔢𝔰 𝔊𝔞𝔯𝔳𝔢𝔩 𝔊𝔰𝔱𝔞𝔱𝔢                          1007 N. Federal Hwy #220
28 Old Brompton Road, <u>Suite 158</u>            Fort Lauderdale, FL 33304-1422
London, SW7 3SS, England, U.K.                   **TEL/FAX FWD 1 212 715 6746**

April 26, 2007                                   **OVERNIGHT DELIVERY**

Honorable Governor Eliot Spitzer
Executive Chambers – 2^(nd) floor
New York State Capital
Albany, New York 12224

**Re:    Official request for appointment of a Special Inspector General concerning**
**        allegations against Westchester Surrogate's Court**

Dear Governor Spitzer,

I respectfully request that you immediately appoint a Special Inspector General to oversee, investigate and prosecute if necessary, matters touched on in the enclosed Compliant that I filed in Federal Court in Fort Lauderdale on April 20, 2007.

I recently confirmed that Tom Carvel's death certificate contains information that was not provided by the alleged certifying physician, although this false presentation succeeded in avoiding a then-required autopsy.

The only relief sought in the Federal Complaint is a needed exhumation order for the body of my late uncle, Tom Carvel; however, my experiences in Westchester Surrogate's Court in the course of protecting the life and rights of my aunt Agnes Carvel, Tom's widow, opened my eyes to violations of Constitutional rights by Surrogate's Emanuelli and Scarpino that I never expected to see.

Thomas Carvel's estate is not an isolated case in Westchester Surrogate's Court of the routine abuse of widows and named beneficiaries in favor of politically connected attorneys and corporate fiduciaries. Agnes Carvel was summarily ignored by the Westchester Surrogate, and by then-Westchester District Attorney Pirro, when presented with evidence of criminal activities.   Indeed, it was the office of New York's prior Attorney General that succeeded in prosecuting various criminal acts against the Carvels that resulted in felony convictions of the fraudsters.

Agnes Carvel was not simply ignored.  A concerted effort was made by the Court to harass, intimidate and silence Agnes by cutting off all funds necessary to live or to pay legal professionals to defend Agnes' life, liberty and right to happiness.  This scenario is repeated over and over again in other Westchester estates where the widows and named beneficiaries are denied all benefit due only them under their loved ones' Will; where widows are threatened with guardians who will wipe out all their claims; where sanctions are used to silence opposition.

Agnes Carvel never received one penny from Tom's estate for as long as she lived as widow (8 years). Agnes and now her estate are denied indemnification of legal fees to defend Agnes' rights although her adversaries draw freely and without restriction on

1

Agnes Carvel Estate
28 Old Brompton Road, Suite 158
London, SW7 3SS, England, U.K.

1007 N. Federal Hwy #220
Fort Lauderdale, FL 33304-1422
TEL/FAX FWD 1 212 715 6746

Agnes' assets. Beneficiary-fiduciaries, in estate after estate, are denied payment of legal fees as fiduciaries while their adversaries, who are strangers and corporate fiduciaries, draw on estate and trust funds without prior consent of the court, without fee applications, without accountings, and without notice to, or scrutiny from, the named beneficiaries. In my opinion, such one-sided funding of litigation can demonstrate nothing other than the intent to fraudulently convert estate and trust assets away from the intended beneficiaries.

I respectfully request that you immediately appoint a Special Inspector General to oversee all matters in the Surrogate's Court of Westchester County.

Yours truly,

Agnes Carvel Estate

by Pamela Carvel

2

# EXHIBIT 18

*Pamela Carvel*, a member of the *Association of Certified Fraud Examiners*
28 *Old Brompton Road, Suite 158   London SW7 953 England*
U.S. tel / fax  1 212 751 6746

RECEIVED

JUN 2 9 2007

**Hand Delivered**
Andrew Cuomo
New York Attorney General
120 Broadway
New York, New York 10271 USA

**NYS OFFICE OF THE ATTORNEY GENERAL
NEW YORK CITY OFFICE**

Re: <u>Criminal Complaint: WILLIAM GRIFFIN: HUDSON VALLEY BANK</u>
      for crimes against Thomas and Agnes Carvel, their estates and their charities

Dear Mr. Cuomo,

My aunt Agnes Carvel, our investigators and I previously informed Scott J. Andersen of Attorney General Spitzer's Office Securities Protection Unit of financial frauds and real estate scams against Carvel assets. We subsequently assisted the Attorney General's office in the successful criminal prosecutions of William Zuga and Francis Zarro. I here attach new information of the latest events in a continuing pattern of estate frauds.

On May 8, 2007, I discovered that WILLIAM GRIFFIN who alleges himself to be president of the alleged THOMAS AND AGNES CARVEL FOUNDATION, fraudulently transferred of Agnes Carvel's estate's $10 million dollar, 16 acre property in Ardsley, New York, without notice to the Estate, its creditors or its beneficiaries, by transferring title to one of GRIFFIN'S business associates for only $2 million dollars; and then that business associate assigned the property back to GRIFFIN through HUDSON VALLEY BANK.

At that same time I also discovered that GRIFFIN loaned Westchester County Surrogate Anthony Scarpino $300,000 through HUDSON VALLEY BANK. The loans coincided with Carvel trials. Both GRIFFIN and Scarpino have concealed the loans since 2001 although GRIFFIN, purporting to represent the alleged foundation, appears before the Surrogate in litigation <u>against Agnes Carvel</u>, the foundation's founder and benefactor.

These frauds, in the Carvel estates alone, divert into the underground economy untaxed millions each year. My research indicates that a pattern of fraudulent conversion of estate assets is being repeated in estate after estate in Westchester County. Your office needs to be acutely aware that the Carvel estates are not but the tip of the iceberg for money laundering to defraud testators, beneficiaries and charities, by those like William Griffin controlling banks like Hudson Valley Bank, and by lawyers like Malcolm Wilson and William Griffin controlling Surrogate's Court judges like Albert Emanuelli and Anthony Scarpino.

Throughout our years of investigations, my aunt's attempts to recover her own assets from strangers, to be paid mandatory income, to receive justice for herself and her

charities, and to thwart criminal activities in the theft and abuse of Carvel funds, were constantly obstructed and opposed by attorney WILLIAM GRIFFIN who is chairman and major stock controller in HUDSON VALLEY BANK. In the midst of our assistance to Attorney General Abram's investigation into charity frauds by those who stole control of the Carvels' charities by forgery, the usurpers of the "THOMAS AND AGNES CARVEL FOUNDATION" made a written statement of their illegal intentions to fraudulently convert all Carvel assets to themselves to the exclusion Agnes Carvel, the sole legitimate asset owner, and charitable benefactor (see Exhibit 1 dated February 18, 1992).  The usurpers also made the written stated intent to illegally withhold charity control from the Carvels by rigged voting wherein WILLIAM GRIFFIN and anyone from "Hudson Valley"[Bank] could be counted among "loyalists" to prevent Agnes Carvel from recovering control of her own assets and her own charities (see Exhibit 2 dated April 9, 1992).

The Attorney General's ouster of two prime foundation fraudsters (Mildred Arcadipane and Robert Davis) happened only after the fraudsters moved all foundation records to the Hudson Valley Bank Building and rigged control to put all charity assets into the hands of WILLIAM GRIFFIN operating in the guise of the president of the alleged "THOMAS AND AGNES CARVEL FOUNDATION" and the "INTERNATIONAL INSTITUTE OF HEALTH FOODS".

In my role as fraud investigator for Thomas and Agnes Carvel and as the sole legitimate successor Foundation Member to Thomas and Agnes Carvel in the legitimate THOMAS AND AGNES CARVEL FOUNDATION, I make this criminal complaint against WILLIAM GRIFFIN and HUDSON VALLEY BANK for apparent crimes including but not limited to 1) multi-million dollar theft of Carvel real estate assets; 2) illegal use of charity assets contrary to public policy; 3) threats and intimidation of Agnes Carvel as an elder person to procure her death by stress; 4) fraudulent conversion of Carvel charity assets to individuals associated with WILLIAM GRIFFIN; 5) bank fraud; 6) money laundering; 7) corporate identity theft and 8) bribery of Westchester Surrogate Anthony Scarpino in the form of alleged loans from HUDSON VALLEY BANK to coincide with Carvel trials wherein WILLIAM GRIFFIN was a witness and litigant against Agnes Carvel.

