## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### Case No. 07–CV- 00273-***

_____
                                                        )
Pamela Carvel, as Citizen,                              )   **AMENDED**
as Delaware Ancillary Administrator                     )   **COMPLAINT**
        for Agnes Carvel Estate,                        )
as Member for Thomas and Agnes Carvel Foundation        )
        Plaintiffs                                      )
        v.                                              )   **DEMAND FOR**
William Griffin                                         )   **JURY TRIAL**
Marie Abplanalp                                         )
Salvatore Molella                                       )
Robert Davis                                            )
        and                                             )
John/Jane Doe 1-20                                      )
Doe Corp. 1-20                                          )
        Defendants                                      )
_____ ___)

### COMPLAINT FOR CONTINUING CONSPIRACY TO VIOLATE
### CONSTITUTIONAL RIGHTS & COMMIT FRAUDS
### AND
### DEMAND FOR JURY TRIAL

# APPENDIX   2 (con't)

Pamela Carvel, appearing *pro se*
PLAINTIFF
28 Old Brompton Road, Suite 158
London SW7 3SS England

US tel/fax  1 954 524 1909

```
------------------------------------------------------x
```

THE THOMAS AND AGNES CARVEL FOUNDATION
ANNUAL MEETING OF MEMBERS

At the offices of Kent, Hazzard, Jaeger, Wilson,
Fay and Conroy
50 Main Street
Suite 760
White Plains, New York 10606

Thursday, March 21, 2002
10:30 A.M.

```
------------------------------------------------------x
```

PRESENT:          WILLIAM GRIFFIN
                  ANN McHUGH
                  SALVATORE MOLELLA
                  ROBERT ABPLANALP
                  PAMELA CARVEL
                  KATHERINE CONROY
                  GOV. BRENDAN BYRNE
                  STEVEN FINK, ESQ.
                  ROBERT M. REDIS, ESQ.

SULLIVAN REPORTING
200 Mamaroneck Avenue
White Plains, New York
(914) 949-4545

2

1

2

3              MR. GRIFFIN:  I would start the meeting,

4      if I could.  Couple of things, we sure miss Larry Fay

5      and sure miss Dave Jewell.  Doesn't seem like the same

6      without them, tell you the truth.  And Governor Byrne

7      is stuck on the bridge right now.  He just called said

8      he's on the Malcolm Wilson Bridge.

9              MS. CONROY:  Today it's the Tappan Zee

10     Bridge.

11             MR. GRIFFIN:  He said he will be here in

12     20 minutes.

13             Also there is a mistake on the agenda.  The

14     action to elect six directors, it's five not six.

15             First, if everything is all right I will act

16     as Chairman and have Karen act as Secretary of the

17     meeting.

18             I have submitted the affidavit of mailing.

19     Mailing and notice of the meeting.  Karen, you have it,

20     right?  Submission of proxies, if any.  Anybody have a

21     proxy?

22             Governor Byrne is on his way we just have to

23     wait for him.

24             Approval of minutes of March 13, 2001.  I

25     think they were submitted to everyone.  Let me just

**A-70**

3

```
1       pass them around if it's all right with you to sign
2       them.
3                   MS. McHUGH:  I make a motion to accept
4       the minutes.
5                   MR. GRIFFIN:  Second?
6                   MS. CONROY:  Second.
7                   MR. GRIFFIN:  All in favor?
8                   MS. CARVEL:  Can I make a comment?
9                   MR. GRIFFIN:  Sure.
10                  MS. CARVEL:  There are two points I
11      wanted to clarify.  The minutes say that foundation
12      members have no fiduciary responsibility to the
13      charity.  Is that what you still assert?
14                  MR. FINK:  The members do not owe
15      fiduciary duties to the foundation.
16                  MS. CARVEL:  Mr. Fink, are you here
17      representing the members?
18                  MR. FINK:  I'm here as counsel to the
19      foundation.
20                  MS. CARVEL:  Who hired you?
21                  MR. FINK:  The foundation retained my
22      firm.
23                  MS. CARVEL:  The foundation is the
24      members.  Did the members retain you?
25                  MR. FINK:  Miss Carvel, the foundation
```

4

1    acts through actions of its Board of Directors and the
2    foundation retained my firm.
3              MS. CARVEL:  So then you're retained by
4    an act of the directors and paid by an act of the
5    directors?
6              MR. FINK:  My firm's retention is by the
7    foundation through actions of the directors.
8              MS. CARVEL:  Well, this is a meeting of
9    the members not a meeting of the directors.  And I
10   would assert for you to advise the members is a
11   conflict of interest because if the directors have some
12   sort of a conflict you have a conflict because you are
13   here at the request of the directors.
14        This is not a director's meeting.
15             MR. FINK:  I appreciate your position and
16   I have provided information to you in an effort to be
17   helpful in that context at this point.
18             MS. CARVEL:  I just want to have it on
19   the record that I believe Mr. Fink is not here in any
20   legal capacity representing the members because you
21   have asserted that I have no attorney-client
22   relationship with you because I'm a member.
23             MR. FINK:  And I most certainly do not
24   purport to represent you as a member or anyone else
25   here as a member.

5

```
 1                    MS. CARVEL:  Since this is a members'
 2          meeting I would suggest that your comments are not part
 3          of the meeting.
 4                    MR. FINK:  You're certainly welcome.
 5                    MS. CARVEL:  So I'm asking the people who
 6          purport to be members that are sitting here, do they
 7          assert that the members have no fiduciary
 8          responsibility to the charity or its purpose?
 9                    MR. GRIFFIN:  We have relied on in the
10          past the representation of their firm, Dave Jewell last
11          year.
12                    MS. CARVEL:  So you have relied on it as
13          a director?
14                    MR. GRIFFIN:  Relying on it as well --
15                    MS. CARVEL:  As a member but as a member
16          you have made no separate --
17                    MR. GRIFFIN:  This came up last year and
18          I'm almost positive it was Dave Jewell's position on
19          this.
20                    MS. CARVEL:  I'm bringing it up again
21          because I assert that the members here have not
22          retained counsel to advise them individually or as
23          alleged group.
24                    The other issue was that the minutes
25          represent that the foundation directors who are
```

**A-73**

6

```
 1        operating the foundation or the managers who are

 2        operating the foundation have no intention of taking

 3        any action with regards on the fiduciary actions in the

 4        estate of Thomas Carvel until the end of the final

 5        accounting.

 6              I would like to know, have you, as members,

 7        authorized actions to be taken in the estate of Thomas

 8        Carvel?

 9              MR. FINK:  Again, the comment I would

10        make is that the actions that the foundation has taken

11        through its counsel in the estate litigation have been

12        actions authorized by the foundation acting through its

13        board.

14              MS. CARVEL:  Just for the record, I would

15        note that all of the people who purport to be members

16        of the foundation also elect themselves directors and

17        officers of the foundation, with me being the only

18        exception, and I assert I'm the only legitimate member

19        at this meeting and that this is not a properly

20        constituted or properly noticed or properly called

21        meeting.

22              The Directors have indeed either authorized,

23        or through counsel have acted without authorization to

24        take steps to interfere or to intercede in the estate

25        of Thomas Carvel.  So I would state on those, on that
```

**A-74**

7

1 basis the minutes are accurate but misleading as to

2 what the conduct of the members and the members

3 electing themselves as directors is.

4     MR. GRIFFIN:  So noted.  You can provide

5 me with a copy of the transcript.

6     MS. CARVEL:  I will provide you with it.

7     MR. GRIFFIN: The approval of the minutes

8 we approved.  You're abstaining from that?

9     MS. CONROY:  It's being circulated.  I'm

10 just announcing that the availability of the member's

11 minute book for inspection by any member is here.  This

12 is it.  I think you have copies of it.

13     MS. REDIS:  I have the minutes of last

14 week.

15     MS. CARVEL:  Can I note for the record

16 that the book only begins March 13th, 2001 and the book

17 ends as I see it goes backwards.  It ends at March 13,

18 2001 and it begins March 15, 1991.

19    Can I ask where the rest of the minutes are?

20     MR. GRIFFIN:  Are there any other

21 minutes?

22     MS. SPRINGFIELD:  No, there are not.  I

23 don't have any.

24     MR. GRIFFIN:  I don't know.

25     MS. CARVEL:  The corporation began in

8

```
 1          1976.  Where are the rest of the minutes?
 2                    MR. GRIFFIN:  Don't know.
 3                    MS. CARVEL:  Who has been in charge of
 4          the minutes for the last 10 years, 12 years since 1990?
 5                    MS. McHUGH: Mildred, who was buried last
 6          year.
 7                    MS. CARVEL:  We happen to know that the
 8          minutes were in Malcolm Wilson's office in 1991.  Where
 9          are the rest of the minutes?
10                    MR. GRIFFIN:  Don't know.
11                    MS. CONROY:  When you say you happen to
12          know that the minutes were in this office --
13                    MS. CARVEL:  Yes.
14                    MS. CONROY:  They may well have been.
15          There may well have been minutes in this office.  I
16          have no confidence that minutes which may or may not be
17          missing were in this office at that time.  I just don't
18          know.
19                    MR. GRIFFIN:  I will take on the
20          responsibility of seeing if I can find any additional
21          minutes for you.
22                    MS. CARVEL:  Well, this is --
23                    MR. GRIFFIN:  And give you a report.
24                    MS. CARVEL:  I think this is a serious
25          problem because the minutes, and I have questioned the
```

**A-76**

```
 1     minutes prior to 1991.  I have specifically questioned
 2     Mr. Davis' sworn testimony in court that there was a
 3     members' meeting removing all the directors that were
 4     elected in January of 1990.  And now suddenly those
 5     minutes are missing.  They have been here before.  And
 6     the directors are charged, the directors who seek to be
 7     reelected are charged with safeguarding the records of
 8     the corporation.  And yet they are suddenly missing and
 9     nobody knows where they are.
10          MS. CONROY:  That I'm unaware of, Pam.
11     I'm not aware that there are minutes that were there
12     that are no longer there.  I'm not aware of that.  Mr.
13     Griffin has said that he will --
14          MR. GRIFFIN:  I don't know what the
15     answer is.
16          MS. CARVEL:  These were the minutes that
17     were produced by Malcolm Wilson's office in March of
18     1991.  They are substantial and they were here when I
19     reviewed the records in 1999 perhaps, perhaps also in
20     2000.
21          MS. CONROY:  And how far back does that
22     copy of the minutes that you have go back?
23          MS. CARVEL:  They go back to 1976 when
24     the corporation was commenced.  And they have
25     significant difficulties --
```

10

1                    MS. CONROY:  When you say, corporation,

2          you mean foundation.

