IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Pamela Carvel, as Citizen, as Delaware Ancillary
Administrator for Agnes Carvel Estate, as Member
for Thomas and Agnes Carvel Foundation

        Plaintiffs

v.

William Griffin, Marie Abplanalp, Salvatore
Molella, Robert Davis and John/Jane Doe 1-20 Doe
Corp. 1-20

        Defendants

C.A. No. 07-CV-00273

## AFFIDAVIT OF STEVEN J. FINK IN OPPOSITION TO
## PAMELA CARVEL'S MOTION TO APPOINT A RECEIVER

STATE OF NEW YORK    )
                   ) ss.:
COUNTY OF NEW YORK  )

STEVEN J. FINK, being duly sworn, deposes and says:

1. I am a member of the law firm Orrick, Herrington & Sutcliffe LLP ("Orrick"),
counsel to Defendants William Griffin, Marie Abplanalp Holcombe and Salvador Molella (the
"Defendants"). I have been admitted *pro hac vice* to practice before the Court for purposes of
the above-captioned matter. I submit this affidavit in opposition to Pamela Carvel's ("Pamela")
motion to appoint a receiver.

2. On or about May 17, 2007, Pamela, obtained an Order to Show Cause issued
by the Surrogate's Court of the State of New York, Westchester County, requiring the

Foundation to show cause why the Surrogate's Court should not enter an Order, *inter alia*, "staying all powers and actions of the current board of the 'Thomas and Agnes Carvel Foundation, and those individuals or entities acting, or purporting to act, on their behalf, from disbursing or disposing on [sic] any and all assets of the foundation without further order of this Court with notice to the parties. . . ."  Pamela's Order to Show Cause, In the Matter of the Final Accounting of Ross, File No. 2165/1998, at ¶ 1, a true and correct copy of which, with Pamela's Affidavit in Support (without exhibits), is annexed hereto collectively as Exhibit 1.

      3.  On or about October 1, 2007, Pamela filed a Complaint in the United States District Court for the Northern District of New York against New York State Attorney General Andrew Cuomo requesting, *inter alia*, that the New York Attorney General be compelled "to immediately place the all [sic] assets of the alleged Thomas and Agnes Carvel Foundation (New York) into the hands of an independent court-appointed receiver until distributed by the court." Pamela's Complaint, Carvel v. Cuomo, Index No. 07-cv-1034 (N.D.N.Y), at WHEREFORE clause b, a true and correct copy of which, without exhibits, is annexed hereto as Exhibit 2.

      4.  Also on or about October 1, 2007, Pamela filed a "Claim" in the High Court of Justice, Chancery Division, London, England (the "High Court") against Guy Greenhous, the Court-appointed Judicial Trustee of the Estate of Agnes Carvel appointed by the High Court when it removed Pamela as personal representative of that Estate.  By her Claim, Pamela seeks, *inter alia*, "[a]n Order for delivery to the jurisdiction of the High Court all Estate assets held by Leonard Ross and the alleged 'Thomas and Agnes Carvel Foundation' in New York. . . ." Pamela's Complaint, Carvel v. Greenhouse [sic], Claim No. HC07C02611 (High Court of Justice, Chancery Div., London, England), at ¶ 28.2, a true and correct copy of which, with the

First Witness Statement of Pamela Carvel in support (without exhibits), is annexed hereto

collectively as Exhibit 3.

      5.  On or about October 12, 2007, Pamela filed a motion in the Court of Chancery

of the State of Delaware seeking, *inter alia*, "an Order appointing an independent Receiver in

Delaware to hold all Agnes Carvel's assets prematurely delivered in trust to Petitioner. . . ."

Pamela's Motion, <u>The Thomas and Agnes Carvel Foundation v. Carvel</u>, C.A. No. 3185-VCP

(Del. Ch. Ct.), at WHEREFORE Clause 3, a true and correct copy of which, with Pamela's

Affidavit in support (without exhibits), is annexed hereto collectively as Exhibit 4.

_____
                   Steven J. Fink

Sworn to and subscribed before me this
26th day of November 2007

_____
              Notary Public
        ALISON FRANCES SWAP
     Notary Public, State of New York
        No. 02SW6154070
     Qualified in New York County
  Commission Expires October 23, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2007, a copy of the foregoing was electronically

filed and was also caused to be served on the following as indicated:

### VIA FEDERAL EXPRESS

Pamela Carvel
28 Old Brompton Road, Suite 158
London SW7 3SS
England
United Kingdom

Jameson A.L. Tweedie (#4927)
tweedie@rlf.com

> At the Surrogate's Court of the
> County of Westchester at
> 111 Dr. Martin Luther King Blvd.
> in the City of White Plains,
> State of New York
> On the ~~17th~~ day of May, 2007
> *17th*

PRESENT:

                                                   No. 2165/1998

        Hon. ANTHONY A. SCARPINO, JR.

                                   Surrogate

-------------------------------------------------------------x

In Matter of the Final Accounting of Leonard M. Ross
as Ancillary Administrator c.t.a. of the Estate of

             AGNES CARVEL,

                            Deceased.

-------------------------------------------------------------x

**ORDER TO SHOW
CAUSE FOR
PRELIMINARY
INJUNCTION &
TEMPORARY
RESTRAINING
ORDER**

**UPON** the annexed affidavit of Pamela Carvel, sole executor of the uncontested Will of

Agnes Carvel and Member of the Thomas and Agnes Carvel Foundation, appearing *pro se*,

sworn to this 17th day of May 2007,

**LET** any party in these proceedings **SHOW CAUSE BEFORE THIS COURT,** at the

courthouse thereof, located at 111 Dr. Martin Luther King Blvd., White Plains, New York

10601, on the *9th day of July,* ~~18th day of May~~ 2007 at 9:30 in the forenoon of that date or as soon thereafter as

counsel may be heard, why order should not be made and entered:

1.       staying all powers and actions of the current board of the "Thomas and Agnes Carvel

Foundation, and those individuals or entities acting, or purporting to act, on their behalf from

disbursing or disposing on any and all assets of the foundation without further order of this Court

with notice to the all parties ;

and

2.       granting such other an further relief as to the court may seem just and equitable.

**SUFFICIENT CAUSE THEREFORE APPEARING**, it is

~~ORDERED, that all actions and powers of the officers and directors of the Thomas and Agnes Carvel Foundation and their agents everywhere are stayed;~~

~~ORDERED, that pending the hearing and determination of this order to show cause, all disbursements or transfers from the foundation's funds are stayed without further order of this court;~~

**ORDERED**, that service of a copy of this order to show cause and papers upon which it *identified in the attached statement of interested parties, by service pursuant to CPLR 2103(b)* was made upon all parties ~~by personal service and service on the New York Attorney General by fax this day, May 17, 2007 shall be sufficient thereof.~~ *on or before June 1, 2007; answering papers shall be served on or before June 22, 2007; and filed and reply papers shall be served and filed on or before June 29, 2007.*

AS/
JSC

Dated: May 17, 2007

White Plains, New York

Hon. Anthony A. Scarpino, Jr., Surrogate

TO: Steven J. Fink, Esq.
Tanya D. McDuffie, Esq.
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103
(212) 506-5000
Attorneys for The Thomas and Agnes
Carvel Foundation

Hal Neier, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, New York  10019
(212) 833-1100
Attorneys for Lawrence Newman and
Betty Godley as Co-Trustees of the Agnes
Carvel 1991 Trust

~~Pamela Carvel~~
~~P.O. Box 58~~
~~Cranbury, NJ 08512-0058~~

Robert M. Redis, Esq.
McCarthy Fingar LLP
11 Martine Avenue
White Plains, New York  10606-1934
(914) 946-3700
Attorneys for McCarthy Fingar LLP

Laura Werner, Esq.
Attorney General of the State of New York
120 Broadway
New York, New York 10710

*Eve Rachel Markewich*
*Markewich and Rosenstein*
*8 East 41st Street  Fifth Floor*
*New York, NY 10017*
*attorney for Leonard Ross*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------------------X    File No. 2165/1998
In the Matter of the Final Accounting of Leonard M. Ross,
as Ancillary Administrator c.t.a. of the Estate of

        AGNES CARVEL,

                                 Deceased.
------------------------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF
ORDER TO SHOW CAUSE
FOR PRELIMINARY
INJUNCTION & TEMPORARY
RESTRAINING ORDER**

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF NEW YORK  )

        Pamela Carvel executor of the Agnes Carvel Estate ("Estate") compelled to appear *pro se* by denial of Estate funds, and as Member of the Thomas and Agnes Carvel Foundation, under penalty of perjury deposes and says:

1.    It has been previously delivered to Surrogate Scarpino on May 9, 2007 evidence of the alleged sale of the property of Agnes Carvel without notice to any interested parties or creditors. The alleged foundation managers, officers and directors profess no personal knowledge of the proceeding before this court. The alleged foundation managers, officers and directors are trying to dispose of the assets of the foundation to before any claims can be laid against those asset for taxes, debts, or other expenses required to be paid y order of this court or any other court.

2.    The alleged foundation will not need to make any grants until November 30, 2007, therefore it will not be prejudiced by this request to stay the powers of the managers and agents. The legitimate interests of the foundation and the Estate will be irreparable harmed if the assets are disposed of to alleged thrid parties who are in fact insiders, self-dealing with the foundation managers.

3.    On May 8, 2007 my investigations revealed that at least US$9 million in property in New York was apparently stolen from the Agnes Carvel Estate and charity through self-dealing by William Griffin, alleged director and president for the alleged foundation. This

matter is also being referred for criminal investigation for grand larceny, tax fraud, charity fraud and money laundering.

4. This property was in the care and custody of Griffin until the final accounting in Agnes Carvel's London estate determined a remainder amount and the legitimate beneficiary thereof. The alleged foundation seeks to divest the Estate of all assets to thwart a ruling to pay creditors or an adverse ruling on who is the legitimate beneficiary of the remainder. The alleged foundation is disqualified from inheriting by public policy and under Article Two (E) of Agnes Carvel's Will. The High Court of Justice for England and Wales recognized the Carvel Foundation is not bound by the New York proceeding because it did not receive notice.

5. William Griffin, the alleged foundation's alleged director and president, is also controlling stockholder and chairman of Hudson Valley Bank. On more than one occasion, Hudson Valley Bank was instrumental in the diversion and conversion of Carvel assets. This latest scam is an insider real estate transaction by the alleged foundation as represented by Griffin selling Agnes' New York property currently valued at over US$10 million to the relative of Griffin's law partner for only US$2 million, and then the property was returned to Griffin through Hudson Valley Bank in the form of an alleged lease assignment and mortgage.

## THE FOUNDATION USURPERS HAVE STOLEN FROM CHARITY AND FROM THE ESTATE

6. On 6 October 2006 William Griffin, who is not only the chairman of Hudson Valley Bank and one of the Banks controlling shareholders, alleged to act as the president of the "Thomas and Agnes Carvel Foundation" in order to sell Agnes Carvel's former residence in Ardsley, New York containing two parcels of land of approximately 16 acres (currently valued at **$10 million**) to a shell company belonging to Denis Amicucci, a relative of Griffin's business associate Paul Amicucci, for only **$700,000** and US**$1.3 million** (previously provided).

7. On that same day, 6 October 2006, the shell company returned control of the whole property back to Griffin through Hudson Valley Bank as an alleged lease assignment for security for an alleged US$1.3 million mortgage from Hudson Valley Bank (previously provided) where Griffin is not only chairman but a controlling shareholder along with alleged foundation director Marie Abplanalp Holcombe .

8. This same Ardsley property was appraised at US**$1.1 million in 1990** when Thomas Carvel died.  While all surrounding real estate has increased in value 300-400%, the Carvels' exclusive mountain-top acreage property only increased about 82%. Agnes Carvel's other Westchester property, the first Carvel ice cream stand in Hartsdale, also stolen from Agnes' estate, was also sold by Griffin in 2006 allegedly for $2.8 million to the owner of the current Carvel franchise. The property increased 375% from its 1990 appraised value of $600,000.

9. The shell company, Chauncey Partners LLC, was formed in March 2006 by Daniel A. Amicucci.  Paul Amicucci is listed as part of Griffin's law firm Griffin, Coogan and Veneruso, P.C. (previously provided) and also appears to be the attorney in the firm of Walsh and Amicucci, LLP for other charities controlled by Griffin. Paul Amicucci is also listed among the "Hudson Valley Bank Business Development Board" that has an incestuous, covert political relationship to the Carvel estate manipulations in Westchester Surrogate's Court (previously provided)

## HUDSON VALLEY BANK'S INCESTUOUS RELATIONS IN THE ALLEGED FOUNDATION

10. The foundation usurpers now controlling the alleged "Thomas and Agnes Carvel Foundation" with Griffin have been Agnes' only adversaries preventing her from inheriting the Carvel money that she spent her life earning.

11. Trials began in Thomas Carvel's estate in September 2001. In October 2001 Hudson Valley Bank loaned Surrogate Scarpino $200,000. The accounting proceeding in Agnes Carvel's London estate's New York ancillary administration began in May 2005. In December 2004, Hudson Valley Bank loaned Surrogate Scarpino another $100,000.

12. Westchester County Surrogate Scarpino never disclosed these "loans" to the parties although the William Griffin, chairman of Hudson Valley Bank and a principal shareholder, is alleged to be the "most knowledgeable" director who represents the foundation usurpers at trials, although Griffin knows little or nothing about the litigation he authorizes against Agnes Carvel's estate.

13. Research thus far seems to indicate that these and other "loans" were excluded from the Surrogate's mandatory financial disclosures. Surrogate Scarpino signed my request for a subpoena duce tecum for alleged foundation documents, and then retracted it when the foundation usurpers complained, and excluded all inquiry into the alleged foundation's legitimacy from the New York ancillary administration accounting trial.

14. Marie Abplanalp Holcombe, another principal shareholder in the Bank, is alleged to be a foundation member and director but refuses to answer any questions at trial, professing to know nothing about what goes on in the alleged Carvel foundation she controls with Griffin (see Affidavit to Quash Subpoena).

15. Brendan Bryne, alleged foundation member and director, who seeks to become executor of Agnes Carvel's estate, also denies any substantive knowledge about the issues in the litigation for which he authorizes over US$1 million in legal fees (see Affidavit to Quash Subpoena).

16. The last remaining director, Salvatore Molella, also denies any substantive knowledge of the issues for which he authorizes litigation (see Affidavit to Quash Subpoena).

17. As soon as Thomas Carvel was dead, the business documents belonging to Agnes Carvel, and the many charities Thomas and Agnes founded and funded, were stolen from the Carvels' offices and moved to the Hudson Valley Bank Building. Never to be returned. Hidden from scrutiny demanded by Agnes or me. The alleged foundation rented pricey offices in the Hudson Valley Bank Building since 1991.

18. Evidence of Hudson Valley Bank manipulations of Carvel bank accounts and U.S. Treasury securities was the first fraud that I uncovered in Thomas Carvel's estate in 1991. The foundation usurpers fear loosing control of misappropriated Carvel assets. The

foundation fraudsters' intention was bluntly stated in memos written on February 18, 1992 and April 9, 1991 while the Attorney General's charity fraud investigations were going on. Nothing could more clearly demonstrate the <u>intent</u> to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates by obstructing "**family with opportunity to assume control of Foundation, or at least Estate and Agnes' assets**.".

19. At item 11 of the February memo and Second item of the April memo the acceptable "loyalists" are identified who could become members and directors to stack the vote against Agnes. At item 11, "Hudson Valley" was identified generically; <u>anyone</u> in the Hudson Valley group could be counted on to oppose the Carvels' control of Carvel money.

20. Hudson Valley Bank and its "owners" William Griffin, the Abplanalps, and their co-conspirators stole control of the Thomas and Agnes Carvel Foundation so as to abuse the Carvel' good name and assets to further the organized political and financial influence that the bank generates in numerous ways. Upon Robert Abplanalp's death, his daughter Marie Abplanalp Holcombe took his place as the "Hudson Valley" representative as stated in the 1992 manifesto to maintain control against the Carvels.

21. The bank also runs something called "Hudson Valley Bank's Business Development Board" of which the bank itself says,

- "members benefit from their association with Hudson Valley Bank through networking opportunities and exposure for their businesses"

- "The Board of Directors looks to fill these positions with highly-qualified professionals, <u>who can assist in achieving the Bank's goals</u>." (emphasis added)

22. James Landy, an officer of Hudson Valley Bank, is chairman of the board of St, Joseph's Medial Center, recipient a phoney foundation grant in which Griffin again was the go-between. Mathew Landy is James' cousin and the alleged office manager over one secretary of the alleged foundation. The alleged foundation purports to not accept independent grant proposals. It only makes grants proposed by insiders --- the "loyalists".

23. Every grant since Thomas Carvel's death that was investigated in Agnes Carvel's lifetime was phoney, showed self-dealing, contained kick-backs, or attempted to influence elections – all of which activities are prohibited to legitimate charity by law. When Agnes Carvel called for explanations and documentation for her investigations, she was kicked off the board of the charity she founded and funded so that she would not be in a position of authority that entitled her to these records.

24. William Griffin, chairman of Hudson Valley Bank, major stock controller, and alleged foundation president, was "research counsel" to Lt. Gov. Malcolm Wilson. After Thomas Carvel's death and without Agnes' knowledge, Wilson became the foundation usurper's general counsel, and then alleged foundation member and director. Wilson installed his buddy Griffin on the foundation as "loyalist" to bolster the phoney votes.

25. Wilson was the "campaign chairman" for Surrogate Emanuelli's unopposed "election". Surrogate Emanuelli turned a blind eye to all crimes committed against Agnes Carvel, withheld all mandatory income due Agnes Carvel, to prevent her challenging the legitimacy of the foundation usurpers, and to harass Agnes until death resulted.

26. The Hudson Valley Bank Business Development Board also includes:

- Marc Oxman, who was installed as Guardian Ad Litem for Agnes Carvel, is one such person who "assists in achieving the Bank's goals" along with Oxman's law partner Andrew Natale, Jr. Oxman was hired to cause Agnes' death in London by stress, and so he did.

- Daniel Hollis is partner to Stuart Shamberg who was attorney for the Westchester County Public Administrator who hijacked control of the Estate by perjury by the alleged foundation's lawyers in New York in November 1998 despite the probate in England in October 1998.

- Edward A. Sheeran, Executive Director, Yonkers Industrial Development Agency ("IDA"), the agency that play a part in the phony St. Joseph Hospital grant where Griffin purchased a property only after he knew his cronies in the alleged foundation approved a $2,000,000

purchase grant for a $700,000 parcel of land.   Over $1,300,000 disappeared along with a corner of the property that was a branch office of Hudson Valley Bank. The IDA then stepped in to provide more financing.

- Michael Spicer, President and CEO of St. Joseph's Hospital, recipient of numerous unaccounted-for grants.

- In 1982, the Bank and its vice president John Finnerty (who remains on the Business Development Board) faced and survived indictment for phony "loan" schemes and "various counts of larceny and misapplication of property".

## CONCLUSION

27.   This is not the first matter of potential grand theft, conspiracy to defraud, and money laundering involving the foundation usurpers that I brought to law enforcement agencies. My assistance as a fraud investigator to the New York Attorney General for two previous illicit real estate scams, involving the alleged foundation in Thomas Carvel's estate, resulted in three felony convictions.

28.   Those who are alleged foundation before the Court are politicos i) who own, control and are aligned with Hudson Valley Bank in Westchester County, New York; ii) who stole control of the legitimate foundation's name and property away from Agnes Carvel by forgery and fraud; iii) who spent the Carvels' donations, that are restricted to charity, to litigate against Agnes Carvel to procure her death and fraudulently convert all her assets to the alleged foundation.