WILLIAM GRIFFIN stole restricted charitable gifts and the good name of the Carvels to further political and financial manipulations for and by HUDSON VALLEY BANK and the HUDSON VALLEY BANK BUSINESS DEVELOPMENT BOARD. At least one alleged foundation "grant" to St. Joseph's Hospital resulted in profit to WILLIAM GRIFFIN and HUDSON VALLEY BANK. There exists a clear record of a continuing pattern of apparent criminal abuse of Carvel assets to obstruct justice in the Carvels' estates. Please call me at the above New York telephone number for further information.

Yours truly


Pamela Carvel

cc: Richard Friedman, Securities Protection Unit

# EXHIBIT 19

*Pamela Carvel, a member of the Association of Certified Fraud Examiners*

94 Old Brompton Road, Suite 158   London SW7 3SS England
P.O. Box 58, Cranbury, New Jersey 08512-0058
U.S. tel / fax fwd 1 212 751 6746

<u>Hand Delivered</u>
Ann T. Pfau
Chief Administrative Judge                                            August 28, 2007
The Office of Court Administration
25 Beaver Street, 11 Floor
New York, New York 10004 USA

Re: <u>COMPLAINT: Westchester County Surrogate Judge Anthony Scarpino</u>
    for apparent bribery, civil rights violations, and aiding and abetting crimes against
    Thomas and Agnes Carvel, their estates and their charities; and
    Pamela Carvel as their fiduciary and successor

Dear Justice Pfau,

I write about the serious matter of the appearance of over $300,000 bribery of the
Westchester County Surrogate Anthony Scarpino by the controlling stockholders of
Hudson Valley Bank, who are the sole adverse litigants to the Carvel interests in trials
before the Surrogate. There is a long-standing pattern of apparently improper influence
over Westchester Surrogates Albert Emanuelli (1991-2000) and Anthony Scarpino
(2001-present) by Hudson Valley Bank politicos who stole the identity and assets of the
"Thomas and Agnes Carvel Foundation", and the Carvel family, after the suspicious
death of Thomas Carvel. The Bank's incestuous influence over Surrogate's Court
proceedings is extended through the Hudson Valley Bank Business Development
Board, which counts among its players several attorneys who received assets,
appointments, and payments from the Surrogates, always opposing Carvel interests in
Carvel estate matters.

My aunt Agnes Carvel, our investigators and I previously informed Scott J. Andersen of
Attorney General Spitzer's Office Securities Protection Unit of financial frauds and real
estate scams against Carvel assets that were occurring under the nose of Surrogate
Emanuelli, who ignored our evidence and pleadings. We subsequently assisted the
Attorney General's office in the successful criminal prosecutions of William Zuga and
Francis Zerro for several felony counts for financial frauds. The U.S. Attorney convicted
another Carvel estate fraudster, William Fugazy, for perjury. The attached information is
the latest events in a continuing pattern of multi-million dollar estate frauds in
Westchester Surrogate's Court, in which the Carvel estates are not alone.

On May 8, 2007, I discovered that William Griffin who alleges himself to be president of
the alleged Thomas and Agnes Carvel Foundation, fraudulently transferred Agnes
Carvel's estate's $10 million dollar, 16 acre property in Ardsley, New York (without
notice to the Estate, its creditors or its beneficiaries) by transferring title to one of

Griffin's business associates for only $2 million dollars; and then that business associate assigned the property back to Griffin through Hudson Valley Bank. Surrogate Scarpino gave Griffin control of Agnes Carvel's property without restriction, without scrutiny, without accountability, without notice to named beneficiaries, and without first paying funeral expenses, administrative expenses or creditors in at least four U.S. states and the United Kingdom.

At that same time the real estate scam was uncovered, I also discovered that Griffin, who is also chairman and controlling stockholder of Hudson Valley Bank, loaned Westchester County Surrogate Anthony Scarpino $300,000 through Hudson Valley Bank.



The "loans" coincided with Carvel trials by which Griffin obtained control over the above-mentioned Ardsley property and other multi-million-dollar Carvel real estate. Surrogates Emanuelli and Scarpino denied the Carvels equal indemnification of fiduciary expenses, while giving Griffin and his cohorts unlimited access to Carvel assets, without scrutiny or restriction, to oppose the Carvels.

Both Griffin and Scarpino concealed the loans since 2001 although Griffin, purporting to represent the alleged foundation, continues to appear before the Surrogate in litigation against Agnes Carvel, the foundation's founder and exclusive benefactor, and against Pamela Carvel the sole legitimate Foundation Member, who continues to oppose the foundation usurpers' criminal acts of charity fraud. Surrogate Scarpino refused to disqualify himself when confronted with Griffin fraudulent conversion of Carvel real estate and the appearance of bribery by Griffin through his Bank.

Surrogate Scarpino aids and abets the cover-up of apparent criminal activities by denial of due process and unequal treatment of the Carvels compared to the alleged foundation managers who are denoted in written documents as "loyalist" with Griffin whose written stated criminal intent has been to prevent Carvel family control of all Carvel family assets. Surrogate Scarpino denies discovery to Pamela Carvel against the foundation usurpers whose legitimacy is contested since 1991, but grants discovery requested by the usurpers against the Carvels. Surrogate Scarpino denies Carvel funds to the Carvels, but gives unrestricted use of Carvel funds to the foundation usurpers.

These frauds in the Carvel estates divert into the underground economy untaxed millions each year. My research indicates that a pattern of fraudulent conversion of estate assets is being repeated in estate after estate in Westchester County. Your office needs to be acutely aware that the Carvel estates are not but the tip of the iceberg for conversion, tax fraud and money laundering to defraud testators, beneficiaries and charities, by lawyers like William Griffin controlling banks like Hudson Valley Bank, and by lawyers like Malcolm Wilson and William Griffin controlling Surrogate's Court judges like Albert Emanuelli and Anthony Scarpino.

Throughout our years of investigations, my aunt's attempts to recover her own assets from strangers, to be paid mandatory income require by law, to receive justice for herself and her charities, and to thwart criminal activities in the theft and abuse of Carvel funds, were constantly obstructed and opposed by attorney William Griffin who is chairman and major stock controller in Hudson Valley Bank and who abuses Carvel charitable donations to abuse the Carvels personally with litigation.

In the midst of our assistance to Attorney General Abram's investigation into charity frauds by those who stole the identities of the Carvels' charities by forgery, the usurpers of the "Thomas and Agnes Carvel Foundation" made a written statement of their illegal intentions to fraudulently convert all Carvel assets to themselves to the exclusion Agnes Carvel, the sole legitimate asset owner, and charitable benefactor (see Exhibit 1 dated February 10, 1992). The usurpers also made the written stated intent to illegally withhold charity control from the Carvels by rigged voting wherein William Griffin and anyone from "Hudson Valley"[Bank] could be counted among "loyalists" to prevent Agnes Carvel from recovering control of her own assets and her own charities (see Exhibit 2 dated April 9, 1992). All these stated illegal intents and the actual fraudulent conversion of the $10 million Ardsley property were ignored when put before Surrogate Scarpino.

I make this complaint against Surrogate Scarpino as judge and attorney for aiding and abetting apparent crimes by the controlling stockholders of Husdon Valley Bank including but not limited to 1) multi-million dollar theft of Carvel real estate assets; 2) illegal use of charity assets contrary to public policy; 3) threats and intimidation of Agnes Carvel as an elder person to procure her death by stress (felony murder); 4) fraudulent conversion of Carvel charity assets to individuals associated with William Griffin; 5) bank fraud; 6) money laundering; 7) corporate identity theft and 8) bribery of Westchester Surrogate Anthony Scarpino in the form of alleged loans from Hudson Valley Bank to coincide with Carvel trials wherein William Griffin was a witness and litigant against Agnes Carvel.

Surrogate Scarpino deprives the People of honest services, and violates rights guaranteed to the Carvels by the laws of the United States, as a result of apparent bias and the appearance of impropriety and bribery by William Griffin who stole restricted charitable gifts and the good name of the Carvels to further political and financial manipulations for and by Hudson Valley Bank and the Hudson Valley Bank Business Development Board. There exists a clear record of a continuing pattern of apparent criminal abuse of Carvel assets to obstruct justice in the Carvels' estates. I regret to say my investigations indicate the Carvel estates are not lone isolated incidents of criminal conversion of assets with the compliance of the Westchester Surrogates. Please call me at the above New York telephone number for further information.