3                    MS. CARVEL:  It's a corporation.

4                    MS. REDIS:  It's a not-for-profit.

5                    MS. CARVEL:  It was commenced in December

6          of 1976, the minutes go back to then.  They were

7          presented by Malcolm Wilson as general counsel to the

8          foundation in March of 1991.  They were copied.

9              And another copy was given to me, I believe in

10         the Year 2000 when I reviewed the minutes again.  And

11         now suddenly they are missing?

12                   MR. GRIFFIN:  If they are they are not

13         suppose to be.

14                   MS. CARVEL:  Mildred hasn't been a member

15         of this foundation since when?  She hasn't been

16         secretary officer since when?

17                   MR. GRIFFIN:  What I will do is take a

18         look at the situation for you.  If you can give me

19         copies of what you have got.

20                   MS. CARVEL:  No, I will reserve those.

21                   MR. GRIFFIN:  Okay.  I will see what I

22         can find out for you.

23                   MS. CARVEL:  You as the officers and

24         directors who are taking salary from restricted funds

25         have the responsibility for that.

**A-78**

1          Now, I'd like to ask, are the financial

2     statements as required attached to these minutes?  I

3     don't see them.  It's required that every year the

4     directors provide a report to the members and that that

5     report be attached to the minutes.  It's not here.

6     Where are they?

7               MR. GRIFFIN:  Are you looking for the

8     financial statements?

9               MS. CARVEL:  I'm looking for the required

10    documents, by law that have to be attached to the

11    members minutes.

12               MR. GRIFFIN:  I don't know.  If they are

13    suppose to be attached they will be attached and we

14    will send you a copy.

15               MS. CONROY:  I see that as administerial

16    if indeed they should be attached then they certainly

17    will be attached.

18               MS. CARVEL:  I would see it as

19    administerial also if I was provided with copies when I

20    requested them.  But every time, as a member, I request

21    the document I'm entitled to review as a member I have

22    been denied and stonewalled and I find that to be

23    offensive.

24               And when you're not following the prescribed

25    law and you quoted back to me as the reasons for not

1       providing me with information I find something

2       seriously wrong.  And there are directors that are

3       being asked to be reelected by the purported members

4       here.  If those directors are not behaving properly

5       then they do not qualify as people who should be

6       reelected as directors.

7                 MR. FINK:  In connection with your

8       suggestion that the foundation has refused to provide

9       you with financial statements, you have requested

10      financial statements for 1999, 2000 and 2001.  We have

11      advised your counsel that we will provide you with the

12      1999/2000 statements and the 2001 statement will be

13      finalized.

14                MS. CARVEL:  Mr. Fink, I shouldn't have

15      to write to you being a member of the foundation and

16      remind you that you are supposed to provide me with

17      minutes of the meeting and the finalized financial

18      statements and the finalized tax returns.  You do not

19      provide me with the minutes until one week before the

20      next meeting.  You do not provide me with finalized

21      financial statements and you do not provide me with the

22      finalized tax returns.  Those things I shouldn't have

23      to ask for.  And I shouldn't have to go back three

24      years to get them.

25                MS. FINK:  Miss Carvel, those are matters

13

```
1        which you're entitled to request an inspection in which
2        the foundation to the extent they are properly
3        available is made available to you.  I have indicated
4        we will do so.
5                    MS. CARVEL:  I just want to put on the
6        record that I have not had these records available for
7        several years.  And I have not had them available prior
8        to this meeting.
9                    MR. FINK:  And we're not aware of
10       instances where you have requested those documents.
11                   MS. CARVEL:  I have requested them at
12       every meeting.   I have sent letters to Mr. Griffin
13       requesting them.
14                   MR. GRIFFIN:  They set them on for today.
15                   MS. CARVEL:  And I have got nothing in
16       return.
17                   MR. GRIFFIN:  Anything else?  Report of
18       the D'Arcangelo and Company 2001 financial audit, tax
19       return.
20                   MR. D'ARCANGELO:  For the record, I'm Jim
21       D'Arcangelo, Tony Pennella is with me today.  He will
22       be handing out copies of the draft audits report for
23       the Year 2001.
24                   MR. GRIFFIN:  These are the draft?
25                   MR. PENNELLA:  These are the drafts.
```

**A-81**

ORIGINAL

. . . . . . . . . . . . . . . . . . . . . . . . . X

Annual Members Meeting of the:

Thomas and Agnes Carvel Foundation

. . . . . . . . . . . . . . . . . . . . . . . . . X

                        111 Church Street
                        White Plains, New York  10601
                        March 31, 2004   10:00 a.m.


APPEARANCES:


            Katharine Wilson Conroy, Esquire

            Steven J. Fink, Esquire

            Salvador Molella, Member

            Ann M. McHugh, Member

            William R. Griffin, Member

            Brendan Byrne, Member

            Pamela Carvel, Member

            Karen Springfield

            Anthony Pennella, Accountant




        J & L REPORTING SERVICE
          of Westchester, Inc.
          200 East Post Road
    White Plains, New York 10601
            (914) 682-1888
    Joseph S. Jacoby, Reporter

2

1

2          MR. GRIFFIN:  Start the meeting.

3     I'll act as chairman.  Mrs. Springfield

4     will act as secretary of the meeting,

5     submission of secretary of mailing of

6     notice of meeting, we have the

7     certificate here.  Give you the mailing.

8     Submission of proxies.  If no one has any

9     proxies, everyone is here.  Now it's

10    availability of members might be book by

11    inspection for any member.  The minute

12    books are here.

13         MS. SPRINGFIELD:  They're not here.

14         MR. GRIFFIN:  I thought they were.

15    You have to bring it here.

16         MS. CARVEL:  The ones last year

17    were missing half of the records.  Have

18    you found them?

19         MS. SPRINGFIELD:  No, it's still

20    the same.

21         MS. CARVEL:  You're still missing

22    half the records?  You have to have them

23    here.

24

25

28

1

2      MR. GRIFFIN:  We're not accepting

3      this 2003 audited statement at this

4      point.

5      MR. BYRNE:  We might consider an

6      audit committee at this point.  I'm not

7      making a motion now, but might consider

8      it.

9      MR. GRIFFIN:  Submission of

10     certificate of members entitled to vote

11     signed the certificate that says the

12     members entitled to vote for directors at

13     this meeting.

14     MS. CARVEL:  Griffin, McHugh and

15     Salvador Molella.  I'm sorry to say we're

16     missing one guy died in August 30.

17     MS. CARVEL:  I didn't know.  --

18     Robert H. Abplanalp.

19     MR. GRIFFIN:  Last couple of years

20     we lost three great guys.  Larry, his

21     partner Dave and now Bob.  That's the

22     certificate.

23     MS. CARVEL:  Can I ask you again

24     how you have the record for the members?

25     MR. GRIFFIN:  I'm sorry?

29

1

2          MS. CARVEL:  The records for who

3     are the members, there's nothing here.

4          MR. GRIFFIN:  I have go through

5     those records.  I'm going to send them

6     up.

7          MS. CARVEL:  Those are the minutes

8     we were talking about.  What are the

9     records of the members?  How do you hold

10    the records of members?  What is the

11    authorization of membership?

12         MR. GRIFFIN:  I'm not understanding

13    the question.

14         MS. CONROY:  You're asking how is

15    it that Bill Griffin knows who the

16    members are that are entitled to vote at

17    the meeting?

18         MS. CARVEL:  What documents does he

19    refer to?

20         MS. CONROY:  That is, I assume, in

21    the history of the foundation contained

22    in the minute books.

23         MR. GRIFFIN:  These are the members

24    who were certified last year and the year

25    before.

30

1
2          MS. CONROY:  Who were duly elected

3      at the various times members have been

4      elected.

5          MR. GRIFFIN:  Right.  That's the

6      certification.  Action to elect four

7      directors to hold their office for the

8      ensuing year.  Let me pass out some

9      ballots.

10         MS. CARVEL:  Can I ask again how

11     the directors on the ballots were chosen?

12         MR. GRIFFIN:  Yes.  We had various

13     telephonic meetings between us and these

14     are the recommendations of the four of

15     us.

16         MS. CARVEL:  Between us.

17         MR. GRIFFIN:  All four of us.  We

18     have had various telephonic meetings.

19         MS. CARVEL:  Can I see if I

20     understand this correctly.  Four

21     directors --

22         MS. CONROY:  Members.

23         MS. CARVEL:  Four members?

24         MS. CONROY:  Yeah, it's the members

25     who elect the directors.

31

1

2          MS. CARVEL:  Four members, other

3     than me, called each other up and decided

4     they were going to elect themselves

5     directors, other than me; is that

6     correct?