29.   These New York fraudsters and usurpers, who are almost all lawyers, commenced litigation against Agnes Carvel and her estate to abuse the Carvels' donations, restricted exclusively to charitable purpose, thereby lining their own pockets and those of their cohorts via legal fees, salaries, and phoney grants with kick-backs.   Such abuse of charitable funds by incessant litigation against Agnes Carvel, the charity's founder and

benefactor, caused Agnes' death from stress as predicted by Agnes' doctor. Such abuse is contrary to public policy and laws governing charity in both the U.S. and U.K.

30. The long-standing intent and motive of these fraudsters, bluntly stated on February 18, 1992, is to defraud the Carvels' legitimate charitable intentions for their estates by **never providing "family with opportunity to assume control of Foundation, or at least Estate and Agnes' assets.".** Nothing could more clearly demonstrate the intent to defraud Agnes Carvel of her assets.

31. The more Agnes Carvel tried to assert her rights against these fraudsters, the more the fraudsters used their access as fiduciaries to Agnes' money to withhold distributions to Agnes and to litigate to harass Agnes personally to affect her health.

32. As the parties in this action have submitted to the jurisdiction of the English Court, the Court can serve justice by resolving these issues instead of assisting the alleged foundation to prevent any enquiry into the Alleged foundation's conduct in respect of the founder Agnes Carvel's estate and to ensure that Agnes' wishes are followed.

WHEREFORE, I request the Court grant the relief requested.

Any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the State of New York punishable as a Class A misdemeanor. (210.45 NYS Penal Law)

Sworn to May 17, 2007

Pamela Carvel, Executrix, appearing *pro se*
28 Old Brompton Road, Suite 158
London SW7 3SS England
NY tel/fax fwd 1 212 751 6746

8

IN  THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Case No. _____-CIV-_____-_____

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

OCT 0 1 2007

LAWRENCE K. BAERMAN, CLERK
ALBANY

------------------------------------------------------------X

PAMELA CARVEL,
      Plaintiff,

v.

ANDREW CUOMO, Attorney General of the State of
  New York, on behalf of the People of the State of
  New York and the Ultimate Charitable Beneficiaries
  of the Thomas and Agnes Carvel Foundation,

------------------------------------------------------------X

**COMPLAINT**
FOR JUDICIAL
DISSOLUTION
&
DEMAND FOR
JURY TRIAL

07 -CV- 1034

LEK / RFT

**COMPLAINT FOR JUDICIAL DISSOLUTION OF THE
THOMAS AND AGNES CARVEL FOUNDATION
AND DEMAND FOR JURY TRIAL**

# COMPLAINT

Pamela Carvel, appearing *pro se*
PLAINTIFF
28 Old Brompton Road, Suite 158
London SW7 3SS England

US tel/fax  1 212 751 6746

# TABLE OF CONTENTS

NATURE OF COMPLAINT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FEDERAL JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FEDERAL VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POTENTIAL DOE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

OTHER PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

BRIEF BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

ACTIVITIES THAT ARE ILLEGAL
OR CONTRARY TO PUBLIC POLICY . . . . . . . . . . . . . . . . . . . . . . . . . 13

VIOLATIONS OF PUBLIC POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

APPARENT BRIBE VIA HUDSON VALLEY BANK LOANS . . . . . . . 23

HUDSON VALLEY BANK'S INCESTUOUS RELATIONSHIPS . . . . . 25

GRIFFIN'S FRAUDULENT CONVERSION OF REAL ESTATE . . . . . .28

OTHER APPARENTLY SELF-DEALING GRANTS . . . . . . . . . . . . . . .29

INTIMIDATION OF WHISTLEBLOWERS . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

Case No. _____-CIV-_____-_____

-----------------------------------------------------------------X

PAMELA CARVEL,
      Plaintiff,

v.

ANDREW CUOMO, Attorney General of the State of
  New York, on behalf of the People of the State of
  New York and the Ultimate Charitable Beneficiaries
  of the Thomas and Agnes Carvel Foundation,

-----------------------------------------------------------------X

**COMPLAINT**
FOR JUDICIAL
DISSOLUTION
&
DEMAND FOR
JURY TRIAL

### COMPLAINT FOR JUDICIAL DISSOLUTION OF THE
### THOMAS AND AGNES CARVEL FOUNDATION
### AND DEMAND FOR JURY TRIAL

Pamela Carvel, Member of the Thomas and Agnes Carvel Foundation, compelled to appear *pro se* from discriminatory denial of funds, for this compliant avers:

### NATURE OF COMPLAINT

1.    Pamela Carvel is the sole legitimate Member (controlling over 10% of the foundation Membership) and sole successor Member to Thomas Carvel and Agnes Carvel, who were sole Members, founders and benefactors of the "Thomas and Agnes Carvel Foundation", a New York not-for-profit corporation founded in 1976. New York State Supreme Court adjudicated Pamela Carvel the sole successor Member to Agnes Carvel on August 30, 1999. No other person produced the necessary documents to demonstrate authority to act as member (or director or officer) (A1). The identity of the legitimate Thomas and Agnes Carvel Foundation has been stolen.

2.    In the above styled cause, Pamela Carvel seeks judicial dissolution of the New York entity alleged to be the "Thomas and Agnes Carvel Foundation" ("alleged foundation"), pursuant to *Not-For-Profit-Corporation Law* ("*N-PCL*") 1101(a)(2), by Andrew Cuomo as Attorney General in his statutory capacity under New York *Estates, Powers & Trusts Law*

1

("*EPTL*") 8-1.1(f) and *N-PCL* 1102 (b). Plaintiff also seeks that the Attorney General permanently restrain all persons from exercising authority in the name of the foundation in any form, and to place the foundation's assets with a court-appointed receiver.

3.    This Complaint also seeks that the Attorney General civilly and criminally prosecutes those responsible for the crimes described herein. This complaint asserts damages from criminal conspiracy enterprises under *Racketeer Influenced and Corrupt Organizations* statutes (18 U.S.C. §1961, et seq. ("*RICO*")), using the alleged foundation as vehicle for such artifices. The conspirators intentionally harm the Carvels personally, violate the Carvels' rights, defraud the Carvels, defraud state and national government agencies and tax authorities, and defraud the People intended to be the legitimate recipients of benefits from the Carvels' charitable gifts.

4.    Regrettably, the illicit influences of the foundation fraudsters may have caused Assistant Attorney General Laura Werner in the Charities Bureau, New York City, who is charged with monitoring the Thomas and Agnes Carvel estates and trusts, to deprive the Carvels and the People of the intangible right to honest services (18 *U.S.C.* §1346). The Charities Bureau's long failure to address these serious crimes and violations of guaranteed rights necessitates this complaint.

5.    Plaintiff Pamela Carvel (a member of the Association of Certified Fraud Examiners in the U.S. and U.K., who has no legal training or professional legal experience) is compelled to appear *pro se* after Pamela as fiduciary was compelled to spend all her personal disposable resources to defend the rights and physical well being of Agnes Carvel, her aunt and an elder person, against harassment, intimidation, fraudulent conversion, violations of inalienable rights, and obstruction of Carvel control of Carvel assets.

6.    The politicos who stole the identity of the Thomas and Agnes Carvel Foundation violate the Certificate of Incorporation, the By-Laws, the representation made to

2

the IRS and New York State to gain tax-exemption, and the specific 14-year precedent of management in existence in 1988, which caused the Carvels to name the legitimate Thomas and Agnes Carvel Foundation a remainder beneficiary in the Carvels' testamentary plans. The alleged foundation violates every principle established by the Carvels for their restricted charitable gifts.

7.     All attempts are thwarted to verify the records by which the foundation usurpers alleged control. Underlying documents for tax returns, and other required reports are denied. Any means for Plaintiff as sole legitimate Member to evaluate or substantiate the qualifications or actions of the directors prior to re-election are denied. The usurpers repeatedly alleged all original records that prove their membership are "missing" (A1). All experts' reviews of the records available indicate forgery, missing records, inconsistent or contradictory minutes, and fraudulent manipulations of the alleged foundation records (e.g. A17). All attempts to seek voluntary compliance, restitution, and reimbursement are obstructed by those who have stolen the identity of the Thomas and Agnes Carvel Foundation (as well as the American Institute of Health, International Institute of Health Foods, and all other Carvel charities). These foundation identity thieves abuse the Carvels' restricted charitable gifts in violations of tax-exempt restrictions, self-dealing, and litigating against Agnes and Pamela Carvel's rights.

8.     The fraudsters who stole control of the alleged foundation after Thomas Carvel's suspicious death on October 21, 1990, burglarized Agnes' offices, homes and safe; looted or wasted estate, trust and corporate assets. The identity thieves perpetuate the alleged foundation solely for their personal benefit, or otherwise act in an illegal, oppressive or fraudulent manner, particularly seeking to physically and financially harm the Carvels personally (*N-PCL* 1102 (a)(2)(D)). The alleged foundation no longer carries out the legitimate tax-exempt purposes for which the Carvels founded, funded and managed the

3

legitimate Thomas and Agnes Carvel Foundation in a careful precedent established for fourteen years (1976-1990) prior to Thomas Carvel's suspicious death (*N-PCL* 1102 (a)(2)(E). The alleged foundation bears no resemblance whatsoever to the principles seriously adhered to by the Carvels to secure the honest use of their gifts.

9.　　The Carvels' good name and gifts restricted to charity are perverted by the theft of the legal identity of the legitimate Thomas and Agnes Carvel Foundation (and other Carvel founded and funded charities) by politico William Griffin and other shareholders controlling Hudson Valley Bank and the Bank's Business Development Board. The alleged foundation has become a vehicle for criminal activities, corruption, theft, embezzlement, forgery, burglary, as well as the sole instrument used to institute incessant violations of civil and human rights against the Carvels personally by abusing the Carvels' gifts in multi-million dollar litigation threats, intimidation, and extortion tactics to silence Agnes and Pamela Carvel's investigations into the criminal activities of Griffin and his co-conspirators.

10.　　The New York State Attorney General has the duty and the power to prohibit the fraudulent use of private foundations to further the criminal enterprises for profit by those illegitimate persons who alleged to be foundation managers and act contrary to public policy. "New Yorkers donate more than $10 billion to charity every year. The Attorney General's Charities Bureau is responsible for supervising charitable organizations to ensure that donors and beneficiaries of those charities are protected from unscrupulous practices in the solicitation and management of charitable assets. The Bureau also supervises the activity of foundations and other charities to insure that their funds and other property devoted to charitable purposes are properly used. The Bureau protects the interest of the public as ultimate beneficiaries of charitable gifts and bequests contained in wills and trusts." (*Attorney General's Report, Charities Bureau*, 2000).

4

11.    The Attorney General may bring an action for the dissolution of a corporation upon grounds that the corporation has exceeded the authority conferred upon it by law, or has violated any provision of law whereby it has forfeited its charter, or carried on, conducted or transacted its business in a persistently fraudulent or illegal manner, or by the abuse of its powers contrary to public policy of the state has become liable to be dissolved (*N-PCL* 1101).

12.    The Attorney General's office is the only New York State agency authorized by to bring civil or criminal actions in court, to seek injunctive relief, to issue subpoenas and take testimony, and to seek from a court an order awarding restitution, damages, and costs; and removing any director or other person responsible for the violations of the law; dissolving a corporation and other relief which the court may deem proper.

13.    The Attorney General's office has the necessary power to commence civil and criminal prosecutions. The People may have been deprived of the intangible right to honest services since 1991 by the gross negligence of Assistant Attorney General Laura Werner who has failed or refused to take actions to protect the interests of the Carvels as benefactors, to protect the interests the People as beneficiaries, or to protect the interests of government agencies by identifying and prosecuting the alleged foundation managers' self-dealings, money laundering, tax frauds, charity frauds, and other potentially criminal activities including (but not limited to) deprivation of civil rights under color of law and elder abuse of Agnes Carvel resulting in felony murder.

14.    It is contrary to every common sense and public policy that any benefactors would intentionally make themselves suffer the hardships and waste of litigation by providing tax-exempt gifts for the purposes of persons who litigate to harass, harm, and render the benefactors destitute by depriving the benefactors of their own funds. The Attorney General is charged with preventing or stopping such abuses contrary to public policy. Laura Werner

5

failed in this duty. Plaintiff now seeks to finally remedy that negligence by dissolution of the offensive alleged foundation.

15.    Thomas and Agnes Carvel (or any benefactor) would never willing deliver their gifts into the hands of persons who engage in actions and intentions exclusively designed to physically, financially and emotionally harm the Carvels, deprive them of their lifetimes' of income and property rights, so that foundation identity thieves could profit themselves and their cronies through fraudulent grants, litigation expenses, and self-dealing disposal of assets at undervalued prices. The Fourteenth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law. It is the Attorney General's duty of care to the public, to the benefactors, and to the elderly beneficiaries to prevent charity "law" from being abused to dispense restricted charitable gifts to litigate to oppress testators, grantors, benefactors, and beneficiaries in the name of a "charity" as alleged "remainderman".

16.    Criminal acts and other charity abuses contrary to public policy disqualify tax-exempt status, demand dissolution of the alleged Thomas and Agnes Carvel Foundation, and compel restitution from the conspirators who are profiteers at the expense of the Carvels' legitimate charity and the People.

## FEDERAL JURISDICTION

17.    United States District Court has original jurisdiction over this action pursuant to 18 *U.S.C.* 1965 (RICO) and 28 *U.S.C.* §1331 (federal questions) for civil actions arising under the Constitution and laws of the United States; including but not limited to: 18 *U.S.C.* §241 (conspiracy against rights), §242 (deprivation of rights), §245 (protected activities), §371 (conspiracy to defraud), §1111 (felony murder), §1117 (conspiracy to murder), §1341(frauds and swindles), §1343 (fraud by wire), §1344 (bank fraud), §1346 (honest services), §1512 (tampering with witness, victim, informant), §1951 (robbery, extortion),

6

§1952 (aid of racketeering), §1961, et seq. (RICO), §1962 . (prohibited activities), §1964 (a),(c) (civil RICO remedies), §2314 (transportation of stolen securities), §2315 (receipt of stolen moneys); 26 *U.S.C.* §*6501* (tax fraud); §*6655*; 28 *U.S.C.* §455 (disqualify judge), §1343 (civil rights); 42 *U.S.C.* §1981(equal rights), §1982 (property rights), §1983 (deprivation of rights), §1985 (conspiracy against rights), §1886 (neglect to prevent), §1988 (proceeding in civil rights); and under the First (redress of grievances); Fifth (due process), Ninth (other rights), and Fourteenth (equal treatment) Amendments to the Constitution of the United States, and equivalent civil and criminal protections under the laws of New York.

18. This Court has supplemental jurisdiction over the state claims herein pursuant to 28 *U.S.C.* §1367, as Plaintiff asserts state claims arising from a common nucleus of operative facts with Plaintiff's Federal claims.

19. Plaintiff's Complaint includes 18 *U.S.C.* §1964 on the information and belief that past events and future discovery will prove that the foundation fraudsters and their agents plotted and conspired for more than one year to abuse Carvel assets, to fraudulently evade payments due Agnes Carvel, to obstruct the Carvels' indemnification equal to that provided to other fiduciaries, to evade taxes to defraud government agencies, and to evade payment of any judgment to creditors.

20. There exist questions of U.S. Constitutional law including (but not limited to) possible criminal intent and/or conspiracy:

i)    to procure the death of Thomas, and later, Agnes Carvel during the commission of felonies;

ii)   to defraud and embezzle from the Carvels, their estates, their trusts and their charities;

iii)  to impersonate Carvel entities and abuse the Carvels' good name and reputation;

iv)   to steal and/or fraudulently convert Agnes Carvel's property to strangers;

7

v)     to threaten and cause financial damage to Pamela Carvel individually and as fiduciary

for protecting and defending the rights of Agnes Carvel, an elder person, and asserting

Agnes' testamentary intentions for legitimate charity;

vi)     to transport stolen property across state lines by mail or by wire; to negotiate stolen

U.S. government instruments; and

vii)     to deny Agnes Carvel, her Estate and her fiduciary the fundamental, substantive and

material rights to equal treatment, due process, and protection from violations of

Constitutionally guaranteed rights.

## FEDERAL VENUE

21.     Venue in this District Court is proper under 18 *U.S.C.* §1965. This Complaint

alleges RICO violations and therefore invokes the venue provisions of the RICO statute.

Justice demands that the Northern New York District Court as the primary location of the

Office of the Attorney General hear this case, as provided in 18 *U.S.C.* §1965(b), because

apparent criminal enterprises, bribery and political corruption in Westchester County, New

York denied Plaintiff's the right to redress grievances.

## PARTIES

22.     Plaintiff Pamela Carvel is a citizen of Florida, as sole legitimate Member of

the legitimate Thomas and Agnes Carvel Foundation, now a registered United Kingdom

registered, having a mailing address of 28 Old Brompton Road, Suite 158, London SW7 3SS

England, United Kingdom.

23.     Defendant Andrew Cuomo, Attorney General of the State of New York, on

behalf of the People of the State of New York and the ultimate charitable beneficiaries of the

Thomas and Agnes Carvel Foundation is a citizen of New York, having a mailing address of

The Capitol, Albany, New York 12224-0341, U.S.A.

8

## POTENTIAL "DOE" DEFENDANTS

24.     Upon information and belief, Defendants John/Jane Doe and Doe Co. are individuals and businesses, to be identified upon discovery, which participated in the activities described herein. Plaintiff is ignorant of the true names, capacities, nature and extent of participation in the course of conduct alleged here and, therefore, seeks redress by such fictitious names. Plaintiff will, if necessary, seek leave of Court to further amend this Complaint to reflect the true names and capacities of the defendants designated potentially as Doe defendants when their identities and liabilities become known. "Doe" defendants, participated as co-conspirators in the violations alleged in this Complaint, performed acts, and made statements in furtherance thereof. Such Doe defendants as co-conspirators aided, abetted, or participated in the enterprises identified herein in the commission of the wrongful acts or otherwise caused the damages suffered by Plaintiff and charity.

## OTHER PARTIES

25.     Plaintiff asserts that the People and government entities of the United States and United Kingdom, on behalf of whom Plaintiff also complains, are harmed. On information and belief, conspirators induce others to breach their duty of loyalty, fiduciary obligations, oath of public office, and also damage others through criminal acts, tax fraud, money laundering, and charity fraud.

26.     Plaintiff complains also on behalf of other directly or proximately injured parties, which injury or damage arises from Doe defendants' tortious actions. These parties include: Federal Government of the U. S.; Internal Revenue Service of the U. S.; Government of the United Kingdom ("U.K."); Inland Revenue of the U.K.; legitimate charities of the U.S. and elsewhere; Plaintiff's various creditors who may have not been paid, through the systematic pattern of racketeering activity alleged herein; others whose proper payments were unnecessarily delayed with exactly the same purpose and motive, of which Plaintiff

complains herein; as well as other unknown injured parties that may yet be discovered. These parties are included in accordance with the provisions of *FRCP* Rule 71.

## BRIEF BACKGROUND

27.     Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History. Tom's wife, Agnes, invested her time and money in the couples' first business venture that became the Carvel franchise system. Agnes worked in every aspect of the business. Tom relied on Agnes' incomparable common sense approach to business problems to run the business for over 50 years. Bruce Carvel, Tom's older brother and Pamela's father, designed and built the first continuous soft ice cream freezers that became the Carvel franchise trademark. Bruce formulated the products that comprised the unique Carvel line of specialities.