Yours truly

*Pamela Carvel*

enclosures

# EXHIBIT 20

SEP SEP '87 '95  18:10 914-476-7951



COPY

632-3315

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

AGNES CARVEL and
PAMELA CARVEL,

        Plaintiffs,

    v.

ANDREAS HOLDINGS CORP.,
a Delaware corporation and
BETTY GODLEY,

        Defendants.

Civil Action No. _____

## COMPLAINT PURSUANT TO 8 Del. C. §225(a)

Plaintiffs, Agnes Carvel and Pamela Carvel (the "Plain-
tiffs"), by their undersigned attorneys, hereby bring this action
against defendants, Andreas Holdings Corp. ("Andreas") and Betty
Godley ("Godley"), pursuant to 8 Del. C. §225(a), and allege as
follows:

### The Parties

1.   Plaintiffs Agnes Carvel and Pamela Carvel are
residents of the State of Florida, and are respectively, in spite
of the wrongful acts complained of herein, the President of Andreas
and Vice President and Secretary of Andreas.

2.   Andreas is a Delaware corporation with its principal
place of business in Yonkers, New York.  Andreas is a real estate
holding company.

3.   Defendant Godley is a resident of New York, and, by
virtue of the wrongful acts complained of herein, allegedly the
sole director of Andreas and its President and Treasurer.

SEP SEP 07 '95 10:10 914-476-7951 LL M SMITH ESQ                                       P.5

## The Controversy

4.    Agnes Carvel and her husband, Thomas Carvel, were married for over 50 years. Throughout their marriage, Thomas Carvel was responsible for the business and financial affairs of the family. As a matter of practice, Thomas Carvel put the ownership of stock, land, buildings and other assets related to the family's business in the joint names of Thomas and Agnes Carvel, as joint tenants with right of survivorship.

5.    On information and belief, at all times relevant hereto, all of the outstanding common stock of Andreas has been owned by Thomas Carvel and Agnes Carvel, as joint tenants.

6.    In October, 1990, Thomas Carvel died, and by operation of law, all of the outstanding common stock of Andreas then became owned solely by Agnes Carvel, the surviving joint tenant.

7.    Shortly after the death of Thomas Carvel, with the consent of Agnes Carvel — the than sole stockholder of Andreas — Agnes Carvel assumed the position of the President of Andreas (the position her husband had previously held) and Pamela Carvel assumed the position of Vice President of Andreas. Thereafter, Pamela Carvel also became Secretary of Andreas.

8.    Despite the fact that Agnes Carvel is the only stockholder of Andreas, the estate of Thomas Carvel, through a majority of its executors, has asserted the right of ownership of all of the common stock, alleging that the stock was owned solely in the name of Thomas Carvel, thus belonging to the estate of

SEP SEP  07,'95  10:11 914-476-7951LL  M SMITH ESQ

Thomas Carvel under the terms of the last will and testament of Thomas Carvel.

9.    The executors of the estate of Thomas Carvel were Plaintiffs, Godley, Herbert Roth, Robert Davis, Mildred Arcadipane, and the executors, other than Plaintiffs (collectively, the "Controlling Executors"), have acted in a manner contrary to the best interests of Agnes Carvel, as the owner of all of the stock of Andreas.    These Controlling Executors have attempted to gain control of the management of Andreas and exclude Agnes Carvel and Pamela Carvel from the day to day operations of Andreas.

10.    Ultimately, on May 2, 1995, at an invalidly noticed and held meeting of the stockholders of Andreas (the "Illegal Stockholders Meeting"), the Controlling Executors purported to vote all of the outstanding shares of Andreas common stock in favor of (a) removing Plaintiffs as officers of Andreas, and (b) appointing Godley as the sole director, President and Treasurer of Andreas. Since that Illegal Stockholders Meeting, the Plaintiffs have been excluded from the management of Andreas by the Controlling Executors, and Godley has held herself out to the public as the sole director and an officer of Andreas.

11.    Thereafter, in the Surrogate's Court in Westchester County, New York, even though that court has no jurisdiction over the internal corporate affairs of a Delaware corporation and no cause was ever shown, the Controlling Executors sought to complete their ouster of Plaintiffs from the management of Andreas by obtaining an Order which allegedly "suspends" the powers of

SEP 07 '95 10:11 914-476-7951
SEP '95 9:17  FROM RUSSELL M SMITH ESQ

Plaintiffs to act as officers and directors of Andreas, but does not remove Plaintiffs as officers of Andreas.

12.  The Controlling Executors who acted at the Illegal Stockholders Meeting to vote the shares of common stock of Andreas had no authority to vote those shares.  Such Controlling Executors, other than Plaintiffs, have never offered or provided any proof of their claim that the estate of Thomas Carvel is the rightful owner of all of the common stock of Andreas, and Plaintiffs are unaware of any books and records of Andreas which reflect that such stock was registered and held in the name of Thomas Carvel only.

13.  Agnes Carvel, as the sole holder of common stock of Andreas, did not vote any of the shares of the common stock of Andreas at the Illegal Stockholders Meeting, nor did she give the estate of Thomas Carvel or the Controlling Executors of the estate a proxy to vote those shares or to vote the shares in favor of removing Plaintiffs as officers or appointing Godley as a director or officer of Andreas.

## COUNT I

14.  Plaintiffs hereby repeat and reallege paragraphs 1 through 12 as if fully set forth herein.

15.  Under Section 225(a) of the Delaware General Corporation Law, this Court is vested with the authority to hear and determine the validity of any election of directors, and officers of Delaware corporations whose entitlement to office is contested are also entitled under this Section to have this Court

determine the validity of any election of officers and the right of any officer to hold such office.

16. Plaintiff Agnes Carvel, as the only holder of common stock of Andreas, is entitled to a declaration that the alleged election of Godley as a director of Andreas is void.

17. Plaintiffs, as officers of Andreas whose entitlement to office is contested by Defendants, are entitled to a declaration that they, rather than Godley, are the proper officers of Andreas.

18. Plaintiffs are further entitled to a declaration that Agnes Carvel is the sole and rightful owner of 100% of the shares of Andreas, and that only Agnes Carvel is entitled to the exercise and enjoyment of all rights and benefits of such owner- ship, including the full voting rights with respect to those shares.

WHEREFORE, Plaintiffs respectfully request, pursuant to 8 Del. C. §225(a), that this Court:

a. Declare that all of the actions taken at the Illegal Stockholders Meeting of Andreas on May 2, 1995 which allegedly replaced existing management and elected Godley as a director and officer are void and of no effect, and that Agnes Carvel remains as President of Andreas and that Pamela Carvel remains as the Vice President and Secretary of Andreas;

b. Declare that Agnes Carvel is the sole stock- holder of Andreas and entitled to vote all of the shares of Andreas and exercise all rights thereto;

-5-

** TOTAL PAGE.007 **
SEP '95  10:12  914-476-7951

e. — Award Plaintiffs their costs and disbursements incurred in connection with this action, including without limitation their reasonable attorneys' fees; and

d. — Grant such other relief as the Court may deem just and proper.