7          MR. GRIFFIN:  Yes.  I'm going to do

8     an amendment here.  I'm going to suggest

9     instead of four we elect six.  I'm going

10    to propose two new directors.  At the

11    present time we're recommending that the

12    four directors Brendan Byrne, William

13    Griffin, Ann McHugh and Sal Molella, I'm

14    making two nominations Marie Alplanlp's

15    and Marie Hockim, that's Bob Abplanlp's

16    daughter.  And the sixth one would be

17    Betty Godley, who's the niece of Agnes

18    Carvel.

19          MR. GRIFFIN:  So, if you --

20          MS. CARVEL:  Before we get to the

21    voting, can I ask for the existing

22    directors, who they have been accountable

23    to in the last year, if not longer, to

24    verify that they're qualified to be

25    reelected?

32

1

2          MS. CONROY:  I would say they're

3     accountable to each other, ultimately to

4     the Attorney General of the State of New

5     York.  They are running a foundation

6     which by its nature has a board that's

7     elected by its members and the members

8     are in effect self perpetuating.

9          MS. CARVEL:  How are the members

10    self perpetuating.

11         MS. CONROY:  They elect new

12    members.  The members recollect new

13    member.  The members elect the directors.

14    Not at all an uncommon practice in

15    not-for-profit corporations.

16         MS. CARVEL:  The directors are

17    accountable only to each other?

18         MS. CONROY:  They are ultimately

19    accountable to the many people of the

20    State of New York.

21         MS. CARVEL:  There were two

22    grantors funding groups.

23         MS. CONROY:  I'm absolutely

24    confident if Thomas or Agnes Carvel asked

25    for an accounting, how the money was

33

1

2      spent, they would be happily provided

3      that information.  I don't think that's

4      going to happen.

5            MS. CARVEL:  I wouldn't be too sure

6      about that.  If Thomas or Agnes Carvel as

7      grantors or the people authorized to act

8      on their behalf ask for an accounting and

9      how it's been managed, you would provide

10     it.

11           MS. CONROY:  Thomas or Agnes,

12     neither of whom are available --

13           MS. CARVEL:  You're making an empty

14     offer.

15           MR. BYRNE:  Do we have any further

16     obligations prior to voting?

17           MS. CONROY:  No.

18           MR. BYRNE:  I move we collect the

19     ballots.

20           MR. GRIFFIN:  Do you have any

21     ballots?

22           MS. CARVEL:  I abstain.  I don't

23     think this is an authorized meetings.

24           MR. GRIFFIN:  I'll announce that

25     the ballots show that four members:  Ann

34

1

2      McHugh, Sal Molella, Brendan Byrne and

3      Bill Griffin.  Six directors, those

4      directors Bynre, McHugh, Molella, Godley

5      and Halcombe.  There's one member who did

6      not provide us with any ballot at all

7      that's abstaining; is that correct.

8              MS. CARVEL:  Yes.  Governor Byrne,

9      for your information, why I'm asking

10     questions about the directors

11     accountability, the New York State

12     Attorney General filed thirty-nine counts

13     against an attorney who was involved with

14     Betty Godley in certain financial

15     dealings.  The Attorney General arrested

16     and convicted another person involved

17     with Betty Godley in financial real

18     estate dealings.  Nobody on the board of

19     directors when this was going on and

20     Agnes Carvel objected to the elicit

21     dealings with these two gentlemen are

22     under indictment or conviction by the New

23     York State Attorney General, nobody on

24     the board supported Agnes Carvel.

25     Approximately five million dollar in

35

1

2          Thomas Carvel's assets were wasted in

3          this little fiasco.  It's apparent that

4          Betty Godley was involved in illegal,

5          inappropriate, improper financial

6          accounting in Thomas Carvel's estate and

7          the board members supported that.  They

8          actually went into Court and where Betty

9          Godley didn't provide any case to

10         proceed.  The foundation defending her

11         accountings and those accountings appear

12         to be fraudulent, I'm asking for the

13         accountability of the directors and their

14         qualifications to be directed.

15              MR. FINK:  There's nothing more

16         that needs be said on the issue of to

17         whom directors are accountable.  You've

18         made a number of comments about actions

19         taken or not taken by the Board of

20         Directors of the foundation.  It's not

21         appropriate at this meeting to comment on

22         that either.  I want the written

23         director -- the foundations silence

24         should not be taken as agreement which is

25         your characterization of the facts.

36

1

2          MS. CARVEL:  Do any of the

3     directors have relationships or if any of

4     the families members.

5          MR. FINK:  You've submitted a

6     number of requests for various requests

7     in writing.  I don't think this meeting

8     is an appropriate forum for questions

9     directed to the directors.  As the

10    foundation's counsel I think it's

11    inappropriate.

12         MS. CARVEL:  A members' meeting

13    where the members are supposed to elect

14    directors and the directors are supposed

15    to have some minuscule amount of

16    responsibility for the running of the

17    foundation, it's inappropriate for a

18    member to seek to find out if the

19    directors have conflicts, if they're

20    doing their job in past years or if

21    they're qualified in any way to hold this

22    position?

23         MR. FINK:  There's been an election

24    in which you abstained.  I don't think

25    it's information that you're entitled to.

1

2    MR. GRIFFIN:  If you have anything

3    you want to do, write it and send it down

4    to both counsels and they could respond

5    appropriately.

6    MS. CARVEL:  Mr. Griffin, every

7    year I write letters to the members and

8    every year I get no response from the

9    members.

10    MR. GRIFFIN:  The members, I'm

11    going to speak for myself, I've

12    instructed our counsel on numerous

13    occasions, if we receive any letters from

14    you or if I receive letters from you, I

15    want him to respond on behalf of myself

16    as a member and on behalf of the Carvel

17    Foundation.  My understanding, everybody

18    else has done the same thing.  The

19    responses that, and I get copies of the

20    responses, so does every other director,

21    those responses are responses for all of

22    us.  I just don't respond myself.  I know

23    I get letters from you.  That's the way

24    I've handled it.  That's the way the

25    other directors have handled it.  The

38

1

2          response comes from Mr. Fink.

3               MS. CARVEL:  This is why I asked

4          Mr. Fink who he represents.  You

5          indicated Mr. Fink represents everybody

6          that's a member, other than me?

7               MS. CONROY:  Again, I think we had

8          that conversation earlier.  Mr. Fink made

9          it clear he represents the foundation.

10         This is not a productive conversation,

11         it's not going to go anywhere.

12              MS. CARVEL:  Maybe not.

13              MR. BYRNE:  Any other business?

14              MR. GRIFFIN:  The next thing I have

15         on the agenda, the approval of the March

16         2003 members' meeting minutes.  I am not

17         asking for approval of these minutes

18         right now, nobody has seen them.  I'm

19         going to pass them out so everybody has a

20         copy, and I would like you to review

21         them, at the same time reviewing the

22         financial statements, you review the

23         minutes.  When you finished, we'll then

24         submit the new minutes for everyone's

25         approval, probably within the next week



1

THE THOMAS AND AGNES CARVEL FOUNDATION

ANNUAL MEETING

March 16th, 2005

10:15 A.M.

PRESENT:

      William E. Griffin

      Salvador Molella

      Steve Frank

      Katherine Conroy

      Matthew Landy

      Karen Springfield

      Gov. Brendan Byrne

      Marie Holcombe

      Pamela Carvel

      James D'Arcangelo

      Anthony Pennella

2

1

2      MR. GRIFFIN: This is the annual meeting

3   of the members of the Thomas and Agnes Carvel

4   Foundation.  I'll act as the Chairman of the Board.

5   And Mrs. Springfield is secretary of the meeting.

6   The first order of business will be the approval of

7   the 2004 member's meeting minutes.  Everybody has

8   got them I believe.  We have got them for a while.

9   Any comments?  Motion to approve --

10      MR. BYRNE: Before motion to

11   approve, there was some things in that minutes that

12   indicated we're going to get more stuff and more in

13   advance this year.  Three weeks in advance.

14      MR. GRIFFIN: You're talking about

15   the financial statements and tax returns?

16      MR. BYRNE: We got it.

17      MR. GRIFFIN: You got it.  I'm not

18   sure it was three weeks.  I imagine everybody got

19   it.

20      MS. CARVEL: I guess I did.

21      MR. BYRNE: I guess I did.

22      MR. GRIFFIN: If you don't Governor

23   the accountants are here.

24      MR. BYRNE: I want to comment on

25   one other thing.  On page four of those minutes this

3

1

2      Mrs. Carvel asked if there was a conflict of

3      interest among the members and directors.  Governor

4      Byrne stated there was no conflicts among the

5      members and directors.  I think I ought to clarify

6      that.  If there is a conflict on a particular

7      application, the directors disqualify themselves

8      with respect to that matter.

9                  MS. CARVEL: I want to make the

10     comment that I make every year, that I don't believe

11     these are the legitimate minutes of a legitimate Tom

12     and Agnes Carvel Foundation meeting and I continue

13     Agnes Carvel's protest that the foundation is not

14     being run according to the precedence set by Tom and

15     Agnes Carvel when they founded the foundation.

16                  MR. GRIFFIN: So noted.  The next

17     order of business is certificate of mailing.  This

18     is by Karen.  I have a copy here which is signed.

19     The next order I have on my sheet is the submission

20     of proxies of anybody.  Does anyone have any

21     proxies?  I think everybody is here.  So there is no

22     proxy.

23                  Next order of business I have

24     which is not on your agenda, is the -- what I wanted

25     to do is nominate a new member.

4

1

2          MS. CARVEL: I ask why it wasn't on

3     the agenda.

4          MR. GRIFFIN: I just forgot it.

5     When I looked at the agenda last night I called Matt

6     and said that I had forgotten it.  And I didn't look

7     at the agendas beforehand.

8          MS. CARVEL: Well, I have a problem

9     that always continues.  I have asked to see the full

10    minutes of the foundation.  They are not present.