28.     The week before Tom died he estimated the family worth to exceed $250 million in cash, Treasury securities, and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock (a Delaware corporation). The week after Tom was found dead, Agnes was told by Malcolm Wilson (partner in Kent Hazzard et al) that there was less than $40 million and that virtually none of it belonged to her.

29.     Undisclosed and unbeknownst to Agnes, Wilson purportedly became the "general counsel" to the alleged Thomas and Agnes Carvel Foundation, without Agnes' knowledge or consent as sole surviving Member, Director and Officer of the legitimate Thomas and Agnes Carvel Foundation. The criminality by Wilson and his clients progressed exponentially from that point.

30.    The unethical, if not illegal, tactics used by Wilson are detailed (albeit anonymously) in the New York Law Journal article by Eve Markewich, "Getting Grounded in Ethical Dilemmas" (A25). Markewich, an attorney hired by Pamela Carvel for the Estate in New York, failed to bring this information to Pamela's attention and failed to assert any claims on behalf of Agnes Carvel because Markewich entered into covert agreements with the foundation usurpers that she would receive $3-4 million in legal fees without contest as long as she obstructed all money from reaching Pamela or the Estate in London. This incredible revelation was made by Leonard Ross, New York ancillary administrator, when pressed for the reasons he refused to assert any demands for payment of the Estate's funeral expenses, debts and administrative expenses.

31.    Agnes and Pamela also knew first hand that Tom and Agnes owned everything jointly with rights of survivorship outside probate; however, deeds, stock and bank accounts were diverted by theft of records or altered by forgery by Wilson's clients.

32.    Agnes died on August 4, 1998 while residing in London, England. Agnes was a United Kingdom citizen since birth. The High Court of Justice for England and Wales admitted her last Will and Testament dated July 7, 1995 for probate **without contest**. That Will was **never** contested and remains in force. Pamela was appointed the sole executor and sole personal representative under that Will.

33.    The foundation usurpers recently spent over $500,000 of the Carvels' restricted charitable gifts to obstruct the Estate's administration and claims by replacing Pamela with the usurper's own hand-picked "judicial trustee" on June 11, 2007 for the stated purpose to end all litigation against the foundation usurpers. The usurpers also seek to obstruct Pamela's pursuit of stolen assets as Delaware ancillary administrator. The foundation usurpers counted on the denial to Pamela of reimbursement of legal fees by Markewich and Ross to prevent prosecutions of claims.

11

34.    Pamela Carvel and the Estate's ability to fight multi-million dollar charity abuse is gravely prejudiced by Pamela's being compelled to act as a *pro se* litigant or allow crimes to continue by default. The New York Attorney General has the expertise, the position, and the duty, to prosecute these crimes on behalf of charitable benefactors and beneficiaries.

35.    The judicial trustee appointed in London has no funds; has no independent power to litigate; does not represent the named interested parties under the Will; does not represent Pamela as executor-creditor; and is neither executor nor personal representative. Without funds, this matter is being appealed in London by Pamela *pro se* based on material errors in fact and law deliberately put forth by foundation usurpers.

36.    It was Agnes Carvel's inalienable right to change her Will, particularly to deny benefit to all those who victimized Agnes and the Carvels' assets. Agnes Carvel's uncontested Will provides that anyone who harmed or litigated against Agnes Carvel in life, or litigated against her estate, shall not inherit. The foundation usurpers use the Carvels' assets, and gifts restricted exclusively to charity to litigate against Agnes Carvel, Agnes' rights, the Estate, Agnes' successors in interest, and against Pamela Carvel as Agnes' fiduciary. This abuse prohibits the usurpers in any guise from benefiting under the Will.

37.    **There has never been any disagreement about money in the Carvel family. All litigation to waste and divert Carvel assets is generated exclusively by the foundation usurpers and their co-conspirators – strangers acting against family, using family funds. <u>Agnes never received one penny of income from Tom's estate as long as she lived.</u>** Not one penny is delivered to Agnes' estate to pay funeral expenses now **nine years old.** Not one penny is delivered to Agnes' estate to pay any debts or administrative expenses, although the **gross value** of Agnes' assets was distributed to the alleged foundation, as mere alleged remainderman by Surrogate Scarpino and an alleged Florida

12

trustees. There is no restraint, scrutiny or court approval required for disbursement of Agnes' gross assets distributed to an alleged remainderman in violation of statutory priorities of payment and abatement of interests, and in contradiction to the terms of the uncontested Will.

38.    Tom's estate was allegedly valued at only $66 million in 1991, not the $250 million Tom estimated. Virtually ALL of the money is gone through waste, embezzlement, and gross mismanagement in collusion with criminals. The foundation usurpers' obstruction of payment of income to Agnes violated the terms of Tom's alleged Last Will, thereby creating tax fraud by the fraudulent elections of QTIP and marital deductions (*I.R.C.* 2056, 2523; 18 *U.S.C. Sec.* 371, 641; 26 *U.S.C. Sec.* 7201 et seq). Agnes' surviving ownership in jointly owned assets was stolen by false statements by alleged foundation attorneys and the by the usurpers' concealment of material facts and documents from Agnes and Pamela.

39.    Agnes' death from stroke was procured deliberately by stress from the foundation usurpers, to retain control (gained by forgery) of charities the Carvels founded and funded. Agnes' death was intended to silence Agnes' accusations, some of which resulted in several felony convictions by the New York Attorney General with Pamela's assistance.

## ACTIVITIES THAT ARE ILLEGAL OR
## CONTRARY TO PUBLIC POLICY

40.    The conspirators are engaged in illicit activities under the guise of tax-exempt status. The conversion of undervalued Carvel assets without tax amounts to money laundering. Exempt purposes may generally be equated with the public good, and violations of law are the antithesis of the public good. Therefore, the conduct of such illegal activities may be a bar to exemption claimed by those who alleged to govern a charity. Factors that have to be considered in determining the effect of illegal activities on an organization's qualification for exemption are the paragraphs of *Internal Revenue Code* under which the organization is exempt (*IRC* 501(c)(3) for private foundations), and the nature and extent of the illegal activities engaged in by the organization.

41.    Exemption recognized under *IRC* 501(c)(3) is unique in that, unlike exemption under other paragraphs of *IRC* 501(c), it is grounded in charity law, so that denial of exemption under *IRC* 501(c)(3) may be based on charity law. Violation of constitutionally valid laws is inconsistent with exemption under *IRC* 501(c)(3). As a matter of trust law, one of the main sources of the general law of charity, **planned activities** that violate laws are not in furtherance of a charitable purpose.

42.    The foundation impostors fear loosing control of misappropriated Carvel assets. These fraudsters' intentions are stated in their manifesto for control of the "Thomas and Agnes Carvel Foundation". The "Confidential" memos were created by Robert Davis dated February 18, 1992 (A32) and April 9, 1992 (A34), in the midst of the Attorney General's charity fraud investigations (*NYS v. Davis, Arcadipane, and Thomas and Agnes Carvel Foundation*, Index No. 93/405052). The first memo states that removing and discrediting Robert Davis and Mildred Arcadipane "**provides family with opportunity to assume control of Foundation, Estate and Agnes' assets.**"

43.    Nothing could more clearly demonstrate the **planned intent** to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates. Such illegal intent (namely the intent to fraudulently convert control of the Carvels' charity and withhold ALL CARVEL ASSETS from Agnes Carvel) for continuing planned activities that violate laws is adhered thereafter by the alleged foundation managers that Davis installed, named "loyalists".

44.    In the same document at #11 (A33), "Hudson Valley" [Bank] is listed generically as "loyalist" successor, i.e. anyone from Hudson Valley Bank (where William Griffin is chairman; and where Griffin and the Abplanalp family are major controlling shareholders) can be counted on to stack the charity's votes against Agnes Carvel. The alleged foundation managers carried out the expressly stated criminal enterprise while Agnes

14

was alive; while she was the sole living charitable benefactor, the sole surviving asset-owner, and the sole mandatory income beneficiary. Such criminal intent continued to deny Pamela Carvel all rights as Agnes Carvel's executor and successor sole legitimate Foundation Member.

45.     The foundation usurpers operate their criminal enterprises under a cloak as "remainderman" with tax-exempt status stolen from the identity of the Carvels' formerly legitimate charities, therefore the tax-exempt status behind which the fraudsters hide must be denied. Foundation usurpers must be held individually accountable for the tax evasion and damages resulting from their conspiracy. The stated illegal intent, to fraudulently convert all Carvel assets by litigating through the charity to deny Agnes Carvel all assets and income, violated restrictions on charitable purposes, the QTIP and Marital Deduction elections for Thomas Carvel's estate taxes as well as contractual obligations to Agnes in Thomas Carvel's alleged 1988 "estate plan".

46.     This stated illegal intent continues to profit the foundation usurpers. Millions of restricted charitable funds are directed to litigation against the Carvels, yearly for 17 years, to accomplish this illicit goal. On information and belief, more funds are disbursed for non-charitable purposes than alleged charitable ones. Litigation expenses always take priority over grants. Foundation usurpers directed restricted charitable gifts be used to harm Agnes Carvel and her legitimate successors in interest, and to cover-up the usurpers' illegal purposes. Such actions violate laws on the protection of rights, laws restricting charitable activities, laws on prohibited activities, laws on disqualified persons, as well as laws on tax fraud, money laundering, and bribery of judges.

47.     "A trust cannot be created for a purpose which is illegal. The purpose is illegal ... if the trust tends to induce the commission of crime or if the accomplishment of the purpose is otherwise against public policy.... Where a policy is articulated in a statute making

15

certain conduct a criminal offense, then ..., a trust is illegal if its performance involves such criminal conduct, or if it tends to encourage such conduct." (*IV Scott on Trusts* Section 377, 3d ed. 1967).

48.     Thus, all charitable trusts (and by implication all charitable organizations, regardless of their form) are subject to the requirement that their purpose may not be illegal or contrary to public policy. (*Rev. Rul.* 71-447, 1971-2 C.B. 230; *Restatement (Second) of Trusts*, Section 377, Comment c (1959)). Moreover by conducting criminal activities, an organization increases the burden of government and thus thwarts a well-recognized charitable goal, i.e., relief of the burdens of government.

49.     Reg. 1.501(c)(3)-1(c)(1) states that an organization will not be regarded as operated "exclusively" for *IRC* 501(c)(3) purposes if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. The presence of a single non-charitable purpose if substantial in nature (such as multi-million-dollar-17-year litigation exclusively against the rights of the elder benefactors) will destroy the exemption regardless of the number or importance of truly charitable purposes (*Better Business Bureau v. United States*, 326 U.S. 279,1945). Therefore, if individuals conduct an organization to engage in illegal acts that are a substantial part of its activities, such organization does not qualify for exemption under *IRC* 501(c)(3).

50.     Those who improperly or illegally hold themselves out to be charity managers in order to commit crimes using the charity's funds have committed those crimes against the benefactor, against the charity, against government, and against all citizens who would benefit from legitimate charitable use of the funds, thereby making this these issues, whether criminal or civil, within the powers designated to the New York Attorney General to prosecute.

51.    According to the analysis of the *Internal Revenue Service, General Counsel Memorandum* ("G.C.M.") 34631, dated October 4, 1971, in determining whether disqualifying activities are present to a "significant extent" (that is, when they become "substantial"), more must be considered than the ratio they bear to activities in furtherance of exempt purposes. The nature of such acts is as important as their quantity. A great many violations of local regulations amounting to a sizable percentage of an organization's operations might be required to disqualify it from 501(c)(3) tax exemption. Yet, if only a small fraction of its activities were directed to robbing banks, it would not be tax exempt. This is an example of an act having a substantial non-exempt nature, while lacking substantiality of amount.

52.    Foundation usurpers' crimes are both substantial in quantity as well as significance, causing multi-million dollar litigation for 17 years, directed at procuring the death of Agnes Carvel through incessant litigation and deprivation of money to sustain life, all done to silence the elder benefactor and beneficiary; depriving Agnes all sources of income, and threatening invasion of Agnes' personal privacy and individual sovereignty, all done to retain illicit control over Agnes' charities. Such acts to harm Agnes resulted in tax fraud. Such acts became directed against Pamela Carvel as Agnes Carvel's sole financial support, sole advocate, whistleblower, witness, and investigator, to silence Carvel revelations of apparent bribery and multi-million dollar embezzlement schemes.

53.    A very little planned violence or support of terrorism would constitute "substantial" activities not in furtherance of exempt purpose. If, as suspected from available evidence, any part of the theft of control of the Carvels' millions was used against the Carvels to thwart discovery and prosecution of the foundation usurpers' aiding and abetting the diversion of Carvel funds to persons and entities in the sale of Carvel Corp. with apparent connections to suspected terrorists, or in the procurement of the deaths of Tom and Agnes as

17

benefactors, then tax-exempt status, used by these foundation fraudsters as their ploy to operate, must certainly be immediately revoked.

54.    In determining whether illegal activities are substantial, it must be borne in mind that actions by members and officers of an organization, (particularly those who are illegally or improperly asserting charity control) do not always reflect on the organization. Because organizations act through individuals, it is necessary to distinguish those activities of individuals that are done in an official capacity for legitimate charitable purposes from those that are not.

55.    Foundation usurpers provided multi-million dollar financing for years of litigation to defend Thomas Carvel's executors' in furtherance of criminal activities involving real estate scam felons, as well as tax fraud by improper accounting practices to deny Agnes Carvel all taxable income mandatory by law. Those improper practices not only harmed Agnes, the beneficiary and charitable benefactor, by allowing gross negligence creating multi-million dollar losses, but also created in the Carvel estates, trusts, and charities, tax frauds for which there are no statutes of limitation (26 *U.S.C. Sec.* 6501 (c)(1,2,4,5,6).

56.    The foundation usurpers' received the gross proceeds from their illicitly funded litigation against Agnes Carvel, before the full and proper administration of Agnes Carvel's London Estate and payment of all creditors in all ancillary jurisdictions. This premature distribution demonstrates the success of foundation fraudsters' written stated fraudulent intent and confirms intentional tax fraud, engagement in criminal activities against the Carvels, and manipulation of ill-gotten gains for the profit of the fraudsters and their agents. All this was accomplished through the identity theft of Carvel charities and the abuse of the charitable "remainderman" status under fraudsters' control.

57.    Not only is the actual conduct of illegal activities inconsistent with tax exemption, but also the planning and sponsoring of such activities are also incompatible with

18

charity and social welfare. G.C.M. 36153, dated January 31, 1975, states that because planning and sponsoring illegal acts are in themselves inconsistent with charity and social welfare it is not necessary to determine whether illegal acts were, in fact, committed in connection with the resulting activities or whether such a determination can be made prior to conviction of an accused. However, it is necessary to establish that the planning and sponsorship are attributable to the organization, if exemption is to be denied or revoked on this ground. As long as foundation usurpers operate the stolen identities of the Carvels' charities, as individuals engaged in illegal activities, tax-exemption must be denied and revoked to the alleged foundation itself.

58.    Because these usurpers were previously under investigation for charity fraud, and because they re-commenced the very same crimes previously committed, Carvels' good name, legitimate intentions, and charitable funds are so violently violated and damaged, that the only reasonable course of action is to dissolve the illicit stolen entity's existence under the name "Thomas and Agnes Carvel Foundation" and distribute the assets along with damages claimed against the fraudsters to other charitable entities with the same purposes set forth in the express and implied intentions of Thomas and Agnes Carvel.

59.    *Prima facie* documentary evidence of the continuing, planned intentions of each and every activity financed by the usurpers is contained in the records of multi-million dollar payments from charity funds to allow the usurpers to engage in the illegal activities including deprivation of constitutional rights, intimidation, harassment, elder abuse resulting in felony murder, tax fraud, bribery of judges, and other, as well as the lack of benefit to legitimate charitable purposes defined by the benefactors. The Attorney General has the power to subpoena such records for analysis by a fraud examiner.

60.    If an *IRC* 501(c)(3) organization engages in activities designed to force an unrelated party to act or refrain from acting in a way that the organization believes will assist

19

them in the accomplishment of their purposes, then questions arise as to whether these activities are permissible methods of furthering educational or charitable purposes.

61.    Violating the benefactor-testators' expressed or implied intentions is contrary to New York statutes and common law. Clearly defined precedents established by the benefactors' in charity management demonstrate intent. Obstructing the benefactor's and Member's rights in order to conceal crimes from prosecution, are not valid charitable activities, in addition to being violations of statutes. Harming the benefactor with her own charitable gifts is certainly against public policy; tax fraud is certainly illegal.

## VIOLATIONS OF PUBLIC POLICY

62.    Discrimination against elder surviving widows, like Agnes Carvel, is not yet as well known or as strongly complained about as racial discrimination because the very nature of the victims – elderly, often infirmed, or financially oppressed – makes it difficult if not impossible for the victims to be heard. Those of us who seek to defend our elders equally become victims of the same threats, intimidations, and financial ruin inflicted on the elders to silence their claims. We can look to the cause for ending racial discrimination to see how once routinely accepted crimes against our citizens can be changed to create a more just society and universally accepted public policy.

63.    Discrimination against Agnes Carvel, the elder benefactor, by the foundation usurpers' unsubstantiated accusations of disability was intended to deprive the benefactor of personal sovereignty. Unsubstantiated accusations provided a means for instigation of judicial intimidation without substantive and material due process. To repeatedly threaten Agnes as an elder person with denial of financial resources, to cause stress to procure death, are all demonstrations of age discrimination used against Agnes Carvel that are routinely employed by those with illicit intents, who seek to deprive widows of mandatory income due from their husband's estates. These acts routinely defraud the government by fraudulent

estate tax elections because the widows are too old or unable to forcibly complain about being victimized.

64.    A recent court case agreed with the Internal Revenue Service that an organization violated well-defined standards of public policy and did not qualify for *IRC* 501(c)(3) exemption. The organization was engaged in clear-cut violations of the law (*The Church of Scientology of California*, Commissioner, 83 T.C. No. 25, 1984). The court concluded that on the basis of all the facts of record the organization's overriding purpose was to make money, and that criminal manipulation of the IRS to maintain its tax exemption was a crucial and purposeful element of the organization's financial planning. The court described this purpose as a conspiracy, the major features of which were to block the IRS from investigating, determining, and collecting taxes from the organization and its affiliates. It stated that the conspiracy covered 8 years and involved the manufacture and falsification of records submitted to the IRS, and subverting government processes for unlawful purposes. Officials of the organization were convicted of conspiring to obstruct justice.

65.    Citing *Restatement (Second) of Trusts* Section 377 (1959), the court stated that it is axiomatic that a charitable trust is invalid if it is created for an illegal purpose. According to the court, a trust can be voided **at the request of an interested party** if trust property is used to perpetuate a crime defined by statute, or if the object of the trust is to defraud the government, or if its purpose is to evade taxes (*IV Scott on Trusts* Section 377, 3d. ed. 1967; and Bogert, *The Law of Trusts and Trustees*, Section 211, pp. 63-64, 114, 2d. ed. Rev. 1979).

66.    According to the court, the organization's conduct over a period of several years constituted a violation of 18 *U.S.C. Sec.* 371 and convincingly showed that the organization had a substantial illegal purpose during the years in question. The court stated that it was not required by either the First Amendment or charitable trust principles to find

21

that the government's only remedy was criminal prosecution. It gave several reasons for this conclusion:

    a.  18 *U.S.C. Sec.* 371, which provides that it is a felony offense for two or more persons to conspire to defraud the United States, is a venerable and major criminal statute;

    b.  the organization's conspiratorial efforts were systematic and long-lived;

    c.  the government's interest in ferreting out crime is not the only interest at stake; and

    d.  the government also had an interest in not subsidizing criminal activity.