DUANE, MORRIS & HECKSCHER

By: _____
Thomas P. Preston
Robert J. Valihura, Jr.
1201 Market Street, Suite 1500
P.O. Box 195
Wilmington, Delaware  19899
(302) 571-5550
    Attorneys for Plaintiffs
    Agnes Carval and
    Pamela Carval

September 5, 1995

-6-

Index No. 3285/1995

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-----------------------------------------------------------------------------

In the Matter of the Application of BETTY GODLEY, MILDRED ARCADIPANE and ROBERT M. DAVIS, as
Executors and Trustees of, and THE THOMAS AND AGNES CARVEL FOUNDATION, as Remainderman under,
the Last Will and Testament of

THOMAS CARVEL,

Deceased,

for a decree revoking letters testamentary and letters of trusteeship issued to PAMELA CARVEL
and revoking letters of trusteeship issued to AGNES CARVEL, and rescinding certain actions take
by them, and granting other relief.
-----------------------------------------------------------------------------

Petition
-----------------------------------------------------------------------------

W. WHITFIELD WELLS, ESQ.
Attorney for BETTY GODLEY
OFFICE AND POST OFFICE ADDRESS
199 Main Street
White Plains, NY 10601
(914) 946-5700

GRAUBARD, MOLLEN, HOROWITZ, POMERANZ & SHAPIRO
Attorneys for MILDRED ARCADIPANE
OFFICE AND POST OFFICE ADDRESS
600 Third Avenue
New York, NY 10016-2097
(212) 818-8800

KENT, HAZZARD, JAEGER, GREER, WILSON & FAY
Attorneys for ROBERT M. DAVIS
OFFICE AND POST OFFICE ADDRESS
50 Main Street
White Plains, NY 10606-1920
(914) 948-4700

DONOVAN, LEISURE, NEWTON & IRVINE
Attorneys for THE THOMAS AND AGNES CARVEL FOUNDATION
OFFICE AND POST OFFICE ADDRESS
30 Rockefeller Plaza
New York, NY 10112
(212) 632-3000

# EXHIBIT 21

Form **706**
(Rev July 1990)
Department of the Treasury
Internal Revenue Service

**United States Estate (and Generation-Skipping Transfer) Tax Return**

Estate of a citizen or resident of the United States (see separate instructions). To be filed for decedents dying after December 31, 1989, and before January 1, 1993.
For Paperwork Reduction Act Notice, see page 1 of the instructions.

OMB No 1545 0015
Expires 6-30 93

**Part 1 — Decedent and Executor**

| | |
|---|---|
| 1a Decedent's first name and middle initial (and maiden name, if any) **THOMAS** | 1b Decedent's last name **CARVEL** |
| | 2 Decedent's social security no. **131 : 09 : 9906** |
| 3a Domicile at time of death (county and state) **WESTCHESTER, NEW YORK** | 3b Year domicile established **1910** | 4 Date of birth **7/14/06** | 5 Date of death **OCTOBER 21, 1990** |
| 6a Name of executor (see instructions) **AGNES CARVEL** | 6b Executor's address (number and street including apartment number or rural route; city, town, or post office; state; and ZIP code) **C/O ANDREAS HOLDINGS CORP.** **165 TUCKAHOE ROAD** **YONKERS, NY  10710** |
| 6c Executor's social security number (see instructions) **057 : 05 : 7711** | |
| 7a Name and location of court where will was probated or estate administered **SURROGATE'S COURT - WESTCHESTER COUNTY, NEW YORK** | 7b Case number **3285-1990** |
| 8 If decedent died testate, check here ▶ ☒ and attach a certified copy of the will. | 9 If Form 4768 is attached, check here ▶ ☒ |
| 10 If Schedule R-1 is attached, check here ▶ ☐ | |

**Part 2 — Tax Computation**

| | | | |
|---|---|---|---|
| 1 | Total gross estate (from Part 5, Recapitulation, page 3, item 10) | 1 | 66,979,592 |
| 2 | Total allowable deductions (from Part 5, Recapitulation, page 3, item 20) | 2 | 65,802,925 |
| 3 | Taxable estate (subtract line 2 from line 1) | 3 | 1,176,667 |
| 4 | Adjusted taxable gifts (total taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts that are includible in decedent's gross estate (section 2001(b)) | 4 | 15,000 |
| 5 | Add lines 3 and 4 | 5 | 1,191,667 |
| 6 | Tentative tax on the amount on line 5 from Table A in the instructions | 6 | 424,384 |
| 7a | If line 5 exceeds $10,000,000, enter the lesser of line 5 or $21,040,000. If line 5 is $10,000,000 or less, skip lines 7a and 7b and enter zero on line 7c | 7a | |
| b | Subtract $10,000,000 from line 7a | 7b | |
| c | Enter 5% (.05) of line 7b | 7c | |
| 8 | Total tentative tax (add lines 6 and 7c) | 8 | 424,384 |
| 9 | Total gift tax payable with respect to gifts made by the decedent after December 31, 1976. Include gift taxes paid by the decedent's spouse for such spouse's share of split gifts (section 2513) only if the decedent was the donor of these gifts and they are includible in the decedent's gross estate (see instructions) | 9 | |
| 10 | Gross estate tax (subtract line 9 from line 8) | 10 | 424,384 |
| 11 | Unified credit against estate tax from Table B in the instructions | 11 | 192,800 | |
| 12 | Adjustment to unified credit (This adjustment may not exceed $6,000. See instructions.) | 12 | | |
| 13 | Allowable unified credit (subtract line 12 from line 11) | 13 | 192,800 |
| 14 | Subtract line 13 from line 10 (but do not enter less than zero) | 14 | 231,584 |
| 15 | Credit for state death taxes. Do not enter more than line 14. Compute credit by using amount on line 3 less $60,000. See Table C in the instructions and attach credit evidence (see instructions) | 15 | 44,667 |
| 16 | Subtract line 15 from line 14 | 16 | 186,917 |
| 17 | Credit for Federal gift taxes on pre-1977 gifts (section 2012)(attach computation) | 17 | | |
| 18 | Credit for foreign death taxes (from Schedule(s) P). (Attach Form(s) 706CE) | 18 | | |
| 19 | Credit for tax on prior transfers (from Schedule Q) | 19 | | |
| 20 | Total (add lines 17, 18, and 19) | 20 | |
| 21 | Net estate tax (subtract line 20 from line 16) | 21 | 186,917 |
| 22 | Generation-skipping transfer taxes (from Schedule R, Part 2, line 10) | 22 | |
| 23 | Section 4980A increased estate tax (from Schedule S, Part I, line 17) (see instructions) | 23 | |
| 24 | Total transfer taxes (add lines 21, 22, and 23) | 24 | 186,917 |
| 25 | Prior payments. Explain in an attached statement  Pd. w/extension 7/10/91 | 25 | 177,715 | |
| 26 | United States Treasury bonds redeemed in payment of estate tax | 26 | | |
| 27 | Total (add lines 25 and 26) | 27 | 177,715 |
| 28 | Balance due (or overpayment) (subtract line 27 from line 24) | 28 | 9,202 |

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer other than the executor is based on all information of which preparer has any knowledge.

Signature(s) of executor(s) _____  Date _____

Signature of preparer other than executor
**MARSHALL L. STEINMAN, C.P.A.**

**Platt, Barth, Elson & Steinman P.C.**
Address (and ZIP code)
**660 White Plains Road, Suite 450**
**White Plains, NY    10591**

Date _____

Form 706 (Rev. 10-88)

Estate of: THOMAS CARVEL

## SCHEDULE B—Stocks and Bonds

*(For jointly owned property that must be disclosed on Schedule E, see the Instructions for Schedule E.)*

| Item number | Description including face amount of bonds or number of shares and par value where needed for identification. Give CUSIP number if available. | Unit value | Alternate valuation date | Alternate value | Value at date of death |
|---|---|---|---|---|---|
| 1 | $600,000-Federal Home Loan Banks Consolidated Bonds 7.9293% Interest accrued on item 1, from Sept. 27, 1990, to Oct. 21, 1990, CUSIP No. 313388XT2 | 99.9687 | | | 599,812. 3,160. |
| 2. | $250,000-Albany New York, dated July 15, 1990, 6.9%, due Jan.15, 1994 Interest accrued on item 2, from July 15, 1990 to Oct. 21, 1990, CUSIP No. 01242BUY2 | 102.3775 | | | 255,943. 4,600. |
| 3. | $250,000-Austin Texas Utility Systems Rev., dated Oct. 1, 1985, 10.25%, due Nov. 15, 2012 Interest accrued on item 3, from May 15, 1990 to Oct. 21, 1990, CUSIP No. 052473ODO | 111.6877 | | | 279,219. 11,104. |
| 4. | $100,000-Babylon New York, dated July 1, 1990, 6.9%, due July 1, 1991 Interest accrued on item 4, from July 1, 1990 to Oct. 21, 1990, CUSIP No. 056201XR2 | 100.6432 | | | 100,643. 2,108. |
| 5. | $100,000-Dallas Texas Independent School District, dated Nov. 1, 1985, 7.0%, due Aug. 15, 1991 Interest accrued on item 5, from Aug. 15, 1990 to Oct. 21, 1990 CUSIP No. 2353072F1 | 100.8145 | | | 100,814. 1,283. |
| 6. | $100,000-Municipal Assistance Corp. New, dated April 1, 1985, 8.25%, due July 1, 1995 Interest accrued on item 6, from July 1, 1990 to Oct. 21, 1990 CUSIP No. 62619ONQ1 | 107.6177 | | | 107,617. 2,520. |
| 7. | $250,000-New York State Dorm Auth Revs., dated June 1, 1990, 6.5%, due July 1, 1995 Interest accrued on item 7, from July 1, 1990 to Oct. 21, 1990 CUSIP No. 6498302Y1 | 100.2281 | | | 250,570. 4,965. |
| 8. | $275,000-New York State Dorm Auth Revs., dated July 1, 1990, 6.1%, due Nov. 1, 1993 Interest accrued on item 8, from July 1, 1990 to Oct. 21, 1990 CUSIP No. 6498303N4 | 100.3122 | | | 275,858. 5,125. |
| | Total from continuation schedule(s) (or additional sheet(s)) attached to this schedule . . . | | | | 19,611,9T2 |
| | TOTAL. (Also enter on Part 5, Recapitulation, page 3, at item 2.) . . . . . . . . . | | | | 21,617,253 |

(If more space is needed, attach the continuation schedule from the end of this package or additional sheets of the same size.)