11         MR. GRIFFIN: Full minutes of what?

12         MS. CARVEL: Of the foundation

13    itself.

14         MR. GRIFFIN: I don't think you're

15    entitled to those.

16         MS. CARVEL: Oh, yes.  From 1976,

17    forward, and all you have is from 1991 forward.

18         MR. GRIFFIN: You're talking about

19    member's minutes?

20         MS. CARVEL: I don't care what they

21    are.  There are minutes that began in 1976.  You

22    have to legitimize how you can sit here and call

23    yourselves members to elect new members and there is

24    nothing in these records here that substantiates the

25    first page that you begin.  Plus, you have minutes

**A-98**

5

1

2  here that are stated to be amended in April for

3  March of 1991.  But you have no original minutes

4  from March 1991, and you have nothing that says what

5  the amendments that were made in April are.  And I

6  have tried to track here when particular members

7  that sit around the table now, were installed.  And

8  I can't find any membership record in here.

9          So perhaps, if you want to tell me

10  where each member was, when they became a member, we

11  can clear that up.  And then you can tell me what

12  happened to the minutes.

13          MR. GRIFFIN: I don't know offhand.

14  I'll have Matt review --

15          MS. CARVEL: It has been about five

16  years I have been asking for '76 through '91.  You

17  have not found them.  So you were the custodians of

18  all the original foundation minutes and you --

19          MS. CONROY: That is.

20          MS. CARVEL: -- lost or misplaced

21  them.

22          MS. CONROY: No, the people present

23  here became the custodians only after the death of

24  Thomas Carvel, and had only that which was available

25  at the time of his death.

6

1

2          MS. CARVEL: Let's make this very

3     direct.  Your office had custody of these records in

4     March of 1991.  What did you do with them?

5          MS. CONROY: Whatever records there

6     were of which our office had custody are here now in

7     the foundation.

8          MS. CARVEL: Could I see them?

9          MS. CONROY: If they are not here

10    it's because we did not have custody.

11          MR. FINK: You're entitled to

12    review minutes of member's proceedings.  Let me

13    finish please.  Those minutes of members meetings,

14    which is are in the foundation's files are being

15    made available for you here today.

16          MS. CARVEL: The song and dance has

17    been going on for a long time.  Malcolm Wilson was

18    your father; wasn't he?

19          MS. CONROY: Yes, he was.

20          MS. CARVEL: He had a meeting with

21    Thomas Reddy, Gary Bashian and Herbert Roth at which

22    point he presented minutes that he said were the

23    complete minutes that he had taken custody of, of

24    the Tom and Agnes Carvel Foundation.  It was around

25    the 3rd of March, 1991.  Now, those were removed

**A-100**

7

from Thomas Carvel's offices, which were the
foundation offices at the time without Agnes
Carvel's consent.  Agnes Carvel has no way of
knowing if the minutes that were taken by your
father were returned in a full and complete
condition.  And now you're telling me that they have
disappeared entirely.

MR. FINK: We're telling you that
the minutes of member's proceedings for the
foundation which were in the foundation's records
are being made available to you.

MS. CARVEL: Where is from 1976 to
1991 Mr. Fink.

MR. FINK: I can't address events
that happened in that time period.  I have told you
and all that I can tell you is that the minutes of
member's proceedings in the foundation's records are
being made available to you.

MS. CARVEL: These minutes that
begin in 1991, make reference to the previous
minutes and rely on those previous minutes as a
basis for this alleged member's meeting that took
place in 1991.  And you're telling me you have no
records beyond April 9th of 1991?

**A-101**

8

1

2          MR. FINK: I'm telling you the

3    minutes of member's proceedings that the foundation

4    has available are being made available to you.

5          MS. CARVEL: I'm just putting on

6    the record here amended minutes that are dated April

7    9th, 1991 there is nothing before it.  There is

8    nothing attached to this.  These minutes that

9    substantiate the people who alleged to be members in

10    1991, had any kind of membership and there is

11    nothing attached to any of these minutes that

12    indicates any of the grants that were made on an

13    annual basis or any of the membership authority that

14    derived from this alleged 1991 meeting.

15          So I think you have a problem

16    electing another member without being able to prove

17    who the current members are.

18          MR. FINK: You have made your

19    comments.  Now for the record, I'll say the minutes

20    speak for themselves.

21          MS. CARVEL: Could I see where the

22    pages that Governor Byrne was nominated a member of

23    the foundation, since that is supposed to be in your

24    minutes here?

25          MR. GRIFFIN: Take a look at all

9

1

2  the minutes.  We will take a look at all the

3  minutes.  I don't have them available nor can I

4  answer your question at the moment what is not

5  available to me.  I haven't looked at these things,

6  nor can I answer your question at the moment but

7  I'll have Matt Landy who is the new executive

8  director, review all these things and get back to

9  you.

10           MS. CARVEL: You say that every

11  year.  It's very convenient for you to say that

12  every year.  But every year, I come back to you and

13  you have had now at least five years to come up with

14  an answer.  We're sitting here.  Here are your

15  minutes right.  Now Governor Byrne had to be elected

16  at a certain point.  Can you tell me where is the

17  proof that he was elected?

18           MR. GRIFFIN: We'll check it out.

19           MS. CARVEL: No, this a member's

20  meeting.  It's a requirement of a member's meeting.

21           MR. GRIFFIN: Can't give you the

22  answer at the moment.

23           MS. CARVEL: So we're holding a

24  member's meeting.  You're going to elect new

25  members.

10

1

2          MR. GRIFFIN: I am going to propose

3     one, yes.

4          MS. CARVEL: And you have no proof

5     of the current --

6          MR. GRIFFIN: I'm going to certify

7     to you right now.  In my opinion, the present

8     members are the four of us.

9          MS. CARVEL: Your opinion doesn't

10    work.  It has to be in the minutes of the members.

11         MR. GRIFFIN: We'll have to get it

12    for you.

13         MS. CARVEL: Where is it now ?

14         MR. GRIFFIN: I don't have it now

15    for you.

16         MS. CARVEL: So this is just going

17    to be a kangaroo court where you roll through?

18         MR. GRIFFIN: It's going to be a

19    meeting like the meeting of last year.

20         MS. CARVEL: Where you were also

21    out of order by not providing these minutes.

22         MR. GRIFFIN: We'll have it checked

23    out for you. The motion before the table is really

24    that I was going to nominate a new member which I'm

25    entitled to do.

**A-104**

FILED
AND
ENTERED
ON *8-30* 1999

WESTCHESTER
COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

PRESENT:   SAMUEL G. FREDMAN
----------------------------------------X
In the Matter of the Application of                 Index No.: 8940/99
                                                    Motion Date: 7/23/99
PAMELA CARVEL,

            Petitioner,

for a Judgment Pursuant to Article 78              DECISION AND ORDER
of the Civil Practice Law and Rules

  - against -

THE THOMAS AND AGNES CARVEL FOUNDATION,

            Respondent.
----------------------------------------X

        The following papers numbered 1 to 32 read on this petition

pursuant to Article 78 seeking an Order of Mandamus.

                                              PAPERS NUMBERED

Notice of Petition-Petition-Exhibits             1-14
Answer-Exhibits                                  15-30
Memoranda of Law                                 31, 32[1]

        Upon the foregoing papers it is ORDERED and adjudged that this

petition is disposed of as follows:

        The underlying facts to this dispute are relatively simply and will

be briefly stated.  Respondent The Thomas and Agnes Carvel Foundation

("Foundation") is a not-for-profit corporation which was incorporated in

1976.  At the time that it was incorporated, the members of the Foundation

---

[1]While Memoranda of Law are not specifically permitted by
CPLR 7804, subdivision (d), the Court, in the interests of
justice, has considered petitioner's reply memorandum and
respondent's memorandum responsive thereto.

                                · DISP

**A-105**

included only Thomas and Agnes Carvel, and as its members they adopted the "Bylaws of the Thomas and Agnes Carvel Foundation."[2] Of particular relevance to this proceeding is Article 1, Section 1 of said By-laws which provided that both Thomas and Agnes Carvel "may [each] designate his or her successor as a member of the Corporation by a written designation filed with the Secretary of the Corporation. Any such designation may be revoked by Thomas Carvel or Agnes Carvel, as the case may be, by a notice of revocation filed with the Secretary of the Corporation."

By their separate purported notices of designation dated December 14, 1976, Agnes and Thomas Carvel designated Mildred Arcadipane, then secretary of the Foundation, as their successor member of the Foundation.[3] On April 16, 1984, Arcadipane, William Manseau and Robert M. Davis were elected by Agnes and Thomas Carvel as additional members of the Foundation pursuant to Article 1, Section 1 of the By-laws and as Board members.

Thereafter, on April 23, 1991, Agnes designated her niece Betty Godley as her successor member of the Foundation, and this designation was duly confirmed by the Foundation's Board of Directors.

On August 22, 1994, Agnes Carvel then designated her niece, petitioner herein, Pamela Carvel, as her successor member. The letter of

---

[2]The By-laws were thereafter Amended in 1991, 1992, 1994, 1997 and on or about March 1, 1999, but did not substantively change the right of Agnes to designate her successor, the relevant issue to be addressed infra.

[3]Petitioner alleges that both of these purported notices of designation were "altered at the hands of persons unknown." In any event and notwithstanding these purported notices of designation, it appears that Arcadipane was not actually admitted as a member of the Foundation until April 16, 1984.

- 2 -

**A-106**

designation provided that "[a]ll prior designation of successor members previously signed by me are null and void."

On May 10, 1995, Davis and Arcadipane resigned their respective positions as members and directors of the Foundation in settlement of an action commenced by the State Attorney General against them alleging, <u>inter alia,</u> improper administration of the Foundation's assets.