67.    The court stated that were it to sustain the organization's exemption from federal income tax under *IRC* 501(c)(3), it in effect would be sanctioning the organization's right to conspire to thwart the IRS at taxpayers' expense.

68.    Plaintiff asserts that in the instant case, the usurpers already wasted multi-millions of dollars of restricted charitable gifts defending their illicit activities against the Attorney General, and lost, but continued the very same type of self-dealing charity frauds as prosecuted by the Attorney General. Such acts demonstrate deliberate **intent** to defraud and a pattern of activities in the furtherance of apparent criminal purposes. No reasonable person could suggest permitting more restricted charitable gifts to be wasted in defence of the usurpers' continuing bad-faith dealings.

69.    According to the court, the public policy requirement is an implied condition of *IRC* 501(c)(3) and its application is consistent with the holding in the *Bob Jones* case (a racial discrimination case; *Bob Jones University v. United States*, 461 U.S. 574 (1983)) that charitable organizations seeking to qualify for exemption from federally imposed taxes must serve a valid public purpose and confer a public benefit. Application of a public policy requirement is neither harsh nor oppressive because the organization had ample notice that it was against the law to conspire to obstruct the IRS (18 *U.S.C. Sec.* 371 had been in effect for

22

over 100 years). *IRC* 7805(b) provides the Commissioner with broad authority to make tax rulings retroactive.

70.    The court cited Rev. Rul. 67-235, 1967-2 C.B. 113, holding that an organization that is not "charitable" in the generally accepted legal sense does not qualify for *IRC* 501(c)(3) exemption, and Reg. 1.501(c)(3)-1(d)(2) which provides that the term "charity" is used in its generally accepted legal sense. It also quoted as follows from Rev. Rul. 71-447, 1971-2 C.B. 230: "All charitable trusts * * * are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy."

71.    As to the necessity for a judicial determination, the IRS is not in a position to make a determination as to the illegality of an act under a provision of law other than the Internal Revenue Code. That is a matter for the judiciary. Such a task would be impossible for the IRS to undertake from an administrative standpoint, and from a legal standpoint it would be improper to delegate such a determination to an administrative body without the procedural and substantive due process protection provided through the judicial process. New York's Attorney General and the District Court have the power to accomplish what the IRS cannot.

### APPARENT BRIBE VIA HUDSON VALLEY BANK LOANS

72.    Agnes Carvel's only adversaries for 17 years are the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets (A32). The same document (#11;A33) named "Hudson Valley" acceptable "loyalists" to become successor members and directors, i.e. anyone from Hudson Valley Bank.

73.    As soon as Tom's was found dead, the usurpers stole all records from the Carvels' offices and moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed to impersonate a foundation member, director and officer. Soon again, the Bank's other major controlling

23

stockholder, Robert Abplanalp, was also installed. Upon Robert Abplanalp's death, his daughter Marie Abplanalp Holcombe took his place as "Hudson Valley" loyalist as stated in the 1992 manifesto, to maintain control against the Carvels. Marie Abplanalp is also a major controlling stockholder in the Bank. After stealing the identity and control of the Carvels' charities, Griffin and the Abplanalps abused Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving any income. The Bank asserts more control over Carvel money than any Carvel.

74.    Trials in the Thomas Carvel estate matters began on September 10, 2001. On October 1, 2001, Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000 (A36). The accounting proceeding in Agnes Carvel's New York ancillary administration began in May 2005. On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000 (A51). Neither of these loans was disclosed. It is Plaintiff's assertion that since the Office of Court Administration does not require "equity loans" to be listed on its forms, this type of loan-ploy forms an innovation in pay-off schemes to encourage favorable decisions.

75.    The average citizen can never know whether these "loans" are repaid by Surrogate Scarpino, or just "written off" as a cost of doing business by Griffin and his Bank. Given Surrogate Scarpino's decisions favoring the foundation usurpers against Agnes, the sole intended beneficiary of everything, there is the appearance of impropriety and bias, namely the appearance of bribery, which is sufficient grounds to judicially disqualify Surrogate Scarpino because he lacks the personal conscience to recuse himself.

76.    The Surrogate placed no restraint whatsoever on disbursements by the usurpers and executors in Thomas Carvel's estate, including the disbursement of assets belonging to Agnes Carvel held in their hands. Legal fees are paid without prior or subsequent consent of the beneficiary or the court. This freedom, to draw down Carvel

property at will, remained with Agnes' adversaries despite Agnes Carvel's warning that her adversaries were engaging in fraudulent business practices with known real estate fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and U.S. and New York Attorney Generals' prosecutions convicted William Zuga twice (2002, 2003) for real estate fraud, convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds, and convicted William Fugazy (1997) for bankruptcy perjury. Millions of dollars were lost to Agnes Carvel by Agnes' adversaries' collusion with these felons, BUT only the whistleblowers, Agnes and Pamela Carvel, were and are denied indemnification of legal fees from Thomas or Agnes' estate assets, or equal indemnification provide to the "loyalists" as alleged foundation members.

77.    The foundation usurpers also draw freely on Agnes' assets prematurely placed in their hands by Surrogate Scarpino without notice to named beneficiaries, and without payment of any taxes, funeral expenses, debts or administrative expenses of Agnes' estate.

78.    It is clear enough that only strangers are intended to become millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses to prosecute claims against these strangers. One-sided funding of litigation seen in the light of $300,000 in undisclosed "loans" to Surrogate Scarpino can demonstrate nothing other than an appearance of bribery with the intent to fraudulently convert estate and trust assets away from the Carvels and their intended beneficiaries.

## HUDSON VALLEY BANK'S INCESTUOUS RELATIONSHIPS

79.    While Surrogate Scarpino concealed loans from Hudson Valley Bank, William Griffin, chairman of Hudson Valley Bank and controlling shareholder, appears before the Surrogate at trial as the alleged "most knowledgeable" director who represents the foundation usurpers at trials, although Griffin admitted under oath that he neither reads what he signs nor understands the contents. Marie Abplanalp Holcombe, another controlling shareholder in the

Bank, is an alleged foundation member and director who authorizes litigation in Surrogate Scarpino's court paid for with Agnes' restricted charitable gifts and Agnes' income denied to Agnes. Holcombe refuses to testify at trial, and states under oath that she only knows what she is told by attorneys. Surrogate Scarpino signed Pamela Carvel's request for subpoenas for alleged foundation documents and testimony by all the alleged foundation managers, but then Surrogate Scarpino retracted those subpoenas when the foundation usurpers complained.

80.     Evidence of Hudson Valley Bank manipulations of Carvel bank accounts and U.S. Treasury securities was the first fraud uncovered by Pamela Carvel in Thomas Carvel's estate. Hudson Valley Bank and its "owners" William Griffin, Robert Abplanalp and their co-conspirators stole control of the Carvels' private charities apparently to abuse the Carvels' good name and assets to further the organized political and financial influence the bank generates in numerous ways.

81.     The Bank runs something called "Hudson Valley Bank's Business Development Board" (A70) of which the Bank itself says,

- "members benefit from their association with Hudson Valley Bank through networking opportunities and exposure for their businesses"

- "The Board of Directors looks to fill these positions with highly-qualified professionals, **who can assist in achieving the Bank's goals**." (emphasis added)

82.     James Landy, the officer of Hudson Valley Bank who presided over the cover-up of the stolen and altered Treasury securities scenario, is chairman of the board of St. Joseph's Medial Center (an alleged grant recipient with kick-backs to Griffin and the Bank). Mathew Landy is James' cousin and the alleged office manager over one secretary of the alleged foundation, although the alleged foundation purports to not accept independent grant proposals. It only makes grants proposed by "insiders".

83.     William Griffin, who alleges to be foundation president, was "research counsel" to New York Lt. Gov. Malcolm Wilson. Wilson became the foundation usurpers'

26

general counsel immediately upon Tom's death, and then alleged himself to be foundation member and director. On information and belief, Wilson directed that Agnes Carvel be denied her position as foundation director when Agnes demanded an investigation into Griffin's involvement in the St. Joseph's Hospital grant scams (A77). Wilson installed his partner Lawrence Fay and their buddy Griffin on the foundation as "loyalist" list to bolster the phoney votes against Agnes (A34, Second).

84.    Wilson was the "campaign chairman" for Surrogate Emanuelli's unopposed "election". Surrogate Emanuelli turned a blind eye to all crimes committed against Agnes Carvel, withheld all mandatory income due Agnes Carvel to prevent her challenging the legitimacy of the foundation usurpers, and harassed Agnes until death resulted.

85.    The Hudson Valley Bank Business Development Board also includes:

- Marc Oxman (A74), installed as Guardian Ad Litem for Agnes Carvel, is one such person who "assists in achieving the Bank's goals" along with Oxman's law partner Andrew Natale, Jr.(A73). Oxman was hired to wipe out Agnes' claims and to cause Agnes' death in London by stress -- and so he did. Oxman hired investigators to stalk Agnes in London at the estate's expense, while Oxman and the foundation usurpers aggressively obstructed all income to Agnes, needed to pay for food and care.

- Daniel Hollis (A72) is partner to Stuart Shamberg. Shamberg was attorney for the Westchester County Public Administrator who hijacked control of the London Estate into New York by perjury by the alleged foundation's lawyers in November 1998 despite the probate in England in October 1998. Over $20,000 was needlessly wasted.

- Edward A. Sheeran (formerly) is Executive Director, Yonkers Industrial Development Agency ("IDA"), the agency that played a part in the phony St. Joseph Hospital grant where Griffin purchased a property only after he knew his cronies in the alleged foundation approved a $2,000,000 purchase grant for a $700,000 parcel of land. Over

27

$1,300,000 disappeared along with a corner of the property that was a branch office of the Hudson Valley Bank. The IDA then stepped in to provide financing (A77).

- Michael Spicer (A75) is President and CEO of St. Joseph's Hospital, recipient of numerous unaccounted-for grants.

- In 1982, the Bank and its vice president John Finnerty (who remains on the Business Development Board, A71) faced and survived indictment for phony "loan" schemes and "various count of larceny and misapplication of property".

### GRIFFIN'S FRAUDULENT CONVERSION OF REAL ESTATE

86.     On October 6, 2006, William Griffin alleged to act as the president of the "Thomas and Agnes Carvel Foundation" in order to sell Agnes Carvel's former residence in Ardsley, New York containing two parcels of land of approximately 16 acres (currently valued at **$8-10 million**) to a shell company belonging to Denis Amicucci, a relative of Griffin's law partner Paul Amicucci, for only **$700,000** (A84) and **$1.3 million** (A87). A similar insider sham transaction is suspected for Agnes' real estate in Florida. All these disposals of Agnes Carvel's assets were done without court approval, without notice to Pamela Carvel as executor, without notice to named beneficiaries, and without notice to creditors.

87.     Daniel A. Amicucci formed the shell company, Chauncey Partners LLC, in March 2006. Paul Amicucci is listed as part of Griffin's law firm Griffin, Coogan and Veneruso, P.C. (A99) and also appears to be the attorney in the firm of Walsh and Amicucci, LLP who act for other charities controlled by Griffin. Paul Amicucci is also listed among the "Hudson Valley Bank Business Development Board" (A70) that has an incestuous, covert political relationship to the Carvel estate manipulations in Westchester Surrogate's Court.

88.     On that same day, October 6, 2006, the shell company returned control of the whole property back to Griffin through Hudson Valley Bank as an alleged lease assignment

28

for security for an alleged US$1.3 million mortgage from Hudson Valley Bank (A90) where Griffin is not only chairman but a controlling shareholder along with alleged foundation manager Marie Abplanalp Holcombe (Exhibit A101).

89.    This same Ardsley property was appraised at **$1.1 million in 1990** when Thomas Carvel died (A106). While all surrounding real estate has increased in value a minimum of 300-400%, the Carvels' exclusive mountaintop acreage property only increased about 82%, despite the rare and unusual nature of so many undeveloped acres in such a sought-after area, and contrary to the high demand exhibited in the past. Agnes Carvel's other Westchester property, the first Carvel ice cream stand location in Hartsdale, was also stolen from Agnes and sold by Griffin in 2006 allegedly for $2.8 million to the owner of the current Carvel franchise. On information and belief, the actual price paid was $3.5 million, i.e. another $700,000 exchanged hands unreported. That property increased 375% from its 1990 appraised value of $600,000. Both properties have similar rocky terrains. Both properties are highly sought after for different uses.

## OTHER APPARENTLY SELF-DEALING GRANTS

90.    The St. Joseph's Medical Center and Hospital grant scam by Griffin is briefly detailed above (A77). William Griffin's wife and alleged foundation manager Ann McHugh were directors on the St. Joseph's Hospital board, in addition to players from the Bank's Business Development Board. The Hospital routinely receives grants without accountability.

91.    On information and belief, alleged grants to St. Joseph School are payments for the tuition fees of Ann McHugh's (a named "loyalist", now deceased) grandchildren (A107). On information and belief, alleged grants to the Visiting Nurse Service were payments for medical assistance to Ann McHugh who died of cancer.

92.    On information and belief, a multi-million dollar grant to St. Agnes Hospital (A111) was made to disappear with the assistance of William Tan, who according to the

29

media was involved with a charitable donations slush fund used for vacations and parties at Westchester Medical Center. When Agnes Carvel asked for the details of how the grants millions were being used, Tan said he reported only to Robert Davis, the fraudster later ousted by the Attorney General. On information and belief, St. Agnes closed in bankruptcy shortly after the alleged foundation made its multi-million dollar payments alleged for new constructions and equipment, that were later sold at auction for a fraction of their price.

93.    The foundation usurpers defended Betty Godley's improper accountings in Thomas Carvel's estate. Betty Godley is also a trustee of an alleged Florida grantor trust. The trust draftsman, attorney Lawrence Newman, stated under oath at trial that the purpose of the trust was to prevent Agnes Carvel from reaching her own money. The trustees transferred over $10 million into that trust from Hudson Valley Bank and Bank of New York without the knowledge or consent of Agnes Carvel.

94.    When Agnes refused to sign a general release exempting the trustees from all accounting and all charges for fraudulently transferring the money, the trustees cut-off all distributions to Agnes. The trustees along with the foundation usurpers diminished the trust assets in litigation opposing enforcement of the accountings and terms of the trust (from what should be over $25 million to less than $7 million). Although the alleged foundation is not yet named beneficiary of the Florida trust, and although payment of Agnes' funeral expenses, debts, taxes, and estate administrative expenses are mandatory under Florida statutes and the terms of the trust, Godley paid several hundred thousand dollars a year to the foundation usurpers, but refused to pay funeral expenses and other claims by Pamela Carvel as executor.

95.    In return for Godley's collusion, the foundation usurpers nominated Godley a foundation director, and pay numerous alleged charitable grants every year to members of Godley's family. St. Barnabus is where Godley lives with her husband who is the pastor. Midnight Run is an alleged food program run by Godley's husband. The David Stewart

30

Memorial Fund is a creation of Godley's brother Jack Stewart. On information and belief, covert payments were made to the Frances Schevier Nursing Home for Godley's mother.

96.     Spiro Scouras, a well-known movie entrepreneur, sought support for the American Museum of Immigration's production of a video on the successes of immigrants in America. This subject was dear to the hearts of both Thomas and Agnes Carvel, who were both immigrants. Agnes personally donated funds. Eventually it was learned that the alleged foundation also donated funds. The video project was represented to be produced by Disney with narration by Leonard Nimoy. When Scouras, who had much experience in this field, received the final tape, he was outraged. It was not an original production by Disney or Nimoy. Souras called it a cut and paste that took ten minutes to put together from stock footage.

97.     Pamela Carvel's investigations learned that the alleged manager of the Museum closed the exhibit housed at the Statute of Liberty, and diverted all the charitable donations to himself as "loans" that were never repaid. The Carvels asked the alleged foundation to stop any funding of the project and seek restitution for all sums paid (A111). The foundation usurpers claimed they had no responsibility for the money once they gave it away. Reports to Charities Bureau Laura Werner were also ignored. On information and belief, the Museum sought dissolution as soon as Pamela Carvel and Spiro Scouras' investigations into the grant-loan fraud began.

98.     In 1991, the assistance of Agnes Carvel's neighbor, Thomas Reddy, was solicited by Malcolm Wilson to "control" Agnes who was living in Florida. Agnes' home mail was diverted to Reddy's house. Reddy telephoned Wilson and Fay with details of Agnes' private finances and business. Reddy alleged himself to be Agnes' "personal attorney" although he was not licensed in Florida. Reddy became a Florida trustee with Godley and an alleged foundation member and director in exchange to misdirecting Agnes

31

and obstructing Pamela's investigations of financial irregularities in Carvel accounts at Hudson Valley Bank.

99.    In further pay-off, Reddy's son-in-law politician Thomas Dickerson was publicly given credit in the newspapers and printed political advertisements for securing an alleged foundation grant to refurbish playgrounds (A113). Dickerson used this grant ploy advertisement again in his next election campaign. These backhanded attempts to influence two elections by using charitable grants is unethical self-dealing, if not disallowed by law.

100.    On information and belief, close scrutiny of all alleged foundation grants will uncover more kickbacks, self-dealing, and outright frauds. These are the very types of charity fraud that the Attorney General prosecuted previously. Such persistent intent to defraud mandates dissolution of the alleged foundation to end the abuses by the fraudsters.

### INTIMIDATION OF WHISTLEBLOWERS

101.    The basic stance of the foundation fraudsters has been to expend over $40 million in legal fees, commissions, salaries, and wasted assets as long as it is to perpetuate litigation by the usurpers and their agents against the Carvels, using the Carvels' restricted charitable funds. The usurpers successfully obstructed all funds from reaching the Carvels so as to inflict fear, hardship, intimidation, and mental anguish on Agnes Carvel as an elder person, and to threaten destitution and inflict financial ruin on Pamela Carvel for daring to oppose the usurpers' theft of Carvel assets. These tactics amount to RICO and felony murder by procuring the death of Agnes Carvel by stress through extortion to silence the Carvels' complaints and investigation against Griffin and his co-conspirators.

102.    Out of 36 fiduciary positions controlling Agnes' property and its income (7 in Thomas Carvel's estate, 12 in two corporations, 4 in an alleged New York unitrust, 3 in the an alleged Florida grantor trust, 10 in the alleged foundation), all of whose legal fees are paid from Agnes' property without notice to the Court or to Agnes as beneficiary, Pamela Carvel

is the sole fiduciary other than Agnes Carvel to be deprived of equal access to funds to retain competent, independent, legal counsel. All other fiduciaries draw down the multi-million dollar Carvel estates' without restriction or approval. Professional legal representation is indispensable for the benefit of Agnes Carvel as sole beneficiary in her lifetime, to defend Agnes' continuing interests through her estate, and to assert the Carvels' testamentary intentions for legitimate charity. Assistant Attorney General Laura Werner did nothing to monitor the unlimited, unrestrained, multi-million dollar payments for legal fees against Agnes Carvel as beneficiary and benefactor, while Agnes was denied all income and equal indemnification.

103.    Fiduciaries controlling at least 22 of these fiduciary positions (excluding only Agnes, Pamela and Adele Alexander) are agents for the foundation usurpers in exchange for financial pay-offs. These fiduciaries acted to withhold all income and property belonging to Agnes. The **only** accountings actually determined at trial were those of Thomas' estate. Most entities owing the Carvels accountability refused to account, refused to provide documents, and evaded scrutiny to conceal fraud and embezzlement.