(The instructions to Schedule B are in the separate instructions.)

page 720.132 1/31/90

Schedule B—Page 10

Form 706 (Rev. 10-88)                    (Make copies of this schedule before completing it if you will need more than one schedule.)

Estate of:    THOMAS CARVEL

# CONTINUATION SCHEDULE

Continuation of Schedule _____ B _____
(Enter letter of schedule you are continuing.)

| Item number | Description For securities, give CUSIP number, if available. | Unit value (Sch B or E only) | Alternate valuation date | Alternate value | Value at date of death or amount deductible |
|---|---|---|---|---|---|
| 9. | $150,000-New York State Dorm Auth Revs., dated July 1, 1990, 6.2%, due May 1, 1994 Interest accrued on item 9, from July 1, 1990 to Oct. 21, 1990 CUSIP No. 6498303P9 | 100.5153 | | | 150,772. 2,841. |
| 10. | $100,000-New York State Dorm Auth Revs., dated Sept. 1, 1989, 6.25%, due Nov. 1, 1993 Interest accrued on item 10, from May 1, 1990 to Oct. 21, 1990 CUSIP No.649830H33 | 100.4205 | | | 100,420. 2,951. |
| 11. | $100,000-New York State Energy Resh & DVA, dated July 15, 1985, 5.4%, due July 15, 2015 Interest accrued on item 11, from July 15, 1990 to Oct. 21, 1990 CUSIP No. 649845BN6 | 99.8163 | | | 99,816. 1,440. |
| 12. | $100,000-New York State Med Care Facs Fin., dated Oct. 1, 1987, 6.75, due May 1, 1992 Interest accrued on item 12, from May 1, 1990 to Oct. 21, 1990 CUSIP No. 649882AJ6 | 101.0125 | | | 101,012. 3,187. |
| 13. | $175,000-New York State Med Care Facs Fin., dated Oct. 1, 1987, 6.75%, due Nov. 1, 1992 Interest accrued on item 13, from May 1, 1990 to Oct. 21, 1990 CUSIP No. 649882AK3 | 101.2395 | | | 177,169. 5,578. |
| 14. | $90,000-New York State Dev Corp Rev., dated August 15, 1985, 8.0%, due January 1, 1994 Interest accrued on item 14, from July 1, 1990 to Oct. 21, 1990 CUSIP No. 6500J3BH4 | 105.1176 | | | 94,605. 2,200. |
| 15. | $150,000-Puerto Rico Pub Bldgs Auth Rev., dated December 1, 1985, 8.87%, due July 1, 2012 Interest accrued on item 15, from July 1, 1990 to Oct. 21, 1990 CUSIP No. 74523SDX6 | 110.6025 | | | 165,903. 4,067. |

TOTAL. (Carry forward to main schedule.). . . . . . . . . . . . . . . . . . . . |  |  |  | 911,961

See instructions on next page.

page 720,156 1/31/89

Form 706 (Rev 10-88)

(Make copies of this schedule before completing it if you will need more than one schedule.)

Estate of:    THOMAS CARVEL

## CONTINUATION SCHEDULE

### Continuation of Schedule ___B___
(Enter letter of schedule you are continuing)

| Item number | Description<br>For securities, give CUSIP number, if available. | Unit value<br>(item 9 or 5 only) | Alternate valuation date | Alternate value | Value at date of death or amount deductible |
|---|---|---|---|---|---|
| 16. | $100,000–Suffolk County New York, dated Oct. 1, 71, 5.25%, due October 1, 1993<br>Interest accrued on item 16, from Oct. 1, 1990 to Oct. 21, 1990<br>CUSIP No. 864762RD3 | 97.3304 | | | 97,330.<br><br>291. |
| 17. | $100,000–Suffolk County New York, dated May 1, 1990, 8.25%, due October 1, 1994<br>Interest accrued on item 17, from Oct. 1, 1990 to Oct. 21, 1990<br>CUSIP No. 864764HS7 | 106.4748 | | | 106,474.<br><br>458. |
| 18. | Texas Public Building Autn Bldg Rev., dated September 1, 1985, 9.375%, due August 1, 2012<br>Interest accrued on item 18, from Aug. 1, 1990 to Oct. 21, 1990<br>CUSIP No. 882668AQ9 | 112.6877 | | | 281,719.<br><br>5,208. |
| 19. | Triborough Bridge and Tunnel Auth N., dated June 15, 1985, 8.875, due January 1, 2005<br>Interest accrued on item 19, from July 1, 1990 to Oct. 21, 1990<br>CUSIP No. 896029GC3 | 110.6025 | | | 110,602.<br><br>2,711. |
| 20. | $1,225,656.430 Dreyfus Tax Exempt Money Market Fund<br>CUSIP No. 999123011 | 1.0000 | | | 1,225,656. |
| 21. | $4,284.240 Dreyfus Tax Exempt Money Market Fund<br>CUSIP No. 999123029 | 1.0000 | | | 4,284. |

TOTAL. (Carry forward to main schedule.)  . . . . . . . . . . . . . . . . . . . . . . . . . | 1,834.733

See instructions on next page.

page 720.156 1/31/90

Form 706 (Rev. 10-88)                                    (Make copies of this schedule before completing it if you will need more than one schedule.)

Estate of:              THOMAS CARVEL

## CONTINUATION SCHEDULE

Continuation of Schedule _____ B _____

(Enter letter of schedule you are continuing.)

| Item number | Description<br>For securities, give CUSIP number, if available. | Unit value<br>(Sch B or G only) | Alternate valuation date | Alternate value | Value at date of death<br>or amount deductible |
|---|---|---|---|---|---|
| 22. | Chain Locations of America, Inc.<br>(100% wholly owned corporation)<br>Per financial statements – attached<br>All real estate owned by said corp.<br>has been valued at appraised values<br>as of the Date of Death. | | | | 7,703,599 |
| 23. | Andreas Holdings Corp.<br>(100% wholly owned corporation)<br>Per financial statements – attached<br>All real estate owned by said corp.<br>has been valued at appraised values<br>as of the Date of Death. | | | | 9,156,192 |
| 24. | 227 Shares of Common Stock of<br>`The Foothill Group Inc.`<br>@ $5.00 per share NASDQ | $5.00 | | | 1,135 |
| 25. | Ardsley Realty Corp.<br>(100% wholly owned corporation)<br>Per financial statement attached | | | | 4,292 |
| | TOTAL. (Carry forward to main schedule.) . . . . . . . . . . . . . . . . . . . . | | | | 16,865,218 |

See instructions on next page.

page 720.156  1/31/89

# EXHIBIT 22

SURROGATE'S COURT

COUNTY OF WESTCHESTER

---

|                                                                      |   |                       |
|----------------------------------------------------------------------|---|-----------------------|
| ACCOUNTING OF                                                        | : |                       |
| Agnes Carvel,                                                        | : | File No J285-1990     |
| Mildred Arcadipane,                                                  | : |                       |
| Pamela Carvel,                                                       | : |                       |
| Mary Ellen Cerrato and Anthony Carrato Jr.                          | : |                       |
| as Executors of Anthony J. Cerrato, deceased                        | : |                       |
| Robert M. Davis, Esq.                                               | : |                       |
| Betty Godley and                                                    | : |                       |
| Herbert F. Roth, Esq.                                               | : |                       |
| as Executors of the Estate of                                       | : |                       |
| Thomas Carvel,                                    Deceased.        | : |                       |

---

TO THE SURROGATE'S COURT OF THE COUNTY OF WESTCHESTER:

The undersigned do hereby render their account of proceedings as follows:

Period of account from October 21, 1990 to March 30, 1993, the date of death of Anthony J. Cerrato.