On February 22, 1999, petitioner, as successor to Agnes Carvel, requested in writing to the Foundation notice of the required annual members' meeting. By responsive letter from the Foundation's counsel dated February 26, 1999, the Foundation apprised petitioner that her designation as successor member to Agnes Carvel was ineffective. This letter further stated that although Mrs. Carvel had never observed the procedural requirement for revoking her designation of Betty Godley, it "nonetheless treated the August 22, 1994 letter as a revocation because of Mrs. Carvel's implicit but clear desire that Mrs. Godley not succeed her." This letter went on to state that "[b]ecause the By-laws provide ... for a single designation of a successor Member and a single revocation thereof, [petitioner's] purported designation as Agnes Carvel's successor Member was of no force or effect."

Subsequent efforts to prevail upon respondent to recognize the designation of petitioner by Agnes Carvel have been to no avail. Indeed, by its counsel's letter to petitioner dated May 11, 1999, respondent asserts that Agnes Carvel's initial "designation" of Arcadipane as successor member was academic as a result of Arcadipane's subsequent election to the Foundation as a member.

This Article 78 proceeding ensued and petitioner seeks mandamus relief directing respondent to admit petitioner as a lawful member of the

- 3 -

Foundation pursuant to respondent's By-laws. Essentially, petitioner argues that the By-laws are binding upon the Foundation and its members, and that they must be interpreted pursuant to their plain meaning. It is argued that respondent has interpreted Article 1, Section 1 of the Foundation's By-laws in a manner "wholly inconsistent" with their plain language and have wrongly "attempted to import additional prohibitive language, which cannot be found anywhere in the documents prepared by it, to conclude that both Agnes and Thomas had but one right of designation and only one right of revocation."

Respondent agrees with petitioner that By-law Article 1, Section 1 is clear and unambiguous, but it construes such provision as allowing only a single designation and a single revocation, and thus claims that since Agnes previously exercised her right to a single designation in designating Betty Godley, her subsequent attempt to designate petitioner herein was void ab initio.

After its consideration of all of the submissions at bar, the Court grants the Petition and directs respondent to admit petitioner's membership in the Foundation.

If is of course well-settled that "contract interpretation is the province of the Court, and an unambiguous contract is to be interpreted in accordance with its clear language so as to effectuate the intent of the parties (citations omitted)." Desir v. Spano, __A.D.2d__, 687 N.Y.S.2d 411 (2nd Dept. 1999). This Court agrees with the parties that the subject By-law provision relating to successor designations is unambiguous. Equally clear to this Court is that the right to appoint and the right to revoke designations as set forth in Article 1, Section 1 of the By-laws is unfettered and unrestricted. Respondent has failed to proffer any evidence

- 4 -

in support of its contention that the By-law at issue must reasonably be interpreted to mean that designation rights are limited to a single exercise. Respondent's interpretation undermines the plain language provided since the subject By-law contains no specific single restriction language which could easily have been provided for by the Carvels had that been their intention.

Since the Court finds that the relevant By-law is not limiting as to the rights of designation and revocation, it is irrelevant whether Agnes Carvel properly previously designated Arcadipane or Godley.

Petition granted.   Submit Judgment on notice.

DATED:   White Plains, New York
         August 20 , 1999

_____
·HON. SAMUEL G. FREDMAN
Justice of the Supreme Court


Spitzer & Feldman, P.C.
Attorney for Petitioner
405 Park Avenue
New York, NY 10022

Orrick, Herrington & Sutcliffe, LLP
Attorney for Respondent
666 Fifth Avenue
New York, NY 10103

- 5 -

**A-109**

ANDREAS HOLDINGS
BEGINNING BALANCE

| DESCRIPTION | ALL AMERICAN SPORTS CITY | CHAUNCEY ADVERTISING | TOTAL |
|---|---|---|---|
| CASH | 125,478.21 | 31,689.23 | 157,167.44 |
| ACCOUNTS RECEIVABLE | 92,441.00 | 10,074,085.16 | 10,166,526.16 |
| CURRENT ACCOUNT | | (88,421.11) | (88,421.11) |
| INVENTORY | 3,158.58 | | 3,158.58 |
| PREPAID REAL ESTATE TAX | 49,348.74 | | 49,348.74 |
| INVESTMENT IN REAL ESTATE: | | | |
| LAND | 5,034,110.00 | | 5,034,110.00 |
| DWELLING | 391,502.00 | | 391,502.00 |
| AUX. BUILDING | 572,276.00 | | 572,276.00 |
| GOLF COURSE | 1,502,298.00 | | 1,502,298.00 |
| TENNIS COURT | 40,488.00 | | 40,488.00 |
| CARVEL LAKE | 1,451,662.00 | | 1,451,662.00 |
| NEW CLUB HOUSE | 1,446,413.00 | | 1,446,413.00 |
| DEP. AUTOS, TRUCKS & CARTS | 40,872.00 | | 40,872.00 |
| FURNITURE & FIXTURES | 60,275.00 | | 60,275.00 |
| DEP. FURNITURE & FIXTURES | | | |
| MACHINERY & EQUIPMENT | 103,449.00 | | 103,449.00 |
| DEP. MACHINERY & EQUIPMENT | | | |
| TOTAL ASSETS | 10,913,771.53 | 10,017,353.28 | 20,931,124.81 |
| ACCOUNTS PAYABLE | 22,427.00 | 0.00 | 22,427.00 |
| CUSTOMERS DEPOSIT | 200.00 | | 200.00 |
| DUE TO CHAIN LOCATIONS | 102,897.53 | | 102,897.53 |
| SALES TAX PAYABLE | 2,084.00 | | 2,084.00 |
| ACCRUED LIABLITIES | 24,603.00 | 0.00 | 24,603.00 |
| EXCHANGE | (3,500.00) | | (3,500.00) |
| COMMON STOCK | 10,765,060.00 | | 10,765,060.00 |
| CAPITAL STOCK | | 2,500.00 | 2,500.00 |
| RETAINED EARNINGS | | 10,014,853.28 | 10,014,853.28 |
| TOTAL LIABILITIES & RETAINED EARNINGS | 10,913,771.53 | 10,017,353.28 | 20,931,124.81 |

**A-110**

# AFFIDAVIT

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | )ss: |
| **COUNTY OF WESTCHESTER** | ) |

Robert M. Davis, the undersigned, does hereby depose and says as follows:

1. I am an attorney a duly licensed to practice in the State of New York. For many years, I have acted as counsel to Thomas Carvel and his corporations.

2. Mr. Carvel died on October 21, 1990. On February 13, 1988, he executed a Will. A signed copy of the Will had not been located and, therefore, on October 24, 1990, I arranged to open a safe located at his home at Winding Road Farm, Ardsley, New York, which was located in the wall of a private bathroom off his office at the south end of the house. The safe was identified as an Atlas Floor Safe Serial Number 6348.

3. The locksmith who opened the safe was Roger Thode of Safeguard Lock & Key Co., Inc. of 483 South Broadway, Yonkers, New York (telephone 914-963-6390). The contents of the safe were removed by Salvador Molella in my presence and in the presence of Ann McHugh.

4. Mr. Carvel's Will was not contained in the safe. The contents were as follows:

A jewel box with assorted cuff links and tie bars; 1 gold cuff link with a pearl center and 5 matching gold studs; a man's Swiss wrist watch with a mesh bracelet; a man's Omega wrist watch with a white gold bracelet; a man's Elgin wrist watch; and cash in the amount of $9,310.

5. All of the contents were returned to the safe except that the cash was deposited on the same day at Hudson Valley National Bank in an account in the name of the Estate of Thomas Carvel (deposit receipt attached).

6. Also attached is the business card of the locksmith and his invoice.

Robert M. Davis

Sworn to before me this
29 day of October, 1990

Notary Public

SARGIS MIRZA
Notary Public, State of New York
No. 60-4845567

W13:46

A-111

# FORENSIC DOCUMENT EXAMINATION

---

# REPORT OF FINDINGS

PAUL A. OSBORN, FORENSIC DOCUMENT EXAMINER
139 FULTON STREET, NEW YORK, NY 10038

# RE: Thomas Carvel Signatures

RE:  **Thomas Carvel Signatures**

DOCUMENTS SUBMITTED:

There have been received for examination thirty-five photocopies of a variety of documents in connection with The Thomas and Agnes Carvel Foundation. These documents are collectively marked Exhibit A in the upper right corner of the first page, and each page is marked with a number followed by a slash and the figures "201." Each page bears one or two questioned signatures "Thomas Carvel." The pages are numbered (followed by "/201") as follows: 13 through 15, 16(2), 28 through 30, 32, 33, 37, 38, 51, 55, 58, 61, 63, 69, 70, 80, 87 through 89, 113, 118, 120(2), 126, 130, 132(2), 136, 147, 157, 167, 193, 195 and 198.

For purposes of comparison there have also been submitted photocopies of known genuine signatures of Thomas Carvel. These include signatures on items A through H as listed in Schedule B attached hereto. They also include photocopies of known genuine signatures on:

    I.      Photograph page of Passport bearing stamp date of May 2, 1953

    J.      Photograph page of Passport bearing stamp date of September 13, 1957.

    K.      Photography page of Passport bearing issue date of December 21, 1967.

PROBLEM:

The questions to resolve, if possible, are whether or not each of the unknown signatures

I

**A-113**

is genuine and, if any are not, can it be determined if they were written by one or more than one writers.

FINDINGS:

It is my qualified opinion that:

(A)    Items 13, 58, 136 and 147 probably bear genuine signatures.

(B)    Items 28, 32, 33, 70 and 113 bear non-genuine signatures probably done by one writer.