104.    The Thomas Carvel estate accountings were supported and defended exclusively by the alleged foundation's attorneys and such defence was merely "adopted" by the executors. Those accountings were deemed by Surrogate's Court to be incorrect, improper, and not in compliance with New York law. The accountings were defended against Agnes' interests to income by the foundation usurpers using Agnes' charitable gifts exclusively for the reason to deprive Agnes Carvel of mandatory income due under the marital deduction and QTIP elections for estate tax exemption. Assistant Attorney General Laura Werner did nothing to restrain the abuse of restricted Carvel charitable gifts against Agnes' interests, or to support the rights of the benefactor against charity abuses.

33

105.    The actions of these conflicted fiduciaries violated the purported terms of the 1988 "estate plan", violated the Internal Revenue Code, and violated the law, but nonetheless, their actions were supported by the foundation usurpers, and never scrutinized by the Court, Laura Werner, or anyone else but the Carvels. The Carvels were denied funds to defend their rights against these abuses. The foundation usurpers allowed all these fiduciaries legal fees to be paid from Agnes' property without question, often without invoices, but continue to oppose payment of all Carvel legal expenses and obstruct all distributions of Agnes' income.

106.    The alleged foundation permitted more than 25 attorneys to be paid in full without fee applications, often without invoices, without scrutiny by Agnes, her Estate, her beneficiaries, her creditors, or Westchester Surrogate's Court. Many of these attorneys, like Kent Hazzard, directly represented foundation usurpers in numerous conflicted positions, double and triple billing the Carvel fund. This one-sided obstruction of financial resources was intended to discriminate against the Carvels as victims, to harm Agnes as an elder person, and is intended to harm Agnes' intentions for legitimate charitable dispositions through her Estate.

107.    Agnes and Pamela are the only fiduciaries in Carvel matters who are denied equal indemnification of legal fees and reimbursement of litigation expenses because they are also the only "whistleblowers" concerning criminal activities, including judicial misconduct. Carvel investigators assisted New York State Attorney Generals Abrams and Spitzer in felony convictions for financial fraudsters operating in connection with Thomas Carvel's estate (William Zuga (twice), Francis Zarro). The U.S. Attorney in another matter convicted another Carvel estate fraudster, William Fugazy, for perjury. Although the Attorney General's Securities Prosecution Unit was actively prosecuting these financial felons, Laura Werner failed to support the Carvels' attempts in Surrogate's Court to stop the foundation fraudsters' and their agents' who continued to support these illegal real estate scams. Not

34

even perjury by the alleged foundation's counsel was enough to draw Ms. Werner's attention to stop this abuse. Over $5 million of Agnes' income was needlessly lost to these scam artists. Several millions more were lost to charity by the foundation fraudsters' and their agents' litigation to perpetuate these scams.

108.    The Carvels also assisted the New York Attorney General in charity fraud investigations that forced the ouster of two alleged Carvel charity managers for charity frauds and self-dealing grants, but not before the duo installed their "loyalist" cronies to pay the fraudsters' legal fees and to litigate against Agnes thereby creating additional tax fraud in activities not permitted under *I.R.C.* 501(c)(3).

109.    Since 1991, Ms. Werner failed to support the Carvels in stopping criminal activities in Surrogate's Court. Ms. Werner presides over the spending of approximately $3-4 million per year by the foundation usurpers and their agents for the illegal purpose of denying Agnes Carvel her rights as beneficiary and surviving asset owner.

110.    On information and belief, Laura Werner was copied on every document filed with the Court since 1991, yet not one of these document was available from the Charities Bureau in response to a Freedom Of Information Law request. Although the Attorney General's written policy is to retain litigation records for 20 years, nothing of substance could be produced concerning the charity fraud complaints and investigations concerning the alleged foundation. Not one charity complaint to Ms. Werner from Pamela Carvel was answered. Not one inquiry directed to Ms. Werner for her accountability was answered by Ms. Werner. On information and belief, Laura Werner allowed attorneys for the foundation fraudsters to write papers opposing the rights Agnes Carvel, sole intended beneficiary who never received one penny from Thomas Carvel's estate. Those papers were then submitted to the Court on behalf of the Charities Bureau.

111.    The Attorney General has the power to set aside the sale of properties made with the intent to defraud the Carvels and charity for personal profit to Griffin and his cohorts. Laura Werner ignored all these covert and blatant abuses. Demand is herewith made on the Attorney General in Albany to find a new broom, and to sweep this matter clean by dissolving this alleged foundation.

WHEREFORE, as a result of criminal enterprises to defraud the Carvels, to defraud charity, to defraud the People, and to defraud taxing authorities, this Complaint seeks to compel the New York Attorney General:

   a.  to deny and revoke tax-exempt status, and to dissolve the alleged Thomas and Agnes Carvel Foundation in New York for identity theft, to prevent further harm to the Carvel name, to the Carvel family, to the People, and to send a clear signal to all that charity fraud shall not be tolerated;

   b.  to immediately place the all assets of the alleged Thomas and Agnes Carvel Foundation (New York) into the hands of an independent court-appointed receiver until distributed by the court;

   c.  to immediately and permanently restrain alleged foundation managers William Griffin, Marie Abplanalp Holcombe, Salvatore Molella, Brendan Bryne, Mathew Landy, and Karen Springfield, their employees, their attorneys, their agents, and others not yet identified at this time, from using the Carvel named in any form or taking any action alleged to be in the name of any Carvel charity or business entity;

   d.  to recover treble damages from the above alleged foundation managers for: gross breach of fiduciary duties; all legal expenses paid out of the charity's funds or caused to Agnes and Pamela Carvel; tax fraud, penalties, interest;

charity grant fraud; self-dealing; fraudulent conversion; and other criminal enterprises against the People of the State of New York and the Carvel family;

e.  to distribute all the assets of the alleged Thomas and Agnes Carvel Foundation (New York) held as of October 21, 1990, with statutory interest thereon, on a pro rata basis only to those charities now in existence that received grants prior to November 1990 (A114, some dates missing); and only to those charities that never had any connections to: Hudson Valley Bank, the Hudson Valley Bank Business Development Board, alleged foundation managers, their relatives or business associates, because of past collusion in grant frauds by these persons;

f.  pursuant to Agnes Carvel's express and implied intentions, to distribute to the legitimate Thomas and Agnes Carvel Foundation (London, England) and/or the Carvel Foundation (Florida) all the assets of the alleged Thomas and Agnes Carvel Foundation (New York) acquired at the expenses of Agnes Carvel subsequent to October 21, 1990, along with all interest and damages thereon, to be monitored by the Charity Commission of the United Kingdom and/or the Attorney General of Florida;

g.  to disaffirm and rescind all individual, representative, professional acts taken by the alleged foundation managers or their agents for their own profit or against the Carvels', to divert and fraudulently convert Carvel property, and impersonate Carvel entities.

September 2, 2007

Pamela Carvel, Member, appearing *pro se*
Thomas and Agnes Carvel Foundation
28 Old Brompton Road, Suite 158
London SW7 3SS
NY tel/fax fwd 1 212 751 6746

37



# Claim Form
## (CPR Part 8)



| | |
|---|---|
| **In the** HIGH COURT OF JUSTICE | |
| **Claim No.** | HC07C02611 |

IN THE ESTATE OF THE LATE AGNES CARVEL, DECEASED



Claimant

PAMELA CARVEL (EXECUTOR, 4/8/98-11/6/07)
litigant in person for lack of funds
28 Old Brompton Road, Suite 158
London SW7 3SS England
tel/fax 0207 278 1726

Defendant(s)

1) GUY GREENHOUSE (JUDICIAL TRUSTEE, 11/6/07)

with notice to:

Roy Clark, Director, Criminal Investigations, on behalf of INLAND REVENUE
    Customs House, 20 Lower Thames Street, London EC3R 6EE

Attorney General, Serious Fraud Office, on behalf of CHARITIES
    Elm House, 10-16 Elm Street, London WC1X 0BJ

also:

Serious Organized Crime Agency    P.O. Box 8000, London SE11 5EN

Does your claim include any issues under the Human Rights Act 1998?  [X] Yes  [ ] No

Details of claim (see also overleaf)

The Claimant seeks the following relief:

1. Enforcement by the High Court of the uncontested Last Will and Testament of Agnes Carvel as granted probated by the High Court on 2 October 1998

2. An Order for delivery to the jurisdiction of the High Court all Estate assets held by Leonard Ross and the alleged "Thomas and Agnes Carvel Foundation" in New York, since those parties voluntarily submitted to the jurisdiction of the High Court

3. An Order for the delivery to the jurisdiction of the High Court all assets held by the so-called "Agnes Carvel 1991 Trust", since those assets were represented to the High Court as comprising the Estate's property; and since those assets are distributed to the alleged New York foundation as alleged remainder beneficiary before the required payment of the Estate's debts, expenses and taxes

| Defendant's name and address | GUY GEENHOUS RadcliffesLeBrasseur 5 Great College Street London SW1P 3SJ |
|---|---|

| | |
|---|---|
| Court fee | |
| Solicitor's costs | |
| Issue date | 0 1 OCT 2007 |

The court office at CHANCERY

is open between 10 am and 4 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

N208 Claim form (CPR Part 8) (10.00)                                Printed on behalf of The Court Service

| Claim No. | |
|---|---|

## Details of claim *(continued)*

4. An Order appointing an independent Receiver in England to hold all Estate assets pending: i) determination by the High Court (and Inland Revenue) of all debts, expenses, taxes, and beneficiaries of the Estate payable pursuant to the uncontested Last Will under English law; ii) approval of Pamela Carvel's accounting; iii) delivery of a closing letter from Inland Revenue

5. An Order compelling Guy Greenhous, a professional fiduciary, to disclose the source of payments or promised payment to him, since there are no Estate funds in England, and Pamela Carvel as executor was denied necessary funds for nine years

6. An Order rescinding for lack of funds all court costs order on 11 June 2007 to be paid by Pamela Carvel by 1 October 2007, or deducting such costs from the debts, expenses, and legacies payable to Pamela Carvel under the Will

7. An Order appointing Pamela Carvel administrator of the Estate in Florida and Delaware to continue to pursue existing claims

8. A Declaration of the priority of the rights of Agnes Carvel and Pamela Carvel (benefactors, beneficiaries, fiduciaries, creditors) not to be victimized or abused for the financial profit of others, or to conceal the fraudulent transfer of Carvel family assets, or to punish the Carvels as whistleblowers for alerting law enforcement as to possible criminal activities; and determination of damages payable by abusers, alleging standing by mere remainder interest, for obstructing guaranteed civil and human rights

---

**Statement of Truth**

*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name ___PAMELA CARVEL___

Name of claimant's solicitor's firm ___LITIGANT IN PERSON FOR LACK OF FUNDS___

signed ___*[signature]*_____ position or office held_____

*(Claimant)(Litigation friend)(Claimant's solicitor)  (if signing on behalf of firm or company)
*delete as appropriate

Claimant's or claimant's solicitor's address to which documents should be sent if different from overleaf. If you are prepared to accept service by DX, fax or e-mail, please add details.

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION

CLAIM NUMBER: _____

IN THE ESTATE OF AGNES CARVEL, DECEASED

BETWEEN:

PAMELA CARVEL, (EXECUTOR 4/8/98-11/6/07)

Claimant

and

(1) GUY GREENHOUS (JUDICIAL TRUSTEE, 11/6/07)

Defendant

With notice to :
Roy Clark (on behalf of Inland Revenue)
Director, Criminal Investigations
Customs House
20 Lower Thames Street
London EC3R 6EE

Attorney General (on behalf of charities)
Serous Fraud Office
Elm House
10-16 Elm Street
London WC1X 0BJ

with copy to:
Serious Organized Crime Agency
P.O. Box 8000
London SE11 5EN

---

**FIRST WITNESS STATEMENT OF
PAMELA CARVEL**

---

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

I, **PAMELA CARVEL** of 28 Old Brompton Road, Suite 158, London SW7 3SS say as follows:

## MY BACKGROUND

1. I am a member of the Association of Certified Fraud Examiners in the United States and Great Britain. I choose not to be a "certified" or "chartered" accountant or examiner because I prefer to work directly in conjunction with the Criminal Investigation Divisions, taxing authorities and law enforcement to allow government agencies to identify any possible violations, conflicts of law, or interpretation of regulations. For approximately 30 years my experience is in uncovering international corporate deceptions and other "business" ploys used to defraud. My statements are based on opinions from experts, facts from law enforcement, and on information and belief based on documentary evidence and testimony that I know about.

2. I am Plaintiff in this proceeding. I make this Statement in support to the my Claim for orders by the High Court in protection of Agnes Carvel's estate and Agnes Carvel's successors in interest, and in complaint of apparent violations of human rights. I make this Witness Statement from knowing Agnes Carvel Deceased ("my aunt") and from the knowledge I have gained for the last 17 years while I tried to look after the health and financial affairs of her whilst she was alive, and of her estate after her death. I am the sole executor and personal representative under the uncontested Last Will and Testament of Agnes Carvel granted probate by the High Court without contest on 2 October 1998.

3. I exhausted my finances caring for my aunt who was denied almost all benefit from her life's work and savings by greedy strangers. On information and belief, I have been unfairly denied all reimbursement that is normal under the law for executors.

4. The High Court replaced me with judicial trustee Guy Greenhous, a professional fiduciary, on 11 June 2007 at the behest of New York politicos. I assert that the obstruction of the full administration of Agnes Carvel's estate pursuant the uncontested Last Will, by this group of New York politicos who by forgery usurped the identity of the "Thomas and Agnes Carvel Foundation" ("foundation usurpers") in New York, is intended to conceal international criminal activities, the abuse of the Carvels' gifts restricted to charity, and the violation of the Carvels' human rights guaranteed in the

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

United Kingdom and Constitutional rights guaranteed in the United States. The usurpers have been the subject of several fraud investigations since 1991, resulting in the ousted of two alleged charity managers by the New York Attorney State General and several felony convictions for financial fraudsters. The usurpers stated purpose to the High Court for replacing me was to end all litigation against them in the United States to continue to recover Carvel assets fraudulently converted by these conspirators.

### ILLEGAL INTENT DISQUALIFIES TAX-EXEMPTION

5.   The foundation usurpers cannot be beneficiaries of the Estate because they are the sole adverse litigants to Agnes Carvel rights. These fraudsters' intentions are stated in their manifesto for control of the "Thomas and Agnes Carvel Foundation". The "Confidential" memos were created by Robert Davis dated February 18, 1992 (See **Exhibit PC1 Tab 1**) and April 9, 1992 (See **Exhibit PC1 Tab 2**), in the midst of the Attorney General's charity fraud investigations (*NYS v. Davis, Arcadipane, and Thomas and Agnes Carvel Foundation*, Index No. 93/405052). The first memo states that removing and discrediting Robert Davis and Mildred Arcadipane "**provides family with opportunity to assume control of Foundation, Estate and Agnes' assets.**"

6.   Nothing could more clearly demonstrate the **planned intent** to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates. Such illegal intent (namely the intent to fraudulently convert control of the Carvels' charity and withhold ALL CARVEL ASSETS from Agnes Carvel) for continuing planned activities that violate laws is adhered thereafter by the alleged foundation managers that Davis installed, named as "loyalists".

7.    In the same document at #11 (See **Exhibit PC1 Tab 1**), "Hudson Valley" [Bank] is listed generically as "loyalist" successor, i.e. anyone from Hudson Valley Bank (where William Griffin is chairman; and where Griffin and the Abplanalp family are controlling shareholders) can be counted on to stack the charity's votes against Agnes or me. Griffin as alleged foundation president, disposed of Agnes' multi-million dollar assets at under-value to his business partners. The alleged foundation managers carried out the expressly stated criminal enterprise while Agnes was alive; while she was the sole living charitable benefactor, the sole surviving asset-owner, and the sole mandatory

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

documents for 17 years. Agnes' death was procured by extortion when the foundation usurpers cut off all funds to silence Agnes' demands for the return of her property.

11.  Agnes Carvel's only adversaries for 17 years are the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets. It was Agnes Carvel's inalienable right to change her Will, particularly to deny benefit to all those who victimized Agnes and the Carvels' assets. Agnes Carvel's uncontested Will provides that anyone who harmed or litigated against Agnes Carvel in life, or litigated against her estate, shall not inherit. The foundation usurpers use the Carvels' assets, and gifts restricted exclusively to charity to litigate exclusively against Agnes Carvel, Agnes' rights, the Estate, Agnes' successors in interest, and against me as Agnes' fiduciary. Such abuse prohibits the usurpers in any guise from benefiting from tax-exempt status or benefiting under the Will.

## UNEQUAL TREATMENT

12.  Out of 36 fiduciary positions controlling Agnes' property and its income (7 in Tom's estate, 12 in two corporations, 4 in an alleged New York unitrust, 3 in the an alleged Florida grantor trust, 10 in the alleged foundation) all of whose legal fees are paid from Agnes' property, I am the sole fiduciary other than Agnes Carvel to be deprived of equal access as all other fiduciaries to the multi-million dollar Carvel estates fund to retain competent, independent, legal counsel for the benefit of Agnes Carvel as sole beneficiary in her lifetime, to defend Agnes' continuing interests through her estate, and to assert the Carvels' testamentary intentions.

13.  The actions of the other conflicted fiduciaries violated the purported terms of Thomas Carvel's 1988 "estate plan", violated the Internal Revenue Code, and violated the law, but nonetheless, their actions were never scrutinized by the Court, or anyone else. The foundation usurpers allowed all these fiduciaries legal fees to be paid from Agnes' property without question. The foundation usurpers approve about $2-3 million in legal fees each year from Carvel funds in the hands of their agents. Many of these attorneys directly represented foundation usurpers in numerous conflicted positions. This one-sided obstruction of financial resources was intended to harm Agnes as an elder person and is intended to harm Agnes' intentions for legitimate charitable dispositions through the Estate.

5

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

14. My expenses on my submissions in the United Kingdom and United States were not object to — any payment to me as fiduciary is opposed because I might hire effective professionals to recover more assets from the foundation usurpers. The High Court set aside the original Chancery court judgment and directed that I re-submit the claims not before 1 October 2007. I herewith re-submit two groups of claims asserted against the Estate's assets that are now located in the United States and seek payment of those claims in England. Should any items by duplicative, I naturally only seek payment once. Because I have no more money, I seek the High Court to rescind the payment of prior court costs as ordered; or deduct the amount from sums I am owed as executor.

15. I seek an order of the High Court to collect all Estate assets in the hands of a court-appointed, independent Receiver (that is, not Guy Greenhous) since all those persons holding Estate assets voluntarily submitted to the High Court's jurisdiction, and made representations to the High Court of the alleged amount of the Estate's assets, but have for nine years refused to provide documentation requested by me as executor. Since my discovery in New York of apparent bribery and fraudulent transfers of Agnes property, I assert that the only protection for Agnes' assets is in England.

16. If the High Court does not collect all the assets in England, then I assert that the Carvels' rights were violated with the intent to defraud Agnes Carvel, defraud me as fiduciary-creditor-beneficiary, and to commit tax fraud in the United Kingdom and United States. The foundation usurpers and their agents sought to deny me standing to pursue claims in the United States, even before 11 June 2007. I seek the High Court's appointment of me as U.S. administrator because I am the only person with knowledge of the Estate's claims, and the only person who has persisted even without funds. It is discrimination against the rights of Agnes Carvel to favour the foundation usurpers who are the only adverse litigant to Agnes, using the benefactor's money to deprive the benefactor of her rights

### APPARENT BRIBE OF JUDGE VIA HUDSON VALLEY BANK LOANS

17. As soon as Tom's was found dead, the usurpers stole all records from the Carvels' offices and moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed to impersonate a foundation member, director and officer. Soon again, the Bank's other major controlling stockholder, Robert Abplanalp, was also installed. Upon Robert

6

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

Abplanalp's death, his daughter Marie Abplanalp Holcombe took his place as the "Hudson Valley" loyalist stated in the 1992 manifesto, to maintain control against the Carvels. Marie Abplanalp is also a major controlling stockholder in the Bank. After stealing the identity and control of the Carvels' charities, Griffin and the Abplanalps abused Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving any income. The Bank asserts more control over Carvel money than any Carvel. The first financial frauds I discovered in Thomas Carvel's estate was the theft and alteration of U.S. Treasury securities at Hudson Valley Bank. This was used to steal over $5 million from Agnes.