This is an intermediate account.

## PRINCIPAL

### Schedule A
Statement of Principal Received

### Schedule AA
Statement of Subsequent Receipts of Principal

### Schedule A-1
Statement of Increases on Sales, Liquidation or Distribution

### Schedule B
Statement of Decreases Due to Sales, Liquidation,
Collection, Distribution or Uncollectibility

### Schedule C
Statement of Funeral and Administration
Expenses Chargeable to Principal

### Schedule C-1
Statement of Unpaid Administration Expenses

### Schedule D
Statement of All Creditors' Claims

Schedule E
Statement of Distributions of Principal

Schedule F
Statement of New Investments, Exchanges and Stock Distributions

Schedule G
Statement of Principal Remaining on Hand


INCOME

Schedule A-2
Statement of All Income Collected

Schedule B-1
Statement Showing Decreases Resulting from Sales
or Other Disposition of Income Assets

Schedule C-2
Statement of Administration Expenses Chargeable to Income

Schedule E-1
Statement of Distributions of Income

Schedule F-1
Statement of New Investments, Exchanges and
Stock Distributions of Income Assets

Schedule G-1
Statement of Income on Hand


AS TO GENERAL ESTATE MATTERS

Schedule H
Statement of Interested Parties

Schedule I
Statement of Estate Taxes Paid and Allocation Thereof

Schedule J
Statement of Computation of Commissions

Schedule K
Statement of Other Pertinent Facts and of Cash Reconciliation

SUMMARY STATEMENT

PRINCIPAL  ACCOUNT

CHARGES:

| | | |
|---|---|---|
| Amount shown by Schedule A<br>(Principal received) | $    35,158,733.70 | |
| Amount shown by Schedule AA<br>(Subsequent receipts of principal) | 59,773.29 | |
| Amount shown by Schedule A-1<br>(Realized increases on principal) | 83,407.18 | |
| Total principal charges | | $    35,301,914.17 |

CREDITS:

| | | |
|---|---|---|
| Amount shown by Schedule B<br>(Realized decreases on principal) | $    19,114.75 | |
| Amount shown by Schedule C<br>(Funeral and administration expenses) | 2,460,084.36 | |
| Amount shown by Schedule D<br>(Creditors' claims actually paid) | 375,097.00 | |
| Amount shown by Schedule E<br>(Distributions of principal) | 945,000.00 | |
| Total principal credits | | 3,799,296.11 |
| Principal balance on hand shown by Schedule G | | $    31,502,618.06 |

Summary Statement
Page  1

SUMMARY STATEMENT (CONTINUED)

INCOME ACCOUNT

CHARGES:

| | | | | |
|---|---|---|---|---|
| Amount shown by Schedule A-2<br>(Income collected) | $ | 988,860.26 | | |
| Total income charges | | | $ | 988,860.26 |

CREDITS:

| | | | |
|---|---|---|---|
| Amount shown by Schedule C-2<br>(Administration expenses) | $ | 1,761,744.61 | |
| Amount shown by Schedule E-1<br>(Distributions of income) | | 0.00 | |
| Total income credits | | | 1,761,744.61 |
| Balance of undistributed income remaining on hand<br>as shown in Schedule G-1 | | $ | (772,884.35) |

Summary Statement
Page   2

SUMMARY STATEMENT (CONTINUED)

COMBINED ACCOUNTS

Principal remaining on hand                     $31,502,618.06
Income remaining on hand                        (    772,884.35)

     Total on hand                              $30,729,733.71

The foregoing principal balance of $31,502,618.06 consists of
$1,096,587.93 in cash and $30,406,030.13 in other property on hand
as of the 30th day of March, 1993. It is subject to deductions of
principal commissions amounting to $350,000, shown in Schedule J,
and to the proper charge to principal of expenses of this
accounting.

The foregoing income balance of ($772,884.35) consists of
($772,884.35) in cash and $0.00 in other property on hand as of the
30th day of March, 1993.

The attached schedules are part of this account.

                                                      _____
                                                      Mrs. Agnes Carvel

                                                      _____
                                                      Ms. Mildred Arcadipane

Ms. Pamela Carvel

Robert M. Davis, Esq.

Ms. Betty Godley

Herbert F. Roth, Esq.

Estate of Anthony J. Cerrato

By:_____
                                                   Executor

                                                   Executor
As Executors

SCHEDULE A

Statement of Principal Received

| Par Value | Bonds, Debentures, T-bills | | Inventory Value 10/21/90 |
|---|---|---|---|
| 250,000 | Albany New York<br>Face Value of $250,000<br>6.90%  Due 01-15-94 | $ | 255,943.75 |
| | Interest accrued to date of death | | 4,600.00 |
| 250,000 | Austin Texas Utility Systems<br>Face Value of $250,000<br>10.25%  Due 11-15-12 | | 279,219.25 |
| | Interest accrued to date of death | | 11,104.00 |
| 100,000 | Babylon New York<br>Face Value of $100,000<br>6.90%  Due 07-01-91 | | 100,643.20 |
| | Interest accrued to date of death | | 2,108.00 |
| 100,000 | Dallas Texas Independent<br>School District<br>Face Value of $100,000<br>7.00%  Due 08-15-91 | | 100,814.50 |
| | Interest accrued to date of death | | 1,283.00 |
| 600,000 | Federal Home Loan Banks<br>Face Value of $600,000<br>8.30% Due 09-27-93 | | 599,812.20 |
| | Interest accrued to date of death | | 3,160.00 |
| 100,000 | Municipal Assistance<br>Corporation<br>Face Value of $100,000<br>8.25%  Due 07-01-95 | | 107,617.70 |
| | Interest accrued to date of death | | 2,520.00 |
| 275,000 | New York State Dormitory<br>Authority<br>Face Value of $275,000<br>6.10%  Due 11-01-93 | | 275,858.55 |
| | Interest accrued to date of death | | 5,125.00 |

Schedule A
Page  1

SCHEDULE A (CONTINUED)

| Par Value | Bonds, Debentures, T-bills | Inventory Value 10/21/90 |
|---|---|---|
| 150,000 | New York State Dormitory Authority Face Value of $150,000 6.20%  Due 05-01-94 | $  150,772.95 |
| | Interest accrued to date of death | 2,841.00 |
| 100,000 | New York State Dormitory Authority Face Value of $100,000 6.25%  Due 11-01-93 | 100,420.50 |
| | Interest accrued to date of death | 2,951.00 |
| 250,000 | New York State Dormitory Authority Face Value of $250,000 6.50%  Due 07-01-95 | 250,570.25 |
| | Interest accrued to date of death | 4,965.00 |
| 100,000 | New York State Energy Face Value of $100,000 5.40%  Due 07-15-15 | 99,816.30 |
| | Interest accrued to date of death | 1,440.00 |
| 100,000 | New York State Medical Care Facilities Face Value of $100,000 6.75%  Due 05-01-92 | 101,012.50 |
| | Interest accrued to date of death | 3,187.00 |
| 175,000 | New York State Medical Care Facilities Face Value of $175,000 6.75%  Due 11-01-92 | 177,169.13 |
| | Interest accrued to date of death | 5,578.00 |
| 90,000 | New York State Urban Development Face Value of $90,000 8.00%  Due 01-01-94 | 94,605.84 |
| | Interest accrued to date of death | 2,200.00 |

Schedule A
Page  2

SCHEDULE A (CONTINUED)

| Par Value | Bonds, Debentures, T-bills | Inventory Value 10/21/90 |
|---|---|---|
| 150,000 | Puerto Rico Public Building Authority Face Value of $150,000 8.875% Due 07-01-12 | $ 165,903.75 |
| | Interest accrued to date of death | 4,067.00 |
| 100,000 | Suffolk County New York Face Value of $100,000 5.25% Due 10-01-93 | 97,330.40 |
| | Interest accrued to date of death | 291.00 |
| 100,000 | Suffolk County New York Face Value of $100,000 8.25% Due 04-01-94 | 106,474.80 |
| | Interest accrued to date of death | 458.00 |
| 250,000 | Texas Public Building Authority Face Value of $250,000 9.375% Due 08-01-12 | 281,719.25 |
| | Interest accrued to date of death | 5,208.00 |
| 100,000 | Triborough Bridge & Tunnel Authority Face Value of $100,000 8.875% Due 01-01-05 | 110,602.50 |
| | Interest accrued to date of death | 2,711.00 |

| No. of Shares | Stocks | |
|---|---|---|
| 227 | The Foothill Group Inc., common stock | 1,135.00 |