(C)    The remaining items probably bear non-genuine signatures written by a second writer.

REASONS FOR OPINION:

Concerning the questioned signatures in item (B), they differ from the genuine writing identities of Thomas Carvel in the same manner as the questioned endorsement signatures which were reported on by this office in a report dated January 3, 1994.

The questioned signatures in item (C) contain characteristics that are also inconsistent with the genuine writing habits of Thomas Carvel. However, these questioned names, while consistent between themselves for the most part, differ in several respects from the handwritten names in item (B) above. It is my best judgment that the repetitious characteristics in the names in item (B) and the (previously submitted) check endorsements, which differ from the characteristics in the group of signatures in item (C), strongly suggest the work of two different

2

**A-114**

imitators.

Reference is made to the enlarged signature comparison charts submitted with this report. The middle chart numbered 2 illustrates nine of the known genuine signatures of Thomas Carvel. The chart hinged to the left numbered 1 illustrates the five questioned signatures as listed under (B) above. The questioned signatures illustrated on the right side in the chart numbered 3 are five of the disputed names from the group listed in item (C) above.

These questioned and known signatures illustrated in the three numbered charts are pictorially similar. However, this would be expected from attempts at imitation as that is the whole purpose of the imitator.

The five questioned signatures in chart 1 differ from the genuine signatures as described in detail in the report dated January 3, 1994. The five questioned signatures in chart 3 do not repeat all the genuine identities in the known signatures of Thomas Carvel, but also differ from the characteristics seen in the names on chart 1.

The main differences between the two groups of signatures in charts 1 and 3 include the width of the "T's," the form of the final part of the small "h, the manner in which the "m" (or abbreviated form of this letter) is written and the manner in which the "m" is connected to the start of the capital letter "C."

I cannot exclude the possibility that all of these questioned signatures were written by one person, but for the reasons expressed above, it is my strong suspicion that more than one

3

**A-115**

imitator was involved in the writing of the questioned names.

    The Findings expressed in this report are qualified due to the fact that photocopies and not the original documents have been examined.

Respectfully submitted,

October 3, 1994

4

**A-116**

*/.*

QUESTIONED

28/201

President

32/201

President

33/201

Very truly yours,

Thomas Carvel

70/201

113/201

Thomas Carvel, President

2.

GENUINE



Thomas Carvel

ONE INCH
OSBORN & SON

A-118

3.

QUESTIONED



affixed.

President

24/201

affixed.

President

30/201

Thomas Carvel

38/201

Thomas Carvel

51/201

Thomas Carvel

55/201



STATE OF NEW YORK
DEPARTMENT OF LAW
120 BROADWAY
NEW YORK, NY 10271
(212) 341-2405

ROBERT ABRAMS
Attorney General

PAMELA A. MANN
Assistant Attorney General in Charge
Charities Bureau

May 17, 1991

Re:  Thomas and Agnes Carvel Foundation
----------------------------------------------------

Dear Members of the Board:

As each of you are already aware, the Attorney General has questioned certain transactions engaged in by the Thomas and Agnes Carvel Foundation (the "Foundation").

This is to set forth this office's position with respect to certain of the practices of the Thomas and Agnes Carvel Foundation which are a subject of investigtion by this office. We believe that one series of payments by the Foundation warrants immediate action by the Board of Directors.

In 1987 and 1989 the Foundation paid $25,000 each to Iona College and Pace University School of Law. These payments, however, were not contributions; rather they represented tuition payment on behalf of two individuals. First, The Foundation paid $25,000 towards the Iona College tuition of James J. Arcadipane, the nephew of Mildred Arcadipane. (see, November 30, 1987 check in the amount of $20,000, and November 29, 1989 check in the amount of $5,000, copies of which are enclosed herein.) Second, the Foundation paid $25,000 toward the Pace Law school tuition of Christine Szoeke, a Carvel Corporation employee. (see, November 23, 1987 check in the amount of $25,000 a copy of which is enclosed herein). In each case, these checks were signed by Mildred Arcadipane.

None of these payments represented proper contributions by the Foundation. Rather, they were issued for the benefit of private persons who have relationships to Ms. Arcadipane. Accordingly, these improper payments of personal expense must be repaid to the Foundation. We have already discussed these payments with your attorney, Lawrence Fay. He has agreed to insure that restitution will be made to the Foundation.

**A-121**

Beyond restitution, however, further action must be taken.  In particular, we strongly believe that Mildred Arcadipane must be removed as a member and director of the Foundation.  Ms. Arcadipane signed Foundation checks which paid for her nephew's and a former co-worker's tuitions; such action constituted self-dealing.  These payments were authorized by Ms. Arcadipane in blatant violation of her fiduciary duty and duty of loyalty to the Foundation.  Ms. Arcadipane has argued that these payments were made at the direction of Thomas Carvel.  Such direction, however, would not defend Ms. Arcadipane's actions.  Directors must exercise their judgment independently, and in the interests of the Foundation.  Ms. Arcadipane has clearly failed to meet that requisite standard of behavior.  Accordingly, she should be removed from her positions with the Foundation. Your failure to take this action may leave this office with no choice but to consider pursuit of that remedy through litigation.

Please also be advised that with respect to another matter, the sale of certain Carvel Corporation stock by the Foundation to CKIC, Inc., our investigation is continuing. In furtherance of that investigation, we may need to contact you individually for information in the near future.

Thank you for your time and anticipated cooperation.

Very truly yours,

LAURIE LINTON
Assistant Attorney General

<u>VIA OVERNIGHT MAIL</u>

To:  Brendan Byrne
     c/o Carella Byrne
      Bain or Gilfillan
     6 Becker Farm Road
     Roseland, NJ 07068

     Agnes Carvel
     265 N Country Club Dr.
     Atlantis, FL 33462

Anthony Cerrato
300 Martine Avenue
White Plains, NY 10601

Robert Davis
430 East 57th Street
New York, NY 10710

Ann McHugh
69 Wendover Road
Yonkers, NY 10709

Salvador Molella
All American Sports City
Ferris Road
Pine Plains, NY 10567

Thomas Reddy
225 W Country Club Dr.
Atlantis, FL 33462

Malcolm Wilson
24 Windsor Road
Scarsdale, NY 10583


LLB:ko

1099

THOMAS AND AGNES CARVEL FOUNDATION

November 30 19 87

PAY TO THE ORDER OF  Iona College

$ 20,000.00

The sum of 20,000 dol's 00 cts                    DOLLARS

HUDSON VALLEY
NATIONAL BANK

FOR James J. Arcadipane I.D. #086A-8/8 #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

1099

1100

THOMAS AND AGNES CARVEL FOUNDATION

November 30 19 87

PAY TO THE ORDER OF  The Make a Wish Foundation of the Hudson Valley

$ 10,000.00

The sum of 10,000 dol's 00 cts                    DOLLARS

HUDSON VALLEY
NATIONAL BANK

FOR Contribution

A-124

FB 'W 07
0214-0950-8

FOR DEPOSIT
IONA COLLEGE
L50-0058

0219085214
12/14/70 JANOPIRNITY DR
NEW-323-9470 BARCLAIS NY

27896978

161003941

1182

THOMAS AND AGNES CARVEL FOUNDATION

11/29                    19 89

PAY
TO THE
ORDER OF  _Iona College_                          $ 5000.00

The sum of 5,000 dol's 00 cts                      DOLLAR

HUDSON VALLEY
NATIONAL BANK

FOR _James Assadipane_  #018-546768

⑈0219093001⑈ 012474250⑈        000000 500000

9:54 '91, 21 MAY        PAGE.005

A-125

THOMAS AND AGNES CARVEL FOUNDATION

Nov. 23, 87

PAY TO THE ORDER OF Pace University School of Law                    $ 25000

The sum of 25,000 dol's 00 cts                                        DO

HUDSON VALLEY
NATIONAL BANK

FOR Contribution          ⑆021909300⑈ 0124742⌐50 1⑈        ⑈000 25000

A-126

STATE OF NEW YORK
DEPARTMENT OF LAW
120 BROADWAY
NEW YORK, NY 10271

(212) 416-8400

ROBERT ABRAMS
Attorney General

PAMELA A. MANN
Assistant Attorney General in Charge
Charities Bureau

July 24, 1992

Robert Davis
430 East 57 Street
New York, New York   10710

Re: The Thomas and Agnes Carvel
    Foundation
------------------------------------------

Dear Mr. Davis:

This letter sets forth this office's position with respect to certain activities of the Thomas and Agnes Carvel Foundation ("the Foundation") which have been the subject of an extensive investigation by this office. As you are aware, the Attorney General's office has been investigating two areas of concern involving the Board's administration of the Foundation's assets during 1987 and 1989. Because we believe that our investigation has revealed serious illegality and dereliction of fiduciary duty, we are prepared to commence litigation seeking the removal of Mildred Arcadipane and Robert Davis as members, directors, and officers of the Foundation, together with other appropriate remedies against these two individuals. However, in an effort to exhaust all possible answers for achieving an amicable resolution of this matter, we are advising you of our position, in detail, prior to the commencement of any litigation.

### The Tuition Payments

By our letter of May 17, 1991, this Bureau formally notified all directors of clear evidence that Foundation funds had been diverted to pay for tuition expenses for specific Carvel Corporation employees and their relatives. As a fiduciary, you are aware that the assets of a not-for-profit corporation can only be expended for purposes which benefit an indefinite class of beneficiaries as set

A-127

forth in its certificate of incorporation, and that distributions for the benefit of a director of a private foundation are prohibited acts of self-dealing. At that time, we demanded that these funds be repaid with interest, and that the director and member who signed these checks, Mildred Arcadipane, be immediately removed from both of those positions. (A copy of our letter is enclosed.) Not only did Ms. Arcadipane benefit her nephew with two of these payments, but she also submitted false financial statements to this office, signed under oath, characterizing the payments as legitimate contributions. Although Ms. Arcadipane later conceded that her conduct was wrong, she has refused to resign her position at the Foundation. In our view, this conduct is an irrefutable basis for her removal.