18. Trials in the Thomas Carvel estate matters began on September 10, 2001. On October 1, 2001, Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000. The accounting proceeding in Agnes Carvel's New York ancillary administration began in May 2005. On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000. Neither of these loans was disclosed. It is my assertion that since the Office of Court Administration does not require "equity loans" to be listed on its forms, this type of loan-ploy forms an innovation in pay-off schemes to encourage favourable decisions.

19. The average citizen can never know whether these "loans" are repaid by Surrogate Scarpino, or just "written off" as a cost of doing business by Griffin and his Bank. Given Surrogate Scarpino's decisions favoring the foundation usurpers against Agnes, the sole intended beneficiary of everything, there is the appearance of impropriety and bias, namely the appearance of bribery, which is sufficient grounds to judicially disqualify Surrogate Scarpino because he lacks the personal conscience to recuse himself. All of Surrogate Scarpino's decisions are suspect.

20. The Surrogate placed no restraint whatsoever on disbursements by the usurpers and executors in Thomas Carvel's estate, including the disbursement of assets belonging to Agnes Carvel held in their hands. Legal fees are paid without prior or subsequent consent of the beneficiary or the court. This freedom, to draw down Carvel property at will, remained with Agnes' adversaries despite Agnes Carvel's warning that her adversaries were engaging in fraudulent business practices with known real estate fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and U.S. and New York State Attorney Generals' prosecutions convicted William Zuga twice (2002, 2003) for real estate fraud, convicted attorney Francis Zarro

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

(2004) for 13 felony counts of financial frauds, and convicted William Fugazy (1997) for bankruptcy perjury. Millions of dollars were lost to Agnes Carvel by Agnes' adversaries' collusion with these felons, BUT only the whistleblowers, Agnes and I, were and are denied indemnification of legal fees from Thomas or Agnes' estate assets, or equal indemnification provide to the "loyalists" as alleged foundation managers.

21.    The foundation usurpers also draw freely on Agnes' assets prematurely placed in their hands by Surrogate Scarpino, without notice to named beneficiaries, and without payment of any taxes, funeral expenses, debts or administrative expenses of Agnes' estate. It is clear enough that only strangers are intended to become millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses to prosecute claims against these strangers. One-sided funding of litigation seen in the light of $300,000 in undisclosed "loans" to Surrogate Scarpino can demonstrate nothing other than an appearance of bribery with the intent to fraudulently convert estate and trust assets away from the Carvels and their intended beneficiaries.

## GRIFFIN'S FRAUDULENT CONVERSION OF REAL ESTATE

22.    On October 6, 2006, William Griffin alleged to act as the president of the "Thomas and Agnes Carvel Foundation" in order to sell Agnes Carvel's former residence in Ardsley, New York containing two parcels of land of approximately 16 acres (currently valued at **$8-10 million**) to a shell company belonging to Denis Amicucci, a relative of Griffin's law partner Paul Amicucci, for only **$2 million** (if in fact anything was paid at all). A similar insider sham transaction is suspected for Agnes' real estate in Florida. All these disposals of Agnes Carvel's assets were done without court approval, without notice to me as executor, without notice to named beneficiaries, and without notice to creditors.

23.    Daniel A. Amicucci formed the shell company, Chauncey Partners LLC, in March 2006. Paul Amicucci is listed as part of Griffin's law firm Griffin, Coogan and Veneruso, P.C. (A99) and also appears to be the attorney in the firm of Walsh and Amicucci, LLP who act for other charities controlled by Griffin. Paul Amicucci is also listed among the "Hudson Valley Bank Business Development Board" that has an incestuous, covert political relationship to the Carvel estate manipulations in Westchester Surrogate's Court.

24.    On that same day, October 6, 2006, the shell company returned control of the whole property back to Griffin through Hudson Valley Bank as an alleged lease assignment

8

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

for security for an alleged US$1.3 million mortgage from Hudson Valley Bank where Griffin is not only chairman, but a controlling shareholder along with alleged foundation manager Marie Abplanalp Holcombe.

25. This same Ardsley property was appraised at **$1.1 million in 1990** when Thomas Carvel died. While all surrounding real estate has increased in value a minimum of 300-400%, the Carvels' exclusive mountaintop acreage property only increased about 82%, despite the rare and unusual nature of so many undeveloped acres in such a sought-after area, and contrary to the high demand exhibited in the past. Agnes Carvel's other Westchester property, the first Carvel ice cream stand location in Hartsdale, was also stolen from Agnes and sold by Griffin in 2006 allegedly for $2.8 million to the owner of the current Carvel franchise. On information and belief, the actual price paid was $3.5 million, i.e. another $700,000 exchanged hands unreported. That property increased 375% from its 1990 appraised value of $600,000. Both properties have similar rocky terrains. Both properties are highly sought after for different uses.

26. Once again, the foundation usurpers are under criminal investigation by the New York State Attorney General. Other agencies have also been alerted to the apparent bribery and fraudulent transfer of assets. As sole legitimate Foundation Member, I seek the U.S. Federal Court to revoke the usurpers use of tax-exemption because litigation against the benefactor is not a charitable purpose, and criminal acts are contrary to public policy.

27. The High Court cannot possibly suggest that a fiduciary to the deceased and the named beneficiaries of the deceased are not owed a superior obligation to known criminals whose activities are being investigated and prosecuted by the same fiduciary for the benefit of the estate. Such a position would constitute the fiduciary's aiding and abetting crimes against to the testator. If criminal acts are known to the fiduciary, surely that information must be passed to law enforcement, even while continuing to pursue civil remedies for the benefit of legitimate beneficiaries in compliance with the law, and for the benefit of charity as normally accepted by public policy.

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

## MY APPLICATION

28.    I respectfully seek:

1.    Enforcement by the High Court of the uncontested Last Will and Testament of Agnes Carvel as granted probated by the High Court on 2 October 1998.

2.    An Order for delivery to the jurisdiction of the High Court all Estate assets held by Leonard Ross and the alleged "Thomas and Agnes Carvel Foundation" in New York, since those parties voluntarily submitted to the jurisdiction of the High Court.

3.    An Order for the delivery to the jurisdiction of the High Court all assets held by the so-called "Agnes Carvel 1991 Trust", since those assets were represented to the High Court as comprising the Estate's property; and since those assets are distributed to the alleged New York foundation as alleged remainder beneficiary before the required payment of the Estate's debts, expenses and taxes.

4.    An Order appointing an independent Receiver in England to hold all Estate assets pending:

i) determination by the High Court (and Inland Revenue) of all debts, expenses, taxes, and beneficiaries of the Estate payable pursuant to the uncontested Last Will under English law;

ii) approval of my accounting;

iii) delivery of a closing letter from Inland Revenue.

5.    An Order compelling Guy Greenhous, a professional fiduciary, to disclose the source of payments or promised payment to him, since there are no Estate funds in England, and Pamela Carvel as executor was denied necessary funds for nine years.

6.    An Order rescinding for lack of funds all court costs order on 11 June 2007 to be paid by Pamela Carvel by 1 October 2007, or deducting such costs from the debts, expenses, and legacies payable to Pamela Carvel under the Will.

7.    An Order appointing Pamela Carvel administrator of the Estate in Florida and Delaware to continue to pursue existing claims.

Pamela Carvel
Plaintiff
Statement
Exhibit: PC1
1 October 2007

8.    A Declaration of the priority of the rights of Agnes Carvel and Pamela Carvel (benefactors, beneficiaries, fiduciaries, creditors) not to be victimized or abused for the financial profit of others, or to conceal the fraudulent transfer of Carvel family assets, or to punish the Carvels as whistleblowers for alerting law enforcement as to possible criminal activities; and determination of damages payable by abusers, alleging standing by mere remainder interest, for obstructing guaranteed civil and human rights.

29.    As the parties in this action have submitted to the jurisdiction of the English Court, the Court must serve justice by resolving these issues, after replacing me to prevent payment of my expenses so as to stop any enquiry into the conduct of the foundation usurpers and their agents in respect of my aunt's estate and to ensure that my aunt's wishes are followed.

I believe that the facts stated in this statement are true.

Signed:    ......................................

PAMELA CARVEL

Dated      1 OCTOBER.2007

11

**EFiled: Oct 12 2007 9:46AM EDT**
**Transaction ID 16646500**
**Case No. 3185-VCP**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| THE THOMAS AND AGNES CARVEL FOUNDATION )<br><br>Petitioner, )<br><br>v. )<br><br>PAMELA CARVEL, individually and as Ancillary Administratix with Will Annexed of Agnes Carvel, )<br>Respondent. ) | C.A. No. 3185-VCP |

### PAMELA CARVEL'S MOTION TO ADJUDICATE INTERMEDIATE ACCOUNTING OF ANCILLARY ADMINISTRATOR AND TO APPOINT A RECEIVER TO HOLD ALL ESTATE ASSETS NOW IN PLAINTIFF'S HANDS

Respondent Pamela Carvel, Delaware Ancillary Administrator, hereby moves the Court on submission of papers for an Order pursuant to Chancery Court Rule 7a for:

1. an Order for the Court of Chancery to take jurisdiction over an intermediate accounting proceeding in the Estate; to compel discovery from Petitioner who has possession and control of all documents relevant to Estate assets potentially in Delaware, and other pertinent records that have been are denied to Pamela Carvel;

2. an Order for the production of proof of all alleged foundation records, including but not limited to membership records of those who alleged to be Petitioner; financial records for all disposal of assets and disbursements from Estate assets in trust and restricted charitable gifts; and for determination by Delaware Department of Taxation and the Internal Revenue Service as to the tax-exempt status of Petitioner as an alleged charity;

3. an Order appointing an independent Receiver in Delaware to hold all Agnes Carvel's assets prematurely delivered in trust to Petitioner, that are being disposed of without notice to named beneficiaries or creditors, until this court determines the assets of the Estate, and orders payment of debts, expenses, obligations, and taxes;

4. an Order for civil rights damages, other and further relief as the court may deem appropriate.

October 3, 2007

Pamela Carvel, appreaing *pro se*
28 Old Brompton Road, Suite 158
London, SW7 3SS England
U.S. tel/ fax fwd 1 212 751 6746

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| THE THOMAS AND AGNES CARVEL FOUNDATION | ) ) ) | |
| Petitioner, | ) | C.A. No. 3185-VCP |
| v. | ) ) | |
| PAMELA CARVEL, individually and as Ancillary Administratix with Will Annexed of Agnes Carvel, | ) ) ) | |
| Respondent. | ) | |

**PAMELA CARVEL'S ANSWER IN OPPOSITION TO PLAINTIFFS PETITION TO REMOVAL ANCILLARY ADMINISTRATOR**
**AND**
**AFFIDAVIT IN SUPPORT OF MOTION TO ADJUDICATE INTERMEDIATE ACCOUNTING OF ANCILLARY ADMINISTRATOR AND TO APPOINT A RECEIVER TO HOLD ALL ESTATE ASSETS NOW IN PLAINTIFF'S HANDS**

NOW COMES Pamela Carvel, Delaware Ancillary Administrator for the Agnes Carvel Estate ("Estate"), Respondent in the above-entitled Petition and responding thereto, states as follows:

1.    To the extent that Paragraph 1 contains allegations of fact they are denied. Paragraph 1 misrepresents the facts. Those New York politicos who are Petitioner are identity thieves. Petitioner is not entitled to tax-exempt status. In any guise, Petitioner's abusive and harmful acts against Agnes Carvel disqualified those persons under Agnes Carvel's uncontested Last Will from any benefit whatsoever from the Estate of Agnes Carvel.

2.    Respondent admits that Pamela Carvel is Delaware Ancillary Administrator; for the balance of Paragraph 2 the records of the Register of Wills speak for themselves.

1

3.     To the extent that Paragraph 3 contains allegations of fact they are denied. Paragraph 3 alleges conclusions of law properly decided by this court.

4.     Pamela Carvel is without sufficient information to form an opinion of the truth of Paragraph 4. Petitioner and co-conspirators burgled Agnes Carvel's homes and offices while Agnes was at the funeral of her husband Thomas Carvel. The veracity of the documents alleged by Petitioner remains unknown. Petitioner draws conclusions of law properly decided by the court.

5.     To the extent that Paragraph 5 contains allegations of fact they are denied. Paragraph 5 alleges conclusions of law properly decided by this court. The documents referred to speak for themselves, but the veracity of the alleged Agreement is denied.

6.     Pamela Carvel admits in Paragraph 6 that Thomas Carvel was found dead on October 21, 1990, and that Agnes Carvel survived him. Pamela Carvel recently discovered that Thomas Carvel's death certificate was falsified to evade an autopsy; no doctor ever examined the body; the death certificate was forged. No medical determination has yet been made as to when (or how) Thomas Carvel died. Those who are Petitioner are suspect in procuring an unnatural and untimely death for Thomas Carvel.

7.     To the extent that Paragraph 7 contains allegations of fact they are denied.

8.     To the extent that Paragraph 8 contains allegations of fact they are denied. Paragraph 8 misstates and misrepresents the facts. Agnes Carvel is the sole Subscriber (not Pamela Carvel) to incorporate the Carvel Foundation in conjunction with the issuance of Agnes Carvel's Last Will and Testament dated July 7, 1995. Petitioner repeatedly misrepresented this material fact to all courts to create prejudice -- courts that failed to take notice of the documentary evidence filed with the State of Florida.

2

9.      Pamela Carvel admits Paragraph 9.

10.     Pamela Carvel admits in Paragraph 10 that Agnes Carvel's Last Will and Testament was submitted to the High Court for probate. Probate was not contested by any party, including Petitioner. Pamela Carvel denies probate was granted on October 4, 1998.

11.     Pamela Carvel denies Paragraph 11 as misrepresentation of the facts; except that Pamela Carvel admits Leonard Ross is New York Ancillary Administrator c.t.a.

12.     Pamela Carvel denies Paragraph 12. Petitioner misstates and misrepresents the facts. Paragraph 12 alleges conclusions of law properly decided by this court.

13.     Pamela Carvel denies Paragraph 13. Petitioner misstates and misrepresents the facts. The decisions (if valid) speak for themselves.

14.     Pamela Carvel denies Paragraph 14. Petitioner misstates and misrepresents the facts, and fails to include those ruling that proved Pamela Carvel's actions correct for the benefit of the estates and Thomas and Agnes Carvel.

15.     Pamela Carvel denies Paragraph 15. Petitioner misstates and misrepresents the facts.

16.     Pamela Carvel denies Paragraph 16. Petitioner misrepresents the facts. Pamela Carvel admits that as a *pro se litigant* guidance to issue a claim was sought from the High Court and the High Court's directions and orders were followed.

17.     Paragraph 17 documents speak for themselves. Petitioner misrepresents the facts. Pamela Carvel admits that as a *pro se litigant* guidance to domesticate a foreign judgment was sought from the Broward County Clerk (county of residence for the parties, Pamela Carvel and the Carvel Foundation), and those directions and orders were followed.

3

18.    Pamela Carvel denies Paragraph 18 as a misrepresentation of facts. Pamela Carvel admits that a 15 minute hearing was held, wherein Pamela Carvel as *pro se litigant* participated from London by telephone, and the Petitioner paid at least two lawyers to appear in person, using the Carvels gifts restricted to charity.

19.    Pamela Carvel denies Paragraph 19, but admits that on June 10, 2007 Westchester Surrogate's Court issued a Citation for an accounting from August 18, 1999 to May 10, 2005.

20.    Paragraph 20 documents speak for themselves. Pamela Carvel admits that as a *pro se litigant* guidance to domesticate a foreign judgment was sought from the Nassau County Clerk and Sheriff's office (resident county of the assets of the Estate of Agnes Carvel), and those directions and orders were followed.

21.    Pamela Carvel denies Paragraph 21 as a misstatement and misrepresentation of facts. Paragraph 21 documents speak for themselves. Pamela Carvel admits that as a *pro se litigant* guidance to domesticate a foreign judgment was sought from the Nassau County Clerk and those directions and orders were followed. Responses to the Nassau County Clerk indicated perjury by the banks and by Leonard Ross.

22.    Paragraph 22 documents speak for themselves. Petitioner misstates and misrepresents facts.

23.    Paragraph 23 documents speak for themselves. Pamela Carvel admits that as a *pro se litigant* guidance to register a foreign judgment was sought from the Pro Se Desk of the U.S. District Court of the Eastern District of New York and those directions and orders were followed. Petitioner misrepresents the facts by failing to reveal prior and subsequent orders denying Pamela Carvel's standing in Westchester Surrogate's Court, New York, and then

4

denying Pamela Carvel's Constitutional right to redress in all other courts of the world, although outside the Surrogate's jurisdiction.

24.    Paragraph 24 documents speak for themselves.

25.    Paragraph 25 documents speak for themselves. Pamela Carvel admits that Petitioner's handcrafted words, prepared for the Broward County Court judge, are used repeatedly by Petitioner.

26.    Pamela Carvel denies Paragraph 26. Paragraph 26 documents speak for themselves. Respondent draws this court's attention to the statement at the beginning of the decision at #2 saying that only the Petitioner's recitation of the facts was used. Pamela Carvel's request is pending for Appeal in London (as a *pro se litigant*) based on mistakes in fact and law.

27.    Pamela Carvel denies Paragraph 27. Inland Revenue determines "excepted estates" but was not given notice of the proceeding in London by Petitioner.

28.    Paragraph 28 documents speak for themselves. The Attorney General determines issues on behalf of charities, but was not given notice of the proceeding in London by Petitioner. Pamela Carvel draws this court's attention to the statement at the beginning of the decision at # 2 saying that only the Petitioner's recitation of the facts was used. Pamela Carvel's request is pending for Appeal in London (as a *pro se litigant*) based on mistakes in fact and law.

29.    Respondent denies Paragraph 29. Paragraph misstates and misrepresents the facts. Before the hearing in London, Petitioner withdrew its request to be determined to be the beneficiary of the Estate under English law, and all other remedies originally requested in its claim because a trial on the evidence would have been required. Petitioner massaged the court into arriving at summary judgment denying a trial in order to replace Pamela Carvel with a

5

"judicial trustee" with no funds and power to litigate without a court order. No executor or personal representative was appointed.

30.    Pamela Carvel denies Paragraph 30. Paragraph misstates and misrepresents the facts. Pamela Carvel denies that the recitation reflects the true nature of English law applicable.

31.    Paragraph 31 documents speak for themselves.

32.    Pamela Carvel denies Paragraph 32. Paragraph 32 misstates and misrepresents the facts, and draws conclusions of law properly decided by this court.

33.    Paragraph 33 documents speak for themselves.

34.    Pamela Carvel denies Paragraph 34. Paragraph 34 misrepresents the facts. Paragraph 34 documents speak for themselves. Respondent draws this courts attention to the last page notarized in London May 16, 2003.

35.    Pamela Carvel denies Paragraph 35. Pamela Carvel refers this court to records of conversations with the Register of Wills and Department of Taxation, if such records are retained. Paragraph 35 alleges conclusions of law properly decided by this court.