Cash

|  | | |
|---|---|---|
| | Hudson Valley National Bank 35 East Grassy Sprain Road Yonkers, New York 10710 Checking Acct #0132299046 | 6,200,656.00 |

Schedule A
Page  3

SCHEDULE A (CONTINUED)

| | Inventory<br>Value<br>10/21/90 |
|---|---|
| Savings Account / Money Market | |
| Dreyfus Tax Exempt Money<br>Market Fund Bank of New York<br>Account #55107 | $   1,229,940.67 |
| Tangible Personal Property | |
| Personal Articles | 25,000.00 |
| Miscellaneous | |
| 1990 Federal Income Tax refund<br>- per form 1040 | 205,664.00 |
| 1990 New York State Income Tax<br>refund per form IT-201 | 48,934.00 |
| Distribution receivable from<br>Thomas Carvel Charitable<br>Remainder Unitrust of March 1,<br>1989 | 205,619.54 |
| Estimated amount due decedent<br>from Carvel Tax Escrow Fund<br>and Carvel Environmental<br>Escrow Fund created by a<br>certain agreement dated<br>11/21/89 ($2,000,000 x<br>43.22%)(RE: Sale of Carvel<br>Corporation shares)  See<br>Schedule K for additional<br>information. | 864,400.00 |
| Refund of Real Estate Taxes<br>from the City of Yonkers, for<br>the Carvel Inn, for the year<br>1987/88 | 42,678.18 |
| Refund of Real Estate Taxes<br>from the City of Yonkers, for<br>the Carvel Inn, for the year<br>1988/89 | 44,743.98 |
| Refund of Real Estate Taxes<br>from the City of Yonkers, for<br>the Carvel Inn, for the year<br>1989/90 | 49,917.45 |

Schedule A
Page   4

SCHEDULE A (CONTINUED)

| | Inventory Value 10/21/90 |
|---|---|
| **Miscellaneous** | |
| Refund of Real Estate Taxes from Westchester County, for the Carvel Inn, for the year 1988 | $    13,764.49 |
| Refund of Real Estate Taxes from Westchester County, for the Carvel Inn, for the year 1989 | 14,222.72 |
| Refund of Real Estate Taxes from Westchester County, for the Carvel Inn, for the year 1990 | 15,870.35 |
| **Real Estate** | |
| 76 - Unit Motel Facility (Carvel Inn):    165 Tuckahoe Road, Yonkers,   N.Y., Section J, Block 3151,  Lots 40 & 100 | 3,000,000.00 |
| Farm (Hedge Farms), Comprised of several buildings and approximately 822.10 acres on Route 199, Town of Milan, Grid 12-6672-00-583233 and Town of Pine Plains, part of Grid 12-6672-00-92-321 Dutchess County, New York. | 2,350,000.00 |
| Warehouse (vacant), located on Route 199, Town of Pine Plains, part of Grid 12-6672-00-920321, Dutchess County, New York, on 4.6 acres. | 400,000.00 |
| **Notes** | |
| See Schedule K for discussion of possible claim against Hudson Valley National Bank with respect to United States Treasury obligations. | 0.00 |

Schedule A
Page  5

SCHEDULE A (CONTINUED)

|  | Notes | | Inventory Value 10/21/90 |
|---|---|---|---|
|  | See Schedule K for discussion of other possible claims by the Estate. | $ | 0.00 |

| No. of Units | Partnerships | Inventory Value |
|---|---|---|
| 28.6140 | Fli Energy Four Associates<br>2 Jericho Plaza<br>Jericho, New York 11753<br>28.614% Limited Partnership Interest | 20,000.00 |
| 15.8340 | Fli Energy Three Associates<br>2 Jericho Plaza<br>Jericho, New York 11753<br>15.834% Limited Partnership Interest | 10,000.00 |
| 47.5000 | Fli Energy Two Associates<br>2 Jericho Plaza<br>Jericho, New York 11753<br>47.5% Limited Partnership Interest | 30,000.00 |

| No. of Shares | Closely Held Corporations | Inventory Value |
|---|---|---|
|  | Andreas Holdings Corporation<br>(100% wholly owned corporation) | 9,156,192.00 |
| * | Ardsley Realty Corporation<br>(100% wholly owned corporation) | 4,292.00 |
| * | Chain Locations of America, Inc. (100% wholly owned corporation) | 7,703,599.00 |
|  | Total Schedule A | $ 35,158,733.70 |

* Agnes Carvel, spouse of the decedent, has asserted
  a claim to 50% of these Corporations.  See Schedules
  D and K for further information.

Schedule A
Page  6

# EXHIBIT 23

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

AGNES CARVEL and PAMELA  :
CARVEL,         :
            :
    Plaintiffs,   :
            :
  v.          :  Civil Action No. 14520
            :
ANDREAS HOLDINGS CORP., a  :
Delaware corporation and   :
BETTY GODLEY,      :
            :
    Defendants.   :

## AFFIDAVIT OF LAWRENCE F. FAY

STATE OF NEW YORK  )
         ) SS:
COUNTY OF WESTCHESTER)

    Lawrence F. Fay, being duly sworn, deposes and says:

    1.  I am a member of the Bar of the State of New York and a partner at the law firm of Kent Hazzard Jaeger Greer Wilson & Fay, which has served as counsel to Robert M. Davis, one of the executors under the Last Will and Testament of Thomas Carvel since 1990. I am familiar with the facts stated herein.

### The Estate Of Thomas Carvel

    2.  Thomas Carvel was the founder of Carvel Corporation and Chain Locations, Inc. ("Chain Locations"). Initially, all the stock in these companies was held jointly by Thomas Carvel and Plaintiff Agnes Carvel, his wife. In February of 1988, Thomas Carvel and Agnes Carvel revised their estate plan. Pursuant to the revised plan, (i) Thomas and Agnes Carvel agreed to transfer all of their jointly held stock to Thomas Carvel individually and executed and delivered to Carvel Corporation and Chain Locations stock powers for such transfers, (ii) Thomas and Agnes executed

reciprocal complementary wills, providing that the surviving spouse will leave his or her estate to the Thomas and Agnes Carvel Foundation and (iii) Thomas and Agnes executed a reciprocal agreement that the survivor would not change his or her will or make gratuitous transfers of assets. Pursuant to the revised estate plan, the Carvels' main asset, the stock of Carvel Corporation, was transferred of record from joint name into the sole name of Thomas Carvel.

3.   Andreas Holdings Corp. ("Andreas") is the successor to a corporation named CCCC Holdings Corp. formed by Mr. Carvel in 1989.  In 1989, Thomas Carvel sold to a third party all of his outstanding stock of Carvel Corporation. At the time of the sale, Mr. Carvel owned that stock individually, and he, individually, sold the stock and received cash proceeds.

4.   In addition to owning ice cream stores, Carvel Corporation had a subsidiary called All-American Sport City, Inc. ("All-American") that owned certain real estate in Dutchess County, New York. As part of and contemporaneously with the sale of the stock of Carvel Corporation, Mr. Carvel personally purchased the stock of All-American and certain other properties for approximately $11 million. In October of 1989, Mr. Carvel formed a new Delaware corporation named CCCC Holdings Corp. ("CCCC") primarily to hold the stock of All-American. After Mr. Carvel sold the stock of Carvel Corporation and repurchased the stock of All-American, he contributed the stock of All-American to CCCC. Later in 1989, CCCC merged with All-American and certain other corporations. Pursuant to that merger, CCCC changed its name to

-2-

Andreas Holdings Corp., the defendant in this action. While
Plaintiffs contend that the CCCC and Andreas stock was held by
Thomas and Agnes Carvel jointly, the evidence is to the contrary;
the CCCC resolution authorizing the issuance of shares, dated
November 21, 1989, specifically directs the officers of CCCC to
issue shares to Thomas Carvel. A true and correct copy of that
resolution is attached hereto as Exhibit A. Moreover, as part of
a reorganization in 1992, the total authorized shares of Andreas
were reduced from 1,000,000 to 2,500. The consent effectuating
that amendment, which was signed by both Agnes and Pamela Carvel in
their capacity as executors of the Estate and directors of Andreas,
verifies that Thomas Carvel was the "sole stockholder" of Andreas.
A true and correct copy of the consent is attached hereto as
Exhibit B.