To date, one of the tuition payments described in our letter has not been restored and, most importantly, Mildred Arcadipane remains in a fiduciary role as a director and member of the Foundation, participating in grant decisions and supervising the administration of the Foundation's assets.

As indicated by our letter of May 17, 1991, further evidence warranting Ms. Arcadipane's removal as a director and expulsion as a member should not be necessary. However, such evidence was subsequently revealed. Ms. Arcadipane admitted, under oath and in response to specific questioning about every educational "grant" by the Foundation in recent years, that she signed another tuition check on June 28, 1990, made payable to St. Anthony's School and intended for the tuition of a child of Carvel Corporation employee Patricia Potocki. Ms. Potocki worked under Ms. Arcadipane's direct supervision at the time this illegal payment was made. In our view, this further revelation, and especially the fact that this information was not disclosed voluntarily despite repeated demands by this office, only underscores the obvious need for an immediate severing of all of Ms. Arcadipane's fiduciary connections to the Foundation.

### The Sale of Stock to Carvel Employees Investment Corporation

In 1989, the Foundation sold 115,200 shares of Carvel Corporation stock to a newly formed entity called the Carvel Employees Investment Corporation ("CEIC") for $40 per share. The sale of this stock was required by Internal Revenue Code ("IRC") prohibitions against excess business holding by private foundations. These shares were, in turn, sold to Investcorp for over $90 a share when the Carvel Corporation was sold later that year.

-2-

**A-128**

Based on our exhaustive inquiry into all of the circumstances surrounding the transfer of shares to CEIC, it appears that this transfer was merely a sham transaction, designed to circumvent scrutiny and penalties by the Internal Revenue Service and bestow a possible windfall on a favored group of Carvel employees, and not an arms-length sale to a bona fide purchaser for full consideration. Moreover, this purported stock transfer constituted a prohibited act of self-dealing and included an illegal loan for the benefit of Ms. Arcadipane, as a fiduciary of the Foundation. Finally, adequate steps were not taken to protect the Foundation's interests, either before or after the transfer. Prior to the transfer, the directors failed to include either price provisions or "recapture" provisions in the letter agreement sufficient to protect fully the Foundation's interests in the event of a resale. After the transfer, the directors failed to enforce even the limited recapture provision that was included in the agreement.

This sham transfer was effectuated through a complex scheme involving a business corporation controlled by Arcadipane that was formed for this purpose and, later, a limited partnership consisting of 35 Carvel employees as the limited partners, with the business corporation as the general partner. The Foundation's Carvel stock was transferred first to the business corporation, which held it as sole owner until the limited partnership was formed several months later. Thereafter, the business corporation held the stock as general partner on behalf of the partnership. Finally, in late 1989, the partnership along with the other major Carvel stockholders, sold its Carvel stock to an outside purchaser at a windfall profit of over $5 million -- more than twice the price at which it had been acquired from the Foundation.

The CEIC transfer was created and supervised by Director Robert Davis. Mr. Davis created the New York business corporation, called "CEIC, Inc.," on February 1, 1989, with Mildred Arcadipane as its sole shareholder. By that date, the 5 year IRC deadline for the sale of 15,200 shares of the Foundation's holdings of Carvel stock had already passed. Penalties would begin to accrue for the Foundation's holdings of another 100,000 shares of Carvel stock less than two months later on March 21, 1989.

As the Foundation's directors apparently recognized, it was their responsibility as fiduciaries to divest the Foundation of its excess business holdings prior to the applicable deadlines for these blocks of stock. However,

A-129

none of the applicable IRC deadlines for the sale of this stock were met, even assuming that the transfer that ultimately was effectuated was a __bona fide__, arms-length transaction. Notwithstanding the dates on the documents, the Foundation and CEIC did not execute the agreements and exchange the necessary consideration until April, 1989, at the earliest. We are confident that these agreements were not concluded until that time because unexecuted draft copies of the sale documents were circulated to third parties for their review on April 7, 1989 (for 100,000 shares) and April 20, 1989 (for 15,200 shares). Moreover, Mr. Davis has admitted that he backdated these sale documents to read either "March 1, 1989" or "as of March 1, 1989," apparently in order to conceal the failure of the Foundation to dispose of the 115,200 shares prior to the IRC deadlines.

CEIC, Inc. was not the ultimate purchaser of the stock from the Foundation. Some time after August 14, 1989, an agreement was executed creating a Delaware limited partnership called "CEIC Limited Partnership." The partnership was apparently formed because Mr. Davis failed to file documents with the IRS within 75 days after the incorporation of CEIC, Inc. was formed in order to convert CEIC, Inc. into a "subchapter S" corporation, and thereby avoid double taxation if the stock were later resold by CEIC as part of a sale of the Carvel Corporation. Once again, we are confident that the agreement was not executed until at least August, 1989, because an unsigned draft copy was sent to third parties on August 14, 1989. Again, Davis dated the agreement "March 1, 1989" to make it appear that it had been executed on or before the IRC deadline. In fact, the partnership could not have been legally formed until the agreement creating the partnership was filed in Delaware, as required by that state's partnership law, on August 29, 1989. Even upon that filing, the partnership was not legally constituted due to the absence of contributions of any kind by the partners; all of the funds for the downpayment were contributed by the Carvel Corporation.

A number of aspects of the CEIC transaction have led us to conclude that it was merely a paper transfer, designed to give the appearance of compliance by the Foundation with IRC mandates without the Foundation actually relinquishing control of the stock in advance of an anticipated (or at least possible) sale of the Carvel Corporation at a much higher price:

-- Few CEIC limited partners were even aware

-4-

**A-130**

that they had been named as such until
they received a check after the sale
of the Carvel Corporation in November of
1989, and most considered this benefit to
be a gift rather than a capital gain accruing
from the sale of stock;

-- No limited partner was ever asked to make
any type of contribution to the partnership
as required by the agreement (and by basic
principles of partnership law);

-- Few of the partners, almost all of whom
were working people of modest means,
could have afforded to pay their share
of the stock purchase price on the terms
specified in the agreement;

-- The partnership was scheduled to terminate
only months after its formation -- on a
date after the Carvel Corporation was in
fact sold to Investcorp -- suggesting that
a quick resale of the stock was contemplated;

-- The Carvel Corporation did not attempt to
collect any of the interest due in 1989 for
the $608,000 it loaned to the partnership in
order to enable CEIC to purchase 15,200 shares
of the stock from the Foundation;

-- Interest on the remaining $4 million of the
stock purchase price, for which the Foundation
accepted a promissory note from CEIC, was not
scheduled to be paid pursuant to the terms of
the promissory note until mid-1990,
representing an extension of interest-free
credit on a substantial sum for more than one
year -- until a date that was in fact after
the sale of the Carvel Corporation and the
accrued interest could be paid from the
proceeds of the resale.

In sum, we believe that this transaction was structured
in order to deceive the Internal Revenue Service and "park"
the Carvel stock owned by the Foundation until the
negotiations for the sale of the Carvel Corporation could be
either concluded successfully or scuttled entirely.  On the
other hand, if the Investcorp deal were not consummated,
then those 36 loyal, economically dependent partners would

-5-

**A-131**

be reliant upon their superiors at the company to cover their collective obligation or to arrange for another inside buyer. In the latter event, the Foundation would have conspired in a scheme to keep the stock within the Carvel empire, in subversion of the IRC mandate to divest these holdings in an arms-length sale.

When the Corporation was later sold at its takeover value, 36 favored Carvel employees were the beneficiaries of a windfall of over $5 million. As the principal architect and sole interim stakeholder in this illegal scheme, respectively, Robert Davis and Mildred Arcadipane each violated their legal responsibilities as directors of th Foundation. Such conduct constitutes an independent basis for removal and surcharge under the N-PCL.

By participating in the CEIC transaction while she was simultaneously a director of the Foundation, Ms. Arcadipane also violated two separate provisions of New York law. First, as the sole shareholder of CEIC, Inc., Ms. Arcadipane's purchase of the stock was an act of self-dealing by a foundation director that is absolutely prohibited by the New York Estates, Powers and Trusts Law; she violated her duty of loyalty to the foundation by reaping personal benefit in violation of statutory prohibitions against self-dealing.

Second, the New York Not-for-Profit Corporation Law flatly prohibits loans to corporate directors. Her purchase of 100,000 shares of Carvel stock from the Foundation in exchange for a promissory note of $4 million constituted an illegal loan by a private foundation to an entity in which a foundation director held a substantial interest, in violation of Section 716 of the New York Not-for-Profit Corporation Law. As a result of that illegal loan, and the stock transfer which it underwrote, Arcadipane realized a profit of approximately $358,000, her share of the partnership's profit from the resale of the stock.

Other suspicious aspects of the CEIC transaction both suggest that it was not an arms-length sale and give rise to independent claims for dereliction of fiduciary duty. No steps were taken before the CEIC transfer to assess the value of the stock or to negotiate sufficient protections for the Foundation in the agreement in anticipation of an increasingly likely sale of the Carvel Corporation. The stock was sold by the Foundation at the "book value" of $40 per share, without any attempt to determine, by appraisal or consultation with outside experts, whether the serious

-6-

A-132

negotiations with Investcorp (ongoing for several years, far more serious than with any previous potential purchaser, and occurring at a time when Thomas Carvel's age was advancing and his health was declining), should have affected the price per share. Moreover, the other terms of the purchase, such as the length of the "recapture provision" that was included to require additional payments by the purchaser if the stock was later resold at a higher price, were simply replicated from previous sales to the Carvel Retirement Trust. No consideration was given to expanding those protections in light of the strong possibility of a sale of the Carvel Corporation, a prospect of which the directors were well aware given Davis' central role in the sale negotiations.