36.    Pamela Carvel denies Paragraph 36. Petitioner misstates and misrepresents the facts. Paragraph 36 alleges conclusions of law properly decided by this court.

37.    Pamela Carvel denies Paragraph 37. Petitioner misstates and misrepresents the facts. Petitioner's documents attached as exhibits are not the amended complaints currently before the U.S. District Court. Paragraph 37 alleges conclusions of law properly decided by U.S. District Court for Delaware. Pamela Carvel asserts Petitioner seeks to obstruct Agnes and Pamela Carvel's rights guaranteed by the U.S. laws and the Constitution.

38.    Pamela Carvel denies Paragraph 38. Petitioner misstates and misrepresents the facts. Paragraph 38 alleges conclusions of law properly decided by this court.

6

39.     Pamela Carvel denies Paragraph 39. Paragraph 39 alleges conclusions of law properly decided by this court.

40.     Pamela Carvel denies Paragraph 40. Paragraph 40 alleges conclusions of law properly decided by this court.

41.     Pamela Carvel denies Paragraph 41. Petitioner misstates and misrepresents the facts. Paragraph 41 alleges conclusions of law properly decided by this court. Petitioner is not a beneficiary of the Estate, but the sole adverse litigant to Agnes Carvel and the Estate for 17 years. Petitioner abused Carvel restricted charitable gifts to forcibly extort an end to Agnes Carvel's demands for the return of assets stolen by the Petitioner and its agents.

42.     Pamela Carvel denies Paragraph 42. Petitioner misstates and misrepresents the facts. Paragraph 42 alleges conclusions of law properly decided by this court.

43.     Pamela Carvel denies Paragraph 43. Petitioner misstates and misrepresents the facts.

44.     For all answers 1-43, Petitioner failed to state any cause of action "individually" against Pamela Carvel. Pamela Carvel denies any duty or liability "individually" to the Petitioner; and moves this court to dismiss all alleged claims or damages asserted "individually". Petitioner seeks to deprive Pamela Carvel "individually" of rights guaranteed under the Constitution and the laws of the United States. On information and belief, it is unethical if not illegal for a lawyer to seek improper remedies from the court and constitutes an abuse of process or obstruction to justice.

45.     Pamela Carvel concurrently moves this court for remedies that are affirmative defenses to this Petition.

7

## AFFIDAVIT IN SUPPORT OF MOTION TO ADJUDICATE INTERMEDIATE ACCOUNTING OF ANCILLARY ADMINISTRATOR AND TO APPOINT A RECEIVER TO HOLD ESTATE'S ASSETS <u>NOW IN THE HANDS OF PETITIONER</u>

### BRIEF BACKGROUND

46.    Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History. Tom's wife, Agnes, invested her time and money in the couples' first business venture that became the Carvel franchise system. Agnes worked in every aspect of the business. Tom relied on Agnes' incomparable common sense approach to business problems to run the business for over 50 years. Bruce Carvel, Tom's older brother and Pamela's father, designed and built the first continuous soft ice cream freezers that became the Carvel franchise trademark. Bruce formulated the products that comprised the unique Carvel line of specialties.

47.    Pamela Carvel is a member of the Association of Certified Fraud Examiners in the United States and United Kingdom.  In 1990, Tom asked Pamela to return to the United States to commence fraud investigations relating to his employees and the theft of money and real estate from the sale of Carvel Corp. stock. Tom stated that his attorney in the sale, Robert Davis, was working for the buyers, "Investcorp". Tom stated on Friday, October 19, 1990 and Saturday, October 20, 1990 that on Monday, October 22, 1990 he was going to fire secretary Mildred Arcadipane and attorney Robert Davis. Tom and Pamela would then investigate the apparent embezzlement of more than $100 million known to Tom at that time, but Tom was found dead Sunday morning, October 21, 1990.

48.    Instead of being unemployed on Monday morning, Arcadipane and Davis gained controlled everything away from Agnes Carvel as surviving joint owner outside probate. By

8

illicit means (forgery, burglary, bank fraud, theft of records, etc., from Tom and Agnes' offices and homes) a group of fraudsters including bank employees and attorneys colluded with Arcadipane and Davis to control and manipulated banks accounts, cash, gold, deeds, U.S. Securities, trusts, private corporations, and documents, to the exclusion of Agnes Carvel as legitimate surviving owner.

49.    Thomas Carvel died at home, allegedly in his sleep, without a doctor's care, and without any reported unusual health complaints prior to his death. Recently, Pamela discovered that the death certificate information was falsified by stating that Tom saw a doctor days before he died and that said doctor verified the cause of death on the death certificate. This was a lie apparently to evade an autopsy to determine Tom's cause of death. The death certificate was forged. No doctor ever examined the body. No doctor ever determined the cause of death or when it occurred.

50.    The week before Tom died he estimated the family worth to exceed $250 million in cash, Treasury securities, and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock (a Delaware corporation). The week after Tom was found dead, Agnes was told by Malcolm Wilson (partner in Kent Hazzard et al, foundation usurpers) that there was less than $40 million and that virtually none of it belonged to her.

51.    Undisclosed and unbeknownst to Agnes, Wilson purportedly became the "general counsel" to the alleged Thomas and Agnes Carvel Foundation, without Agnes' knowledge or consent as sole surviving Member, Director and Officer of the legitimate Thomas and Agnes Carvel Foundation. The criminality by Wilson and his clients progressed exponentially from that point. The unethical, if not illegal, tactics used by Wilson are detailed (albeit anonymously) in

9

the New York Law Journal article by Eve Markewich, "Getting Grounded in Ethical Dilemmas" (February 14, 2005). Markewich, an attorney hired by Pamela Carvel for the Estate in New York, failed to bring this information to Pamela's attention and failed to assert any claims on behalf of Agnes Carvel because Markewich entered into covert agreements with the foundation usurpers that she would receive $3-4 million in legal fees without contest as long as she obstructed all money from reaching Pamela or the Estate in London. This incredible revelation was made by Leonard Ross, New York ancillary administrator, when pressed for the reasons he refused to provide documents or assert any demands for payment of the Estate's funeral expenses, debts and administrative expenses.

## IDENTITY THIEVES -- NOT BENEFICIARY

52.    Petitioner is NOT a beneficiary but a predator, who harmed, abused and procured the death of Agnes Carvel, an elder person, for the personal profit of those who stole the identity of the Thomas and Agnes Carvel Foundation ("alleged foundation", "usurpers") and other Carvel founded and funded private charities. Petitioner bears no resemblance to the legitimate charity founded by the Carvels. **The usurpers legitimacy has never been determined yet by any court**. The usurpers' violations of tax law are now before U.S. District Court. The usurpers' criminal activities are now under investigation by the New York Attorney General. The usurpers are once again trying to extort silence from Pamela Carvel in an attempt to derail full scrutiny of these issues in Delaware.

53.    These politicos who stole the identity of the Thomas and Agnes Carvel Foundation violate the Certificate of Incorporation, the By-Laws, and the representations made to the IRS and New York Attorney General to gain tax-exemption. The usurpers pervert the specific 14-year precedent of management that caused the Carvels to name the legitimate

10

Thomas and Agnes Carvel Foundation a remainder beneficiary in the Carvels' testamentary plans in 1988. The alleged foundation violates every principle established by the Carvels for their restricted charitable gifts.

54.    The usurpers routinely use extortion tactics to force capitulation from the Carvels, their victims. The usurpers used this same tactic when Agnes and the New York Attorney General investigated the usurpers for charity fraud in 1991 and lodged fraud charges in 1992 (Exhibit 1; New York State Attorney General's letters on 17 May 1991 and 24 July 1992).

55.    The foundation impostors fear loosing control of misappropriated Carvel assets. These fraudsters' intentions are stated in their manifesto for control of the "Thomas and Agnes Carvel Foundation". Robert Davis created "Confidential" memos (Exhibit 2) dated February 18, 1992 and April 9, 1992, in the midst of the Attorney General's charity fraud investigations (*NYS v. Davis, Arcadipane, and Thomas and Agnes Carvel Foundation*, Index No. 93/405052). The first memo states that removing and discrediting Robert Davis and Mildred Arcadipane **"provides family with opportunity to assume control of Foundation, Estate and Agnes' assets."** Arcadipane and Davis were indeed forced to resign by the Attorney General but not before installing the current board of "loyalists" who would pay the multi-millions dollar legal fees and not demand restitution.

56.    Nothing could more clearly demonstrate the planned intent to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates. Such illegal intent (namely the intent to fraudulently transfer the Carvels' charity and withhold ALL CARVEL ASSETS from Agnes Carvel) for continuing planned activities that violate laws is adhered to thereafter by the alleged foundation managers that Davis installed, and named "loyalists".

57.    The same document states: **"Retain Membership to prevent family control."** (#7) and **"Revised budget - shortfall in grants for 1992 without reduction of legal expense"** (# 13). At #11, "Hudson Valley" [Bank] is listed generically as "loyalist" successor, i.e. anyone from Hudson Valley Bank (where William Griffin is chairman; and where Griffin and the Abplanalp family are major controlling shareholders) can be counted on to stack the charity's votes against Agnes Carvel. The alleged foundation managers carried out the expressly stated criminal enterprise while Agnes was alive, while Agnes was the sole living charitable benefactor, the sole surviving asset-owner, and the sole mandatory income beneficiary. Such criminal intent continued to deny Pamela Carvel all rights as Agnes Carvel's executor and successor as sole legitimate Foundation Member.

58.    The foundation usurpers operate their criminal enterprises under a cloak as "remainderman" with tax-exempt status stolen from the identity of the Carvels' formerly legitimate charities. Therefore, the tax-exempt status behind which the fraudsters hide must be denied. This request is pending before U.S. District Court. Foundation usurpers must be held individually accountable for the tax evasion and damages resulting from their conspiracy. The stated illegal intent, to fraudulently convert all Carvel assets by litigating through the charity to deny Agnes Carvel all assets and income, violates restrictions on charitable purposes, the QTIP and Marital Deduction elections for Thomas Carvel's estate taxes, as well as contractual obligations to Agnes in Thomas Carvel's alleged 1988 "estate plan" and the "Agreement".

59.    The statement of intent in the February 18, 1992 memo (Exhibit 2) to control "Agnes' assets" was written while Agnes Carvel was still alive. The statement of intent to control Thomas Carvel's estate was written while Agnes was still executrix, entitled to mandatory income and empowered to direct the use of non-income producing property. The

12

foundation usurpers' stated intent is tax fraud. The stated intent to deny Agnes asset control is in direct violation of the stated intent of Thomas' 1988 Will to prefer Agnes' income as beneficiary and not to preserve principal for the "remaindermen" (Petitioner's Exhibit A; page 8, EIGHTH).

"I declare that in creating the trusts provided for In this will my primary purpose has been to benefit [Agnes] the beneficiaries of the income and not to preserve the principal for the benefit of the remaindermen [the foundation], and I direct that this purpose be carried out in determining any questions which may arise between the Interests of the beneficiaries of the Income and the Interests of the beneficiaries of the remainders"(emphasis added).

60.     Agnes Carvel was sole income beneficiary. **Agnes NEVER RECEIVED ON PENNY from Thomas Carvel's estate.** This failure constitutes not only fraud against Agnes but tax fraud for which there is no statute of limitations. Agnes' benefit of unrestricted income was alleged to be the basis for validity of the "Agreement". Failure to fulfill the terms of Thomas Carvel's Will to benefit Agnes is a breach the "Agreement" contract that is enforceable by Agnes. The usurpers' denial of income to Agnes in life, coupled with the usurpers' current attempts in New York to withhold all disposal income belonging to Agnes' estate, constitutes misrepresentation of substantive material facts at trial, and thereby yet another fraud on the Carvels.

61.     Pamela Carvel (a member of the Association of Certified Fraud Examiners in the U.S. and U.K., who has no legal training or professional legal experience) is compelled to appear *pro se* as fiduciary after Pamela was compelled to spend all her personal disposable resources to defend the rights and physical well being of Agnes Carvel, her aunt and an elder person, against harassment, intimidation, fraudulent conversion, violations of inalienable rights, and obstruction of Carvel control of Carvel assets.

13

62.    Out of 36 fiduciary positions controlling Agnes' property and its income (7 in Tom's estate, 12 in two corporations, 4 in an alleged New York unitrust, 3 in the an alleged Florida grantor trust, 10 in the alleged foundation) all of whose legal fees are paid from Agnes' property, Pamela Carvel is the sole fiduciary other than Agnes Carvel to be deprived of equal access as all other fiduciaries to the multi-million dollar Carvel estates fund to retain competent, independent, legal counsel for the benefit of Agnes Carvel as sole beneficiary in her lifetime, to defend Agnes' continuing interests through her estate, and to assert the Carvels' testamentary intentions (e.g. Exhibit 3, denying funds to pursue litigation transferred back to Delaware after 8 years).

63.    The actions of the other conflicted fiduciaries violated the purported terms of Thomas Carvel's 1988 "estate plan", violated the Internal Revenue Code, and violated the law, but nonetheless, the Court, or anyone else never scrutinized their actions. The foundation usurpers allowed all these fiduciaries legal fees to be paid from Agnes' property without question. The foundation usurpers approve about $2-3 million in legal fees each year from Carvel funds in the hands of their agents. Many of these attorneys directly represented foundation usurpers in numerous conflicted positions. This one-sided obstruction of financial resources was intended to harm Agnes as an elder person and is intended to harm Agnes' intentions for legitimate charitable dispositions through the Estate. It is no secret that in the American justice system, the *pro se litigant* has little chance of surviving against the multi-million dollar law firms. The intent is to silence claims by denying representation or driving Pamela into financial ruin, like Agnes before her.

64.    Pamela Carvel is the sole legitimate Member and sole successor Member to Thomas Carvel and Agnes Carvel, who were sole Members, founders and benefactors of the

14

"Thomas and Agnes Carvel Foundation", a New York not-for-profit corporation founded in 1976. **New York State Supreme Court adjudicated Pamela Carvel the sole successor Member to Agnes Carvel on August 30, 1999.**

65.    The persons, who allege herein to be Petitioner, never produced any necessary documents to demonstrate authority to act as member (or director or officer) (Exhibit 4). The identity of the legitimate Thomas and Agnes Carvel Foundation has been stolen. Pamela Carvel moves this court for a full accounting trial compelling the identification of the beneficiaries of the Estate; compelling the usurpers to produce documents within their possession and control that are withheld from Pamela Carvel as Delaware Ancillary administrator (Exhibits 3 , 4).

66.    An accounting trial in Delaware would reveal whether it is contrary to public policy for a benefactor to be abused for her money by those who alleged to control the charity she founded. An accounting trial would permit the Department of Taxation and the Internal Revenue Service to identify whether public policy disqualifies the New York usurpers from tax-exempt status as a result of their abuse of restricted charitable assets to litigate exclusively for the detriment of the charity's founder and benefactor.

67.    The usurpers admit that they never contested the Last Will (Exhibit5; October 29, 2001, "Agreement" contract trial transcript, 19:5-19:7). The usurpers are persons disqualified from benefit in the Estate by Article Two (E) of the uncontested Last Will for their acts to harm Agnes Carvel and the Estate (Petitioner's Exhibit D). The Agreement decision (April 1, 2002) specifically states at page 21 (Petitioner's Exhibit E) "**It is also correct that the Court may not set up Agnes' 1988 or 1990 will as her last will and testament** (see Tutunjian v Vetzigan, [299 NY] 315)"; (if such decision remains valid after the New York State Attorney General's criminal

15

investigations into the apparent $300,000 bribery of the Surrogate Scarpino and massive charity frauds by the foundation usurpers).

68.     Agnes Carvel's 1995 Last Will clearly states by this instrument that Agnes Carvel, "revoke any and all former Wills and Codicils and declare this to be my Will." Previous Wills are therefore null and void. Agnes Carvel had Wills going back as far as the 1950s. The foundation usurpers failed to notify any courts of Agnes Carvel's previous Wills, many of which were stolen from the Carvels' homes and offices by the usurpers (Exhibit 6).

69.     The Last Will was written in Florida. "If the provisions of the will are clear and unambiguous, we need not engage in judicial construction; rather, we apply the provisions according to their plain and ordinary meaning. See *Kernkamp v. Bolthouse*, 714 So. 2d 655, 656 (Fla. 5th DCA 1998) (citing *First Nat'l Bank of Fla. v. Moffett*, 479 So. 2d 312 (Fla. 5th DCA 1985))... Equally important, we must strive to discern the intent of the testator and give effect to his or her wishes. Moffett. ....Abiding by the fundamental rule that requires us to give effect to the testator's clearly expressed intent" (*Barley v Barcus*, 877 So. 2d 42; 2004 Fla. App.)

70.     New York also demands that the court's task is to ascertain the testator's intention from the words used in the trust instrument, and to give effect to that intention unless contrary to public policy or an established rule of law. (*In re: Marine Midland Bank-Western*, 55 A.D.2d 215, 389 N.Y.S.2d 705 [4th Dept. 1976]; *In re: Day's Trust*, 10 A.D.2d 220, 198 N.Y.S.2d 760 [1st Dept. 1960].)  Language that is unambiguous and supports a reasonable meaning of a trust must be accepted as manifesting the grantor's intention. Therefore, the court is bound to such language and may not engage in rules of construction. (*In re: Gouraud*, 85 A.D.2d 342, 448 N.Y.S.2d 186 [1st Dept. 1982] aff'd 59 N.Y.2d 925, 453 N.E.2d 548, 466 N.Y.S.2d 319 [1983].)

16

**71.**     It is settled that the everyday and ordinary meaning of words reigns supreme when ascertaining the testator's intent. (*Matter of Gustafson,* 74 N.Y.2d 448, 453, 547 N.E.2d 1152, 548 N.Y.S.2d 625 [1989].) The testator's intention is to be gleaned from the language of the instrument as a whole, not from detached portions alone, and contradictory clauses are, whenever possible, to be reconciled accordingly. (106 *New York Jurisprudence 2d,* Trusts, § 100.) The foundation usurpers **never** contested the Last Will. The "Agreement" contract does not cure the illicit intent amply demonstrated by the usurpers and the harm they caused to Agnes and her estate. The usurpers are not the legitimate Thomas and Agnes Carvel Foundation.

## APPARENT BRIBERY OF JUDGE VIA HUDSON VALLEY BANK LOANS

72.     There has never been any disagreement about money in the Carvel family. All litigation to waste and divert over $300 million in Carvel assets is generated exclusively by the foundation usurpers, Petitioner in this action, and their co-conspirators – strangers acting against family, using family funds. **Agnes Carvel never received one penny of income from Tom's estate as long as she lived as a result of the obstructions of the foundation usurpers**. Agnes Carvel's only adversaries for 17 years are the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets (Exhibit 2). The same document (#11) named "Hudson Valley" acceptable "loyalists" to become successor members and directors, i.e. anyone from Hudson Valley Bank would stack the vote against Agnes or Pamela.

73.     As soon as Tom's was found dead, the usurpers stole foundation and other records from the Carvels' offices and moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed to impersonate a foundation member, director and officer. Soon again, the Bank's other major controlling stockholder, Robert Abplanalp, was also installed. Upon Robert Abplanalp's death,

17

his daughter Marie Abplanalp Holcombe took his place as "Hudson Valley" loyalist as stated in the 1992 manifesto, to maintain control against the Carvels. Marie Abplanalp is also a major controlling stockholder in the Bank. After stealing the identity and control of the Carvels' charities, Griffin and the Abplanalps abused Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving any income. The Bank asserts more control over Carvel money than any Carvel.