        5.    In or about October 1990, Thomas Carvel died and the
co-executors of the Estate, including Plaintiffs Agnes Carvel and
Pamela Carvel, began the administration of the Estate under the
laws of New York and the supervision of the New York Court. From
the time of Mr. Carvel's death in 1990 until April of 1994, all of
the co-executors of the Estate -- including Agnes and Pamela --
confirmed the stock of Chain Locations and Andreas belonged to the
Estate. The executors -- including Agnes and Pamela -- filed
numerous corporate and tax documents which so stated.

**Agnes And Pamela Transfer Funds Of Chain Locations To Offshore Accounts In Their Own Names**

6.   Prior to May of 1995, Agnes and Pamela Carvel served as officers and directors of both Andreas and Chain Locations.  The only other director of these companies was Betty Godley, an co-executor of the Estate and a defendant herein.

7.   In April of 1994, the co-executors of the Estate (other than Agnes and Pamela) (hereinafter, the "Co-Executors") filed accountings with the New York Court showing that the Estate owned all of the stock of Chain Locations and Andreas.  Pamela and Agnes filed formal exceptions to these accounts, taking the position, for the first time, that Agnes owned 50% of the stock of Chain Locations.  In January of 1995, Agnes and Pamela amended this claim to allege that Agnes owned 93.5% of the stock of Chain Locations.

8.   Notwithstanding that the stock ownership of Chain Locations was submitted to the New York Court for adjudication, Pamela and Agnes Carvel thereafter took numerous surreptitious steps to transfer over $2 million of Chain Locations' funds to an offshore bank account opened in the joint name of Agnes and Pamela Carvel.  These acts are detailed in the Verified Petition filed with the New York Court on September 15, 1995, a true and correct copy of which is attached hereto as Exhibit C (the "Petition").  Briefly, the Petition avers that in November of 1994, the then-directors of Chain Locations passed a resolution in November of 1994 the effect of which was to declare Agnes Carvel the owner of

-4-

93.5% of the shares of Chain Locations.[1] Later in November, Pamela requested that the Co-Executors of the Estate approve the transfer of over $900,000 from Chain to Agnes, based on a claim that the sum represented principal and interest on a "loan" from Agnes to Chain Locations.    When   the   Co-Executors   refused   to   authorize   this payment, Pamela -- even though she was still an executor with fiduciary duties to the Estate -- used her position as an officer and director of Chain Locations to cause Chain to pay this sum to Agnes.    (Petition ¶¶ 5-21).

     9.    In January and February of 1995, without even consulting her fellow executors, Pamela again used her position as an officer and director of Chain Locations to cause Chain to make payments to Agnes, this time totalling over $1,000,000.    These payments were premised on the assignment to Chain of purported "claims" that Agnes had against Andreas.    Pamela and Agnes thereafter caused all of the funds paid by Chain to Agnes -- totalling over $2 million -- to be transferred to an account opened at Swiss Bank Corp. in London, England jointly in the name of Agnes and Pamela Carvel.    (Petition ¶¶ 22-27).

     10.    On February 7, 1995, Pamela acting in her capacity as Vice President and Assistant Treasurer of Andreas, purported to consent to a confession of judgment by Andreas in favor of Chain Locations, in the amount of $4,129,882.51.    Pamela then caused the filing in Dutchess County, New York of five Forms UCC-1 encumbering

---

[1]    Betty Godley signed the resolution only because she thought that the resolution would place the ownership issue before the New York Court.  She did not believe that the resolution would significantly impact administration of the Estate.

-5-

the real property of the Estate, Andreas and Chain Locations. In each case, the secured party was Agnes Carvel, and in each case the alleged assignee of the security interest was a corporation known as "Realties" whose business address is believed to be the residence address of Pamela Carvel. (Petition ¶¶ 31-34, Ex. A).

### Agnes Resigns As Executor, And The New York Court Takes Action Against Pamela.

11. When the Co-Executors learned of Agnes' and Pamela's theft of property of the Estate, they called a meeting of stockholders of Andreas and on May 2, 1995, voted as the sole shareholder of Andreas to remove Agnes and Pamela as directors of Andreas. On June 12, 1995, the New York Court issued a ruling, confirmed by a formal Order entered on July 5, 1995, (i) accepting Agnes' resignation as an executor of the Estate, (ii) suspending Pamela's powers to act as an executor of the Estate, (iii) suspending Agnes' and Pamela's "powers to act as officers, directors or signatories of Chain Locations and Andreas Holdings Corporation" and (iv) requiring Pamela to turn over to Betty Godley (who remained as the only acting director and officer of Andreas and Chain Locations) "all books, records, checks and like documents and materials in her possession, custody or control relating to such corporations." A true and correct copy of the July 5 Order is attached hereto as Exhibit D.

### The Status Of The New York Action

12. As noted previously, on September 15, 1995, the Co-Executors of the Estate filed the Petition, which seeks, _inter alia_, to declare that Pamela and Agnes have breached fiduciary

-6-

duties to the Estate, to revoke the letters testamentary of Pamela, to vacate the confession of judgment and Forms UCC-1 filed by Pamela, and to restrain Pamela and Agnes from further prosecuting the present Delaware lawsuit. The Co-Executors expect the New York Court to entertain and promptly decide a motion seeking to restrain plaintiffs from further prosecuting this action. The Co-Executors expect to bring this motion on within the next two weeks, and expect that the New York Court will promptly decide their motion to restrain Plaintiffs from further prosecuting this action.

13. Moreover, the New York Court has set a schedule for completion of discovery on the Co-Executors' Petition to Remove Pamela as an Executor and has put this matter on its calendar for February 8, 1996. A true and correct copy of the Court's Scheduling Order is attached hereto as Exhibit E. That Petition necessarily will involve the very question that is central to the case before this Court -- whether Agnes or the Estate owns all of the stock of Andreas. If Agnes does own all of that stock, as Plaintiffs assert herein, then Pamela did not harm the Estate when she consented to the confession of a judgment of over $4,000,000 against Andreas. Thus, the very issue that Plaintiffs seek to have this Court adjudicate is already before the New York Court, in a prior-pending action, with a full discovery and hearing schedule in place.

_____
Lawrence F. Fay

SWORN TO AND SUBSCRIBED
BEFORE ME this _____ day
of September, 1995.

_____
Notary Public

-7-

duties to the Estate, to revoke the letters testamentary of Pamela, to vacate the confession of judgment and Forms UCC-1 filed by Pamela, and to restrain Pamela and Agnes from further prosecuting the present Delaware lawsuit. The Co-Executors expect the New York Court to entertain and promptly decide a motion seeking to restrain plaintiffs from further prosecuting this action. The Co-Executors expect to bring this motion on within the next two weeks, and expect that the New York Court will promptly decide their motion to restrain Plaintiffs from further prosecuting this action.

13. Moreover, the New York Court has set a schedule for completion of discovery on the Co-Executors' Petition to Remove Pamela as an Executor and has put this matter on its calendar for February 8, 1996. A true and correct copy of the Court's Scheduling Order is attached hereto as Exhibit X. That Petition necessarily will involve the very question that is central to the case before this Court -- whether Agnes or the Estate owns all of the stock of Andreas. If Agnes does own all of that stock, as Plaintiffs assert herein, then Pamela did not harm the Estate when she consented to the confession of a judgment of over $4,000,000 against Andreas. Thus, the very issue that Plaintiffs seek to have this Court adjudicate is already before the New York Court, in a prior-pending action, with a full discovery and hearing schedule in place.

Lawrence F. Fay

SWORN TO AND SUBSCRIBED
BEFORE ME this 22ⁿᵈ day
of September, 1995.

Notary Public

REGINA M. POCKL
Notary Public, State of New York
No 01 PR 3139225
Qualified in West Chester County
Commission Expires November 4, 19__