Finally, the directors have failed to take any steps to enforce the terms of the recapture provision for the Foundation built into the CEIC transfer; this inaction is not consistent with their fiduciary responsibility to protect the Foundation's assets. The recapture provision was triggered if the partnership received a "firm offer" to resell the stock within six months after the sale to CEIC. Because Investcorp tendered an unconditional "firm offer" to buy the stock on September 29, 1989, -- approximately five months after the sales by the Foundation to CEIC -- the Foundation was entitled to recover at least $215,000 pursuant to the formula contained in the recapture provision. CEIC did not acquire 100,000 shares of the stock until at least April 7, 1989, and did not acquire 15,200 shares until at least April 20, 1989. The fact that CEIC and the other Carvel sellers did not actually accept the offer from Investcorp to buy their stock until November, 1989, is irrelevant; the language of the recapture provision had been previously amended to provide explicitly for a trigger upon offer, not acceptance. Although we have been advised that the Foundation's independent counsel has been considering appropriate remedies under the recapture provision, we remain concerned that no steps have been taken to date affirmatively to pursue that relief.

Conclusion

Based on the foregoing analysis, the removal of Mr. Davis and Ms. Arcadipane as directors and officers, their expulsion as members, and their dismissal from any other future role in the Foundation is unequivocally warranted. Through her diversion of Foundation monies for her relatives' and associates' tuition expenses and her personal profit from the sham stock sale, Ms. Arcadipane has demonstrated her complete disregard for her obligations as a fiduciary of

-7-

A-133

charitable assets.  As the principal architect of the CEIC
transaction, Mr. Davis has evinced contempt for a primary
obligation of a Foundation director, to obey the law.  In
addition, the Foundation is entitled to recover money
damages based on the profit realized from the illegal loan
to Ms. Arcadipane, the damages resulting from the disregard
of the recapture provision, and the lost value suffered from
the failure to assess the true value of the Carvel
Corporation stock before its sale by the Foundation to CEIC.

As you are aware, this office has made exhaustive
attempts to negotiate a voluntary resolution of these
issues.  To date, those discussions have not produced an
agreement that would both restore the Foundation's assets
and adequately remedy the serious violations of law
committed by Mr. Davis and Ms. Arcadipane.  Thus, while in
no way intending to disparage the contributions of time,
money and energy to the Foundation by past and present
members of the Foundation's Board, we have concluded that,
in the absence of satisfactory settlement of this matter,
legal action by this office is required.

Sincerely,

PAMELA A. MANN

SD2/bg

cc:  Thomas A. Melfe, Esq.
     Lawrence F. Fay, Esq.
     Scott E. Mollen, Esq.
     Emily M. Bass, Esq.
     Gary Bashian, Esq.

-8-

A-134

Defendant
First Statement
GRG
Exhibit GRG 1-2
Dated 12.10.07

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

CLAIM NUMBER: HC07C02611

IN THE ESTATE OF AGNES CARVEL, DECEASED

BETWEEN:

PAMELA CARVEL (EXECUTOR 4/8/98-11/6/07)

Claimant

- and -

(1) GUY GREENHOUS (JUDICIAL TRUSTEE 11/6/07)

Defendant

---

WITNESS STATEMENT OF
GUY GREENHOUS

---

I, **GUY RICHARD GREENHOUS** (this is the correct spelling of my surname) of 5 Great
College Street, Westminster, London SW1P 3SJ say as follows:-

1. I am a solicitor and a partner in the firm of RadcliffesLeBrasseur. I am the Judicial Trustee
   appointed to administer the Estate of Agnes Carvel ("Agnes") who died on 4th August 1998.
   I was appointed by an Order dated 11th June 2007 of Mr Justice Lewison in proceedings
   between the Thomas and Agnes Carvel Foundation (as Claimants) and Pamela Carvel

**A-135**

RADCLIFFESLEBRASSEUR

☑007

("Pamela", the Claimant in these proceedings) and Carvel Foundation Inc (as Defendants). I exhibit a copy of the Order as exhibit "**GRG 1**".

2.  The effect of the order was to appoint me as judicial trustee to administer the Estate of Agnes in substitution for Pamela who had been granted probate of Agnes's will dated 7th July 1995 on 2nd October 1998.

3.  Pamela has applied to the Court of Appeal seeking leave to appeal Mr Justice Lewison's Order and I understand that this application is still being considered by that Court.

4.  Paragraphs 3 and 4 of Mr Justice Lewison's Order required Pamela to deliver to me all property forming part of Agnes's Estate which is in her hands (together with all deeds and documents relating thereto) and to prepare and deliver to me accounts for the Estate from the date of death until the date of the Order. Pamela has not complied with these obligations.

5.  As will be noted from clause 9 of the Order, there are other Chancery proceedings in relation to the Agnes Carvel Estate under claim number HC03C02156. These were initially brought by Pamela as Claimant against herself as Executrix of Agnes as Defendant. Carvel Foundation Inc was subsequently joined as a Defendant to those proceedings in place of Pamela. In those proceedings Pamela has sought to recover:

    (1)    Sums which she claims to have incurred on behalf of Agnes during Agnes's lifetime.

    (2)    Debts which Pamela claims that Agnes had contracted but had not paid; and

    (3)    Sums which Pamela claims to have incurred as Agnes's Executrix.

    Clause 9 of the Order of Lewison J of 11th June 2007 set aside all existing judgments within those proceedings.

6.  There has been an enormous amount of litigation on both sides of the Atlantic in relation to Agnes's Estate. The principal dispute is between Pamela and the Thomas and Agnes Carvel Foundation and the Trustees of the Agnes Carvel 1991 Trust dated April 22nd 1991. I exhibit hereto marked "**GRG 2**" a copy of the full Judgement of Mr Justice Lewison, as this usefully

sets out in detail the background and history of the Agnes Carvel Estate and the litigation associated with it.

7. In litigation in the State of New York USA judgement was given by the Westchester Surrogate's Court that the will of Agnes dated 7th July 1995 contravened an Estate Plan created in 1988 and clearly constituted a total breach of a reciprocal Will Agreement dated 13th February 1988 and made between Agnes Carvel and her husband Thomas Carvel. I understand that the effect of such an agreement is similar to the signing of mutual Wills in this country. Consequently, the Thomas and Agnes Foundation became entitled to receive the assets of Agnes Carvel's Estate. The decision of the Westchester Surrogate's Court was subsequently affirmed on appeal by the Appellate Division of the Supreme Court of New York.

8. It seems to me that the present proceedings are simply a continuation of the overall dispute between Pamela and the Thomas and Agnes Carvel Foundation I would respectfully suggest that the Court order that the Thomas and Agnes Carvel Foundation be joined as a Defendant to these proceedings. Whilst I accept that I may be a necessary party to these proceedings, I do not intend to play an active role within them, and will abide by the decision of the Court.

9. This is for a number of reasons. Firstly, I am not competent to comment on the allegations contained in Paragraphs 5 to 27 of the Claimant's First Witness Statement as I have not been involved in the years of litigation preceding my appointment as Judicial Trustee that have been conducted both in this Court and the Courts of New York, Delaware and Florida.

10. Secondly, as set out above, the dispute here is between Pamela and the Thomas and Agnes Carvel Foundation.

11. Finally, I am not currently in a position to play an active role in these proceedings, as there are no Estate assets within my control, and I am without funding to play any part in this claim. When my firm, RadcliffesLeBrasseur, were approached by Messrs Herbert Smith acting on behalf of the Thomas and Agnes Carvel Foundation with a view to my agreeing to

my appointment as Judicial Trustee, it was made clear by us to Messrs Herbert Smith that both my firm's and my involvement must be on the basis of my firm's costs being paid in full and when requested. The Client Care letter that we subsequently submitted to Messrs Herbert Smith for approval was agreed. However, on my firm rendering its first bills, which we were directed to send to the Trustees of the Agnes Carvel 1991 Trust, initially payment was refused. Consequent upon this, we notified Messrs Herbert Smith that if payment was not forthcoming we would seek my discharge as Judicial Trustee. The bills were subsequently paid by Messrs Herbert Smith.

12. I have already sought Counsel's opinion on my role as Judicial Trustee. I have been advised that I should seek guidance and advice from New York lawyers as to whether I should take an active role in the long running litigation in relation to the Estate of Agnes Carvel in the Surrogate's Court, The State of New York, County of Westchester in the matter of the Final Accounting of Mr Leonard M Ross as Ancillary Administrator of the Estate of Agnes Carvel deceased. Knowing that any New York lawyers that we instructed would require to be paid in full and on a monthly basis, my firm requested £15,000 on account of costs. This has recently been received but it is earmarked for obtaining New York advice and we have no other funds with which to conduct litigation in England.

13. Although I have asked for the assurance that I was given at the time that I agreed to become Judicial Trustee to be fully honoured, no agreement to do so has so far been forthcoming. Indeed, I have paid Counsel's initial fees of £1,468.75 personally and out of my own pocket and have not yet been reimbursed. That there are no assets in this country belonging to the Estate is confirmed by paragraph 5 of the Claimant's details of claim.

14. For the above reasons I do not intend for the time being to take an active role within these proceedings, and suggest that the Thomas and Agnes Carvel Foundation should be added as a Defendant.

3333798

**A-138**

I believe the facts stated in this Statement are true.

Signed ......................................................

**GUY RICHARD GREENHOUS**

Dated .................. October 12th .......... 2007

3333798

**A-139**