74.    Trials in the Thomas Carvel estate matters began on September 10, 2001. On October 1, 2001, Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000. The accounting proceeding in Agnes Carvel's New York ancillary administration began in May 2005. On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000. Neither of these loans was disclosed. It is Plaintiff's assertion that since the Office of Court Administration does not require "equity loans" to be listed on its forms, this type of loan-ploy forms an innovation in pay-off schemes to encourage favorable decisions.

75.    The average citizen can never know whether these "loans" are repaid by Surrogate Scarpino, or just "written off" as a cost of doing business by Griffin and his Bank. Given Surrogate Scarpino's decisions favoring the foundation usurpers against Agnes, the sole intended beneficiary of everything, there is the appearance of impropriety and bias, namely the appearance of bribery, which is sufficient grounds to judicially disqualify Surrogate Scarpino because he lacks the personal conscience to recuse himself. This demand is before the U.S. District Court in Delaware and the subject of criminal investigation by the New York attorney General.

76.    The Surrogate placed no restraint whatsoever on disbursements by the usurpers and executors in Thomas Carvel's estate, including the disbursement of assets belonging to

18

Agnes Carvel held in their hands. Legal fees are paid without prior or subsequent consent of the beneficiary or the court. This freedom, to draw down Carvel property at will, remained with Agnes' adversaries despite Agnes Carvel's warning that her adversaries were engaging in fraudulent business practices with known real estate fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and Attorney General prosecutions of three financial felons who caused losses in excess of $5 million to Agnes.

77.    It is clear enough that only strangers are intended to become millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses to prosecute claims against these strangers. One-sided funding of litigation seen in the light of $300,000 in undisclosed "loans" to Surrogate Scarpino can demonstrate nothing other than an appearance of bribery with the intent to fraudulently convert estate and trust assets away from the Carvels and their intended beneficiaries.

## GRIFFIN'S FRAUDULENT CONVERSION OF REAL ESTATE

78.    On October 6, 2006, William Griffin alleged to act as the president of the "Thomas and Agnes Carvel Foundation" in order to sell Agnes Carvel's former residence in Ardsley, New York containing two parcels of land of approximately 16 acres (currently valued at $8-10 million) to a shell company belonging to Denis Amicucci, a relative of Griffin's law partner Paul Amicucci. The price paid was allegedly merely $2 million, if any money changed hands at all.

79.    Daniel A. Amicucci formed the shell company, Chauncey Partners LLC, in March 2006. Paul Amicucci is listed as part of Griffin's law firm Griffin, Coogan and Veneruso, P.C. and also appears to be the attorney in the firm of Walsh and Amicucci, LLP who act for other charities controlled by Griffin. Paul Amicucci is also listed among the "Hudson Valley Bank

19

Business Development Board" that has an incestuous, covert political relationship to the Carvel estate manipulations in Westchester Surrogate's Court.

80.     On that same day of the alleged sale, October 6, 2006, the shell company returned control of the whole property back to Griffin through Hudson Valley Bank as an alleged lease assignment for security for an alleged US$1.3 million mortgage from Hudson Valley Bank where Griffin is not only chairman but a controlling shareholder along with alleged foundation usurper Marie Abplanalp Holcombe.

81.     This same Ardsley property was appraised at $1.1 million in 1990 when Thomas Carvel died. While all surrounding real estate has increased in value a minimum of 300-400%, the Carvels' exclusive mountaintop acreage property only increased about 82%, despite the rare and unusual nature of so many undeveloped acres in such a sought-after area, and contrary to the high demand exhibited in the past. Agnes Carvel's other Westchester property, the first Carvel ice cream stand location in Hartsdale, was also stolen from Agnes and sold by Griffin in 2006 allegedly for $2.8 million to the owner of the current Carvel franchise. On information and belief, the actual price paid was $3.5 million, i.e. another $700,000 exchanged hands unreported. That property increased 375% from its 1990 appraised value of $600,000. Both properties have similar rocky terrains. Both properties are highly sought after for different uses.

82.     A similar insider sham transaction is suspected for Agnes' real estate in Florida wher Griffin and the buyer show the same address. The foundation usurpers disposed of Agnes Florida real estate without notice to the Palm Beach probate court where multi-million creditors claims by the Estate were pending. All these disposals of Agnes Carvel's assets in New York and Florida were property held in trust by the foundation usurpers pursuant to court order and New York statute (SCPA 2215(3)). All these fraudulent transfers were done without court approval,

20

without notice to Pamela Carvel as executor, without notice to named beneficiaries, and without notice to creditors. The true amount of income from the sale of this real estate belongs to Agnes and her Delaware successor's in interest as "unrestricted income" disposed of Agnes Carvel in her lifetime. The Agreement decision in New York was by default against Agnes' Delaware successors in interest who asserted lack of jurisdiction in New York.

## OBSTRUCTION OF RIGHTS

83.    Pamela Carvel asserts that Petitioner's intentional obstruction of Agnes and Pamela Carvel's rights to redress of grievances, due process, equal treatment, and other rights guaranteed by U.S. laws and the Constitution, demonstrated illegal intent to deprive the Carvels of inalienable rights in order to profit of the usurpers.

84.    Pamela Carvel called the Registry of Wills in 2006 to determine if a formal accounting was required each year even though there are no changes, and information is still being withheld. Pamela Carvel understood that an accounting was not necessary if there were no changes. If this understanding is incorrect, and not within the discretion of the Register of Wills to permit, or to give notice before enforcement, then the remedy is for this court is to take jurisdiction over the an intermediate accounting proceeding and demand the documents from the foundation usurpers who have now voluntarily submitted to the jurisdiction of this Court.

85.    The usurpers admit at #41 of their Petition that Petitioner asserts there are no assets or liabilities in Delaware, therefore no "losses" could be incurred (#42) that are a liability of the Delaware ancillary administration, and the legal fees are generated by harassment. On this alleged basis of ZERO assets in Delaware (which Pamela Carvel does not adopt), the Petitioner seeks an extraordinary remedy for accountings that by Petitioner's admission would reflect nothing, and therefore could cause no possible harm to Petitioner.

21

86.    Nothing prevents additional inventories from being filed (12 *Del. C.* 1910). The usurpers, even as an alleged remainderman, do not stand ahead of the payment funeral expenses, taxes, creditors, Delaware obligations, or other beneficiaries. This priority of payments, and abatement of interests if funds are not enough, holds true in Florida and New York as well. Just as stated in 1992, the usurpers' criminal intent seeks to take everything, not merely a fair or legal share.

87.    *In Matter of the Estate of Missimer* (299 Del. Ch. LEXIS 206), where beneficiaries actually claimed assets and income, the remedy determined for alleged breach of duty to account was "The executor shall present a form of order granting him 30 days from the hearing date to file an amended inventory and final account. See *12 Del. C. § 1911*."; and the beneficiaries shall present "the reasonable cost of presenting the exceptions, and that this amount be deducted from the executor's commission and thus be available for distribution to the beneficiaries. See *12 Del.C. § 2305(a), (c)*; Ch. Ct. Rule 192." The foundation usurpers are not entitled to legal fees because they are not taking action on behalf of the Estate or its legitimate beneficiaries. The usurpers are taking actions using restricted charitable gifts and the Estate's assets denied to the Estate to harm the expressed and implied intentions of Agnes Carvel as executor; and the testator's inalienable right to not benefit those persons who abused and victimized her in life and engaged in behavior that would procure Agnes Carvel's death after being given warning of those very consequences by Agnes' doctor.

88.    Pamela Carvel asserts that over $50 million dollars in the possession of the foundation usurpers are Delaware corporate assets denied to Agnes by fraud. An accounting proceeding, with documents produced, would confirm or refute Pamela Carvel's assertions. The

22

foundation usurpers' continuing stonewalling demonstrates a cover-up to evade taxes and defraud Agnes and her successors in interest under Delaware law.

89.    The ONLY purpose of this Petition is the obstruction of justice. If the lawsuits in U.S. District Court were "frivolous", the U.S. District Court and the U.S. Supreme Court are more than capable of making that determination. The lawsuits were filed at the appropriate times given the circumstances that occurred. The demand for rent could only be made after the expiration of the lease on April 30, 2007. The demands against the usurpers and Leonard Ross cold only be made after the evidence discovered on May 8, 2007 of the apparent bribery in Surrogate Scarpino and the apparent theft of the real estate by Griffin.

90.    Despite the Petitioner's previous attempts to discredit the Carvel's, Pamela Carvel assisted the U.S. and New York Attorney Generals' prosecutions of Carvel estate fraudsters that convicted William Zuga twice (2002, 2003) for real estate fraud; convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds; and convicted William Fugazy (1997) for bankruptcy perjury. Millions of dollars were lost to Agnes Carvel by Agnes' adversaries' collusion with these felons, BUT only the whistleblowers, Agnes and Pamela Carvel, were and are denied indemnification of legal fees from Thomas or Agnes' estate assets, or equal indemnification provide to the foundation "loyalists" who are Petitioner herein. Petitioner fears that against all adversities, someone, somewhere, may again understand the issues being raised by Pamela as a *pro se litigant* in an attempt to break the "probate mafia".

### THE USURPERS MISREPRESENT THE "AGREEMENT" DECISION

91.    The "Agreement" decision is equally enforceable by Agnes against the usurpers to demand the promised consideration of unrestricted income for the "Agreement". To deny "consideration" would result in fraud. To deny Agnes' unrestricted disposal of her income would

23

be tax fraud by violation of the US Internal Revenue Code Marital Deduction and QTIP elections.

92.    The usurpers misrepresent the obligations under the Agreement decision and the limits placed by law on the usurpers' demand for assets, even under the 1988 Will. The usurpers allege that the Agnes' New York assets had already been awarded to the usurpers. This is untrue. Pursuant to New York statute cited in the decision (Surrogate's Court Procedure Act 2215(3); p.22) the usurpers must hold those assets in trust and return "the assets" if they are in excess of merely the remainder of the Estate. The usurpers have disposed of all those assets in self-dealing under-valued transfers by Griffin. These assets include assets subject to Delaware claims. Pamela Carvel moves this court to appoint a Receiver to hold all assets delivered to the usurpers since 1991.

93.    Westchester Surrogate's Court denied "a series of repetitive applications" by the usurpers to force payment of the gross value of Agnes' property to it (decisions June 23, 2006, December 4, 2003, June 30, 2003, and the original Agreement decision on April 1, 2002), but the Surrogate did nothing to protect the assets previously distributed in trust to the usurpers.

94.    Agnes' Will was a creation during her lifetime disposing of property that by law should have been paid to her in her lifetime. Therefore, the income cannot be restrained now without creating intentional fraud by the representations made at trial. Agnes' obligation assumed in 1988 was to name the "Thomas and Agnes Carvel Foundation" as remainder beneficiary [p.21]. The foundation usurpers bear no resemblance to the legitimate Thomas and Agnes Carvel Foundation that was named and intended in 1988. Agnes took the legitimate foundation back in 1994 (Exhibit 7). Pamela Carvel has reasserted that position ever since. Only

24

now has there been sufficient documentary evidence to demonstrate the continuing criminal intent of the usurpers.

95.    Pamela Carvel moves this court to take jurisdiction over an intermediate accounting to determine the identity of the beneficiaries under Delaware law. The foundation usurpers misstated and misrepresented their standing in New York, and never asserted the validity of the foreign New York judgment against the Estate in any jurisdiction. None of the New York proceeding gave notice to any interested party as named beneficiary under the Last Will. The Carvel Foundation, named remainder beneficiary, was not given notice of any New York proceedings. The New York court lacks jurisdiction over almost all of the named beneficiaries qualified to inherit. The Agreement decision was by default against Agnes' Delaware successors in interest. The usurpers made deliberate misrepresentations of material facts about the "Agreement" contract. All of which may render the Agreement decision a fraud upon Agnes, the Estate, and Agnes' Delaware successors in interest.

### USURPERS' SUCCESSFUL USE OF PERJURY

96.    In 1995, the usurpers' general counsel Lawrence Fay submitted a perjured statement (Exhibit 8) to the Court of Chancery to deny a swift determination of corporate ownership and thwart the determination of Agnes Carvel's claim to over \$200 million in Delaware corporate assets. Immediately after the Court of Chancery stay in Delaware, Fay boasted at a recorded meeting that he ha hoodwinked the court because the matter "was not and never would be pending in Surrogate's Court". This perjury was proven again when Orrick, the foundation usurpers "special counsel" made a similar statement that the issue of Andreas ownership was not before the Surrogate. The final proof of the perjury came SEVEN YEARS AFTER THE STAY when Surrogate Scarpino render a decision allegedly returning the corporate

25

ownershi determination to Delaware (Exhibit 9, p.7). This whole thing was a hoax that successfully duped the Court of Chancery at Agnes Carvel expense. When Pamela Carvel sought to become Delaware Ancillary Administrator and sought funds to pursue these claims, the Surrogate denied that any New York law provided for protections of the Delaware ancillary administration (Exhibit 3). The same ploy is being used here again!

97.    Over $10 million in assets "disappeared" from Chauncey Advertising through the alleged merger of Carvel Corp. subsidiaries into Andreas Holdings Corp. (Exhibit 10, as of November 21, 1989). Although Agnes was the joint shareholder of the subsidiaries, the merger allegedly took place without notice to her or her consent. On closer examination, the merger documents were inconsistent and appeared to be less than required by law. Further investigation in Thomas Carvel's estate (alleged shareholder after his death) indicated that there were no shares issued, there was never a valid shareholder meeting, and there was a possible criminal conspiracy to ignore missing assets. Agnes Carvel's ownership of taxable proceeds of the sale of Carvel Corp. stock (a Delaware corporation), and subsidiaries retained by Tom in the sale, were fraudulently converted to Investcorp and to the usurpers' control.

98.    After Agnes Carvel's death the THREE original Carvel Corp. (a Delaware corporation) share certificates -- unendorsed, never surrendered -- came to light. The week before Tom died he estimated the family worth to exceed $250 million in cash and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock to Investcorp. The week after Tom was found dead, Agnes was told by the usurpers that there was less than $40 million and that virtually none of it belonged to her. Robert Davis told Pamela in December 1990 that Tom and Agnes were virtually penniless before the sale of Carvel Corp. Pamela knew first hand that this was an extreme lie. Agnes and Pamela also knew

26

first hand that Tom and Agnes owned everything jointly with rights of survivorship, but the usurpers were in power through forgery and theft of documents.

99.    Not one original document can be found for the sale of jointly owned Carvel Corp. stock on November 21, 1989. No documents bear an ink signature of Tom or Agnes. All three original stock certificates, all issued on January 13, 1986 to "Thomas Carvel and Agnes Carvel, Joint Tenants", remained in Agnes Carvel's possession (Nos. NB 853, 857, 863). The stock certificates were never endorsed to transfer joint ownership at any time. No stock powers were used to transfer joint ownership. Arcadipane or Davis signed many alleged sale documents instead of the Carvels, although neither usurper had power of attorney to act on the Carvels' behalf. Other documents have signature-only pages that do not match the preceding pages that alleged to contain agreement terms. Although reference to payments by notes for approximately $100 million was found, such payments are totally missing.

100.    The copies of stock sale documents, produced by the usurpers after Thomas Carvel's death, allege a sale of only half the stock owned by Tom and Agnes, i.e. only 660,646 shares not 1,321,292 shares. The missing 660,646 shares (No. NB 863) appear to constitute the missing $100 million that Thomas Carvel intended to investigate with Pamela before his suspiciously timed death occurred. Agnes Carvel, as surviving joint owner, was also defrauded out of the alleged sale proceeds by a series of fraudulent bank and trust transactions involving Hudson Valley Bank, Bank of New York (on probation for money-laundering violations), NatWest Bank, Barnett Bank and the usurpers who own Hudson Valley Bank and boast close personal relationships to the officers of the other banks.

101.    The banks allowed Arcadipane and Davis to fax instructions to move millions of Carvel money in and out of Tom, Agnes and Bruce Carvel's personal bank accounts without the

27

knowledge or consent of Tom, Agnes or Bruce and without any "power of attorney" to act on any Carvels' behalf. Investigations by the New York State Department of Banking confirmed Pamela's discovery that Davis altered at least $4.75 million in U.S. Treasury Bills and Notes held by Hudson Valley Bank to appear to give Agnes ownership; but in actuality, Davis was covering up his previous manipulations of ownership title resulting in the theft of over $15 million sale proceeds in Hudson Valley Bank that belonged to Agnes as surviving joint owner. When Pamela uncovered the theft, the $4.75 million that had been allegedly transferred to Agnes was then fraudulently converted to a Florida trust without Agnes' knowledge. The Florida trustees then withheld the money from Agnes and her estate. The trustees, who were cohorts of Davis and Arcadipane, obstructed further investigations into the theft. These Florida trustees pay themselves and their attorneys millions from Agnes' money to litigate against Agnes's demand for accountings and return of her money, while Agnes received nothing but the tax bill.

102.   A similar scenarios played out in Chain Locations of America, Inc.($25 million missing), the so-called Thomas Carvel Charitable Remainder Unitrust ($24-35 million missing), the so-called "Agnes Carvel 1991 Trust" ($20 million missing), Ardsley Realty Corp. ($40,000 missing), the International Institute of Health Foods (over 41 million missing), and others. Every time the Carvels discovered a theft, extortion tactics cut off Agnes' money needed to live and protect her rights. The usurpers intention was to cause fear and deprivation to procure Agnes' death because the usurpers ignored all warnings from Agnes' doctor and, in fact, increased their harassment after the doctor's affidavit for a protective order stated that the continued harassment would be fatal. Agnes died days after being told she was cut-off from all funds, despite Pamela's attempts to provide her aunt with security and peace of mind in London.

28

## CONCLUSION

103.    For the above reasons, Pamela carvel moves the Court of Chancery to take jurisdiction over the foundation usurpers now that they voluntarily come before the court, to compel the Estate's asset to be delivered to a Receiver in Delaware for safekeeping pending the accounting proceeding in the ancillary administration, including determination of the legitimate beneficiaries, identification of the assets, and payment of the claims and obligations of the Estate. Justice delayed in Delaware was justice denied to Agnes Carvel. Justice cannot be served when "charity" abuses its benefactor for profit. The Delaware courts have the opportunity to break the New York "probate mafia" and demonstrated what the law can do when applied without political corruption.

WHEREFORE, Pamela Carvel moves this court for an Order:

for an Order pursuant to Chancery Court Rule 7a for:

1. an Order for the Court of Chancery to take jurisdiction over an intermediate accounting proceeding in the Estate; to compel discovery from Petitioner who has possession and control of all documents relevant to Estate assets potentially in Delaware, and other pertinent records that have been are denied to Pamela Carvel;

2. an Order for the production of proof of all alleged foundation records, including but not limited to membership records of those who alleged to be Petitioner; financial records for all disposal of assets and disbursements from Estate assets in trust and restricted charitable gifts; and for determination by Delaware Department of Taxation and the Internal Revenue Service as to the tax-exempt status of Petitioner as an alleged charity;

3. an Order appointing an independent Receiver in Delaware to hold all Agnes Carvel's assets prematurely delivered in trust to Petitioner, that are being disposed of without

notice to named beneficiaries or creditors, until this court determines the assets of the Estate, and orders payment of debts, expenses, obligations, and taxes;

4. an Order for civil rights damages, other and further relief as the court may deem appropriate.

October 3, 2007

Pamela Carvel, appreaing *pro se*
28 Old Brompton Road, Suite 158
London, SW7 3SS England
U.S. tel/ fax fwd 1 212 751 6746

30